Nos. 25-1018, 25-1019

In the United States Court of Appeals
for the Fourth Circuit

JEFFERSON GRIFFIN,

*Petitioner-Appellee,*

v.

NORTH CAROLINA STATE BOARD OF ELECTIONS,

*Respondent-Appellant*

and

ALLISON RIGGS, et al.,

*Intervenor-Respondents.*

On Appeal from the United States District Court
for the Eastern District of North Carolina

## RESPONDENT-APPELLANT'S MOTION TO STAY AND REQUEST FOR AN IMMEDIATE ADMINISTRATIVE STAY PENDING RULING ON STAY MOTION

Mary Carla Babb
Terence Steed
Special Deputy Attorneys General
N.C. Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
(919) 716-6400
*Counsel for Respondent-Appellants*

## INTRODUCTION

This case involves a dispute over the 2024 general election results for a seat as Associate Justice on the North Carolina Supreme Court. After a full count of the votes, a full machine recount of the votes, and a partial hand recount of the votes, the final canvassed results of the election show Petitioner Judge Jefferson Griffin trailing his opponent, Intervenor Justice Allison Riggs. Petitioner now makes an astonishing request: to change longstanding election rules after an election has taken place and disenfranchise more than 60,000 North Carolina voters who followed the rules in place at the time of that election.

Although Petitioner initially sought that relief by filing an original action in the North Carolina Supreme Court, the State Board of Elections removed the case to the U.S. District Court for the Eastern District of North Carolina. The district court below held that 28 U.S.C. § 1443(2) provided a proper basis for the Board's removal. Slip op. at 17-20 (Ex. 1 at 18-21). That provision allows state officials to remove to federal court any suit brought against them for refusing to take an action that is inconsistent with a "law providing for equal rights." 28 U.S.C. § 1443(2). Specifically, the court explained that this lawsuit is

1

based on the Board's refusal to accede to Petitioner's request to disenfranchise voters in violation of the National Voter Registration Act—a law that provides for equal rights. Slip op. at 19 (Ex. 1 at 20). That holding aligned with a decision that this Court issued two months ago arising out of similar facts in North Carolina's 2024 general election. *Republican Nat'l Comm. v. N.C. State Bd. of Elections* ("*RNC*"), 120 F.4th 390, 408 (4th Cir. 2024) (holding that the National Voter Registration Act "provides a proper basis for removal under Section 1443(2)").

Despite holding that the Board had made a "good faith" and "colorable claim" that Petitioner's requested relief would require the State Board to violate federal civil-rights law, Slip op. at 19 (Ex. 1 at 20), the district court abstained from deciding the important federal issues raised by this case, citing *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). It did so despite the fact that no party had ever mentioned *Burford* abstention in their briefing, and the Board had no prior notice that the Court was considering this basis for abstention. The district court thus denied the Board any opportunity to be heard on this issue. Had the Board been given that opportunity, it would have pointed out

2

that abstention is inappropriate when state court proceedings threaten civil rights protected by federal law—and that, as far as the Board is aware, no federal court in history has *ever before* invoked *Burford* abstention in a federal civil-rights removal case. It would defeat entirely the point of the civil-rights removal statute for federal courts to abstain from deciding cases where a state officer has refused to take actions that would violate federal civil rights laws. Indeed, it is precisely a case like this one—where a party seeks to retroactively disenfranchise tens of thousands of eligible voters, in violation of multiple federal civil-rights laws—where the federal courts' "virtually unflagging" obligation to exercise their federal subject-matter jurisdiction is most urgent. *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817 (1976).

In addition, the district court immediately remanded this case back to state court—sending certified copies of the remand order to the state court within minutes of the order being issued, and thereafter closing the federal case docket. By doing so, the district court effectively denied the Board any ability to seek a stay of its remand order. Yet it is black-letter law that an abstention-based remand order

3

is appealable under 28 U.S.C. § 1291. *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 715 (1996). As a result, "allowing a district court to render the permitted appeal nugatory by prematurely returning the case to the state court would defeat the very purpose of permitting an appeal and leave a defendant who prevails on appeal holding an empty bag." *Forty Six Hundred LLC v. Cadence Educ., LLC*, 15 F.4th 70, 79 (1st Cir. 2021). Nothing in the law "demands so illogical a result." *Id.*

Because the district court has already returned this case to state court, this Court should preserve the Board's right to appeal by exercising the Court's supervisory power over the district court and directing it to "retrieve the action forthwith from the state court." *Id.* at 81; *see id.* at 78-81. This Court should also enter a stay of the district court's remand order through the pendency of the Board's appeal to this Court, as well as an immediate administrative stay pending a ruling on this motion. In entering these orders, this Court would remain open as a federal forum for any relief that Petitioner may wish to seek. The Board stands ready to expeditiously assist this Court in its consideration of the important issues in this appeal, on any schedule that the Court deems appropriate.

4

## STATEMENT OF FACTS

Petitioner Judge Jefferson Griffin and Intervenor Associate Justice Allison Riggs were candidates in the statewide 2024 general election for Associate Justice on the North Carolina Supreme Court. Final canvassed results of the election show Justice Riggs to be in the lead.

On November 19, 2024, Petitioner filed hundreds of election protests throughout the State challenging the election results. The Board voted unanimously to take jurisdiction over three categories of protests, which "presented legal questions of statewide significance": (1) ballots cast by registered voters with alleged incomplete voter registrations (60,273 votes); (2) ballots cast by overseas citizens who have never resided in the United States (266 votes); and (3) ballots cast by military and overseas-citizen voters who did not include a photocopy of a photo ID with their absentee ballots (1,409 votes). D.E. 1-5 at 43-44.[1]

---

[1]    Citations to "D.E." throughout this brief refer to docket entries found on the district court docket for this case, *Jefferson Griffin v. North Carolina State Board of Elections*, No. 5:24-cv-00724-M-RN (E.D.N.C.).

In a December 13 order, the Board dismissed the protests, concluding that they "were not served on affected voters in accordance with law" and were also "legally deficient."  D.E. 1-5 at 46.[2]

On the first protest about alleged incomplete registrations, the Board noted that the district court below had previously held, in considering the same arguments at issue in this case, that equitable principles "prohibit[] granting Plaintiffs relief in connection with the most recent election."  D.E. 1-5 at 60 (alteration in original) (quoting *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, No. 5:24-cv-00547, Dkt. Entry 1-4 at 4 (E.D.N.C.)).  The Board similarly concluded

---

[2]    The Board instructed county boards of elections to consider the remaining three categories of protests, "which were focused on individual, fact-specific determinations of voter eligibility."  D.E. 1-5 at 44.  On December 27, 2024, the Board dismissed these protests for failure to substantially comply with service requirements and because they challenged an inadequate number of votes to change the outcome of the contest. D.E. 38-1.  As a result, under state law, absent a court order to the contrary, the Board is required to certify the election by January 10, 2025.  *See* N.C. Gen. Stat. § 163-182.14(b).  After certification issues, the election results are final, and any protests are rendered moot.  *Id.* § 163-182(2) (providing that a "certificate of election" is the document "conferring upon a candidate the right to assume an elective office as a result of being elected to it").  Here, following the district court's remand order, the North Carolina Supreme Court issued a stay of the statutory certification deadline.  *See* Ex. 3.

that votes cannot be invalidated after an election when eligible voters complied with all the instructions they had been given when they registered and voted. D.E. 1-5 at 60-62. Doing so, the Board held, would violate the Fourteenth Amendment as well as the NVRA, which prohibits en masse removal of voters from the rolls within 90 days of a general election. D.E. 1-5 at 64-66.

The Board also rejected Petitioner's protests as to overseas voters who have never resided in the United States but whose parents had been North Carolina residents. The Board noted that the state legislature had passed a statute explicitly allowing these persons to vote in North Carolina elections. D.E. 1-5 at 70-71 (citing N.C. Gen. Stat. §§ 163-258.6 through -258.15).

Finally, the Board rejected Petitioner's protests to cancel the votes of military and overseas voters who did not include a copy of a photo ID with their ballot. The Board noted that the state legislature had passed a statute covering these voters that does not require them to send a copy of their photo ID to vote. D.E. 1-5 at 72-75. The Board also relied on state regulations which provide explicitly that photo ID requirements do not apply to military and overseas voters. D.E. 1-5 at

7

72-75.  And the Board reasoned that imposing a requirement on uniformed and overseas voters that is inconsistent with federal law would likely violate the Supremacy Clause of the U.S. Constitution. D.E. 1-5 at 75-76.

On December 18, 2024, Petitioner filed an original action, framed as a petition for writ of prohibition, in the North Carolina Supreme Court challenging Respondent's final decision.  D.E. 1-4.  The petition seeks declaratory rulings interpreting the Help America Vote Act, 52 U.S.C. § 20901, *et seq*.; the NVRA, 52 U.S.C. § 20501, *et seq*., the Voting Rights Act, 52 U.S.C. § 10307; the Civil Rights Act, 52 U.S.C. § 10101; the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20301, *et seq*.; and the Fourteenth Amendment.  D.E. 1-4.

The Board removed to federal court.  D.E. 1.  On December 23, 2024, Petitioner moved for a preliminary injunction seeking to stop the Board from issuing the certificate of election.  D.E. 31.  On December 26, the district court directed the Board to respond to this motion, and further to show cause why this case should not be remanded back to the North Carolina Supreme Court.

On January 1, 2025, the Board responded to Petitioner's motion

for a preliminary injunction and the district court's order to show cause.
D.E. 39 ("Board's Resp. to Mot. for Prelim. Inj. and Show Cause Order")
(Ex. 2).  The Board argued that removal was proper under 28 U.S.C.
§ 1441(a), as Petitioner argues, among other things, that voters should
be disenfranchised because they were improperly registered under a
federal statute, HAVA. D.E. 39 at 11-13 (Ex. 2 at 40-42). The Board also
argued that removal was proper under 28 U.S.C. § 1443(2), as it was
being sued for refusing to take actions that would violate the NVRA, the
VRA, and the Fourteenth Amendment. D.E. 39 at 14-17 (Ex. 2 at 43-46).
The Board further explained that Petitioner's protests violated the
procedural due process rights of voters because he had failed to
adequately notify them that he was challenging their votes, and that
Petitioner's requested relief would violate federal civil-rights statutes
and the Fourteenth Amendment. D.E. 39 at 19-24 (Ex. 2 at 48-53).
Finally, the Board pointed out that Petitioner had failed to adequately
allege that any challenged voters *did*, in fact, register to vote in
violation of HAVA, which allows certain voters to lawfully register
without providing their driver's license or social security numbers. D.E.
39 at 25-26 (Ex. 2 at 54-55).

9

On Friday, January 3, 2025, Petitioner filed a motion to remand the case back to the North Carolina Supreme Court. D.E. 48. On Monday, January 6, 2025, the district court issued an order remanding the case back to the North Carolina Supreme Court based on *Burford* abstention. *See generally* Slip op. (Ex. 1).[3] It issued this order without giving the Board any opportunity to respond to Petitioner's remand motion, or address abstention.[4]

The district court first held that it had jurisdiction under 28 U.S.C. § 1443(2), as the Board was refusing to act on the basis that doing so would violate the NVRA, a law providing for equal rights that

---

[3]     Because the district court immediately sent the certified remand order to state court—denying the Board the opportunity to seek a stay—it would be impracticable to request a stay from the district court before seeking relief in this Court. *See* Fed. R. App. P. 8(a)(2)(A)(i).

[4]     Petitioner briefly mentioned a *different* abstention doctrine, under *Railroad Comm 'n of Tex. v. Pullman Co.*, 312 U.S. 496,501 (1941), in his preliminary injunction brief. In a two-sentence passage, supported by no reasoning or argument, Petitioner noted that he intended to raise this form of abstention in a forthcoming motion to remand. D.E. 32 at 9-10. Petitioner articulated the substance of this *Pullman* argument for the first time in his January 3, 2025, motion to remand. Undersigned counsel were in the process of preparing a response to that new argument when, without notice, the district court issued its remand order invoking *Burford* abstention. No party or amicus has ever mentioned *Burford* as a possible basis for abstention.

10

concerns racial equality. Slip op. at 18-19 (Ex. 1 at 19-20). However, the district court abstained from deciding Petitioner's motion for a preliminary injunction under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25 (1959), and their progeny. Slip op. at 1 (Ex. 1 at 2).

Within minutes of issuing this decision, the district court sent certified copies of the remand order to the state supreme court and thereafter closed the federal case docket. *See* D.E. 51. Respondent filed a notice of appeal that same day, January 6, 2025. On January 7, 2025, this Court issued an order consolidating this appeal with *Jefferson Griffin v. N.C. Alliance for Retired Americans*, No. 25-1019 (4th Cir.). That same day, the North Carolina Supreme Court issued an order granting Petitioner's motion for a temporary stay of the certificate of election and setting an expedited briefing schedule. Order at 1-2, No. 320P24 (N.C.) (Ex. 3).

## ARGUMENT

The district court's remand order should be stayed pending appeal because (1) the Board is likely to succeed on appeal in reversing that order; (2) the Board will be irreparably injured absent a stay; (3) a stay

11

would impose no harm on Petitioner; and (4) the public interest
overwhelmingly favors a stay. *See Nken v. Holder*, 556 U.S. 418, 434
(2009) (enumerating these four factors for a stay pending appeal); *see
also Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970).

## I.    The State Board Is Likely to Succeed on the Merits of Its Appeal.

As the district court correctly held, the Board properly removed
Petitioner's lawsuit seeking a writ under the civil-rights removal
statute. Slip op. 17-20 (Ex. 1 at 18-21). Specifically, Petitioner's
lawsuit is based on the Board's refusal to accede to his demand that it
take actions that would violate federal civil-rights laws. However, the
Court abstained from deciding the federal issues in this case under
*Burford* and *Thibodaux*. That decision was error.

The federal courts have a "virtually unflagging" obligation to
exercise their federal subject-matter jurisdiction. *Colorado River,* 424
U.S. at 817. This jurisdiction is mandatory: a court "must take
jurisdiction if it should." *Cohens v. State of Virginia,* l 9 U.S. 264, 404
(1821). As the district court recognized, "[a]bstention is therefore
reserved for the rare and exceptional cases." Slip op. at 22 (Ex. 1 at 23).
However, it wrongly concluded that this is one of those rare cases.

12

Under *Burford*, federal courts may abstain from exercising jurisdiction in certain "extraordinary circumstances," when "the state's interest in uniform regulation outweighs the federal interest in adjudicating the case at bar." *Martin v. Stewart*, 499 F.3d 360, 364-65 (4th Cir. 2007) (quoting *Quackenbush*, 517 U.S. at 726-27). "This balance only rarely favors abstention." *Id.* at 364 (quoting *Quackenbush*, 517 U.S. at 728).

As a threshold matter, the district court erred in applying *Burford* to this case because it ignored the weighty federal interest in resolving this case in federal court. Notably, *Burford* and its progeny have not addressed removal under section 1443(2)'s "refusal" clause. This clause allows state officials to remove cases to federal court when state officials are challenged based on their refusal "to do any act" that would be inconsistent with a federal "law providing for equal rights." 42 U.S.C. § 1443(2). In cases where the refusal clause is invoked to protect federally protected civil rights, there is naturally a paramount interest in providing a federal forum. The Board is aware of no previous case in which *Burford* abstention has been invoked to decline to decide a case that was properly removed under the civil-rights removal statute.

13

Indeed, in *Greenberg v. Veteran*, the Second Circuit reversed a district court's decision to abstain under *Burford* in a case where the refusal clause had been invoked. 889 F.2d 418 (2d Cir. 1989). Given "Congress's explicit determination that state officials facing the type of federal-state conflict" addressed by the refusal clause "should be afforded the option of a Federal forum," *Greenberg v. Veteran*, 710 F. Supp. 962, 970 n.7 (S.D.N.Y. 1989), the Second Circuit held that abstention under *Burford* "would be inconsistent with the purpose" of the refusal clause. 889 F.2d at 422. In the district court's analysis in this case, however, it failed to consider the unique nature of removal under the refusal clause and the paramount federal interest in protecting rights protected under federal civil-rights laws.

That failure is aggravated, moreover, because this case concerns voting rights. Courts have repeatedly recognized that "*Burford* abstention is inappropriate" in cases where federal voting rights are at issue. *Dem. Nat'l Comm. v. Bostelmann*, 466 F. Supp. 3d 957, 969 (W.D. Wis. 2020) (listing cases). As the Supreme Court has declared, abstention is inappropriate in such cases given the "importance" of cases involving "fundamental" voting rights of "broad class of citizens."

14

*Harman v. Forssenius*, 380 U.S. 528, 537 (1965).  Similarly, the Eleventh Circuit has emphasized that "voting rights cases are particularly inappropriate for abstention."  *Siegel v. LePore*, 234 F.3d 1163, 1174 (11th Cir. 2000); *see also, e.g.*, *League of Women Voters of Fla., Inc. v. Detzner*, 354 F. Supp. 3d 1280, 1283 (N.D. Fla. 2018) ("Federal courts do not abstain when voting rights are alleged to be violated."); *Ortiz v. N.C. State Bd. of Elections*, No. 5:24-CV-00420, 2024 WL 3764561 (E.D.N.C. Aug. 12, 2024) (holding that "federal interests" outweighed state interests in election case).

Moreover, even if *Burford* abstention were otherwise applicable in the voting-rights or civil-rights removal contexts, it still would not be proper here.  There are only two situations in which *Burford* abstention is appropriate—when (1) there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends" the instant case or (2) "where the exercise of federal review . . . would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Town of Nags Head v. Toloczko*, 728 F.3d 391, 396 (4th Cir. 2013) (quoting *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*,

15

491 U.S. 350, 361 (1989)). Similarly, under *Thibodaux*, abstention is appropriate only where exercising jurisdiction would require federal courts to decide unsettled issues of state law. *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 27 (1959).

The district court held that these factors are satisfied here because, in its view: (1) Petitioner's "protests reflect unsettled questions of state constitutional and statutory law and bear directly on North Carolina's right to self-government," (2) "there is an existing dispute resolution process designated by state law, which a federal court should be hesitant to disrupt," (3) "Griffin's claims arise purely under state law," and (4) "the federal interest in this case is tenuous, and a state tribunal is competent to protect federal constitutional rights." Slip op. at 22-23 (Ex. 1 at 23-24).

None of these considerations hold water. As an initial matter, while there may be an existing state-law dispute-resolution process, Petitioner has refused to follow it. Instead, he bypassed the procedure designated by state law and filed an unprecedented original action directly in the North Carolina Supreme Court, asking it to immediately cancel more than 60,000 votes and award him the election, without

16

allowing any factfinding regarding his claims that those voters were ineligible based upon certain information missing from a government database. D.E. 1-4.

More importantly, the district court's reasoning is based entirely upon the misconception that Petitioner's claims arise only under state law. That is mistaken. Petitioner's main protest—through which he seeks to disenfranchise over 60,000 North Carolina voters—relates directly to a *federal statute*: HAVA. Petitioner claims that these voters were not properly registered under state law. But that state law directly implements HAVA. *See* N.C. Sess. Law 2003-226, § 1 (describing the purpose of the statute as "ensur[ing] that the State of North Carolina has a system for North Carolina elections that complies with the requirements for federal elections set forth in the federal Help America Vote Act of 2002"). Indeed, as this Court has recognized, "North Carolina has a unified registration system for both state and federal elections, and thus is bound by the provisions" of federal registration law, like HAVA and the NVRA. *RNC*, 120 F.4th at 401-02. Petitioner also seeks a judicial declaration that his requested relief does not violate four federal statutes and the Fourteenth Amendment. Given

17

these facts, it is clear that Petitioner's claims not only directly involve federal law but also that the federal interest here is paramount.

Moreover, applying the specific *Burford* factors, it is clear that neither applies here. This case does not present "difficult questions of state law" where "the exercise of federal review . . . would be disruptive of state efforts to establish a coherent policy on a matter of substantial concern." *Nags Head*, 728 F.3d at 396. Such policy concerns typically accrue where a State builds out a complex regulatory or administrative system where the adjudication of a single case may affect the "uniformity in the treatment of an essentially local problem." *NOPSI*, 491 U.S. at 362 (internal quotations omitted); *LCS Servs. Inc. v. Hamrick*, 1991 U.S. App. LEXIS 28677, at *9 (4th Cir. Dec. 6, 1991). That is why, "[w]hile zoning and land use cases do not automatically warrant *Burford* abstention," this Circuit has held that those kinds of cases "characteristically meet the *Burford* abstention criteria." *Nags Head*, 728 F.3d at 396 (internal citations omitted); *see also id.* n.5 (collecting cases).

None of those policy concerns are present here. In this case, there is no complex administrative system being administered by the State.

18

Instead, Griffin's challenge is based on common questions of statutory interpretation that federal courts routinely handle. Moreover, contrary to being a "local problem," the issue of whether and in what circumstances a voter's vote may count in specific races is a question that implicates far-reaching federal interests. *RNC*, 120 F.4th at 404 ("A state court ruling could very much change how federal law is enforced for this federal election and in future elections.").

Indeed, because the State Board has removed Griffin's petition under § 1443(2), the district court's refusal to adjudicate this claim is more likely to disrupt important *federal* efforts to establish a coherent policy with respect to federal civil-rights law. *See Edwards v. Sammons*, 437 F.2d 1240, 1241-42 (5th Cir. 1971) (reversing lower court's decision to abstain because "abstention is not countenanced in cases involving such a strong national interest as the right to vote"). And federal courts regularly decide cases involving the interplay between state elections statutes—including those relating to voter registration and voting—and federal law, without fear of destabilizing principles of federalism. *See, e.g.*, *Gay v. Bd. of Registration Comm'rs*, 466 F.2d 879, 882-83 (6th Cir. 1972) (reversing abstention under

19

*Burford* in case challenging the constitutionality of a state voter registration statute); *Barber v. Bennett*, No. CV-14-02489, 2014 WL 6694451, at *8-9 (D. Ariz. Nov. 27, 2014) (declining to abstain on *Burford* grounds from a case raising claims of improper voter registration under both Arizona state law and the U.S. Constitution); *see also Mich. State A. Philip Randolph Inst. v. Johnson*, 209 F. Supp. 3d 935, 943 (E.D. Mich. 2016) (declining to abstain from a case involving HAVA because "federal review of similar cases has never been overly disruptive of state efforts to develop a coherent voting policy").

Finally, the district court's reliance on *Thibodaux* abstention was erroneous for another reason. This form of abstention is only warranted "in *diversity* cases." *Nature Conservancy v. Machipongo Club, Inc.*, 579 F.2d 873, 875 (4th Cir. 1978) (emphasis added); *see also* Erwin Chemerinsky, *Federal Jurisdiction* 846 (7th ed. 2016) (explaining that *Thibodaux* "establish[es] that federal courts should abstain in *diversity* cases" in certain circumstances (emphasis added)). Here, of course, the district court's jurisdiction is not premised on the diversity of the parties, but rather on the refusal clause, under which there is an especially compelling need for a federal forum.

20

In sum, this case raises federal interests of paramount importance. When a State removes a case to federal court because a party is demanding that it violate federal civil-rights law, particularly to disenfranchise tens of thousands of voters after an election, abstention is inappropriate. Neither Petitioner nor the district court have identified any prior case where a federal court has *ever* abstained from exercising federal subject-matter jurisdiction in this context. The district court's decision to do so here was gravely mistaken.

## II.    The State Board Will Be Irreparably Harmed Absent a Stay.

The State Board will also suffer irreparable harm if this Court does not issue a stay.

In addition to holding that this case should be remanded to state court, the district court also immediately entered an order effecting that remand. D.E. 51. The court thus gave the Board no opportunity to seek a stay of the order during the pendency of its appeal—an appeal right that the Board unquestionably has under 28 U.S.C. § 1291. *Quackenbush*, 517 U.S. at 715. Without a stay, the district court's improper remand could "render the permitted appeal nugatory by prematurely returning the case to the state court," thus defeating "the

21

very purpose of permitting an appeal." *Cadence Education*, 15 F.4th at 79. A stay would prevent that "illogical" result. *Id.* As this Court recently recognized when it previously stayed a remand order raising the same underlying legal dispute, a stay to protect this Court's jurisdiction is appropriate here. *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, No. 24-2044, Dkt. 33, 41, 64 (granting and extending temporary administrative stays).

It is of no moment that the district court's remand order has already gone into effect. As the First Circuit has recently explained, appellate courts may, exercising their supervisory authority over the district courts, order a district court to retrieve an improperly remanded case. *Cadence Education*, 15 F.4th at 80 ("The case law abounds with examples of federal courts using informal processes to retrieve improvidently remanded cases from state courts.").

Exercising supervisory authority in that manner is appropriate under these circumstances. Now that a remand order has already been issued, the state supreme court could reach final judgment before the Board's appeal of the remand order to this Court is resolved. Indeed, the state supreme court just today entered an order staying the

22

certificate of election and setting a briefing order on Petitioner's writ of prohibition, directing the Board to file a response by January 21, 2025. *See* Ex. 3. The potential loss of appellate rights that the Board could suffer absent a stay here constitutes irreparable harm. *Cf. Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 218 (4th Cir. 2019) (an "unrecoverable" loss is the kind of "irreparable injury justifying preliminary relief").

Moreover, even if the state court does not enter final judgment before this appeal is resolved, if this Court were to ultimately reverse, the district court and state court would need to sort out what to make of the state-court proceedings that have transpired in the meantime. That would create a "rat's nest of comity and federalism issues" that federal courts should strive to avoid. *Northrop Grumman Tech. Servs., Inc. v. DynCorp Int'l LLC*, No. 16-cv-534, 2016 WL 3346349, at *4 (E.D. Va. June 16, 2016).

A stay is necessary to ensure that the Board is permitted to avail itself of the right to a federal forum under the civil-rights removal statute. When state officials exercise "the extraordinary right of seeking removal," "it would seem to be a significant indication that they

are forgoing their accustomed forum because the federal issue they seek to litigate is so substantial." *White v. Wellington*, 627 F.2d 582, 590 (2d Cir. 1980) (Kaufman, J., concurring).  The Board should be permitted to access the federal forum that federal law guarantees.

## III.    Petitioner Will Suffer No Harm If the Remand Is Stayed Pending Appeal.

Under North Carolina law, absent a court order staying the certificate of election, the Board was required to issue a certify the results in the race in question by January 10, 2025.  This morning, following the district court's immediate issuance of its remand order, the North Carolina Supreme Court entered a temporary stay of the certification.  *See* Ex. 3.

A stay of the *remand* does nothing to impair Petitioner's rights. The federal courts—including this Court—have jurisdiction to consider any motion by Petitioner to delay certification or any other appropriate relief.  Indeed, Petitioner has already filed two such motions in the district court here.  *See* D.E. 13; D.E. 31.  For its part, the Board stands ready to assist this Court in resolving the merits of this appeal, as well as the merits of Petitioner's underlying claims, in an expeditious manner on whatever schedule the Court deems appropriate.

24

## IV.    The Public Interest Is Served by Granting the Stay.

Finally, the public interest is best served by this Court's granting a stay pending appeal.  Petitioner has sought extraordinary relief—a court order retroactively throwing away tens of thousands of votes by lawfully eligible voters who complied with the voting rules in place at the time of the election.  He has failed to identify a single voter who is *actually* ineligible to vote in North Carolina state elections.  And he seeks relief that would apply only to a subset of identically situated voters—voters who cast ballots absentee or at early voting sites *before* the election, while not challenging voters who cast ballots *on* election day.

As the Board explained in its brief to the district court, this audacious request violates multiple federal civil-rights laws, including the Fourteenth Amendment.  D.E. 39 at 14-24 (Ex. 2 at 43-53).  It is strongly in the public interest to ensure that claims such as these are resolved in a federal forum.  A stay of the remand order issued by this Court would secure federal jurisdiction over these grave issues of federal civil-rights law.

25

## CONCLUSION

For the foregoing reasons, the State Board asks this Court to exercise its supervisory power over the district court and direct it to retrieve the action forthwith from the state court. In addition, the Board requests that the Court stay the remand order pending appeal and to issue an immediate administrative stay pending a ruling on the stay motion. Intervenor-Respondents represented to undersigned that they consent to this motion and join in the request for a stay. Undersigned counsel reached out to Petitioner's counsel, who represented that Petitioner opposes this motion and request and wishes to file responses in opposition.

This the 7th day of January, 2025.

/s/ Mary Carla Babb
Mary Carla Babb
Special Deputy Attorney General
N.C. State Bar No. 25731
MCBabb@ncdoj.gov

Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
TSteed@ncdoj.gov

*Counsel for State Board Respondent-Appellant*

## CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that this motion complies with Fed.

R. App. P. 27(d)(2)(C), 32(a)(5), 32(g)(1), and Local Rule 27.

This the 7th day of January, 2025.

/s/ Mary Carla Babb
Mary Carla Babb
Special Deputy Attorney General
N.C. State Bar No. 25731
MCBabb@ncdoj.gov

# APPENDIX TO MOTION

# INDEX

<u>No.</u>          <u>Exhibit</u>                                                      <u>Page</u>

*Filings in No. 24-cv-00724*

1        District Court's Remand Order [D.E. 50] ................................ 2

2        State Board's Response to Preliminary Injunction
         Motion and Order to Show Cause [D.E. 39] ......................... 30

*Other*

3        N.C. Supreme Court Order filed in *Griffin v.*
         *N.C. State Bd. of Elections*, No. 320P24 (Jan. 7, 2025) ........ 62

EXHIBIT 1

- 2 -

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Case No. 5:24-CV-00724-M

| | |
|---|---|
| JEFFERSON GRIFFIN, | |
| Plaintiff, | |
| v. | |
| NORTH CAROLINA STATE BOARD OF ELECTIONS, | ORDER |
| Defendant, | |
| ALLISON RIGGS, | |
| Intervenor-Defendant, and | |
| NORTH CAROLINA ALLIANCE FOR RETIRED AMERICANS et al., | |
| Intervenor-Defendants. | |

This matter comes before the court on Plaintiff Jefferson Griffin's ("Griffin") motion for

preliminary injunction [DE 31]. In this removed state action, a sitting state court judge seeks a

writ of prohibition (a form of judicial relief authorized by the state constitution) from the state

supreme court that would enjoin the state board of elections from counting votes for a state election

contest that were cast by voters in a manner allegedly inconsistent with state law. Should a federal

tribunal resolve such a dispute? This court, with due regard for state sovereignty and the

independence of states to decide matters of substantial public concern, thinks not. For that reason,

the court abstains from deciding Griffin's motion under *Burford*, *Louisiana Power*, and their

progeny and remands this matter to North Carolina's Supreme Court. *See Burford v. Sun Oil Co.*,

1

319 U.S. 315, 332 (1943); *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 29 (1959).

## I.     Introduction and Procedural History

Griffin is a Judge on North Carolina's Court of Appeals (the state's intermediate appellate court) and candidate for Seat 6 on North Carolina's Supreme Court (the state's court of last resort). DE 1-4 at 16.[1]  Griffin ran in the 2024 general election as a Republican against Allison Riggs ("Riggs"), the Democratic candidate who is currently a sitting Justice on the North Carolina Supreme Court. *Id.* at 17.  After a full count of votes, machine recount, and partial hand recount, the canvassed results show Riggs leading Griffin by 734 votes, but Defendant North Carolina State Board of Elections (the "State Board") has not yet certified the results.  *See* DE 32 at 3; DE 39 at 7.

Griffin indicates that he "became aware of numerous irregularities with ballots cast during the election."  DE 32 at 3.  As a result, he "filed election protests" with county boards of election "in each of North Carolina's 100 counties."  DE 1-4 at 18.  Three protests are the subject of this action:

1.  First, Griffin challenges the votes of over 60,000 individuals who, at some point over the past 20 years, registered to vote in North Carolina without providing either their driver's license numbers or the last four digits of their social security numbers.  *Id.* at 19.  According to Griffin, this past registration error contravenes state law and renders illegitimate the resulting votes from these individuals.  *See id.* (citing N.C.G.S. §§ 163-82.1 & 163-82.4 for proposition that "unless someone is lawfully registered to vote, he cannot vote").

---

[1] All pin cites to materials in the record will refer to the page numbers that appear in the footer appended to those materials upon their docketing in the CM/ECF system, and not to any internal pagination.

2

2. Second, Griffin challenges absentee ballots cast by 267 individuals who admittedly have never resided in North Carolina (or anywhere in the United States). *Id.* at 20. Notwithstanding state law granting this group of individuals (whose parents are either uniformed-service or overseas voters) the right to vote in North Carolina, *see* N.C.G.S. § 163-258.2(e), Griffin asserts that counting their votes violates the North Carolina Constitution, DE 1-4 at 19-20.

3. Third, Griffin challenges the votes of approximately 5,500 overseas absentee voters who did not provide copies of their photo identification with their absentee ballots, which he contends violates state law. *Id.* at 20-21; *see also* N.C.G.S. § 163-230.1.

The State Board subsequently assumed jurisdiction over Griffin's three protests. *Id.* at 21. After a public hearing on December 11, 2024, the State Board issued a written decision that rejected Griffin's challenges on various grounds:

1. The State Board concluded that Griffin failed to properly serve potentially affected voters because, instead of serving them with copies of his protests, he mailed them postcards with the message that their "vote may be affected by one or more protests" and a QR code that linked to a website containing the hundreds of protests ongoing in North Carolina, at which point the voter would have to sift through spreadsheets of names attached to each protest to determine whether their vote had been challenged and in which protest. DE 1-5 at 46-50. The State Board found that this method of service violated a rule that it had promulgated as well as the procedural due process rights of voters. *Id.* at 50-54.

2. The State Board found that even if it credited Griffin's state law arguments in connection with his first challenge, which targets the 60,000 voters who had allegedly

3

- 5 -

registered to vote without providing their driver's license numbers or the last four digits of their social security numbers, granting him relief by discarding that group of votes would violate the voters' substantive due process rights, state law, and federal statutory law, including the Help America Vote Act ("HAVA") and the National Voter Registration Act ("NVRA"). *Id.* at 60-67.

3. The State Board also rejected each of Griffin's challenges on its merits. *Id.* at 54-60, 69-79.

North Carolina law provides that a party aggrieved by a decision of the State Board "has the right to appeal the final decision to the Superior Court of Wake County within 10 days of the date of service" of the State Board's decision. N.C.G.S. § 163-182.14(b). "Unless an appealing party obtains a stay of the certification from the Superior Court of Wake County within 10 days after the date of service," the election results "shall issue." *Id.* Rather than follow the appeal process provided by state law, Griffin filed this action directly in the North Carolina Supreme Court, seeking a writ of prohibition that would enjoin "the State Board [] from counting unlawful ballots cast in the 2024 general election." DE 1-4 at 14.

In his petition for a writ of prohibition, Griffin addresses his three challenges on their merits, each of which entail alleged violations of either state election law or the state Constitution. *See id.* at 33-40, 44-45, 47-50, 53-59. Griffin next argues that the State Board and Riggs' invocation of various federal laws in defense to his challenges are inapposite. *Id.* at 40-46, 50-51, 59-60, 67-74. He also responds to the procedural defects raised by the State Board. *Id.* at 60-67.

Griffin seeks various forms of relief, including the discarding of votes from voters covered by each of his three challenges and declaratory relief rejecting various conclusions of the State Board. *Id.* at 83-84. He sought this relief directly from the North Carolina Supreme Court, rather

4

than file an appeal in the Superior Court of Wake County, because of his concern that the State Board would "try to strip [that court] of jurisdiction to decide this case by improperly removing it to federal court." *Id.* at 24. The day after Griffin filed his petition, the State Board removed it to this court. DE 1.

In its notice of removal, the State Board invokes this court's subject-matter jurisdiction under 28 U.S.C. § 1441(a), which permits removal of claims arising under federal law, and 28 U.S.C. § 1443(2), which authorizes removal when a party has been sued for refusing to act on the ground that performing the act would contravene federal civil rights law. *Id.* at 1-2. The day after the State Board removed this matter to federal court, Griffin filed a motion for temporary restraining order ("TRO"), which sought a court order prohibiting the certification of the results for Seat 6. DE 13; DE 14. This court denied Griffin's motion because the alleged harm he described was not so immediate that he required a TRO "before [the State Board could] be heard in opposition." Text Order dated December 20, 2024.

Riggs promptly sought intervention in this matter and, after denial of the TRO, so did the North Carolina Alliance for Retired Americans, VoteVets Action Fund, Tanya Webster-Durham, Sarah Smith, and Juanita Anderson (the "NCARA parties"). DE 7; DE 8; DE 24; DE 25. The court granted both motions for intervention. *See* Text Order dated December 26, 2024.

On December 23, Griffin filed the instant motion for preliminary injunction, along with a consent motion to expedite briefing on the preliminary injunction motion. DE 31; DE 33. The court granted the consent motion and ordered expedited briefing, and additionally ordered the State Board, in responding to Griffin's motion, to show cause why this matter should not be remanded to the North Carolina Supreme Court for lack of subject-matter jurisdiction. *See* Text Order dated

December 26, 2024. The court also offered Griffin the opportunity to respond to the State Board's arguments regarding subject-matter jurisdiction in his reply. *Id.*

All parties complied with the court's briefing schedule. DE 39; DE 40; DE 42; DE 47; DE 48; DE 49.[2] In addition, Former Senate Majority Leader Thomas Daschle, former House Majority Leader Richard Gephardt, and former Representatives Christopher Shays, Jim Greenwood, Robert Wexler, Wayne Gilchrest, and Steve Israel (the "Former Members of Congress") moved the court for leave to file an amicus brief, DE 37, as did the North Carolina League of Women Voters, DE 41. The court grants those motions for leave, has considered the respective briefs, and notes the extent to which they aided in the court's decisional process.

Unless this court (or another) issues an order enjoining the State Board from certifying the election for Seat 6, those results will issue on January 10, which will render moot Griffin's protests. *See* DE 39 at 2. Griffin's motion for preliminary injunction is fully briefed, the court has considered each filing, and this matter is ready for disposition.[3]

## II.    Legal Framework

This matter, which involves a state, not federal, election, involves potential practical implications but a crucial theoretical distinction, which has in turn led some of the parties (and amici) to at times conflate what precisely is at issue. In the context of a federal election, the States and Congress enjoy dual sovereignty. U.S. CONST. art 1 § 4, cl. 1. The "States have a major role to play in structuring and monitoring the [national] election process." *California Democratic Party v. Jones*, 530 U.S. 567, 572 (2000). They must "prescribe the time, place, and manner of

---

[2] In lieu of incorporating his arguments pertaining to subject-matter jurisdiction into his reply, DE 47, Griffin separately filed a motion to remand (and supporting memorandum), DE 48; DE 49. For practical purposes, the court considers these as one filing, and not a new motion to which the State Board must be offered an opportunity to respond, because the State Board has already briefed its position on subject-matter jurisdiction in response to the court's show cause order. DE 39.

[3] Considering the short timeline between now and certification, as well as the lack of factual disputes presented by this matter, the court finds that a hearing is not necessary.

6

electing Representatives and Senators" for the national Congress. *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 8 (2013). But this grant of authority to States for federal elections only goes "so far as Congress declines to preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997).

Elections for state office are different because "the Constitution was also intended to preserve to the States the power that even the Colonies had to establish and maintain their own separate and independent governments, except insofar as the Constitution itself commands otherwise." *Oregon v. Mitchell*, 400 U.S. 112, 124 (1970) (opinion of Black, J.). Put another way, "Article I, Section IV does not give Congress the power to directly regulate state voter registration procedures in state elections or state ballot issues." *Dobrovolny v. Nebraska*, 100 F. Supp. 2d 1012, 1028 (D. Neb. 2000). And "[a]bsent the invocation by Congress of its authority under the Fourteenth [or Fifteenth] Amendment[s]," the states retain "the power to fix the time, place, and manner of the election of [their own] officials." *Voting Rts. Coal. v. Wilson*, 60 F.3d 1411, 1415 (9th Cir. 1995). Due respect for States' authority to set forth rules governing their own elections reflects the constitutional (and commonsense) principle that "[n]o function is more essential to the separate and independent existence of the States and their governments than the power to determine within the limits of the Constitution . . . the nature of their own machinery for filling local public offices." *Mitchell*, 400 U.S. at 125 (opinion of Black, J.).[4]

Pursuant to its authority under the Civil War Amendments, Congress has passed laws that apply in the context of *both* state and federal elections, including the Civil Rights Act and the Voting Rights Act. 52 U.S.C. § 10101; 52 U.S.C. § 10301. Congress has also enacted a series of

---

[4] Of course, state regulation of state and local elections remains subject to federal constitutional constraints. *E.g.*, *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 451 (2008); *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 215 (1986).

7

laws that govern *only* federal elections, notably here the NVRA and HAVA.  52 U.S.C. § 20501; 52 U.S.C. § 21081.  "The NVRA requires States to provide simplified systems for registering to vote in *federal* elections, i.e., elections for federal officials, such as the President, congressional Representatives, and United States Senators."  *Young v. Fordice*, 520 U.S. 273, 275 (1997) (emphasis in original).  Likewise HAVA, which seeks to establish minimum standards of election administration, "applies only to federal elections."  *Bay Cnty. Democratic Party v. Land*, 347 F. Supp. 2d 404, 436 (E.D. Mich. 2004); *accord Broyles v. Texas*, 381 F. App'x 370, 373 n.1 (5th Cir. 2010).

After passage of HAVA, North Carolina's General Assembly enacted a series of laws to implement HAVA and adopt equivalent requirements in the context of state and local elections. *E.g.*, N.C.G.S. §§ 163-82.4, 162-82.11, & 163-166.12.  As a result, and as a practical matter, "North Carolina has a unified registration system for both state and federal elections." *Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th 390, 401 (4th Cir. 2024) ("*RNC*"). But that unified system is a choice that the people of North Carolina made through their elected representatives; nothing in federal law compels North Carolina to adopt HAVA's procedures for state and local elections.  *See Mitchell*, 400 U.S. at 125; *Dobrovolny*, 100 F. Supp. 2d at 1028. Thus, to the extent North Carolina election law for state and local elections mirrors or parallels federal law, that symmetry "is state-created, not federal."  *Crowley v. Nevada ex rel. Nevada Sec'y of State*, 678 F.3d 730, 735 (9th Cir. 2012).

III.    **Analysis**

a.    Subject-Matter Jurisdiction

As the court previously explained in a recent election-related lawsuit, "[t]here exist two possible paths to establishing subject matter jurisdiction in this action.  First, the claims could raise

8

a federal question under 28 U.S.C. § 1331, which would permit removal under 28 U.S.C. § 1441(a). Second, the action could implicate a federal law providing for equal rights in terms of racial equality, which would authorize removal under 28 U.S.C. § 1443(2)." *Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, No. 5:24-CV-00547, 2024 WL 4523912, at *2 (E.D.N.C. Oct. 17, 2024), *rev'd and remanded*, 120 F.4th 390 (4th Cir. 2024). Extensive repetition of the relevant history of subject-matter jurisdiction is unnecessary here. *See id.* at *2-7.

       b.   Removal under 28 U.S.C. § 1441

       This court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. If a plaintiff initiates a civil action "in a State court of which" a federal district court has "original jurisdiction," that action "may be removed by the defendant . . . to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). Where a plaintiff's claims all arise under state law, those claims will only present a federal question over which a district court may maintain original jurisdiction "if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013); *see also Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005); *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 810 (1986); *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. California*, 463 U.S. 1, 13 (1983).

       In assessing whether a plaintiff's claim necessarily raises an issue of federal law, the court follows the well-pleaded complaint rule: "federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). In this context, *complaint* really means *claim*; a federal question is not

9

presented on the face of a complaint unless it is an "essential element[] of the plaintiff's—and only

the plaintiff's—claim." *Capitol Broad. Co., Inc. v. City of Raleigh, N. Carolina*, 104 F.4th 536,

540 (4th Cir. 2024). In other words, "[i]t is *not* enough that federal law becomes relevant by virtue

of a defense." *Burrell v. Bayer Corp.*, 918 F.3d 372, 381 (4th Cir. 2019) (emphasis in original)

(internal quotation mark omitted). This is true even where a plaintiff "'goes beyond a statement

of [his] cause of action and anticipates or replies to a probable defense,' even if that defense itself

raises a federal question." *Capitol Broadcasting*, 104 F.4th at 539–40 (quoting *Gully v. First Nat.

Bank*, 299 U.S. 109, 113 (1936)).

At the outset, the court finds that Griffin's petition in the North Carolina Supreme Court

constitutes a "civil action" within the meaning of Section 1441. Review of dictionaries, both

contemporaneous with passage of Section 1441 and more recent, reflect a capacious definition of

the term: a civil action is a judicial proceeding in which a party seeks a decree to redress a private

right. *E.g.*, *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006) (concluding that "action" meant

"any proceeding in a court of justice") (quoting Black's Law Dictionary 1488, 1603 (4th ed.1951)

(internal ellipses omitted)); *In Re Teter*, 90 F.4th 493, 499 (6th Cir. 2024) (observing that civil

action "is a generous term" and "encompass[es] the old categories of actions at law and suits in

equity," i.e., "all types of actions other than criminal proceedings") (quoting Black's Law

Dictionary (5th ed. 1979)); *Black v. Black*, No. 1:22-CV-03098, 2023 WL 3976422, at *3 (D. Colo.

Apr. 5, 2023) (noting that a "civil action is simply a civil judicial proceeding") (quoting Black's

Law Dictionary (11th ed. 2019) (cleaned up)).

Griffin's petition for a writ of prohibition squares with that definition: it is an original civil

(not criminal) judicial proceeding through which he seeks to vindicate his private (not public)

rights. The petition therefore qualifies as a civil action subject to removal under Section 1441.

10

- 12 -

*See City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164 (1997) (holding that state court proceeding created by state law that entailed quasi-appellate review of administrative board decision was removable where claims in proceeding included federal constitutional challenge); *Casale v. Metro. Transp. Auth.*, No. 05-CV-4232, 2005 WL 3466405, at *7 (S.D.N.Y. Dec. 19, 2005) (explaining that "technicalities of local procedure, such as what an action or pleading is called, do not affect federal question jurisdiction and removability").[5]

Although the court finds that the form of Griffin's petition permits removal to federal court under Section 1441, it concludes that the substance of the petition does not, in that it could not "have been brought in federal court originally." *Sonoco Prod. Co. v. Physicians Health Plan, Inc.*, 338 F.3d 366, 370 (4th Cir. 2003). The State Board contends that Griffin's petition to the North Carolina Supreme Court presents a federal question, but Griffin's "claims" (such as they are) falter at the first step of the *Gunn* test: no issue of federal law is *necessarily* raised.

Griffin seeks a writ of prohibition, a form of judicial relief authorized by the North Carolina Constitution. N.C. CONST. art. IV, § 12(1). To obtain such a writ, he must show that the State Board is poised to act in a manner "at variance with . . . the law of the land." *State v. Allen*, 24 N.C. 183, 189 (1841).[6] As recounted previously, Griffin's theory is that the State Board's

---

[5] The court notes Griffin's reliance on *Barrow v. Hunter*, 99 U.S. 80 (1878), but agrees with the Fifth Circuit that *Barrow's* distinction between actions "tantamount to the common-law practice of moving to set aside a judgment for irregularity" and actions "tantamount to a bill in equity to set aside a decree for fraud," *Barrow*, 99 U.S. at 83, may no longer be "good law for the purposes of 28 U.S.C. § 1441" because the basis for that distinction "relied on an interpretation of removal which may well be no longer valid" and does not reflect "the modern view of removal," *Matter of Meyerland Co.*, 910 F.2d 1257, 1261 (5th Cir. 1990). In addition, *Barrow* on its facts does not control this scenario, where Griffin filed an original action directly in North Carolina's Supreme Court rather than follow the appellate procedure designated by state law. *See* N.C.G.S. § 163-182.14(b).

[6] This showing is necessary but not sufficient; Griffin also must show that his grievance could not be "redressed, in the ordinary course of judicial proceedings, by appeal." *State v. Whitaker*, 114 N.C. 818, 19 S.E. 376, 376 (1894); *see also State v. Inman*, 224 N.C. 531, 542, 31 S.E.2d 641, 646–47 (1944) (explaining that state supreme court "uniformly denie[s]" petitions for writs of prohibition "where there is other remedy," such as an appeal); *Mountain Retreat Ass'n v. Mt. Mitchell Dev. Co.*, 183 N.C. 43, 110 S.E. 524, 525 (1922) (emphasizing that state Supreme Court will not 'allow a litigant . . . to withdraw his case from the tribunal where the statute has placed it" by filing writ when alternative remedy is available). This is a merits issue that the court need not reach at this point.

11

imminent certification of the election results for Seat 6 entail its disregard of the state Constitution and several state laws, which he raised in his three protests to the State Board (and which he restates in his petition for a writ of prohibition). *See generally* DE 1-4; DE 33.

First, Griffin challenges the votes of voters who initially registered to vote in North Carolina without providing their driver's license numbers or the last four digits of their social security numbers, in alleged violation of state law. *See* N.C.G.S. § 163-82.4. Next, Griffin challenges the votes of voters who have never resided in North Carolina, which involves an apparent conflict between state law and the North Carolina Constitution. N.C. CONST. art. VI, § 1; N.C.G.S. § 163-258.2(e). Lastly, he contests the votes of absentee voters who failed to include a copy of their photo ID with their absentee ballot, which he argues contravenes state law. *See* N.C.G.S. § 163-230.1.

An issue of federal law is not "a necessary element" of Griffin's first challenge, and his right to relief does not "necessarily turn[] on some construction of federal law." *Franchise Tax Bd.*, 463 U.S. at 9, 14. That challenge can be resolved with exclusive reference to state law. *See* N.C.G.S. § 163-82.4. The relevant provision of North Carolina law states that a voter registration form "shall request the applicant's . . . [d]rivers license number or, if the applicant does not have a drivers license number, the last four digits of the applicant's social security number." N.C.G.S. § 163-82.4(a)(11). Per Griffin, if individuals do not provide one of those numbers, they have not been "lawfully registered" and therefore "cannot vote." DE 1-4 at 19 (citing in addition N.C. CONST. art. VI, § 3(1)). This first challenge does not reference or require consultation of federal law.[7]

---

[7] Section 163-82.4 is distinguishable in a key respect from the state statute at issue in *RNC*, which incorporated by express reference a federal standard. *See RNC*, 2024 WL 4523912, at *9 (evaluating N.C.G.S. § 163-82.11(c), which required State Board to "update the statewide computerized voter registration list and database to meet the requirements of section 303(a) of [HAVA]").

- 14 -

The State Board asserts that Griffin's challenge to voters' registrations would "require[] this [c]ourt to construe HAVA," DE 39 at 11, but that is incorrect.  After Congress passed HAVA, North Carolina's General Assembly enacted parallel legislation, establishing a uniform system of registration for both state and federal elections.  *See RNC*, 120 F.4th at 401.  But that uniform system does not eliminate the legal distinction between federal elections, which Congress may regulate (*see* 52 U.S.C. § 21081), and state elections, which Congress (with limited exception) may not (*see Mitchell*, 400 U.S. at 125).  And this matter involves a state election, so HAVA, even if practically relevant, is legally irrelevant.

As the Fourth Circuit observed under analogous circumstances in *Vlaming*, the fact that relevant provisions of state law may be "coextensive with [] analogous federal [] provisions" does not mean that a state law argument necessarily raises an issue of federal law.  *Vlaming v. W. Point Sch. Bd.*, 10 F.4th 300, 307 (4th Cir. 2021).  "Although [North Carolina] courts may rely on federal law to decide a state [law] question, there is no requirement that they must" and "[n]othing prevents [Griffin] from prevailing on his state [law arguments] on exclusively state grounds."  *Id.* at 308.  Thus, because North Carolina's Supreme Court "is not required to rely on federal law" to resolve Griffin's first challenge, "no federal question is necessarily raised."  *Id.*

As other courts have concluded, "[t]he fact that State law may look to federal law does not mean that federal law is a necessary element," and "the fact that the same set of alleged facts could trigger federal issues [], does not mean that a substantial question of federal law is *necessarily* raised; it only points to parallel federal and state cases arising from the same set of facts."  *Sage v. Tacoma Sch. Dist. No. 10*, No. 3:17-CV-5277, 2017 WL 6033015, at *2 (W.D. Wash. Dec. 6, 2017) (emphasis in original); *accord Beavers v. City of Jackson*, 439 F. Supp. 3d 824, 829 (S.D. Miss. 2020).  Phrased another way, "[w]hether a state court will adopt as the meaning of the state's

13

[law] the federal courts' interpretation of parallel language in the United States Co[de] is a matter of state law." *Rossello-Gonzalez v. Calderon-Serra*, 398 F.3d 1, 13 (1st Cir. 2004).

In this regard, the court appreciates but disagrees with the considered view of the amici Former Members of Congress. DE 37; DE 37-1. Amici concede that HAVA "only applies to federal elections," but contend nonetheless that because the State Board "uses a single voter form," the outcome of Griffin's challenge "will also dictate whether [the 60,000 voters] can vote in federal elections." DE 37-1 at 7-8. This contention conflates a potential practical implication with an important legal distinction. The people of North Carolina have chosen to implement a uniform system for both state and federal election registration. *RNC*, 120 F.4th at 401. But that legislative choice, itself a creature of state law, does not transform state law issues with state elections into federal questions for federal courts merely because resolution of the state law issues, by implication, could also inform litigation in the context of a federal election. Any symmetry between North Carolina law (for state elections) and HAVA (for federal elections) "is state-created, not federal," *Crowley*, 678 F.3d at 735, and no court's interpretation of Section 163-82.4 would *control* or *bind* future unrelated proceedings involving analogous provisions of HAVA.

A case from the Fifth Circuit is instructive. *See American Airlines, Inc. v. Sabre, Inc.*, 694 F.3d 539 (5th Cir. 2012). There, the plaintiff sued the defendant in both federal and state court. *Id.* at 541. The federal case alleged antitrust "violations of Sections 1 and 2 of the Sherman Act," whereas the state case involved a state law antitrust claim alleging "monopolization in violation of [] the Texas Free Enterprise and Antitrust Act of 1983." *Id.* The Texas antitrust law provided that its provisions "shall be construed to accomplish [its] purpose and shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes to the extent consistent with [its] purpose." *Id.* at 542 (citing Tex. Bus. & Com. Code § 15.04). The defendant removed

14

the state case to federal court, the plaintiff sought remand, and the federal district court remanded the matter. *Id.* at 541.

In affirming the decision of the district court, the Fifth Circuit observed that, notwithstanding the plaintiff's parallel lawsuits and parallel claims under federal and state law, "nothing in the plain language of the [Texas antitrust law] requires that federal law control Texas's interpretation of its state antitrust statute." *Id.* at 542. The Fifth Circuit also rejected an argument (similar to that made by amici) about the practical implications: even if a federal court's conclusion on the Sherman Act claims suggested that the plaintiff's "parallel state antitrust case would suffer a similar fate," that does not compel the conclusion that the plaintiff somehow "g[a]ve up or alter[ed] its particular rights to pursue its state-law remedies in state court." *Id.* at 544. In sum, the Fifth Circuit agreed with the district court that "the mere fact that a federal standard is to be referenced [] in determining whether there has been a state-law violation" does not "cause[] a state-law claim to 'necessarily raise a stated federal issue.'" *Id.* at 543 (quoting *Grable*, 545 U.S. at 314).

The same is true here. Nothing in Section 163-82.4 "requires that [HAVA] control [North Carolina's] interpretation of its state [election] statute." *Id.* at 542. Further, the practical implications of a state court's interpretation of Section 163-82.4, or even its "reference[]" to HAVA in making such an interpretation, does not cause Griffin's first challenge "to necessarily raise a stated federal issue." *Id.* at 543 (internal quotation marks omitted). Because Griffin's first challenge does not require resort to HAVA, it does not necessarily raise a question of federal law. *See Grable*, 545 U.S. at 314.

Griffin's second challenge also does not raise an issue of federal law. That challenge, targeting voters who have never resided in North Carolina, involves an apparent conflict between

15

state law (which grants this group of individuals the right to vote) and the state Constitution (which includes a bona fide residency requirement). DE 1-4 at 44-45 (citing N.C. CONST. art. VI, § 1); *see also* N.C.G.S. § 163-258.2(e). No party (including the State Board, Riggs, the NCARA parties, or amici) have argued that Griffin's second challenge involves an issue of federal law, and the court discerns none. *See* DE 37-1; DE 39; DE 40; DE 41-1; DE 42.

That leaves Griffin's third challenge, which contests approximately 5,500 overseas absentee ballots that voters submitted without including a copy of their photo IDs. DE 1-4 at 53-57. The State Board argues that this challenge raises an issue of federal law because a state law addressing overseas absentee voting incorporates by reference a federal requirement found in a federal statute. DE 39 at 12 (citing N.C.G.S. § 163-258.6(b), which references 52 U.S.C. § 20303). But the State Board's argument represents a defense to Griffin's claim, which is that counting the votes of these voters would violate a separate state statute, which does not reference federal law. *See* DE 1-4 at 54; DE 49 at 15 (both addressing N.C.G.S. § 163-230.1).

Under the well-pleaded complaint rule, a state law claim only raises an issue of federal law if it "is a necessary element" of the state claim. *Franchise Tax Bd.*, 463 U.S. at 13; *Caterpillar*, 482 U.S. at 392. "It is *not* enough that federal law becomes relevant by virtue of a defense." *Burrell*, 918 F.3d at 381 (emphasis in original) (internal quotation mark omitted). Here, the State Board's invocation of state law (that references federal law) only becomes relevant by way of its defense, so it is not a necessary element of Griffin's third challenge.

The last argument for federal question jurisdiction, raised by the State Board and the NCARA parties, is that Griffin's petition raises a federal question because he seeks a declaration that the State Board's "arguments under the NVRA, HAVA, the VRA, and the Civil Rights Act against the relief requested by Judge Griffin are rejected." DE 1-4 at 83; see also DE 39 at 13; DE

16

42 at 35-36. This argument fails for the same reason: the State Board's arguments about federal laws were invoked as defenses to Griffin's protests. *See* DE 1-5 at 60-67. By raising those same arguments in his petition, and seeking a declaration that they "are rejected," DE 1-4 at 83, Griffin is merely "anticipat[ing] or repl[ying] to a probable defense" that the State Board would also make before the state Supreme Court. *Capitol Broadcasting*, 104 F.4th at 540. Plaintiffs may "go[] beyond a statement of the[ir] cause of action" and anticipate federal defenses in their pleadings without converting their state law claims into federal questions. *Gully*, 299 U.S. at 113.

Under the circumstances, it was understandable that Griffin would raise the State Board's federal defenses in his petition: the State Board had just cited them as bases for rejecting his protests. DE 1-5 at 60-67. By attempting to "anticipate[] and rebut[ those] defense[s]," Griffin did not inject a federal question into his petition. *Pressl v. Appalachian Power Co.*, 842 F.3d 299, 302 (4th Cir. 2016). "[E]ven if the complaint begs the assertion of [federal] defense[s] . . . that does not" transform Griffin's protests into claims "arising under federal law." *Pinney v. Nokia, Inc.*, 402 F.3d 430, 446 (4th Cir. 2005).

In sum, the court finds that none of the three challenges in Griffin's petition necessarily raise an issue of federal law, and his request for a declaration rejecting the State Board's federal law arguments is simply an anticipatory effort at rebutting predictable federal defenses. Therefore, Griffin's petition does not arise under the laws of the United States, this court would not have had original jurisdiction over it, and removal under Section 1441 was improper. *See* 28 U.S.C. § 1331; 28 U.S.C. § 1441(a).

     c.   <u>28 U.S.C. § 1443(2)</u>

Removal is independently authorized for any civil action that involves an "act under color of authority derived from any law providing for equal rights," or the refusal "to do any act on the

17

ground that it would be inconsistent with such law." 28 U.S.C. § 1443(2). The second portion of

that provision is relevant here, known as the refusal clause. *Stephenson v. Bartlett*, 180 F. Supp.

2d 779, 785 (E.D.N.C. 2001) (explaining that refusal clause "provides that state officers can

remove to federal court if sued for refusing to do any act on the ground that it would be inconsistent

with any law providing for civil rights") (internal brackets and quotation marks omitted).

Although the plain terms of Section 1443(2) appear to capture any number of recognized

civil rights, "[t]he Supreme Court has limited the meaning of a 'law providing for equal rights' in

§ 1443 to only those concerning racial equality." *Vlaming v. W. Point Sch. Bd.*, 10 F.4th 300, 309

(4th Cir. 2021). In *Rachel*, the Supreme Court concluded that the statutory language "must be

construed to mean any law providing for specific civil rights *stated in terms of racial equality*."

*State of Ga. v. Rachel*, 384 U.S. 780, 792 (1966) (emphasis added). On the other hand, laws that

"are phrased in terms of general application available to all persons or citizens," and not in

"specific language of racial equality," do not grant removal jurisdiction under Section 1443. *Id.*

Although "the plain text of the statute suggests a broader interpretation," this court "must take the

Supreme Court at its word and faithfully apply its precedent." *Vlaming*, 10 F.4th at 310. The

Fourth Circuit has recently clarified that the NVRA "provides a proper basis for removal under

Section 1443(2)." *RNC*, 120 F.4th at 408.

The court first finds that, contrary Griffin's primary argument against removal under

Section 1443(2), he did seek a writ of prohibition against the State Board because of its "refus[al]"

to do something: the refusal to sustain his challenges and discard the votes of tens of thousands of

voters. *See* DE 49 at 26. Had the State Board adopted Griffin's arguments and removed the in-

question votes from the current tally, i.e., had the State Board taken affirmative action, Griffin

would not have sought a writ of prohibition from the state Supreme Court. Thus, it is the State

18

Board's "inaction," not its "action," that prompted Griffin's petition. *City & Cnty. of San Francisco v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, No. 02-CV-03462, 2002 WL 1677711, at *4 (N.D. Cal. July 24, 2002); *see also id.* (noting that "the remand suit must challenge a failure to act or enforce state law").

Having concluded that the State Board refused to act within the meaning of Section 1443(2), the court turns next to whether that refusal was based on the State Board's belief that, had it acted, it would have violated federal civil rights law stated in terms of racial equality. 28 U.S.C. § 1443(2); *Rachel*, 384 U.S. at 792. The State Board rejected Griffin's challenges in part based on its position that "[r]etroactively removing these voters from the list of voters eligible to cast a ballot in the election would violate [the NVRA]." DE 1-5 at 67. The NVRA "provides a proper basis for removal under Section 1443(2)." *RNC*, 120 F.4th at 408. Accordingly, the State Board refused to "act on the ground that [action] would be inconsistent with [federal civil rights] law," and removal is permitted. 28 U.S.C. § 1443(2).

In reaching this conclusion, the court notes that it does not agree with the State Board that the NVRA precludes it from acting in the context of a state election. *See Young*, 520 U.S. at 275 (explaining that NVRA establishes procedures for federal elections). But that is ultimately a merits (not jurisdictional) issue; defendants seeking removal under Section 1443(2) must only make a "colorable claim" based on their "good faith belief" that their "conduct, if violative of state law," was required by a "federal statutory duty." *White v. Wellington*, 627 F.2d 582, 586 (2d Cir. 1980)[8]; *see also Cavanagh v. Brock*, 577 F. Supp. 176, 180 (E.D.N.C. 1983) (holding that a "colorable federal defense in the removal papers suffices to make removal—and therefore jurisdiction— proper pursuant to § 1443(2)"). And in analogous circumstances, the Fourth Circuit and Supreme

---

[8] By operation of North Carolina law, the court presumes the State Board acts in good faith. *City of Raleigh v. Riley*, 64 N.C. App. 623, 636, 308 S.E.2d 464, 473 (1983).

19

- 21 -

Court have indicated that a defendant's invocation of federal law will only fail to provide a jurisdictional basis on removal if the theory is "so attenuated and unsubstantial as to be absolutely devoid of merit; wholly insubstantial; obviously frivolous; plainly unsubstantial; or no longer open to discussion." *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 206 (4th Cir. 2022) (citing *Hagans v. Lavine*, 415 U.S. 528, 536–37 (1974)); *cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) ("It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction."). The court may not agree with the State Board as to the applicability of the NVRA, but considering North Carolina's unified system of registration and election administration, the State Board's argument in favor of removal is not absolutely devoid of merit or insubstantial. The court therefore finds that removal under Section 1443(2) is permitted on that basis and does not reach the State Board's arguments related to the Voting Rights Act or Equal Protection Clause.

   d. *Burford & Louisiana Power*[9]

"Although a federal equity court does have jurisdiction of a particular proceeding, it may, in its sound discretion, . . . refuse to enforce or protect legal rights" out of "proper regard for the rightful independence of state governments in carrying out their domestic policy." *Burford v. Sun Oil Co.*, 319 U.S. 315, 317–18 (1943). This form of judicial "abstention is an exception to the general rule that federal courts must decide cases over which they have jurisdiction." *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 96 (4th Cir. 2022). The doctrine is grounded in two considerations: (1) the flexibility inherent in "traditional equity practice," but more importantly

---

[9] Griffin raises *Pullman* as a basis for abstention. DE 49 at 6-8. The court finds that doctrine is relevant, but that *Burford* and *Louisiana Power* provide more compelling bases for abstention under the circumstances. Such a conclusion is fully consistent with the principle of party presentation, meaning that the court must "address only the issues raised by the parties," *Short v. Hartman*, 87 F.4th 593, 604 (4th Cir. 2023), because once "an issue [such as abstention] is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Id.* (citing *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991)).

20

(2) "the notion of comity," meaning the "'belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.'" *Erie Ins. Exch. v. Maryland Ins. Admin.*, 105 F.4th 145, 149 (4th Cir. 2024) (quoting *Younger v. Harris*, 401 U.S. 37, 44 (1971)).

Distilled to its essence, the doctrine of *Burford* abstention instructs that "[w]here timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989) (internal quotation marks omitted) ("*NOPSI*").

"Another doctrine . . . allows abstention in cases raising issues intimately involved with the State's sovereign prerogative." *Martin v. Stewart*, 499 F.3d 360, 364 (4th Cir. 2007). In *Louisiana Power*, the Supreme Court recognized that certain "decisive issues of state law" that are "intimately involved with sovereign prerogative" should be decided in the first instance by the State's courts. *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 28–29 (1959). Rather than make "a dubious and tentative forecast" on unsettled questions of state law that implicate state sovereignty, the court should abstain and defer to state courts on the question. *Id.* at 29. Such a course of action "does not constitute abnegation of judicial duty" but rather constitutes "a wise and productive discharge of it." *Id.*

21

To be sure, *Burford* and *Louisiana Power* are not talismanic incantations that free a federal district court of its "virtually unflagging" obligation to exercise subject-matter jurisdiction when it has it. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Just as a court "will not take jurisdiction if it should not," the court "must take jurisdiction if it should." *Cohens v. State of Virginia*, 19 U.S. 264, 404 (1821). Abstention is therefore reserved for the rare and exceptional cases.

Determining whether a matter represents one of those rare cases for which abstention is warranted is no easy task. What is a *difficult* question of state law? A policy problem of *substantial* public import? How *intimately* involved must a state law issue be with considerations of sovereignty? As these nebulous terms suggest, there exists no "formulaic test for determining when dismissal [or remand] under *Burford* [or *Louisiana Power*] is appropriate." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 727 (1996). And "[t]he various types of abstention are not rigid pigeonholes into which federal courts must try to fit cases." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 12 n.9 (1987). "Overlapping rationales motivate these doctrines and considerations that support abstaining under one will often support abstaining under another." *Martin*, 499 F.3d at 364. With that said, abstention doctrines do not permit "*ad hoc* judicial balancing of the totality of state and federal interests in a case" and a court must tether its analysis to "specific doctrines that apply in particular classes of cases." *Id.* (italics in original).

Considering the relevant standards, the court finds that abstention under *Burford* and *Louisiana Power* is appropriate in this case for four reasons: (1) the issues raised in Griffin's protests reflect unsettled questions of state constitutional and statutory law and bear directly on North Carolina's right to self-government, (2) there is an existing dispute resolution process designated by state law, which a federal court should be hesitant to disrupt, (3) Griffin's claims

22

arise purely under state law, and (4) the federal interest in this case is tenuous, and a state tribunal is competent to protect federal constitutional rights. Taken together, those factors counsel in favor of abstention.

First, Griffin's protests raise unsettled questions of state law: whether individuals who registered to vote without providing either their driver's license numbers or the last four digits of their social security numbers may vote in state elections, whether state law granting the right to vote to individuals who have never resided in North Carolina (Section 163-258.2(e)) conflicts with the state Constitution's bona fide residency requirement, and whether North Carolina's voter ID law applies to absentee ballots submitted by overseas voters in state elections. *See* DE 1-4 at 19-21 (summary of three challenges). In responding to Griffin's motion for preliminary injunction, the State Board has identified one trial court-level decision addressing the same substance as Griffin's second protest. DE 39 at 27. That hardly reflects a consensus view on the issues raised by the petition. *See Wise v. Circosta*, 978 F.3d 93, 101 (4th Cir. 2020) (finding that "*close* issue of state law involving competing interpretations of North Carolina's statutes governing election procedures" that "state courts" have not "settled . . . conclusively" supported abstention under *Pullman*) (emphasis in original); *see also Martin*, 499 F.3d at 364 (observing that abstention doctrines often contain "[o]verlapping rationales").

In *Johnson v. Collins Entertainment*, the Fourth Circuit found that it would "contravene[] *Burford* principles" for a federal district court to attempt to answer "disputed questions of state [] law that so powerfully impact the welfare of [the State's] citizens." *Johnson v. Collins Ent. Co.*, 199 F.3d 710, 720 (4th Cir. 1999). *Johnson* involved state gambling regulations, which "lie[] at the heart of the state's police power." *Id.* This matter involves the right to vote in a state election and the outcome of a state contest for a seat on the state supreme court, which lie at the heart of

23

state sovereignty and right to self-government. *Mitchell*, 400 U.S. at 125. The court finds that a citizen's right to participate in electing representatives for state government and a state's right to interpret state law in that context is no less (and likely more so) inextricably intertwined with a citizenry's welfare than the gambling regulations at issue in *Johnson*.

Likewise in *Louisiana Power*, Justice Frankfurter admonished that federal judges should hesitate to make "a dubious and tentative forecast" on unsettled questions of state law that implicate state sovereignty. *Louisiana Power*, 360 U.S. at 29. That advice maps onto this case: Griffin's protests raise novel questions of state law, and the answers to those questions could sway the outcome of a state election and affect the right to vote for tens of thousands of individuals in future *state* elections. *See NOPSI*, 491 U.S. at 361 (where "importance" of state law issues "transcends the result in the case then at bar," *Burford* abstention may be appropriate).

Second, North Carolina law designates an appellate procedure for disputes over decisions of the State Board. N.C.G.S. § 163-182.14(b). That procedure reflects the view of the General Assembly that election disputes should, after review by the State Board, proceed to the Superior Court of Wake County. *See id.* Because in these circumstances "timely and adequate state-court review is available," this court should refrain from "interfer[ing] with the [] orders of state administrative agencies," such as the State Board. *NOPSI*, 491 U.S. at 361. As the Fourth Circuit similarly concluded in *Johnson*, "[f]ederal equitable intervention" in this case "risks the disruption of state efforts to establish a coherent policy with respect to [state elections]" and "threatens the creation of a patchwork of inconsistent" interpretations of state election law. *Johnson*, 199 F.3d at 723.

Taking the third and fourth factors together, the court further finds that the primacy of state law issues in this matter, and the relatively tenuous federal interest, militate in favor of abstention

as well. *See Johnson*, 199 F.3d at 723 (explaining that "the predominance of state law issues affecting state public policy" should "counsel[] caution on the part of federal court"). As the court summarized previously, Griffin's challenges consist of contentions that arise exclusively under state law. *See supra* at 9-17. A federal court is poorly positioned to resolve those contentions in the first instance, particularly where such resolution (even if practically relevant) would not legally implicate federal elections. *See Moore v. Sims*, 442 U.S. 415, 429 (1979) ("State courts are the principal expositors of state law.").

The federal interest in this action also pales in comparison with the predominance of state law issues. The State Board has cited the NVRA as a basis for removal, which the court has credited. *See supra* at 17-20. But the NVRA's connection to this state election is somewhat dubious. *See Young*, 520 U.S. at 275. The State Board has also invoked federal constitutional concerns such as procedural and substantive due process, but a state court is competent to enforce federal constitutional rights. *See Huffman v. Pursue, Ltd.*, 420 U.S. 592, 609, n.21 (1975). Just as importantly, a state court could resolve Griffin's protests on the merits of their state law arguments, obviating the need for disposition of the federal constitutional issues. That consideration also tilts the scales towards abstention. *Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941); *see also Martin*, 499 F.3d at 364 (observing that abstention doctrines often contain "[o]verlapping rationales").[10]

If our system of federalism is to exist in more than name only, it means that this court should abstain in this case, under these circumstances. "As every schoolchild learns, our

---

[10] In weighing these third and fourth factors, the court is cognizant that it may not engage in "*ad hoc* judicial balancing of the totality of state and federal interests in a case." *Martin*, 499 F.3d at 364. Rather than engage in such ad hoc balancing, the court finds that those respective interests are directly relevant to answering whether the state law questions are difficult, the manner in which they transcend the case at bar, and whether they reflect substantially important state policy. *See NOPSI*, 491 U.S. at 361; *Louisiana Power*, 360 U.S. at 29; *Johnson*, 199 F.3d at 723.

25

Constitution establishes a system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). This dual-system reflects that "the perpetuity and indissolubility of the Union[] by no means implies the loss of distinct and individual existence, or of the right of self-government by the States." *Texas v. White*, 74 U.S. 700, 725 (1868). The right of self-government must include "all the functions essential to separate and independent existence"; otherwise "there could be no such political body as the United States." *Lane Cnty. v. State of Oregon*, 74 U.S. 71, 76 (1868).

The court ends as it began: a sitting state court judge seeks a writ of prohibition (a form of judicial relief authorized by the state constitution) from the state supreme court that would enjoin the state board of elections from counting votes for a state election contest that were cast by voters in a manner allegedly inconsistent with state law. A federal tribunal should "wise[ly] and productive[ly] discharge" its "judicial duty" by abstaining in such circumstances, *Louisiana Power*, 360 U.S. at 29, because "timely and adequate state-court review is available," *NOPSI*, 491 U.S. at 361; N.C.G.S. § 163-182.14(b). The issues of state law raised in this action are not just difficult and "disputed," *Johnson*, 199 F.3d at 720, they also go to the heart of North Carolina's sovereign right "to establish and maintain [its] own separate and independent government[]," *Mitchell*, 400 U.S. at 125. At bottom, the court finds that abstention under *Burford* and *Louisiana Power* is warranted.

26

**IV.    Conclusion**

The court has removal jurisdiction under 28 U.S.C. § 1443(2) but abstains from reaching the merits of Griffin's motion for preliminary injunction and remands this matter to the North Carolina Supreme Court.

SO ORDERED this __6th__ day of January, 2025.

_Richard E Myers II_
RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE

27

EXHIBIT 2

- 30 -

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**No. 5:24-cv-00724-M**

| | |
|---|---|
| JEFFERSON GRIFFIN,<br><br>        Petitioner,<br><br>v.<br><br>NORTH CAROLINA STATE BOARD OF ELECTIONS,<br><br>        Respondent,<br><br>and<br><br>ALLISON RIGGS, et al.,<br><br>        Intervenor-Respondents. | **STATE BOARD'S RESPONSE TO PETITIONER'S MOTION FOR PRELIMINARY INJUNCTION AND THE COURT'S SHOW CAUSE ORDER** |

**NOW COMES** Respondent North Carolina State Board of Elections, by and through undersigned counsel, to provide this response to Petitioner's Motion for Preliminary Injunction [D.E. 31, 32] and the Court's December 26, 2024 Order to Show Cause.

**INTRODUCTION**

In this lawsuit, Petitioner makes an astonishing request: to change longstanding election rules *after* an election has already taken place and, by doing so, disenfranchise more than 60,000 voters—voters who followed the rules in place at the time of that election. This requested relief confers jurisdiction on this Court several times over. It squarely raises substantial federal questions under the United States Constitution, the Help America Vote Act, and other federal statutes. Indeed, Petitioner himself asks for a judicial decree that his requested relief does *not* violate these statutes or the U.S. Constitution. Given this request, it is hard to envision a lawsuit that more squarely implicates federal law. *See* 28 U.S.C. § 1441. Federal jurisdiction is also proper because granting Petitioner's

requested relief would require the State Board of Elections to violate federal civil-rights laws. *See id.* § 1443. Among other things, Petitioner seeks relief that would violate the National Voter Registration Act's limits on how States may remove voters from the rolls.

After exercising jurisdiction, this Court should deny Petitioner's request for a preliminary injunction. The Board does not contest that, under the timing rules established by state law, it must now certify the election in question by January 10, 2024—and that doing so will moot Petitioner's lawsuit. But irreparable harm alone cannot justify an injunction. Petitioner's claims stand no chance of success on the merits. First of all, granting the requested relief would violate procedural due process, because Petitioner failed to give the challenged voters adequate notice. It would also violate federal civil-rights laws and the Fourteenth Amendment to change the rules of the election months after it has taken place—and thereby disenfranchise tens of thousands of lawful North Carolina voters. Notably, for the vast majority of those voters, Petitioner does not claim that they are actually ineligible to vote in North Carolina state elections. Finally, each of his arguments for invalidating those votes fails on the merits. He has not made a credible showing—let alone the clear showing required to sustain a preliminary injunction—that the Board erred by following the State's longstanding election rules and counting these votes.

## STATEMENT OF FACTS

### A.    Statutory Background

#### 1.    The Help America Vote Act

The Help America Vote Act ("HAVA") seeks to establish "uniform and nondiscriminatory election technology and administration requirements" across the States to govern federal elections. Pub. L. No. 107-252, §§ 301-12, 116 Stat. 1666 (2002). Among other things, HAVA directs States to establish "a single, uniform, official, centralized, interactive computerized statewide voter registration list" to "serve as the official voter registration list" for all federal elections. 52 U.S.C. §§ 21083(a)(1)(A), (a)(1)(A)(viii).

- 32 -

HAVA also imposes voter-list-maintenance and registration requirements on States. As for voter-list maintenance, HAVA directs States to maintain voter lists "on a regular basis." *Id.* § 21083(a)(2)(A). But HAVA limits how they may do so. For example, States may only remove individuals from the voter list consistent with the requirements in the National Voter Registration Act ("NVRA"), Pub. L. No. 103-31, 107 Stat. 77 (1993). *Id.* §§ 21083(a)(2)(A)(i)-(ii).

As for voter-registration applications, HAVA prohibits States from "accept[ing] or process[ing]" any application unless it includes the applicant's driver's license number or the last four digits of the applicant's social security number, if the applicant possesses such information. *Id.* §§ 21083(a)(5)(A)(i)–(ii). HAVA instructs State election officials to establish a system to attempt to "match" the identification number provided in an application with existing government records, *id.* § 21083(a)(5)(B)(i), and to establish state-law procedures to address registrations that do not match with such records, *see id.* § 21083(a)(5)(A)(iii). HAVA does not make a match a prerequisite to accepting an application. *See id.* §§ 21083(a)(5)(A), (b).

In certain circumstances, HAVA allows voters who do not provide a driver's license number or the last four digits of their social security number in a registration application to register to vote. For applicants who have not been "issued" either number, HAVA instructs States to instead assign "a number which will serve to identify the applicant for voter registration purposes." *Id.* § 21083(a)(5)(A)(ii). And if the State did not have a system complying with the requirement to collect a driver's license number or last four digits of a social security number, HAVA provides that a new voter registration applicant by mail may vote by providing an alternative form of identification before or upon voting for the first time. *See id.* §§ 21083(b)(1)-(3). This identification may include "a current and valid photo identification" or "a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter." *Id.* §§ 21083(b)(2)(A)(i)-(ii).

3

- 33 -

Although HAVA only applies to federal elections, in 2003, the North Carolina General Assembly enacted a statute that applied HAVA's federal rules to state elections. The law's express purpose was to "ensure that the State of North Carolina has a system for all North Carolina elections that complies with the requirements for federal elections set forth in the federal Help America Vote Act of 2002." N.C. Sess. Law 2003-226, § 1. The law specifically instructed the Board to ensure "compliance with federal law" by "updat[ing] the statewide computerized voter registration list and database to meet the requirements of section 303(a) of the Help America Vote Act of 2002." *Id.* § 6 (codified at N.C. Gen. Stat. § 163-82.11(c)).

Through this statute, the General Assembly amended several of North Carolina's voter registration and list-maintenance statutory provisions to incorporate HAVA's requirements. For example, section 163-82.4(a) now requires all voter registration applications to request that voters provide their driver's license number or the last four digits of their social security number. N.C. Gen. Stat. § 163-82.4(a)(11). Like HAVA, however, the statute allows voters who have not been issued one of those numbers to receive a "unique identifier number" from the Board for registration. *Id.* § 163-82.4(b). Like HAVA, North Carolina law also requires voters who register by mail and who have not had their driver's license or social security number validated beforehand to present a HAVA ID when they vote for the first time. *Id.* §§ 163-166.12(a)-(b), (f). And although state law directs county boards to attempt to match an identification number provided on a registration form with an existing government database, *id.* §§ 163-82.12(6)-(9), when the information provided by the voter does not match, voters may vote by providing a HAVA ID before voting for the first time, *id.* § 163-166.12(d); *see also* Voting Site Station Guide, p. 24, https://s3.amazonaws.com/dl.ncsbe.gov/Voter%20ID/County%20Board%20Training%20and%20Resources/Check%20In%20Station%20Guide_2024%20FINAL.pdf (last visited January 1, 2025) (same).

4

The result is that, like most States, North Carolina has a single voter registration system for both federal and state elections that incorporates HAVA's requirements.  *See Republican Nat'l Comm. v. N.C. State Bd. of Elections* ("*RNC*"), 120 F.4th 390, 401 (4th Cir. 2024) ("North Carolina has a unified registration system for both state and federal elections."); N.C. Gen. Stat. § 163-82.11(a) ("The system shall serve as the single . . . official list of registered voters . . . for the conduct of all elections in the State.").  North Carolina "thus is bound by" provisions of federal law, like HAVA, governing voter registration and list maintenance.  *See RNC*, 120 F.4th at 401.

### 2.    UOCAVA and UMOVA

In addition to HAVA registration, military and overseas voters may register and vote under a separate federal statute, the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA").  52 U.S.C. §§ 20301-11.  UOCAVA requires that all States allow military members and their families and other United States citizens living abroad to register to vote and vote absentee in federal elections.  *Id.* § 20302.  For federal elections, States must accept certain federally designated absentee ballots and applications to register to vote.  *Id.* §§ 20302(a)(3), (4).  Federal law does not require voters to provide a photocopy of their identification when they vote.

Under North Carolina's Uniform Military and Overseas Voter Act ("UMOVA"), N.C. Gen. Stat. § 163-258.1 *et seq.*, located in Article 21A of the General Statutes, state law extends UOCAVA's provisions for federal elections to all elections in North Carolina.  N.C. Gen. Stat. § 163-258.3(1).  Like federal law, state law does not require these voters to provide a photocopy of their identification to vote.  *Id.* §§ 163-258.13 and -258.17(a)-(b).  For *other* voters, however, North Carolina law does require voters to present a photo ID to vote, with certain exceptions.  *Id.* § 163-166.16.

North Carolina law allows certain other overseas individuals to vote as well.  Under a separate provision of UMOVA, state law authorizes certain overseas voters "who [were] born outside the United States" and never resided in North Carolina to vote if their parents would have been eligible to vote in North Carolina before leaving the country.  *See id.* § 163-258.2(1)(e).

5

- 35 -

### 3.   Statutory provisions governing voter-list maintenance and vote counting.

Once voters are registered, several other federal laws govern how States maintain their voter lists and calculate election results.

*First*, both HAVA and North Carolina law require any voter-registration list maintenance to be performed in accordance with the NVRA.  52 U.S.C. § 21083(a)(2)(A); N.C. Gen. Stat. § 163-82.14.  The NVRA only allows the removal of voters from the rolls in specific, enumerated circumstances: (1) at the request of the registrant, (2) for criminal conviction or mental incapacity, as provided by State law, (3) for death or a change in residence, and (4) if an individual has not participated or responded to a notice in two consecutive federal general elections.  52 U.S.C. §§ 20507(a)(3), (a)(4), (b)(2).  In addition, systematic removals, other than by registrant request, felony conviction, or death, must be completed "not later than 90 days prior to the date of a primary or general election for Federal office."  *Id.* § 20507(c)(2)(A).

*Second*, the Civil Rights Act curtails the ability of election officials to bar individuals from voting based on mistakes in the registration process.  Election officials may not "deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting," so long as the mistake "is not material" to the individual's qualification to vote.  *Id.* § 10101(a)(2)(B).

*Third*, the Voting Rights Act ("VRA") prohibits election officials from discounting ballots that have been cast in an election.  Under the VRA, election officials may not "fail or refuse to permit any person to vote who is entitled to vote" or otherwise "willfully fail or refuse to tabulate, count, and report such person's vote."  *Id.* § 10307(a).

### B.   Procedural History

Petitioner Judge Jefferson Griffin and Intervenor Associate Justice Allison Riggs were candidates in the statewide 2024 General Election for associate justice on the North Carolina Supreme Court.  The vast majority of in-person voters—99.9%—presented a photo ID to election

6

officials prior to voting.  *See* N.C. State Bd. of Elections, *Provisional Voters* (Nov. 5, 2024),

https://tinyurl.com/mscy8vcv, (last visited January 1, 2025).[1]  After the county boards of elections

conducted a full count of the votes, a full machine recount of the votes, and a partial hand recount of

the votes, final canvassed results of the election show Justice Riggs to be in the lead.

      On November 19, 2024, Petitioner filed hundreds of election protests throughout the State

challenging the election results.  Petitioner's protests were based on six categories of allegations that

certain voters' ballots were invalid.  D.E. 1-5 at 43.  Following a public meeting, the Board voted

unanimously to take jurisdiction over the first three categories of protests, which "presented legal

questions of statewide significance": (1) ballots cast by registered voters with alleged incomplete

voter registrations (60,273 votes); (2) ballots cast by overseas citizens who have never resided in the

United States (266 votes); and (3) ballots cast by military and overseas-citizen voters who did not

include a photocopy of a photo ID with their absentee ballots (1,409 votes).  D.E. 1-5 at 43-44; *see

also id.*, n.2 (explaining the small discrepancies between the number of voters Petitioner asserts he

challenged and the number Petitioner actually timely challenged).  The Board instructed county

boards of elections to consider the remaining three categories of protests, "which were focused on

individual, fact-specific determinations of voter eligibility."[2]  *Id.* at 44.

---

[1]      Provisional voting generally applies to in-person voting only.  The State Board does not have
readily available figures on photo ID for absentee voters, who do not vote provisionally when
claiming an exception to the ID requirement. *See* N.C. Gen. Stat. § 163-230.1(f1). However, all
absentee voters are required to provide either their driver's license number or the last four digits of
their social security number *each time* they submit a request for an absentee ballot, and if they claim
an exception to the photo ID requirement, they must provide one of those numbers *again* when they
vote.  *Id.* §§ 163-230.2(a)(4), -230.1(g)(2).

[2]      The remaining three categories of protests challenged ballots cast by voters (1) who were
serving a felony sentence; (2) who were deceased; and (3) whose registration was denied or removed.
D.E. 1-5 at 43. On December 27, 2024, the Board dismissed these protests for failure to substantially
comply with service requirements and because they challenged an inadequate number of votes to
change the outcome of the contest.  D.E. 38-1.  If Petitioner does not obtain a stay of the certification
of election by January 9, 2024, the certification will issue the following day.  *See* N.C. Gen. Stat.

The State Board held a public meeting on December 11 to consider Petitioner's three protests. Two days later, the Board dismissed the protests, concluding that they "were not served on affected voters in accordance with law" and were also "legally deficient." *Id.* at 46.

On the first protest, the Board noted that this Court had held, in considering the same HAVA arguments here, that equitable principles "prohibit[] granting Plaintiffs relief in connection with the most recent election." D.E. 1-5 at 60 (alteration in original) (quoting *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, No. 5:24-cv-00547, Dkt. Entry 1-4 at 4 (E.D.N.C.)). The Board similarly concluded that votes cannot be invalidated after an election when eligible voters complied with all the instructions they had been given when they registered and voted—particularly when their identities were confirmed by the alternative means set forth in HAVA before they first voted. D.E. 1-5 at 60-62. Doing so, the Board held, would violate the Fourteenth Amendment as well as the NVRA, which prohibits en masse removal of voters from the rolls within 90 days of a general election. *Id.* at 64-66.

The Board also rejected Petitioner's protests as to overseas voters who have never resided in the United States but whose parents had been North Carolina residents. The Board noted that the state legislature had passed a statute explicitly allowing these persons to vote in North Carolina elections. *Id.* at 70-71 (citing N.C. Gen. Stat. §§ 163-258.6 through -258.15).

Finally, the Board rejected Petitioner's protests to cancel the votes of military and overseas voters who did not include a copy of a photo ID with their ballot. The Board noted that the North Carolina General Assembly had passed a statute covering these voters that does not require these voters to send a copy of their photo ID to vote. *Id.* at 72-75. The Board also relied on state

_____

§ 163-182.14(b). After certification issues, as Petitioner agrees, the election results are final, and his protests are rendered moot. D.E. 1-4 at 23; *see also* N.C. Gen. Stat. § 163-182(2) (providing that a "certificate of election" is the document "conferring upon a candidate the right to assume an elective office as a result of being elected to it").

8

regulations which provide explicitly that photo ID requirements do not apply to military and overseas voters. *Id.* at 72-75. And the Board reasoned that imposing a requirement on uniformed and overseas voters that is inconsistent with federal law would likely violate the Supremacy Clause of the U.S. Constitution. *Id.* at 75-76.

On December 18, 2024, Petitioner filed an original action, framed as a petition for writ of prohibition, in the North Carolina Supreme Court challenging Respondent's final decision. D.E. 1-4. The petition seeks declaratory rulings interpreting HAVA, 52 U.S.C. § 20901, *et seq.*; the NVRA, 52 U.S.C. § 20501, *et seq.*, the VRA, 52 U.S.C. § 10307; the Civil Rights Act, 52 U.S.C. § 10101; UOCAVA, 52 U.S.C. § 20301, *et seq.*; and the Fourteenth Amendment. D.E. 1-4. The Board removed to this Court. D.E. 1.[3] On December 23, 2024, Petitioner filed a motion for preliminary injunction seeking to enjoin the Board from issuing the certificate of election. Mot. for Prelim. Inj. (D.E. 31). On December 26, this Court directed the Board to respond to this motion, and further to show cause why this case should not be remanded back to the North Carolina Supreme Court.

## RESPONSE TO SHOW CAUSE ORDER

### I.    Legal Standard

"Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed" to federal district court. 28 U.S.C. § 1441(a). Separately, "[a]ny . . . civil action[] . . . commenced in a State court may be removed" if it is based on a "refus[al] to do any act on the ground that it would be inconsistent with" "any law providing for equal rights." *Id.* § 1443(2).

Petitioner's writ of prohibition is a "civil action" under § 1441 and § 1443—it is a civil proceeding seeking judicial relief of a civil nature. *See, e.g., Ponder v. Joslin*, 262 N.C. 496, 497,

---

[3]    Petitioner separately filed three petitions for judicial review in state trial court on his three categories of election protests. *See Griffin v. N.C. State Bd. of Elections*, No. 5:24-cv-00731, Dkt. Entries 1-4, 1-5, 1-6 (E.D.N.C.). The Board again removed to this Court. *Id.*, Dkt. Entry 1.

9

138 S.E.2d 143, 144 (N.C. 1964) (holding that a lawsuit seeking a "writ of mandamus" against the State Board of Elections concerning an election protest was a "civil action"); *cf. In re Smith*, 114 F.3d 1247, 1250 (D.C. Cir. 1997) ("Although Congress did not define the term 'civil action' for purposes of the PLRA, we conclude that it includes a petition for a writ of prohibition that . . . includes underlying claims that are civil in nature."). Petitions seeking extraordinary writs under state law are therefore removable if they otherwise meet the requirements for federal removal jurisdiction. *See, e.g.*, *Indep. Living Ctr. of S. Cal., Inc. v. Kent*, 909 F.3d 272, 276, 278 (9th Cir. 2018) (holding that "a petition for a writ of mandamus" under state law was properly removed because petition raised "federal question[s]").

In addition, because the federal removal statutes speak broadly of removing "any civil action brought in" or "commenced in" "a State court," 28 U.S.C. §§ 1441(a), 1443, cases pending in state appellate courts are also removable. *See, e.g.*, *Harris v. U.S. Dep't of Transp. FMCSA*, 122 F.4th 418, 422-24 (D.C. Cir. 2024); *Yassan v. J.P. Morgan Chase & Co.*, 708 F.3d 963, 969 (7th Cir. 2013); *Resol. Tr. Corp. v. Allen*, 16 F.3d 568, 572 n.4 (4th Cir. 1994).

## II.    Removal Is Proper Under § 1441 Because the Petition Raises Federal Questions.

Removal of the petition is proper under 28 U.S.C. § 1441(a) because this Court would have had original jurisdiction over the issues raised here. Federal district courts have original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." *Id.* § 1331; *see also* U.S. Const., art. III, § 2, cl. 1.

A suit that contains only state-law claims can "arise under" federal law where vindication of an alleged state-law right "turns on some construction of federal law." *North Carolina ex. rel. N.C. Dep't of Admin. v. Alcoa Power Generating, Inc.*, 853 F.3d 140, 146 (4th Cir. 2017) (cleaned up). It is "common[] sense" that federal courts "ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). The relevant test is whether the state-law claim

10

- 40 -

implicates a federal issue that is: "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013).

Here, Petitioner seeks judicial relief that "prohibits the State Board from counting ballots cast in violation of North Carolina's statutes and constitution." D.E. 1-4 at 15. Because that request implicates numerous substantial federal issues, this Court has jurisdiction.

**A.      The Court must construe multiple federal laws to resolve the petition.**

Substantial issues of federal law pervade the petition. The petition asks, most notably, to throw out ballots cast by eligible voters who, it claims, registered in violation of HAVA. It also asks for a decree rejecting "[a]ll arguments under the NVRA, HAVA, the VRA, and the Civil Rights Act," as well as under the "federal constitution" that would bar his requested relief. D.E. 1-4 at 83-84. It would be hard to fashion a claim that more clearly turns on federal law.

**i.      The Petition requires construction of HAVA.**

Petitioner first seeks to cancel the votes of eligible voters who he claims improperly registered by failing to provide their driver's license or social security number on their registration application. D.E. 1-4 at 33-37. Deciding whether these voters were properly registered necessarily requires this Court to construe HAVA. HAVA directs States to ask voters to provide a driver's license or social security number at registration. 52 U.S.C. § 21083(a)(5)(A)(i). HAVA also instructs States to create a uniform voter list that elections officials are to regularly maintain. *Id.* §§ 21083(a)(1), (2). Just a year after Congress enacted HAVA, the North Carolina legislature passed a law whose express purpose was to "ensure that the State of North Carolina has a system for North Carolina elections that complies with the requirements for federal elections set forth in the federal Help America Vote Act of 2002." N.C. Sess. Law 2003-226, § 1. In keeping with this purpose, the General Assembly updated state law on voter registration and voter-list maintenance to incorporate HAVA's requirements and establish a single voter-registration system for federal and state elections. *See supra* pp 4-5.

11

- 41 -

Here, Petitioner claims that certain voters were improperly registered because they did not provide a driver's license or social-security number on their voter-registration form. D.E. 1-4 at 34. As the Fourth Circuit has held, a "federal question[] [is] essential to resolving" this state-law issue: whether "North Carolina's previous voter registration form violate[d] HAVA." *RNC*, 120 F.4th at 400. As this issue "contains no articulation of a state [law] violation separate and apart from an alleged HAVA violation," it is a "state cause of action in name only." *Id.* at 401. Petitioner attempts to distinguish *RNC* by noting that HAVA itself "does not apply to elections for state offices." D.E. 1-4 at 40. As the Fourth Circuit has held, this misunderstands the law. North Carolina law fully incorporates and applies HAVA's federal rules for state elections as well. As a result, "North Carolina has a unified registration system for both state and federal elections, and thus is bound by the provisions" of federal registration law—including HAVA—for *both* state and federal elections. *RNC*, 120 F.4th at 401-02. Federal law thus controls on this issue.

### ii.    The Petition also requires this Court to construe UOCAVA.

Petitioner also asks this Court to cancel the votes of overseas voters who did not include a copy of a photo ID with their absentee ballot. This question requires this Court to interpret a federal statute: UOCAVA. A state statute, UMOVA, implements UOCAVA's requirement that States establish procedures allowing military and other overseas voters to register to vote and to vote absentee. *See* N.C. Gen. Stat. § 163-258.3(1). UMOVA also requires North Carolina election officials to accept voter registration applications and absentee ballot applications from military and other overseas voters as "prescribed" in that federal law. *Id.* §§ 163-258.6, 163-258.7. Given this incorporation of federal law into the relevant state law, this Court must necessarily construe federal law to determine voting procedures for military and overseas voters in North Carolina state elections.

Petitioner argues otherwise, noting again that UOCAVA itself applies only to federal elections. D.E. 1-4 at 59. But again, state law makes clear that UOCAVA rules apply to military or overseas voting in *all elections*—including state races. Specifically, the General Assembly mandated

12

that "the voting procedures in [UMOVA] apply to" a "primary, general, or special election for federal or State office" for these voters. N.C. Gen. Stat. § 163-258.3(1). And state law allows military or overseas voters to use ballots "in accordance with [UOCAVA] . . . to vote for all offices and ballot measures" in an election. *Id.* § 163-258.11. Thus, because state law expressly incorporates federal standards, the state-law issues raised by Petitioner turn on federal law.

### iii. The Petition specifically asks for relief under the NVRA, the Voting Rights Act, the Civil Rights Act, and the Fourteenth Amendment.

The petition specifically requests a judicial decree declaring that its requested relief does not violate four federal statutes—the NVRA, HAVA, the Voting Rights Act, and the Civil Rights Act—as well as the Fourteenth Amendment. D.E. 1-4 at 83-84. By doing so, the petition necessarily raises substantial issues of federal law. Federal courts, of course, have jurisdiction over concrete cases and controversies requesting judgments about whether and how federal law applies. *Shaw v. Delta Air Lines*, 463 U.S. 85, 96 & n.14 (1983). It is difficult to think of a clearer invocation of federal law than a party asking for a judgment about how a federal statute or the federal constitution applies.

### B. The State Board disagrees with Petitioner's construction of federal law.

The federal questions raised in the petition are also "actually disputed." *Gunn*, 568 U.S. at 258. The Board does not read HAVA or UOCAVA as requiring it to cancel the challenged votes. D.E. 1-5 at 57-60. In addition, the Board reads federal law to prevent it from canceling the votes as Petitioner demands. *Id.* at 65-67, 77, 79.

### C. The federal-law disputes here are substantial.

A federal question underlying a state-law claim is sufficiently substantial to trigger federal-court jurisdiction when it is "importan[t] . . . to the federal system as a whole." *RNC*, 120 F.4th at 404 (quoting *Gunn*, 568 U.S. at 260). The federal issues raised in this petition are undoubtedly substantial. Petitioner aims to cancel more than 60,000 votes by changing the rules *after* an election. A decision based on federal law that could have such wide-ranging consequences to the fundamental

13

rights of voters is "substantial" under any understanding of the word. Thus, the Fourth Circuit recently had "no hesitation concluding that this issue is of substantial importance to the federal system as a whole." *Id.*

### D. Federal jurisdiction appropriately respects the federal-state balance.

Federal court review is appropriate when there is no danger that hearing a case will "attract[] a horde of original filings and removal cases raising other state claims." *Grable*, 545 U.S. at 318. But "it will be the rare state equal protection case that turns on a violation of HAVA or the NVRA." *RNC*, 120 F.4th at 404-05. It will also be the rare case that would seek to cancel votes after an election, in relief that turns on five federal statutes and the Fourteenth Amendment. Moreover, because the petition, while "cloaked in state [law] garb," raises only federal questions, it is appropriate for federal courts to answer those questions. *Id.* at 405. As the Fourth Circuit held in *RNC*, Congress could not have intended to bar federal courts from deciding cases where interpretation of a federal statute decides whether thousands of voters can vote in an election. *Id.* "The mere invocation" of state law should not prevent federal courts from hearing this case. *Id.*

### III. Removal Is Proper Under § 1443 Because the Petition Asks the Board to Violate Federal Civil-Rights Laws.

This Court also has jurisdiction under the civil-rights removal statute, 28 U.S.C. § 1443(2). That statute permits removal to federal court of any suit brought against a state official "for refusing to do any act on the ground that it would be inconsistent with" "any law providing for equal rights." *Id.* Petitioner demands that the Board cancel more than 60,000 votes cast during the recent election. D.E. 1-4 at 78, 81-84. The Board has refused to do so because it would run afoul of the NVRA, the VRA, and the Fourteenth Amendment. D.E. 1-4 at 24-25; D.E. 1 at 2. Since all these laws are "law[s] providing for equal rights," removal is appropriate under § 1443(2).

For purposes of § 1443, a "law providing for equal rights" is one that concerns racial equality. *Georgia v. Rachel*, 384 U.S. 780, 792 (1966). To satisfy this standard, the specific statutory

provision at issue need not mention race. All that is required is that the "basis for removal" be a *statute as a whole* that addresses racial equality. *Id.* at 792-93; *see RNC*, 120 F.4th at 407 (same). Applying this standard here, the relevant laws that the Board has refused to violate—the NVRA, the VRA, and the Fourteenth Amendment—allow for civil-rights removal.

### A. Civil-rights removal is proper under the NVRA.

The NVRA precludes the Board from discounting the votes of people who did not provide a driver's license or social security number at registration. Under the NVRA, once a person is registered to vote, they may be removed from the rolls only in narrow, enumerated circumstances that are indisputably not present here. 52 U.S.C. §§ 20507(a)(3), (a)(4), (b)(2), (c)(1); *see supra* pp 5-6. The NVRA also prohibits officials from "systematically remov[ing]" voters from the rolls within 90 days of an election, again except in narrow, enumerated circumstances that are indisputably not present here. *Id.* § 20507(c)(2)(A); *see supra* p 6.

Moreover, as the Fourth Circuit has recently held, the NVRA is a "law providing for equal rights" under § 1443(2). One of the NVRA's central purposes is to promote racial equality. "The text of the NVRA, including its lead provision, reveals that it is a law 'providing for specific civil rights stated in terms of racial equality.'" *RNC*, 120 F.4th at 407-08 (quoting *Rachel*, 384 U.S. at 792). Specifically, the NVRA states expressly that the law was enacted to eliminate "discriminatory and unfair registration laws and procedures" that "have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. § 20501(a)(3).

Here, the NVRA clearly prohibits the Board from canceling more than 60,000 votes that have already been cast. Again, Petitioner does not assert that his basis for canceling these votes falls among the narrow, enumerated reasons that the NVRA allows for removing voters from the rolls. *See* D.E. 1-4 at 41-42. The NVRA therefore squarely forecloses Petitioner's requested relief. *See*

15

*RNC*, 120 F.4th at 402-03 (concluding that the NVRA does not authorize removal from voter rolls based on this same allegation of HAVA non-compliance).

In addition, the NVRA forecloses Petitioner's relief for a separate reason as well:  while we are not technically within the NVRA's 90-day quiet period barring the State from removing voters *en masse* from the rolls, requiring the Board to do so now would completely undermine the quiet period's purpose.  *See* 52 U.S.C. § 20507(c)(2)(A).  Congress enacted the quiet period to "prevent the discriminatory nature of periodic voter purges, which . . . appear to affect [B]lacks and minorities more than others."  S. Rep. No. 103-6, at 20 (1993).  It would be strange indeed for Congress to institute a prophylactic prohibition against voter purges for the 90-day period before an election only for the State to implement mass voter purges *after* an election has occurred and apply that purge to the already-conducted election.  If Petitioner were right, the NVRA's protections against pre-election voter purges would be a dead letter.

In response, Petitioner claims that the NVRA only bars the Board from canceling voter registrations, not canceling votes.  D.E. 1-4 at 41-42.  This tortured logic fails.  Petitioner argues that certain voters are ineligible to vote *because* they did not properly register.  *Id.* at 33.  His challenge is therefore an attack on the challenged voters' *registrations*—not just their ballots.  As the Board explained, "having a list of voters who are eligible to vote" makes no sense if "the government [then] removes their ballot[s]."  D.E. 1-5 at 66-67 n.17.  The petition therefore squarely implicates the NVRA's limits on removing registered voters from the rolls.  After all, "[t]he right to vote encompasses the right to register."  *United States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967).

In sum, because the Board has refused to grant Petitioner's requested relief on the ground that it would violate the NVRA, removal is proper under § 1443.

## B.    Removal is appropriate under the Voting Rights Act.

Petitioner's demand that the Board invalidate more than 60,000 votes also would require it to violate the VRA, which prohibits officials from "willfully fail[ing] or refus[ing] to tabulate, count,

and report" the votes of individuals who were qualified to vote in the election.  52 U.S.C. § 10307(a).
Because the VRA is a quintessential "law providing for equal rights," courts have consistently
permitted removal under § 1443(2) when a state official refuses to take an act that is inconsistent
with the VRA.  *See, e.g.*, *Smith v. Winter*, 717 F.2d 191, 194 (5th Cir. 1983); *see also RNC*, 120 F.4th
at 406 n.5 (observing that courts have held that § 1443 removal under § 10307 of the VRA is proper).
Because all three of the categories of challenged voters are qualified to vote under federal and state
law, the VRA prohibits the Board from refusing to count their votes.  Civil-rights removal is thus
proper on this basis as well.

> C.    **Removal is appropriate under the Equal Protection Clause.**

Finally, civil-rights removal is also proper under the Equal Protection Clause of the
Fourteenth Amendment.  The Supreme Court has foreclosed civil-rights removal based on the
Fourteenth Amendment's Due Process Clause because that clause is "phrased in terms of general
application available to all persons or citizens, rather than in the specific language of racial equality
that § 1443 demands."  *Rachel*, 384 U.S. at 792.  By contrast, the Equal Protection Clause *is* a law
providing for equal civil rights based in racial equality.  *Shaw v. Reno*, 509 U.S. 630, 642 (1993)
(observing that the "central purpose" of the Equal Protection Clause "is to prevent the States from
purposefully discriminating between individuals on the basis of race").  If the Board were to nullify
the challenged votes, it would violate this constitutional guarantee.  *See infra* pp 24.  The Board's
refusal to do so also forms an appropriate basis for removal.

> **RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION**

> I.    **Legal Standard**

A preliminary injunction is "an extraordinary remedy never awarded as of right."  *Winter v.
Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Mandatory injunctive relief is especially
"disfavored, and warranted only in the most extraordinary circumstances."  *In re Microsoft Corp.
Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003).  To obtain a preliminary injunction, Petitioner

17

- 47 -

must show: (1) a likelihood of success on the merits; (2) irreparable harm; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. Petitioner "bears the burden of establishing that each of these factors supports granting the injunction." *Direx Israel, Ltd. v. Breakthrough Med. Corp*., 952 F.2d 802, 812 (4th Cir. 1991). "*Each* of these four factors must be satisfied to obtain preliminary injunctive relief," and it is "unnecessary to address all four factors when one or more ha[ve] not been satisfied." *Henderson v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018); *Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023) ("[A] district court is entitled to deny preliminary injunctive relief on the failure of any single *Winter* factor.").

Petitioner contends that an injunction is needed because his protests will become moot once the Board issues a certificate of election—currently scheduled for January 10, 2025. The Board does not dispute that certification will moot Petitioner's protests, and that this eventuality constitutes irreparable harm. However, the Board submits that an injunction is not appropriate here because Petitioner cannot establish any of the other three required factors.

First and most importantly, Petitioner cannot establish a likelihood of success on the merits. For an injunction to issue, Petitioner must make a "clear showing" he is likely to succeed on the merits. *Dewhurst v. Century Alum. Co.,* 649 F.3d 287, 293 (4th Cir. 2011) (quoting *Winter*, 555 U.S. at 22). Here, for the reasons described below, Petitioner has failed to make this showing; his request for an injunction should be denied on that basis alone. *See infra* pp 19-29.

Petitioner also cannot establish the third and fourth *Winter* factors—that the equities tip in his favor and an injunction is in the public interest. *See Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 225 (4th Cir. 2024) (noting that when a State is a defendant, these two factors merge). In this case, the public interest in orderly and fair elections favors denial of the injunction. It is true that Petitioner seeks only a limited stay until the federal courts can decide the merits of his claims. However, he is wrong that certification would alter the status quo. The status quo is North Carolina's prevailing system for registration and voting—under rules that have been on the books for numerous

18

election cycles, without challenge. Because voters rely on established election rules when deciding how and when to cast their ballots, "altering state election rules in the period close to an election" is strongly disfavored. *Andino v. Middleton*, 141 S. Ct. 9, 10 (2020) (Kavanaugh, J., concurring). This principle applies with even greater force *after* ballots have already been cast and counted. *See id.* at 9-10 (staying injunction of state election rule, while ordering that ballots cast before the stay "may not be rejected for failing to comply" with the rule). As this Court has itself recognized, given the unfairness of retroactively disenfranchising voters who complied with the rules in place on election day, any flaws identified by Petitioner must be resolved prospectively alone. *See RNC*, No. 5:24-cv-00547, Dkt. Entry 73, Order at 4 (E.D.N.C. Nov. 22, 2024).

## II.    Petitioner Has Not Made a Clear Showing of Likelihood of Succeed on the Merits.

A preliminary injunction should also be denied because Petitioner's arguments are bound to fail on the merits. Granting Petitioner's requested relief to throw out more than 60,000 votes after an election would be unconstitutional several times over. And in any event, Petitioner's three arguments for why those votes should be canceled are meritless.

### A.    Petitioner's requested relief would deny procedural due process because he failed to give voters adequate notice that he was challenging their votes.

Petitioner's protests fail because he did not provide voters sufficient notice of his protests. This failure denied voters procedural due process. Voters have a "constitutionally protected liberty interest" in their right to vote. *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 227 (M.D.N.C. 2020). As a result, when a voter's "ballot [is] challenged," due process requires that voters be "given notice," so they can protect their vote. *Id.* at 228. This notice must be "reasonably calculated, under all the circumstances, to apprise" voters of the challenge to their votes. *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).

Here, Petitioner failed to adequately apprise voters of his protests. Petitioner did not send physical copies of the protests to voters' addresses. Instead, his political party mailed voters a

postcard stating that their "vote *may* be affected by one or more protests filed in relation to the 2024 General Election." D.E. 1-5 at 178 (emphasis added). The postcard did not inform voters whether their vote *was* actually under protest. It also did not inform voters that it was meant to effect formal service of an election protest. *Id.* Instead, the postcard merely directed voters "to scan [a] QR code to view the protest filings." *Id.* This code, when scanned with a smartphone, took users to a website where hundreds of protests were listed. *Id.* at 81-82 (showing smartphone screenshots). Voters then, to find out if any protests concerned them, had to hunt among the hundreds of protests and try to find their names on attached spreadsheets. These spreadsheets listed voters' names in small print, out of alphabetical order. Some spreadsheets contained hundreds of pages, listing thousands of names. *Id.*

Neither the postcard nor its QR code were "reasonably calculated . . . to apprise" voters that their votes were under protest. *Mullane*, 339 U.S. at 314. The postcard, for example, did not even inform voters that their votes had *actually* been challenged. Vague, equivocal notice of this kind, which does not "specifically" disclose that a person's rights will be impaired, does not give "adequate notice." *In re Linkous*, 990 F.2d 160, 162 (4th Cir. 1993); *see Fogel v. Zell*, 221 F.3d 955, 962 (7th Cir. 2000) (if a "notice is unclear," it is not adequate).

This lack of specificity, moreover, was not cured by the QR code. Many voters do not own smartphones. *See* Pew, *Mobile Fact Sheet* (Nov. 13, 2024), https://tinyurl.com/yeywjxfn (noting that one in five senior citizens do not have a smartphone) (last visited January 1, 2025). These voters would therefore not have been able to scan the code to learn if a protest affected them. As a result, in "a significant number of instances," notice by QR code would not "provide [voters with] actual notice" of protests. *Greene v. Lindsey*, 456 U.S. 444, 453 (1982). And as the Supreme Court has held, where a chosen form of notice will not notify a "significant number" of persons, it does not satisfy "due process." *Id.* Despite this authority, Petitioner suggests that the Supreme Court has held that notice is sufficient so long as most affected persons receive notice. D.E. 1-4 at 65. He is mistaken. It has actually held repeatedly that where service of papers via "the mails" is possible,

20

then that form of notice is *required*. *Mullane*, 339 U.S. at 319; *see also Greene*, 456 U.S. at 455. Petitioner failed to provide such notice here.

Finally, even if a QR code could theoretically provide adequate notice, it did not do so here. The Fourth Circuit recently held that an eviction warning provided inadequate notice when "it [was] time-consuming to wade through" the entire form at issue in order to locate the warning, which was listed "in small print two-thirds of the way down the back of a form." *Todman v. Mayor & City Council of Baltimore*, 104 F.4th 479, 488-89 (4th Cir. 2024). Here, for voters to find out if protests affected them, they had to "wade through" hundreds of protests, some of which listed thousands of names "in small print." *Id.* This kind of needle-in-a-haystack notice offends due process because it is not "reasonably calculated" to convey notice. *Id.* at 488.

### B. Granting Petitioner's requested relief would violate several federal civil-rights laws and the Fourteenth Amendment.

Petitioner seeks to cancel 60,000 votes after an election, even though those votes were cast under rules that had long been in place at the time of the election. As explained *supra* pp 14-17, granting this relief would violate multiple federal civil rights statutes, including the NVRA and the Voting Rights Act. It would also violate the Fourteenth Amendment. Simply put, Petitioner wants to change the rules of the game after it has already been played. Doing so is "patently and fundamentally unfair." *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978) (cleaned up); *see also Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983).

The Fourteenth Amendment's Due Process Clause bars the systematic, "retroactive invalidation" of votes. *Griffin*, 570 F.2d at 1079-80. The seminal case on this point is *Griffin v. Burns*. There, election officials in Rhode Island issued absentee ballots in a party primary—a practice which had been in place for seven years, and which the officials believed was authorized by state law. *Id.* at 1067. After the primary, the losing candidate asserted that the use of such ballots was unlawful. *Id.* The state supreme court agreed, invalidated those ballots, and changed the

21

- 51 -

outcome of the election. *Id.* The First Circuit held that this abrupt reversal violated voters' due process rights. *Id.* at 1078. As the court explained, because absentee voters had cast their ballots in an "officially-endorsed manner," invalidating their ballots *en masse* resulted in "broad-gauged unfairness." *Id.* at 1073, 1077. The constitution forbids a state from discounting votes that had been cast in accordance with "longstanding practice" and "the instructions of the officials charged with running the election." *Id.* at 1075-76.

That principle applies fully here. The challenged election rules have long been in place without challenge—in election after election. Voters whose registration information may lack a driver's license or social security number have been permitted to vote in North Carolina elections for twenty years. *See* N.C. Sess. Law. 2003-226, §§ 9, 16, 22; N.C. Gen. Stat. §§ 163-82.4, -166.12. The same is true for UOCAVA voters, who also have been able to vote without providing a photo ID in North Carolina state elections since 2003, including after the legislature's passed general photo ID laws. *See* N.C. Gen. Stat. §§ 163-258.1. And since 2011, overseas citizens who are the children of former residents of North Carolina have been free to vote in North Carolina elections. *Id.* § 163-258.2(1)(e). None of these longstanding elections rules *ever* elicited a challenge until the current election cycle—and all of those recent challenges were unsuccessful in state and federal court prior to the election.

It is unconstitutional to punish voters for voting in accordance with prevailing election laws. Yet that is the relief Petitioner seeks: "massive *ex post* disenfranchisement," for reasons that would have been a "total surprise to the typical voter." *Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998). Had the challenged voters had *any reason* to doubt that their ballots would be counted, they could have acted accordingly—say, in the case of the UMOVA voters, by providing a copy of their photo ID. Indeed, other than the handful of overseas voters who have never lived in the United States, Petitioner has never suggested that the more than 60,000 voters he challenges are *actually* ineligible to vote in North Carolina elections. *See* N.C. Gen. Stat. § 163-55 (outlining statutory

22

qualifications to vote); N.C. Const. art. VI, § 2 (same, constitutional).  Moreover, all persons who register to vote, including those challenged here, are required to affirm that they meet all the qualifications to vote, under penalty of a Class I felony.  *See* N.C. Gen. Stat. § 163-82.4(c)(1), (e); *see also* North Carolina Voter Registration Form, Section 11,

https://s3.amazonaws.com/dl.ncsbe.gov/Voter_Registration/NCVoterRegForm_06.pdf (last visited January 1, 2025).  Petitioner thus seeks to use technicalities to disenfranchise tens of thousands of lawful North Carolina voters—again, the vast majority of whom he does not dispute are lawfully eligible to vote—because he lost an election.  The federal constitution forbids this audacious request.

The *Anderson-Burdick* test yields the same answer.  Under that test, state actions that "impose a severe burden on ballot access" are "subject to strict scrutiny."  *Pisano v. Strach,* 743 F.3d 927, 933 (4th Cir. 2014).  The relief Petitioner seeks would impose the most severe possible burden—mass disenfranchisement—while advancing only peripheral state interests at best.  Petitioner says that he prevails under *Anderson-Burdick* because he is merely asking the Board to enforce evenhanded state laws.  *See* D.E. 1-4 at 70-71.  That framing is deeply misleading.  Asking voters to append a driver's license or social security number to their registration would perhaps impose a "modest burden" *before an election takes place*.  But the relevant action here is Petitioner's request to nullify those voters' ballots *after the fact*.  Doing so is plainly unconstitutional under *Anderson-Burdick*.[4]

---

[4]     Petitioner compares this case to *James v. Bartlett*, 359 N.C. 260 (2005).  There, the North Carolina Supreme Court discounted provisional ballots that were cast outside of voters' assigned precincts.  *Id.* at 271.  *James* is nothing like this case.  Unlike here, the election in *James* was the "first time in North Carolina history that State election officials counted out-of-precinct provisional ballots."  *Id.* at 265.  Relevant statutes and the Board's own regulations at the time indicated that "voters must cast ballots . . . in their precincts of residence."  *Id.* at 267-68.  And the Board's own general counsel had advised before the election that such ballots would not be counted.  *Id.* at 265.  When the Board counted out-of-precinct ballots anyway, the state supreme court rightly reversed.  In contrast here, state law, the Board's regulations, and judicial decisions issued before the election all affirmed that the ballots Petitioner challenges *would* be counted.

23

For a separate reason, sustaining Petitioner's protests would also violate the Equal Protection Clause. "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 90, 104-05 (2000) (per curiam). But were Petitioner to prevail, "the standards for accepting or rejecting" ballots would "vary" for wholly arbitrary reasons. *Id.* The vast majority of the ballots Petitioner seeks to invalidate were cast by voters (1) whose registration records are missing driver's license or social security numbers, and (2) voted *before* election day (either absentee, or early in-person). He has not challenged voters who voted *on election day*—and who also lacked a driver's license or social security number in their records. *See, e.g.*, *RNC*, 120 F.4th at 398 (noting allegation that 225,000 registered voters were missing this data in their records). By seeking only to invalidate pre-election day votes, Petitioner would force the Board to arbitrarily "valu[e] one person's vote over that of another." *Bush*, 531 U.S. at 104-05; *see Lecky v. Virginia State Bd. of Elections*, 285 F. Supp. 3d 908, 920 (E.D. Va. 2018) ("Courts have generally found equal protection violations where a lack of uniform standards and procedures results in arbitrary and disparate treatment of different voters.").

In sum, the "retroactive invalidation" of votes that Petitioner seeks would amount to "patent and fundamental unfairness"; severely burden ballot access without any meaningful countervailing state interest; and arbitrarily "value one person's vote over that of another." *Griffin*, 570 F.2d at 1079-80; *Pisano,* 743 F.3d 927 at 933; *Bush*, 531 U.S. at 104-05. Relief of this kind violates several federal civil-rights statutes, as well as the Fourteenth Amendment.

**C. Petitioner's protests are all unlikely to succeed on their merits.**

A preliminary injunction should also be denied because Petitioner is unlikely to succeed on the merits of any of his three election protests.

24

- 54 -

### i.  Petitioner's HAVA protest is meritless.

Petitioner seeks to cancel the votes of roughly 60,000 voters who lack a recorded driver's license or social security number in the Board's voter registration database because, he claims, those registrations violated HAVA.  But Petitioner has not established a violation of HAVA here.

To begin, Petitioner has not adequately alleged or shown facts that would establish a violation of law.  Petitioner assumes that if a driver's license or social security number is not recorded in the Board's database that necessarily means the voters were improperly registered.  D.E. 1-4 at 33.  But that assumption is based on a false premise.  Voters may lack this information in their records and still be legally registered.  For example, voters who have not been issued a driver's license or social security number may nonetheless register to vote using a number assigned to them by the Board.  52 U.S.C. § 21083(a)(5)(A)(ii).  In addition, voters may lack a recorded identification number in the Board's database because of a database-matching failure, for example, because of "routine data-entry errors by county workers."  D.E. 1-5 at 16, 64-65, n.16.  But HAVA does not treat such voters as improperly registered.  *See* 52 U.S.C. § 21083(a)(5)(A), (b).  Critically, Petitioner has failed to allege, let alone show, that any of the 60,000 voters he targets fall outside these circumstances where HAVA explicitly allows voters to register and vote without a driver's license or social security number in the State's voter registration database.  D.E. 1-5 at 55-57.  His claim fails for this reason alone.

Petitioner is also incorrect on the law.  At the outset, Petitioner contends that HAVA does not apply here, because the statute governs only federal elections.  But as discussed above, the North Carolina legislature has expressly applied and incorporated HAVA's federal-election requirements to state elections as well.  *See supra* pp 4-5.  HAVA is thus squarely at issue.

When Petitioner addresses HAVA, his arguments are unpersuasive.  Petitioner is correct that HAVA generally prohibits a State from accepting or processing a voter-registration application unless it includes a driver's license number or the last four digits of a social-security number.  52 U.S.C. § 21083(a)(5)(A)(i)(I)-(II).  But Petitioner proceeds as if this were HAVA's only provision.  D.E. 1-4 at

25

35.  To the contrary, as discussed, HAVA elsewhere allows some voters to register and cast ballots absent this information.  For example, voters who have not been issued a driver's license or social security number may register to vote.  Moreover, HAVA permits a voter to register when they provide one of these numbers but that number does not validate against other government databases.  52 U.S.C. § 21083(a)(5)(A)(iii).  In North Carolina, when a number does not validate, it is not retained and the voter's database record will lack a number.  D.E. 1-5, p. 56.  Thus, there are voters within this group who *did* provide a driver's license or social security number when registering, but because it did not validate, the statewide database lacks an entry in that data field.  *Id.*  In addition, when voters register by mail, HAVA allows voters whose registration application lacks an identification number to cast ballots by providing a HAVA ID.  And the Board requires a HAVA ID for individuals who are voting for the first time and who, at the time of registration, did not provide a driver's license number or the last four digits of their social security number.  *See supra* p 4.  Thus, no voter could have cast a ballot without at least first presenting election officials with a HAVA ID—just as federal law requires.

Petitioner is thus left to argue that North Carolina state law seeking to *implement* HAVA somehow imposes more requirements than HAVA does.  But these arguments fail.  As discussed above, the North Carolina legislature has applied HAVA to state elections and maintains a unified voter-registration system for both federal and state contests.  *See supra* pp 4-5.  HAVA, not state law, thus provides the relevant rule of decision.

In sum, Petitioner's claim under HAVA is fatally flawed.

### ii.    Petitioner's "never resident" protest is meritless.

Petitioner also seeks to cancel the votes of citizens living abroad who have never resided in the United States but whose parents resided in North Carolina before moving abroad.  D.E. 1-4 at 41. In 2011, the North Carolina legislature enacted a statute specifically granting this group of citizens the right to vote in North Carolina.  N.C. Gen. Stat. § 163-258.2(1)(e).

- 56 -

Petitioner claims that this statute is unlawful because the North Carolina Constitution requires that voters have "resided in the State of North Carolina for one year . . . preceding an election." D.E. 1-4 at 45 (quoting N.C. Const. art. VI, § 2(1)). But a North Carolina court recently rejected this exact argument. In *Kivett v. North Carolina State Board of Elections*, a state trial court held that the plaintiffs in that case "failed to persuade this court that they are more likely than not to succeed" in proving that the provision is unconstitutional. No. 24 CV 031557-910 (Wake Cnty. Sup. Ct.), Order ¶ 6, *supersedeas denied*, No. P24-735 (N.C. Ct. App.), *pet. for writ of supersedeas and disc. review pending*, No. 281P24 (N.C.).

The state court's conclusion was correct. To start, Petitioner misstates the constitutional provision. For elections to state offices, the North Carolina Constitution guarantees that "[a]ny person who has resided in the State of North Carolina for one year . . . preceding an election . . . shall be entitled to vote at any election held in this State." N.C. Const., art. VI, § 2(1). This provision does not *forbid* anyone from voting. Instead, it *guarantees* that certain persons have the right to vote in North Carolina. The state statute granting a small subset of overseas voters the right to vote is thus entirely consistent with the constitutional provision.

Even if this Court were to adopt Petitioner's reading of the state constitution, contrary to the only state court to have construed it, that reading would stand in considerable tension with federal law. Specifically, in *Dunn v. Blumstein*, 405 U.S. 330 (1972), the Supreme Court held that a one-year residency requirement violated the Equal Protection Clause. *Id.* at 334. While "bona fide residence requirements" are still valid, the Court explicitly rejected such a long temporal residency requirement. *Id.*; *accord Lloyd v. Babb*, 296 N.C. 416, 439, 251 S.E.2d 843, 858 (1979). If the state constitutional provision on which Petitioner relies were to be read as a residency requirement, it is durational and would violate the federal constitution.

Petitioner disagrees, claiming that *Dunn* turns an unconstitutional durational residency requirement into a "bona fide" residency requirement that prohibits persons who have never resided

27

in North Carolina from voting. D.E. 1-4 at 48. But as noted, nothing in the state constitution *requires* voters to have resided in North Carolina for any amount of time. Thus, nothing forecloses the state legislature from enfranchising this small subset of overseas voters.[5]

### iii.    Petitioner's UOCAVA protest is meritless as well.

Petitioner finally seeks to cancel the votes of a third group of voters—military and overseas voters who followed North Carolina statutory law and the Board's guidance by not including a photocopy of their identification with their absentee ballot. D.E. 1-4 at 53. But under the rules in place at the time of the election, "[m]ilitary and [o]verseas . . . voter[s]" were "not required to submit a photocopy of acceptable photo identification" or an affidavit explaining their reason for not doing so. 08 N.C. Admin. Code 17.0109(d). Petitioner apparently fails to comprehend that absentee ballots in North Carolina can be submitted under two different sets of rules—one for civilian residents, and one for overseas and military voters. For civilian residents, absentee ballots must be cast under Article 20 of Chapter 163 of the General Statutes. Under that article, all absentee ballots must "accompanied by a photocopy of [an] identification" or an "affidavit." N.C. Gen. Stat. § 163-230.1(f1). By its own terms, however, this requirement is limited to only a certain category of voters. The statute states that "ballots [voted] *under this section* shall be accompanied by a photocopy of identification." *Id.* (emphasis added).

But the voters subject to Petitioner's protest did not cast ballots under that section. Instead, Petitioner challenges military and overseas voters who submitted absentee ballots under the rules found in Article 21A. The North Carolina General Assembly enacted UMOVA in Article 21A

---

[5]    Petitioner strangely claims that his rule would only affect non-military overseas voters in state contests—not military voters, or votes cast in federal contests. D.E. 1-4 at 37. But he presents no principled limit on his arguments that could possibly explain this position. Petitioner cannot limit the logical scope of his legal arguments through bare assertions. And by asking to disenfranchise only a subset of identically situated overseas voters, Petitioner again requests relief that would violate the Equal Protection Clause. *See supra* p 24.

28

- 58 -

explicitly to implement a federal law, UOCAVA, which requires states to allow military and overseas voters to register, request ballots, and vote by mail in federal elections using specific federal forms. *See* 52 U.S.C. §§ 20301-11.  In implementing UOCAVA through UMOVA in Article 21A, the General Assembly chose to allow military and overseas voters to vote in both federal *and state* elections under the same sets of rules.  *See, e.g.*, N.C. Gen. Stat. § 163-258.3; *supra* p 5.

Neither UOCAVA nor UMOVA require military and overseas voters to provide a photocopy of an identification with their absentee ballots.  Rather, UMOVA calls for a voter's identity to be verified through other means, which do not require photocopied identification.  *See, e.g.*, N.C. Gen. Stat. §§ 163-258.4(e), -258.13, -258.17(b).  In short, these voters correctly cast their absentee ballots under UMOVA's rules and were under no obligation to include a photocopy of identification with their absentee ballots.  *See* D.E. 1-5 at 43, 72-79.[6]

## CONCLUSION

For the foregoing reasons, the State Board of Elections respectfully submits that this Court should retain jurisdiction and deny the motion for a preliminary injunction.

This 1st day of January, 2025.

<div style="margin-left: 40%;">

/s/ Mary Carla Babb
Mary Carla Babb
Special Deputy Attorney General
N.C. State Bar No. 25731
MCBabb@ncdoj.gov

Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
TSteed@ncdoj.gov

North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602

</div>

---

[6]    Petitioner also suggests that Article 21A might violate the state constitution. D.E. 1-4 at 59. Because Petitioner does not provide any citations to support this argument, it is abandoned. *Root v. Robinson*, No. 5:20-cv-00239-M, 2021 WL 2601045 at *3 n.3 (E.D.N.C. June 24, 2021).

Phone: 919-716-6900
Fax: 919-716-6758

*Counsel for Respondent*

30

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.2(f)(3)**

Undersigned counsel certifies that this memorandum of law complies with Local Rule 7.2(f)(3) in that the brief, including headings, footnotes, citations, and quotations, contains no more than 30 pages.

This 1st day of January 2025.

/s/ Mary Carla Babb
Mary Carla Babb
Special Deputy Attorney General

# EXHIBIT 3

No. 320P24

### SUPREME COURT OF NORTH CAROLINA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| JEFFERSON GRIFFIN | From N.C. Board of Elections |
| v. | |
| NORTH CAROLINA BOARD OF ELECTIONS | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

<u>ORDER</u>

On 18 December 2024, petitioner filed a petition for writ of prohibition and motion for temporary stay related to the 2024 election for a Seat 6 on Supreme Court of North Carolina. Prior to filing a response or this Court taking action on petitioner's filings, respondent Board of Elections filed with this Court on 19 December 2024 a notice of removal of this action to the United States District Court for the Eastern District of North Carolina. On 6 January 2025, the United States District Court for the Eastern District of North Carolina remanded the matter to this Court.

Even though we received notice from the Board of Elections of its appeal of the order from the United States District Court for the Eastern District of North Carolina, in the absence of a stay from federal court, this matter should be addressed expeditiously because it concerns certification of an election.

Therefore, petitioner's motion for temporary stay is allowed, and the Court upon its own motion sets the following expedited briefing schedule concerning the writ of prohibition:

- 63 -

GRIFFIN V. STATE BOARD OF ELECTIONS

No. 320P24

*Order of the Court*

1. Petitioner shall file his brief on or before 14 January 2025;

2. Respondent shall file its response on or before 21 January 2025; and

3. Petitioner shall file his reply brief on or before 24 January 2025.

By order of the Court in Conference, this the 7th day of January 2025.

/s/ Allen, J.
For the Court

Riggs, J., recused

Earls, J. dissents on the grounds that the standard for a temporary stay has not been met here, where there is no likelihood of success on the merits and the public interest requires that the Court not interfere with the ordinary course of democratic processes as set by statute and the state constitution.
Further dissents or concurrences, if any, will be filed through an Amended Order.

WITNESS my hand and the seal of the Supreme Court of North Carolina, this the 7th day of January 2025.



Grant E. Buckner
Clerk of the Supreme Court

Copy to:
Mr. Troy D. Shelton, Attorney at Law, For Griffin, Jefferson - (By Email)
Ms. Sarah G. Boyce, Deputy Attorney General, For State Board of Elections - (By Email)
Ms. Mary Carla Babb, Special Deputy Attorney General, For State Board of Elections - (By Email)
Mr. Terrence Steed, Special Deputy Attorney General, For State Board of Elections - (By Email)

GRIFFIN V. STATE BOARD OF ELECTIONS

No. 320P24

*Order of the Court*

Mr. Craig D. Schauer, Attorney at Law, For Griffin, Jefferson - (By Email)
Mr. W. Michael Dowling, Attorney at Law, For Griffin, Jefferson - (By Email)
Mr. Philip Thomas, Attorney, For Griffin, Jefferson - (By Email)
Mr. Paul Mason Cox, Special Deputy Attorney General, For State Board of Elections - (By Email)
Mr. Raymond M. Bennett, Attorney at Law - (By Email)
Mr. Samuel B. Hartzell, Attorney at Law - (By Email)
Mr. John R. Wallace, Attorney at Law - (By Email)
Ms. Shana L. Fulton, Attorney at Law - (By Email)
Mr. William A. Robertson, Attorney at Law - (By Email)
Mr. James W. Whalen, Attorney at Law - (By Email)
West Publishing - (By Email)
Lexis-Nexis - (By Email)

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will automatically serve electronic copies on all counsel of record.

This the 7th day of January, 2025.

<u>/s/ Mary Carla Babb</u>
Mary Carla Babb
Special Deputy Attorney General
N.C. State Bar No. 25731
MCBabb@ncdoj.gov