Nos. 25-1018, 25-1019, 25-1024

In the United States Court of Appeals
for the Fourth Circuit

JEFFERSON GRIFFIN,

*Petitioner-Appellee*,

v.

NORTH CAROLINA STATE BOARD OF ELECTIONS,

*Respondent-Appellant*,

and

ALLISON RIGGS, et al.,

*Intervenor-Respondents*.

On Appeal from the United States District Court
for the Eastern District of North Carolina

**JOINT APPENDIX**

(*Counsel listed on inside cover*)

Nicholas S. Brod
Deputy Solicitor General

Mary Carla Babb
Terence Steed
Special Deputy Attorneys General

NC Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
(919) 716-6400
nbrod@ncdoj.gov
mcbabb@ncdoj.gov
tsteed@ncdoj.gov

*Counsel for North Carolina State Board
of Elections*

Christopher D. Dodge
Lalitha Devi Madduri
Tina Meng Morrison
ELIAS LAW GROUP LLP
Suite 400
250 Massachusetts Avenue NW
Washington, DC 20001
cdodge@elias.law
lmadduri@elias.law
tmengmorrison@elias.law

Narendra K. Ghosh
PATTERSON HARKAVY, LLP
Suite 420
100 Europa Drive
Chapel Hill, NC 27517
nghosh@pathlaw.com

*Counsel for North Carolina Alliance for
Retired Americans et al.*

Kyle D. Hawkins
William Thomas Thompson
LEHOTSKY KELLER COHN LLP
5th Floor
408 West 11th Street
Austin, TX 78701
kyle@lkcfirm.com
will@lkcfirm.com

Mark Montgomery Rothrock
LEHOTSKY KELLER COHN LLP
8513 Caldbeck Drive
Raleigh, NC 27615
mark@lkcfirm.com

William Michael Dowling
Craig Daniel Schauer
Troy Dean Shelton
DOWLING FIRM PLLC
Suite 260
3801 Lake Boone Trail
Raleigh, NC 27607
mike@dowlingfirm.com
cschauer@dowlingfirm.com
tshelton@dowlingfirm.com

*Counsel for Jefferson Griffin*

Raymond Michael Bennett
Samuel B. Hartzell
WOMBLE BOND DICKINSON (US)
LLP
Suite 1100
555 Fayetteville Street
Raleigh, NC 27601
ray.bennett@wbd-us.com
sam.hartzell@wbd-us.com

*Counsel for Allison Riggs*

## Table of Contents

| Document | Dkt | Page |
|---|---|---|
| Trial Court Docket | | JA1 |
| Notice of Removal | 1 | JA13 |
| Petition for Writ of Prohibition | 1-4 | JA19 |
| Excerpts of Appendix to Writ of Prohibition | | |
|     State Board's December 13 decision and order | 1-5, at 41-83 | JA105 |
|     Affidavit of Kyle Offerman | 1-5 at 174-178 | JA148 |
|     Affidavit of Ryan Bonifay | 1-5, at 379-382 | JA153 |
| Motion to Intervene by North Carolina Alliance for Retired Americans et al. | 24 | JA157 |
| Exhibits in Support of Motion to Intervene | | |
|     Exhibit 1: Dworkin Declaration | 24-1 | JA159 |
|     Exhibit 2: Webster-Durham Declaration | 24-2 | JA163 |
|     Exhibit 3: Smith Declaration | 24-3 | JA165 |
|     Exhibit 4: Anderson Declaration | 24-4 | JA167 |
|     Exhibit 5: Mellman Declaration | 24-5 | JA169 |

| Document | Dkt | Page |
|---|---|---|
| Motion for Preliminary Injunction | 31 | JA172 |
| Memorandum in support of motion for preliminary injunction | 32 | JA175 |
| Notice of State Board's December 27 decision and order | 38 | JA198 |
| State Board's December 27 decision and order | 38-1 | JA201 |
| State Board's response in opposition to motion for preliminary injunction | 39 | JA223 |
| Reply in support of motion for preliminary injunction | 47 | JA254 |
| Motion to remand | 48 | JA267 |
| Memorandum in support of motion to remand | 49 | JA270 |
| Order on motion for preliminary injunction | 50 | JA301 |
| Letter regarding remand to the North Carolina Supreme Court | 51 | JA328 |
| State Board's notice of appeal | 52 | JA329 |
| North Carolina Alliance for Retired Americans et al. notice of appeal | 54 | JA331 |
| Justice Riggs's notice of appeal | 58 | JA333 |
| *Griffin v. N.C. Bd. of Elecs.*, Amended Order, No. 320P24 (N.C. Jan. 7, 2025) | | JA334 |

**Query   Reports   Utilities   Help   Log Out**

APPEAL,CLOSED

# U.S. District Court
# EASTERN DISTRICT OF NORTH CAROLINA (Western Division)
## CIVIL DOCKET FOR CASE #: 5:24-cv-00724-M-RN

Griffin v. North Carolina State Board of Elections

Assigned to: Chief Judge Richard E. Myers, II

Referred to: Magistrate Judge Robert T. Numbers, II

Case in other court:  USCA, 25-01018

                   USCA, 25-01019

                   USCA, 25-01024

                   North Carolina Supreme Court, 320P24

Cause: 28:1442 Petition for Removal

Date Filed: 12/19/2024

Date Terminated: 01/06/2025

Jury Demand: None

Nature of Suit: 441 Civil Rights: Voting

Jurisdiction: Federal Question

**Plaintiff**

**Jefferson Griffin**

represented by   **Mark Montgomery Rothrock**
Lehotsky Keller Cohn LLP
8513 Caldbeck Drive
Raleigh, NC 27615
336-416-3326
Email: mark@lkcfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Troy D. Shelton**
Dowling PLLC
3801 Lake Boone Trail
Ste 260
Raleigh, NC 27606
919-529-3351
Email: tshelton@dowlingfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Craig Daniel Schauer**
Dowling PLLC
3801 Lake Boone Trail
Suite 260
Raleigh, NC 27607
919-529-3351
Fax: 919-529-3351
Email: cschauer@dowlingfirm.com
*ATTORNEY TO BE NOTICED*

**Philip R. Thomas**
Chalmers, Adams, Backer & Kaufman, LLC
204 N. Person St.
Raleigh, NC 27601

JA 1

919-670-5185
Email: pthomas@chalmersadams.com
*ATTORNEY TO BE NOTICED*

**William Michael Dowling**
Dowling PLLC
P.O. Box 27843
Raleigh, NC 27611
919-529-3351
Email: mike@dowlingfirm.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **North Carolina State Board of Elections** | represented by | **Terence Steed** |

NC Department of Justice - Public Safety
Section
P. O. Box 629
Raleigh, NC 27602
919-716-6567
Fax: 919-716-6761
Email: tsteed@ncdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mary Carla Babb**
NC Department of Justice
Post Office Box 629
Raleigh, NC 27602-0629
919-716-6573
Fax: 919-716-0001
Email: mcbabb@ncdoj.gov
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **Thomas Daschle** | represented by | **William C. McKinney** |

Haynsworth Sinkler Boyd
One N. Main St., 2nd Floor
2nd Floor
SC
Greenville, SC 29205
864-240-3271
Email: wmckinney@hsblawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **Richard Gephardt** | represented by | **William C. McKinney** |

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

JA 2

**Amicus**

**Steve Israel**                                    represented by **William C. McKinney**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**Amicus**

**Christopher Shays**                              represented by **William C. McKinney**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**Amicus**

**Robert Wexler**                                  represented by **William C. McKinney**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**Amicus**

**James Greenwood**                                represented by **William C. McKinney**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**Amicus**

**Wayne Gilchrest**                                represented by **William C. McKinney**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**Amicus**

**League of Women Voters of North**                represented by **Jessica Ann Marsden**
**Carolina**                                        Protect Democracy Project
*League of Women Voters of North Carolina,*         510 Meadowmont Village Circle, No. 328
*Susan Copland Arnold Rudolph, Heba*                Chapel Hill, NC 27517
*Salama, Jennifer Baddour, Spring Dawson-*          202-579-4582
*McClure, Iryna Merideth, and Rani Dasi*            Email: jess.marsden@protectdemocracy.org
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

V.

**Intervenor**

**Allison Riggs**                                  represented by **Raymond M. Bennett**
                                                    Womble Bond Dickinson (US) LLP
                                                    555 Fayetteville Street, Suite 1100
                                                    Raleigh, NC 27601
                                                    919-755-2158
                                                    Fax: 919-755-6068
                                                    Email: ray.bennett@wbd-us.com
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

JA 3

**Samuel B. Hartzell**
Womble Bond Dickinson (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
(919) 755-2112
Fax: (919) 755-6772
Email: Sam.Hartzell@wbd-us.com
*ATTORNEY TO BE NOTICED*

**Intervenor**

**North Carolina Alliance for Retired Americans**          represented by     **Narendra K. Ghosh**
Patterson Harkavy LLP
100 Europa Drive, Suite 420
Chapel Hill, NC 27517
919-942-5200
Fax: 919-942-5256
Email: nghosh@pathlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher D. Dodge**
Elias Law Group LLP
250 Massachusetts Ave NW
Suite 400
Washington, DC 20001
202-987-4928
Email: cdodge@elias.law
*ATTORNEY TO BE NOTICED*

**Julie Zuckerbrod**
Elias Law Group LLP
250 Massachusetts Ave NW
Suite 400
Washington, DC 20001
202-987-5680
Email: jzuckerbrod@elias.law
*ATTORNEY TO BE NOTICED*

**Tina Meng Morrison**
Elias Law Group LLP
250 Massachusetts Ave NW
Suite 400
Washington, DC 20001
718-909-8665
Email: tmengmorrison@elias.law
*ATTORNEY TO BE NOTICED*

**Intervenor**

**VoteVets Action Fund**          represented by     **Narendra K. Ghosh**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

JA 4

**Christopher D. Dodge**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julie Zuckerbrod**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tina Meng Morrison**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Tanya Webster-Durham**                represented by   **Narendra K. Ghosh**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher D. Dodge**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julie Zuckerbrod**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tina Meng Morrison**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Sarah Smith**                represented by   **Narendra K. Ghosh**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher D. Dodge**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julie Zuckerbrod**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tina Meng Morrison**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Juanita Anderson**                represented by   **Narendra K. Ghosh**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

JA 5

**Christopher D. Dodge**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julie Zuckerbrod**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tina Meng Morrison**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/19/2024 | 1 | NOTICE OF REMOVAL by NORTH CAROLINA STATE BOARD OF ELECTIONS from SUPREME COURT OF NORTH CAROLINA, case number 320P24. ( Filing fee $ 405 receipt number ANCEDC-7902555), filed by NORTH CAROLINA STATE BOARD OF ELECTIONS. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet, # 2 Civil Cover Sheet Supplemental Removal Cover Sheet, # 3 Index Index of Exhibits, # 4 Exhibit A-Petition for Writ of Prohibition, # 5 Exhibit B-Appendix) (Babb, Mary) (Entered: 12/19/2024) |
| 12/19/2024 | 2 | Notice of Appearance filed by Mary Carla Babb on behalf of NORTH CAROLINA STATE BOARD OF ELECTIONS. (Babb, Mary) (Entered: 12/19/2024) |
| 12/19/2024 | 3 | Financial Disclosure Statement by NORTH CAROLINA STATE BOARD OF ELECTIONS (Babb, Mary) (Entered: 12/19/2024) |
| 12/19/2024 | 4 | Notice of Appearance filed by Terence Steed on behalf of NORTH CAROLINA STATE BOARD OF ELECTIONS. (Steed, Terence) (Entered: 12/19/2024) |
| 12/19/2024 | 5 | Notice filed by NORTH CAROLINA STATE BOARD OF ELECTIONS regarding 1 Notice of Removal, *Notice of Related Case*. (Babb, Mary) (Entered: 12/19/2024) |
| 12/19/2024 | 6 | Notice filed by NORTH CAROLINA STATE BOARD OF ELECTIONS *State Court Notice of Removal*. (Babb, Mary) (Entered: 12/19/2024) |
| 12/19/2024 | 7 | Consent MOTION to Intervene filed by Allison Riggs. (Bennett, Raymond) (Entered: 12/19/2024) |
| 12/19/2024 | 8 | Memorandum in Support regarding 7 Consent MOTION to Intervene filed by Allison Riggs. (Attachments: # 1 Exhibit Ex. 1 - Riggs Brief) (Bennett, Raymond) (Entered: 12/19/2024) |
| 12/19/2024 | 9 | Notice of Appearance filed by Raymond M. Bennett on behalf of Allison Riggs. (Bennett, Raymond) (Entered: 12/19/2024) |
| 12/19/2024 | 10 | Financial Disclosure Statement by Allison Riggs (Bennett, Raymond) (Entered: 12/19/2024) |
| 12/19/2024 | 11 | Notice of Appearance filed by Samuel B. Hartzell on behalf of Allison Riggs. (Hartzell, Samuel) (Entered: 12/19/2024) |
| 12/20/2024 | 12 | Notice of Appearance filed by Mark Montgomery Rothrock on behalf of Jefferson Griffin. (Rothrock, Mark) (Entered: 12/20/2024) |
| 12/20/2024 | 13 | MOTION for Temporary Restraining Order filed by Jefferson Griffin. (Rothrock, Mark) (Entered: 12/20/2024) |

JA 6

| 12/20/2024 | 14 | Memorandum in Support regarding 13 MOTION for Temporary Restraining Order filed by Jefferson Griffin. (Rothrock, Mark) (Entered: 12/20/2024) |
| 12/20/2024 | | NOTICE OF DEFICIENCY regarding 7 Motion to Intervene. At the direction of the court, counsel shall file a proposed order. The order must be filed electronically using the event PROPOSED ORDER located in the RESPONSES AND REPLIES category. Additionally, the judge's practice preferences MAY require counsel to email the proposed order in a word processing format. (Edwards, S.) (Entered: 12/20/2024) |
| 12/20/2024 | | NOTICE OF DEFICIENCY regarding 13 Motion for TRO. At the direction of the court, counsel shall file a proposed order. The order must be filed electronically using the event PROPOSED ORDER located in the RESPONSES AND REPLIES category. Additionally, the judge's practice preferences MAY require counsel to email the proposed order in a word processing format. (Edwards, S.) (Entered: 12/20/2024) |
| 12/20/2024 | 15 | Proposed Order regarding 13 MOTION for Temporary Restraining Order filed by Jefferson Griffin. (Rothrock, Mark) (Entered: 12/20/2024) |
| 12/20/2024 | | Notice to Counsel - All Counsel shall file a Notice of Appearance pursuant to Local Civil Rule 5.2(a). (Rudd, D.) (Entered: 12/20/2024) |
| 12/20/2024 | | NOTICE OF DEFICIENCY - Failure to File Financial Disclosure Statement as to Jefferson Griffin. Pursuant to 7.1 of the Federal Rules of Civil Procedure and Local Civil Rule 7.3, all parties shall file a financial disclosure statement. A negative statement is required if a party has no disclosures to make. The disclosure statement must be on a form provided by the clerk. This form is available at the clerk's office and on the court's website. (Rudd, D.) (Entered: 12/20/2024) |
| 12/20/2024 | 16 | Proposed Order regarding 7 Consent MOTION to Intervene filed by Allison Riggs. (Bennett, Raymond) (Entered: 12/20/2024) |
| 12/20/2024 | 17 | Financial Disclosure Statement by Jefferson Griffin (Rothrock, Mark) (Entered: 12/20/2024) |
| 12/20/2024 | 18 | Notice of Appearance filed by Craig Daniel Schauer on behalf of Jefferson Griffin. (Schauer, Craig) (Entered: 12/20/2024) |
| 12/20/2024 | 19 | Notice of Appearance filed by William Michael Dowling on behalf of Jefferson Griffin. (Dowling, William) (Entered: 12/20/2024) |
| 12/20/2024 | 20 | Notice of Appearance filed by Troy D. Shelton on behalf of Jefferson Griffin. (Shelton, Troy) (Entered: 12/20/2024) |
| 12/20/2024 | | **TEXT ORDER: This matter comes before the court on Plaintiff's motion for temporary restraining order [DE 13]. A motion for temporary restraining may only issue if the movant makes a clear showing of immediate injury. Fed R. Civ. P. 65(b)(1)(A). The factual predicate for that showing must be demonstrated by "specific facts in an affidavit or [] verified complaint." Id. With that standard in mind, Plaintiff's motion is DENIED. Defendant provided notice to Plaintiff and the court that no election certification will occur until January 3, 2025, or more likely January 6. DE 1 at 3-4. With notice of Defendants' position, Plaintiff's counsel responds in briefing that Defendants are "poised to certify the election results in a matter of days." DE 14 at 1. The statements of counsel in briefing are not "specific facts in an affidavit or [] verified complaint," and the court finds that Plaintiff has failed to make a clear showing that he will suffer immediate injury before Defendant can be heard in opposition. Fed. R. Civ. P. 65(b)(1)(A). Entered by Chief U.S. District Judge Richard E. Myers II on 12/20/2024.** (McNally, Kimberly) (Entered: 12/20/2024) |

JA 7

| 12/21/2024 | 21 | Notice of Special Appearance for non-district by Christopher D. Dodge on behalf of North Carolina Alliance for Retired Americans, VoteVets Action Fund, Tanya Webster-Durham, Sarah Smith, Juanita Anderson. (Dodge, Christopher) (Entered: 12/21/2024) |
| 12/21/2024 | 22 | Notice of Special Appearance for non-district by Julie Zuckerbrod on behalf of North Carolina Alliance for Retired Americans, VoteVets Action Fund, Tanya Webster-Durham, Sarah Smith, Juanita Anderson. (Zuckerbrod, Julie) (Entered: 12/21/2024) |
| 12/21/2024 | 23 | Notice of Appearance filed by Narendra K. Ghosh on behalf of North Carolina Alliance for Retired Americans, VoteVets Action Fund, Tanya Webster-Durham, Sarah Smith, Juanita Anderson. (Ghosh, Narendra) (Entered: 12/21/2024) |
| 12/21/2024 | 24 | MOTION to Intervene *as Defendants* filed by North Carolina Alliance for Retired Americans, VoteVets Action Fund, Tanya Webster-Durham, Sarah Smith, Juanita Anderson. (Attachments: # 1 Exhibit 1 -- Dworkin Declaration, # 2 Exhibit 2 -- Webster-Durham Declaration, # 3 Exhibit 3 -- Smith Declaration, # 4 Exhibit 4 -- Anderson Declaration, # 5 Exhibit 5 -- Mellman Declaration, # 6 Text of Proposed Order) (Ghosh, Narendra) (Entered: 12/21/2024) |
| 12/21/2024 | 25 | Memorandum in Support regarding 24 MOTION to Intervene *as Defendants* filed by North Carolina Alliance for Retired Americans, VoteVets Action Fund, Tanya Webster-Durham, Sarah Smith, Juanita Anderson. (Ghosh, Narendra) (Entered: 12/21/2024) |
| 12/23/2024 | 26 | Financial Disclosure Statement by North Carolina Alliance for Retired Americans (Ghosh, Narendra) (Entered: 12/23/2024) |
| 12/23/2024 | 27 | Financial Disclosure Statement by VoteVets Action Fund (Ghosh, Narendra) (Entered: 12/23/2024) |
| 12/23/2024 | 28 | Financial Disclosure Statement by Juanita Anderson (Ghosh, Narendra) (Entered: 12/23/2024) |
| 12/23/2024 | 29 | Financial Disclosure Statement by Sarah Smith (Ghosh, Narendra) (Entered: 12/23/2024) |
| 12/23/2024 | 30 | Financial Disclosure Statement by Tanya Webster-Durham (Ghosh, Narendra) (Entered: 12/23/2024) |
| 12/23/2024 | | Notice to Counsel regarding: 7 Consent Motion to Intervene. Pursuant to the Practice Preferences of Chief Judge Myers, please file a proposed order using the 'Proposed Order' event in the Responses and Replies category and link it back to the motion to which it corresponds. Please also email the proposed order in a word processing format to Documents_Judge_Myers@nced.uscourts.gov. (McNally, Kimberly) (Entered: 12/23/2024) |
| 12/23/2024 | | Motion Submitted to Chief U.S. District Judge Richard E. Myers II regarding 7 Consent MOTION to Intervene. (McNally, Kimberly) (Entered: 12/23/2024) |
| 12/23/2024 | 31 | MOTION for Preliminary Injunction filed by Jefferson Griffin. (Attachments: # 1 Exhibit A - Declaration of Craig Schauer, # 2 Exhibit B - Conferral Email, # 3 Text of Proposed Order Granting Preliminary Injunction) (Rothrock, Mark) (Entered: 12/23/2024) |
| 12/23/2024 | 32 | Memorandum in Support regarding 31 MOTION for Preliminary Injunction filed by Jefferson Griffin. (Rothrock, Mark) (Entered: 12/23/2024) |
| 12/23/2024 | 33 | Consent MOTION to Expedite *Briefing* filed by Jefferson Griffin. (Attachments: # 1 Text of Proposed Order Granting Consent Motion to Expedite Briefing) (Rothrock, Mark) (Entered: 12/23/2024) |
| 12/26/2024 | | Notice to Counsel regarding: 33 Motion to Expedite Briefing. Pursuant to the Practice Preferences of Chief Judge Myers, please also email the proposed order in a word |

| | | |
|---|---|---|
| | | processing format to Documents_Judge_Myers@nced.uscourts.gov. (McNally, Kimberly) (Entered: 12/26/2024) |
| 12/26/2024 | | Motion Submitted to Chief U.S. District Judge Richard E. Myers II regarding 33 Consent MOTION to Expedite *Briefing*. (McNally, Kimberly) (Entered: 12/26/2024) |
| 12/26/2024 | 34 | Notice of Appearance filed by Philip R. Thomas on behalf of Jefferson Griffin. (Thomas, Philip) (Entered: 12/26/2024) |
| 12/26/2024 | | **TEXT ORDER: This matter comes before the court on Justice Allison Riggs' consent motion to intervene [DE 7], the North Carolina Alliance for Retired Americans, VoteVets Action Fund, Tanya Webster-Durham, Sarah Smith, and Juanita Anderson's (the "Voters and Organizations") motion to intervene [DE 24], and Judge Jefferson Griffin and the North Carolina State Board of Elections' (the "NCSBE") consent motion to expedite the briefing schedule for Judge Griffin's motion for preliminary injunction [DE 33]. The court GRANTS intervention as of right to Justice Riggs and permissive intervention to the Voters and Organizations pursuant to Rule 24 of the Federal Rules of Civil Procedure. Further, the court GRANTS the motion for expedited briefing in connection with the motion for preliminary injunction. The NCSBE and Intervenors shall file responses to Judge Griffin's motion on or before January 1, 2025. As part of its response, the NCSBE is ordered to SHOW CAUSE why this matter should not be remanded to the North Carolina Supreme Court for lack of subject-matter jurisdiction. Judge Griffin shall file a reply on or before January 3, and may respond to the NCSBE's arguments related to subject-matter jurisdiction at that time. Entered by Chief U.S. District Judge Richard E. Myers II on 12/26/2024.** (McNally, Kimberly) (Entered: 12/26/2024) |
| 12/31/2024 | 35 | Notice of Special Appearance for non-district by Tina Meng Morrison on behalf of North Carolina Alliance for Retired Americans, VoteVets Action Fund, Tanya Webster-Durham, Sarah Smith, Juanita Anderson. (Morrison, Tina) (Entered: 12/31/2024) |
| 12/31/2024 | 36 | Amicus Curiae APPEARANCE entered by William C. McKinney on behalf of Thomas Daschle, Richard Gephardt, Steve Israel, Christopher Shays, Robert Wexler, James Greenwood, Wayne Gilchrest (McKinney, William) (Entered: 12/31/2024) |
| 12/31/2024 | 37 | MOTION for Leave to File *Amicus Curiae Brief in Opposition to Remand* filed by Thomas Daschle, Richard Gephardt, Steve Israel, Christopher Shays, Robert Wexler, James Greenwood, Wayne Gilchrest. (Attachments: # 1 Exhibit A - Motion for Leave to File Amicus Brief) (McKinney, William) (Entered: 12/31/2024) |
| 12/31/2024 | 38 | Notice filed by Jefferson Griffin . (Attachments: # 1 Exhibit A - State Board's Order Denying Remaining Protests, # 2 Exhibit B - State Board's Representation) (Rothrock, Mark) Modified on 1/2/2025 to create docket entry relationship with the corresponding motion (McNally, Kimberly). (Entered: 12/31/2024) |
| 01/01/2025 | 39 | RESPONSE in Opposition regarding 31 MOTION for Preliminary Injunction *and the Court's Show Cause Order* filed by North Carolina State Board of Elections. (Babb, Mary) (Entered: 01/01/2025) |
| 01/01/2025 | 40 | RESPONSE to Motion regarding 31 MOTION for Preliminary Injunction filed by Allison Riggs. (Attachments: # 1 Order Denying Pls. Mot., Kivett v. N.C. State Bd. Elections, No. 24CV031557-910 (N.C. Super. Ct. Oct. 21, 2024), # 2 Order, Kivett v. N.C. State Bd. Elections, No. P24-735 (N.C. Ct. App. Oct. 29, 2024), # 3 Pls. Pet. Writ Supersedeas & Discret. Rev., Kivett v. N.C. State Bd. Elections, No. 281P24 (N.C. filed Nov. 1, 2024)) (Bennett, Raymond) (Entered: 01/01/2025) |
| 01/01/2025 | 41 | First MOTION for Leave to File *Amicus Brief* filed by League of Women Voters of North Carolina. (Attachments: # 1 Exhibit Proposed Amicus Brief) (Marsden, Jessica) (Entered: |

| | | |
|---|---|---|
| | | 01/01/2025) |
| 01/01/2025 | 42 | RESPONSE in Opposition regarding 31 MOTION for Preliminary Injunction filed by North Carolina Alliance for Retired Americans, VoteVets Action Fund, Tanya Webster-Durham, Sarah Smith, Juanita Anderson. (Ghosh, Narendra) (Entered: 01/01/2025) |
| 01/02/2025 | | Notice to Counsel regarding: 41 Motion for Leave to File *Amicus Brief* . Please file a Notice of Appearance pursuant to Local Civil Rule 5.2(a). (McNally, Kimberly) (Entered: 01/02/2025) |
| 01/02/2025 | | Notice to Counsel regarding: 37 Motion for Leave to File *Amicus Brief* and 41 Motion for Leave to File *Amicus Brief* . Pursuant to the Practice Preferences of Chief Judge Myers, please file a proposed order using the 'Proposed Order' event in the Responses and Replies category and link it back to the motion to which it corresponds. Please also email the proposed order in a word processing format to Documents_Judge_Myers@nced.uscourts.gov. Additionally, counsel's motion does not comply with Chief Judge Myers's practice preferences as it relates to prior consultation with other parties and their views of the requests made within the motion. Counsel should file a **supplemental statement (not a motion)** containing the movant's efforts to confer with other parties and their position on the relief requested. (McNally, Kimberly) (Entered: 01/02/2025) |
| 01/02/2025 | 43 | Amicus Curiae APPEARANCE entered by Jessica Ann Marsden on behalf of League of Women Voters of North Carolina (Marsden, Jessica) (Entered: 01/02/2025) |
| 01/02/2025 | 44 | Proposed Order regarding 41 First MOTION for Leave to File *Amicus Brief* filed by League of Women Voters of North Carolina. (Marsden, Jessica) (Entered: 01/02/2025) |
| 01/02/2025 | 45 | Notice filed by Thomas Daschle, Richard Gephardt, Steve Israel, Christopher Shays, Robert Wexler, James Greenwood, Wayne Gilchrest regarding 37 MOTION for Leave to File *Amicus Curiae Brief in Opposition to Remand - Supplemental Statement to Motion for Leave*. (McKinney, William) (Entered: 01/02/2025) |
| 01/02/2025 | 46 | Proposed Order *as to Motion for Leave to File Amicus Curiae Brief in Opposition to Remand* filed by Thomas Daschle, Richard Gephardt, Steve Israel, Christopher Shays, Robert Wexler, James Greenwood, Wayne Gilchrest. (McKinney, William) (Entered: 01/02/2025) |
| 01/03/2025 | 47 | REPLY to Response to Motion regarding 31 MOTION for Preliminary Injunction filed by Jefferson Griffin. (Rothrock, Mark) (Entered: 01/03/2025) |
| 01/03/2025 | 48 | MOTION to Remand filed by Jefferson Griffin. (Attachments: # 1 Text of Proposed Order Granting Motion to Remand) (Rothrock, Mark) (Entered: 01/03/2025) |
| 01/03/2025 | 49 | Memorandum in Support regarding 48 MOTION to Remand filed by Jefferson Griffin. (Rothrock, Mark) (Entered: 01/03/2025) |
| 01/06/2025 | | Motion Submitted to Chief U.S. District Judge Richard E. Myers II regarding 31 MOTION for Preliminary Injunction. (McNally, Kimberly) (Entered: 01/06/2025) |
| 01/06/2025 | | Motions Submitted to Chief U.S. District Judge Richard E. Myers II: 37 MOTION for Leave to File *Amicus Curiae Brief in Opposition to Remand*; 41 First MOTION for Leave to File *Amicus Brief*; and 48 MOTION to Remand. (McNally, Kimberly) (Entered: 01/06/2025) |
| 01/06/2025 | 50 | **ORDER regarding 31 MOTION for Preliminary Injunction. The court has removal jurisdiction under 28 U.S.C. § 1443(2) but abstains from reaching the merits of Griffin's motion for preliminary injunction and remands this matter to the North** |

JA 10

|  |  | Carolina Supreme Court. Signed by Chief U.S. District Judge Richard E. Myers II on 1/6/2025. (McNally, Kimberly) (Entered: 01/06/2025) |
|---|---|---|
| 01/06/2025 | 51 | Letter regarding Remand to the North Carolina Supreme Court. (McNally, Kimberly) (Entered: 01/06/2025) |
| 01/06/2025 | 52 | Notice of Appeal filed by North Carolina State Board of Elections as to 50 Order,. Filing fee, receipt number 5384273. (Babb, Mary) (Entered: 01/06/2025) |
| 01/07/2025 | 53 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals regarding 52 Notice of Appeal. (Foell, S.) (Entered: 01/07/2025) |
| 01/07/2025 | 54 | Notice of Appeal filed by North Carolina Alliance for Retired Americans, VoteVets Action Fund, Tanya Webster-Durham, Sarah Smith, Juanita Anderson as to 50 Order,. Filing fee, receipt number ANCEDC-7923041. (Dodge, Christopher) (Entered: 01/07/2025) |
| 01/07/2025 | 55 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals regarding 54 Notice of Appeal. (Foell, S.) (Entered: 01/07/2025) |
| 01/07/2025 | 56 | US Court of Appeals Case Number **25-1018** (Rachel Phillips, Case Manager) as to 52 Notice of Appeal filed by **North Carolina State Board of Elections** . (Foell, S.) (Entered: 01/07/2025) |
| 01/07/2025 | 57 | US Court of Appeals Case Number **25-1019** (Rachel Phillips, Case Manager) as to 54 Notice of Appeal filed by **VoteVets Action Fund, Sarah Smith, Juanita Anderson, Tanya Webster-Durham, North Carolina Alliance for Retired Americans.** (Foell, S.) (Entered: 01/07/2025) |
| 01/07/2025 | 58 | Notice of Appeal filed by Allison Riggs as to 50 Order,. Filing fee, receipt number ANCEDC-7923813. (Bennett, Raymond) (Entered: 01/07/2025) |
| 01/07/2025 | 59 | ORDER of US Court of Appeals consolidating cases 25-1018 and 25-1019 as to 52 Notice of Appeal filed by North Carolina State Board of Elections, 54 Notice of Appeal filed by VoteVets Action Fund, Sarah Smith, Juanita Anderson, Tanya Webster-Durham, North Carolina Alliance for Retired Americans. (Foell, S.) (Entered: 01/07/2025) |
| 01/07/2025 | 60 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals regarding 58 Notice of Appeal. (Foell, S.) (Entered: 01/07/2025) |
| 01/07/2025 | 61 | US Court of Appeals Case Number **25-1024** (Rachel Phillips, Case Manager) as to 58 Notice of Appeal filed by Allison Riggs. (Foell, S.) (Entered: 01/07/2025) |
| 01/07/2025 | 62 | ORDER of US Court of Appeals. The court consolidates Case No. 25-1018 (L), Case No. 25-1019, and Case No. 25-1024. Entry of appearance forms and disclosure statements filed by counsel and parties to the lead case are deemed filed in the secondary case, as to 52 , 54 , 58 Notice of Appeal. (Foell, S.) (Entered: 01/07/2025) |
| 01/09/2025 | 63 | Notice of Special Appearance for non-district by William C. McKinney on behalf of Thomas Daschle. (McKinney, William) (Entered: 01/09/2025) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 01/14/2025 15:09:07 | | |
| **PACER Login:** | nd1379HPA | **Client Code:** | doj |
| **Description:** | Docket Report | **Search Criteria:** | 5:24-cv-00724-M-RN |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |

JA 11

JA 12

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION
### No. _____

|  |  |
|---|---|
| JEFFERSON GRIFFIN, | |
| Petitioner, | **NOTICE OF REMOVAL OF CIVIL ACTION NO. 320P24 FROM SUPREME COURT OF NORTH CAROLINA** |
| v. | |
| NORTH CAROLINA STATE BOARD OF ELECTIONS, | |
| Respondent. | |

TO:     The United States District Court for the Eastern District of North Carolina

PLEASE TAKE NOTICE THAT Defendant removes Civil Action No. 320P24 from the Supreme Court of North Carolina to this Honorable Court, pursuant to 28 U.S.C. §§ 1331, 1441(a), 1443(2), and 1367(a). In support of this notice, Defendant states the following:

1.     On December 18, 2024, Petitioner Judge Jefferson Griffin filed an original action, styled as a petition for writ of prohibition, in the North Carolina Supreme Court. He served the petition on Defendant that same day.

2.     The petition seeks declaratory rulings interpreting the Help America Vote Act (HAVA), Pub. L. No. 107-252, 116 Stat. 1666 (2002) *codified at* 52 U.S.C. § 20901, *et seq*; the National Voter Registration Act (NVRA), Pub. L. No. 103-31, 107 Stat. 77 (1993) *codified at* 52 U.S.C. § 20501, *et seq.*; the Voting Rights Act (VRA), Pub. L. No.

89-110, 79 Stat. 437 (1965) *codified in relevant part at* 52 U.S.C. § 10307; the Civil

Rights Act (CRA), Pub. L. No. 85-315, 71 Stat. 634 (1957) *codified in relevant part at* 52

U.S.C. § 10101, the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA),

Pub. L. No. 99-410, 100 Stat. 924 (1986), *codified in relevant part at* 52 U.S.C. § 20302

and the Fourteenth Amendment to the United States Constitution. Pet. 70-71 (asking the

North Carolina Supreme Court to issue an "order" that "hold[s]" that "[a]ll arguments

under the NVRA, HAVA, the VRA, and the Civil Rights Act against the relief requested

by Judge Griffin are rejected" and "all arguments under the state or federal constitution . .

. are rejected"); *see also id.* at 46-47, 54-61.

     3.     Because the petition is a civil action bringing claims arising under the laws

of the United States, this Court has original jurisdiction over such claims. 28 U.S.C.

§ 1331. Removal is therefore proper. *Id.* § 1441(a).

     4.     The petition further alleges that Defendant has refused to take certain

actions. To the extent Defendant has indeed refused to take certain actions, its refusal was

based on its obligation to comply with 52 U.S.C. § 10101(a)(2), 52 U.S.C. § 10307(a), 52

U.S.C. § 20507(c)(2)(A), and the Fourteenth Amendment of the United States

Constitution.

     5.     Because Judge Griffin has brought a civil action seeking relief for

Defendant's refusal to do an "act on the ground that [the act] would be inconsistent" with

52 U.S.C. § 10101(a)(2), 52 U.S.C. § 10307(a), and 52 U.S.C. § 20507(c)(2)(A), removal

is proper. 28 U.S.C. § 1443(2).

6.    Because Judge Griffin served his petition on Defendant on December 18, 2024, this removal notice is timely. 28 U.S.C. § 1446(b).

7.    Judge Griffin's petition incorrectly states that Defendant will issue a certificate of election to his opponent thereby mooting this case unless a court grants him a stay by Monday, December 23, 2024. Pet. 10. Under state law, Defendant cannot issue a certificate of election until thirteen days[1] after Defendant serves on both candidates a decision resolving *all* pending protests in a contest. *See* N.C. Gen. Stat. § 163-182.14(b). Judge Griffin has numerous protests that remain pending before Defendant. Defendant will hear the remaining protests on Friday, December 20, 2024, and if that hearing resolves those protests, the earliest Defendant could issue a written decision would be that same day.[2] Thus, the earliest Defendant could issue a certificate of election in this contest, if the resolution of the remaining protests is a dismissal of those protests, is Friday, January 3, 2025, assuming a stay is not obtained by or before January 2, 2025. As a practical matter, however, Defendant will likely not be able to issue its written decision

---

[1]    "An aggrieved party has the right to appeal [the State Board's] final decision to the Superior Court of Wake County within 10 days of the date of service." N.C. Gen. Stat. § 163-182.14. But when the State Board serves the parties by mail, as it did here, the parties receive an additional three days. *Id.* (citing N.C. R. Civ. P. 6(e)). Thus, even if the State Board had resolved all of Judge Griffin's protest on December 13, which it did not, no certificate of election would issue until December 27, 2024. (December 26, 2024 is a state holiday, *see* Holidays, N.C. Office of State Human Resources (last visited Dec. 18, 2024), https://oshr.nc.gov/state-employee-resources/benefits/leave/holidays#2024-2618).

[2]    *See* Notice of Meeting, N.C. State Bd. of Elections (Dec. 18, 2024), https://www.ncsbe.gov/news/press-releases/2024/12/18/state-board-meeting-december-20-2024 (noticing a meeting to consider "protests of Jefferson Griffin" that were "initially considered by county boards of elections").

that same day and it is reasonable to expect that the written decision will be issued, at the earliest, the following Monday, December 23, 2024.Therefore, the party aggrieved by a dismissal decision would have until Monday, January 6, 2025, to obtain a stay. If no stay is obtained, the certification of election would issue on Tuesday, January 7, 2025. Finally, if the protests are resolved in a manner other than dismissal following the December 20, 2024, hearing (*e.g.*, remand back to county boards of elections for further action on the protests), then no certificate of election would be issued while the protest proceedings remain pending.

8.    Pursuant to Local Rule 5.3(a)(1), copies of all process and pleadings in Defendant's possession are attached to this petition as separate distinctly titled exhibits. Defendant is also filing in the North Carolina Supreme Court notice of removal, as required by 28 U.S.C. § 1446(d), and has requested a complete copy of the state court file to be filed in this Court. A copy of that notice is included below.

Wherefore, Defendant removes to this Court Civil Action No. 320P24 from the Supreme Court of North Carolina to the United States District Court for the Eastern District of North Carolina.

Respectfully submitted, this 19th day of December 2024.

/s/ Mary Carla Babb
Mary Carla Babb
Special Deputy Attorney General
N.C. State Bar No. 25731
MCBabb@ncdoj.gov

/s/ Terence Steed
Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
TSteed@ncdoj.gov

North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
Phone: 919-716-6900
Fax: 919-716-6758

*Counsel for Defendant*

## **CERIFICATE OF SERVICE**

I certify that the foregoing Notice of Removal was filed electronically with the

Clerk of Court using the CM/ECF system which will send notification of such filing to

the below listed attorneys for Petitioner, if registered, and I have served the document

upon opposing counsel by mailing via the US Mail, first class, postage prepaid, addressed

as follows:

Craig D. Schauer
Troy D. Shelton
Dowling PLLC
3801 Lake Boone Trail
Suite 2600
Raleigh, NC 27607
(919) 529-3351
cschauer@dowlingfirm.com
tshelton@dowlingfirm.com

Philip R. Thomas
N.C. State Bar No. 53751
pthomas@chalmersadams.com
Chalmers, Adams, Backer & Kaufman, PLLC
204 N Person Street
Raleigh, North Carolina 27601
(919) 670-5185

*Counsel for Petitioner*

This the 19th day of December, 2024.

/s/ Mary Carla Babb
Mary Carla Babb
Special Deputy Attorney General

No. _____

SUPREME COURT OF NORTH CAROLINA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JEFFERSON GRIFFIN,

          Petitioner,

    v.

NORTH CAROLINA BOARD OF
ELECTIONS,

          Respondent,

From the North Carolina
State Board of Elections

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PETITION FOR WRIT OF PROHIBITION OF
THE HONORABLE JEFFERSON GRIFFIN**

**IMMEDIATE ACTION REQUESTED BEFORE
MONDAY, 23 DECEMBER 2024**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# INDEX

TABLE OF CASES AND AUTHORITIES...................................... v

SUMMARY OF REQUEST FOR RELIEF........................................1

INTRODUCTION................................................................. 2

STATEMENT OF THE FACTS...............................................5

    A.    The Election Protests ...................................5

    B.    Further Proceedings ..................................... 8

MOTION FOR TEMPORARY STAY............................................. 9

THE COURT'S POWER TO ISSUE THE WRIT OF
PROHIBITION ................................................................14

I.    The Constitution Empowers the Court to Issue Writs
to Inferior Tribunals. ................................................14

II.    The Standard for a Writ of Prohibition..................................17

ISSUES PRESENTED........................................................18

REASONS WHY THE WRIT SHOULD ISSUE ...........................18

I.    It's Unlawful to Count the Votes of People Who Did
Not Lawfully Register to Vote. ........................................... 20

    A.    State law prohibits anyone from voting unless
he has provided a drivers license or social
security number when registering to vote.................. 20

    B.    The State Board admits that it broke the law. ............23

    C.    The unlawful registrations haven't been
"cured." .................................................... 24

    D.    Judge Griffin's protests do not implicate federal
election laws................................................27

II.    The Boards of Election Cannot Count the Votes of
       People Who Have Never Lived Here. ...................................31

       A.    The state constitution forbids counting the
             votes of Never Residents. ..............................................31

       B.    The residency clause is not preempted by the
             federal constitution. .....................................................32

       C.    If UMOVA permits these votes to be counted,
             it is unconstitutional as applied to these
             circumstances. ...............................................................34

       D.    This argument has no impact on votes cast for
             federal elections, military voters, or North
             Carolina residents living overseas. ...............................37

       E.    Residency isn't inheritable under the state
             constitution's voter qualifications. ..............................38

III.   Overseas Voters Who Did Not Provide Photo
       Identification Cannot Cast a Ballot in State Elections. ..........40

       A.    Article 21A, which governs overseas absentee
             voters, incorporates Article 20's requirements
             for absentee voters. .......................................................41

       B.    Nothing in Article 21A excuses overseas voters
             from providing photo identification. ............................43

       C.    The fact that the Board issued a rule excusing
             overseas voters from providing photo
             identification does not immunize the Board's
             decision from judicial review. ......................................44

       D.    Federal law has no bearing on the photo-
             identification requirement. ...........................................46

IV.    The State Board Manufactured Procedural Defects. ............47

       A.    The protests should not have been filed as voter
             challenges. .....................................................................47

- iii -

B.    The Board wrongly dismissed the protests for lack of service. ............................................... 49

C.    Judge Griffin timely filed his protests. ....................... 52

V.    No Other Federal Statute Bars the Protests. ........................ 54

A.    The Civil Rights Act does not impact the protests. ........................................................ 54

B.    The Voting Rights Act does not impact the protests. ........................................................ 55

VI.    The Protests Comport with Equal Protection and Substantive Due Process. ....................................... 56

A.    The *Anderson-Burdick* test. ............................ 56

B.    The protests do not seek to impose severe limitations on voting. ................................... 57

C.    The laws at issue are tailored to compelling state interests. ........................................... 60

VII.    The Appropriate Remedy Is Discounting the Illegal Ballots. ................................................... 62

A.    To succeed, Judge Griffin need only provide substantial evidence of an outcome-determinative violation of election law. .................... 62

B.    Judge Griffin provided substantial evidence of outcome-determinative election-law violations. .......... 64

C.    The Board tried to cast doubts about its own data. ................................................. 66

D.    The Court should order the ineligible votes discounted and the election results retabulated. ........ 68

REQUESTED RULINGS AND RELIEF ...................................... 70

CONCLUSION ....................................................... 71

- iv -

VERIFICATION .............................................................................73

CERTIFICATE OF SERVICE .........................................................74

- v -

## TABLE OF CASES AND AUTHORITIES

### Cases

*A.L.A. Schechter Poultry Corp. v. United States*,
  295 U.S. 495 (1935) ....................................................... 51

*Adams v. N.C. Dep't of Nat. & Econ. Res.*,
  295 N.C. 683, 249 S.E.2d 402 (1978) ..................................... 51

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983) ....................................................... 65

*Appeal of Ramseur*,
  120 N.C. App. 521, 463 S.E.2d 254 (1995) ........................... 22

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
  570 U.S. 1 (2013) ......................................................... 13

*Askew v. City of Kinston*,
  906 S.E.2d 500 (N.C. Ct. App. 2024) .................................... 53

*Bayard v. Singleton*,
  1 N.C. (Mart.) 5 (1787) .................................................. 45

*Beaufort Cnty. Bd. of Educ. v. Beaufort Cnty. Bd. of Comm'rs*,
  363 N.C. 500, 681 S.E.2d 278 (2009) ................................... 20

*Bouvier v. Porter*,
  279 N.C. App. 528, 865 S.E.2d 732 (2024) ........................... 54

*Bouvier v. Porter*,
  386 N.C. 1, 900 S.E.2d 838 (2024) ................................. *passim*

*Brnovich v. Democratic Nat'l Comm.*,
  594 U.S. 647 (2021) ...................................................... 64

*Broyles v. Texas*,
  618 F. Supp. 2d 661 (S.D. Tex. 2009) .................................... 33

*Bush v. Gore*,
  531 U.S. 98 (2000). ................................................... 69, 78

*Cohoon v. Swain,*
     216 N.C. 317, 5 S.E.2d 1 (1939) ................................................12

*Colon-Marrero v. Velez,*
     813 F.3d 1 (1st Cir. 2016) ........................................................13

*Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.,*
     376 N.C. 558, 853 S.E.2d 698 (2021) ......................................17

*Crawford v. Marion Cnty. Election Bd.,*
     553 U.S. 181 (2008) ..........................................................*passim*

*Dobrovolny v. Nebraska,*
     100 F. Supp. 2d 1012 (D. Neb. 2000) ......................................33

*Dunn v. Blumstein,*
     405 U.S. 330 (1972) ..........................................................*passim*

*EchoStar Commc'ns Corp. v. FCC,*
     292 F.3d 749 (D.C. Cir. 2002) ................................................73

*Fla. State Conf. of NAACP v. Browning,*
     522 F.3d 1153 (11th Cir. 2008) .........................................*passim*

*Graham v. Nw. Bank,*
     16 N.C. App. 287, 192 S.E.2d 109 (1972)..............................61

*Greene v. Charlotte Chem. Lab'ys, Inc.,*
     254 N.C. 680, 120 S.E.2d 82 (1961).......................................19

*Harper v. Hall,*
     379 N.C. 656, 865 S.E.2d 301 (2021). ....................................15

*Harper v. Hall,*
     384 N.C. 292, 886 S.E.2d 393 (2023) ....................................71

*In re Arthur,*
     291 N.C. 640, 231 S.E.2d 614 (1977)......................................41

*In re Chastain,*
     No. 283A22-2, 2024 WL 5100940 (N.C. Dec. 13, 2024) ..... 42

*In re Election Protest of Fletcher*,
175 N.C. App. 755, 625 S.E.2d 564 (2006) ...........................12

*In re Protest of Whittacre*,
228 N.C. App. 58, 743 S.E.2d 68 (2013)................................ 11

*James v. Bartlett*,
359 N.C. 260,607 S.E.2d 638 (2005) ......................................5

*Kinsey v. Garver*,
91 N.E.2d 54 (Ohio Com. Pl. 1950) ......................................23

*La. Public Service Comm'n v. FERC*,
20 F.4th 1 (D.C. Cir. 2021) ....................................................73

*Lackey v. Dept. of Human Resources*,
306 N.C. 231, 293 S.E.2d 171 (1982)............................... 73, 75

*Libertarian Party of N.C. v. State*,
365 N.C. 41, 707 S.E.2d 199 (2011)...................................... 64

*Lloyd v. Babb*,
296 N.C. 416, 251 S.E.2d 843 (1979) .............................. *passim*

*Mansfield v. McShurley*,
911 N.E.2d 581 (Ind. Ct. App. 2009) ....................................23

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803) ................................................ 46

*Mayo v. James*,
53 Va. (12 Gratt.) 17 (1855) ..................................................18

*Mid Continent Steel & Wire, Inc. v. United States*,
940 F.3d 662 (Fed. Cir. 2019)................................................73

*Moses v. State Highway Comm'n*,
261 N.C. 316, 134 S.E.2d 664 (1964)............................... 17, 19

*Mountain Retreat Ass'n v. Mt. Mitchell Dev. Co.*,
183 N.C. 43, 110 S.E. 524 (1922)...........................................16

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
    339 U.S. 306 (1950) .................................................................59

*Munro v. Socialist Workers Party*,
    479 U.S. 189 (1986) ................................................................ 70

*N.C. Bar & Tavern Ass'n v. Cooper*,
    901 S.E.2d 355 (N.C. Ct. App. 2024) .....................................53

*N.C. State Bd. of Educ. v. State*,
    371 N.C. 149, 814 S.E.2d 54 (2018) .......................................41

*N.C. State Conf. of NAACP v. Moore*,
    382 N.C. 129, 876 S.E.2d 513 (2022) .....................................14

*Orange Cnty. v. N.C. Dep't of Transp.*,
    46 N.C. App. 350, 265 S.E.2d 890 (1980) ............................. 68

*Overton v. Mayor & City Comm'rs of City of Hendersonville*,
    253 N.C. 306, 116 S.E.2d 808 (1960) .....................................67

*Park Terrace, Inc. v. Phoenix Indem. Co.*,
    243 N.C. 595, 91 S.E.2d 584 (1956) ...................................... 20

*Perloff v. Edington*,
    293 Ala. 277, 302 So. 2d 92 (1974) .........................................23

*Pettengill v. Putnam Cnty. R-1 Sch. Dist., Unionville, Mo.*,
    472 F.2d 121 (8th Cir. 1973) ................................................. 68

*Pollock v. Parnell*,
    126 N.C. App. 358, 484 S.E.2d 864 (1997) .............................61

*Powell v. Power*,
    436 F.2d 84 (2d Cir. 1970) ................................................63, 68

*Pree v. D.C. Bd. of Elections & Ethics*,
    645 A.2d 603 (D.C. 1994) .......................................................33

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006) ................................................................... 69

- ix -

*Reynolds v. Sims*,
    377 U.S. 533 (1964) ..................................................................77

*Singleton v. N.C. Dep't of Health & Hum. Servs.*,
    906 S.E.2d 806 (N.C. 2024) ...................................................43

*State v. Allen*,
    24 N.C. (2 Ired.) 183 (1841) ..................................................20

*State v. Butler*,
    356 N.C. 141, 567 S.E.2d 137 (2002).....................................72

*State v. Ellis*,
    361 N.C. 200, 639 S.E.2d 425 (2007) ..............................19, 20

*State v. Harris*,
    216 N.C. 746, 6 S.E.2d 854 (1940).........................................52

*State v. Hunt*,
    357 N.C. 454, 591 S.E.2d 502 (2003) ....................................11

*State v. McElrath*,
    351 S.E.2d 557 (N.C. 1986) ...................................................11

*State v. Stanley*,
    288 N.C. 19, 215 S.E.2d 589 (1975) ......................................20

*State v. Taylor*,
    379 N.C. 589, 866 S.E.2d 740 (2021).....................................72

*State v. Whitaker*,
    114 N.C. 818, 19 S.E. 376 (1894) ....................................11, 16

*Storer v. Brown*,
    415 U.S. 724 (1974) ...............................................................64

*Timmons v. Twin Cities Area New Party*,
    520 U.S. 351 (1997) ...............................................................65

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008)................................................................14

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ................................................................52

*White v. Willett,*
    456 S.W.3d 810 (Ky. 2015) .................................................. 20

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ................................................................52

*Woodall v. W. Wake Highway Comm'n,*
    176 N.C. 377, 97 S.E. 226 (1918) ..........................................67

**Statutes**

28 U.S.C. § 1443 .................................................................12

28 U.S.C. § 1447 .................................................................12

52 U.S.C. § 10101 ...............................................................54

52 U.S.C. § 10307 ...............................................................56

52 U.S.C. § 20302 ..........................................................37, 46

52 U.S.C. § 20501 ..........................................................11, 28

52 U.S.C. § 20507 ..........................................................*passim*

52 U.S.C. § 21081 ..........................................................*passim*

52 U.S.C. § 21083 ..........................................................*passim*

N.C. Gen. Stat. § 163-54 ................................................*passim*

N.C. Gen. Stat. § 163-82.1 ............................................6, 21

N.C. Gen. Stat. § 163-82.3 ..............................................21

N.C. Gen. Stat. § 163-82.4 ............................................*passim*

N.C. Gen. Stat. § 163-82.8 ..............................................51

N.C. Gen. Stat. § 163-82.11 ............................................21

N.C. Gen. Stat. § 163-82.12 ....................................................... 25, 55

N.C. Gen. Stat. § 163-132.5G ...........................................................43

N.C. Gen. Stat. § 163-166.12 ......................................................24, 25

N.C. Gen. Stat. § 163-166.16 ...................................................7, 26, 41

N.C. Gen. Stat. § 163-182.9 .................................................... *passim*

N.C. Gen. Stat. § 163-182.10 .................................................. *passim*

N.C. Gen. Stat. § 163-182.12 ............................................................ 6

N.C. Gen. Stat. § 163-182.14 .................................................. *passim*

N.C. Gen. Stat. § 163-182.19 .....................................................63, 66

N.C. Gen. Stat. § 163-230.1 ....................................................7, 41, 42

N.C. Gen. Stat. § 163-231 ...................................................... *passim*

N.C. Gen. Stat. § 163-234 .................................................................43

N.C. Gen. Stat. § 163-258.17 .....................................................43, 44

N.C. Gen. Stat. § 163-258.2 .................................................... *passim*

N.C. Gen. Stat. § 163-258.3 ............................................................34

N.C. Gen. Stat. § 163-258.4 .............................................................43

N.C. Gen. Stat. § 163-258.6 ............................................................34

N.C. Sess. Law 2003-226 ............................................................6, 21

N.C. Sess. Law 2011-182 ........................................................34, 41

N.C. Sess. Law 2019-239 .............................................................41

**Other Authorities**

33 Charles A. Wright & Arthur R. Miller, *Federal Practice and
    Procedure* § 8306 (2d ed. Westlaw June 2024 update) ...........15

Canon 3, N.C. Canon of Judicial Ethics .............................................. 8

Guide to Judiciary Policy, Vol. 2B, Ch. 2, § 220, Ethics Advisory
        Opinion No. 58 .......................................................................... 8

H.R. Rep. No. 107-329, pt. 1 (2001), 2001 WL 1579545 ................... 11

Raoul Berger, *Standing to Sue in Public Actions: Is It a Constitutional
        Requirement?*, 78 Yale L.J. 816 (1969) .................................... 15

**Rules**

8 N.C. Admin. Code § 02.0111 ........................................................ 49

8 N.C. Admin. Code § 17.0109 ........................................................ 44

N.C. R. App. P. 2 ........................................................................... 18

N.C. R. App. P. 22, Drafting Committee Note (1975) ..................... 15

N.C. R. App. P. 23 .......................................................................... 13

N.C. R. Civ. P. 42 ........................................................................... 37

**Constitutional Provisions**

N.C. Const. art. I, § 10 ................................................................... 62

N.C. Const. art. I, § 19 ................................................................... 46

N.C. Const. art. IV, § 1 .......................................................... *passim*

N.C. Const. art. IV, § 12 ........................................................ *passim*

N.C. Const. art. VI, § 2 .......................................................... *passim*

N.C. Const. art. VI, § 3 .......................................................... *passim*

N.C. Const. of 1776, art. VIII ......................................................... 32

U.S. Const. art. I, § 4 ................................................................ 12, 28

No. _____

SUPREME COURT OF NORTH CAROLINA
*********************************************

JEFFERSON GRIFFIN,

        Petitioner,

    v.

NORTH CAROLINA BOARD OF
ELECTIONS,

        Respondent,

From the North Carolina
State Board of Elections

**********************************

**PETITION FOR WRIT OF PROHIBITION OF
THE HONORABLE JEFFERSON GRIFFIN**

**IMMEDIATE ACTION REQUESTED BEFORE
MONDAY, 23 DECEMBER 2024**

**********************************

TO THE HONORABLE SUPREME COURT OF NORTH CAROLINA:

The Honorable Jefferson Griffin respectfully petitions this Court to issue a writ of prohibition to stop the State Board of Elections from counting unlawful ballots cast in the 2024 general election. In addition, Judge Griffin also requests a temporary stay from the Court before Monday, 23 December 2024. That stay is necessary to enable the Court to consider and rule on Judge Griffin's petition for a writ of prohibition.

### SUMMARY OF REQUEST FOR RELIEF

Judge Griffin first moves the Court to **immediately issue a temporary stay** of (1) the State Board's certification of the election for Seat 6 of the North Carolina Supreme

JA 32

- 2 -

Court and (2) the requirement that Judge Griffin file a petition for judicial review within 10 days of service of the State Board's decision. As explained below, a temporary stay will protect this Court's jurisdiction to decide the questions of law that are raised in Judge Griffin's election protests—questions that our nation's system of federalism reserves for state courts, not federal courts.

Second, Judge Griffin asks the Court to exercise its power—as granted by the North Carolina Constitution—to supervise inferior tribunals, such as the State Board. Judge Griffin asks the Court to issue a writ of prohibition that prohibits the State Board from counting ballots cast in violation of North Carolina's statutes and constitution. As explained below, the State Board has continued to issue rulings and administer our elections in violation of North Carolina law, and the Board's lawlessness cannot be allowed to continue.

## INTRODUCTION

Judge Griffin seeks a writ of prohibition to stop the counting of unlawful ballots by the State Board of Elections. The State Board is an administrative agency that has knowingly broken the law and refused to do anything about it. Indeed, the Board has been breaking our election laws for decades. This lawlessness was brought to the Board's attention back in 2023, before the 2024 general election, but the Board refused to correct its errors. Now those chickens have come home to roost. In the 2024 general election, the Board's errors changed the outcome of the election for the open seat on this Court. When those errors were raised again in valid election protests, the Board then claimed that it was too late to fix its law-breaking.

- 3 -

At bottom, this case presents a fundamental question: who decides our election laws? Is it the people and their elected representatives, or the unelected bureaucrats sitting on the State Board of Elections? If the Board gets its way, then it is the real sovereign here. It can ignore the election statutes and constitutional provisions, while administering an election however it wants.

Judge Griffin, currently a judge of the North Carolina Court of Appeals and candidate for Seat 6 on the Supreme Court of North Carolina, seeks to restore the supremacy of the democratic process and the preeminence of the rule of law. He filed election protests across all North Carolina counties to challenge the State Board's lawless administration of his electoral contest. With this petition for a writ of prohibition, there are three types of election protests at issue.

First, the Board intends to count ballots that were cast by people who did not lawfully register to vote. Since 2004, state law has required voter applicants to provide their drivers license or social security number before lawfully registering to vote. However, the State Board chose to ignore this law for decades. Thus, approximately 60,000 people cast votes in the protested judicial race without providing that statutorily required information on their voter applications. These voters were not allowed to cast a ballot in this race because they were not "'legally registered' to vote." *Bouvier v. Porter*, 386 N.C. 1, 4 n.2, 900 S.E.2d 838, 843 n.2 (2024) (quoting N.C. Gen. Stat. § 163-54).

Second, the State Board decided to count ballots cast by voters who have, by their own admission, never resided in North Carolina or anywhere else in the United States.

- 4 -

Since 1776, our state constitution has limited eligible voters in state races to bona fide North Carolina residents. *See id.* ("Certain categories of individuals are also categorically ineligible to vote, such as . . . nonresidents . . . ."). But ballots were accepted in the Supreme Court race from people who were born outside the United States and have never lived *anywhere* in the United States. Counting the votes of these "Never Residents" was illegal.

Third, the Board has accepted absentee ballots cast by people who failed to provide photo identification with their ballots. Thousands of overseas voters cast ballots without providing their photo identification. But state law requires all voters to provide photo identification to vote; overseas voters casting absentee ballots do not get special treatment. The Board likewise broke the law by counting these ballots.

In response to these protests, the State Board and the opposing candidate, Justice Allison Riggs, have claimed that Judge Griffin is seeking a retroactive change in the election laws. That flatly mischaracterizes the timeline. Our registration statutes required drivers license or social security numbers back in 2004. Our state constitution has imposed a residency requirement since 1776. And photo identification has been required for absentee voting since at least 2018. The laws that *should* have governed this election were, therefore, established long before this election. The State Board simply chose to break the law.

But the State Board of Elections is no super-legislature. It doesn't get to make up its own rules, disregard state statutes, or rewrite the state constitution. Rather, the Board was required to discount votes that were cast in violation of state law. Like this Court explained twenty years ago, in an identical situation, "[t]o permit unlawful votes to be counted along

- 5 -

with lawful ballots in contested elections effectively 'disenfranchises' those voters who cast legal ballots, at least where the counting of unlawful votes determines an election's outcome." *James v. Bartlett*, 359 N.C. 260, 270, 607 S.E.2d 638, 644 (2005).

Through its lawlessness, the State Board of Elections is attempting to change the outcome of this election. Such threatened misconduct should be prohibited. Given the public's interest in reaching finality on this contested race, and the lack of alternative remedies given the need for an expeditious and final determination, issuance of the writ of prohibition is a proper exercise of this Court's constitutional duty to supervise and control the exercise of judicial power in the state. N.C. Const. art. IV, § 12(1).

## STATEMENT OF THE FACTS

On Election Day, Judge Griffin maintained a sizeable lead over Justice Riggs. However, as ballots continued to trickle in over the next week, Justice Riggs took the lead. As of today, Justice Riggs leads by 734 votes.

### A. The Election Protests

On 19 November 2024, Judge Griffin filed election protests in each of North Carolina's 100 counties.[1] In total, Judge Griffin filed six categories of election protests. However, only three categories of protests are relevant here. Those three relevant categories are described briefly below, as well as the likely impact of each on the outcome of the election.

---

**1**    Three candidates for the state legislature filed similar protests for their respective districts. Although the State Board rejected their protests on the same grounds, the appeal for state legislative candidates goes to the respective houses of the General Assembly for a final decision. N.C. Gen. Stat. § 163-182.14(c).

- 6 -

Election protests matter when they change the outcome of an election. *Bouvier*, 386 N.C. at 4, 900 S.E.2d at 843 (discussing N.C. Gen. Stat. § 163-182.12).

*Incomplete Voter Registrations*. Since 2004, the General Assembly has required someone registering to vote to provide his drivers license or last four digits of his social security number on his voter registration application. N.C. Sess. Law 2003-226, § 9 (codified as amended at N.C. Gen. Stat. § 163-82.4). However, until December 2023, the State Board of Elections chose not to enforce this law. And even when the Board admitted its decades of lawlessness, it refused to cure the improper registrations, and only began requiring the information from new registrants. In the race for Seat 6 of this Court, over 60,000 people cast ballots, even though they had never provided the statutorily required information to become lawful voter registrants. Under state law, unless someone is lawfully registered to vote, he cannot vote. N.C. Const. art. VI, § 3(1); N.C. Gen. Stat. § 163-82.1(a).

The form of the protests that Judge Griffin filed with the county boards is the same, except for attachments that identify particular voters in the county. A sample of the protest for incomplete voter registrations can be found at appendix pages 1745-1830, for Guilford County.

Judge Griffin anticipates that, if these unlawful ballots are excluded, then he will have won the contest.

*Never Residents*. Our state constitution limits voters for state offices to people who actually reside in North Carolina. N.C. Const. art. VI, § 2(1); *Bouvier*, 386 N.C. at 4 n.2, 900 S.E.2d at 843 n.2 (explaining that "nonresidents" are "categorically ineligible to vote"

JA 37

for state offices). Nonetheless, the State Board allowed approximately 267 people to vote in the protested election who have never resided in North Carolina or anywhere else in the United States. These voters self-identified themselves as such, stating on a form "I am a U.S. citizen living outside the country, and I have never lived in the United States." Counting these ballots is unlawful. An example of this type of protest can be found in the appendix at pages 1729-1744.

It is unknown whether this category of election protests will affect the outcome of the election, standing alone. As it stands, fewer than 300 Never Residents voted in the election, and the current margin between the candidates is over 700 votes. Judge Griffin filed other categories of election protests that are currently making their way through the administrative process, including protests targeting deceased voters, felon voters, and voters who had their registrations denied. The impact on the outcome of the election from those other protests, which target considerably fewer voters, is presently unknown. These other protests only affect about 817 voters. App. 40 n.3.

*No Photo ID.* It's well known that photo identification is required for all voters, both those voting absentee ballots and those voting in person. N.C. Gen. Stat. § 163-230.1(a)(4), (b)(4), (e)(3), (f1) (absentee ballots); *id.* § 163-166.16(a) (in-person voting); N.C. Const. art. VI, §§ 2(4), 3(2) (same). Yet the State Board decided not to require photo identification for absentee ballots cast by voters who live overseas. State law, however, doesn't exempt overseas voters from the photo-identification requirement. An example of this type of protest can be found in the appendix at pages 1831-1878.

- 8 -

Thousands of such ballots were unlawfully cast in the election. Judge Griffin antici-

pates that, if these unlawful ballots are excluded, he will win the election.

**B.    Further Proceedings**

After Judge Griffin filed his protests, the State Board took over jurisdiction from the

county boards for the three categories of protests just described. App. 1-2.

On 26 November 2024, Judge Griffin filed a motion to disqualify a Board member,

Siobhan Millen, from participating in the Board's adjudication of his protests. App. 81-90.

Siobhan Millen is married to Justice Riggs' lead attorney at Womble Bond Dickinson

("Womble"). Womble has been Justice Riggs' legal counsel both before and after Election

Day. Pressley Millen is a partner at Womble; and, leading up to Election Day, he held him-

self out as Justice Riggs' lead attorney. App. 93-94. Admittedly, Mr. Millen has disappeared

from Justice Riggs' legal team. But the Millen family's ownership of a partnership share of

Womble, App. 101, nonetheless disqualifies Ms. Millen from ruling on Judge Griffin's pro-

tests. *See* Canon 3(C)-(D)(iii), N.C. Canon of Judicial Ethics; *see also* Guide to Judiciary

Policy, Vol. 2B, Ch. 2, § 220, Ethics Advisory Opinion No. 58 (Disqualification When Rel-

ative Is Employed by a Participating Law Firm). The State Board, however, refused to dis-

qualify Ms. Millen and, instead, allowed her to be the deciding vote on many of two of the

three categories of protests. App. 117-18.

Meanwhile, on 6 December 2024, the North Carolina Democratic Party (NCDP)

preemptively filed a lawsuit inviting the federal courts to decide Judge Griffin's protests.

The NCDP, acting as a surrogate for its nominee Justice Riggs, and purporting to act on

JA 39

behalf of all voters in the state, filed a federal lawsuit against the individual members of the State Board of Elections. App. 131-56. The NCDP has brought four claims for relief. The complaint alleges (1) a violation of the National Voter Registration Act by removing voters from the voter rolls after an election; (2) a violation of procedural due process under 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution because of risk of discounting illegally cast ballots; (3) a further violation of § 1983 and the fundamental right to vote; and (4) a violation of the Help America Vote Act by discounting unlawful ballots.

Because the NCDP chose not to name Judge Griffin as a party, he has moved to intervene in the NCDP's federal action. Otherwise, nothing has happened in the case. A copy of the current federal docket is included in the appendix. App. 157-61.

Back at the State Board, the parties filed briefs, and the State Board heard arguments on the protests on 11 December 2024. On 13 December 2024, the Board emailed the parties a copy of its final decision on these categories of protests. App. 38-77.

This decision consolidated the Board's treatment of a number of the protests. The decision is a final decision as to hundreds of protests. Although voluminous, the protests dismissed by the State Board's order are included in the appendix to this petition for completeness. App. 352-3902.

## MOTION FOR TEMPORARY STAY

Pursuant to Appellate Rule 23(e), Judge Griffin respectfully applies to the Court for a temporary stay. A petition for a writ of prohibition, like with supersedeas, is generally

- 10 -

paired with a temporary stay of inferior court proceedings. *State v. Whitaker*, 114 N.C. 818, 822, 19 S.E. 376, 377 (1894) ("When entertained, the usual course, unless prior notice of the petition has been given, is to issue a notice to the lower court to show cause why the writ should not issue, and to order a stay of proceedings in the meantime."); *State v. McElrath*, 351 S.E.2d 557 (N.C. 1986) (issuing temporary stay of proceedings pending this Court's consideration of the petition); *State v. Hunt*, 357 N.C. 454, 456, 591 S.E.2d 502, 503 (2003) (staying further proceedings).

A temporary stay is necessary here to perform two functions: (1) stay the issuance of a certificate of election by the State Board, and (2) stay the deadline for Judge Griffin to file a petition for judicial review in the superior court. Both stays are necessary for this Court to be able to exercise jurisdiction over the petition itself.

As to the first point, once the certificate of election issues, election protests, like those here, become moot. *In re Protest of Whittacre*, 228 N.C. App. 58, 59, 743 S.E.2d 68, 69 (2013) (dismissing appeal as moot because "[t]he declaration of election as contained in the certificate conclusively settles *prima facie* the right of the person so ascertained and declared to be elected to be inducted into, and exercise the duties of the office" (quoting *Cohoon v. Swain*, 216 N.C. 317, 319, 5 S.E.2d 1, 3 (1939))); *In re Election Protest of Fletcher*, 175 N.C. App. 755, 759, 625 S.E.2d 564, 567 (2006) (same). A temporary stay, therefore, preserves this Court's jurisdiction to decide the petition.

On the second point, absent a stay, Judge Griffin will have to file a petition in superior court within 10 days of service of the Board's final decision. N.C. Gen. Stat. § 163-

- 11 -

182.14(b). But the State Board and Justice Riggs have given every indication that, upon the filing of a petition for judicial review, they will try to strip state courts of jurisdiction to decide this case by improperly removing it to federal court. Judge Griffin's election protests raise only questions of state law. However, the State Board, following the argument of Justice Riggs, has injected various federal statutes into this case, even though those federal statutes, by their own terms, do not apply. The federal statutes on which they have relied in this action, as well as in Justice Riggs's duplicative federal action, are the Help America Vote Act (HAVA) and the National Voter Registration Act (NVRA).

As explained in more detail below, *infra* Argument §§ I.D, the State Board and Justice Riggs have repeatedly relied on HAVA and the NVRA to excuse the State Board's lawlessness. Yet each of these statutes state that they only apply to "an election for Federal office." 52 U.S.C. § 21081(a) (HAVA); *id.* § 21083(A)(1)(a)(viii) (HAVA); *James*, 359 N.C. at 268, 607 S.E.2d at 643 ("HAVA, ***which does not apply to state and local elections***, was initiated in the wake of allegations of irregularity and fraud in the 2000 presidential election." (emphasis added)); 52 U.S.C. § 20507(c)(2)(A) (NVRA); *id.* § 20501(b)(1)-(2) (NVRA).

Even setting aside the plain language, it's impossible for these federal laws to apply to this case. Congress enacted HAVA and the NVRA under the federal constitution's elections clause. *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 15 (2013) (NVRA); H.R. Rep. No. 107-329, pt. 1, at 57 (2001), 2001 WL 1579545 (explaining the constitutional authority for HAVA); *Colon-Marrero v. Velez*, 813 F.3d 1, 19 (1st Cir. 2016) (same). But

JA 42

- 12 -

under the elections clause, Congress can only create rules for elections to federal office, not state office. *See* U.S. Const. Art. I, § 4, cl. 1; *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008) (elections clause makes clear that states have "control over the election process for state offices").

Once Judge Griffin files his petition for judicial review in superior court from the State Board's dismissal of his election protests, the Board and Justice Riggs will remove the case to federal court. An eventual remand back to state court from federal court is inevitable because these federal statutes cannot apply to an election for state office. Nonetheless, it will take considerable time before a remand motion is briefed and ruled on, and then the Board and Justice Riggs are certain to delay the matter further by taking an appeal. *See* 28 U.S.C. § 1447(d) (permitting appeal of remand orders for cases removed under 28 U.S.C. § 1443(2)). It could be 2026 before those proceedings end and the case returns to state court. Although Justice Riggs would holdover in her office until her successor is determined, this Court has expressed grave concern about letting an improperly elected official exercise the duties of her office in cases of great public significance. *See N.C. State Conf. of NAACP v. Moore*, 382 N.C. 129, 165, 876 S.E.2d 513, 539 (2022).

By issuing a temporary stay of Judge Griffin's deadline to file his petition for judicial review, this can all be avoided. The Court that has the final say on questions of state law will be able to exercise its lawful jurisdiction without an illegitimate detour through federal court. Conversely, without a temporary stay that tolls the deadline for filing a petition for judicial review, Judge Griffin will have to file his petition by 23 December 2024 to have a

- 13 -

right to seek judicial review in state court of the dismissal of his election protests. N.C. Gen. Stat. § 163-182.14 (petition must be filed within 10 days' of service of Board's final decision). And then the Board and Justice Riggs will remove that petition to federal court. In fact, just a few months ago, the State Board used this same removal tactic to place a state lawsuit concerning the Board's incomplete-voter registrations in the hands of the federal courts. *See infra* Argument § I.D.3.

This Court can and has exercised its powers to change deadlines of this sort. For instance, in *Harper v. Hall* this Court changed the date of the state's primary elections from March to May as well as the candidate-filing deadline, and then stated that it had the power to make "other administrative adjustments" as well. 379 N.C. 656, 658, 865 S.E.2d 301, 302 (2021). The Court justified the exercise of these extraordinary powers by pointing to "the great public interest in the subject matter of these cases, the importance of the issues to the constitutional jurisprudence of this State, and the need for urgency in reaching a final resolution on the merits at the earliest possible opportunity." *Id.* Here, the need for this Court's intervention is at least as pressing.

For these reasons, Judge Griffin respectfully requests a temporary stay that (1) stays the issuance of a certificate of election by the State Board, and (2) stays the deadline for Judge Griffin to file a petition for judicial review in the superior court. Judge Griffin respectfully requests that this Court grant the temporary stay without awaiting a response, given the time-sensitive nature of the request. *See* N.C. R. App. P. 23(e).

- 14 -

## THE COURT'S POWER TO ISSUE THE WRIT OF PROHIBITION

This Court has the power to issue a writ of prohibition to stop the State Board from counting unlawful ballots. A writ of prohibition issues from this Court to an inferior tribunal to halt threatened, unlawful action, especially in matters of great public significance.

## I.    The Constitution Empowers the Court to Issue Writs to Inferior Tribunals.

This Court "may issue any remedial writs necessary to give it general supervision and control over the proceedings of the other courts." N.C. Const. art. IV, § 12(1). Those "other courts" include all kinds of judicial and quasi-judicial bodies. For example, this Court has explained that it may issue a writ of prohibition to "inferior courts" and quasi-judicial officers below the superior court, such as "probate court," "justices of the peace," and the clerk of superior court. *Whitaker*, 114 N.C. at 820-22, 19 S.E. at 376-77; *Mountain Retreat Ass'n v. Mt. Mitchell Dev. Co.*, 183 N.C. 43, 45, 110 S.E. 524, 525 (1922).

The writ also extends to administrative agencies. As this Court has explained, the Court's constitutional power and duty to control and supervise the exercise of judicial power in the state extends to issuing writs that "will aid State agencies in the performance of their duties." *Moses v. State Highway Comm'n*, 261 N.C. 316, 317, 134 S.E.2d 664, 665 (1964). The prerogative writs have historically been "used to regulate administrative agencies performing judicial functions." *Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*,

- 15 -

376 N.C. 558, 568 n.11, 853 S.E.2d 698, 708 n.11 (2021) (citing Raoul Berger, *Standing to Sue in Public Actions: Is It a Constitutional Requirement?*, 78 Yale L.J. 816, 821-22 (1969)).[2]

This Court's power to issue such writs to quasi-judicial agencies is not an anomaly. Federal courts likewise have the power to issue writs to administrative agencies. The leading treatise on federal procedure, Wright and Miller, explains that the writ is a "tradition-bound technique for seeking judicial review of agency action. Courts may use this writ to enjoin a judicial or quasi-judicial action." 33 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 8306 & n.14 (2d ed. Westlaw June 2024 update).

The writ of prohibition is unique. It is not a civil action, pitting parties against each other. Instead, "[i]t is, in effect, a proceeding between two courts—a superior and an inferior—and is the means whereby the superior exercises its due superintendence over the inferior, and keeps it within the limits and bounds of the jurisdiction prescribed to it by law." *Mayo v. James*, 53 Va. (12 Gratt.) 17, 23 (1855). For that reason, as this Court has explained, "[t]he main feature of the traditional form [of the writ] is the opportunity it provides for the affected judicial officer to participate directly. This feature may be important when the conduct drawn in question is alleged to contain elements of abuse of power, or to reflect a recurring pattern in similar cases." N.C. R. App. P. 22, Drafting Committee Note (1975), *reprinted at* 287 N.C. 671, 732.

---

**2**     This influential law review article explained that the writs of certiorari and prohibition were both used to control administrative agencies at common law. Berger, *supra*, at 821-22.

- 16 -

The writ falls within this Court's constitutional duty to supervise and control the exercise of judicial power by inferior tribunals. N.C. Const. art. IV, § 12(1). Because this Court's general supervisory powers spring from the state constitution, they can't be limited by statute. *State v. Ellis*, 361 N.C. 200, 639 S.E.2d 425 (2007).[3] This Court will use its constitutional supervisory powers in cases like this one. For instance, this Court will use its "general supervisory authority when necessary to promote the expeditious administration of justice, and may do so to consider questions which are not properly presented according to its rules." *Id.* at 205, 639 S.E.2d at 428. The Court will even exercise its supervisory power in the middle of a proceeding when "the parties desire an answer to a question which is fundamental in determining their rights, is also of public importance, and when decided will aid State agencies in the performance of their duties." *Moses*, 261 N.C. at 317, 134 S.E.2d at 665. Such immediate intervention is warranted so that a case of great public significance "may be tried on the correct theory below and unnecessary delay in the administration of justice be thereby prevented." *Greene v. Charlotte Chem. Lab'ys, Inc.*, 254 N.C. 680, 694, 120 S.E.2d 82, 91 (1961).

Although Judge Griffin believes the applicable law here is clear, the writ of prohibition will issue "to promptly resolve a novel issue of great import," even if the law was unclear when passed upon below. *Beaufort Cnty. Bd. of Educ. v. Beaufort Cnty. Bd. of Comm'rs*,

---

**3**    Which makes sense: "The General Assembly shall have no power to deprive the judicial department of any power or jurisdiction that rightfully pertains to it as a co-ordinate department of the government." N.C. Const. art. IV, § 1.

- 17 -

363 N.C. 500, 506-07, 681 S.E.2d 278, 283 (2009). Indeed, the appellate courts "will not hesitate to exercise" this supervisory power when, as here, there is a need for "the expeditious administration of justice." *Park Terrace, Inc. v. Phoenix Indem. Co.*, 243 N.C. 595, 597, 91 S.E.2d 584, 586 (1956); *see also, e.g.*, *Ellis*, 361 N.C. at 205, 639 S.E.2d at428; *State v. Stanley*, 288 N.C. 19, 26, 215 S.E.2d 589, 594 (1975).

## II.    The Standard for a Writ of Prohibition.

This Court has explained that a writ of prohibition is an appropriate remedy in any of three instances: "[1] to restrain other Courts either from proceeding in a matter not within their jurisdiction, or [2] from acting in a matter, whereof they have jurisdiction, by rules at variance with those which the law of the land prescribes, or [3] from proceeding therein after a manner which will defeat a legal right." *State v. Allen*, 24 N.C. (2 Ired.) 183, 188-89 (1841); *see also White v. Willett*, 456 S.W.3d 810, 812 (Ky. 2015) ("An appellate court has discretion to grant a writ where a trial court is proceeding within its jurisdiction upon a showing that the court is (1) acting or is about to act erroneously, (2) there exists no adequate remedy by appeal or otherwise, and (3) great injustice and irreparable injury will result if the petition is not granted.").

The State Board has acted under rules that violate the law of North Carolina, and in a way that will defeat the right of Judge Griffin and the public to an accurate counting of ballots. Under the state constitution and the General Assembly's enactments, the State Board was not permitted to count the votes of unlawful registrants, Never Residents, or voters who did not present photo identification. Yet the State Board has said that is exactly

what it plans to do. The Board has determined that it can ignore registration information mandated by the legislature. The Board is also giving state statutes an interpretation that plainly conflicts with the state constitution. And the Board says that it will follow its own administrative rules, despite their conflict with statutes.

When a state agency acts lawlessly on a matter of such great public importance, and when there is such need for judicial expediency, the only adequate remedy is in this Court, which holds the fullness of the judicial power. N.C. Const. art. IV. §§ 1, 12(1); *see also* N.C. R. App. P. 2 (this Court has the power to suspend the rules to "prevent manifest injustice to a party, or to expedite decision in the public interest").

## ISSUES PRESENTED

Whether the Court should issue a writ of prohibition, ordering the State Board of Elections not to count ballots from people who failed to complete their registrations, from Never Residents, and from overseas absentee voters who did not provide photo identification.

## REASONS WHY THE WRIT SHOULD ISSUE

The writ of prohibition should issue because the State Board intends to count unlawful ballots, and thereby change the outcome of the election.

The merits of each of the three categories of election protests are addressed below, as well as the grave errors committed by the State Board. All the issues presented in this petition are questions of law that are reviewed de novo. *See, e.g.*, *Appeal of Ramseur*, 120

- 19 -

N.C. App. 521, 523-24, 463 S.E.2d 254, 256 (1995). As the State Board agreed, these pro-

tests present "legal questions of statewide significance." App. 41.

After addressing the merits, the brief addresses the State Board's attempt to dismiss

the protests, on alternative grounds, for procedural defaults. But it is easy to see that the

Board had no justification for trying to disqualify Judge Griffin from challenging the elec-

tion results. Judge Griffin's protests complied with all of the relevant procedural require-

ments.

Next, Justice Riggs raised a hodgepodge of federal laws that, she has argued, requires

the State Board to count illegal ballots and declare her the winner of this race. But federal

law has nothing to say about the issues in Judge Griffin's protests.

Finally, Judge Griffin addresses the objections of the State Board and Justice Riggs

that, because the ballots of ineligible voters have already been counted, it's too late to do

anything about it. While voting is a constitutional right, the U.S. Supreme Court has long

explained that the right must be balanced with the State's duty to protect the integrity of

elections.

Judge Griffin respectfully requests that the Court rule on each of the issues ad-

dressed in this brief. The candidates and the public have a vital interest in this election

receiving finality as expeditiously as possible. *See, e.g.*, *Perloff v. Edington*, 293 Ala. 277, 281,

302 So. 2d 92, 96 (1974) ("The public has an interest in the speedy determination of elec-

tion contests . . . ."); *Kinsey v. Garver*, 91 N.E.2d 54, 56 (Ohio Com. Pl. 1950) ("an interest

in the public exists in the speedy determination of election results"); *Mansfield v.*

*McShurley*, 911 N.E.2d 581, 585 (Ind. Ct. App. 2009) ("The public has an interest in the speedy determination of controversies affecting elections . . . ."). By ruling on each of these issues, including issues of federal law, this Court can ensure finality across all litigation, for cases pending both in state and federal tribunals.

## I. It's Unlawful to Count the Votes of People Who Did Not Lawfully Register to Vote.

Before someone can vote for in a state race in North Carolina, he must be lawfully registered to vote. To lawfully register, a person must, by statute, provide his drivers license or social security numbers in his voter registration application. This information is used to verify the voter's residence and identity via government databases. But our election boards have been registering people to vote who never provided this statutorily required information for decades. The ballots cast by these improper registrants lack statutory authorization because no one can vote if he is improperly registered.

### A. State law prohibits anyone from voting unless he has provided a drivers license or social security number when registering to vote.

Under state law, a person must provide his drivers license or social security number at the time of registration before he can lawfully cast a ballot.

Before voting in an election, a person must lawfully register to vote. Under article VI of the state constitution, "[e]very person offering to vote shall be at the time legally registered as a voter as herein prescribed and in the manner provided by law." N.C. Const. art. VI, § 3(1). That's also true by statute: "No person shall be permitted to vote who has not been registered under" the state's registration statutes. *See* N.C. Gen. Stat. § 163-

82.1(a) (making registration a "prerequisite to voting"); *see also id.* § 163-54 ("Only such persons as are legally registered shall be entitled to vote in any primary or election held under this Chapter.").

The protests here involve people who were not legally registered to vote in a manner provided by law, section 163-82.4, because they failed to provide statutorily required application information. Since January 2004, state law has required voter registrants to provide their drivers license or social security number in their voter application. N.C. Sess. Law 2003-226, § 9 (amending N.C. Gen. Stat. § 163-82.4), § 22 (amendment effective 1 January 2004). This information is used with a statewide computer registration system to verify the voter's identity and important details about the voter. *See, e.g.*, N.C. Gen. Stat. § 163-82.11.

The State Board of Elections is required to create an application form for voter registration. *Id.* § 163-82.3(a). From 2004 onward, the General Assembly commanded that the form require an applicant to provide his "[d]rivers license number or, if the applicant does not have a drivers license number, the last four digits of the applicant's social security number." *Id.* § 163-82.4(a)(11). However, a board can accept an application without a drivers license or social security number only if the applicant "has *not been issued* either a current and valid drivers license or a social security number." *Id.* § 163-82.4(b) (emphasis added).

There's a statutory cure process for somebody who omits their drivers license and social security numbers, but the omissions raised in these protests have never been cured by this process. If a person has a drivers license or social security number, but fails to provide those numbers on their voter application, then the election board shall not allow the

- 22 -

person to vote unless the voter cures the deficient application before the county canvass deadline. *Id.* § 163-82.4(f). The statutory cure procedure applies to a voter who "fails to complete any required item on the voter registration form." *Id.* The board shall notify the voter of the omission and request completion of a corrected application before the county canvass. *Id.* Only if the required information is delivered by that time will the voter's ballot be counted. *Id.* ("If the correct information is provided to the county board of elections by at least 5:00 P.M. on the day before the county canvass, the board shall count any portion of the provisional official ballot that the voter is eligible to vote."). No state law, however, permits a board of elections to count a ballot for a person who never provided a drivers license or social security number on his voter registration form.

Mandating such information from voter registrants is not unique to North Carolina. For elections to federal offices, Congress, through HAVA, also requires the states to collect the drivers license or social security number from registrants. 52 U.S.C. § 21083(a)(5)(A)(i). If a person with a drivers license or social security card fails to provide those identifiers on a voter application form, then the application "may not be accepted or processed by a State." *Id.*

Although HAVA and federal law don't apply to elections for state offices—such as the election at issue here—this federal prerequisite to voting in federal elections corroborates the importance of collecting such information from would-be voters. In other words, the information required by the General Assembly is not some new law designed to burden voters but a decades-old feature of election law that protects the integrity of our elections.

JA 53

- 23 -

**B.     The State Board admits that it broke the law.**

No one thinks that the State Board actually complied with the law. Instead, it's clear that the Board broke the law for twenty years.

Despite the clarity in the law since enactment in 2003, the State Board did not require voters to provide a drivers license or social security number when people registered to vote. Before December 2023, the voter application form appeared like this:



As this image reveals, the application did not tell registrants that these identifiers were required because it was not in red text. Yet this information is required. N.C. Gen. Stat. § 163-82.4(a)(11).

The Board admitted that it allowed voters to register in violation of the law when it entered an order on an administrative complaint from 2023 that raised the issue. In that order, the Board concluded that similar provisions of HAVA could be violated "as a result of the current North Carolina voter registration application form failing to require an applicant to provide an identification number or indicate that they do not possess such a number." Order at 4, *In re HAVA Complaint of Carol Snow* (N.C. State Bd. of Elections Dec. 6,

- 24 -

2023) [App. 165]. The Board ordered its staff to revise the form going forward.[4] *Id.* But the Board refused to remedy its past legal violations.

Now, however, the issue has caused irregularities in the protested election, and those irregularities are outcome dispositive.

### C.     The unlawful registrations haven't been "cured."

The State Board said nothing in its final decision to suggest it followed the law. Instead, the State Board sought to excuse its lawlessness by reimagining the election laws. The Board reasoned that any error by a voter was harmless because the people who did not properly register cured their defects by providing additional documents as allowed by state law. *See* App. 55-56. The Board's logic is rejected by the relevant statutes' plain language.

First, there is no state law permitting a "cure" by providing additional documents. The only state law to which the State Board could possibly cite would be subsections (a) and (b) of N.C. Gen. Stat. § 163-166.12.[5] Both of these provisions plainly require a person "who *has registered* to vote by mail" to provide additional documentation when they actually vote. N.C. Gen. Stat. § 163-166.12(a), (b) (emphasis added); *see Fla. State Conf. of NAACP v. Browning,* 522 F.3d 1153, 1169 (11th Cir. 2008) (holding that HAVA's identical

---

[4]     In light of this order, the Board's counsel has advised county boards that they cannot register new voter applicants who fail to provide a drivers license or social security number and who also fail to "state in writing that they lack these numbers." Email of Paul Cox, N.C. State Bd. of Elections, to Directors of County Bds. of Election (Sept. 4, 2024) [App. 167-68].

[5]     Strangely, the State Board cited the provisions of HAVA—which govern federal elections, *e.g.*, 52 U.S.C. § 21081(a)—rather than the similar provisions found in North Carolina law—which govern this state election. *See* App. 55.

requirements "impos[e] additional restrictions on those individuals who registered by mail before they can vote either a regular or a provisional ballot"). Again, to be registered, a person must first provide a drivers license or social security number. *See* N.C. Gen. Stat. § 163-82.4(a)(11). A statute that places an additional obligation on a voter who is registered (by mail) cannot be a "cure" for somebody who failed to register properly.

Moreover, subsections (a) and (b) cannot be a cure for somebody who failed to provide a drivers license or social security number because the additional documentation required by these subsections is not a substitute for providing a drivers license or social security number. At the time of registration, the State Board is supposed to verify the identity of the registrant by matching the registrant's drivers license or social security number to other government databases. *See id.* § 163-82.12(6), (8), (9). And if the drivers license or social security numbers don't result in a match, the Board must take additional steps to verify the applicant's identity. *Id.* § 163-166.12(d). [6] In contrast, subsections (a) and (b) let a registered voter provide ***any*** of the following documents: current and valid photo identification, a current utility bill, bank statement, government check, paycheck, or other government document showing the voter's address. *Id.* § 163-166.12(a)-(b). The mere presentation of those documents is not the equivalent of an identity match with government databases. They are apples and oranges. The people who cast the ballots at issue here never

---

**6**     Subsection (d) can't carry the weight Justice Riggs wishes to put on it. It only applies to people who actually provided these digits when they registered to vote, and Judge Griffin is not challenging such voters—he's only challenging voters who never provided either number.

went through that verification procedure, and the fact that they might have provided additional documents when they voted does nothing to remedy the registration defect.

This is also why Justice Riggs was wrong to argue to the State Board that the unlawful registrants cured their registration defects when they presented a photo identification in 2024. *See generally id.* § 163-166.16. This theory fails for at least two reasons. First, although voter identification laws were in place in 2024, the laws allowed a plethora of alternative forms of photo identification (e.g., student, teacher, and tribal identification cards) and even permitted voters to provide *no identification at all* in certain circumstances. *See id.* § 163-166.16(a), (d). Second, photo identification guards against voter impersonation (i.e., an imposter claiming to be a person who is a registered voter); it does not guard against somebody registering by manufacturing a fake identity. Absent a drivers license or social security number, the State Board simply cannot verify the identity of somebody registering to vote. Photo identification requirements are not a substitute for providing a drivers license or social security number.[7]

Nor did the General Assembly provide that these provisions can cure an improper voter registration. The General Assembly has decided that there is precisely one way to cure an improper registration. *Id.* § 163-82.4(f). The individuals challenged by Judge

---

[7]    Indeed, even if a voter provided a drivers license when voting, *see id.* § 163-166.16(a)(1)(a), the poll worker simply looked at the picture and handed the voter a ballot. The poll worker certainly did not write down the drivers license number, turn the number over to the State Board, and wait for the State Board to perform a match against government databases.

- 27 -

Griffin did not use this statutory cure process. The State Board doesn't have the authority to reinvent state law to create its own "cure" procedures. It has a duty to follow state law, not make law.

### D.    Judge Griffin's protests do not implicate federal election laws.

The State Board plainly rejected Judge Griffin's interpretation of state laws and, therefore, dismissed his protests on that basis alone. However, as an alternative ground for the Board's outcome, the Board attempted to inject federal law—the Help America Vote Act (HAVA) and the National Voter Registration Act (NVRA)—into a state-law election issue. App. 54-57. But HAVA and the NVRA have nothing to do with this case.

### 1.    HAVA has no bearing on state elections.

Judge Griffin has protested ballots cast in a *state election* by people who sought to register in violation of *state law*, as the above discussion showed. The State Board, however, attempts to rely on HAVA as justification for flouting state law. Invoking HAVA makes no sense here because HAVA does not apply to elections for state offices, as this Court has held. *James*, 359 N.C. at 268, 607 S.E.2d at 643 ("HAVA, *which does not apply to state and local elections*, was initiated in the wake of allegations of irregularity and fraud in the 2000 presidential election." (emphasis added)). The plain language of HAVA leaves no doubt. The registration systems mandated by HAVA apply only to "an election for Federal office." 52 U.S.C. § 21081(a); *id.* § 21083(A)(1)(a)(viii). Thus, no one can claim a HAVA violation related to an election for state office. *James*, 359 N.C. at 268, 607 S.E.2d at 643. As in *James*, the issue is controlled by "state law." *Id.*

JA 58

- 28 -

### 2.    The NVRA has no bearing on votes counted in state elections.

The State Board also reasons that, as an alternative basis for its ruling, the NVRA prohibits Judge Griffin's election protests. *See* App. 62-64. But the NVRA has nothing to do with this case because this federal law doesn't apply to elections for state offices, nor does it apply to election protests.

The NVRA, by its own terms, applies only to elections for federal offices and not elections to state offices. The stated purpose of the law is just to affect participation in "elections for Federal office." 52 U.S.C. § 20501(b)(1)-(2). Indeed, Congress enacted the NVRA under the federal constitution's elections clause, and that clause, by its own terms, only lets Congress regulate the "Times, Places, and Manner" of selecting Senators and Representatives to Congress. U.S. Const. art. I, § 4, cl. 1.[8]

That's equally true of the particular provision cited by the Board. In its order, the State Board explains that the NVRA "restricts the removal of voters from 'the official list of eligible voters' in an election." App. 62 (quoting 52 U.S.C. § 20507(a)(3)). The State Board knowingly omitted that these restrictions apply "to voter registration for elections

---

[8]    If the NVRA purported to regulate elections for state offices—which it doesn't— then it would exceed Congress's authority under the federal constitution's election clause. Many courts have therefore acknowledged the only reasonable conclusion from the text of the NVRA: it cannot apply when the argument is about an election to a state office. *See, e.g.*, *Dobrovolny v. Nebraska*, 100 F. Supp. 2d 1012, 1028 (D. Neb. 2000); *Broyles v. Texas*, 618 F. Supp. 2d 661, 691 (S.D. Tex. 2009), *aff'd*, 381 F. App'x 370 (5th Cir. 2010); *Pree v. D.C. Bd. of Elections & Ethics*, 645 A.2d 603, 605 (D.C. 1994). Thus, no one can complain about NVRA issues in a state election.

**for Federal office**." 52 U.S.C. § 20507(a) (emphasis added). Judge Griffin did not stand for election to a federal office.

Relying on the NVRA presents another threshold problem: the statute applies only to state efforts to remove voters from the voter rolls. 52 U.S.C. § 20507(a)(3), (c). But Judge Griffin has not requested in his protests for anyone to be removed from the voter rolls. Indeed, his election protest challenges only the outcome of *his* election—it doesn't even affect an ineligible voter's vote in *another* race in 2024 elections, much less cause that voter to be removed from the voter rolls.

As explained below, the function of an election protest is to challenge the results of an election, not to remove anyone from the voter rolls. *See infra* Argument § IV.A. By law, a successful election protest does not result in anyone being removed from the voter rolls. Instead, it results in inaccurate results being corrected, or vote being recounted. N.C. Gen. Stat. § 163-182.10(d)(2)(e)(1)-(2). As *Bouvier* explained, "[w]here the irregularity affects the accuracy of the election results, the county board of elections may order the ineligible ballots excluded from the vote total, and in some instances, may order a full recount." 386 N.C. at 4, 900 S.E.2d at 843.

> 3. **The issues raised in Judge Griffin's protests have not been decided by the federal courts' rulings in the ongoing *RNC* case.**

To buttress its attempt to inject HAVA and the NVRA into a state-election dispute, the State Board sought to manufacture connections between Judge Griffin's protests and *Republican National Committee v. North Carolina State Board of Elections*, No. 5:24-cv-547

- 30 -

(E.D.N.C.) (the "*RNC* case"), which is a case pending in U.S. District Court for the Eastern District of North Carolina. *See* App. 57. The State Board reasoned that the federal courts in the *RNC* case have already resolved Judge Griffin's claims here. The Board is wrong.

Before the 2024 general election, the RNC filed a two-count complaint against the State Board in state court. Count one sought a writ of mandamus directing the State Board to comply with HAVA and its analogous state-law provision. Count two alleged that the State Board violated the equal protection clause of the North Carolina Constitution through violations of HAVA. The gravamen of RNC's request for relief was to remove certain ineligible voters from the voter rolls ahead of the election.

After the State Board and NCDP removed the case to federal court, the federal district court dismissed the first count on the grounds that the relevant statutes didn't provide for a private right of action. The district court then declined to exercise supplemental jurisdiction over the second count (the state constitutional claim) and remanded it to state court. The Fourth Circuit, though, reversed the district court's remand order, holding that the state constitutional claim contained an embedded federal question related to HAVA and the NVRA, over which the district court had jurisdiction. The case is still pending.

Critically, the *RNC* case, according to the Fourth Circuit, was about the interplay between federal and state law as they apply to the state's maintenance of voter rolls. The *RNC* case did not involve a request to correct a vote count in a state race based on a

violation of state law—which is what Judge Griffin does in this case. The rulings in the *RNC* case did not consider, much less adjudicate, any of the questions presented here.

## II. The Boards of Election Cannot Count the Votes of People Who Have Never Lived Here.

Although United States citizenship may be a birthright, the right to vote in North Carolina elections for state offices is not. Instead, it is a right granted only to those who reside here. Our state constitution restricts voting rights to people who reside in North Carolina "to preserve the basic conception of a political community." *Lloyd v. Babb*, 296 N.C. 416, 449, 251 S.E.2d 843, 864 (1979). That is why, just months ago, this Court confirmed that "nonresidents" are "categorically ineligible to vote" for state offices. *Bouvier*, 386 N.C. at 4 n.2, 900 S.E.2d at 843 n.2.

Yet people voted in the 2024 general election who, by their own admission, were born overseas and have never resided in North Carolina or anywhere else in the United States. These overseas voters are United States citizens, but they aren't residents of North Carolina who can vote for state contests. It's unlawful to count the votes of these Never Residents.

### A. The state constitution forbids counting the votes of Never Residents.

The North Carolina Constitution defines the political community for purposes of voting in our elections. No one can vote in a state election unless they meet the "qualifications" in article VI of the constitution. N.C. Const. art. VI, § 1. The constitution then sets out the first of the qualifications in the voter residency clause. Under that clause, to vote in

- 32 -

an election for a state office, a person must have "resided in the State of North Carolina for one year . . . next preceding an election." *Id.* § 2(1). This requirement is nothing new. In our original constitution, a person could vote for a legislator only in the county in which he "reside[d]." *See* N.C. Const. of 1776, art. VIII.

Despite the constitution's plain language, the election boards permitted people to vote in the general election who have never resided in North Carolina or anywhere else in the United States. The State Board, in response to a public records request, identified overseas voters who voted in the 2024 general election but who self-identified as having never lived in the United States. App. 1736-37 ¶¶ 10-13. The Board identified a list of voters who, the Board explained, checked a box on a federal post card application that stated, "I am a U.S. citizen living outside the country, and I have never lived in the United States." App. 1736-37, 1741 (sample FPCA).

Someone who has never lived in the United States has never resided in North Carolina. These people, therefore, were not qualified to vote in our state elections under the voter residency clause. Yet the State Board chose to count their votes anyway. That was unlawful.

## B.    The residency clause is not preempted by the federal constitution.

Proponents of Never Resident voting have argued that our state constitution violates the federal constitution. But this broadside attack on the state constitution cannot prevail.

In *Dunn v. Blumstein*, the U.S. Supreme Court considered whether a one-year durational residency requirement, as a prerequisite to registering to vote, violated the equal

- 33 -

protection clause of the Fourteenth Amendment. 405 U.S. 330, 334 (1972). The Court held that a one-year residency requirement was too long to comply with the equal protection clause. *Id.* at 334. In so holding, the Court made clear that it was not ruling on whether Tennessee could "restrict the vote to bona fide Tennessee residents." *Id.* Indeed, the Court emphasized that its prior precedent had already established the constitutionality of "bona fide residence requirements." *See id.* at 343-44.

This Court has since considered the impact of *Dunn* on the residency requirement of our own state constitution and explained that *Dunn* drew a "careful distinction . . . between durational residence requirements and bona fide residence requirements." *Lloyd*, 296 N.C. at 439, 251 S.E.2d at 858. Therefore, "[a]ppropriately defined and [u]niformly applied bona fide residence requirements are permissible" under the federal constitution. *Id.* at 440, 251 S.E.2d at 859. And just a few months ago, this Court confirmed that "non-residents" are "categorically ineligible to vote" under the residency clause of the state constitution. *Bouvier*, 386 N.C. at 4 n.2, 900 S.E.2d at 843 n.2 (citing N.C. Const. art. VI, §§ 1-2).

As these cases show, *Dunn* does not invalidate the state constitution's bona fide residency requirement. The voters at issue with this protest have told the election boards that they have *never* resided in North Carolina or anywhere else in the United States. They've never been bona fide state residents. Therefore, counting the votes of Never Residents violates the North Carolina Constitution.

JA 64

- 34 -

**C.  If UMOVA permits these votes to be counted, it is unconstitutional as applied to these circumstances.**

The State Board turned to a state statute, UMOVA, to justify Never Resident voting. Of course, if the statute permits voting by those ineligible to vote under the constitution, it violates the constitution. UMOVA, therefore, should not be read to conflict with the state constitution.

In 2011, the General Assembly enacted the Uniform Military and Overseas Voters Act (UMOVA). N.C. Sess. Law 2011-182 (enacting N.C. Gen. Stat. §§ 163-258.1 to -258.20). As the name suggests, this bill was originally drafted by the Uniform Law Commission, which recommended its adoption among the states.

UMOVA lets a "covered voter" register to vote in various ways for elections for federal and state offices. *See* N.C. Gen. Stat. § 163-258.3 (defining elections covered by UMOVA); *id.* § 163-258.6 (setting out methods of registration). At issue is who counts as a "covered voter." The relevant definition is provided here in full:

> (1) "Covered voter" means any of the following:
>
> a. A uniformed-service voter or an overseas voter who is registered to vote in this State.
>
> b. A uniformed-service voter defined in subdivision (7) of this section whose voting residence is in this State and who otherwise satisfies this State's voter eligibility requirements.
>
> c. An overseas voter who, before leaving the United States, was last eligible to vote in this State and, except for a State residency requirement, otherwise satisfies this State's voter eligibility requirements.

JA 65

- 35 -

d. An overseas voter who, before leaving the United States, would have been last eligible to vote in this State had the voter then been of voting age and, except for a State residency requirement, otherwise satisfies this State's voter eligibility requirements.

e. An overseas voter who was born outside the United States, is not described in sub-subdivision c. or d. of this subdivision, and, except for a State residency requirement, otherwise satisfies this State's voter eligibility requirements, if:

1. The last place where a parent or legal guardian of the voter was, or under this Article would have been, eligible to vote before leaving the United States is within this State; and

2. The voter has not previously registered to vote in any other state.

*Id.* § 163-258.2(1).

Judge Griffin is challenging ballots cast by overseas voters who identified themselves as United States citizens who have never resided in the United States. Such voters could only plausibly count as UMOVA "covered voters" under subsection (1)(e).

UMOVA doesn't define the phrase "State residency requirement" that such a voter needs to comply with. The term is not defined anywhere in the Act. As it stands, the phrase is ambiguous as to whether it means a durational residency requirement or a bona fide residency requirement. If the ambiguous phrase were interpreted to mean just a durational residency requirement, it's possible that UMOVA would, at least in some circumstances, be constitutional under the residency clause, as that clause is limited by *Dunn*. But if, on the other hand, the ambiguous clause were interpreted to let someone vote who has *never* been a resident, it would be unenforceable under the bona fide residency requirement of the state constitution.

The canon of constitutional avoidance requires the Court to interpret N.C. Gen. Stat. § 163-258.2(1)(e) as exempting overseas voters only from a durational residency requirement, and not a bona fide residency requirement. Only such an interpretation could save the statute from being invalidated. "[W]here one of two reasonable constructions will raise a serious constitutional question, the construction which avoids this question should be adopted." *N.C. State Bd. of Educ. v. State*, 371 N.C. 149, 160, 814 S.E.2d 54, 62 (2018) (quoting *In re Arthur*, 291 N.C. 640, 642, 231 S.E.2d 614, 616 (1977)).

Before the State Board, Judge Griffin asked the Board to apply the canon of constitutional avoidance to this subsection of UMOVA. But the State Board just misconstrued that as a request to find the provision unconstitutional. App. 66. The State Board held that it was incompetent to hold a state statute unconstitutional. App. 68-69. The Board then decided to opine on the constitutional question anyway, stating in one sentence that, if this subsubsection of UMOVA violated the state constitution, then the federal constitution's doctrine of substantive due process would reinstate the state law. App. 69. The theory appears to be that applying our state constitution to this election would be applying a "newly announced rule of law." App. 62. The Board, however, has confused the chronology. The residency requirement in the state constitution has existed and persisted since the Revolutionary War. UMOVA was enacted 235 years later. Not exactly a new rule of law.

Even setting aside the statute of constitutional avoidance, if the Court does not believe section 163-258.2(1)(e) is reasonably susceptible to Judge Griffin's proposed interpretation, then the Court should refuse to enforce the statute as it applies to Never Residents.

- 37 -

When "there is a conflict between a statute and the Constitution, this Court must determine the rights and liabilities or duties of the litigants before it in accordance with the Constitution, because the Constitution is the superior rule of law in that situation." *In re Chastain*, No. 283A22-2, 2024 WL 5100940, at *6 (N.C. Dec. 13, 2024) (Riggs, J.) [App. 128]. And the constitution is clear: only bona fide residents can vote for state offices.[9]

## D. This argument has no impact on votes cast for federal elections, military voters, or North Carolina residents living overseas.

To be clear, Judge Griffin is not challenging the votes of military voters, nor is he challenging any vote cast for federal contests.

Judge Griffin was not a candidate for federal office. And federal statutory law, which imposes duties on states for uniformed services voters and other overseas voters, applies only to "elections for Federal office." *See* 52 U.S.C. § 20302(a). Besides, it's highly unlikely the Never Residents includes servicemembers, because these are people who were born abroad and have never lived anywhere in the United States.[10]

---

[9]     This argument is not required to be decided by a three-judge panel in superior court. First, UMOVA can and should be interpreted not to permit Never Resident voting. Second, this is not a facial challenge to UMOVA but is at most an as-applied challenge. Even accepting the Board's interpretation of UMOVA, Judge Griffin is challenging only a small subset of UMOVA-covered voters, and he's not seeking relief "far beyond the particular circumstances" of this election protest. *Singleton v. N.C. Dep't of Health & Hum. Servs.*, 906 S.E.2d 806, 808 (N.C. 2024). Finally, an appellate petition never requires transfer. Transfer is appropriate only if the "complaint," "answer," or "responsive pleading" contains a facial challenge to a state statute. N.C. R. Civ. P. 42(b)(4). This filing is none of those things.

[10]    Because this case does not involve an election for a federal office, other provisions of the state constitution are not implicated. Article VI of the North Carolina Constitution lets the General Assembly reduce the residency requirement, but such short-

- 38 -

UMOVA also distinguishes between, on one hand, uniformed-service voters and overseas voters who have resided in this state, N.C. Gen. Stat. § 163-258.2(1)(a)-(d), and, on the other hand, overseas voters who were born abroad and have never resided in this state, *id.* § 163-258.2(1)(e). Judge Griffin has challenged the votes of this latter group ***only***.

Anyway, a servicemember who previously resided in North Carolina but is deployed overseas does not lose his North Carolina residency. Unless a servicemember leaves the state and intends never to return, he remains a resident of the state. *See Lloyd*, 296 N.C. at 444, 251 S.E.2d at 861 (student who leaves for college becomes resident at the place of his college unless he intends to return to his former home after graduation). Unless the servicemember has "abandoned" his home in North Carolina, he remains a resident here for voting purposes. *Id.* at 449, 251 S.E.2d at 864. By contrast, the Never Residents never had a home in North Carolina that they could abandon.

### E. Residency isn't inheritable under the state constitution's voter qualifications.

Justice Riggs has argued that Never Residents inherit the residences of their parents. She analogizes to the law of domiciliary for infants. Yet the analogy crumbles upon inspection because infants can't vote. N.C. Const. art. VI, § 1 (voting rights limited to those at least "18 years of age"). Unlike an infant, an 18-year-old *chooses* where he resides. If he wishes to become a member of North Carolina's political community, he must decide, as

---

term residents can only vote for president and vice president. N.C. Const. art. VI, § 2(2).

- 39 -

an adult, to reside in North Carolina. Otherwise, he is not a member of our political community entitled to vote. There is no such thing as "birthright residency" for purposes of voting in our state.

Inherited voting rights also make no sense when applied to the circumstances of the Never Residents. Under Justice Riggs' theory, a child's residence or domicile is the same as his parents. But recall that the Never Residents were born abroad and have never lived in the United States. That means that the parents of the Never Residents have been abroad for all eighteen years of the Never Resident's childhood. But a person can only establish residency in a place in which they have actually lived. When the Never Resident turned 18, his residence was where his parents had set up their international abode. Wherever that was, it wasn't in North Carolina.

By its own terms, UMOVA doesn't care whether the Never Residents' parents set up a fixed habitation somewhere abroad. Instead, it ascribes to the parent a North Carolina residency, even when the parent has settled down in a foreign country eighteen years ago. *See* N.C. Gen. Stat. § 163-258.2(1)(e). Justice Riggs argues that this is constitutional because the legislature can ascribe a fictional residency to a person by statute. That is true when the residency matters for other statutory or common law purposes. But the legislature is powerless to rewrite the meaning of "residency" as it's set out in the North Carolina Constitution. The ratifiers of our constitution would not have imposed a residency requirement in our charter of government just so the legislature can override it. The word "residency" continues to carry the original public meaning that it has carried through our state's

- 40 -

history. To suggest that the legislature could ignore this meaning or change it by statute is an affront to judicial review. *Bayard v. Singleton*, 1 N.C. (Mart.) 5 (1787); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177-78 (1803).

\*      \*      \*

The original public meaning of "residency" as used of voting rights in our constitution has always required the would-be voter to, at a minimum, live in North Carolina. That commonsense requirement of physical presence cannot be eliminated by statute. It is fundamental to the identity of our political community, and our constitution does not let the General Assembly change our community by granting voting rights to Never Residents. UMOVA doesn't do that because doing so would be unconstitutional.

If the Board counts the votes of people who have *never* been members of our political community, it will violate our state constitution. That harms not only Judge Griffin, but also the true members of our state's political community.

## III.  Overseas Voters Who Did Not Provide Photo Identification Cannot Cast a Ballot in State Elections.

The final category of protests before the State Board involved ballots cast by overseas voters more generally. State law requires these voters to submit photo identification along with their absentee ballots, just like all other voters. But the State Board decided to accept overseas absentee ballots without accompanying identification, in violation of state law.

- 41 -

### A. Article 21A, which governs overseas absentee voters, incorporates Article 20's requirements for absentee voters.

Subchapter VII of Chapter 163 of the General Statutes contains the requirements for all types of absentee-ballot voting in North Carolina. Article 20 of that subchapter sets out the general rules for absentee voting. *See* N.C. Gen. Stat. §§ 163-226 to -239. Article 21A (which is UMOVA) layers on additional rules for absentee voting by military and overseas voters. *See id.* §§ 163-258.1 to -258.31. The general absentee voting provisions of Article 20 apply to overseas absentee voting under Article 21A, and not vice versa. Section 163-239 states, "Except as otherwise provided therein, Article 21A of this Chapter [for overseas absentee voting] shall not apply to or modify the provisions of this Article [20]."

One of the key provisions of Article 20 is the requirement of photo identification for absentee voting. N.C. Gen. Stat. § 163-230.1(a)(4), (b)(4), (e)(3), (f1). These provisions equalize the burden of voting: both in-person voters and absentee voters must show photo identification to cast a ballot. *See id.* § 163-166.16(a) (requiring photo identification for in-person voting); N.C. Const. art. VI, §§ 2(4), 3(2) (same). The General Assembly first enacted UMOVA in 2011 to regulate absentee ballots cast by overseas voters. *See* N.C. Sess. Law 2011-182. The General Assembly then added legislation to require photo identification for absentee ballots. *See, e.g.*, N.C. Sess. Law 2019-239, § 1.2(b). When it did so, it did not exempt overseas voters. If our legislature intended to exempt overseas absentee voters from the photo identification requirement, it would have said so explicitly.

- 42 -

But overseas voters are not exempt from this equalization requirement and must provide photo identification to vote. All absentee ballots—cast under either Article 20 or Article 21A—must be transmitted to the relevant county board of elections by placing it in a "sealed container-return envelope." N.C. Gen. Stat. § 163-231(b)(1). This reference to a sealed container-return envelope applies expressly to absentee ballots cast under both Articles 20 and 21A. To understand what an overseas voter must put in the "sealed container-return envelope," the voter must look at the requirements under Article 20, since Article 21A does not answer the question. *See id.* §§ 163-258.1 to -258.31.

Article 20 is clear that the "sealed container-return envelope" exists, in part, to hold the photo identification of *all* absentee ballots. The container-return envelope must contain a valid photo identification: "Each container-return envelope returned to the county board with application and voted ballots under this section shall be accompanied by a photocopy of identification . . . ." *Id.* § 163-230.1(f1). The failure to include a photo identification in the container-return envelope is a curable deficiency, but only if the proper identification is received the day before the county canvass. *Id.* § 163-230.1(e). None of the challenged ballots were cured.

Even at a more general level, absentee ballots cast both within and without the United States (Article 20 and Article 21A absentee ballots) are generally treated alike and are all considered absentee ballots:

- 43 -

- "The county board shall report ballots cast during early voting under Part 5 of Article 14A of this Chapter separately from mail-in absentee ballots cast under Article 20 or 21A of this Chapter." *Id.* § 163-132.5G(a1)(4).

- "The sealed container-return envelope in which executed absentee ballots have been placed shall be transmitted to the county board of elections who issued those ballots as follows . . . All ballots issued under the provisions of this Article and Article 21A of this Chapter shall be transmitted by one of the following means . . . ." *Id.* § 163-231(b).

- The lawful procedure for counting absentee ballots cast under both Article 20 and Article 21A are set out in Article 20. *Id.* § 163-234.

**B.    Nothing in Article 21A excuses overseas voters from providing photo identification.**

The State Board reasoned that Article 21A excused overseas voters from providing photo identification because section 163-258.17(b) established the exclusive means to authenticate the identity of the voter. App. 70-71. But subsection (b) says no such thing.

That subsection states that the lone "authentication" required "for *execution of a document*" for overseas voters are the declarations permitted for overseas voters. N.C. Gen. Stat. § 163-258.17(b) (emphasis added); *see id.* § 163-258.4 (describing declaration that acknowledges misstatements are grounds for perjury). Subsection (b) cannot exempt an overseas voter from the photo-identification requirement because photo identification is not the "authentication" of a document—it's the authentication of the voter's identity.

- 44 -

This conclusion is easily confirmed by looking at Article 20. Similar to section 163-258.17(b)'s authentication requirement, Article 20 also requires absentee ballots to be authenticated by notarization or a witness. *See id.* § 163-231. Notably, the photo identification requirement is an entirely separate requirement found in another statute within Article 20. *Id.* § 163-230.1. Why? Because photo identification is not an "authentication" of a document.

Justice Riggs argued to the Board that Article 21A prohibits a photo identification requirement because section 163-258.17(a) permits the counting of improper ballots cast by overseas voters if the ballots are missing "nonessential" information. *Id.* § 163-258.17(a). The statute gives examples of nonessential requirements that can be ignored: failing to use "paper or envelopes of a specified size or weight." *Id.* Photo identification is a material requirement; it isn't "nonessential." Anyone suggesting that photo identification is immaterial must have missed the last decade and a half of legislation, litigation, and constitutional amendments surrounding photo identification. Notably, the Board declined to adopt Justice Riggs' argument.

## C. The fact that the Board issued a rule excusing overseas voters from providing photo identification does not immunize the Board's decision from judicial review.

The State Board also defended its decision to excuse overseas voters from the photo-identification requirement on the grounds that the Board had already issued a rule saying so. App. 73-74 (citing 8 N.C. Admin. Code 17.0109(d)). But the General Assembly never delegated to the State Board the power to make the major policy decision of whether to

require photo identification from a class of voters. Photo identification was a decision made by the legislature (and even the voters, through a constitutional amendment).

Indeed, the delegation of such an important question would be unconstitutional. An administrative agency cannot be "asked to make important policy choices which might just as easily be made by the elected representatives in the legislature." *Adams v. N.C. Dep't of Nat. & Econ. Res.*, 295 N.C. 683, 697-98, 249 S.E.2d 402, 411 (1978). If such legislative power could be delegated, it would be "delegation running riot." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 553 (1935) (administrative delegation held unconstitutional under non-delegation doctrine); *see also State v. Harris*, 216 N.C. 746, 6 S.E.2d 854, 860 (1940) (same).

As the Supreme Court of the United States has observed, when an administrative agency makes an extraordinary claim of authority with "political significance," that gives courts a "reason to hesitate" before concluding that the legislature meant to confer the claimed authority. *West Virginia v. EPA*, 597 U.S. 697, 721 (2022). Under the major questions doctrine, courts recognize that the legislature does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Scalia, J.). "[S]eparation of powers principles" caution against such unrestrained readings of administrative authority. *West Virginia*, 597 U.S. at 723.

There is no textual indication that the General Assembly ever intended for the State Board to decide whether to require photo identification for any kind of voter, much less

- 46 -

overseas voters. And even if there were some "colorable textual basis," *id.*, the major questions doctrine would caution the Court to interpret the statutes against a delegation.

The rule would also collapse under the state constitution. If voters are to be treated differently, there must be a rational basis for differential treatment. *See* N.C. Const. art. I, § 19 ("No person shall be denied the equal protection of the laws . . . ."); *Lloyd*, 296 N.C. at 439, 251 S.E.2d at 858 ("[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." (quoting *Dunn*, 405 U.S. at 336); *N.C. Bar & Tavern Ass'n v. Cooper*, 901 S.E.2d 355, 373 (N.C. Ct. App.), *review allowed*, 901 S.E.2d 232 (N.C. 2024); *Askew v. City of Kinston*, 906 S.E.2d 500, 507 (N.C. Ct. App. 2024). But there is no legitimate reason to impose a greater burden—photo identification—on those living in North Carolina than is imposed on those living abroad. There is no reason to think that the General Assembly intended that bizarre, differential treatment, which could violate the state constitution's equal protection clause.

### D. Federal law has no bearing on the photo-identification requirement.

Because state law offered by the State Board provides no refuge, the Board also sought to intertwine its reasoning with federal law, citing 52 U.S.C. § 20302. App. 74-76. But, as with HAVA and the NVRA, federal law has no application here. The statute on which the Board relies, by its own terms, only applies "elections for Federal office." *E.g.*, 52 U.S.C. § 20302(a)(1)-(3), (6)-(8), (b)(1), (c).

- 47 -

\*       \*       \*

Ultimately, it would make no sense to require photo identification for voters present in the United States, but not for overseas voters. The General Assembly did not require photo identification for one category of voter and not the other. Rather, *everyone* voting in a North Carolina election, whether voting in person or by any kind of absentee ballot, must submit a photo identification to vote.

Therefore, these absentee ballots, submitted under Article 21A, cannot be counted for the contests that are the subject of these election protests.

## IV.    The State Board Manufactured Procedural Defects.

To reject Judge Griffin's protests, the State Board not only misconstrued North Carolina law, it also tried to disqualify the protests on procedural technicalities. It is clear, however, that Judge Griffin's protests complied with all relevant procedural requirements.

### A.    The protests should not have been filed as voter challenges.

The Board reasoned that it should dismiss the protests because they were untimely voter challenges. App. 64-66. But the State Board had already rejected its own argument in 2016, and this Court said the same thing earlier this year.

In 2016, an election protest was filed by the Pat McCrory campaign in the governor's race, challenging the eligibility of certain voters to cast ballots in that election. *Bouvier*, 386 N.C. at 5-6, 900 S.E.2d at 843-44. McCrory's opponent, Roy Cooper, argued that the protests should be dismissed because they merely challenged the eligibility of certain voters, and therefore should have been brought as voter challenges instead. *See Bouvier v. Porter*,

- 48 -

279 N.C. App. 528, 542, 865 S.E.2d 732, 741-42, *rev'd in part and remanded,* 386 N.C. 1, 900 S.E.2d 838 (2024); *In re Consideration of Certain Legal Questions Affecting the Authentication of the 2016 General Election* (N.C. State Bd. of Elections Nov. 28, 2016) [App. 344-45].

The State Board rejected Cooper's argument. App. 334-45. In an order on Cooper's request to dismiss the protests, the Board explained that an election protest "must prove the occurrence of an outcome-determinative violation of election law, irregularity, or misconduct." App. 344 ¶ 3. Although an election protest "may not merely dispute the eligibility of a voter," an election protest may challenge a voter's eligibility if the "claims regarding the eligibility of certain voters" are presented "as evidence that an outcome-determinative violation of election law, irregularity, or misconduct has occurred." App. 345 ¶ 5. Thus, an election board may "discount a ballot cast by an unqualified voter" if an election protest shows "that ineligible voters participated in number sufficient to change the outcome of the election." App. 345 ¶ 7.

The McCrory election protest spun off collateral litigation that wound up at this Court as *Bouvier v. Porter*, 386 N.C. 1, 900 S.E.2d 838 (2024). One of the issues in *Bouvier* continued to be whether an election protest can challenge the eligibility of certain voters. The Court affirmed the logic of the Board's 2016 order, explaining that "an election protest may address any 'irregularity' or 'misconduct' in the election process, including the counting and tabulation of ballots cast by ineligible voters." *Id.* at 4, 900 S.E.2d at 843 (citations omitted). Such ineligible voters, who could be targeted by an election protest, include

- 49 -

"nonresidents," who are "categorically ineligible to vote." *Id.* at 4 n.2, 900 S.E.2d at 843 n.2. It also includes people who are not "'legally registered' to vote." *Id.* (quoting N.C. Gen. Stat. § 163-54).

The Board's final decision on Judge Griffin's protests made no effort to reconcile its reasoning with its prior 2016 order or *Bouvier*. It is but another example of the State Board ignoring the law and exercising power untethered to principle.

### B.    The Board wrongly dismissed the protests for lack of service.

Before addressing the merits of the three categories of protests, the State Board alternatively dismissed Judge Griffin's protests because he did not properly serve the protests on affected voters. The State Board's ruling is wrong because (1) the Board does not have statutory authority to impose a service obligation on protestors and (2), even if it did, Judge Griffin's service satisfied the Board's service demands.

The State Board promulgated a protest template that includes a demand that protestors "must serve copies of all filings on every person with a direct stake in the outcome of this protest." 8 N.C. Admin. Code § 02.0111 (the protest-form template). The service can be accomplished by "transmittal through U.S. Mail" and has to "occur within one (1) business day" of filing a protest. *Id.*

First, there is no statutory authority for the Board to force protestors to serve copies of protests on affected parties. The State Board claims that it can compel protestors to serve parties because the Board has the power to "prescribe forms for filing protests." App. 43-44 (citing N.C. Gen. Stat. § 163-182.9(c)). But the power *to merely create a template* for a

- 50 -

protest does not include the power to burden protestors with providing notice to affected parties. That is especially so when the protest statutes explicitly burden someone else with the duty to provide notice to affected parties: the county boards. *See* N.C. Gen. Stat. § 163-182.10(b). The General Assembly never authorized the State Board to outsource the county boards' notice obligations to protestors and then penalize those protestors for failing to do the county boards' jobs for them. The Board acted beyond its authority in dismissing protests on service grounds.

Second, Judge Griffin nevertheless complied with the Board's service demand by mailing a postcard by U.S. First-Class Mail to over 60,000 voters at the voters' addresses of record. The postcard stated the following:

> * * * NOTICE * * *
>
> [[First Name]] [[Middle Name]] [[Last Name]], your vote may be affected by one of more protests filed in the 2024 general elections. Please scan this QR code to view the protests filings. Please check under the county in which you cast a ballot to see what protest may related to you…. For more information on when your County Board of Elections will hold a hearing on this matter, please visit the State Board of Elections' website link found on the Protest Cite (via the QR code).

App. 175 (Offerman Aff., Attach. 1).

The State Board criticized Judge Griffin's service efforts as "junk mail" because it was (1) a postcard that (2) didn't announce that the protests were "challenging the voter's eligibility" and (3) used a QR code to provide access to the filed materials. App. 45-51. The Board concluded that such postcards did not properly inform voters of the protests and provide them an opportunity to object. App. 49.

- 51 -

The Board's critique of Judge Griffin's service efforts is misplaced. First, the State Board cannot belittle postcards as "junk mail" when the Board itself routinely mails cards to voters. *See* N.C. Gen. Stat. § 163-82.8(c) (mailing of voter registration cards); *id.* § 163-82.14(d)(2) (confirming address by mailing cards). Second, the postcard states that "your vote may be affected by one of more protests" and instructs voters to contact their county boards for information on "a hearing on this matter." App. 175. The postcard, thus, notifies voters that their vote is being implicated by a legal proceeding and, appropriately, directs them to find more information on the proceeding. Finally, the Board's distrust of QR codes is belied by the Board's own use of QR codes in the "Voter Photo ID" mailers that it recently distributed across the state. *See* N.C. State Bd. of Elections, *Press Release: State Board Launches Photo ID Educational Campaign* (Feb. 13, 2024) [App. 346-49], *available at* https://www.ncsbe.gov/news/press-releases/2024/02/13/state-board-launches-photo-id-educational-campaign (visit the link "Voter Photo ID Mailer (PDF)").[11]

To be clear, the constitutional standard for notice is that it be "reasonably certain to inform those affected." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 315 (1950). The standard does not demand perfection. *See id.* at 319 ("We think that under such circumstances reasonable risks that notice might not actually reach every beneficiary are

---

[11]    The Board's press release boasted that its new voter ID "campaign is designed to *reach every corner of North Carolina*, including rural and urban areas, in as many ways as possible." *Id.* (emphasis added). The Board posted the "Voter Photo ID Mailer (PDF)" at https://s3.amazonaws.com/dl.ncsbe.gov/Voter%20ID/Voter-ID-Mailer.pdf. It is available in the appendix at pages 350-51.

- 52 -

justifiable."). Moreover, Judge Griffin served over 60,000 voters. The interests of each voter "is identical with that of a class" and, therefore, "notice reasonably certain to reach most of those interested in objecting is likely to safeguard the interests of all, since any sustained would inure to the benefit of all." *Id.* Given that Judge Griffin's service on 60,000 voters replicates the State Board's own methods of notifying voters, the Board had no grounds to claim his method of service was deficient.

### C.    Judge Griffin timely filed his protests.

The Board mentions, in passing, that some of Judge Griffin's protests might have been untimely filed and, therefore, could be subject to dismissal. App. 6 n.4. This is baseless. The General Statutes are explicit that only "substantial compliance" is required with the filing deadlines for election protests; and Judge Griffin's protests substantially complied with the protest-filing deadline.

Section 163-182.9 sets forth the requirements of an election protest. In addition to a protest being in writing and containing certain information, the section sets forth deadlines for filing a protest. N.C. Gen. Stat. § 163-182.9(b). "If the protest concerns an irregularity other than vote counting or result tabulation, the protest shall be filed no later than 5:00 P.M. on the second business day after the county board has completed its canvass and declared the results." *Id.* § 163-182.9(b)(4)(c).

The next statute, section 163-182.10, then dictates an elections board's review of whether a protest complies with these requirements. Section 163-182.10 explicitly states that a board shall "determine whether the protest *substantially complies* with G.S. 163-182.9

- 53 -

and whether it establishes probable cause to believe that a violation of election law or irregularity or misconduct has occurred." *Id.* § 163-182.10(a)(1) (emphasis added). Therefore, for a protest to proceed to a review of its merits, the protest must substantially comply with the 5:00 P.M. filing deadline.

The affidavit of Kyle Offerman establishes that all of Judge Griffin's protests were submitted via email to the county board before the 5:00 P.M. deadline. App. 172 (Offerman Aff. ¶¶ 8-9). The possibility that some of these protests might have hit election officials' inboxes a few minutes after 5:00 P.M. is irrelevant. The protests would have nonetheless been filed in substantial compliance with the statutory filing deadline.

North Carolina courts have, for decades, explained what is required when a statute demands only substantial compliance with certain requirements. In such statutes, substantial means "[i]n a substantial manner, in substance, essentially. It does not mean an accurate or exact copy." *Graham v. Nw. Bank*, 16 N.C. App. 287, 291, 192 S.E.2d 109, 112 (1972) (cleaned up). In other words, substantial compliance with a requirement is something less than precise satisfaction of the requirement.

This standard of leniency is not uncommon. It also appears in litigation. For example, the North Carolina Court of Appeals applies a substantial compliance standard to the application of the appellate rules: "[T]his court has held that when a litigant exercises 'substantial compliance' with the appellate rules, the appeal may not be dismissed for a technical violation of the rules." *Pollock v. Parnell*, 126 N.C. App. 358, 362, 484 S.E.2d 864, 866

- 54 -

(1997). Thus, a substantial-compliance standard precludes a judicial body from dismissing a filing for mere failure to comply with the technical rules.

There is no doubt that a filing received by the board of elections within minutes of the deadline in section 163-182.9 is in "substantial compliance" with the deadline. The filing of a protest within minutes of a deadline would be "essentially" or "in substance" complying with the deadline, even if it is not technically complying with the deadline. Under section 163-182.10(a)(1), any such protest must, as a matter of law, be allowed to proceed to the merits.

## V.    No Other Federal Statute Bars the Protests.

Justice Riggs argued that additional federal statutes preclude Judge Griffin's protests from succeeding. The Board did not address these statutes because they are irrelevant to the protests at issue.

### A.    The Civil Rights Act does not impact the protests.

Justice Riggs argued to the State Board that the "materiality provision" of the federal Civil Rights Act of 1964 barred Judge Griffin's election protests based on ballots cast by people with incomplete voter registrations. But her argument has already been rejected by other courts.

The Civil Rights Act's materiality provision prohibits any "person acting under color of law" from denying an individual's vote due to an error or omission "if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B). The Eleventh Circuit has already

- 55 -

determined that a drivers license or social security number is material in determining whether an individual is qualified by law to vote. *See Browning*, 522 F.3d at 1174 n.22 ("because Congress required the identification numbers [drivers license numbers or partial social security numbers] to be on voter registration applications, they are *per se* material under [the Civil Rights Act's materiality provision]").

Indeed, the materiality provision only applies to the provision of "trivial information" that serves no purpose other than "inducing voter-generated errors that could be used to justify rejecting applicants." *Id.* at 1173. The General Assembly has determined that some information on the voter application form is immaterial and can be lawfully omitted—like "race, ethnicity, gender, or telephone number." N.C. Gen. Stat. § 163-82.4(a). But drivers license and social security numbers are far from immaterial. The information at issue is used to validate the identity of the applicant. *Id.* § 163-82.12(8), (9). Thus, the Eleventh Circuit described such information as "per se" material under the Civil Rights Act. *Browning*, 522 F.3d at 1174 n.22. The court was skeptical that the government "would mandate the gathering of information—indeed, that it would make that a precondition for accepting registration application—that it also deems immaterial." *Id.* at 1174.

**B.    The Voting Rights Act does not impact the protests.**

At the State Board, Justice Riggs claimed that the Voting Rights Act of 1965 (VRA) prevents the State Board from enforcing the election laws identified in Judge Griffin's protests. That is wrong.

- 56 -

The Voting Rights Act prohibits refusing to count the vote of anyone "who is entitled to vote under any provision of this Act or is otherwise qualified to vote." 52 U.S.C. § 10307(a). Justice Riggs never pointed to any provision of the Act that the election protests purportedly violate. Indeed, the enforcement provision of the VRA exists just to enforce "the Act's comprehensive scheme to eliminate racial discrimination in the conduct of public elections." *Powell v. Power*, 436 F.2d 84, 86 (2d Cir. 1970). Absent racial discrimination, "the Act provides no remedy." *Id.* at 87. As the U.S. Supreme Court has recently explained, the VRA is Congress's effort to bring to "an end to the denial of the right to vote based on race." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 655 (2021). No one has ever suggested that this case involves racial discrimination—it quite obviously doesn't. So the Voting Rights Act is irrelevant.

## VI.    The Protests Comport with Equal Protection and Substantive Due Process.

The right to vote is fundamental. But like all fundamental rights, voting is not an absolute right. The U.S. Supreme Court has established a test that balances the right to vote with a state's interest in ensuring election integrity. The protests, which seek to enforce laws that go to the heart of election integrity, satisfy this balancing test.

### A.    The *Anderson-Burdick* test.

Voting is a fundamental right. *E.g., Burdick v. Takushi*, 504 U.S. 428, 433 (1992). Yet, the U.S. Supreme Court has recognized that "[t]here must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974).

JA 87

- 57 -

The U.S. Supreme Court has established the *Anderson-Burdick* test to strike a balance between the right to vote and the need for fair elections. *See Libertarian Party of N.C. v. State*, 365 N.C. 41, 47-48, 707 S.E.2d 199, 203-04 (2011) (discussing test). The test requires that a regulation imposing a severe burden on voting be "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434 (internal quotation marks omitted). Severe burdens are defined as invidious restrictions that "are unrelated to voter qualifications." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189 (2008).

The test also accounts for non-severe burdens, which include "'evenhanded restrictions that protect the integrity and reliability of the electoral process itself.'" *Id.* at 189-90 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 n.9 (1983)). These lesser burdens are subject to a flexible balancing standard, which "weigh[s] 'the character and magnitude of the asserted injury'" against "'the precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). Such burdens are usually justified by "a State's important regulatory interests." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 351 (1997).

**B.     The protests do not seek to impose severe limitations on voting.**

Judge Griffin is not asking the State Borad to enforce laws that would severely burden voting.

To start, the North Carolina Constitution establishes that both lawful registration and residency are voter qualifications. N.C. Const. art. VI, §§ 2(1), 3(1). And anybody who wants to vote in North Carolina must be a resident and lawfully registered—no exceptions

JA 88

- 58 -

are allowed. Judge Griffin's request that the State Board enforce this *evenhanded* pair of voter *qualifications* cannot, as a matter of law, severely burden the right to vote. *See Crawford*, 553 U.S. at 189-90.

The third law that Judge Griffin asked the State Board to enforce (overseas voters providing photo identification) is enshrined in the General Statutes. *See supra* Argument § III. Like registration and residency, this requirement is also evenhanded—applying to all voters equally. Indeed, Judge Griffin filed the protest because the State Board unlawfully exempted one demographic of voters—those living overseas—from this universal requirement. The U.S. Supreme Court has already concluded that reasonable photo-identification requirements do not impose "a substantial burden on the right to vote." *Crawford*, 553 U.S. 191-98.

The State Board never mentions the *Anderson-Burdick* test anywhere in its order. Rather, in discussing the incomplete-registration protests, the Board defends its dismissal of those protests on the grounds that the individuals "did everything they were told to do to register." App. 57. The Board then relies on this Court's decisions in *Overton v. Mayor & City Commissioners of City of Hendersonville*, 253 N.C. 306, 116 S.E.2d 808 (1960), and *Woodall v. W. Wake Highway Commission*, 176 N.C. 377, 97 S.E. 226 (1918), for the Board's conclusion that "error by election officials in the processing of voter registration cannot be used to discount a voter's ballot." App. 59-60. But the decisions in *Woodall* and *Overton* do not hold such. Rather, those decisions reasoned that, because registrars had a duty to issue oaths (while voters had no obligation to take an oath), a *registrar's failure* of his *personal*

JA 89

- 59 -

duty could not result in a voter being disqualified. *See Overton*, 253 N.C. at 315, 116 S.E.2d at 815; *Woodall*, 176 N.C. 377, 97 S.E. at 232.

Here, in contrast, a North Carolina statute imposes a duty on applicants to provide a drivers license or social security number that validates the applicants' identities. *See* N.C. Gen. Stat. § 162-82.4(a)(11), (d), (f). The Board's willingness to register applicants without this information does not excuse applicants of their duty to provide it. Moreover, *Woodall* and *Overton* cannot stand for an absolute rule that election-official errors can never result in the disqualification of voters because the Court plainly held otherwise in *James*, 359 N.C. at 270, 607 S.E.2d at 644, where the Court disqualified thousands of voters who (unlawfully) voted out of precinct at the instruction of poll workers. *James* even cited to *Burdick* to justify its result, seeing no conflict with this remedy and the *Anderson-Burdick* framework. *Id.*

Unlike in *Woodall*, *Overton*, and *James*, this is not an instance in which an election official's error prevented eligible voters from casting their ballots. This is an instance in which, after the State Board decided to not inform individuals of certain requirements, the individuals' ignorance resulted in them failing to take the steps necessary to become eligible voters. As courts have often held, "ignorance of the law is no excuse for a failure to comply with the law." *Orange Cnty. v. N.C. Dep't of Transp.*, 46 N.C. App. 350, 377, 265 S.E.2d

- 60 -

890, 908 (1980). It's not unconstitutional to require the public to be as knowledgeable of election laws as other laws.[12]

### C.    The laws at issue are tailored to compelling state interests.

But even if the Court were to find that the enforcement of the laws at issue severely burdened the right to vote, North Carolina is well justified in enforcing these laws.

The State has an undeniable interest in restricting voting to only those who are eligible to vote, thereby ensuring that the votes of eligible voters are not diluted by ineligible ballots. *Bush v. Gore*, 531 U.S. 98, 105 (2000). Indeed, counting only eligible ballots is the ultimate means of accomplishing the State's "compelling interest in preserving the integrity of its election process." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (cleaned up). Demanding that only qualified voters—those lawfully registered, residing in North Carolina, and producing photo identification—be allowed to cast a ballot is perfectly tailored to protecting eligible voters from vote dilution.

The State's compelling interest in election integrity also empowers the States to enact protections against possible voter fraud, because such protections assuage the public's

---

12    Even assuming citizens could blame the State Board for their failure to become eligible to vote, human error by government employees does not automatically create a constitutional violation. *See Pettengill v. Putnam Cnty. R-1 Sch. Dist., Unionville, Mo.*, 472 F.2d 121, 122 (8th Cir. 1973) (holding no constitutional violation absent "aggravating factors such as denying the right of citizens to vote for reasons of race, or fraudulent interference with a free election by stuffing of the ballot box, or other unlawful conduct which interferes with the individual's right to vote" (citations omitted)); *Powell*, 436 F.2d at 88 (holding that neither the Equal Protection and Due Process Clauses of the Fourteenth Amendment "guarantee against errors in the administration of an election").

- 61 -

"fear [that] legitimate votes will be outweighed by fraudulent ones." *Id.* Thus, the State is justified in requiring that all voters provide photo identification as a means of identity verification. Moreover, the *Anderson-Burdick* standard does not demand an "elaborate, empirical verification" of efforts to counteract voter fraud. *Timmons*, 520 U.S. at 364. Rather, the State is free to protect against voter fraud "with foresight rather than reactively," so long as the protections are "reasonable" and don't "significantly impinge" constitutional rights. *Munro v. Socialist Workers Party*, 479 U.S. 189, 195-96 (1986).

It is no longer debatable that universal photo-identification requirements are a constitutionally acceptable way to guard against impersonation of registered voters. *See Crawford*, 553 U.S. at 194-97 (Stevens, J.); *see also id.* at 209 (Scalia, J., concurring) ("The universally applicable requirements of Indiana's voter-identification law are eminently reasonable.").

It is equally established that North Carolina's requirement that individuals, in order to be qualified to vote, verify their identities via a drivers license or social security number guards against fraudulent registrations. *See Browning*, 522 F.3d at 1168 (describing HAVA's mirror requirement for such information as being "Congress's attempt to . . . prevent[] voter impersonation fraud"). "'The electoral system cannot inspire public confidence if no safeguards exist . . . to confirm the identity of voters.'" *Crawford*, 553 U.S. at 194 (quoting Building Confidence in U.S. Elections § 2.5 (Sept. 2005)).

JA 92

- 62 -

## VII.    The Appropriate Remedy Is Discounting the Illegal Ballots.

In the end, the State Board and Justice Riggs do not disagree with Judge Griffin's reading of the law—they simply believe it's too late to comply with the law. But the results of an election cannot be tainted by ballots unlawfully cast. Judge Griffin's protests satisfy the legal standards established in the election-protest statutes and, therefore, the Court should order that any unlawful vote be discounted.

### A.    To succeed, Judge Griffin need only provide substantial evidence of an outcome-determinative violation of election law.

To ensure that no election is subject to the taint of inaccurate results, the General Assembly provided a lenient standard for the success of an election protest.

Our state constitution requires that elections be "free." N.C. Const. art. I, § 10. An election is free only if "the votes are *accurately* counted. Inherently, votes are not accurately counted if ineligible voters' ballots are included in the election results." *Bouvier*, 386 N.C. at 3, 900 S.E.2d at 842 (quoting *Harper v. Hall*, 384 N.C. 292, 363, 886 S.E.2d 393, 439 (2023)).

The election-protest process is the legislature's recognition that free—and, thus, accurate—elections "are vital to maintaining the public's trust and confidence in our system of self-government." *Id.* at 4, 900 S.E.2d at 842. The election-protests process is meant "to assure that an election is determined without taint of fraud or corruption and without irregularities that may have changed the result of an election." *Id.* at 4, 900 S.E.2d at 843.

- 63 -

Given the critical role that protests play in ensuring the public's confidence in the democratic process, the General Assembly provided for a lenient standard for a successful protest. This is because election boards "must expeditiously resolve election protests to facilitate appeals and the timely certification of elections." *Id.* at 16, 900 S.E.2d at 850. Election protests, therefore, "proceed rapidly, and the process does not lend itself to exhaustive discovery and absolute precision." *Id.*

For an election protest to succeed, the election protest only needs to present "**substantial evidence to believe** that a violation of the election law or other irregularity or misconduct did occur and that it was sufficiently serious to cast doubt on the apparent results of the election." N.C. Gen. Stat. § 163-182.19(d)(2)(d), (e) (emphasis added). If an election protest is successful, the statutes authorize the elections board to correct the vote count and declare new results. *Id.* § 163-182.19(d)(2)(d), (e).

This Court has described the "substantial evidence" standard as creating a "low" bar. *State v. Taylor*, 379 N.C. 589, 611, 866 S.E.2d 740, 757 (2021). Thus, in *State v. Butler*, this Court stated: "To be substantial, the evidence need not be irrefutable or uncontroverted; it need only be such as would satisfy a reasonable mind as being adequate to support a conclusion." 356 N.C. 141, 145, 567 S.E.2d 137, 139 (2002) (quotation omitted). In plain terms, "substantial evidence is simply evidence that is "more than a scintilla" and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lackey v. Dept. of Human Resources*, 306 N.C. 231, 238, 293 S.E.2d 171, 176 (1982).

- 64 -

Courts routinely apply the "substantial evidence" standard, and have recognized for decades that "uncorroborated and untested testimony and hearsay testimony" can constitute substantial evidence, as long as that evidence is reliable and trustworthy. *EchoStar Commc'ns Corp. v. FCC*, 292 F.3d 749, 753 (D.C. Cir. 2002). It is also generally accepted that the "substantial evidence" standard can be satisfied by something less than a preponderance of the evidence, *La. Public Service Comm'n v. FERC*, 20 F.4th 1, 7 (D.C. Cir. 2021), and that the possibility of drawing two inconsistent conclusions from the evidence does not prevent a finding from being supported by substantial evidence, *Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 669 (Fed. Cir. 2019).

### B. Judge Griffin provided substantial evidence of outcome-determinative election-law violations.

For the reasons already discussed, Judge Griffin's protests identify three categories of voters who, as a matter of law, are ineligible to vote in the 2024 elections. There is no doubt that North Carolina law prohibited these three categories of voters to cast ballots for Seat 6 of the North Carolina Supreme Court. The State Board's willingness to allow these voters to potentially determine the outcome of the election is a clear violation of election law.

In addition to establishing election-law violations, Judge Griffin's protests provide the identities of the ineligible voters. Judge Griffin's protests were each accompanied by an affidavit that (1) explained how the identities of these ineligible voters were determined **based on data from the State Board** and (2) attached the resulting lists of the voters'

JA 95

- 65 -

identities. In the aggregate, the affidavits and lists that accompany the protests establish the following numbers of ineligible voters by category:

- Incomplete voter registration: 60,273.

- Never residents: 267.[13]

- Overseas voters without photo IDs: 5,509.[14]

Judge Griffin currently trails Justice Riggs by only 734 votes. There is no question that the State Board's unlawful decision to permit 5,509 overseas voters to cast ballots without providing photo identification is of a magnitude that it casts doubt on the outcome of the election. That is all the more true of the State Board's unlawful decision to allow 60,273 individuals to cast ballots despite the individuals never completing registration. While the Never Residents are, in isolation, insufficient to change the outcome of the election, those 267 voters could become outcome-determinative after the results are adjusted for the other categories of unlawful voters.

---

**13**   Judge Griffin was able to identify Never Residents who had submitted materials to the State Board. There are additional Never Residents who cast ballots but submitted their materials to the county boards of elections. Although Judge Griffin is not certain that these additional Never Residents are sufficient in number to change the outcome of his election, Judge Griffin ask that the Court's relief make clear that all Never Residents—whether they submitted materials to the State Board or a county board—be ineligible to vote in a state election.

**14**   Judge Griffin filed protests challenging no-ID overseas voters in six counties. Before filing the protest, counsel to Judge Griffin requested the list of such voters from six counties. App. 176. When the protests were originally filed, only one county (Guilford) had provided a list of such voters, and this list was included with the protest filed in Guilford County. App. 1831-78. Since filing the protests, Durham, Forsyth, Buncombe counties have provided the lists as well, and the lists were filed as supplements to Judge Griffin's protests. App. 177-343.

JA 96

- 66 -

Again, the General Statutes require only "substantial evidence" of an outcome-de-
terminative election-law violation. N.C. Gen. Stat. § 163-182.19(d)(2)(d), (e). This is a
"low" bar, *Taylor*, 379 N.C. at 611, 866 S.E.2d at 757, that does not require "irrefutable or
uncontroverted" evidence—it requires only that "a reasonable mind" might find the evi-
dence to be adequate, *Butler*, 356 N.C. at 145, 567 S.E.2d at 139. The affidavits and lists
constitute "substantial evidence" of outcome-determinative election-law violations be-
cause the affidavits and lists are, as a matter of law, sufficient to support a reasonable mind's
conclusion that such voters were ineligible to vote. *See Lackey*, 306 N.C. at 238, 293 S.E.2d
at 176.

**C.    The Board tried to cast doubts about its own data.**

In its decision, the Board cast doubt on the unrebutted evidence offered in support
of Judge Griffin's protests. Namely, the Board questioned whether the 60,000 voters iden-
tified in the protests had failed to provide their drivers license or social security numbers.
App. 52.

As a threshold matter, the affidavits that accompany Judge Griffin's protest explain
that the list identifying the incomplete registrants was **provided by the State Board itself**
in response to a public records request. App. 1754-55 ¶¶ 9-11. The fact that the Board is
now attempting to impeach its own data should make the Court suspicious of the Board's
purported factual concerns. But the Court can also quickly dispense with these concerns
on the merits.

JA 97

To try to create doubt about the list provided by the State Board, the Board now speculates that the list could be over inclusive.

The State Board first speculates that the list might include individuals who were never issued a drivers license or social security number. *See* App. 52-53. But the Board—which certainly knows the answer to its own question—stops short of alleging that a single individual on the list falls within this category.

Second, the Board theorizes that some individuals might appear on the Board's list because, despite providing a drivers license or social security number with their application, the number was removed from "the voter's registration record" after the number failed the validation process. App. 53-54. But the Board concedes that, while the number is no longer in the "voter's registration record," "the *data is still retained* elsewhere in the system." App. 54 (emphasis added). The Board, moreover, provided a list of voters for which the Board's records did "not contain **data**" of either a drivers license number or social security numbers. App. 1754-55 (emphasis added).[15] According to the Board itself, the Board provided a list of voters for which the Board had no data of a drivers license or social security numbers. Notably, the Board never alleges that a single individual on the list provided a drivers license or social security number.

---

**15**     Mr. Bonifay explains in his affidavit that he screened the Board's list for individuals who lacked data for both a drivers license number and a social security number, and then he matched that subset against a list of individuals who voted by absentee or provisional ballot. App. 1755.

- 68 -

None of the Board's speculation undermines the reality that Judge Griffin's incomplete-registration protests provide substantial evidence of an outcome-determinative election-law violation.

**D.      The Court should order the ineligible votes discounted and the election results retabulated.**

Like this Court held decades ago, "To permit unlawful votes to be counted along with lawful ballots in contested elections effectively 'disenfranchises' those voters who cast legal ballots, at least where the counting of unlawful votes determines an election's outcome." *James*, 359 N.C. at 270, 607 S.E.2d at 644. And the U.S. Supreme Court made the same point decades before that, reconfirming it in *Bush v. Gore*: "And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964), *quoted by Bush v. Gore*, 531 U.S. 98, 105 (2000).

This case is not the first time that an election protest has caught the State Board violating the law and counting unlawful ballots. In the 2004 general election, the Board "improperly counted provisional ballots cast outside voters' precincts of residence on election day." *James*, 359 N.C. at 269, 607 S.E.2d at 644. As this Court held, state law did not allow these voters to cast ballots. The issue came to the Court from an election protest. *Id.* at 263, 607 S.E.2d at 640. And like the violation of law here, that one too was "statutorily unauthorized" and resulted in "thousands of citizens" being denied "the right to vote on election day." *Id.* at 269, 607 S.E.2d at 644. Nonetheless, this Court unanimously held that

JA 99

- 69 -

the error could not be remedied in a way to ensure the votes were counted: "This Court is without power to rectify the Board's unilateral decision to instruct voters to cast provisional ballots in a manner not authorized by State law." *Id.* at 270, 607 S.E.2d at 644. If the Court had simply permitted the State Board to count the statutorily unauthorized ballots, it would have disenfranchised those who cast lawful ballots: "To permit unlawful votes to be counted along with lawful ballots in contested elections effectively 'disenfranchises' those voters who cast legal ballots, at least where the counting of unlawful votes determines an election's outcome." *Id.*

Of course, Judge Griffin filed his election protests because unlawful votes have been counted, which has likely determined the election's outcome. Under *James*, the Board was required to discount the unlawful ballots. That is the normal result of a successful election protest. *See Bouvier*, 386 N.C. at 4, 900 S.E.2d at 843 ("Where the irregularity affects the accuracy of the election results, the county board of elections may order the ineligible ballots excluded from the vote total . . . .").

Before the State Board of Elections, there was discussion of whether the Board could order a post-election cure period for some of Judge Griffin's protests. But Justice Riggs's counsel adamantly opposed a cure opportunity, calling it unconstitutional and *ultra vires*. If there is to be no post-election cure opportunity, then the only remedy left is the *James* remedy: excluding the ineligible ballots.

- 70 -

## REQUESTED RULINGS AND RELIEF

In the interests of finality and expediency, Judge Griffin respectfully requests that the Court's order on the petition a writ of prohibition address every issue that has been raised in this proceeding. To summarize the preceding points, Judge Griffin requests that the Court hold:

(a)    Ballots cast by people who failed to provide their drivers license number or social security number when they registered to vote cannot be counted for this electoral contest.

(b)    Ballots cast by people who represented that "I am a U.S. citizen living outside the country, and I have never lived in the United States" cannot be counted for this electoral contest.

(c)    Ballots cast by overseas voters who did not present a photo identification cannot be counted for this electoral contest.

(d)    Judge Griffin's election protests were properly brought as election protests and were not required to be brought as voter challenges.

(e)    Judge Griffin's election protests do not require the removal of any person from the voter rolls.

(f)    All arguments under the NVRA, HAVA, the VRA, and the Civil Rights Act against the relief requested by Judge Griffin are rejected.

(g)     All arguments under the state or federal constitution that affected persons who cast ballots were improperly served or are due additional process are rejected.

(h)     All other arguments that the ballots cannot be discounted without violating the federal or state constitution are rejected.

(i)     This State Board is prohibited from counting the above-identified ballots, which were not lawfully cast.

## CONCLUSION

Judge Griffin respectfully requests that the Court issue a writ of prohibition prohibiting the Board from counting the unlawful ballots in the election for Seat 6 of the North Carolina Supreme Court and ordering the State Board correct the vote count.

This the 18th day of December, 2024.

Electronically submitted
Troy D. Shelton
N.C. State Bar No. 48070
tshelton@dowlingfirm.com
DOWLING PLLC
3801 Lake Boone Trail
Suite 260
Raleigh, North Carolina 27607
Telephone: (919) 529-3351

N.C. App. R. 33(b) Certification: I certify that the attorneys listed below have authorized me to list their names on this document as if they had personally signed.

Craig D. Schauer
N.C. State Bar No. 41571

- 72 -

cschauer@dowlingfirm.com
W. Michael Dowling
N.C. State Bar No. 42790
mike@dowlingfirm.com

Philip R. Thomas
N.C. State Bar No. 53751
pthomas@chalmersadams.com
Chalmers, Adams, Backer & Kaufman, PLLC
204 N Person Street
Raleigh, North Carolina 27601
Telephone: (919) 670-5185

*Counsel for the Honorable Jefferson Griffin*

## VERIFICATION OF COUNSEL

Pursuant to N.C. Gen. Stat. § 7A-98, counsel submits the following declaration:

I declare under penalty of perjury under the laws of North Carolina that the statements of fact in the foregoing document are true and correct to the best of my knowledge.

Executed on December 18, 2024.

Craig D. Schauer

- App. 38 -

STATE OF NORTH CAROLINA
WAKE COUNTY

BEFORE THE STATE BOARD OF ELECTIONS

|  |  |
|---|---|
| ) | |
| ) | |
| IN RE ELECTION PROTESTS OF ) | **DECISION AND ORDER** |
| JEFFERSON GRIFFIN, ASHLEE ) | |
| ADAMS, FRANK SOSSAMON, AND ) | |
| STACIE McGINN ) | |
| ) | |
| ) | |

At a public meeting held on December 11, 2024, the State Board of Elections ("State Board") considered election protests filed by four candidates in the 2024 General Election: Jefferson Griffin, a Republican candidate for associate justice of the Supreme Court of North Carolina; Ashlee Adams, a Republican candidate for N.C. Senate District 18; Stacie McGinn, a Republican candidate for N.C. Senate District 42; and Frank Sossamon, a Republican candidate for N.C. House District 32 (collectively, the "Protesters"). The Board consolidated the protests filed by these candidates for its decision, because they all involve the same sets of legal issues.

Upon consideration of the protest materials submitted by the Protesters; the briefs submitted by the Protesters, opposing candidates, and other interested parties; the oral argument presented to the State Board by counsel for the candidates; and the matters upon which judicial notice was taken, the Board concluded that the protests did not substantially comply with the service requirements and did not establish probable cause to believe that a violation of election law or irregularity or misconduct occurred in the protested elections. The Board therefore dismisses these protests.

## I.      BACKGROUND

On November 19, 2024, the Protesters filed over 300 protests across the state challenging the apparent results of their elections. After the county boards of elections conducted recounts in all of these contests, the final canvassed results are as follows:

| CONTEST | CANDIDATE | PARTY | BALLOT COUNT | PERCENT |
|---------|-----------|-------|--------------|---------|
| Supreme Court Associate Justice | Allison Riggs | DEM | 2,770,412 | 50.01% |
| | Jefferson G. Griffin | REP | 2,769,678 | 49.99% |
| NC Senate District 18 | Terence Everitt | DEM | 59,667 | 48.47% |
| | Ashlee Bryan Adams | REP | 59,539 | 48.36% |
| | Brad Hessel | LIB | 3,906 | 3.17% |
| NC Senate District 42 | Mrs. Woodson Bradley | DEM | 62,260 | 50.08% |
| | Stacie McGinn | REP | 62,051 | 49.92% |
| NC House District 32 | Bryan Cohn | DEM | 21,215 | 48.95% |
| | Frank Sossamon | REP | 20,987 | 48.42% |
| | Ryan Brown | LIB | 1,140 | 2.63% |

Protests were filed in almost every county in the state.[1] Those protests are based on six categories of allegations that certain general election voters' ballots were invalid. Those six categories and the number of voters challenged per category are:

---

[1] The legislative candidates filed protests in only those counties within the jurisdiction of their legislative contests.

1. Ballots cast by registered voters whose voter registration database records contain neither a driver's license number nor the last-four digits of a social security number—60,273 voters challenged;

2. Ballots cast by overseas citizens who have not resided in North Carolina but whose parents or legal guardians were eligible North Carolina voters before leaving the United States—266 voters challenged;

3. Ballots cast by military or overseas citizens under Article 21A of Chapter 163, when those ballots were not accompanied by a photocopy of a photo ID or ID Exception Form—1,409 voters challenged;[2]

4. Ballots cast by voters who were serving a felony sentence as of Election Day—240 voters challenged;

5. Ballots cast by voters who were deceased on Election Day—156 voters challenged; and

6. Ballots cast by voters who registration was denied or removed—572 voters challenged.[3]

Across all counties and among the four Protesters, the protests alleging the same category of allegedly ineligible voters are structured and pleaded in the same fashion. The only differences among county protests of the same category are the identities of the voters being

---

[2] Griffin has sought to add voters to the second and third protest categories in supplemental filings submitted after the deadline to file an election protest. *See* G.S. § 163-182.9(b)(4). Because the Board determines these protests are legally deficient, it need not determine whether such supplementations are allowable under the General Statutes and Administrative Code.

[3] Some challenged voters are included in multiple protests filed in the same county. For instance, voters removed after dying before Election Day may be in both the deceased and removed protests. Additionally, Griffin has withdrawn his protests in a few counties. Accordingly, while these last three types of protests together appear to total 968 voters, in actuality they involve a combined 817 voters.

3

challenged—i.e., only voters registered in the county receiving the protest are part of a protest that the county board received.

On Wednesday, November 20, 2024, the State Board held a meeting, noticed on an emergency basis under N.C.G.S. § 143-318.12, to consider whether to take jurisdiction over some of the protests, which the State Board may do under N.C.G.S. § 163-182.12. The Board voted unanimously to take jurisdiction over the first three categories of protests, which presented legal questions of statewide significance. The Board instructed the county boards of elections to retain jurisdiction to consider the remaining three categories of protests, which were focused on individual, fact-specific determinations of voter eligibility.

Currently, the last three categories of protests are at various stages in the election protest process, with some still pending with and yet to be finally decided by the county boards, some having been decided with no timely appeal, some that are subject to appeal, and some that have been withdrawn by the Protester.

This decision concerns the first three categories of election protests.

## II.    STANDARD OF DECISION

The State Board assumed jurisdiction over these protests pursuant to its authority under N.C.G.S. § 163-182.12, which states, in relevant part:

> The State Board of Elections may consider protests that were not filed in compliance with G.S. 163-182.9, may initiate and consider complaints on its own motion, may intervene and take jurisdiction over protests pending before a county board, and may take any other action necessary to assure that an election is determined without taint of fraud or corruption and without irregularities that may have changed the result of an election.

When a protest is filed with a county board, the county board must first hold a "preliminary consideration" meeting. N.C.G.S. § 163-182.10(a). At that meeting, before a protest

4

- App. 42 -

may advance to an evidentiary hearing on the allegations, the county board must first "determine whether the protest substantially complies with G.S. 163-182.9 and whether it establishes probable cause to believe that a violation of election law or irregularity or misconduct has occurred." *Id.* Only if a protest satisfies both of these requirements will it advance to an evidentiary hearing. *Id.*

The first preliminary consideration requirement considers whether the protest satisfied the filing requirements in N.C.G.S. § 163-182.9. These requirements include the deadline by which a protest must be filed, how the protest must be filed, and the use of the State Board's election protest form, which is promulgated in an administrative rule, 08 NCAC 02 .0111, pursuant to a statutory mandate for the State Board to "prescribe forms for filing protests." N.C.G.S. § 163-182.9.

The second preliminary consideration requirement considers whether the substance of the protest meets the pleading threshold to advance to a hearing—"whether it establishes probable cause to believe that a violation of election law or irregularity or misconduct has occurred." N.C.G.S. § 163-182.10(a)(1). This standard involves both legal and factual questions. Legally, the Board must decide whether the claims made in the protest are actionable via a protest as a matter of law—whether the allegations even amount to a violation, irregularity, or misconduct in the conduct of the election. If so, the Board must decide whether the factual allegations and evidence attached to the protest establish probable cause to believe that the alleged violation, irregularity, or misconduct actually occurred.

Probable cause is a commonsense, practical standard: Is the material submitted by the protester sufficient for a reasonable and prudent person to believe that election law violations, irregularities, or misconduct occurred in the conduct of the election. It does not mean that such a

5

belief is necessarily correct or more likely true than false. A probability of an irregularity in the conduct of the election is sufficient. *See Adams v. City of Raleigh*, 245 N.C. App. 330, 336–37, 782 S.E.2d 108, 113–14 (2016).

The General Statutes are not clear whether the State Board must conduct preliminary consideration, which is prescribed for county board protest procedures in N.C.G.S. § 163-182.10, when the State Board exercises jurisdiction over a protest in the first instance under N.C.G.S. § 163-182.12. Nonetheless, the State Board adopts this established preliminary consideration procedure with regard to these protests, in the interest of the efficient administration of justice.

## III.     ANALYSIS

The protests at issue were not served on affected voters in accordance with law. Additionally, each of the three categories of protests is legally deficient. The protests are therefore dismissed.

### A. Service of Protests on Challenged Voters[4]

The Board first concludes that the Protesters failed to serve the registered voters they seek to challenge in their protests in a manner that would comply with the North Carolina Administrative Code and be consistent with the requirements of constitutional due process.

When a board of elections conducts its preliminary consideration of a protest filing, it is tasked with first determining "whether the protest substantially complies with G.S. 163-182.9." N.C.G.S. § 163-182.10(a)(1). That statute requires certain information to be contained within the protest filing (*i.e.*, identification of the protestor, the basis of the protest, and the remedy

---

[4] A small number of the protests encompassed within this order may not have been timely filed under G.S. § 163-182.9(b)(4), including all of Adams's protests and the Griffin protests filed in Moore, Orange, and Richmond counties. Nonetheless, the Board does not need to decide whether they were timely or whether the Board would exercise its jurisdiction under G.S. § 163-182.12 to consider such untimely protests, as it is dismissing these protests for other reasons.

6

requested), while also stating the following: "The State Board of Elections shall prescribe forms for filing protests." N.C.G.S. § 163-182.9(c).

The State Board has promulgated such a form in the administrative code at 08 NCAC 02 .0111. This rule, which carries the force of law, makes clear the protestor's responsibilities in completing, filing, and serving the form. The Board promulgated this rule in 2020 under its specific statutory authority to do so under N.C.G.S. §§ 163-182.9(c) and 163-182.10(e), and under its general statutory authority for rulemaking under N.C.G.S. § 163-22(a).

Any voters whose right to vote is called into question by the protest are "affected parties" who must be served with copies of <u>all</u> protest filings, as follows:

> *You must serve copies of all filings* on every person with a direct stake in the outcome of this protest ("Affected Parties"). . . . *If a protest concerns the eligibility or ineligibility of particular voters, all such voters are Affected Parties and must be served.* Address information for registered voters is available from the county board of elections or using the Voter Lookup at www.ncsbe.gov.

08 NCAC 02 .0111 (emphasis added).

The rule provides the following instruction for how and when to serve the protest filings:

> *Materials may be served by personal delivery, transmittal through U.S. Mail or commercial carrier service to the Affected Party's mailing address of record on file with the county board of elections or the State Board, or by any other means affirmatively authorized by the Affected Party.* . . . Service must occur within one (1) business day of filing materials with the county board of elections. If service is by transmittal through the U.S. Mail or commercial carrier service, service will be complete when the properly addressed, postage-paid *parcel* is deposited into the care and custody of the U.S. Mail or commercial carrier service. It is [the protester's] responsibility to ensure service is made on all Affected Parties.

*Id.* (emphasis added).

The question at hand is whether the Protesters' method of service satisfies the requirement in 08 NCAC 02 .0111 to "serve" the voters with "copies of all filings."

7

i.  *Method of service used by the Protesters*

The Protesters did not personally deliver physical copies of the filings to the voters or mail physical copies of the filings to the voters' address in their voter registration record. Instead, the Protesters mailed a postcard, with the sender identified as the North Carolina Republican Party, and this message: "your vote may be affected by one or more protests filed in relation to the 2024 General Election," and an instruction to scan a QR code[5] to view the protest filings. The postcard does not inform the voter that it is Griffin, Adams, McGinn, or Sossamon protesting, that they are challenging the voter's eligibility to vote, or include the text of the link that the QR code points to (https://www.nc.gop/griffin_protest). This means that the method of service used by Griffin requires a recipient to somehow know this postcard is intended to be a legal document, and to trust the card is not a scam[6] or junk mail. The voter must also have a smartphone and know how to scan a QR code.[7] There is no other way from the face of the postcard for the recipient voter to know what website to visit to obtain access to the information and materials necessary to know the nature of the proceeding and how the voter is affected by it.

---

[5] "QR codes (or Quick Response codes) are two-dimensional codes that you can scan with a smartphone. The code contains information, usually a site address, and once you scan it, the code connects you with a resource on the web." *Introduction to QR codes*, Digital.gov, available at https://digital.gov/resources/introduction-to-qr-codes/ (last visited December 9, 2024).

[6] While generally useful and increasingly more common, the federal government has made clear that there can be security issues with using QR codes, because "[c]ybercriminals can tamper with QR codes, replacing them altogether with QR code stickers or interfering with the link that's embedded in the code." *Introduction to QR codes*, Digital.gov (referring to guidance from the Federal Bureau of Investigations in 2022).

[7] *See Symbology Innovations, LLC v. Lego Sys.*, 158 F. Supp. 3d 916, 922 (E.D. Va. 2017) ("To access information stored in the QR code, a consumer must have a QR code reader application ("app") installed on the consumer's smart phone. When presented with a QR code, the consumer opens the app, which activates the smartphone's camera to scan the QR code. The app then processes the QR code, decodes its message, and uses the encoded URL to access the online content sought by the consumer." (citations omitted)).

8

If the voter has a smartphone and knows how to scan the QR code, then they will be taken to a website, on the browser app of their smartphone, hosted by the North Carolina Republican Party containing links to the hundreds of protests filed by all four of the Protesters.[8] Despite the postcard informing the voter to "check under the county in which you cast a ballot to see what protest may relate to you," only the Griffin protest is organized by county. The Adams protest filing links include names of counties that may clue in a voter that they must be registered to vote in that county to be subject to that particular protest, but the six McGinn protest filing links and five Sossamon protest filing links contain no such information. Again, the postcard does not inform the voter which candidate is challenging their eligibility, so a voter would need to review the Griffin, Adams, McGinn, and Sossamon protest filings to determine whether they are affected, and then choose from among the several categories of protests listed. All this must be done on the browser app of a voter's smartphone if they have one.

Once a voter has located which of the hundreds of protest filings linked on the website might include them, they must then peruse the filings, on their smartphone, to locate their name in printouts of spreadsheets attached to a protest filing. These attachments do not list voters alphabetically and, depending on the basis of the protest, may contain hundreds of names across numerous pages. Take for instance the Lee County protests filed by Griffin. The "Incomplete Voter" protest alone contains almost 200 voters' names across five pages,[9] with another 10

---

[8] Screenshots of the website as displayed on a smartphone are in Attachment A to this decision.

[9] A screenshot of the spreadsheet listing voters' names for this protest as displayed on a smartphone is in Attachment A to this decision.

9

voters challenged across three other protest filings.[10] A Lee County voter in receipt of Griffin's postcard would have to read through every line of text in the spreadsheets attached to these four protests to determine if their name is on one or more of the lists of voters challenged by Griffin, as well as the other protests listed on the website. And even if the voter finds their name, in most instances the only way to confirm the name listed refers to them would be to look up their NCID number or voter registration number (VRN) on their voter registration card (if they have ready access to it) or voter profile on the State Board's website.[11] This is because the only demographic information listed on the spreadsheet for most of the protests is the voter's name and those identifier numbers, which are only relevant for administrative election purposes and are generally not know by a voter. The face of the protest form likewise does not contain any challenged voter's demographic information.

### ii. Compliance with the service requirements

The method of service employed here does not comport with the plain text of the rule or the constitutional due-process requirements to serve an affected party.

**First**, a straightforward reading of the instructions in 08 NCAC 02 .0111 make it clear that the "materials" to be served through personal delivery or as a "parcel" in the mail are *physical* "copies of all filings."

This plain reading of the rule makes even more sense when considering how service is typically made in other contexts. For example, service of process on a natural person (*i.e.*, a

---

[10] Copies of all protests filed by Griffin, including those that may have been late or not actually received by a county, are available on the State Board's website at: https://dl.ncsbe.gov/?prefix=Legal/Nov%202024%20Protests/Griffin/.

[11] Available at: https://vt.ncsbe.gov/RegLkup/.

10

person, not a corporation) in a civil lawsuit must be done by "*delivering a copy* of the summons and of the complaint" to person, or their agent, by "*leaving copies* thereof" at the person's home, by "*mailing a copy* of the summons and of the complaint" by certified mail or through a designated delivery service. N.C.G.S. § 1A-1, Rule 4(j)(1) (emphasis added). As another example, when documents other than the summons and complaint must be served directly on a party to a civil lawsuit, service must be done as provided in Rule 4, or by "*delivering a copy* to the party," which means physically "*handing it to* the party," or by "*mailing a copy* to the party at the party's last known address," or by email "if the party has consented to receive e-mail service in the case at a particular e-mail address, and a copy of the consent is filed with the court by any party." N.C.G.S. § 1A-1, Rule 5(b)(2) (emphasis added). There is no North Carolina statute or rule that authorizes service of a document to be made by directing a recipient to a website through a QR code located on a postcard mailed in lieu actually including the document required to be served. This is especially important here because the postcard never states clearly that the recipient's right to vote is being challenged.

**Second**, the method of service employed by the Protesters violates the constitutional due process rights of the affected voters.

Election protests are quasi-judicial proceedings. *Bouvier v. Porter*, 386 N.C. 1, 12, 900 S.E.2d 838, 848 (2024). When a board of elections proceeds in its quasi-judicial capacity, the due process rights of the participants must be protected. *See Rotruck v. Guilford Cty. Bd. of Elections*, 267 N.C. App. 260, 265, 833 S.E.2d 345, 349 (2019) (applying *Coastal Ready-Mix Concrete Co. v. Bd. of Comm'rs*, 299 N.C. 620, 265 S.E.2d 379 (1980), in reviewing a voter registration challenge heard before a county board of elections). This protection is particularly important when the election protest challenges the eligibility of voters to vote in the protested

11

- App. 49 -

contest, because a successful protest will mean the discarding of their votes. Voters have a constitutionally protected liberty interest in their right to vote. See *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 227 (M.D.N.C. 2020).

At a minimum, due process requires "notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313, 70 S. Ct. 652, 656-57 (1950); *see McMillan v. Robeson Cty.*, 262 N.C. 413, 417, 137 S.E.2d 105, 108 (1964) (incorporating these procedural due process requirements through the "law of the land" and "due process of law" provisions of the North Carolina Constitution.). "This right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." *Mullane*, 339 U.S. at 314, 70 S. Ct. at 657.

"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 314, 70 S. Ct. at 657 (cleaned up); see *In re Appeal of McElwee*, 304 N.C. 68, 81, 283 S.E.2d 115, 123 (1981) (applying *Mullane*). "[W]hen notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected, or, where conditions do not reasonably permit such notice, that the form chosen is not substantially less likely to bring home notice than other of the feasible and customary substitutes." *Mullane*, 339 U.S. at 315, 70 S. Ct. at 657–58 (cleaned up).

12

- App. 50 -

The Protesters' chosen method of service is not reasonably calculated under the circumstances to inform the challenged voters as to what action is pending, nor does it provide enough information for the voters to determine what they can even do about it. Instead, the postcard with a QR code method can reasonably be described as a "mere gesture" at providing the voters with notice. After all, not every voter will even have a smartphone or the wherewithal for scanning the QR code, or be trusting enough of an unsolicited postcard mailing from a political party to even follow that QR code. And the wording of the postcard is so vague that it is unlikely to clearly inform the recipient that a legal proceeding has been filed against them. For those voters who happen to understand that the postcard is notifying them that a legal proceeding has been filed against them, and who are trusting and savvy enough to follow the QR code on their smartphone, they still have to engage in a needle-in-a-haystack effort to locate what has been alleged about them and by whom, and what is the authority underlying the legal proceeding which would perhaps give them an indication of how and whether they can respond. The method of service chosen here is substantially less likely to give the voters notice than any other customary alternatives.

As Griffin notes in his brief, the Supreme Court of North Carolina has observed that the election protest process is supposed to be "simple so that everyone, not just lawyers, can use it." *Bouvier v. Porter*, 386 N.C. 1, 4, 900 S.E.2d 838, 843 (2024).[12] The applicable rule is quite simple when it comes to service of the protest filings on affected parties. And following its direction would indeed ensure that the affected party receives adequate notice of the proceedings. Yet, instead of simply mailing to each voter a physical copy of the filing that is actually

---

[12] This notion should apply to not only the people bringing the protest, but obviously, for those who may have their votes stripped through the protest, as well.

13

JA 117

applicable to the voter, the Protesters chose to have their political party send each of voters they have challenged on a journey that would likely leave many of the voters wishing they had a digital-age Lewis and Clark to lead the way.  Accordingly, the Protesters have failed to meet this "elementary and fundamental requirement of due process" with their chosen method of service. *Mullane*, 339 U.S. at 314, 70 S. Ct. at 657.

In sum, the Protesters have failed to show substantial compliance with the requirement of 08 NCAC 02 .0111 to "serve" the voters they are challenging with "copies of all filings," and their decision to employ the postcard QR code method of service was not reasonably certain to inform the affected voters of the matter such that they could choose for themselves how to respond.

For these reasons, the State Board concludes, by a vote of 3 to 2, that the protests were not properly served on affected parties required to receive service of copies of the protest filings and therefore do not substantially comply with N.C.G.S. § 163-182.9. The Board will nonetheless address the remaining aspects of preliminary consideration review, because the General Statutes call for reviewing the protest for both procedural compliance and probable cause at the preliminary consideration stage. *See* N.C.G.S. § 163-182.10(a)(1) ("If the board determines that one *or both requirements* are not met, the board shall dismiss the protest." (emphasis added)).

### B.  Alleged Incomplete Registrations

The protests regarding allegedly incomplete voter registration forms fail to establish probable cause that a violation, irregularity, or misconduct in the election, that is actionable via a post-election protest, has occurred.

14

The Protesters filed a series of protests across the state which challenged the eligibility of over 60,000 voters who cast ballots in the November 2024 general election and whose electronic voter registration database records displayed neither a driver's license number nor the last four digits of a social security number. The Protesters conclude that these voters never submitted either of these numbers when registering to vote. Accordingly, the Protesters request that these voters' ballots be removed from the official count, or, if the voters submit the missing information in some post-canvass information-gathering procedure yet to be devised, their vote may count.

### i. Factual basis for the protests

As an initial matter, the Protest filings include insufficient allegations and evidence to establish probable cause to believe that their challenged voters failed to provide one of these identification numbers on their voter registration application.

The Protesters and their affiant in support of their protest filings make the factual assumption that a list of voters who lack certain data in the voter registration database record never provided that data. As their affiant states, to produce their list, they requested a list of voters who "do not contain data in one or more of the following data fields: (1) Driver's License Number; or (2) Last Four Digits of Social Security Number." It requires a factual inference to then conclude that the absence of these data elements in a database means that a voter's registration application was incomplete when submitted. It would be an unwarranted inference, based on the language of our statutes and prior Board decisions on this issue.

First, a voter who submits a registration application without one of these identification numbers because they do not have one is nonetheless allowed to register to vote, despite their form lacking these numbers. *See* N.C.G.S. § 163-82.4(b) ("The State Board shall assign a unique

15

identifier number to an applicant for voter registration if the applicant has not been issued either a current and valid drivers license or a social security number."); *see also* 52 U.S.C. § 21083(a)(5)(ii) (similar).

Second, when a registrant provides one of these numbers but the number does not validate through a database match among different government databases, their voter registration database record will lack such a number. When a person submits a voter registration application with a driver's license number or the last four digits of a social security number, the county board must attempt to validate that number using N.C. Division of Motor Vehicles (NCDMV) and Social Security Administration databases. *See* N.C.G.S. § 163-82.12(6)–(9). If that number does not validate, then the person must be informed of that fact and offered an alternative means of confirming their identity before they first vote. *Id.* §§ 163-82.12(9), 163-166.12(d). They may do so by presenting a "current and valid photo identification," or a "copy of one of the following documents that shows the name and address of the voter: a current utility bill, bank statement, government check, paycheck, or other government document." *Id.* § 163-166.12(a), (d). Unvalidated identification numbers are not retained in a voter's registration record. *See In re: HAVA Complaint of Joanne Empie*, N.C. State Bd. of Elections, at 7 (Nov. 11, 2024) ("Once that happens, the database removes the unverified driver's license number or last four digits of a social security number from the electronic registration record, although the data is still retained elsewhere within the system.").[13]

---

[13] Available at https://s3.amazonaws.com/dl.ncsbe.gov/HAVA%20Administrative%20Complaints/2024-08-07%20Empie/ED%20Recommendation%20-%20HAVA%20Complaint%20Decision%20-%20Empie.pdf. The State Board takes judicial notice of its prior decisions on the issue of identification numbers on voter registration applications. Such notice was announced at the State

16

- App. 54 -

Accordingly, it would be an unwarranted inference to conclude that the lack of numbers in a voter registration database field for a driver's license number or last four digits of a social security number means that the person registered to vote without providing one of these numbers, despite having such a number. The Protesters offer no reason in their protest papers to conclude that any of the voters they are challenging fall outside these categories. The Protests therefore lack sufficient factual enhancement to establish probable cause to believe a violation of law, irregularity, or misconduct in the conduct of the election has occurred, even assuming what has been alleged is such a violation. N.C.G.S. § 163-182.10(a)(1).

### ii. Legal basis for the protests

Even assuming the facts alleged and the affidavit accompanying the protests established probable cause to believe some voters registered without providing their identification numbers and they actually possessed such numbers, the fact that these registered voters cast ballots is not a violation, irregularity, or misconduct in the conduct of the election, for the following reasons.

#### a. Previous decisions foreclose these protests.

The legal requirement to require one of these identification numbers derives from federal law, and the complained-of issue has been remedied consistent with federal law.

No provision of North Carolina law clearly states that a county board may not process a registration application from a voter who does not provide one of these identification numbers. The General Statutes provide that the voter registration form must "request" this information. N.C.G.S. § 163-82.4(a). It requires an inference, based on the fact that specific other items are

_____

Board's December 11, 2024, meeting where the Board received argument from Protesters' and Respondents' counsel, and counsel were offered an opportunity to object to such notice. No objection was raised.

17

- App. 55 -

referred to as "optional" in the statute, to conclude that the absence of such "request[ed]" information on a voter registration application requires a county board to reject a person's registration application as a matter of state law, as the Protesters contend. They perhaps draw that inference from another subsection of the same statute, subsection (f), which states, "If the voter fails to complete any *required item* on the voter registration form but provides enough information on the form to enable the county board of elections to identify and contact the voter, the voter shall be notified of the omission and given the opportunity to complete the form at least by 5:00 P.M. on the day before the county canvass as set in G.S. 163-182.5(b)." (Emphasis added.) But it's a question-begging argument to assert that the "request[ed]" identification numbers identified in subsection (a) of this statute is a "required item" under subsection (f), simply because subsection (f) refers indiscriminately to a "required item" on the form.

To be sure, the State Board considers this a required item, not because of state law, but because of federal law. Since 2004,[14] the federal Help America Vote Act (HAVA) has prohibited a state from processing a voter registration application without one of these numbers, if the voter has one. 52 U.S.C. § 21083(a)(5)(A). But this Board and a federal court, examining this very issue prior to and during this election, determined that any previous failure to implement this federal requirement cannot be held against already-registered voters casting ballots in this election, as explained below.

After receiving a HAVA administrative complaint in 2023 seeking a similar remedy based on the alleged registration of voters who did not provide these numbers despite having them, this Board determined that retroactively requiring this information of registered voters was

---

[14] Or 2006, depending on a federal waiver. *See* 52 U.S.C. § 21083(d)(1).

18

- App. 56 -

a remedy not authorized by HAVA. *In re: HAVA Complaint of Carol Snow*, N.C. State Bd. of

Elections, at 4 (Dec. 6, 2023).[15] In its determination, the Board noted that "the law's purpose of

identifying the registrant upon initial registration is already accomplished because any voter who

did not provide a driver's license number or the last four digits of a Social Security number

would have had to provide additional documentation to prove their identity before being allowed

to vote, by operation of the separate provision of HAVA . . . . In other words, no one who lacked

this information when registering since the enactment of HAVA would have been allowed to

vote without proving their identity consistent with HAVA." *Id.* at 4–5.

That separate provision of HAVA states that a new voter registration applicant must

provide an alternative form of identification before or upon voting for the first time, if the state

did not have a system complying with the requirement to collect a driver's license number or last

four digits of a social security number. *See* 52 U.S.C. § 21083(b)(1)–(3). Those alternative forms

of identification, as discussed already, include "a current and valid photo identification," or "a

copy of a current utility bill, bank statement, government check, paycheck, or other government

document that shows the name and address of the voter." *Id.* § 21083(b)(2)(A)(i)–(ii). North

Carolina's election officials refer to these alternative forms of identification as "HAVA ID." As

---

[15] *Available at*
https://s3.amazonaws.com/dl.ncsbe.gov/HAVA%20Administrative%20Complaints/2023-10-06%20Snow/NCSBE%20HAVA%20Complaint%20Decision%20-%20Snow.pdf. The motion
that the Board unanimously adopted at this hearing stated, "the State Board resolve[s] the HAVA
complaint filed by Carol Snow by determining that a violation of Section 303 of HAVA could
occur as a result of the voter registration application form failing to require an applicant to
provide an identification number or indicate that they do not possess such a number, and that the
appropriate remedy is the implementation of staff's recommended changes to the voter
registration application form and any related materials." *See* Minutes of Meeting, N.C. State Bd.
of Elections (Nov. 28, 2023), *available at*
https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/State_Board_Meeting_Minutes/2023%20SBOE%20Minutes/SBE%20Open%20Session%20Minutes%2011.28.23.pdf.

19

JA 123

noted in this prior Board decision on the HAVA complaint, the boards of elections require voters without these numbers in their database record to provide HAVA ID before they can first cast a ballot. *In re: HAVA Complaint of Carol Snow* at 4–5.

Prior to the General Election, the Republican National Committee and North Carolina Republican Party filed a lawsuit seeking the same relief sought by Protesters here. The federal district court for the Eastern District of North Carolina acknowledged the legal flaw in awarding such relief in the instant election, given that there had been no meaningful opportunity for the voters at issue to address any potential deficiency far enough in advance of the election to comply with the law. The court noted that it was a meritorious contention that equitable principles "prohibit[] granting Plaintiffs relief in connection with the most recent election." Order at 4, *Repub. Nat'l Comm. v. N.C. State Bd. of Elections*, No. 5:24-cv-547 (Nov 22, 2024). The court further affirmed, when discussing the equitable doctrine of laches, that "Plaintiffs in this action are not going to obtain any relief in connection with the most recent election." *Id.*

Accordingly, to the extent there is a potential violation of HAVA involved in the registration of voters in the past, it was remedied consistent with a separate provision of HAVA, and a federal court has determined that no further remedy would be permissible for the current election.

> b. *Protests cannot be used to remove ballots of eligible voters who did everything they were told to do to register.*

A violation, irregularity, or misconduct does not occur when a voter does everything the government requires of them to register, they possess the qualifications to vote, and they vote. Because the protests do not allege otherwise, they have failed to allege a protest that is actionable as a matter of law.

20

- App. 58 -

Assuming that the protests provide a sufficient basis to conclude that any of the challenged voters registered without providing an identification number and did not indicate that they lacked such numbers, the Protesters admit that it would not have been the voter's fault that they were able to nonetheless register. They explain, correctly, that for a number of years and spanning multiple Board administrations, the voter registration form in North Carolina did not fully inform voters that these identification numbers were required to be submitted with the form. As the State Board concluded when considering the aforementioned HAVA complaint, "a violation of [HAVA's requirement to gather these numbers during registration] could occur as a result of the current North Carolina voter registration application form failing to require an applicant to provide an identification number or indicate that they do not possess such a number." *In re: HAVA Complaint of Carol Snow*, N.C. State Bd. of Elections, at 4 (Dec. 6, 2023). The Board therefore ordered the form be changed in December 2023 and ordered that county boards be instructed that such numbers must be obtained before processing registrations going forward, unless the voter affirmed that they lacked these numbers. *Id.*

With regard to already-registered voters, the Board explained that any voters who were able to register without providing one of the identification numbers would have been required to use HAVA's alternative means of confirming their identity before voting: a current and valid photo identification, or a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter. *See id.* at 4–5 (citing to 52 U.S.C. § 21083(b)(2)(A)). Moreover, in all elections since April 2023, all such voters, whether they had provided an identification number at registration or presented an alternative form of ID when they first voted, have be asked to provide a valid photo ID under state law to prove their identity during every election. N.C.G.S. § 163-166.16.

21

- App. 59 -

Accordingly, at best, the Protesters' argument is that the voters they challenge did everything that was asked of them to prove their identity to register and vote, yet through an administrative error in the processing of registration forms, the boards of elections did not collect these voters' driver's license or last four digits of the social security number. Importantly, the Protesters do not allege that any of the challenged voters in this category lack the substantive qualifications to vote. This category of protests hinges only on alleged noncompliance with voter registration procedures. Under North Carolina law, however, this sort of challenge to an election is forbidden.

In a directly applicable case from the North Carolina Supreme Court, the court concluded that an error by election officials in the processing of voter registration cannot be used to discount a voter's ballot. *Woodall v. W. Wake Highway Com.*, 176 N.C. 377, 388, 97 S.E. 226, 231 (1918). There, registrars failed to administer an oath to voters, which was a legal prerequisite to registration. The court held,

> A vote received and deposited by the judges of the election is presumed to be a legal vote, although the voter may not actually have complied entirely with the requirements of the registration law; and it then devolves upon the party contesting to show that it was an illegal vote, and this cannot be shown by proving merely that the registration law had not been complied with.

*Id.* at 389, 97 S.E. at 232. The court further explained,

> Where a voter has registered, but the registration books show that he had not complied with all the minutiae of the registration law, his vote will not be rejected. Such legislation is not to be regarded as hostile to the free exercise of the right of franchise, and should receive such construction by the courts as will be conclusive as to a full and fair expression of the will of the qualified voters.

*Id.*

22

JA 126

- App. 60 -

The Supreme Court reaffirmed the holding in *Woodall* decades later in *Overton v. Mayor & City Comm'rs of Hendersonville*, 253 N.C. 306, 316, 116 S.E.2d 808, 815 (1960). The court stated,

> [A] statute prescribing the powers and duties of registration officers should not be so construed as to make the right to vote by registered voters depend upon a strict observance of the registrars of all the minute directions of the statute in preparing the voting list, and thus render the constitutional right of suffrage liable to be defeated, without the fault of the elector, by fraud, caprice, ignorance, or negligence of the registrars.

*Id.* (quoting *Gibson v. Bd. of Comm'rs*, 163 N.C. 510, 513, 79 S.E. 976, 977 (1913)).

Counsel for the Protesters offered no response to this directly applicable legal authority on which they had notice prior to the argument on these protests, even despite a Board member's request during argument for the Protesters to rebut it.

Not only does North Carolina law forbid this type of election protest, federal law also forbids it because it would violate substantive due process protections under the U.S. Constitution.

In *Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978), election officials in Rhode Island, believing the issuance of absentee ballots in party primaries was authorized, and acting in accordance with a practice that had existed for about seven years in the case of primaries, advertised and issued those ballots for use in a party primary. *Id.* at 1067. After the primary, the losing candidate for the first time questioned the statutory and constitutional authority of the election officials to issue and count the ballots. *Id.* After being denied relief by the state elections board, the Rhode Island Supreme Court invalidated those absentee ballots and quashed the certificate of nomination, finding "there is no constitutional or statutory basis for allowing absentee and shut-in voters to cast their votes in a primary election." *Id.* at 1068. The prevailing

23

candidate then filed a lawsuit in federal court. The First Circuit found that the retroactive

invalidation of the ballots cast constituted "broad-gauged unfairness" prohibited under

substantive due process jurisprudence, because the "issuance of such ballots followed long-

standing practice; and *in utilizing such ballots voters were doing no more than following the*

*instructions of the officials charged with running the election*." *Id.* at 1075-76 (emphasis added).

The Fourth Circuit has adopted the Griffin framework as "settled" law. *Hendon v. N.C.*

*State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983); *see also Bennett v. Yoshina*, 140 F.3d

1218, 1226–27 (9th Cir. 1998) (adopting the *Griffin* framework and explaining, "a court will

strike down an election on substantive due process grounds if two elements are present: (1) likely

reliance by voters on an established election procedure and/or official pronouncements about

what the procedure will be in the coming election; and (2) significant disenfranchisement that

results from a change in the election procedures.").

Here, the protests are premised on voters not supplying their driver's license or social

security number when registering to vote, and the county boards of elections processing those

forms. The grounds for the protest resulted from the State Board-produced voter registration

form and past guidance from the State Board that would lead those counties to treat forms

without such an identifier as requiring the voter to show a HAVA ID before voting rather than be

considered incomplete. That is what the voters were informed to do to validly vote, and they

relied on that information. Under these circumstances, to remove the ballots of any of these

voters—whether automatically in resolution of the protest after hearing the evidence[16] or upon

---

[16] Even if the State Board agreed with the Protesters that should voters' ballots could be removed
pursuant to the protest, before doing so, evidence would need to establish that each of these
voters was actually registered after the effective date of HAVA without providing a driver's

24

some post-canvass notice procedure involving the voters, as the Protesters suggest would be permissible—would result in "the kind of 'broad-gauged unfairness' that renders an election patently and fundamentally unfair." *Lecky v. Va. State Bd. of Elections*, 285 F. Supp. 3d 908, 916 (E.D. Va. 2018). As Chief Judge Myers of the Federal District Court for the Eastern District of North Carolina stated during oral argument over this same class of voters, "We certainly can't be disenfranchising people who did what they were told to do who are eligible voters." Transcript at 64:7–9, Doc. 63, *Repub. Nat'l Comm. v. N.C. State Bd. of Elections*, No. 5:24-cv-547 (Oct. 20, 2024). Accordingly, regardless of whether state law permits this election protest to proceed, the federal constitution does not.

c.   *Removing these voters' ballots on this basis would violate the registration laws.*

To grant the Protesters the relief they request in these protests, moreover, would violate state and federal voter registration laws. Without question, these challenged voters are registered voters. State and federal statutes restrict the removal of voters from "the official list of eligible voters" in an election unless those voters do not meet the substantive qualifications to vote. 52 U.S.C. § 20507(a)(3); N.C.G.S. § 163-82.14(a).

---

license number or last four digits of their social security number on their voter registration application, if they had one. As noted in the previous section, voter records routinely lack these numbers for other permissible reasons. Any such evidentiary review would also need to factor in routine data entry errors where county workers do not enter all the data from a registration form into the database, situations when a voter supplied such a number in a previous application under a different registration record than the one challenged, and situations when a voter registered prior to the effective date of HAVA but a new registration was created for them that is not linked to that older registration, among other potential reasons that any of the challenged voters may have been registered consistent with HAVA but nonetheless their database record lacks these numbers.

25

- App. 63 -

Under state law, "[e]very person registered to vote by a county board of elections in accordance with this Article *shall remain registered* until: (1) The registrant requests in writing to the county board of elections to be removed from the list of registered voters; or (2) The registrant becomes disqualified through death, conviction of a felony, or removal out of the county; or (3) The county board of elections determines, through the procedure outlined in G.S. 163-82.14, that it can no longer confirm where the voter resides." N.C.G.S. § 163-82.1(c) (emphasis added). None of these provisions apply to permit the removal of the registrants challenged by the Protesters.

Under federal law, the National Voter Registration Act (NVRA), once a person is registered to vote, "a registrant may not be removed from the official list of eligible voters except" (A) at the request of the registrant; (B) by reason of criminal conviction or mental incapacity under state law; or (C) through list maintenance based on change of residency or death. 52 U.S.C. § 20507(a)(3), (a)(4), (c)(1). None of those reasons apply here. Another provision of the NVRA prohibits a state from conducting "any program" to "systematically remove the names of ineligible voters from the official lists of eligible voters" within 90 days of a federal election. *Id.* § 20507(c)(2).[17]

---

[17] It cannot reasonably be contended that removing voters under such a program from the list of voters eligible to cast a ballot in an election would be permissible if done immediately after an election and that removal is retroactive to the election. The result is the same—the voter has been removed from the "official list of eligible voters" in *that election* in a manner that occurred too late under federal law. 52 U.S.C. § 20507(a). The Protesters sought to draw a distinction at oral argument between a voter being on the list of eligible voters in an election and that voter having their ballot removed from the count in that election yet remaining on the list of eligible voters. To describe that attempted distinction is to prove its lack of logic. It would completely undermine the purpose of having a list of voters who are eligible to vote in an election if a voter is on that list yet the government removes their ballot. *See Majority Forward v. Ben Hill Cty. Bd. of Elections*, 512 F. Supp. 3d 1354, 1368 (M.D. Ga. 2021) (rejecting this same argument as

26

- App. 64 -

A separate federal law, HAVA, requires that any maintenance of the voter lists by a state be "conducted in a manner that ensures that—(i) the name of each registered voter appears in the computerized list; [and] (ii) only voters who are not registered or who are not eligible to vote are removed from the computerized list." 52 U.S.C. § 21083(a)(2)(B). Like the reasons set forth in the NVRA, those reasons for removal do not apply here either, by Protesters own admission.

Our state law directs that we maintain the voter rolls in compliance with the NVRA, N.C.G.S. § 163-82.14(a1), and this provision of HAVA, *id.* § 163-82.11(c). In other words, North Carolina has what is called a "unified" registration system, meaning that we have the same rules for registration for voters in state and federal elections, and there is one eligible voter list for both types of elections. *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390 (4th Cir. 2024).

Retroactively removing these voters from the list of voters eligible to cast a ballot in the election would violate all of these federal law provisions. Accordingly, this protest does not allege a violation, irregularity, or misconduct that is legally actionable via a post-election protest.

> d. *The protests contravene the intent of North Carolina law.*

This category of protests is also unlawful under state law because it would undermine the clear intent of the legislature with regard to how a voter may have their eligibility to vote challenged in an election.

The General Statutes provide that the only basis to discount a registered voter's ballot is to properly allege and prove that such a voter lacks the substantive qualifications to vote in the

---

drawing "a distinction without a difference" because "[t]he effect of not appearing on the list of electors is the same as not being eligible to vote").

27

election, the voter has already voted or is being impersonated, or the voter failed to follow the photo ID law. *See* N.C.G.S. ch. 163, art. 8 (governing voter challenges). The voter challenge statutes of Chapter 163 provide that the only valid bases to challenge the right of someone's ballot to count in a general election are:

- the voter is not a resident of voting jurisdiction,

- the voter is not 18 years of age (or will not be by Election Day),

- the voter is serving a felony sentence,

- the voter is dead,

- the voter is not a citizen of the United States,

- the voter is not who he or she represents himself or herself to be,

- the voter already voted,

- the voter does not present photo identification in accordance with N.C.G.S. § 163-166.16.

N.C.G.S. §§ 163-85(c), -87, -89(c). The Protesters allege none of these disqualifications among the voters they challenge.

For the State Board to permit an election protest to seek to disqualify voters' ballots on bases that are not permitted by the voter challenge statutes would violate the clear intent of state law. The General Assembly has specifically provided the specific substantive grounds for challenging the eligibility of voters in an election. Allowing an election protest to expand on those grounds would work an end-run around that law. *DTH Media Corp. v. Folt*, 374 N.C. 292, 300, 841 S.E.2d 251, 257 (2020) ("When multiple statutes address a single matter or subject, they must be construed together, *in pari materia*, to determine the legislature's intent."); *Cooper v. Berger*, 371 N.C. 799, 810, 822 S.E.2d 286, 296 (2018) ("Under the doctrine of *expressio*

28

*unius est exclusio alterius*, when a statute lists the situations to which it applies, it implies the exclusion of situations not contained in the list. . . . In other words, sometimes a provision is written (or a set of provisions are written) in such a way that a reasonable negative inference can and should be drawn.").

For all these reasons, the State Board concluded, by a vote of 3 to 2, that this category of protests does not establish probable cause to believe a violation of law, irregularity, or misconduct occurred in the conduct of the general election. N.C.G.S. § 163-182.10(a)(1).

### C.  U.S. Citizens Whose Parents Were North Carolina Residents but Who Have Never Resided in the United States

Next, the Board concludes that the protests regarding overseas-citizen voters who have never resided in the United States but whose parents resided in North Carolina before moving abroad fails to allege a violation, irregularity, or misconduct in the conduct of the election.

With regard to this category of protests, the Protesters are asking the State Board of Elections, an administrative agency, to ignore a statute of the General Assembly under the theory that the State Board should deem that statute unconstitutional. This, the Board cannot do.

In June 2011, the North Carolina General Assembly, while under the control of the Protesters' political party, unanimously adopted Session Law 2011-182, entitled "An Act to Adopt Provisions of the Uniform Military and Overseas Voters Act Promulgated by the National Conference of Commissioners on Uniform State Law, While Retaining Existing North Carolina Law More Beneficial to Those Voters."[18] The act referenced in the title of the session law is a federal law that extends certain absentee voting privileges to military members and their families

---

[18] https://www.ncleg.gov/Sessions/2011/Bills/House/PDF/H514v0.pdf.

29

JA 133

and overseas citizens that are not available to civilians living in the United States. *See* 52 U.S.C. §§ 20301 – 20311.

Session Law 2011-182 specifically authorized U.S. citizens who have never lived in the United States to vote in North Carolina elections if they have a familial connection to this state. The session law enacted Article 21A of Chapter 163 of the General Statutes, or the Uniform Military and Overseas Voters Act. That Act allows "covered voters" to use unique procedures to register to vote, request an absentee ballot, and submit an absentee ballot, which are not available to civilian voters in the United States who may only vote absentee using procedures in Article 20 of Chapter 163. *See* N.C.G.S. §§ 163-258.6 through -258.15. Particularly relevant here, the Act defines "covered voters" to include the following:

> An overseas voter who was born outside the United States, is not described in sub-subdivision c. or d. of this subdivision, and, except for a State residency requirement, otherwise satisfies this State's voter eligibility requirements, if:

> 1. The last place where a parent or legal guardian of the voter was, or under this Article would have been, eligible to vote before leaving the United States is within this State; and

> 2. The voter has not previously registered to vote in any other state.

*Id.* § 163-258.2(1)e.

The Act further reiterates the special procedures afforded such voters when it deems, for the purpose of voter registration, that the residence assigned to such voters shall be "the address of the last place of residence in this State of the parent or legal guardian of the voter. If that address is no longer a recognized residential address, the voter shall be assigned an address for voting purposes." *Id.* § 163-258.5. Such voters are authorized to use special forms, developed by

30

the United States Government for military and overseas-citizen voters, to register to vote and

request an absentee ballot. *Id.* §§ 163-258.6, -258.7.

The Act is very clear that such voters are entitled to cast an absentee ballot under these

procedures: "An application from a covered voter for a military-overseas ballot shall be

considered a valid absentee ballot request for any election covered under G.S. 163-258.3 held

during the calendar year in which the application was received." *Id.* § 163-258.8. The Act is also

clear that a validly returned absentee ballot from such voters must be counted: "A valid military-

overseas ballot cast in accordance with G.S. 163-258.10 shall be counted if it is delivered to the

address that the appropriate State or local election office has specified by the end of business on

the business day before the canvass conducted by the county board of elections held pursuant to

G.S. 163-182.5 to determine the final official results." *Id.* § 163-258.12(a).

The foregoing statutes have been the law of North Carolina for thirteen years and have

been faithfully implemented in 43 elections in this state since that time.[19]

In spite of the clear instructions from the General Assembly in the Act, the Protesters ask

the State Board to invalidate the ballots of a specific category of "covered voters," thereby

contravening the governing statutes. The State Board of Elections will not do this.

As an administrative agency, the State Board is bound to follow the law that governs it.

The Protesters suggest that this law need not be followed because, in their view, it violates the

North Carolina Constitution. The State Board does not have the authority to declare an act of the

General Assembly to be unconstitutional and thereby ignore it. *In re Redmond*, 369 N.C. 490,

493, 797 S.E.2d 275, 277 (2017) ("[I]t is a well-settled rule that a statute's constitutionality shall

---

[19] See er.ncsbe.gov, showing in the "Election" dropdown menu each election that has occurred
since the effective date of the Act, January 1, 2012.

be determined by the judiciary, not an administrative board." (internal quotations omitted)). Absent a judicial decision declaring the aforementioned laws unconstitutional, they are presumed to be valid and in compliance with the constitutional. *Hart v. State*, 368 N.C. 122, 126, 774 S.E.2d 281, 284 (2015).

Additionally, for the reasons discussed above regarding the identification number protests, even if it were later determined that these statutes are unconstitutional, it would violate the federal constitution's guarantee of substantive due process to apply such a newly announced rule of law to remove voters' ballots after an election, when those voters participated in the election in reliance on the established law at the time of the election to properly cast their ballots.

The State Board therefore concludes, by a vote of 3 to 2, that this category of protests does not allege a violation of law, irregularity, or misconduct in the conduct of the general election. N.C.G.S. § 163-182.10(a)(1).

### D. Military and Overseas Citizen Absentee Voters Who Did Not Send Photo ID

Finally, the Board concludes that the protests regarding military and overseas-citizen voters who did not include a photocopy of photo identification or an ID Exception Form with their absentee ballots fails to allege a violation, irregularity, or misconduct in the conduct of the general election.

As with the prior category of protests, the body of law that applies to the voters challenged in this category of protests is Article 21A of Chapter 163 of the General Statutes. That article comprehensively addresses the requirements for voting by absentee ballot for "covered persons." By contrast, the provisions of Article 20 comprehensively address the requirements for civilian absentee voting. The requirements of one article do not apply to the class of individuals subject to the other article, unless otherwise stated in statute.

32

To request a ballot under Article 21A, a covered voter must apply for an absentee ballot, which typically involves the submission of a standard federal form, a federal postcard application (FPCA) or a federal write-in absentee ballot (FWAB).[20] N.C.G.S. § 163-258.7. The State Board also makes the FPCA available through a secure online portal that covered voters may use to request and submit their absentee ballots. *Id.* §§ 163-258.4(c), -258.7(c), -258.9(b), -258.10. To confirm the voter's identity, the standard federal forms require the voter to provide their name, birthdate, and their driver's license number or social security number. The voter must also attest under penalty of perjury that the information on the forms "is true, accurate, and complete to the best of my knowledge." Additionally, Article 21A requires covered voters to complete a declaration where they "swear or affirm specific representations pertaining to the voter's identity, eligibility to vote, status as a covered voter, and timely and proper completion of an overseas-military ballot." *Id.* § 163-258.4(e); *see id.* § 163-258.13.

These are the sole provisions applying to the authentication of a covered voter who uses the provisions of Article 21A to vote by absentee ballot. Nowhere in Article 21A is there any reference to a covered voter supplying a photocopy of a photo ID with their absentee ballot. To remove any doubt about whether a separate authentication is required, a provision in Article 21A spells this out plainly: "An authentication, other than the declaration specified in G.S. 163-258.13 or the declaration on the federal postcard application and federal write-in absentee ballot, *is not required for execution of a document under this Article*. The declaration and any

---

[20] These forms are available at https://www.fvap.gov/eo/overview/materials/forms and are provided by the Federal Voting Assistance Program, which is an agency of the United States Department of Defense.

33

information in the declaration may be compared against information on file to ascertain the validity of the document." *Id.* § 163-258.17(a) (emphasis added).

The requirement to provide a photocopy of photo ID with an absentee ballot appears in Article 20 of Chapter 163, which governs civilian absentee voters residing in the United States. The relevant statute reads, "Each container-return envelope returned to the county board with application and voted ballots *under this section* shall be accompanied by a photocopy of identification described in G.S. 163-166.16(a) or an affidavit as described in G.S. 163-166.16(d)(1), (d)(2), or (d)(3)." *Id.* § 163-230.1(f1) (emphasis added). When the statute refers to "this section," it is referring to N.C.G.S. § 163-230.1, which is a statute that provides requirements for requesting and completing absentee ballots for civilian voters under Article 20. Recall that the requirements for covered voters to request and complete absentee ballots appear in a completely different article of Chapter 163, at sections 163-258.7 and 163-258.12 of Article 21A. In addition to requiring photo ID from civilian absentee voters, Article 20 also requires two witnesses or a notary to authenticate a civilian absentee voter. *Id.* § 163-231. Article 20 also requires a civilian absentee voter, when they request an absentee ballot, to complete a request form created by the State Board (not the federal government) that includes their personal information, their birth date, and either an NCDMV identification number or the last four digits of the voter's social security number. *Id.* § 163-230.2(a).

Additionally, the methods and deadlines for submitting absentee ballot requests and absentee ballots for civilian voters are completely distinct from such provisions for military and overseas-citizen voters. *Compare id.* §§ 163-230.2, -230.3, -231 (civilian), *with id.* §§ 163-258.7, -258.8, -258.10, -258.12 (military and overseas).

34

- App. 72 -

As the foregoing shows, by setting forth two distinct sets of comprehensive regulations for requesting and casting absentee ballots for two distinct classes of voters, and separating those comprehensive regulations in different statutory articles, the General Assembly clearly did not intend for the State Board to pick and choose laws from one article and apply those laws to persons subject to the other article, as the Protesters would have the State Board do.

To be sure, "covered voters" subject to Article 21A are expressly authorized to decline to use the absentee voting procedures of that article, and may choose instead to vote using the procedures applicable to civilian voters in Article 20. A covered voter "may apply for a military-overseas ballot using either the regular application provided by Article 20 of this Chapter or the federal postcard application." *Id.* § 163-258.7(a). This just reiterates the distinction between the two application methods. If a covered voter chooses to submit an "application provided by Article 20," that application is required to be "accompanied by" a photocopy of a photo ID. *Id.* § 163-230.1(f1). But the federal postcard application has no such requirement. Similarly, Article 21A "does not preclude a covered voter from voting an absentee ballot under Article 20 of this Chapter." *Id.* § 163-258.7(f). This express authorization to vote by either method further proves that the legislature intended these methods of voting to be governed by different bodies of law.

The crux of Protesters' argument that the provisions of Article 20 apply to voters using the provisions of Article 21A is language from a section of Article 20, section 163-239. That section is entitled, "Article 21A relating to absentee voting by military and overseas voters *not applicable*." (Emphasis added.) It states, "[e]xcept as otherwise provided therein, Article 21A of this Chapter shall not apply to or modify the provisions of this Article." *Id.* § 163-239. This language, and especially the title of the statute, prove the point that the legislature intended to establish two distinct absentee voting schemes for these distinct classes of voters. This provision

35

merely highlights that the special provisions applicable to military and overseas-citizen voters "shall not apply to or modify" the provisions of Article 20, which apply to all other voters. The clear intent is to remove any doubt that only voters subject to Article 21A may use the procedures in Article 21A to vote by absentee ballot.

Even if the State Board were to adopt the Protesters' reading of this statute and assume that Article 20 applied to covered voters, it would still do so "[e]xcept as otherwise provided [in Article 21A]." *Id.* And, as explained, when it comes to voter identification requirements, Article 21A provides otherwise. It states that "the voter's identity" is affirmed by a specific declaration applicable only to covered voters. *Id.* § 163-258.4(e). And it confirms that "[a]n authentication, other than the declaration specified in G.S. 163-258.13 or the declaration on the federal postcard application and federal write-in absentee ballot, *is not required for execution of a document under this Article.*" *Id.* § 163-258.17(a) (emphasis added). Accordingly, the statute the Protesters rely on for their argument actually undermines their reading of the law.

In recognition of the fact that Article 21A includes no requirement for covered voters to include a photocopy of their photo ID, the State Board has promulgated an administrative rule through permanent rulemaking that makes it clear that the county boards of elections may not impose the photo ID requirement on such voters. In a Rule entitled "Exception for Military and Overseas Voters," the Code provides that "A voter who is casting a ballot pursuant to G.S. 163, Article 21A, Part 1 is not required to submit a photocopy of acceptable photo identification under Paragraph (a) of this Rule or claim an exception under G.S. 163-166.16(d)." 08 NCAC 17

.0109(d). This Rule has been in effect, first as a temporary rule that became effective on August 1, 2023, and now as a permanent rule that became effective April 1, 2024.[21]

During the rulemaking process, none of the Protesters submitted comments on this Rule objecting to it. Nor did they seek to use administrative or judicial procedures to challenge the validity of this Rule prior to the election. The North Carolina Republican Party, which is participating in the prosecution of these protests, submitted thorough comments on this Rule but notably did *not* object to this aspect of the Rule, or seek to invalidate that aspect of the Rule using administrative or judicial procedures.[22] The Rule was approved unanimously by the Rules Review Commission,[23] an agency appointed by the leadership of the General Assembly that is required to object to rules proposed by an administrative agency if those rules exceed the authority of the agency to adopt them. G.S. § 150B-21.9(a)(1). This Rule is therefore directly applicable and enforceable.

Even if there was no such rule, it is questionable whether the State Board could have imposed a photo ID requirement on voters covered under the federal Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA).

Federal law, specifically 52 U.S.C. §§ 20301 – 20311, as implemented through Article 21A of Chapter 163, governs the process for a covered voter to request and submit a ballot. Specifically, under 52 U.S.C. § 20302(a)(3) and (4), a state is required to permit such voters to

---

[21] This particular language in the rule was also in its original codification as a temporary rule that became effective on August 23, 2019, after the photo ID law was originally enacted.

[22] Available starting on pg. 38 at the following location: https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2024-02-15/Photo%20ID%20Rules/Photo%20ID%20comments%20submitted%20by%20email.pdf.

[23] See meeting minutes: https://www.oah.nc.gov/minutes-march-meeting-2024-signedpdf/open.

37

use the federal write-in absentee ballot (FWAB) to vote in general elections for federal office and use the federal postcard application (FPCA) as both a registration application and absentee ballot application. These federally prescribed forms and their instructions, like Article 21A of our general statutes, do not include a requirement for covered voters to include a photocopy of photo identification. In fact, a review of the Federal Voting Assistance Program's (FVAP) comprehensive 2024-2025 Voting Assistance Guide reveals no instruction from any state to its UOCAVA voters stating that they must comply with a photo ID requirement when requesting or voting their ballot.[24] FVAP is an agency of the U.S. Department of Defense that is tasked with administering the federal responsibilities of UOCAVA, *see* 52 U.S.C. § 20301, and the Guide provides UOCAVA voters with instructions on how to register to vote, request a ballot, and transmit their ballot back to their local election office, including the use of an FWAB. There are only two instances where "photo ID" is even mentioned, neither of which apply a photo ID requirement for the submission and counting of a UOCAVA voter's ballot.[25]

Under the Supremacy Clause of the federal Constitution, and even under our state constitution, an effort to place additional, state-level requirements on UOCAVA voters casting a ballot by methods ultimately provided and governed by federal law would be of questionable validity. U.S. Const. art. VI, cl. 2; *see* N.C. Const. art. I, § 5 ("Every citizen of this State owes paramount allegiance to the Constitution and government of the United States, and no law or

---

[24] The Guide is available at: https://www.fvap.gov/uploads/FVAP/States/eVAG.pdf.

[25] Indiana permits a voter to provide a copy of their photo ID rather than write their ID number or Social Security Number on their ballot request form, and only if doing so must that ID meet the state's photo ID law. Wisconsin informs "temporary overseas voters" that they must include a copy of a photo ID with their ballot because that state does not consider them to be an overseas voter.

38

ordinance of the State in contravention or subversion thereof can have any binding force."). Notably, FVAP has taken that view in the past, informing a state that applying a photo ID requirement to a UOCAVA voter using an FPCA "may likely be in conflict with federal statute."[26]

In sum, as this Board has determined through rulemaking, military and overseas-citizen voters are not subject to the requirement to provide a photocopy of their photo ID with their absentee ballot when voting under the provisions of Article 21A. This has been the clear, established law in North Carolina ever since the photo ID law was given effect in April 2023, through six separate elections. In accordance with this established law, no voters using the Article 21A processes were ever informed that they were required to provide photo ID with their absentee ballots.

For these reasons, as with the prior two categories of protests, even if it were later determined that the state photo ID requirement actually applies to these voters, it would violate the federal constitution's guarantee of substantive due process to apply such a newly announced rule of law to remove voters' ballots after an election, when those voters participated in the election in reliance on the established law at the time of the election to properly cast their ballots.

For these reasons, the State Board concludes, by a 5 to 0 vote, that this category of protests fails to allege a violation, irregularity, or misconduct in the conduct of the general election.

---

[26] FVAP's letter communicating this position is available at:
https://www.fvap.gov/uploads/FVAP/EO/VaSEOLtrSB872_20170206_FINAL.pdf.

39

**IV.     CONCLUSION**

When a person challenges the results of an election by alleging that certain voters cast ineligible ballots, our law requires that person to provide adequate notice to these voters. That was not done here. These protests therefore fail to substantially comply with the requirements to initiate a protest under N.C.G.S. § 163-182.9. Even if the voters challenged in these protests had received adequate notice, the grounds for these protests are legally invalid for the reasons outlined in this decision.

The protests are DISMISSED.

This 13th day of December, 2024.

_____
Alan Hirsch, Chair
STATE BOARD OF ELECTIONS

40

ATTACHMENT A





41





CERTIFICATE OF SERVICE

I, Paul Cox, General Counsel for the State Board of Elections, today caused the forgoing

document to be served on the following individuals via FedEx and email:

Craig D. Schauer
cschauer@dowlingfirm.com
Troy D. Shelton
tshelton@dowlingfirm.com
W. Michael Dowling
mike@dowlingfirm.com
DOWLING PLLC
3801 Lake Boone Trail
Suite 260
Raleigh, North Carolina 27607
*Counsel for Jefferson Griffin, Ashlee*
*Adams, and Stacie McGinn*

Philip R. Thomas
pthomas@chalmersadams.com
Chalmers, Adams, Backer &
Kaufman, PLLC
204 N Person St.
Raleigh, NC 27601
*Counsel for Jefferson Griffin*

Phillip J. Strach
phil.strach@nelsonmullins.com
Alyssa M. Riggins
alyssa.riggins@nelsonmullins.com
Cassie A. Holt
cassie.holt@nelsonmullins.com
Jordan A. Koonts
jordan.koonts@nelsonmullins.com
NELSON MULLINS RILEY &

SCARBOROUGH, LLP
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
*Counsel for Frank Sossamon*

Raymond M. Bennett
ray.bennett@wbd-us.com
Samuel B. Hartzell
sam.hartzell@wbd-us.com
Womble Bond Dickinson (US) LLP
555 Fayetteville Street
Suite 1100
Raleigh, NC 27601
*Counsel for Allison Riggs*

Shana L. Fulton
sfulton@brookspierce.com
William A. Robertson
wrobertsone@brookspierce.com
James W. Whalen
jwhalen@brookspierce.com
BROOKS, PIERCE, MCLENDON,
HUMPHREY & LEONARD, LLP
150 Fayetteville Street
1700 Wells Fargo Capitol Center
Raleigh, NC 27601
*Counsel for Woodson Bradley,*
*Terence Everitt, and*
*Bryan Cohn*

This 13th day of December, 2024.

/s/ Paul Cox

43

STATE OF NORTH CAROLINA        )
COUNTY OF WAKE                 )
                              )
                              )
**AFFIDAVIT OF KYLE OFFERMAN**  )
                              )
                              )
_____ )

I, Kyle Offerman, being duly sworn, depose and state as follows:

### Background and Qualifications

1. I am over 18 years of age and fully competent to make this affidavit.

2. I have personal knowledge of the facts and matters set forth herein.

3. I am a citizen of the United States and a resident of Wendell, Wake County, North Carolina.

4. I am employed as the Chief Counsel of the North Carolina Republican Party.

### Preparation of Filing

5. In preparation for filing election protests related to the 2024 General Election, my team and I conducted a thorough review of 08 NCAC 02 .0111, which outlines the filing requirements for an Election Protest.

6. We assembled the list of all County Board of Elections Directors in North Carolina from https://vt.ncsbe.gov/BOEInfo/PrintableVersion/ to gather their applicable emails as provided by the State Board of Elections.

7. We then prepared one hundred emails to be sent to the County Board of Elections Directors with the applicable Jefferson Griffin protests for said county and a cover letter attached.

### Filing

8. We then sent said Jefferson Griffin protests from legal@ncgop.org with the Counsel for Jefferson Griffin, Craig Schauer, carbon copied.

9. All protests on behalf of Jefferson Griffin were submitted by 5:00 PM Eastern Standard Time in accordance with N.C.G.S. § 163-182.9(b).

### Preparation of Service

10. In preparation for filing election protests related to the 2024 General Election, my team and I conducted a thorough review of 08 NCAC 02 .0111, which outlines the service requirements for affected parties.

11. We compiled an Excel file containing the names and addresses of those parties affected by the protests filed by Jefferson Griffin, Ashlee Adams, Stacie McGinn, and Frank Sossaman.

12. To ensure conformity with North Carolina law and on behalf of these candidates, we created a webpage hosted on www.ncgop.org, accessible to those who receive service that a protest has been filed that may affect his or her vote.

13. A QR code was generated to provide a direct link to this webpage.

14. We designed a service postcard, incorporating the QR code, to notify all affected parties. A draft of this postcard is attached hereto as Attachment 1.

2

JA 149

15. A third-party vendor was contracted to handle the mailing of these service postcards in compliance with 08 NCAC 02 .0111.

16. The third-party vendor was provided with the Excel file containing the names and addresses of all affected parties to facilitate the mailing process.

## Service

17. The third-party vendor prepared and mailed the service postcards to all affected parties by the deadline established in 08 NCAC 02 .0111.

18. Each postcard directs recipients, via the QR code, to the public webpage where all filed protests are uploaded and available for review.

19. Once on the webpage, affected parties can easily locate the relevant protest filed in their county in which they are named.

20. The process and manner of service adhered to the requirements set forth in 08 NCAC 02 .0111.

Further, the affiant sayeth not.

This ~~22~~ day of November 2024.

_____
KYLE OFFERMAN

STATE OF NORTH CAROLINA
COUNTY OF WAKE

Signed and sworn to (or affirmed) before me by _Kyle Offerman_ .

Date: _11/22/2024_        _____
                          [Official Signature of Notary]

DANIEL MILAN KRCHNAVEK
NOTARY PUBLIC
WAKE COUNTY, NC
[Official Seal]
My Commission Expires 04-04-2026

_Daniel Milan Krchnavek_
Notary Public
[Notary's printed or typed name]


My commission expires: _04-04-2026_

4

JA 151

# ATTACHMENT 1

1506 Hillsborough Street
Raleigh, NC 27605

Non-Profit
US Postage
PAID
North Carolina
Republican Party

## \*\*\* NOTICE \*\*\*

[[First Name]] [[Middle Name]] [[Last Name]], your vote may be affected by one or more protests filed in relation to the 2024 General Election.

**Please scan this QR code to view the protest filings.** Please check under the county in which you cast a ballot to see what protest may relate to you.



For more information on when your County Board of Elections will hold a hearing on this matter, please visit the State Board of Elections' website link found on the Protest Site (via the QR code).

Paid for by the North Carolina Republican Party.

5

STATE OF NORTH CAROLINA )
COUNTY OF WAKE )
)
)
**AFFIDAVIT OF RYAN BONIFAY** )
)
)
_____ )

I, Ryan Bonifay, being duly sworn, depose and say as follows:

**Background and Experience**

1.    I am over 18 years of age and competent to make an affidavit.

2.    I have personal knowledge of the matters described herein.

3.    I am a citizen of the United States and a resident of Lexington, North Carolina.

4.    I am employed as Director of Data and Analytics at Coldspark, a political consulting and strategy firm. I have been so employed since January 2023. Previously, I have been employed by the Republican National Committee as Regional Analytics Director and State Analytics Director for North Carolina, as Data Director for Engage Texas, and as Data Director on U.S. Senate, congressional, and gubernatorial campaigns. Altogether I have approximately 10 years of experience as a data analyst for political campaigns and parties, all of them Republican. I have previously worked on North Carolina elections during the 2016 and 2020 election cycles.

5.    I was retained by the North Carolina Republican Party to review and compile publicly-available information from the North Carolina State Board of Elections, either on their website or received through public records requests, in connection with the filing of election protests.

6.      In my professional work I have become familiar with public sources of data on voter registration and voter turnout in North Carolina, and with the inputs to and limitations of such sources.

## Assignment

7.      I was asked to submit this affidavit in support of election protests filed with county boards of elections across North Carolina.

8.      I was asked by counsel to generate a list of individuals who satisfied the following criteria: they (1) registered to vote after Jan. 1, 2004, (2) never provided the last four digits of their Social Security Number nor a North Carolina drivers license number to their local board of elections in conjunction with their voter registration, and (3) cast a ballot in the November 2024 general election, all based on publicly available data.

9.      In aid of compiling this data, lawyers for the North Carolina Republican Party made numerous requests for information under North Carolina's Public Records law.  Once the relevant public agencies produced their responses, I attempted to match the produced records to public voting records to identify voters who may have cast a ballot but were ineligible as of Election Day.  The process for doing so is described in more detail below.

10.     As to voters who registered and voted without providing a driver's license number or the last 4 digits of their Social Security Number, the North Carolina Republican Party made the following public records request to the North Carolina State Board of Elections on November 12, 2024:

    a. A list of all currently registered voters in Active, Inactive, or Temporary Status that do not contain data in one or more of the following data fields: (1) Driver's License Number; or (2) Last Four Digits of Social Security Number.

2

11.     In     response,     NCSBE     produced     a     file     entitled No_SSN_or_DL_Active_Inactive_and_Temporary_Status.csv.     As the filename suggests, it appears to be the NCSBE's list of North Carolina registered voters who did not provide a drivers license number or Social Security Number when registering.

12.     I matched voters identified by the NCSBE who never provided a drivers license number or the last four digits of their SSN to the list of voters who cast a ballot in the November 2024 election based on the statewide voter list, filename ncvoter_Statewide.zip, and absentee voter list, filename absentee_20241105.zip.

13.     I matched the list of individuals who never provided a drivers license number or the last four digits of their Social Security Number to the statewide voter list and absentee voter list based on the voter registration number and NCID number.

14.     This process resulted in a list of likely matches in this county, which is attached as **ATTACHMENT 1**.

15.     Accordingly, Attachment 1 contains a list of people who (1) attempted to vote in the 2024 General Election before November 5, 2024 (via early vote, absentee by mail, etc.), (2) had their vote accepted by their applicable county board of elections, and (3) never provided a North Carolina driver's license number nor the last 4 digits of their Social Security Number to their county board of elections.     Attachment 1 contains additional information about each individual which was contained in the information from the NCSBE.

16.     Attachment 1 does not include whether the applicable county boards of election challenged each of these voters, as that information has not yet been made available by the NCSBE.

3

17.    Attachment 1 also does not include whether the voters identified by the NCSBE who never provided a drivers license number or the last four digits of their SSN voted on election day, November 5, 2024, as the information on who voted on election day has not yet been released by the NCSBE.


Further, the affiant sayeth not.

This �age 19 day of November, 2024.



RYAN BONIFAY

STATE OF NORTH CAROLINA
COUNTY OF WAKE

Signed and sworn to (or affirmed) before me by _Ryan Bonifay_.


Date: _11/19/24_          _Gregory M Fornshell_
                           [Official Signature of Notary]

[Official Seal]            GREGORY M. FORNSHELL
                           Notary Public
                           [Notary's printed or typed name]

                           My commission expires: _12/6/27_

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

JEFFERSON GRIFFIN,

    Plaintiff,

    v.

NORTH CAROLINA STATE BOARD OF ELECTIONS,


    Defendant.

Case No. 5:24-cv-00724-M

## <u>NORTH CAROLINA ALLIANCE FOR RETIRED AMERICANS, VOTEVETS ACTION FUND, TANYA WEBSTER-DURHAM, SARAH SMITH, AND JUANITA ANDERSON'S MOTION TO INTERVENE AS DEFENDANTS</u>

The North Carolina Alliance for Retired Americans, VoteVets Action Fund, Tanya Webster-Durham, Sarah Smith, and Juanita Anderson (collectively "Proposed Intervenors") submit this motion to intervene, requesting that the Court allow them to intervene as of right pursuant to Fed. R. Civ. P. 24(a) or, alternatively, Fed. R. Civ. P. 24(b).

In support of this motion, Proposed Intervenors rely on the bases and authorities set forth in the attached memorandum in support.

Counsel for Proposed Intervenors consulted with counsel for Judge Griffin and counsel for the North Carolina State Board of Elections ("State Board") before filing this motion. Judge Griffin opposes Proposed Intervenors' intervention; the State Board takes no position on the motion.

Dated: December 21, 2024.                    Respectfully submitted,

                                             /s/ Narendra K. Ghosh
                                             Narendra K. Ghosh
                                             N.C. Bar No. 37649
                                             PATTERSON HARKAVY LLP
                                             100 Europa Drive, Suite 420
                                             Chapel Hill, NC 27217
                                             Telephone: (919) 942-5200
                                             nghosh@pathlaw.com

                                             Lalitha D. Madduri**
                                             Christopher D. Dodge*
                                             Tina Meng Morrison**
                                             Makeba A.K. Rutahindurwa**
                                             Julie Zuckerbrod*
                                             ELIAS LAW GROUP LLP
                                             250 Massachusetts Ave, N.W., Suite 400
                                             Washington, D.C. 20001
                                             Telephone: (202) 968-4490
                                             lmadduri@elias.law
                                             cdodge@elias.law
                                             tmengmorrison@elias.law
                                             mrutahindurwa@elias.law
                                             jzuckerbrod@elias.law

                                             *Participating via Notice of Special Appearance*
                                             **Notice of Special Appearance Forthcoming*

                                             *Counsel for Proposed-Intervenors the North
                                             Carolina Alliance for Retired Americans,
                                             VoteVets Action Fund, Tanya Webster-Durham,
                                             Sarah Smith, and Juanita Anderson*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

JEFFERSON GRIFFIN,

     Plaintiff,

     v.

NORTH CAROLINA STATE BOARD OF ELECTIONS,

     Defendant.

Case No. 5:24-cv-00724-M

## <u>DECLARATION OF WILLIAM DWORKIN</u>

I, William Dworkin, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.     I am over the age of 18, have personal knowledge of the facts below, and can competently testify to their truth.

2.     I am the President of the North Carolina Alliance for Retired Americans ("the Alliance"), a 501(c)(4) nonprofit, social welfare organization incorporated in North Carolina. The Alliance has approximately 58,000 members across all of North Carolina's 100 counties. The Alliance is a chartered state affiliate of the Alliance for Retired Americans, a nationwide grassroots organization with more than 4.3 million members.

3.     The Alliance's mission is to ensure social and economic justice and full civil rights for retirees. As a central part of its mission, the Alliance works to protect the rights of its members to vote and to have their votes be counted. The Alliance has strong interests in ensuring that the greatest number of our members are allowed to vote and have their votes counted, as well protecting policies that make voting safe, easy, and reliable for our members.

4.     The Alliance undertakes a broad range of initiatives to enable its members to vote, including tabling at local events to register voters and get out the vote, canvassing before elections to educate voters about how and where to vote, and other voter turnout programming and communications.

5.     The Alliance has also previously initiated and intervened in litigation in North Carolina to protect our members' ability to vote. *See, e.g., N.C. All. for Retired Ams. v. N.C. State Bd. of Elections*, Case No. 20-CVS-8881 (N.C. Super. Ct. Oct. 2, 2020) (Alliance challenged restrictive election procedures implemented during the COVID-19 pandemic); *see also Deas v. North Carolina State Board of Elections*, Case No. 22-CVS-11290 (Wake Cnty. Sup. Ct. Oct. 26, 2022) (granting intervention to Alliance in case involving voting rules); *In re Appeal of Declaratory Ruling from the State Board of Elections*, Case No. 22-CVS-10520 (Wake Cnty. Sup. Ct. Dec. 19, 2022) (same); *Moore v. Circosta*, No. 1:20CV911, 2020 WL 6597291, at *2 (M.D.N.C. Oct. 8, 2020) (same).

6.     As the Alliance engages members and the larger community of retired North Carolinians, it answers questions regarding voting requirements and procedures. For instance, during Alliance meetings, members discuss and learn about key issues and candidate positions, as well as about when and how they can cast their ballots.

7.     Among other efforts, the Alliance develops and circulates a newsletter to educate its members about important issues facing older and retired Americans, including the voting process. The Alliance regularly communicates with its members to keep them aware of issues that could impact them, their rights, and their quality of life.

8.     Alliance members tend to be civically engaged and therefore tend to vote at higher rates than the general public. Because we are an organization of retirees, Alliance members are

generally older individuals, and to my knowledge, the average age is between 60 and 70 years of age. Accordingly, many Alliance members have been registered to vote for decades, including prior to the enactment of federal and North Carolina laws requiring voters to provide a driver's license number or portion of a social security number with their registrations.

9.      While the Alliance's members are civically engaged and tend to vote at high rates, they also often face challenges when voting. Due to their advanced age, our members often experience issues that come naturally with getting older, including difficulty with mobility, memory, vision, and administrative tasks. Many of our members no longer regularly leave home, and so they must plan significantly ahead for errands and other obligations, including voting.

10.     Due to these limitations, Alliance members depend heavily on opportunities to vote by mail or alternatively vote early in-person at a time that is convenient for them and lets them avoid lines. Judge Griffin primarily seeks to disenfranchise mail and early voters who supposedly do not have driver's license or social security numbers in their voter registration files, meaning it directly targets voting methods preferred by Alliance members. Moreover, these challenges punish voters who have been registered to vote since before such numbers were required to register, which will also disproportionately impact Alliance members.

11.     The Alliance has compared the list of voters being challenged with the Alliance's membership lists, and it appears that at least 41 Alliance members are at risk of having their ballots thrown out if the protests are successful. This is likely an underestimate considering the sweeping nature of Judge Griffin's requested relief and the Alliance's broad membership and constituency across North Carolina.

12.     We reached out to the Alliance members targeted by these protests to inform them their ballots were being challenged and that they were at risk of disenfranchisement. We were

concerned that Alliance members would have difficulty responding to Judge Griffin's protests because many Alliance members have limited familiarity and fluency with new technology, including QR codes like those included on the postcards Judge Griffin sent to voters whose ballots are being challenged. Many Alliance members also do not have the mobile smartphones necessary to access QR codes and thus face a heightened risk of never learning whether their votes are being challenged, or on what basis.

13.     Indeed, none of the Alliance members we contacted recalled receiving any correspondence from Judge Griffin or the North Carolina Republican Party about the protests and confirmed that, even if they had, they would not have been able to learn more information because they do not have smartphones and are unfamiliar with QR codes or how to use them. Every single one of these Alliance members we contacted is a long-time North Carolina voter who has never before faced a problem voting under their current registration.

14.     I am deeply concerned that if the protests are successful, Alliance members and other non-member retirees whose interests we seek to protect will have their votes thrown out in this election and it will be harder for them to vote—and for the Alliance to help protect our members' ballots—in future elections. Moreover, if our members' votes are discarded or they are unable to vote in future elections, our mission to ensure social and economic justice and full civil rights for retirees will be frustrated.

I declare under penalty of perjury that the foregoing is true and correct.

Date: _12/20/2024_ _____

_Bill Dworkin_ _____
William Dworkin
President
North Carolina Alliance for Retired Americans

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

JEFFERSON GRIFFIN,

    Plaintiff,

    v.

NORTH CAROLINA STATE BOARD OF ELECTIONS,

    Defendant.

Case No. 5:24-cv-00724-M

## <u>DECLARATION OF TANYA WEBSTER-DURHAM</u>

I, Tanya Webster-Durham, declare as follows:

1.    I am a United States citizen and am over the age of 18. I have never been convicted of a felony.

2.    I currently live in Charlotte, North Carolina, in Mecklenburg County. I have been a resident of Mecklenburg County for nearly ten years.

3.    I am a member of the United Steelworkers and the North Carolina Alliance for Retired Americans.

4.    I first registered to vote in North Carolina in 2004 and voted in every general election until I moved out of state around 2012. I moved back to North Carolina in 2015 and re-registered at a social services office in Mecklenburg County in 2020.

5.    To my knowledge, my initial registration and my new registration were both accepted by the North Carolina State Board of Elections shortly after I submitted them.

JA 163

6.      Since re-registering to vote in North Carolina, I have voted in every municipal, state, and federal election, including primary and general elections, and I have never been turned away from the polls or told there was an issue with my voter registration.

7.      I always bring my driver's license with me when I go to cast a ballot. In the 2024 general election, I went to my early voting polling location on November 1, 2024, presented my driver's license, and an election worker confirmed that I was on the list of registered voters. I was then given a ballot, and I voted in all of the elections on my ballot, including in the election for Associate Supreme Court Justice.

8.      I did not know that Judge Griffin was challenging my vote until I learned from the Alliance for Retired Americans that I was on the list of voters targeted by his protests. I do not recall ever receiving a postcard or any other correspondence from Judge Griffin or the North Carolina Republican Party with information on these protests or indicating that my ballot was being challenged.

9.      I understand that the postcards Judge Griffin mailed to challenged voters included a QR code that recipients could scan to learn more about the protests. Even if I had received the postcard, I do not know how to use QR codes, am not generally familiar with them or how they work, and have never used one before.

10.     As a United States citizen and resident of North Carolina, I believe it is my civic duty to exercise my right to vote in every election. My vote is my voice and allows me to ensure a better future for my family and loved ones. I am very concerned that my vote will not count if Judge Griffin's protests are successful, and I am also worried that it will make it harder for me to vote in future elections.

Date: 12/20/2024
_____

_Tanya Webster-Durham_
Tanya Webster-Durham

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

JEFFERSON GRIFFIN,

     Plaintiff,

     v.

NORTH CAROLINA STATE BOARD OF ELECTIONS,

     Defendant.

Case No. 5:24-cv-00724-M

## <u>DECLARATION OF SARAH SMITH</u>

I, Sarah Smith, declare as follows:

1.     I am a United States citizen and am over the age of 18. I have never been convicted of a felony.

2.     I currently live in Greensboro, North Carolina, in Guilford County. I have been a resident of Guilford County since about 2008.

3.     I am retired telecommunications worker and a member of the Communications Workers of America as well as the North Carolina Alliance for Retired Americans.

4.     I first registered to vote in North Carolina when I turned 18 in 1963. Although I subsequently moved out of state and had to cancel my registration, I re-registered in 2009 after I moved back to North Carolina. To my knowledge, my new registration was accepted by the North Carolina State Board of Elections shortly after I submitted it.

5.     Since re-registering to vote in North Carolina, I have voted in every state and federal election, including primary and general elections, and I have never been turned away from the polls or told there was an issue with my voter registration.

6.      In the 2024 general election, I went to vote at my early voting location on October 28, 2024 to vote via curbside voting, presented my North Carolina driver s license, and an election worker confirmed that I was on the list of registered voters. I was then given a ballot, and I voted in all of the elections listed on my ballot, including in the election for Associate Supreme Court Justice.

7.      I did not know that Judge Griffin was challenging my vote until I learned from the Alliance for Retired Americans that I was on the list of voters targeted by his protests. I do not recall ever receiving a postcard or any other correspondence from Judge Griffin or the North Carolina Republican Party with information on these protests or indicating that my ballot was being challenged.

8.      I understand that the postcards Judge Griffin mailed to challenged voters included a QR code that recipients could scan to learn more about the protests. Even if I had received the postcard, I would not have been able to get more information, as I am unfamiliar with how to use QR codes and have never used one.

9.      I believe voting is my civic duty. Through my vote, I have the power to shape the future for my family, for this state, and for this country. I am very concerned that my vote will not count if Judge Griffin s protests are successful, and I am also worried that it will make it harder for me to vote in future elections.


Date: December 19, 2024                                 s  *Sarah Smith*
                                                        Sarah Smith

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

JEFFERSON GRIFFIN,

     Plaintiff,

     v.

NORTH CAROLINA STATE BOARD OF
ELECTIONS,

     Defendant.

Case No. 5:24-cv-00724-M

## <u>DECLARATION OF JUANITA ANDERSON</u>

I, Juanita Anderson, declare as follows:

1.      I am a United States citizen and am over the age of 18. I have never been convicted of a felony.

2.      I currently live in Franklinton, North Carolina, in Franklin County. I have been a resident of Franklin County for over twenty years.

3.      I am retired schoolteacher and member of the American Federation of Teachers, as well as the North Carolina Alliance for Retired Americans.

4.      I last updated my registration in North Carolina in 2014. To my knowledge, my registration was accepted by the North Carolina State Board of Elections shortly after I submitted it.

5.      Since registering to vote in North Carolina, I have voted in nearly every state and federal election, including primary and general elections, and I have never been turned away from the polls or told there was an issue with my voter registration.

JA 167

6.      I always bring my North Carolina driver's license with me when I go cast a ballot. In the 2024 general election, I went to my early voting polling location on October 31, 2024, presented my driver's license, and an election worker confirmed that I was on the list of registered voters. I was then given a ballot, and I voted in all of the elections listed on my ballot, including in the election for Associate Supreme Court Justice.

7.      I did not know that Judge Griffin was challenging my vote until I learned from the Alliance for Retired Americans that I was on the list of voters targeted by his protests. I do not recall ever receiving a postcard or any other correspondence from Judge Griffin or the North Carolina Republican Party with information on these protests or indicating that my ballot was being challenged.

8.      I understand that the postcards Judge Griffin mailed to challenged voters included a QR code that recipients could scan to learn more about the protests. Even if I had received the postcard, I would not have been able to get more information, as I do not have a smartphone. I am also unfamiliar with QR codes or how they work.

9.      I believe voting is the most important thing I can do as a citizen and resident of North Carolina to protect civil rights, ensure fairness and equality for all, and build a better future for my family. I am very concerned that my vote will not count if Judge Griffin's protests are successful, and I am also worried that it will make it harder for me to vote in future elections.


Date: December 19, 2024                          _/s/ Juanita Anderson_
                                                 Juanita Anderson

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

JEFFERSON GRIFFIN,

    Plaintiff,

    v.

NORTH CAROLINA STATE BOARD OF
ELECTIONS,

    Defendant.

Case No. 5:24-cv-00724-M

**DECLARATION OF PETER MELLMAN**

I, Peter Mellman, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.    I am over the age of 18, have personal knowledge of the facts below, and can competently testify to their truth.

2.    My name is Peter Mellman, and I am the Chief Financial Officer ("CFO") at VoteVets Action Fund ("VoteVets") where I have worked for over 18 years.

3.    VoteVets is a national non-profit organization dedicated to elevating the voices of veterans and their families on issues that affect the lives of those who serve and have served in the Armed Forces, including on issues like veterans' care. VoteVets was founded in 2006 and is organized under Section 501(c)(4) of the Internal Revenue Code of 1986, as amended, to advocate for issues that impact troops, veterans, and their families.

4.    As CFO, my responsibilities include managing personnel as well as the budget and expenditures of programs that are dedicated to serving over 1.5 million subscribers across the country, including thousands in North Carolina, composed mainly of active-duty military members, veterans, and their families. These individuals have taken affirmative steps to become a recipient of communications from us.

5.      In addition to its affirmative subscribers, VoteVets is dedicated to serving all active servicemembers, including those who are deployed, and veterans, by providing the support, training, and tools they need to face issues at home, such as utilizing their voting rights and combating disinformation, as well as challenges in other policy areas like health care, jobs, and more.

6.      Increasing voter turnout among military personnel, veterans, and their families, especially those who are overseas, is critical to VoteVets' mission, as we believe that turning out these groups of voters will benefit all Americans by engaging people who have served their country in the civic process.

7.      To advance this goal, VoteVets dedicates significant resources, such as money, personnel time, and volunteer efforts, to ensure that their constituents—military and veteran voters, as well as their families—can participate in the franchise.

8.      VoteVets and its partners have also built a first-of-its-kind military voter file containing approximately 14 million records of veterans and military family members, including thousands of records for voters in North Carolina, to help the organization focus its mobilization, education, and turnout efforts. VoteVets relies on this voter file to contact military voters and facilitate veteran-to-veteran communications to assist with ensuring that military and veteran votes are counted.

9.      Using this file, VoteVets and its partners sent over 2.5 million texts to 1.5 million military voters, including those overseas, in connection with the 2024 general election, and saw a substantial increase in turnout participation among contacted voters.

10.     This outreach is critical because military voters and veterans often face challenges in exercising their right to vote. Many active-duty servicemembers and their families are deployed away from home, which makes it physically impossible for them to vote in person. As a result, these voters are reliant on laws like the Uniformed And Overseas Citizens Absentee Voting Act ("UOCAVA") and the Uniform Military and Overseas Voters Act ("UMOVA") to participate in the franchise through voting by mail.

11.     Because the constituents and subscribers VoteVets serves are so dependent on mail voting, a large part of the organization's voter education mission and programming efforts focus on absentee voting, including by educating voters about laws like UOCAVA and UMOVA, which ensure military voters and their families can successfully cast ballots. This is true in North Carolina as well as in other states across the country.

12.     To that end, VoteVets also educates military voters about the rules for properly returning their ballots so that each and every vote will get counted. This includes providing information about who may vote under laws like UOCAVA and UMOVA, as well as the requirements to cast ballots under these laws. VoteVets is unable to perform that work in a reliable manner if election rules can be challenged, disrupted, or altered *after* an election has occurred.

13.     This litigation challenges thousands of ballots cast by North Carolinians, including VoteVets' constituents serving overseas who have voted under UOCAVA and UMOVA. These challenges threaten to disenfranchise VoteVets' supporters and constituents who participated in the 2024 election according to existing law with the rightful expectation that their ballots will be counted. VoteVets is extremely disturbed at the prospect that military voters and their families—who did everything right—will have their votes thrown out through no fault of their own, weeks after the election has already occurred.

14.     Disenfranchising VoteVets' constituents also threatens our mission to elevate the voices of military personnel, veterans, and their families on issues that affect their lives and ensure their civic engagement.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 12/20/2024
_____

By: _____

Peter Mellman
Chief Financial Officer
VoteVets Action Fund

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:24-cv-724-M

| | |
|---|---|
| JEFFERSON GRIFFIN, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) |
| NORTH CAROLINA STATE BOARD OF ELECTIONS, | ) |
| | ) |
| | ) |
| Respondent. | ) |

## PETITIONER'S MOTION FOR PRELIMINARY INJUNCTION

Based on the facts established by the verified Petition for Writ of Prohibition, D.E. 1-4 at 1-85; *see also id.* at 86 ("Verification of Counsel"), and the reasons set forth in the accompanying Memorandum, Petitioner Judge Jefferson Griffin respectfully requests that this Court enter, not later than January 6, 2025[1], a preliminary injunction prohibiting Respondent from certifying the election results for the November 2024 general election for Seat 6 of the North Carolina Supreme Court until the merits of Petitioner's Petition are decided, either by this Court or, if the case is remanded, by the North Carolina Supreme Court.

Prior to filing this motion with the Court, Petitioner conferred with Respondent regarding whether the parties could avoid the necessity of this Motion by consenting to a stay of the certification of the election results pending resolution of these judicial proceedings. Respondent refused to consent to that request.

---

[1] Alternatively, if the Board issues its order denying Judge Griffin's remaining protests on a date later than December 23, 2024, that the Court issue a preliminary injunction at least 24 hours prior to the date on which the Board will issue the certificate of election.

JA 172

Dated: December 23, 2024

Respectfully submitted,

/s/ Mark M. Rothrock

Craig D. Schauer
41571 (NC)
DOWLING PLLC
3801 Lake Boone Trail, Suite 260
(919) 529-3351
cschauer@dowlingfirm.com

Mark M. Rothrock
56747 (NC)
Lehotsky Keller Cohn LLP
8513 Caldbeck Drive
Raleigh, NC 27615
(336) 416-3326
mark@lkcfirm.com

Troy D. Shelton
48070 (NC)
DOWLING PLLC
3801 Lake Boone Trail, Suite 260
(919) 529-3351
tshelton@dowlingfirm.com

William T. Thompson*
24088531 (TX)
Lehotsky Keller Cohn LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
will@lkcfirm.com

W. Michael Dowling
42790 (NC)
DOWLING PLLC
3801 Lake Boone Trail, Suite 260
(919) 529-3351
mike@dowlingfirm.com

*Local Rule 83.1(d) special appearance
forthcoming

Attorneys for Petitioner

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2024, I electronically filed the foregoing Petitioner's Motion for Preliminary Injunction with the Clerk of Court using the CM/ECF system, which will send notification of such filing all parties.

/s/ *Mark M. Rothrock*
Mark M. Rothrock

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:24-cv-724-M

| | |
|---|---|
| JEFFERSON GRIFFIN, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) |
| NORTH CAROLINA STATE BOARD OF ELECTIONS, | ) |
| | ) |
| | ) |
| Respondent. | ) |

## PETITIONER'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Petitioner Judge Jefferson Griffin respectfully requests that this Court, not later than January 6, 2025,[1] enter a preliminary injunction enjoining the North Carolina State Board of Elections from certifying the November 2024 general election results for Seat 6 of the North Carolina Supreme Court. That order is necessary to preserve the status quo here. Judge Griffin has filed three categories of election protests, challenging ballots that were cast in violation of state law. The Board has now denied those three protests and has stated to this Court that it may certify the election results as early as January 7, 2025. *See* D.E. 1 at 3-4. Once those results are certified, Judge Griffin's election protests will become moot.

Without a preliminary injunction, mootness will deprive the Court of jurisdiction to consider any of the issues presented in this matter. A preliminary injunction, however, will simply

---

[1] If the Board issues its final decision regarding Judge Griffin's remaining protests on a date later than December 23, 2024, Petitioner respectfully requests that the Court enter a preliminary injunction not later than 24 hours prior to the date on which the Board indicates it will issue the certificate of election.

JA 175

stay the Board's hand while this Court determines whether it can retain jurisdiction over this removed action and, if so, determine whether the Board's decision denying Judge Griffin's protests was valid. The Board will not be harmed by that injunction—indeed, North Carolina law contemplates delays in election certifications while judicial review is pending. By contrast, Judge Griffin will be irreparably harmed absent the injunction: his protests will be mooted, and he will lose the election. And preventing the Board's certification from mooting Judge Griffin's challenges to unlawful ballots will serve the important public interests in election integrity and the franchise, among others. This Court should therefore grant Judge Griffin's motion for a preliminary injunction.

## STATEMENT OF FACTS

This case involves—and almost entirely turns upon—significant and novel issues of North Carolina election law. Indeed, the Board's order admitted that his protests "present[] legal questions of statewide significance." D.E. 1-5 at 44.

Since 1776, North Carolina's Constitution has required voters to be bona fide residents of the state. N.C. Const. of 1776, art. VIII; N.C. Const. art. VI, § 2(1). Since 2004, the General Statutes have required voters to provide their drivers license or social security numbers to be legally registered to vote. N.C. Sess. Law 2003-226, §§ 2, 9; *see* N.C. Gen. Stat. § 163-82.4(a)(11). And since 2018, both the state constitution and various statutory provisions have required all North Carolina voters to present photo identification when they vote, whether in person or by absentee ballot. N.C. Gen. Stat. §§ 163-231(b)(1), 163-230.1(a)(4), (b)(4), (e)(3), (f1); *See id.* § 163-166.16(a); N.C. Const. art. VI, §§ 2(4), 3(2). None of these requirements are new. Indeed, they were all well-established at the time of the November 2024 general election. Yet the North

Carolina State Board of Elections (the "Board") refused to enforce these laws in the election. That refusal changed the outcome of the Seat 6 race for the Supreme Court.

Judge Griffin is currently a Judge on the North Carolina Court of Appeals. During the election, Petitioner Judge Jefferson Griffin ran as the Republican candidate for Seat 6. D.E. 1-4 at 16.[2] In a closely contested race with his Democratic opponent, Justice Allison Riggs, only a few hundred votes ultimately separated Judge Griffin from victory, out of more than 5.5 million cast. *Id.* at 18. But as the county boards of elections canvassed the vote, Judge Griffin became aware of numerous irregularities with ballots cast during the election, implicating the constitutional and statutory provisions outlined above. *Id.* at 18-21. Accordingly, he filed election protests in county boards of election across the state, seeking to prohibit the counting of ballots cast in violation of state law. *Id.*; *see, e.g.*, D.E. 1-5 at 180-346, 379-98, 407-14, 439-45, 454-66, 491-97 (excerpts of various county protests).

Ultimately, the Board assumed initial jurisdiction over three categories of protests, involving more than 60,000 ballots cast across the state. *See* D.E. 1-5 at 4. In the first, Judge Griffin challenged ballots cast by thousands of individuals who failed to verify their identity by providing a drivers license number or social security number with their voter registration, in violation of the General Statutes. *Id.* at 10-14. In the second, he argued that hundreds of ballots were cast by non-residents, in violation of the North Carolina Constitution's residency requirement. *Id.* at 14-26. And in the third, he contended that the county boards of elections had

---

[2] All facts in the Petition for Writ of Prohibition were verified by counsel as part of the filing submitted to the Supreme Court of North Carolina. *See* D.E. 1-4 at 86 ("Verification of Counsel"). And the Appendix to the Petition, which the Board has filed at D.E. 1-5, was part of that verified pleading. To remove any doubt, however, Judge Griffin has filed as an exhibit to this Memorandum a declaration under 28 U.S.C. § 1746, attesting to the same verification contained in the original state-court filing. *See* Ex. A.

accepted, processed, and counted absentee ballots cast by thousands of overseas individuals who had failed to provide a copy of their photo identification (or an exception form), in violation of state law. *Id.* at 26-30. In conjunction with these protests, Judge Griffin sent notice to the thousands of individuals whose votes they affected by sending postcards to their addresses, which indicated that he was challenging the validity of their votes. *Id.* at 174-78.

On December 11, 2024, the Board denied Judge Griffin's protests at a public meeting. Two days later, the Board issued a written order explaining the reasons for its decision. *Id.* at 41-80. Following the Board's decision, on December 18, 2024, Judge Griffin petitioned the North Carolina Supreme Court for writ of prohibition. *See* D.E. 1-4. As required by the North Carolina Rules of Appellate Procedure, Judge Griffin's petition was verified. *See id.* at 86 ("Verification of Counsel"). In that verified petition, Judge Griffin sought to preserve his right to judicial review of the Board's decision by requesting that the Supreme Court stay the Board from certifying the election results. *See id.* at 14-15. Judge Griffin also sought an extension of time to file petitions for judicial review of the Board's decision in state Superior Court. *See* D.E. 1-4 at 14. The writ also asked the Supreme Court to decide the merits of his election protests and to prohibit the Board from counting the unlawful ballots. D.E. 1-4 at 14.

In an unprecedented move, the Board removed Judge Griffin's petition from North Carolina's highest court to this one. D.E. 1. Once the Board removed the Petition, however, Judge Griffin nonetheless filed three separate petitions for judicial review in that court on December 20, 2024, to preserve his right of review; on the same day, the Board removed those three petitions to this Court as a single action. *See Griffin v. N.C. State Bd. of Elections*, Case No. 5:24-cv-00731 (E.D.N.C.).

Also on December 20, 2024, Judge Griffin moved in this Court for a temporary restraining order to enjoin the Board from certifying the election results. The Court denied Judge Griffin's motion by text order, citing the statements in the Board's unverified removal notice that it would not certify the election results until, at the earliest, January 3 or January 7, 2025, and that the Board should therefore have an opportunity to respond to Judge Griffin's request before the Court grants his requested relief.

That same day, the Board held a public meeting to determine whether to deny Judge Griffin's remaining protests (the merits of which are not at issue here). *See* North Carolina State Board of Election, *State Board Meeting: December 20, 2024*, available at https://www.ncsbe.gov/news/press-releases/2024/12/18/state-board-meeting-december-20-2024 (last visited December 23, 2024). Judge Griffin understands that, at that meeting, the Board dismissed his remaining protests. Although the Board has not yet issued its written decision regarding those protests, both its Notice of Removal and an email from the Board's counsel state that the Board is now poised to certify the election as early as January 7, 2025, though that certification date could occur a few days after January 7, 2025, depending on when the Board issues its final decision on the remaining protests. *See* D.E. 1-4 at 3-4; Ex. B at 2.[3]

From December 20 to 23, 2024, in an effort to preserve party and judicial resources, Judge Griffin's counsel conferred with the Board's counsel in an attempt to obtain the Board's consent to a stay of certification until a court decides this proceeding on the merits. But the Board refused to consent to a stay. Because the Board's written decision could issue as early as today, Judge

---

[3] Just prior to filing this Motion, the Board's counsel indicated that the Board may not issue the certificate of election until Friday, December 27, 2024. When the Board files its written decision denying Judge Griffin's remaining protests—whether on December 23, 2024, or at a later date—Judge Griffin will file a notice with the Court indicating the anticipated date for issuance of a certificate of election.

Griffin now moves for a preliminary injunction to enjoin the Board from certifying the election results on January 7, 2025, or a date soon thereafter. The timing of this motion will allow the parties to fully brief this matter and conserve judicial resources by positioning the Court to rule on this motion before the looming certification date.

## LEGAL STANDARD

To obtain a preliminary injunction, a party must establish: "(1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest." *Patel v. Moron*, 897 F. Supp. 2d 389, 395 (E.D.N.C. 2012); Fed. R. Civ. P. 65(b).

Alternatively, state law calls for a related standard: "The court shall not issue a stay of certification unless the petitioner shows the court that the petitioner has appealed the decision of the State Board of Elections, that the petitioner is an aggrieved party, and that the petitioner is likely to prevail in the appeal." N.C. Gen. Stat. § 163-182.14(b).

## ARGUMENT

Judge Griffin is entitled to a preliminary injunction. All the necessary facts are substantiated by his verified petition. *See* D.E. 1-4.

The Court should grant the injunction for four reasons. First, absent a preliminary injunction, state law requires the Board to certify the election results within thirteen days of service of its decision on a protest—here, which may occur as early as January 7, 2025. Once those results are certified, Judge Griffin's protests will all become moot. Denying Judge Griffin a preliminary

injunction will therefore irreparably harm him by denying him any chance to obtain judicial review of the Board's erroneous decision, thereby costing him the election.

Second, the Board will suffer no harm if this Court orders it not to certify the election results until Judge Griffin's petition is decided. Indeed, state law contemplates exactly this sort of delay when the Board's decision on an election protest is under review. The balance of the equities therefore favors Judge Griffin. And enjoining the Board from certifying the election results will permit judicial review of the Board's order and thus serve the important interests the public has in election integrity and in preventing voter disenfranchisement through the counting of unlawful votes. Third, enjoining the Board from certifying the election will maintain the status quo while the Court considers, as a threshold matter, whether it has jurisdiction over of the removed writ of prohibition. Finally, the Board erroneously applied state and federal law when it denied his election protests. Under North Carolina law, the writ of prohibition is designed to correct exactly that sort of legal error. Judge Griffin is therefore likely to succeed on the merits of his petition.

## I.     __Absent a preliminary injunction, Judge Griffin will be irreparably harmed.__

If this Court fails to enjoin the Board from certifying the election results, Judge Griffin will lose the ability to challenge the Board's erroneous decision. State law requires the Board to certify election results 13 days after the Board's final decision on an election protest. N.C. Gen. Stat. § 163-182.15(b)(1); *see id.* § 163-182.14(b); N.C. R. Civ. P. 6(e). Here, the Board has indicated that it will certify the election results as early as January 7, 2025. *See* D.E. 1 at 3-4; Ex. B at 2. And once the Board certifies those results, Judge Griffin's protests will become moot. *In re Protest of Whittacre,* 228 N.C. App. 58, 59, 743 S.E.2d 68, 69 (2013); *In re Election Protest of Fletcher,* 175 N.C. App. 755, 759, 625 S.E.2d 564, 567 (2006). Certification, then, will remove any chance for Judge Griffin to obtain judicial review of the Board's unlawful decision. Indeed, this situation is

exactly why preliminary injunctive relief exists: "the most compelling reason in favor of issuing a preliminary injunction is the need to prevent the judicial process from being rendered futile by defendant's action." *Ortho Pharma. Corp. v. Amgen, Inc.*, 882 F.2d 806, 813 (3d Cir. 1989) (cleaned up); *see In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003) ("The traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits"), *abrogated on other grounds by eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2005). And without judicial review, Judge Griffin will lose the election. He will therefore be irreparably harmed unless this Court stays the Board's hand.

## II. The balance of the equities favors Judge Griffin, and a preliminary injunction will serve the public interest.

By contrast to Judge Griffin, the Board will not be harmed if this Court enters a preliminary injunction. Indeed, state law expressly contemplates that courts may stay election certifications pending judicial review. *See* N.C. Gen. Stat. § 163-182.15. And requiring the Board to stay its hand while a court determines (1) it has jurisdiction over this removed proceeding, and (2) whether the Board's order was lawful will not prejudice that agency. Indeed, the Board has not yet certified the election, and granting a preliminary injunction will simply maintain the status quo until a court can decide these proceedings on the merits. *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999) ("a preliminary injunction preserves the status quo pending a final trial on the merits"). The balance of the equities therefore favors Judge Griffin.

Additionally, issuing a preliminary injunction here will serve the public's interest. Again, enjoining the Board from certifying the election results will permit judicial review to determine whether the Board allowed unlawful ballots to influence the outcome of this election. Judge Griffin argues in his petition that state laws aimed at ensuring election integrity render unlawful

the ballots he has challenged.  And the public manifestly has an interest in preserving the integrity of its election process.  *See Purcell v. Gonzalez,* 549 U.S. 1, 4 (2006).  The public also has an interest in ensuring that unlawful votes are not permitted to dilute and disenfranchise the votes of those who lawfully cast ballots.  *See Bush v. Gore*, 531 U.S. 98, 105 (2000); *Reynolds v. Sims*, 377 U.S. 533, 555 (1964); *James v. Bartlett*, 359 N.C. 260, 270 (2005).  Simply put, a preliminary injunction will permit judicial review, which will ultimately ensure that these important interests are served and that no cloud of illegitimacy surrounds the candidate who ascends to the North Carolina Supreme Court.  Granting a preliminary injunction is therefore in the public interest.

### III.    The Court should maintain the status quo as it considers whether it can exercise jurisdiction over the removed petition.

There are significant questions whether removal to this Court is proper.  The petition to the North Carolina Supreme Court raised state-law issues that will determine the outcome of a state election.  In our system of federalism, federal courts are loath to interfere with a state's control over its own elections.  *See Hutchinson v. Miller*, 797 F.2d 1279, 1280 (4th Cir. 1986) ("Our constitution does not contemplate that the federal judiciary routinely will pass judgment on particular elections for . . . state . . . office.  The conduct of elections is instead a matter committed primarily to the control of states"); *Welch v. McKenzie*, 765 F.2d 1311, 1317 (5th Cir. 1985) (under our federal system, "states are primarily responsible for regulating their own elections").

The statutes the Board cites are clearly inapplicable to a state election and cannot serve as the basis of removal.  *See infra* Section IV.  Indeed, the Board's invocation of those inapplicable federal laws here—to which Judge Griffin was forced to respond in his petition—appears to be a species of disfavored artful pleading designed to secure this Court's jurisdiction.

Additionally, *Pullman* abstention applies here because, were the North Carolina Supreme Court to agree with the Board's interpretation of the currently unsettled state-law issues

undergirding Judge Griffin's protests and petition, that decision would moot the federal constitutional problems the Board has raised in its order. *See Educational Servs., Inc. v. Md. State Bd. for Higher Educ.,* 710 F.2d 170, 174 (4th Cir. 1983) (setting out the test for determining when *Pullman* abstention is appropriate). And because Judge Griffin seeks discretionary equitable relief in his petition, remand based on abstention principles is appropriate. *See, e.g.*, *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 730 (1996).

For these and other reasons, Judge Griffin will in short order file a motion to remand. And the Court may enter a preliminary injunction to preserve existing conditions pending a determination of its own jurisdiction. *See United States v. United Mine Workers of Am.*, 330 U.S. 258, 290 (1947) (holding that the district court "unquestionably had the power to issue a temporary restraining order for the purpose of preserving existing conditions pending a decision upon its own jurisdiction").

## IV. Judge Griffin is likely to succeed on the merits of his petition.

Judge Griffin has petitioned the Supreme Court of North Carolina for a writ of prohibition. D.E. 1-4. The Supreme Court will issue the writ where a state agency's order erroneously applies the law, where there is no adequate remedy by appeal or otherwise, and where great injustice or irreparable injury will result if the writ is not granted. *See State v. Allen*, 24 N.C. (2 Ired.) 183, 188-89 (1841); *see also Moses v. State Highway Comm'n*, 261 N.C. 316, 317 (1964); *White v. Willett*, 456 S.W.3d 810, 812 (Ky. 2015). Here, Judge Griffin can likely satisfy all those factors, and he is therefore likely to succeed on the merits of his petition.

Judge Griffin's petition to the North Carolina Supreme Court laid out in great detail the merits of his arguments. Those merits are summarized below to fall within this Court's word-limit requirement.

A. **The Board erroneously applied state and federal law to deny Judge Griffin's protests.**

Judge Griffin has filed three election protests contending that, during the November 2024 general election for Seat 6 on the North Carolina Supreme Court, more than 60,000 individuals cast ballots in violation of state law. But when the Board ruled on his protests, it incorrectly applied state and federal law to deny them.

i. **The Board erred when it decided to count votes cast by individuals who never properly registered to vote.**

Article VI of the North Carolina Constitution allows residents to vote in state elections only if they are "legally registered" under state law. N.C. Const. art. VI, § 3(1); *see also* N.C. Gen. Stat. § 163-82.1(a) (making legal registration a "Prerequisite to Voting"); *see also id.* § 163-54 ("Only such persons as are legally registered shall be entitled to vote in any primary or election held under this Chapter").

Since 2004, state law has required voter registrants to provide their drivers license or social security numbers in their voter applications. N.C. Sess. Law 2003-226, §§ 2, 9; *see* N.C. Gen. Stat. § 163-82.4(a)(11). This information is critical because it is used with a statewide computer registration system to verify the voter's identity and important details about the voter. *See, e.g.*, N.C. Gen. Stat. § 163-82.11. The law is therefore aimed at ensuring election integrity.

Here, Judge Griffin's protest points out that 60,273 individuals cast ballots in the election for Seat 6 of the North Carolina Supreme Court despite no being legally allowed to do so. *See* D.E. 1-4 at 78. Specifically, data obtained from the Board shows that those individuals did not provide their drivers license or social security numbers with their voter registration applications. *Id.* at 77-78. Indeed, the Board has admitted that it allowed individuals to register to vote without providing that information; the Board's violation of law was identified a year before the election.

*See* D.E. 1-4 at 36-37 (citing Order at 4, *In re HAVA Complaint of Carol Snow* (N.C. State Bd. of Elections Dec. 6, 2023)). Accordingly, those individuals never legally registered to vote and it is therefore unlawful to count their ballots in this election. N.C. Const. art. VI, § 3(1); N.C. Gen. Stat. § 163-82.4(a)(11).

The Board's order does not assert that the individuals Judge Griffin has identified complied with these provisions of North Carolina law when they registered to vote. Instead, it reimagines the state's election laws to excuse their illegal registrations, reasoning that those errors are harmless because the individuals who did not properly register cured their application defects by providing additional documents, which, the Board says, state law permits. *See* D.E. 1-5 at 56. Not so.

There is no state law permitting a "cure" by providing additional documents in this way. Indeed, the General Assembly has provided precisely one method to cure an improper registration, N.C. Gen. Stat. § 163-82.4(f) (allowing voters to correct omissions in their registrations by at least 5:00 p.m. on the day before the county canvass), but the individuals whose ballots Judge Griffin challenges did not use this statutory cure process.

In the alternative, the Board also rejected Judge Griffin's protest on federal-law grounds, claiming that the Help America Vote Act ("HAVA") and the National Voter Registration Act ("NVRA") compel this result. *See* D.E. 1-5 at 65-67. But neither of those federal statutes apply to *state* elections, like the one at issue here. As for HAVA, the plain language of the Act states that the registration systems it mandates apply only to "an election for Federal office." 52 U.S.C. §§ 21081(a), 21083(A)(1)(a)(viii).

So too with the NVRA. That Act, by its own terms, applies only to "elections for federal office." *Id.* §§ 20501(b)(1)-(2). And Congress enacted the NVRA under the federal constitution's Elections Clause, which only allows Congress to regulate the "Times, Places, and Manner" of

selecting Senators and Representatives for Congress.  U.S. Const. art. I, § 4, cl. 1.  Thus, courts must construe the NVRA not to regulate state elections to avoid an unconstitutional interpretation of the Act.  *See, e.g.*, *Dobrovolny v. Nebraska,* 100 F. Supp. 2d 1012, 1028 (D. Neb. 2000)*; Broyles v. Texas,* 618 F. Supp. 2d 661, 691 (S.D. Tex. 2009)*, aff'd,* 381 F. App'x 370 (5th Cir. 2010) (unpublished); *see also Pree v. D.C. Bd. of Elections & Ethics*, 645 A.2d 603, 605 (D.C. 1994).

The Board's attempted reliance on HAVA and the NVRA is flawed for another reason:  the provisions of those acts to which the Board cites, 52 U.S.C. § 20507(a)(3), (c); *id.* § 21083(a)(2)(B), only prohibit states from removing voters from their voter rolls.  But Judge Griffin's protests only challenge the results of his election, and he nowhere requests that the state remove any voters from its registration rolls.  *See* D.E. 1-5 at 31.  Indeed, a successful election protest cannot result in anyone being removed from the voter rolls—it can only lead to the correction of inaccurate results or a recount.  N.C. Gen. Stat. § 163-182.10(d)(2)(e)(1)-(2); *Bouvier v. Porter*, 386 N.C. 1, 4 (2024).  The Board recognizes that Judge Griffin is only seeking to correct the vote count, stating in its order that if his protest is "successful," that will mean that those individuals found to have voted unlawfully will only have their votes "discard[ed]."  D.E. 1-5 at 52; *id.* at 55 ("the Protestors request that these voters' ballots be removed from the official count").

The Board, in its order, also sought to buttress its conclusions regarding the HAVA and NVRA by manufacturing connections between Judge Griffin's protests and *Republican National Committee v. North Carolina State Board of Elections*, No. 5:24-cv-547 (E.D.N.C.) (the "*RNC* case").  D.E. 1-5 at 67.  In that case, the RNC sought a writ of mandamus in state court, requiring the state to remove voters from the state's registration rolls.  The Board removed the state proceedings to this Court, which dismissed one claim and remanded the other.  In an interlocutory appeal of that decision, the Fourth Circuit reversed, characterizing the case as one about the

interplay between federal and state laws as they apply to the state's maintenance of voter rolls during federal elections. But that means that case is inapposite here, for it did not involve a request to correct a vote count in a state race based on a violation of state law. The rulings in the *RNC* case therefore did not consider, much less adjudicate, the questions presented here.

### ii. The Board erroneously decided to count votes cast by "Never Residents."

The North Carolina Constitution contains a bona fide residency requirement, providing that only those individuals yet have "resided in the State of North Carolina for one year . . . next preceding an election" may vote in elections for state offices. N.C. Const. art. VI, § 2(1). This residency requirement is nothing new—it has been a requirement since North Carolina ratified its original constitution in 1776. *See* N.C. Const. of 1776, art. VIII. And bona fide residency requirements are permissible under the United States Constitution. *See Dunn v. Blumstein*, 405 U.S. 330, 344 (1972); *see also Bouvier*, 386 N.C. at 4 n.2; *Lloyd v. Babb*, 296 N.C. 416, 439 (1979).

Here, Judge Griffin, using data provided by the Board, has identified 267 individuals who voted in his election who have *never* resided in North Carolina. *See* D.E. 1-4 at 77-78. But under the North Carolina Constitution, those voters were not permitted to cast those ballots, and the Board must therefore correct the vote count to fix this error.

The Board denied this protest, reasoning that a state statute, the Uniform Military and Overseas Voters Act ("UMOVA"), N.C. Gen. Stat. §§ 163-258.1, *et seq.*, nonetheless permits it to count those votes. But misinterpreting UMOVA to provide an exception to the state constitution's bona fide residency requirement renders it unconstitutional and invalid. Judge Griffin therefore argued that the Board should interpret UMOVA to avoid this serious constitutional defect. *See N.C. State Bd. of Educ. v. State*, 371 N.C. 149, 160 (2018). The Board, however, refused,

inexplicably reasoning that it was incompetent to hold a state statute unconstitutional—something Judge Griffin did not request.  D.E. 1-5 at 69.

The Board also reasoned that if UMOVA violated the state constitution, that the federal constitution's substantive-due-process doctrine would reinstate the law.  Apparently, the Board thought that applying our state constitution to this election in the manner Judge Griffin had requested would amount to applying a "newly announced rule of law."  *Id.* at 72.  But the Board has confused the chronology.  For the state constitution's residency requirement has existed and persisted since the Revolutionary War.

### iii.    The Board incorrectly decided to count absentee ballots submitted without photo identification.

Since 2018, North Carolina law has required individuals submitting absentee ballots to submit a photocopy of their photo identification in a "sealed container-return envelope" along with their ballot.  N.C. Gen. Stat. §§ 163-231(b)(1), 163-230.1(a)(4), (b)(4), (e)(3), (f1).  To be sure, voters who fail to include a photo identification along with their ballot may cure that deficiency, but only if the proper identification is received the day before the county canvass.  *Id.* § 163-230.1(e).  These provisions equalize the burden of voting:  both in-person voters and absentee voters must show photo identification to cast a ballot.  *See id.* § 163-166.16(a); N.C. Const. art. VI, §§ 2(4), 2(2).

Here, Judge Griffin—again using the Board's own data—has identified in his protests 5,509 overseas absentee voters who failed to submit photo identification along with their ballot.  D.E. 1-4 at 77-78.  None of those voters cured this deficiency under section 163-230.1(e).  North Carolina law therefore prohibits counting those ballots.

The Board, however, disagreed.  It reasoned that section 163-258.17(b) established the exclusive means to authenticate the identity of an overseas absentee voter and excused such voters

from providing photo identification. D.E. 1-5 at 73. Subsection (b) says no such thing. It instead refers to the "authentication" required for "execution of a document" for overseas voters. N.C. Gen. Stat. § 163-258.17(b). But North Carolina's photo-identification requirement is an entirely separate requirement found in another statute and is used to verify the voter's identity, not to authenticate a document.

The Board also defended its decision to excuse overseas voters from the photo-identification requirement on the grounds that the Board had already issued a rule to that effect. D.E. 1-5 at 76-77. But the General Assembly never delegated to the Board the power to override state constitutional and statutory requirements. Nor does the state constitution permit the Board to impose a greater burden—photo identification—on those living in North Carolina than it imposes on those living abroad.

Additionally, the Board's attempt to rely on federal law to support its reasoning in this regard fails. The Board cited 52 U.S.C. § 20302 as part of its justification for permitting these ballots to be counted. *Id.* at 77. But, as with HAVA and the NVRA, that statute is inapplicable because it applies only to "elections for Federal office." 52 U.S.C. § 20302 (a)(1)-(3), (6)-(8), (b)(1), (c).

Finally, as with Judge Griffin's Never Residents protest, the Board claims that if state law were interpreted to require a photo identification for overseas absentee ballots, that would amount to a "newly announced rule" of law, violating the federal constitution's substantive due process doctrine. D.E. 1-5 at 79. But again, the Board has confused the chronology. Since 2018, North Carolina law has required all voters to submit a photo identification when they vote.

iv.    **The Board's other reasons for denying Judge Griffin's protests fail.**

The Board relied on several other reasons to deny Judge Griffin's protests, but these all fail as well. First, the Board reasoned that it should dismiss the protests because, it said, they were untimely voter challenges. But that position contravenes not only the Board's previous orders, *see* D.E. 1-4 at 60-61, but also the North Carolina Supreme Court's decision in *Bouvier*. Those authorities stand for the proposition that "an election protest may address any 'irregularity' or 'misconduct' in the election process, including the counting and tabulation of ballots cast by ineligible voters." *Bouvier*, 386 N.C. at 4. And that is exactly what Judge Griffin's protests do here.

Next, the Board purported to dismiss Judge Griffin's protests for lack of service. To reach this decision, the Board partially relied on rules it had promulgated requiring protestors to serve by mail copies of all filings in an election protest on every person with a direct stake in the protest within one business day of filing the protest. 8 N.C. Admin. Code § 02.0111. But that regulation only permits the Board to prescribe the form used for election protests. *Id.* More to the point, the Board has no statutory authority to burden protestors with onerous processes for providing notice to affected parties. And that is especially so where the protest statutes expressly burden the county boards of elections—not the protestors—with the duty to provide notice to affected parties. N.C. Gen. Stat. § 163-182.10(b).

Moreover, Judge Griffin nonetheless complied with the Board's service demand: he not only notified the county boards of elections of his protests, but also mailed postcards to over 60,000 voters at their addresses of record. Those postcards notified those individuals that their vote may be affected by his protests and provided a QR-code link to the protest filings and the county boards of elections website. D.E. 1-5 at 174-78. Indeed, those postcards mirrored the mailers that the

Board itself uses to notify voters of certain requirements.  *See* N.C. Gen. Stat. §§ 163-82.8(c), 163-82.14(d)(2); *See* N.C. State Bd. of Elections*, Press Release: State Board Launches Photo ID Educational Campaign* (Feb. 13, 2024), available at https://www.ncsbe.gov/news/press-releases/2024/02/13/state-board-launches-photo-id-educational-campaign.

Judge Griffin's postcards also satisfy the constitutional standard for notice because they were "reasonably certain to inform those affected." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 315, 319 (1950).  Judge Griffin served over 60,000 voters in this way, and the interests of each of those voters "is identical with that of a class" and, therefore, "notice reasonably certain to reach most of those interested in objecting is likely to safeguard the interests of all, since any sustained would inure to the benefit of all." *Id.* at 319.  Given that Judge Griffin's service on 60,000 voters replicates the Board's own methods of notifying voters, the Board had no grounds to claim his method of notice and service was deficient.

The Board also suggested in passing that Judge Griffin's protests may have been untimely filed.  *See* D.E. 1-5 at 46 n.4.  To be sure, the General Statutes require that protests be filed "no later than 5:00 P.M. on the second business day after the county board has completed its canvass and declared the results."  N.C. Gen. Stat. § 163-182.9(b)(4)(c).  But the General Statutes also expressly provide that only "substantial compliance" with those deadlines is required. *Id.* § 163-182.10(a)(1).  And here, Judge Griffin's protests were all submitted by email to the county boards of elections before the 5:00 P.M. deadline.  D.E. 1-5 at 174-78.  It is possible that some of those emails might have hit election officials' inboxes a few minutes after 5:00 P.M., but that scenario clearly demonstrates "substantial compliance" with the deadline requirement. *See, e.g.*, *Graham v. Nw. Bank*, 16 N.C. App. 287, 291-92, 192 S.E.2d 109, 112 (1972).

Finally, the Board suggests that sustaining Judge Griffin's protests may violate the federal constitution's substantive due process doctrine, ostensibly invoking the *Anderson-Burdick* test, though the Board never mentions that test by name in its order.  That test requires that a regulation imposing a "severe burden" on voting be "narrowly drawn to advance a state interest of compelling importance."  *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).  But here, none of Judge Griffin's protests ask the Board to enforce laws that would severely burden voting.  For asking the Board to enforce the lawful registration, residency, and photo-identification requirements enshrined in the state constitution and the General Statutes merely requires it to apply an evenhanded trio of voter qualifications requirements which cannot, as a matter of law, severely burden the right to vote.  *See Crawford v. Marion Cnty. Elec. Bd*, 553 U.S. 181, 189-98 (2008) (plurality opinion).

The Board also suggests that where voters complied with its instructions to disregard certain registration or voting requirements, sustaining the protests would violate substantive due process.  But this is not a situation in which an election official's error prevented eligible voters from casting their ballots.  Rather, this is an instance in which, after the Board decided to not inform individuals of certain requirements, the individuals' ignorance of those requirements resulted in them failing to take the steps necessary to become eligible voters.  But, in this situation, it is not unconstitutional to require the public to be as knowledgeable of election laws as other laws.  *See, e.g.*, *Pettengill v. Putnam Cnty. R-1 Sch. Dist., Unionville, Mo.,* 472 F.2d 121, 122 (8th Cir. 1973); *Powell v. Bower,* 436 F.2d 84, 88 (2d Cir. 1970).

Moreover, even if the Court were to conclude that enforcing these laws severely burdened the right to vote, they are nonetheless tailored to compelling state interests.  *See Crawford*, 553 U.S. at 194-97; *Purcell*, 549 U.S. at 4; *Bush,* 531 U.S. at 105; *Munro v. Socialist Workers Party*, 479 U.S. 189, 195-96 (1986).  The state is therefore well justified in enforcing them.

\* \* \*

For these reasons, Judge Griffin is likely to show that the Board erroneously applied state and federal law when it denied his protests.  And given that Judge Griffin stands to suffer irreparable harm—*i.e.*, losing his opportunity for judicial review and losing the election—absent the writ and that the Board is acting lawlessly on a matter of great public importance, there is a need for judicial expediency and the only adequate remedy is a writ of prohibition.  Judge Griffin has therefore demonstrated that he likely to succeed on the merits of his petition.

### V.     <u>The Court should waive the bond requirement or set bond at a nominal amount.</u>

While Federal Rule of Civil Procedure 65 provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined," it is well established "the district court retains the discretion to set the bond amount as it sees fit or waive the security requirement," *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013). Here, the Board will not suffer costs and damages from the proposed preliminary injunction, so Judge Griffin should not be required to post security, or should be required to post only a nominal amount.  *See Doe v. Pittsylvania Cnty., Va.*, 842 F. Supp. 2d 927, 937 (W.D. Va. 2012) (requiring no bond because the defendant would suffer "no monetary damages or other harm").

### CONCLUSION

For the foregoing reasons, Judge Griffin respectfully requests that the Court enter, not later than January 6, 2025, a preliminary injunction enjoining the Board from certifying the election results for the November 2024 general election for Seat 6 of the North Carolina Supreme Court until these proceedings are decided on the merits.

Dated: December 23, 2024

Respectfully submitted,

/s/ Mark M. Rothrock

Craig D. Schauer
41571 (NC)
DOWLING PLLC
3801 Lake Boone Trail, Suite 260
(919) 529-3351
cschauer@dowlingfirm.com

Mark M. Rothrock
56747 (NC)
Lehotsky Keller Cohn LLP
8513 Caldbeck Drive
Raleigh, NC 27615
(336) 416-3326
mark@lkcfirm.com

Troy D. Shelton
48070 (NC)
DOWLING PLLC
3801 Lake Boone Trail, Suite 260
(919) 529-3351
tshelton@dowlingfirm.com

William T. Thompson*
24088531 (TX)
Lehotsky Keller Cohn LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
will@lkcfirm.com

W. Michael Dowling
42790 (NC)
DOWLING PLLC
3801 Lake Boone Trail, Suite 260
(919) 529-3351
mike@dowlingfirm.com

*Local Rule 83.1(d) special appearance
forthcoming

Attorneys for Petitioner

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.2(f)(2)

I hereby certify that this Petitioner's Memorandum in Support of Motion for Preliminary Injunction is in compliance with Local Rule 7.2(f)(2), as the document, including headings, footnotes, citations, and quotations, contains no more than 8400 words, as indicated by the word count generated by word processing software.

/s/ *Mark M. Rothrock*
Mark M. Rothrock

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 23, 2024, I electronically filed the foregoing Petitioner's

Memorandum in Support of Motion for Preliminary Injunction with the Clerk of Court using the

CM/ECF system, which will send notification of such filing to all parties.

<u>/s/ *Mark M. Rothrock*</u>
Mark M. Rothrock

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:24-cv-724-M

JEFFERSON GRIFFIN,                    )
                                      )
                  Petitioner,         )
                                      )
        v.                            )
                                      )
NORTH CAROLINA STATE BOARD OF         )
ELECTIONS,                            )
                                      )
                  Respondent.         )

## **NOTICE**

Petitioner Judge Jefferson Griffin notifies the Court that the North Carolina State Board of

Elections issued a final written decision on Judge Griffin's remaining protests on Friday, December

27, 2024. A copy of the written decision is attached as Exhibit A. The State Board's counsel has

represented that, based on a written decision being issued on Friday, December 27, the State Board

would issue the certificate of election for Seat 6 of the North Carolina Supreme Court on Friday,

January 10, 2024, unless a stay of the certification was obtained before that date. A copy of the

State Board's written representation is attached as Exhibit B.

Dated: December 31, 2024

Respectfully submitted,

/s/ Mark M. Rothrock

Craig D. Schauer
41571 (NC)
DOWLING PLLC
3801 Lake Boone Trail, Suite 260
(919) 529-3351
cschauer@dowlingfirm.com

Mark M. Rothrock
56747 (NC)
Lehotsky Keller Cohn LLP
8513 Caldbeck Drive
Raleigh, NC 27615
(336) 416-3326
mark@lkcfirm.com

Troy D. Shelton
48070 (NC)
DOWLING PLLC
3801 Lake Boone Trail, Suite 260
(919) 529-3351
tshelton@dowlingfirm.com

William T. Thompson*
24088531 (TX)
Lehotsky Keller Cohn LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
will@lkcfirm.com

W. Michael Dowling
42790 (NC)
DOWLING PLLC
3801 Lake Boone Trail, Suite 260
(919) 529-3351
mike@dowlingfirm.com

*Local Rule 83.1(d) special appearance
forthcoming

Attorneys for Petitioner

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 31, 2024, I electronically filed the foregoing Notice with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel for all the parties of record.

/s/ *Mark M. Rothrock*
Mark M. Rothrock

# EXHIBIT A

STATE OF NORTH CAROLINA
WAKE COUNTY

BEFORE THE STATE BOARD OF ELECTIONS

|  |  |
|---|---|
| ) | |
| ) | |
| IN RE ELECTION PROTESTS OF ) | **DECISION AND ORDER** |
| JEFFERSON GRIFFIN, ASHLEE ) | |
| ADAMS, FRANK SOSSAMON, AND ) | |
| STACIE McGINN ) | |
| ) | |
| ) | |

At a public meeting held on December 20, 2024,[1] the State Board of Elections ("State

Board") considered election protests filed by four candidates in the 2024 General Election:

Jefferson Griffin, a Republican candidate for associate justice of the Supreme Court of North

Carolina; Ashlee Adams, a Republican candidate for N.C. Senate District 18; Stacie McGinn, a

Republican candidate for N.C. Senate District 42; and Frank Sossamon, a Republican candidate

for N.C. House District 32 (collectively, the "Protesters").

Upon consideration of the record materials from and decisions of the county boards of

elections that conducted evidentiary hearings on the protests; protest materials, including

appeals, submitted by the Protesters; briefs submitted by the Protesters and opposing candidates;

and the oral argument presented to the State Board by counsel for the candidates, the State Board

concluded that the protests addressed in this written decision (1) did not substantially comply

with the service requirements;[2] and (2) presuming without deciding that all voters with ballots in

---

[1] The recording of the Board's meeting is available at:
https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2024-12-20/.
[2] This conclusion regarding service pertained only to the "Deceased," "Felon," and "Not
Registered" protests filed by the Protesters, and does not pertain to the "Residency" protest filed
by McGinn or the "Recount" protest filed by Griffin.

JA 202

the count who were challenged on appeal, potentially subject to appeal, or were referred to the

State Board by the county boards of elections were in fact ineligible, their numbers were

insufficient to affect the outcome of the election in those contests. Based on those conclusions,

the State Board dismissed the protests.

## I.    BACKGROUND

On November 19, 2024, the Protesters filed over 300 protests across the state challenging

the apparent results of their elections. After the county boards of elections conducted recounts in

all of these contests, the final canvassed results are as follows:

| CONTEST | CANDIDATE | PARTY | BALLOT COUNT | PERCENT |
|---|---|---|---|---|
| Supreme Court Associate Justice | Allison Riggs | DEM | 2,770,412 | 50.01% |
| | Jefferson G. Griffin | REP | 2,769,678 | 49.99% |
| NC Senate District 18 | Terence Everitt | DEM | 59,667 | 48.47% |
| | Ashlee Bryan Adams | REP | 59,539 | 48.36% |
| | Brad Hessel | LIB | 3,906 | 3.17% |
| NC Senate District 42 | Mrs. Woodson Bradley | DEM | 62,260 | 50.08% |
| | Stacie McGinn | REP | 62,051 | 49.92% |
| NC House District 32 | Bryan Cohn | DEM | 21,215 | 48.95% |
| | Frank Sossamon | REP | 20,987 | 48.42% |
| | Ryan Brown | LIB | 1,140 | 2.63% |

2

Protests were filed in almost every county in the state.[3] Those protests are based on six categories of allegations that certain general election voters' ballots were invalid. On Wednesday, November 20, 2024, the State Board held a meeting, noticed on an emergency basis under N.C.G.S. § 143-318.12, to consider whether to take jurisdiction over some of the protests pursuant to its statutory authority under N.C.G.S. § 163-182.12. The Board voted unanimously to take jurisdiction over three categories of protests, which presented legal questions of statewide significance.[4] By written decision issued December 13, 2024, the State Board dismissed the three categories of protests that it had assumed jurisdiction over.[5]

The State Board's November 20, 2024, order also instructed the county boards of elections to consider the remaining three categories of protests, which were focused on individual, fact-specific determinations of voter eligibility. These protests are labeled by the Protesters as the "Deceased" protests, "Felon" protests, and "Not Registered" protests.

- The Deceased protests challenge the eligibility of ballots cast by voters who were allegedly deceased on Election Day.

- The Felon protests challenge the eligibility of ballots cast by voters who allegedly were serving a felony sentence as of Election Day.

- The Not Registered protests challenge the eligibility of ballots cast by voters whose registration was allegedly denied or removed on Election Day (*i.e.*, they were not a registered voter in the county on Election Day).

---

[3] The legislative candidates filed protests in only those counties within the jurisdiction of their legislative contests.

[4] The State Board's November 20, 2024, order is available at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/Orders/Other/2024%20Order%20on%20Jurisdiction%20over%20Griffin%20Protests.pdf.

[5] The State Board's December 13, 2024, decision is available at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/Orders/Protest%20Appeals/Griffin-Adams-McGinn-Sossamon_2024.pdf.

3

Across all counties and among the four Protesters, the protests alleging the same category of allegedly ineligible voters are structured and pleaded in the same fashion. The only differences among county protests of the same category are the identities of the voters being challenged—*i.e.*, only voters registered in the county receiving the protest are part of a protest that the county board received. As instructed in the State Board's November 20, 2024, Order, the county boards conducted evidentiary hearings on these protests in accordance with N.C.G.S. § 163-182.10, to determine the eligibility of the voters in question as of Election Day and whether they had a ballot in the count.

In addition to these three categories of protests filed by all Protesters, McGinn timely filed a protest claiming that certain voters resided outside of NC Senate District 42 and were therefore ineligible to vote in the contest (referred to hereafter as the "Residency" protest). The issues presented in the Residency protest were heard by the Mecklenburg County Board of Elections along with the other categories of protests within that county board's jurisdiction. Following two evidentiary hearings on December 2 and December 5, 2024, the county board issued two decisions on December 6, 2024, dismissing the Residency protest. In its decisions, the county board unanimously concluded that the protest lacked substantial evidence to support the protest. McGinn timely appealed the county board's decisions on the Residency protest to the State Board.

Finally, Griffin filed a protest based on the conduct of the machine recount in Randolph County (referred to hereafter as the "Recount" protest). In Griffin's Recount protest, he asserted that the change of the vote count by 103 votes in the county following the machine recount (92 fewer for Griffin and 11 fewer for his opponent, Allison Riggs), which was much higher than any other county, "circumstantially suggest errors or defects occurred in the Randolph County

4

recount to a much greater extent than elsewhere." The protest alleged that "Upon information and belief, the large number of discounted votes may have been caused by an issue with the tabulation machines used by Randolph County in counting absentee ballots, which led to votes being counted twice." And the protest requested a complete hand-to-eye recount of all ballots cast in the contest in Randolph County. On December 5, 2024, the county board conducted a preliminary consideration of the recount protest pursuant to N.C.G.S. § 163-182.10(a) and unanimously concluded that the Recount protest was untimely because it raised issues with the original count of ballots in the contest, rather than the machine recount of the ballots. As a separate ground for dismissal, the county board determined, again unanimously, that the protest failed to meet the probable cause standard, because again, the protest was, in the county board's view, taking issue with the original count and not the recount. Griffin timely appealed the county board's decision on the Recount protest to the State Board.

This decision of the State Board concerns the Deceased protests, Felon protests, and Not Registered protests filed by all Protesters, as well as the Residency protest filed by McGinn and the Recount protest filed by Griffin. These are the only protests that remain pending in each respective contest under protest.

These protests are before the State Board in different procedural postures depending on how the county boards decided the matters before them: (1) untimely protests referred to the State Board by the county boards; (2) referrals to the State Board after evidentiary hearings because the county board found at least one ineligible voter has a ballot in the count in a multicounty contest; (3) appeals by some of the Protesters, taking issue with the county boards' decisions on some of the protests, including the boards' decisions as to the eligibility of the voters called into question in the protests; and (4) protests very recently decided by the county

5

boards for which the time to appeal had not yet run. Pursuant to its authority in N.C.G.S. § 163-182.12, and the intent of N.C.G.S. § 163-182.10(d)(2)d. to facilitate a single decision on protests in a multicounty contest, the State Board, by a 3–2 vote, assumed jurisdiction and consolidated for decision all protests filed by each Protester that have been considered by the county boards, referred to the State Board, or otherwise appealed, into one combined protest per protested contest. Accordingly, for the purposes of this decision, the State Board has consolidated into four separate protests all protests filed by Griffin ("Griffin protests"), all protests filed by Adams ("Adams protests"), all protests filed by Sossamon ("Sossamon protests"), and all protests filed by McGinn ("McGinn protests").

## II.     ANALYSIS

The Deceased, Felon, and Not Registered protests for each candidate were not served on affected voters in accordance with law. Additionally, for all remaining protests, the Protesters have failed to establish substantial evidence to believe that a violation of the election law or other irregularity or misconduct that affected the outcome of the election occurred in those contests. The protests are therefore dismissed.

### A.  Certain Protests Were Not Timely Filed

As an initial, matter, the Adams protests filed in Wake County and the Griffin protests filed in Anson, Moore, Orange, and Richmond counties were not timely filed under N.C.G.S. § 163-182.9(b)(4).

For the November 2024 general election, the county canvass was on November 15, 2024, ten days after Election Day. *See* N.C.G.S. § 163-182.5(b). Protests are required to be filed by a certain date and time, depending on the allegations within the protest, and when, as here, "the protest concerns an irregularity other than vote counting or result tabulation, the protest *shall be*

6

*filed* no later than 5:00 P.M. on the second business day after the county board has completed its canvass and declared the results." N.C.G.S. § 163-182.9(b)(4)c. (emphasis added). If a protest filing is not timely, the administrative code directs the county board to proceed as follows: "The county board shall not consider election protests not timely filed, but shall refer, in the same manner and within the time period provided in [08 NCAC 02 .0110(a)], all such untimely protests, along with copies of the protest and attachments, to the State Board office for consideration under G.S. 163-182.12. For the purposes of this Rule, timely means within the time specified in G.S. 163-182.9." 08 NCAC 02 .0110(b).

For the November 2024 general election, the deadline to file a protest that concerned an irregularity other than vote counting or result tabulation in a contest was November 19, 2024. *See* N.C.G.S. § 163-182.9(b)(4) ("the second business day after the county board has completed its canvass and declared the results"). The Adams protests and the Griffin protests filed in Moore, Orange, and Richmond counties were filed by email, yet those emails were not received by the respective county boards of elections until shortly after 5:00 P.M. on November 19, 2024. The Griffin protest in Anson County, also filed by email, was not received until the following day. As a result of the untimely filing, those counties referred those protests to the State Board pursuant to 08 NCAC 02 .0110(b), so that the State Board could determine whether to exercise its discretionary authority under N.C.G.S. § 163-182.12 to "consider protests that were not filed in compliance with G.S. 163-182.9."

Although the emails provided by the county boards of elections show a "sent" date and time that was after the statutory deadline of 5:00 P.M. on December 19, Adams and Griffin contend those emails were actually sent prior to the deadline. The Griffin protests in Anson County were originally sent prior to the deadline, but they were sent to an outdated email

7

address, as Griffin's counsel acknowledged at the December 20, 2024, hearing.[6] Once that error was realized, the protests were sent to the correct email address on November 20, 2024.

Despite the conflicting evidence regarding when the emails were *sent*, that is beside the point. The plain language of the statutory filing deadlines in N.C.G.S. § 163-182.9(b)(4) is best construed as prescribing deadlines for when a protest filing must be *received* by the county board of elections, at which point in time the act of filing is complete. *See* N.C.G.S. § 163-182.9(b)(4)c. ("the protest *shall be filed no later than . . .*" (emphasis added)). The emails attempting to file the protests were received after 5:00 P.M. on the second business day following the county canvass, and the county boards of elections receiving those emails were correct that those protests were not timely filed by the statutory deadline.

Nevertheless, while the State Board has concluded that these particular protests were not timely filed, the Board by a 4–1 vote has chosen to exercise its discretionary authority under N.C.G.S. § 163-182.12 to consider such untimely protests, taking into account that attempts were made to file the protests prior to or right at the deadline. As such, these protests are part of the Adams protests and Griffin protests addressed in this decision.

**B.  Service of the Protests on Challenged Voters**

The State Board concludes, for the same reasons as stated in the Board's December 13, 2024, decision, that the Protesters failed to serve the registered voters they seek to challenge in their Deceased, Felon, and Not Registered protests in a manner that complies with the North Carolina Administrative Code or in a manner consistent with the requirements of constitutional due process.

---

[6] See meeting recording, starting at the 1:36:55 timestamp.

8

The Protesters used the same method of service for these categories of protests—a postcard with vague language and a QR code to "serve" the challenged voters. As the Board concluded in its December 13, 2024, decision, and does so again here, the Protesters have failed to show substantial compliance with the requirement of 08 NCAC 02 .0111 to "serve" the voters they are challenging with "copies of all filings," and their decision to employ the postcard QR code method of service was not reasonably certain to inform the affected voters of the matter such that they could choose for themselves how to respond.

Separately, it is undisputed that the McGinn Residency protests were never served on the affected voters at all.

For these reasons, and incorporating the Board's reasoning in its December 13, 2024, decision into this written decision, the State Board concludes, by a vote of 3 to 2, that copies of protests were not properly served on affected parties and therefore the protests do not substantially comply with N.C.G.S. § 163-182.9. The Board will nonetheless address the merits of the protests.

### C.  Merits of the Protests

The Protests filed by Griffin, Adams, Sossamon, and McGinn ask that ballots should be removed from. Following hundreds of hours of diligent work, by hundreds of election officials at county boards of elections throughout the state some voters were found to be ineligible and removed from the count, others were found to be eligible, and a small number of ballots were left to review. The undisputed fact is that the number of ballots in question in each contest's protests is, in aggregate, less than the vote margin in each of the protested contests. During the State Board's December 20 meeting, the Protesters' counsel effectively conceded that point. Accordingly, the State Board concludes that the Protesters have failed to establish substantial

9

JA 210

evidence to believe that a violation of the election law or other irregularity or misconduct that affected the outcome of the election occurred in any of these contests.

To succeed in an election protest, a protester must establish that any irregularities in the election were "sufficiently serious to cast doubt on the apparent results of the election." N.C.G.S. § 163-182.10(d)(2)e. Absent such a showing, the protest must be dismissed. *Id.* § 163-182.10(d)(2)c. Likewise, the State Board has independent authority to adjudicate election contests to ensure no irregularities occurred "that may have changed the result of an election." *Id.* § 163-182.12. In sum, a successful election protest must prove that any irregularities in an election might have actually changed the ultimate outcome of the election.

Our courts agree. "North Carolina law on this issue is well settled. An election or referendum result will not be disturbed for irregularities absent a showing that the irregularities are sufficient to alter the result. The burden of proof is upon the unsuccessful candidate or the opponents of a referendum to show that they *would* have been successful had the irregularities not occurred." *In re Appeal of Ramseur*, 120 N.C. App. 521, 525, 463 S.E.2d 254, 256 (1995) (citations omitted) (emphasis in original). "Clearly, if an unsuccessful candidate seeks to invalidate an election, he must be able to show that he would have been successful had the irregularities not occurred." *In re Cleveland Cty. Comrs: Protest of Crawford*, 56 N.C. App. 187, 191, 287 S.E.2d 451, 455 (1982) (quoting *In re Judicial Review by Republican Candidates for Election in Clay Cty.*, 45 N.C. App. 556, 570, 264 S.E.2d 338, 346 (1980)).

Because these protests do not meet this burden, they must be dismissed.

10

JA 211

*i.    Griffin Protests*

The number of voters whose eligibility is called into question by Griffin's Deceased, Felon, and Not Registered protests, and the number of ballots to which Griffin takes issue in the Recount protest, is far below the 734 vote margin in this contest.

In the three categories of protests that are based solely on voters' eligibility, the total number of voters challenged by Griffin per category are: Felon—240 voters challenged; Deceased—156 voters challenged; and Not Registered—572 voters challenged. While these three types of protests together appear at first glance to total 968 voters, these three categories of protests actually challenge a combined 817 voters, because Griffin occasionally challenged the same voter in two protests filed in the same county (*e.g.*, voters removed after dying before Election Day may be in both the deceased and not registered protests), and he withdrew his protests in a few counties.

As the evidence was developed through the hearings conducted by the county boards of elections on these three categories of protests, the number of potentially ineligible voters with ballots in the count was significantly lower than Griffin had alleged. First, the county boards cumulatively determined that 329 challenged voters do not even have a ballot in the count, because their ballot was already challenged by their county board and removed from the count during the canvass period. This is because Griffin's protests are largely based on data from the State Board's own post-election voter eligibility audit, in which the State Board sent lists of voters to the county boards where State Board records showed those voters had voted early or absentee-by-mail yet may have been ineligible for the same reasons identified in Griffin's Deceased, Felon, and Not Registered protests. As part of that process, the county boards reviewed those lists and, entered challenges as appropriate, and followed the appropriate notice

11

and hearing process.[7] If the challenge was upheld, then the voter's ballot was retrieved and removed from the count before the county board finalized its canvass and certified the results. If the county board concluded otherwise, based on the evidence presented at the hearing, then the voter's ballot would remain in the count.

As a result of this work by the county boards during the canvass period, 329 of the 817 voters challenged by Griffin had already been determined to be ineligible to vote as of Election Day, and the canvassed results already reflect that their ballot had been removed from the count prior to the filing of the protests..

As for the remaining voters challenged in Griffin's protests, the county boards determined in the protest hearings that 370 of the remaining 488 voters with a ballot in the count should have their ballot remain in the count. This is either because the voters were found to be eligible, oftentimes with that finding already having been made during the canvass period challenge process, or, in a handful of instances, the county dismissed the appeal on alternative grounds (e.g., lack of proper service). An additional 5 voters were determined to have never cast a ballot at all. Griffin has appealed 19 county board decisions to the State Board, reflecting 81 voters.. Additionally, a total of 68 voters with a ballot in the count were found ineligible by the county boards during the protest hearings and those protests were referred to the State Board. **This means Griffin's protests remaining under these three categories are challenging only 149 voters who have a ballot in the count.**

---

[7] *See* Numbered Memo 2022-05, available at:
https://s3.amazonaws.com/dl.ncsbe.gov/sboe/numbermemo/2022/Numbered%20Memo%202022-05_Absentee%20Voter%20Challenges%20by%20County%20Board.pdf.

Eight county boards did not issue their written decision on the Griffin protests until shortly before the State Board's December 20, 2024, hearing on these protests.[8] The county boards' findings were that of the 52 voters collectively challenged in those eight counties, 43 of them had either already been challenged during the canvass and been removed from the count or were referred to the State Board because they were deemed ineligible and were included in the count (*i.e.*, were part of the 68 ineligible voters discussed above). Only 9 of these voters were eligible and had a ballot in the count, meaning that **at most only 9 more voters with a ballot in the count could potentially be added to the number still under challenge, in the event Griffin appealed the eligibility decisions on those voters and was successful on appeal.**

As to the protests in four counties that were referred to the State Board as untimely filed, those protests together challenge 28 voters as having a ballot in the count despite being allegedly ineligible. And in Yancey County, where the county board had not yet issued a decision on the protests filed with it, 3 voters were similarly challenged. That means that, **assuming all of these voters have a ballot in the count and were not eligible, at most only 31 more voters could be added to the number challenged.**

Therefore, the **maximum number of voters called into question by Griffin's Deceased, Felon, and Not Registered protests is 189 voters (149 voters found ineligible or challenged on appeal by Griffin, 9 potentially still subject to appeal, and 31 whose eligibility had not been determined by a county board). Assuming for argument's sake that all the voters still in question in these three categories were not eligible, 189 is far less than the 734 votes separating Griffin and Riggs.**

---

[8] These counties are Graham, Henderson, Lenoir, Surry, Vance, Warren, Wilkes, and Wilson counties.

13

Finally, in regard to the Recount protest that was dismissed by the Randolph County board at preliminary consideration, the protest largely, if not solely, relies on an inference that a relatively large change in the vote totals (losses of 11 votes for Riggs and 92 votes for Griffin) shows there was an issue with the recount. Assuming, without deciding, that the allegations in the Recount protest were sufficient to meet the probable cause standard to advance that protest to an evidentiary hearing, the net 81-vote change for Griffin resulting from the recount is still not enough to bring into question enough ballots collectively challenged in the Griffin protests.

For all these reasons, the State Board concludes, by a vote of 3 to 2, that the Griffin protests have not established substantial evidence to believe that a violation of the election law or other irregularity or misconduct that affected the outcome of the election occurred in the Supreme Court Associate Justice, Seat 6, contest. N.C.G.S. §§ 163-182.10(d)(2)c., 163-182.12.

ii.    *Adams Protests (Granville and Wake Counties)*

The number of voters whose eligibility is called into question by the Adams protests is far below the 128-vote margin in this contest.

In these three categories of protests that are based solely on voters' eligibility, the total number of voters challenged by Adams per category are: Felon—11 voters challenged; Deceased—2 voters challenged; and Not Registered—24 voters challenged. While these three types of protests together appear to total 37 voters, these three kinds of protests actually challenge a combined 36 voters, because Adams challenged the same voter in two protests filed in Wake county. Accordingly, if Adams was correct and all challenged voters were indeed ineligible and had a ballot in the count, then the number of "irregularities" (*i.e.*, ineligible voters participating in the election) *could not be* sufficient to affect the outcome.

14

The Wake County board, because it properly referred the Adams's protests to the State Board as untimely filed, made no findings as to the eligibility of the voters in question. Adams appealed that decision, meaning 31 voters are called into question by the appeal and could potentially be ineligible yet have a ballot in the count.

The Granville County board conducted an evidentiary hearing on the Adams protests filed in that county. At the conclusion of the hearing, the county board determined that 2 voters have ballots in the count but were found ineligible and referred those findings to the State Board because this is a multicounty contest. The county board also concluded that 3 voters with a ballot in the count were eligible, and Adams has not appealed that conclusion.

Accordingly, 2 voters with a ballot in the count have been found ineligible and another 31 are called into question by Adams's appeal. Therefore, the maximum number of voters called into question by Adams's protests is 33 voters. Assuming for argument's sake that all voters called into question in Adams's protests were not eligible, the total sum of alleged irregularities in the election were not sufficient to change the outcome of this contest. Simply put, 33 is less than the 128 votes that separate Adams and Everitt.

For these reasons, the State Board concludes, by a vote of 3 to 2, that the Adams protests have not established substantial evidence to believe that a violation of the election law or other irregularity or misconduct that affected the outcome of the election occurred in the North Carolina Senate District 18 contest. N.C.G.S. §§ 163-182.10(d)(2)c., 163-182.12.

### iii.    Sossamon Protests (Granville and Vance Counties)

The number of voters whose eligibility is called into question by Sossamon's protests is far below the 228-vote margin in this contest.

The only remaining category of protest filed by Sossamon that is based solely on voters' eligibility are Deceased protests which challenge 5 voters. Accordingly, if Sossamon was correct and all challenged voters were indeed ineligible and had a ballot in the count, then the number of "irregularities" (*i.e.*, ineligible voters participating in the election) could not be sufficient to affect the outcome.

The Granville County board conducted an evidentiary hearing on the Deceased protest filed in that county and determined that 1 voter has a ballot in the count but was ineligible, because the voter died before Election Day. That decision was then referred to the State Board because this is a multicounty contest.

Similarly, the Vance County board conducted an evidentiary hearing on the Deceased protest filed in that county and determined that 4 voters have a ballot in the count but were ineligible, because they died before Election Day. That decision was then referred to the State Board because this is a multicounty contest.

Accordingly, 5 voters with a ballot in the count have been found ineligible in the Sossamon protests, but, as a result, the total sum of alleged irregularities in the election were not sufficient to change the outcome of this contest. Simply put, 5 is much less than the 228 votes that separate Sossamon and Cohn.

For all these reasons, the State Board concludes, by a vote of 3 to 2, that the Sossamon protests have not established substantial evidence to believe that a violation of the election law or other irregularity or misconduct that affected the outcome of the election occurred in the North Carolina House District 32 contest. N.C.G.S. §§ 163-182.10(d)(2)c., 163-182.12.

16

JA 217

iv.    *McGinn Protests (Mecklenburg County)*

The number of voters whose eligibility is called into question by the McGinn protests is far below the 209-vote margin in this contest.

In the Deceased, Felon, and Not Registered protests that are based solely on voters' eligibility and are similar to those filed by the other Protesters, the total number of voters challenged by McGinn per category are: Felon—45 voters challenged; Deceased—28 voters challenged; and Not Registered—45 voters challenged. While these three types of protests together appear to total 118 voters, these three kinds of protests actually challenge a combined 117 voters, because McGinn challenged the same voter in two protests filed in the county. In McGinn's Residency protest, the protest originally challenged 202 voters.

Accordingly, if McGinn was correct and all challenged voters in these four categories of protests were indeed ineligible and had a ballot in the count, then the number of "irregularities" (*i.e.*, ineligible voters participating in the election) would total 319 voters, and that number *could have been* sufficient to affect the outcome.

However, as the evidence developed through the hearings conducted by Mecklenburg County Board of Elections, the number of potentially ineligible voters with ballots in the count is much lower than McGinn alleged. First, as with the Griffin protests discussed above, the vast majority of voters challenged in McGinn's Deceased, Felon, and Not Registered protests were already addressed in the county's canvass, either through the canvass period challenge process or through a review of the voters' provisional ballot applications. In fact, only 1 voter was found to

17

be ineligible and have a ballot in the count.[9] McGinn did not appeal the county board's findings on the other 116 voters challenged in the Deceased, Felon, and Not Registered protests.

Second, following the county board's dismissal of the Residency protest after two evidentiary hearings, McGinn's appeal only challenges the eligibility of, at most, 185 voters. Of the 202 voters under the county board's consideration, McGinn maintains a challenge to the eligibility of only 154 of those voters on appeal. Additionally, at the conclusion of the county board's hearings on the Residency protest, the McGinn requested to add 31 names to the protest. That request was denied by the county board as an untimely oral amendment to the protest, and McGinn seeks to have those voters added to her protest on appeal to the State Board. Again, as noted earlier, McGinn never served any of the voters challenged in her protests.

The county board based its unanimous conclusion that the Residency protest lacked substantial evidence to support the protest on the findings that the protest does not establish the voters established a fixed residence outside of the district prior to Election Day. The county board's order shows that the evidence presented about the challenged voter's residency was based on reviews of the voters' information on various websites, including their information on Whitepages.com and employment history on LinkedIn, and a private investigator's visit to some of their residences.

Assuming, without deciding, that the evidence proffered by McGinn was sufficient to support a conclusion that there is substantial evidence to believe that a violation of the election law or other irregularity or misconduct did occur, McGinn has nonetheless failed to establish a sufficient number of irregularities to affect the outcome of the election. This is not disputed by

---

[9] The finding on the 1 ineligible voter was not referred to the State Board for action on it because this contest is under the jurisdiction of the county board.

McGinn. As stated by McGinn in her brief supporting her appeal, "Since the current margin is 209 votes, these 154 votes now at issue in this protest are not, by themselves, sufficient to change the result. But they could become decisive depending on the resolution by the courts of Ms. McGinn's other pending protests (i.e. the ones previously adjudicated by the State Board in its Dec. 13, 2024 order)." As noted above, those other protests have been dismissed by the State Board.

As found by the Mecklenburg County board, 1 voter with a ballot in the count has been found ineligible. McGinn challenges only another 185 on appeal, if including the 31 she requests to be added to the Residency protest. Therefore, the maximum number of voters called into question by McGinn's protests is 186 voters. Assuming for argument's sake that all voters called into question in McGinn's protests were not eligible, the total sum of alleged irregularities in the election were not sufficient to change the outcome of this contest. Simply put, 186 is less than the 209 votes that separate McGinn and Bradley.

For all these reasons, the State Board concludes, by a vote of 3 to 2, that the McGinn protests have not established substantial evidence to believe that a violation of the election law or other irregularity or misconduct that affected the outcome of the election occurred in the North Carolina Senate District 42 contest. N.C.G.S. §§ 163-182.10(d)(2)c., 163-182.12.

## III.    CONCLUSION

When a person challenges the results of an election by alleging that certain voters cast ineligible ballots, our law requires that person to provide adequate notice to these voters. That was not done for all the voter-eligibility protests addressed in this decision, and those protests therefore fail to substantially comply with the requirements to initiate a protest under N.C.G.S. § 163-182.9. Even if the voters challenged in these protests had received adequate notice, all the

19

remaining Griffin protests, Adams protests, Sossamon protests, and McGinn protests failed to establish substantial evidence to believe that a violation of the election law or other irregularity or misconduct that affected the outcome of the election occurred in those contests for the reasons outlined in this decision.

The protests are DISMISSED.

This 27th day of December, 2024.

_____

Alan Hirsch, Chair
STATE BOARD OF ELECTIONS

20

JA 221

CERTIFICATE OF SERVICE

I, Adam Steele, Associate General Counsel for the State Board of Elections, today caused

the forgoing document to be served on the following individuals via FedEx and email:

Craig D. Schauer
cschauer@dowlingfirm.com
Troy D. Shelton
tshelton@dowlingfirm.com
W. Michael Dowling
mike@dowlingfirm.com
DOWLING PLLC
3801 Lake Boone Trail
Suite 260
Raleigh, North Carolina 27607
*Counsel for Jefferson Griffin, Ashlee
Adams, and Stacie McGinn*

Philip R. Thomas
pthomas@chalmersadams.com
Chalmers, Adams, Backer &
Kaufman, PLLC
204 N Person St.
Raleigh, NC 27601
*Counsel for Jefferson Griffin*

Phillip J. Strach
phil.strach@nelsonmullins.com
Alyssa M. Riggins
alyssa.riggins@nelsonmullins.com
Cassie A. Holt
cassie.holt@nelsonmullins.com
Jordan A. Koonts
jordan.koonts@nelsonmullins.com
NELSON MULLINS RILEY &

SCARBOROUGH, LLP
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
*Counsel for Frank Sossamon*

Raymond M. Bennett
ray.bennett@wbd-us.com
Samuel B. Hartzell
sam.hartzell@wbd-us.com
Womble Bond Dickinson (US) LLP
555 Fayetteville Street
Suite 1100
Raleigh, NC 27601
*Counsel for Allison Riggs*

Shana L. Fulton
sfulton@brookspierce.com
William A. Robertson
wrobertsone@brookspierce.com
James W. Whalen
jwhalen@brookspierce.com
BROOKS, PIERCE, MCLENDON,
HUMPHREY & LEONARD, LLP
150 Fayetteville Street
1700 Wells Fargo Capitol Center
Raleigh, NC 27601
*Counsel for Woodson Bradley,
Terence Everitt, and
Bryan Cohn*

This 27th day of December, 2024.

_____

21

JA 222

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION
## No. 5:24-cv-00724-M

JEFFERSON GRIFFIN,

        Petitioner,

v.

NORTH CAROLINA STATE BOARD OF
ELECTIONS,

        Respondent,

and

ALLISON RIGGS, et al.,

        Intervenor-Respondents.

**STATE BOARD'S RESPONSE
TO PETITIONER'S MOTION FOR
PRELIMINARY INJUNCTION AND THE
COURT'S SHOW CAUSE ORDER**

      **NOW COMES** Respondent North Carolina State Board of Elections, by and through

undersigned counsel, to provide this response to Petitioner's Motion for Preliminary Injunction [D.E.

31, 32] and the Court's December 26, 2024 Order to Show Cause.

### INTRODUCTION

      In this lawsuit, Petitioner makes an astonishing request: to change longstanding election rules

*after* an election has already taken place and, by doing so, disenfranchise more than 60,000 voters—

voters who followed the rules in place at the time of that election. This requested relief confers

jurisdiction on this Court several times over. It squarely raises substantial federal questions under the

United States Constitution, the Help America Vote Act, and other federal statutes. Indeed, Petitioner

himself asks for a judicial decree that his requested relief does *not* violate these statutes or the U.S.

Constitution. Given this request, it is hard to envision a lawsuit that more squarely implicates federal

law. *See* 28 U.S.C. § 1441. Federal jurisdiction is also proper because granting Petitioner's

requested relief would require the State Board of Elections to violate federal civil-rights laws. *See id.* § 1443. Among other things, Petitioner seeks relief that would violate the National Voter Registration Act's limits on how States may remove voters from the rolls.

After exercising jurisdiction, this Court should deny Petitioner's request for a preliminary injunction. The Board does not contest that, under the timing rules established by state law, it must now certify the election in question by January 10, 2024—and that doing so will moot Petitioner's lawsuit. But irreparable harm alone cannot justify an injunction. Petitioner's claims stand no chance of success on the merits. First of all, granting the requested relief would violate procedural due process, because Petitioner failed to give the challenged voters adequate notice. It would also violate federal civil-rights laws and the Fourteenth Amendment to change the rules of the election months after it has taken place—and thereby disenfranchise tens of thousands of lawful North Carolina voters. Notably, for the vast majority of those voters, Petitioner does not claim that they are actually ineligible to vote in North Carolina state elections. Finally, each of his arguments for invalidating those votes fails on the merits. He has not made a credible showing—let alone the clear showing required to sustain a preliminary injunction—that the Board erred by following the State's longstanding election rules and counting these votes.

## STATEMENT OF FACTS

### A.    Statutory Background

#### 1.    The Help America Vote Act

The Help America Vote Act ("HAVA") seeks to establish "uniform and nondiscriminatory election technology and administration requirements" across the States to govern federal elections. Pub. L. No. 107-252, §§ 301-12, 116 Stat. 1666 (2002). Among other things, HAVA directs States to establish "a single, uniform, official, centralized, interactive computerized statewide voter registration list" to "serve as the official voter registration list" for all federal elections. 52 U.S.C. §§ 21083(a)(1)(A), (a)(1)(A)(viii).

2

HAVA also imposes voter-list-maintenance and registration requirements on States. As for voter-list maintenance, HAVA directs States to maintain voter lists "on a regular basis." *Id.* § 21083(a)(2)(A). But HAVA limits how they may do so. For example, States may only remove individuals from the voter list consistent with the requirements in the National Voter Registration Act ("NVRA"), Pub. L. No. 103-31, 107 Stat. 77 (1993). *Id.* §§ 21083(a)(2)(A)(i)-(ii).

As for voter-registration applications, HAVA prohibits States from "accept[ing] or process[ing]" any application unless it includes the applicant's driver's license number or the last four digits of the applicant's social security number, if the applicant possesses such information. *Id.* §§ 21083(a)(5)(A)(i)–(ii). HAVA instructs State election officials to establish a system to attempt to "match" the identification number provided in an application with existing government records, *id.* § 21083(a)(5)(B)(i), and to establish state-law procedures to address registrations that do not match with such records, *see id.* § 21083(a)(5)(A)(iii). HAVA does not make a match a prerequisite to accepting an application. *See id.* §§ 21083(a)(5)(A), (b).

In certain circumstances, HAVA allows voters who do not provide a driver's license number or the last four digits of their social security number in a registration application to register to vote. For applicants who have not been "issued" either number, HAVA instructs States to instead assign "a number which will serve to identify the applicant for voter registration purposes." *Id.* § 21083(a)(5)(A)(ii). And if the State did not have a system complying with the requirement to collect a driver's license number or last four digits of a social security number, HAVA provides that a new voter registration applicant by mail may vote by providing an alternative form of identification before or upon voting for the first time. *See id.* §§ 21083(b)(1)-(3). This identification may include "a current and valid photo identification" or "a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter." *Id.* §§ 21083(b)(2)(A)(i)-(ii).

Although HAVA only applies to federal elections, in 2003, the North Carolina General Assembly enacted a statute that applied HAVA's federal rules to state elections. The law's express purpose was to "ensure that the State of North Carolina has a system for all North Carolina elections that complies with the requirements for federal elections set forth in the federal Help America Vote Act of 2002." N.C. Sess. Law 2003-226, § 1. The law specifically instructed the Board to ensure "compliance with federal law" by "updat[ing] the statewide computerized voter registration list and database to meet the requirements of section 303(a) of the Help America Vote Act of 2002." *Id.* § 6 (codified at N.C. Gen. Stat. § 163-82.11(c)).

Through this statute, the General Assembly amended several of North Carolina's voter registration and list-maintenance statutory provisions to incorporate HAVA's requirements. For example, section 163-82.4(a) now requires all voter registration applications to request that voters provide their driver's license number or the last four digits of their social security number. N.C. Gen. Stat. § 163-82.4(a)(11). Like HAVA, however, the statute allows voters who have not been issued one of those numbers to receive a "unique identifier number" from the Board for registration. *Id.* § 163-82.4(b). Like HAVA, North Carolina law also requires voters who register by mail and who have not had their driver's license or social security number validated beforehand to present a HAVA ID when they vote for the first time. *Id.* §§ 163-166.12(a)-(b), (f). And although state law directs county boards to attempt to match an identification number provided on a registration form with an existing government database, *id.* §§ 163-82.12(6)-(9), when the information provided by the voter does not match, voters may vote by providing a HAVA ID before voting for the first time, *id.* § 163-166.12(d); *see also* Voting Site Station Guide, p. 24,

https://s3.amazonaws.com/dl.ncsbe.gov/Voter%20ID/County%20Board%20Training%20and%20Resources/Check%20In%20Station%20Guide_2024%20FINAL.pdf (last visited January 1, 2025) (same).

4

JA 226

The result is that, like most States, North Carolina has a single voter registration system for both federal and state elections that incorporates HAVA's requirements. *See Republican Nat'l Comm. v. N.C. State Bd. of Elections* ("*RNC*"), 120 F.4th 390, 401 (4th Cir. 2024) ("North Carolina has a unified registration system for both state and federal elections."); N.C. Gen. Stat. § 163-82.11(a) ("The system shall serve as the single . . . official list of registered voters . . . for the conduct of all elections in the State."). North Carolina "thus is bound by" provisions of federal law, like HAVA, governing voter registration and list maintenance. *See RNC*, 120 F.4th at 401.

### 2. UOCAVA and UMOVA

In addition to HAVA registration, military and overseas voters may register and vote under a separate federal statute, the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"). 52 U.S.C. §§ 20301-11. UOCAVA requires that all States allow military members and their families and other United States citizens living abroad to register to vote and vote absentee in federal elections. *Id.* § 20302. For federal elections, States must accept certain federally designated absentee ballots and applications to register to vote. *Id.* §§ 20302(a)(3), (4). Federal law does not require voters to provide a photocopy of their identification when they vote.

Under North Carolina's Uniform Military and Overseas Voter Act ("UMOVA"), N.C. Gen. Stat. § 163-258.1 *et seq.*, located in Article 21A of the General Statutes, state law extends UOCAVA's provisions for federal elections to all elections in North Carolina. N.C. Gen. Stat. § 163-258.3(1). Like federal law, state law does not require these voters to provide a photocopy of their identification to vote. *Id.* §§ 163-258.13 and -258.17(a)-(b). For *other* voters, however, North Carolina law does require voters to present a photo ID to vote, with certain exceptions. *Id.* § 163-166.16.

North Carolina law allows certain other overseas individuals to vote as well. Under a separate provision of UMOVA, state law authorizes certain overseas voters "who [were] born outside the United States" and never resided in North Carolina to vote if their parents would have been eligible to vote in North Carolina before leaving the country. *See id.* § 163-258.2(1)(e).

### 3.     Statutory provisions governing voter-list maintenance and vote counting.

Once voters are registered, several other federal laws govern how States maintain their voter

lists and calculate election results.

*First*, both HAVA and North Carolina law require any voter-registration list maintenance to

be performed in accordance with the NVRA.  52 U.S.C. § 21083(a)(2)(A); N.C. Gen. Stat. § 163-

82.14.  The NVRA only allows the removal of voters from the rolls in specific, enumerated

circumstances: (1) at the request of the registrant, (2) for criminal conviction or mental incapacity, as

provided by State law, (3) for death or a change in residence, and (4) if an individual has not

participated or responded to a notice in two consecutive federal general elections.  52 U.S.C.

§§ 20507(a)(3), (a)(4), (b)(2).  In addition, systematic removals, other than by registrant request,

felony conviction, or death, must be completed "not later than 90 days prior to the date of a primary

or general election for Federal office."  *Id.* § 20507(c)(2)(A).

*Second*, the Civil Rights Act curtails the ability of election officials to bar individuals from

voting based on mistakes in the registration process.  Election officials may not "deny the right of

any individual to vote in any election because of an error or omission on any record or paper relating

to any application, registration, or other act requisite to voting," so long as the mistake "is not

material" to the individual's qualification to vote.  *Id.* § 10101(a)(2)(B).

*Third*, the Voting Rights Act ("VRA") prohibits election officials from discounting ballots

that have been cast in an election.  Under the VRA, election officials may not "fail or refuse to permit

any person to vote who is entitled to vote" or otherwise "willfully fail or refuse to tabulate, count,

and report such person's vote."  *Id.* § 10307(a).

### B.     Procedural History

Petitioner Judge Jefferson Griffin and Intervenor Associate Justice Allison Riggs were

candidates in the statewide 2024 General Election for associate justice on the North Carolina

Supreme Court.  The vast majority of in-person voters—99.9%—presented a photo ID to election

6

officials prior to voting.  *See* N.C. State Bd. of Elections, *Provisional Voters* (Nov. 5, 2024),

https://tinyurl.com/mscy8vcv, (last visited January 1, 2025).[1]  After the county boards of elections

conducted a full count of the votes, a full machine recount of the votes, and a partial hand recount of

the votes, final canvassed results of the election show Justice Riggs to be in the lead.

On November 19, 2024, Petitioner filed hundreds of election protests throughout the State

challenging the election results.  Petitioner's protests were based on six categories of allegations that

certain voters' ballots were invalid.  D.E. 1-5 at 43.  Following a public meeting, the Board voted

unanimously to take jurisdiction over the first three categories of protests, which "presented legal

questions of statewide significance": (1) ballots cast by registered voters with alleged incomplete

voter registrations (60,273 votes); (2) ballots cast by overseas citizens who have never resided in the

United States (266 votes); and (3) ballots cast by military and overseas-citizen voters who did not

include a photocopy of a photo ID with their absentee ballots (1,409 votes).  D.E. 1-5 at 43-44; *see*

*also id.*, n.2 (explaining the small discrepancies between the number of voters Petitioner asserts he

challenged and the number Petitioner actually timely challenged).  The Board instructed county

boards of elections to consider the remaining three categories of protests, "which were focused on

individual, fact-specific determinations of voter eligibility."[2]  *Id.* at 44.

---

[1]     Provisional voting generally applies to in-person voting only.  The State Board does not have readily available figures on photo ID for absentee voters, who do not vote provisionally when claiming an exception to the ID requirement. *See* N.C. Gen. Stat. § 163-230.1(f1). However, all absentee voters are required to provide either their driver's license number or the last four digits of their social security number *each time* they submit a request for an absentee ballot, and if they claim an exception to the photo ID requirement, they must provide one of those numbers *again* when they vote.  *Id.* §§ 163-230.2(a)(4), -230.1(g)(2).

[2]     The remaining three categories of protests challenged ballots cast by voters (1) who were serving a felony sentence; (2) who were deceased; and (3) whose registration was denied or removed. D.E. 1-5 at 43. On December 27, 2024, the Board dismissed these protests for failure to substantially comply with service requirements and because they challenged an inadequate number of votes to change the outcome of the contest.  D.E. 38-1.  If Petitioner does not obtain a stay of the certification of election by January 9, 2024, the certification will issue the following day.  *See* N.C. Gen. Stat.

The State Board held a public meeting on December 11 to consider Petitioner's three protests. Two days later, the Board dismissed the protests, concluding that they "were not served on affected voters in accordance with law" and were also "legally deficient." *Id.* at 46.

On the first protest, the Board noted that this Court had held, in considering the same HAVA arguments here, that equitable principles "prohibit[] granting Plaintiffs relief in connection with the most recent election." D.E. 1-5 at 60 (alteration in original) (quoting *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, No. 5:24-cv-00547, Dkt. Entry 1-4 at 4 (E.D.N.C.)). The Board similarly concluded that votes cannot be invalidated after an election when eligible voters complied with all the instructions they had been given when they registered and voted—particularly when their identities were confirmed by the alternative means set forth in HAVA before they first voted. D.E. 1-5 at 60-62. Doing so, the Board held, would violate the Fourteenth Amendment as well as the NVRA, which prohibits en masse removal of voters from the rolls within 90 days of a general election. *Id.* at 64-66.

The Board also rejected Petitioner's protests as to overseas voters who have never resided in the United States but whose parents had been North Carolina residents. The Board noted that the state legislature had passed a statute explicitly allowing these persons to vote in North Carolina elections. *Id.* at 70-71 (citing N.C. Gen. Stat. §§ 163-258.6 through -258.15).

Finally, the Board rejected Petitioner's protests to cancel the votes of military and overseas voters who did not include a copy of a photo ID with their ballot. The Board noted that the North Carolina General Assembly had passed a statute covering these voters that does not require these voters to send a copy of their photo ID to vote. *Id.* at 72-75. The Board also relied on state

---

§ 163-182.14(b). After certification issues, as Petitioner agrees, the election results are final, and his protests are rendered moot. D.E. 1-4 at 23; *see also* N.C. Gen. Stat. § 163-182(2) (providing that a "certificate of election" is the document "conferring upon a candidate the right to assume an elective office as a result of being elected to it").

regulations which provide explicitly that photo ID requirements do not apply to military and overseas voters.  *Id.* at 72-75.  And the Board reasoned that imposing a requirement on uniformed and overseas voters that is inconsistent with federal law would likely violate the Supremacy Clause of the U.S. Constitution.  *Id.* at 75-76.

On December 18, 2024, Petitioner filed an original action, framed as a petition for writ of prohibition, in the North Carolina Supreme Court challenging Respondent's final decision.  D.E. 1-4.  The petition seeks declaratory rulings interpreting HAVA, 52 U.S.C. § 20901, *et seq.*; the NVRA, 52 U.S.C. § 20501, *et seq.*, the VRA, 52 U.S.C. § 10307; the Civil Rights Act, 52 U.S.C. § 10101; UOCAVA, 52 U.S.C. § 20301, *et seq.*; and the Fourteenth Amendment. D.E. 1-4.  The Board removed to this Court.  D.E. 1.[3]  On December 23, 2024, Petitioner filed a motion for preliminary injunction seeking to enjoin the Board from issuing the certificate of election.  Mot. for Prelim. Inj. (D.E. 31).  On December 26, this Court directed the Board to respond to this motion, and further to show cause why this case should not be remanded back to the North Carolina Supreme Court.

## RESPONSE TO SHOW CAUSE ORDER

### I.  Legal Standard

"Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed" to federal district court.  28 U.S.C. § 1441(a).  Separately, "[a]ny . . . civil action[] . . . commenced in a State court may be removed" if it is based on a "refus[al] to do any act on the ground that it would be inconsistent with" "any law providing for equal rights."  *Id.* § 1443(2).

Petitioner's writ of prohibition is a "civil action" under § 1441 and § 1443—it is a civil proceeding seeking judicial relief of a civil nature.  *See, e.g., Ponder v. Joslin*, 262 N.C. 496, 497,

---

[3]     Petitioner separately filed three petitions for judicial review in state trial court on his three categories of election protests.  *See Griffin v. N.C. State Bd. of Elections*, No. 5:24-cv-00731, Dkt. Entries 1-4, 1-5, 1-6 (E.D.N.C.).  The Board again removed to this Court.  *Id.*, Dkt. Entry 1.

9

138 S.E.2d 143, 144 (N.C. 1964) (holding that a lawsuit seeking a "writ of mandamus" against the State Board of Elections concerning an election protest was a "civil action"); *cf. In re Smith*, 114 F.3d 1247, 1250 (D.C. Cir. 1997) ("Although Congress did not define the term 'civil action' for purposes of the PLRA, we conclude that it includes a petition for a writ of prohibition that . . . includes underlying claims that are civil in nature."). Petitions seeking extraordinary writs under state law are therefore removable if they otherwise meet the requirements for federal removal jurisdiction. *See, e.g.*, *Indep. Living Ctr. of S. Cal., Inc. v. Kent*, 909 F.3d 272, 276, 278 (9th Cir. 2018) (holding that "a petition for a writ of mandamus" under state law was properly removed because petition raised "federal question[s]").

In addition, because the federal removal statutes speak broadly of removing "any civil action brought in" or "commenced in" "a State court," 28 U.S.C. §§ 1441(a), 1443, cases pending in state appellate courts are also removable. *See, e.g.*, *Harris v. U.S. Dep't of Transp. FMCSA*, 122 F.4th 418, 422-24 (D.C. Cir. 2024); *Yassan v. J.P. Morgan Chase & Co.*, 708 F.3d 963, 969 (7th Cir. 2013); *Resol. Tr. Corp. v. Allen*, 16 F.3d 568, 572 n.4 (4th Cir. 1994).

## II. Removal Is Proper Under § 1441 Because the Petition Raises Federal Questions.

Removal of the petition is proper under 28 U.S.C. § 1441(a) because this Court would have had original jurisdiction over the issues raised here. Federal district courts have original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." *Id.* § 1331; *see also* U.S. Const., art. III, § 2, cl. 1.

A suit that contains only state-law claims can "arise under" federal law where vindication of an alleged state-law right "turns on some construction of federal law." *North Carolina ex. rel. N.C. Dep't of Admin. v. Alcoa Power Generating, Inc.*, 853 F.3d 140, 146 (4th Cir. 2017) (cleaned up). It is "common[] sense" that federal courts "ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). The relevant test is whether the state-law claim

10

implicates a federal issue that is: "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013).

Here, Petitioner seeks judicial relief that "prohibits the State Board from counting ballots cast in violation of North Carolina's statutes and constitution." D.E. 1-4 at 15. Because that request implicates numerous substantial federal issues, this Court has jurisdiction.

### A.    The Court must construe multiple federal laws to resolve the petition.

Substantial issues of federal law pervade the petition. The petition asks, most notably, to throw out ballots cast by eligible voters who, it claims, registered in violation of HAVA. It also asks for a decree rejecting "[a]ll arguments under the NVRA, HAVA, the VRA, and the Civil Rights Act," as well as under the "federal constitution" that would bar his requested relief. D.E. 1-4 at 83-84. It would be hard to fashion a claim that more clearly turns on federal law.

### i.    The Petition requires construction of HAVA.

Petitioner first seeks to cancel the votes of eligible voters who he claims improperly registered by failing to provide their driver's license or social security number on their registration application. D.E. 1-4 at 33-37. Deciding whether these voters were properly registered necessarily requires this Court to construe HAVA. HAVA directs States to ask voters to provide a driver's license or social security number at registration. 52 U.S.C. § 21083(a)(5)(A)(i). HAVA also instructs States to create a uniform voter list that elections officials are to regularly maintain. *Id.* §§ 21083(a)(1), (2). Just a year after Congress enacted HAVA, the North Carolina legislature passed a law whose express purpose was to "ensure that the State of North Carolina has a system for North Carolina elections that complies with the requirements for federal elections set forth in the federal Help America Vote Act of 2002." N.C. Sess. Law 2003-226, § 1. In keeping with this purpose, the General Assembly updated state law on voter registration and voter-list maintenance to incorporate HAVA's requirements and establish a single voter-registration system for federal and state elections. *See supra* pp 4-5.

11

Here, Petitioner claims that certain voters were improperly registered because they did not provide a driver's license or social-security number on their voter-registration form. D.E. 1-4 at 34. As the Fourth Circuit has held, a "federal question[] [is] essential to resolving" this state-law issue: whether "North Carolina's previous voter registration form violate[d] HAVA." *RNC*, 120 F.4th at 400. As this issue "contains no articulation of a state [law] violation separate and apart from an alleged HAVA violation," it is a "state cause of action in name only." *Id.* at 401. Petitioner attempts to distinguish *RNC* by noting that HAVA itself "does not apply to elections for state offices." D.E. 1-4 at 40. As the Fourth Circuit has held, this misunderstands the law. North Carolina law fully incorporates and applies HAVA's federal rules for state elections as well. As a result, "North Carolina has a unified registration system for both state and federal elections, and thus is bound by the provisions" of federal registration law—including HAVA—for *both* state and federal elections. *RNC*, 120 F.4th at 401-02. Federal law thus controls on this issue.

### ii.     The Petition also requires this Court to construe UOCAVA.

Petitioner also asks this Court to cancel the votes of overseas voters who did not include a copy of a photo ID with their absentee ballot. This question requires this Court to interpret a federal statute: UOCAVA. A state statute, UMOVA, implements UOCAVA's requirement that States establish procedures allowing military and other overseas voters to register to vote and to vote absentee. *See* N.C. Gen. Stat. § 163-258.3(1). UMOVA also requires North Carolina election officials to accept voter registration applications and absentee ballot applications from military and other overseas voters as "prescribed" in that federal law. *Id.* §§ 163-258.6, 163-258.7. Given this incorporation of federal law into the relevant state law, this Court must necessarily construe federal law to determine voting procedures for military and overseas voters in North Carolina state elections.

Petitioner argues otherwise, noting again that UOCAVA itself applies only to federal elections. D.E. 1-4 at 59. But again, state law makes clear that UOCAVA rules apply to military or overseas voting in *all elections*—including state races. Specifically, the General Assembly mandated

that "the voting procedures in [UMOVA] apply to" a "primary, general, or special election for federal or State office" for these voters. N.C. Gen. Stat. § 163-258.3(1). And state law allows military or overseas voters to use ballots "in accordance with [UOCAVA] . . . to vote for all offices and ballot measures" in an election. *Id.* § 163-258.11. Thus, because state law expressly incorporates federal standards, the state-law issues raised by Petitioner turn on federal law.

### iii. The Petition specifically asks for relief under the NVRA, the Voting Rights Act, the Civil Rights Act, and the Fourteenth Amendment.

The petition specifically requests a judicial decree declaring that its requested relief does not violate four federal statutes—the NVRA, HAVA, the Voting Rights Act, and the Civil Rights Act—as well as the Fourteenth Amendment. D.E. 1-4 at 83-84. By doing so, the petition necessarily raises substantial issues of federal law. Federal courts, of course, have jurisdiction over concrete cases and controversies requesting judgments about whether and how federal law applies. *Shaw v. Delta Air Lines*, 463 U.S. 85, 96 & n.14 (1983). It is difficult to think of a clearer invocation of federal law than a party asking for a judgment about how a federal statute or the federal constitution applies.

### B. The State Board disagrees with Petitioner's construction of federal law.

The federal questions raised in the petition are also "actually disputed." *Gunn*, 568 U.S. at 258. The Board does not read HAVA or UOCAVA as requiring it to cancel the challenged votes. D.E. 1-5 at 57-60. In addition, the Board reads federal law to prevent it from canceling the votes as Petitioner demands. *Id.* at 65-67, 77, 79.

### C. The federal-law disputes here are substantial.

A federal question underlying a state-law claim is sufficiently substantial to trigger federal-court jurisdiction when it is "importan[t] . . . to the federal system as a whole." *RNC*, 120 F.4th at 404 (quoting *Gunn*, 568 U.S. at 260). The federal issues raised in this petition are undoubtedly substantial. Petitioner aims to cancel more than 60,000 votes by changing the rules *after* an election. A decision based on federal law that could have such wide-ranging consequences to the fundamental

rights of voters is "substantial" under any understanding of the word.  Thus, the Fourth Circuit recently had "no hesitation concluding that this issue is of substantial importance to the federal system as a whole."  *Id.*

> **D.    Federal jurisdiction appropriately respects the federal-state balance.**

Federal court review is appropriate when there is no danger that hearing a case will "attract[] a horde of original filings and removal cases raising other state claims."  *Grable*, 545 U.S. at 318.  But "it will be the rare state equal protection case that turns on a violation of HAVA or the NVRA."  *RNC*, 120 F.4th at 404-05.  It will also be the rare case that would seek to cancel votes after an election, in relief that turns on five federal statutes and the Fourteenth Amendment.  Moreover, because the petition, while "cloaked in state [law] garb," raises only federal questions, it is appropriate for federal courts to answer those questions.  *Id.* at 405.  As the Fourth Circuit held in *RNC*, Congress could not have intended to bar federal courts from deciding cases where interpretation of a federal statute decides whether thousands of voters can vote in an election.  *Id.*  "The mere invocation" of state law should not prevent federal courts from hearing this case.  *Id.*

## III.   Removal Is Proper Under § 1443 Because the Petition Asks the Board to Violate Federal Civil-Rights Laws.

This Court also has jurisdiction under the civil-rights removal statute, 28 U.S.C. § 1443(2).  That statute permits removal to federal court of any suit brought against a state official "for refusing to do any act on the ground that it would be inconsistent with" "any law providing for equal rights."  *Id.*  Petitioner demands that the Board cancel more than 60,000 votes cast during the recent election.  D.E. 1-4 at 78, 81-84.  The Board has refused to do so because it would run afoul of the NVRA, the VRA, and the Fourteenth Amendment.  D.E. 1-4 at 24-25; D.E. 1 at 2.  Since all these laws are "law[s] providing for equal rights," removal is appropriate under § 1443(2).

For purposes of § 1443, a "law providing for equal rights" is one that concerns racial equality.  *Georgia v. Rachel*, 384 U.S. 780, 792 (1966).  To satisfy this standard, the specific statutory

provision at issue need not mention race. All that is required is that the "basis for removal" be a *statute as a whole* that addresses racial equality. *Id.* at 792-93; *see RNC*, 120 F.4th at 407 (same). Applying this standard here, the relevant laws that the Board has refused to violate—the NVRA, the VRA, and the Fourteenth Amendment—allow for civil-rights removal.

### A.    Civil-rights removal is proper under the NVRA.

The NVRA precludes the Board from discounting the votes of people who did not provide a driver's license or social security number at registration. Under the NVRA, once a person is registered to vote, they may be removed from the rolls only in narrow, enumerated circumstances that are indisputably not present here. 52 U.S.C. §§ 20507(a)(3), (a)(4), (b)(2), (c)(1); *see supra* pp 5-6. The NVRA also prohibits officials from "systematically remov[ing]" voters from the rolls within 90 days of an election, again except in narrow, enumerated circumstances that are indisputably not present here. *Id.* § 20507(c)(2)(A); *see supra* p 6.

Moreover, as the Fourth Circuit has recently held, the NVRA is a "law providing for equal rights" under § 1443(2). One of the NVRA's central purposes is to promote racial equality. "The text of the NVRA, including its lead provision, reveals that it is a law 'providing for specific civil rights stated in terms of racial equality.'" *RNC*, 120 F.4th at 407-08 (quoting *Rachel*, 384 U.S. at 792). Specifically, the NVRA states expressly that the law was enacted to eliminate "discriminatory and unfair registration laws and procedures" that "have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. § 20501(a)(3).

Here, the NVRA clearly prohibits the Board from canceling more than 60,000 votes that have already been cast. Again, Petitioner does not assert that his basis for canceling these votes falls among the narrow, enumerated reasons that the NVRA allows for removing voters from the rolls. *See* D.E. 1-4 at 41-42. The NVRA therefore squarely forecloses Petitioner's requested relief. *See*

15

*RNC*, 120 F.4th at 402-03 (concluding that the NVRA does not authorize removal from voter rolls based on this same allegation of HAVA non-compliance).

In addition, the NVRA forecloses Petitioner's relief for a separate reason as well: while we are not technically within the NVRA's 90-day quiet period barring the State from removing voters *en masse* from the rolls, requiring the Board to do so now would completely undermine the quiet period's purpose. *See* 52 U.S.C. § 20507(c)(2)(A). Congress enacted the quiet period to "prevent the discriminatory nature of periodic voter purges, which . . . appear to affect [B]lacks and minorities more than others." S. Rep. No. 103-6, at 20 (1993). It would be strange indeed for Congress to institute a prophylactic prohibition against voter purges for the 90-day period before an election only for the State to implement mass voter purges *after* an election has occurred and apply that purge to the already-conducted election. If Petitioner were right, the NVRA's protections against pre-election voter purges would be a dead letter.

In response, Petitioner claims that the NVRA only bars the Board from canceling voter registrations, not canceling votes. D.E. 1-4 at 41-42. This tortured logic fails. Petitioner argues that certain voters are ineligible to vote *because* they did not properly register. *Id.* at 33. His challenge is therefore an attack on the challenged voters' *registrations*—not just their ballots. As the Board explained, "having a list of voters who are eligible to vote" makes no sense if "the government [then] removes their ballot[s]." D.E. 1-5 at 66-67 n.17. The petition therefore squarely implicates the NVRA's limits on removing registered voters from the rolls. After all, "[t]he right to vote encompasses the right to register." *United States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967).

In sum, because the Board has refused to grant Petitioner's requested relief on the ground that it would violate the NVRA, removal is proper under § 1443.

### B.    Removal is appropriate under the Voting Rights Act.

Petitioner's demand that the Board invalidate more than 60,000 votes also would require it to violate the VRA, which prohibits officials from "willfully fail[ing] or refus[ing] to tabulate, count,

and report" the votes of individuals who were qualified to vote in the election.  52 U.S.C. § 10307(a).

Because the VRA is a quintessential "law providing for equal rights," courts have consistently

permitted removal under § 1443(2) when a state official refuses to take an act that is inconsistent

with the VRA.  *See, e.g.*, *Smith v. Winter*, 717 F.2d 191, 194 (5th Cir. 1983); *see also RNC*, 120 F.4th

at 406 n.5 (observing that courts have held that § 1443 removal under § 10307 of the VRA is proper).

Because all three of the categories of challenged voters are qualified to vote under federal and state

law, the VRA prohibits the Board from refusing to count their votes.  Civil-rights removal is thus

proper on this basis as well.

### C.    Removal is appropriate under the Equal Protection Clause.

Finally, civil-rights removal is also proper under the Equal Protection Clause of the

Fourteenth Amendment.  The Supreme Court has foreclosed civil-rights removal based on the

Fourteenth Amendment's Due Process Clause because that clause is "phrased in terms of general

application available to all persons or citizens, rather than in the specific language of racial equality

that § 1443 demands."  *Rachel*, 384 U.S. at 792.  By contrast, the Equal Protection Clause *is* a law

providing for equal civil rights based in racial equality.  *Shaw v. Reno*, 509 U.S. 630, 642 (1993)

(observing that the "central purpose" of the Equal Protection Clause "is to prevent the States from

purposefully discriminating between individuals on the basis of race").  If the Board were to nullify

the challenged votes, it would violate this constitutional guarantee.  *See infra* pp 24.  The Board's

refusal to do so also forms an appropriate basis for removal.

### RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

### I.    Legal Standard

A preliminary injunction is "an extraordinary remedy never awarded as of right."  *Winter v.

Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Mandatory injunctive relief is especially

"disfavored, and warranted only in the most extraordinary circumstances."  *In re Microsoft Corp.

Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003).  To obtain a preliminary injunction, Petitioner

17

must show: (1) a likelihood of success on the merits; (2) irreparable harm; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. Petitioner "bears the burden of establishing that each of these factors supports granting the injunction." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991). "*Each* of these four factors must be satisfied to obtain preliminary injunctive relief," and it is "unnecessary to address all four factors when one or more ha[ve] not been satisfied." *Henderson v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018); *Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023) ("[A] district court is entitled to deny preliminary injunctive relief on the failure of any single *Winter* factor.").

Petitioner contends that an injunction is needed because his protests will become moot once the Board issues a certificate of election—currently scheduled for January 10, 2025. The Board does not dispute that certification will moot Petitioner's protests, and that this eventuality constitutes irreparable harm. However, the Board submits that an injunction is not appropriate here because Petitioner cannot establish any of the other three required factors.

First and most importantly, Petitioner cannot establish a likelihood of success on the merits. For an injunction to issue, Petitioner must make a "clear showing" he is likely to succeed on the merits. *Dewhurst v. Century Alum. Co.,* 649 F.3d 287, 293 (4th Cir. 2011) (quoting *Winter*, 555 U.S. at 22). Here, for the reasons described below, Petitioner has failed to make this showing; his request for an injunction should be denied on that basis alone. *See infra* pp 19-29.

Petitioner also cannot establish the third and fourth *Winter* factors—that the equities tip in his favor and an injunction is in the public interest. *See Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 225 (4th Cir. 2024) (noting that when a State is a defendant, these two factors merge). In this case, the public interest in orderly and fair elections favors denial of the injunction. It is true that Petitioner seeks only a limited stay until the federal courts can decide the merits of his claims. However, he is wrong that certification would alter the status quo. The status quo is North Carolina's prevailing system for registration and voting—under rules that have been on the books for numerous

election cycles, without challenge.  Because voters rely on established election rules when deciding

how and when to cast their ballots, "altering state election rules in the period close to an election" is

strongly disfavored.  *Andino v. Middleton*, 141 S. Ct. 9, 10 (2020) (Kavanaugh, J., concurring).  This

principle applies with even greater force *after* ballots have already been cast and counted.  *See id.* at

9-10 (staying injunction of state election rule, while ordering that ballots cast before the stay "may

not be rejected for failing to comply" with the rule).  As this Court has itself recognized, given the

unfairness of retroactively disenfranchising voters who complied with the rules in place on election

day, any flaws identified by Petitioner must be resolved prospectively alone.  *See RNC*, No. 5:24-cv-

00547, Dkt. Entry 73, Order at 4 (E.D.N.C. Nov. 22, 2024).

## II.    Petitioner Has Not Made a Clear Showing of Likelihood of Succeed on the Merits.

A preliminary injunction should also be denied because Petitioner's arguments are bound to

fail on the merits.  Granting Petitioner's requested relief to throw out more than 60,000 votes after an

election would be unconstitutional several times over.  And in any event, Petitioner's three arguments

for why those votes should be canceled are meritless.

### A.    Petitioner's requested relief would deny procedural due process because he failed to give voters adequate notice that he was challenging their votes.

Petitioner's protests fail because he did not provide voters sufficient notice of his protests.

This failure denied voters procedural due process.  Voters have a "constitutionally protected liberty

interest" in their right to vote.  *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158,

227 (M.D.N.C. 2020).  As a result, when a voter's "ballot [is] challenged," due process requires that

voters be "given notice," so they can protect their vote.  *Id.* at 228.  This notice must be "reasonably

calculated, under all the circumstances, to apprise" voters of the challenge to their votes.  *Mullane v.

Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).

Here, Petitioner failed to adequately apprise voters of his protests.  Petitioner did not send

physical copies of the protests to voters' addresses.  Instead, his political party mailed voters a

postcard stating that their "vote *may* be affected by one or more protests filed in relation to the 2024 General Election." D.E. 1-5 at 178 (emphasis added). The postcard did not inform voters whether their vote *was* actually under protest. It also did not inform voters that it was meant to effect formal service of an election protest. *Id.* Instead, the postcard merely directed voters "to scan [a] QR code to view the protest filings." *Id.* This code, when scanned with a smartphone, took users to a website where hundreds of protests were listed. *Id.* at 81-82 (showing smartphone screenshots). Voters then, to find out if any protests concerned them, had to hunt among the hundreds of protests and try to find their names on attached spreadsheets. These spreadsheets listed voters' names in small print, out of alphabetical order. Some spreadsheets contained hundreds of pages, listing thousands of names. *Id.*

Neither the postcard nor its QR code were "reasonably calculated . . . to apprise" voters that their votes were under protest. *Mullane*, 339 U.S. at 314. The postcard, for example, did not even inform voters that their votes had *actually* been challenged. Vague, equivocal notice of this kind, which does not "specifically" disclose that a person's rights will be impaired, does not give "adequate notice." *In re Linkous*, 990 F.2d 160, 162 (4th Cir. 1993); *see Fogel v. Zell*, 221 F.3d 955, 962 (7th Cir. 2000) (if a "notice is unclear," it is not adequate).

This lack of specificity, moreover, was not cured by the QR code. Many voters do not own smartphones. *See* Pew, *Mobile Fact Sheet* (Nov. 13, 2024), https://tinyurl.com/yeywjxfn (noting that one in five senior citizens do not have a smartphone) (last visited January 1, 2025). These voters would therefore not have been able to scan the code to learn if a protest affected them. As a result, in "a significant number of instances," notice by QR code would not "provide [voters with] actual notice" of protests. *Greene v. Lindsey*, 456 U.S. 444, 453 (1982). And as the Supreme Court has held, where a chosen form of notice will not notify a "significant number" of persons, it does not satisfy "due process." *Id.* Despite this authority, Petitioner suggests that the Supreme Court has held that notice is sufficient so long as most affected persons receive notice. D.E. 1-4 at 65. He is mistaken. It has actually held repeatedly that where service of papers via "the mails" is possible,

then that form of notice is *required*. *Mullane*, 339 U.S. at 319; *see also Greene*, 456 U.S. at 455. Petitioner failed to provide such notice here.

Finally, even if a QR code could theoretically provide adequate notice, it did not do so here. The Fourth Circuit recently held that an eviction warning provided inadequate notice when "it [was] time-consuming to wade through" the entire form at issue in order to locate the warning, which was listed "in small print two-thirds of the way down the back of a form." *Todman v. Mayor & City Council of Baltimore*, 104 F.4th 479, 488-89 (4th Cir. 2024). Here, for voters to find out if protests affected them, they had to "wade through" hundreds of protests, some of which listed thousands of names "in small print." *Id.* This kind of needle-in-a-haystack notice offends due process because it is not "reasonably calculated" to convey notice. *Id.* at 488.

### B. Granting Petitioner's requested relief would violate several federal civil-rights laws and the Fourteenth Amendment.

Petitioner seeks to cancel 60,000 votes after an election, even though those votes were cast under rules that had long been in place at the time of the election. As explained *supra* pp 14-17, granting this relief would violate multiple federal civil rights statutes, including the NVRA and the Voting Rights Act. It would also violate the Fourteenth Amendment. Simply put, Petitioner wants to change the rules of the game after it has already been played. Doing so is "patently and fundamentally unfair." *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978) (cleaned up); *see also Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983).

The Fourteenth Amendment's Due Process Clause bars the systematic, "retroactive invalidation" of votes. *Griffin*, 570 F.2d at 1079-80. The seminal case on this point is *Griffin v. Burns*. There, election officials in Rhode Island issued absentee ballots in a party primary—a practice which had been in place for seven years, and which the officials believed was authorized by state law. *Id.* at 1067. After the primary, the losing candidate asserted that the use of such ballots was unlawful. *Id.* The state supreme court agreed, invalidated those ballots, and changed the

outcome of the election. *Id.* The First Circuit held that this abrupt reversal violated voters' due process rights. *Id.* at 1078. As the court explained, because absentee voters had cast their ballots in an "officially-endorsed manner," invalidating their ballots *en masse* resulted in "broad-gauged unfairness." *Id.* at 1073, 1077. The constitution forbids a state from discounting votes that had been cast in accordance with "longstanding practice" and "the instructions of the officials charged with running the election." *Id.* at 1075-76.

That principle applies fully here. The challenged election rules have long been in place without challenge—in election after election. Voters whose registration information may lack a driver's license or social security number have been permitted to vote in North Carolina elections for twenty years. *See* N.C. Sess. Law. 2003-226, §§ 9, 16, 22; N.C. Gen. Stat. §§ 163-82.4, -166.12. The same is true for UOCAVA voters, who also have been able to vote without providing a photo ID in North Carolina state elections since 2003, including after the legislature's passed general photo ID laws. *See* N.C. Gen. Stat. §§ 163-258.1. And since 2011, overseas citizens who are the children of former residents of North Carolina have been free to vote in North Carolina elections. *Id.* § 163-258.2(1)(e). None of these longstanding elections rules *ever* elicited a challenge until the current election cycle—and all of those recent challenges were unsuccessful in state and federal court prior to the election.

It is unconstitutional to punish voters for voting in accordance with prevailing election laws. Yet that is the relief Petitioner seeks: "massive *ex post* disenfranchisement," for reasons that would have been a "total surprise to the typical voter." *Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998). Had the challenged voters had *any reason* to doubt that their ballots would be counted, they could have acted accordingly—say, in the case of the UMOVA voters, by providing a copy of their photo ID. Indeed, other than the handful of overseas voters who have never lived in the United States, Petitioner has never suggested that the more than 60,000 voters he challenges are *actually* ineligible to vote in North Carolina elections. *See* N.C. Gen. Stat. § 163-55 (outlining statutory

qualifications to vote); N.C. Const. art. VI, § 2 (same, constitutional). Moreover, all persons who register to vote, including those challenged here, are required to affirm that they meet all the qualifications to vote, under penalty of a Class I felony. *See* N.C. Gen. Stat. § 163-82.4(c)(1), (e); *see also* North Carolina Voter Registration Form, Section 11, https://s3.amazonaws.com/dl.ncsbe.gov/Voter_Registration/NCVoterRegForm_06.pdf (last visited January 1, 2025). Petitioner thus seeks to use technicalities to disenfranchise tens of thousands of lawful North Carolina voters—again, the vast majority of whom he does not dispute are lawfully eligible to vote—because he lost an election. The federal constitution forbids this audacious request.

The *Anderson-Burdick* test yields the same answer. Under that test, state actions that "impose a severe burden on ballot access" are "subject to strict scrutiny." *Pisano v. Strach,* 743 F.3d 927, 933 (4th Cir. 2014). The relief Petitioner seeks would impose the most severe possible burden—mass disenfranchisement—while advancing only peripheral state interests at best. Petitioner says that he prevails under *Anderson-Burdick* because he is merely asking the Board to enforce evenhanded state laws. *See* D.E. 1-4 at 70-71. That framing is deeply misleading. Asking voters to append a driver's license or social security number to their registration would perhaps impose a "modest burden" *before an election takes place*. But the relevant action here is Petitioner's request to nullify those voters' ballots *after the fact*. Doing so is plainly unconstitutional under *Anderson-Burdick*.[4]

---

[4] Petitioner compares this case to *James v. Bartlett*, 359 N.C. 260 (2005). There, the North Carolina Supreme Court discounted provisional ballots that were cast outside of voters' assigned precincts. *Id.* at 271. *James* is nothing like this case. Unlike here, the election in *James* was the "first time in North Carolina history that State election officials counted out-of-precinct provisional ballots." *Id.* at 265. Relevant statutes and the Board's own regulations at the time indicated that "voters must cast ballots . . . in their precincts of residence." *Id.* at 267-68. And the Board's own general counsel had advised before the election that such ballots would not be counted. *Id.* at 265. When the Board counted out-of-precinct ballots anyway, the state supreme court rightly reversed. In contrast here, state law, the Board's regulations, and judicial decisions issued before the election all affirmed that the ballots Petitioner challenges *would* be counted.

For a separate reason, sustaining Petitioner's protests would also violate the Equal Protection Clause. "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 90, 104-05 (2000) (per curiam). But were Petitioner to prevail, "the standards for accepting or rejecting" ballots would "vary" for wholly arbitrary reasons. *Id.* The vast majority of the ballots Petitioner seeks to invalidate were cast by voters (1) whose registration records are missing driver's license or social security numbers, and (2) voted *before* election day (either absentee, or early in-person). He has not challenged voters who voted *on election day*—and who also lacked a driver's license or social security number in their records. *See, e.g.*, *RNC*, 120 F.4th at 398 (noting allegation that 225,000 registered voters were missing this data in their records). By seeking only to invalidate pre-election day votes, Petitioner would force the Board to arbitrarily "valu[e] one person's vote over that of another." *Bush*, 531 U.S. at 104-05; *see Lecky v. Virginia State Bd. of Elections*, 285 F. Supp. 3d 908, 920 (E.D. Va. 2018) ("Courts have generally found equal protection violations where a lack of uniform standards and procedures results in arbitrary and disparate treatment of different voters.").

In sum, the "retroactive invalidation" of votes that Petitioner seeks would amount to "patent and fundamental unfairness"; severely burden ballot access without any meaningful countervailing state interest; and arbitrarily "value one person's vote over that of another." *Griffin*, 570 F.2d at 1079-80; *Pisano,* 743 F.3d 927 at 933; *Bush*, 531 U.S. at 104-05. Relief of this kind violates several federal civil-rights statutes, as well as the Fourteenth Amendment.

### C.  Petitioner's protests are all unlikely to succeed on their merits.

A preliminary injunction should also be denied because Petitioner is unlikely to succeed on the merits of any of his three election protests.

24

### i. Petitioner's HAVA protest is meritless.

Petitioner seeks to cancel the votes of roughly 60,000 voters who lack a recorded driver's license or social security number in the Board's voter registration database because, he claims, those registrations violated HAVA. But Petitioner has not established a violation of HAVA here.

To begin, Petitioner has not adequately alleged or shown facts that would establish a violation of law. Petitioner assumes that if a driver's license or social security number is not recorded in the Board's database that necessarily means the voters were improperly registered. D.E. 1-4 at 33. But that assumption is based on a false premise. Voters may lack this information in their records and still be legally registered. For example, voters who have not been issued a driver's license or social security number may nonetheless register to vote using a number assigned to them by the Board. 52 U.S.C. § 21083(a)(5)(A)(ii). In addition, voters may lack a recorded identification number in the Board's database because of a database-matching failure, for example, because of "routine data-entry errors by county workers." D.E. 1-5 at 16, 64-65, n.16. But HAVA does not treat such voters as improperly registered. *See* 52 U.S.C. § 21083(a)(5)(A), (b). Critically, Petitioner has failed to allege, let alone show, that any of the 60,000 voters he targets fall outside these circumstances where HAVA explicitly allows voters to register and vote without a driver's license or social security number in the State's voter registration database. D.E. 1-5 at 55-57. His claim fails for this reason alone.

Petitioner is also incorrect on the law. At the outset, Petitioner contends that HAVA does not apply here, because the statute governs only federal elections. But as discussed above, the North Carolina legislature has expressly applied and incorporated HAVA's federal-election requirements to state elections as well. *See supra* pp 4-5. HAVA is thus squarely at issue.

When Petitioner addresses HAVA, his arguments are unpersuasive. Petitioner is correct that HAVA generally prohibits a State from accepting or processing a voter-registration application unless it includes a driver's license number or the last four digits of a social-security number. 52 U.S.C. § 21083(a)(5)(A)(i)(I)-(II). But Petitioner proceeds as if this were HAVA's only provision. D.E. 1-4 at

25

35.  To the contrary, as discussed, HAVA elsewhere allows some voters to register and cast ballots absent this information.  For example, voters who have not been issued a driver's license or social security number may register to vote.  Moreover, HAVA permits a voter to register when they provide one of these numbers but that number does not validate against other government databases.  52 U.S.C. § 21083(a)(5)(A)(iii).  In North Carolina, when a number does not validate, it is not retained and the voter's database record will lack a number.  D.E. 1-5, p. 56.  Thus, there are voters within this group who *did* provide a driver's license or social security number when registering, but because it did not validate, the statewide database lacks an entry in that data field.  *Id.*  In addition, when voters register by mail, HAVA allows voters whose registration application lacks an identification number to cast ballots by providing a HAVA ID.  And the Board requires a HAVA ID for individuals who are voting for the first time and who, at the time of registration, did not provide a driver's license number or the last four digits of their social security number.  *See supra* p 4.  Thus, no voter could have cast a ballot without at least first presenting election officials with a HAVA ID—just as federal law requires.

Petitioner is thus left to argue that North Carolina state law seeking to *implement* HAVA somehow imposes more requirements than HAVA does.  But these arguments fail.  As discussed above, the North Carolina legislature has applied HAVA to state elections and maintains a unified voter-registration system for both federal and state contests.  *See supra* pp 4-5.  HAVA, not state law, thus provides the relevant rule of decision.

In sum, Petitioner's claim under HAVA is fatally flawed.

###    ii.    Petitioner's "never resident" protest is meritless.

Petitioner also seeks to cancel the votes of citizens living abroad who have never resided in the United States but whose parents resided in North Carolina before moving abroad.  D.E. 1-4 at 41. In 2011, the North Carolina legislature enacted a statute specifically granting this group of citizens the right to vote in North Carolina.  N.C. Gen. Stat. § 163-258.2(1)(e).

Petitioner claims that this statute is unlawful because the North Carolina Constitution requires that voters have "resided in the State of North Carolina for one year . . . preceding an election." D.E. 1-4 at 45 (quoting N.C. Const. art. VI, § 2(1)). But a North Carolina court recently rejected this exact argument. In *Kivett v. North Carolina State Board of Elections*, a state trial court held that the plaintiffs in that case "failed to persuade this court that they are more likely than not to succeed" in proving that the provision is unconstitutional. No. 24 CV 031557-910 (Wake Cnty. Sup. Ct.), Order ¶ 6, *supersedeas denied*, No. P24-735 (N.C. Ct. App.), *pet. for writ of supersedeas and disc. review pending*, No. 281P24 (N.C.).

The state court's conclusion was correct. To start, Petitioner misstates the constitutional provision. For elections to state offices, the North Carolina Constitution guarantees that "[a]ny person who has resided in the State of North Carolina for one year . . . preceding an election . . . shall be entitled to vote at any election held in this State." N.C. Const., art. VI, § 2(1). This provision does not *forbid* anyone from voting. Instead, it *guarantees* that certain persons have the right to vote in North Carolina. The state statute granting a small subset of overseas voters the right to vote is thus entirely consistent with the constitutional provision.

Even if this Court were to adopt Petitioner's reading of the state constitution, contrary to the only state court to have construed it, that reading would stand in considerable tension with federal law. Specifically, in *Dunn v. Blumstein*, 405 U.S. 330 (1972), the Supreme Court held that a one-year residency requirement violated the Equal Protection Clause. *Id.* at 334. While "bona fide residence requirements" are still valid, the Court explicitly rejected such a long temporal residency requirement. *Id.*; *accord Lloyd v. Babb*, 296 N.C. 416, 439, 251 S.E.2d 843, 858 (1979). If the state constitutional provision on which Petitioner relies were to be read as a residency requirement, it is durational and would violate the federal constitution.

Petitioner disagrees, claiming that *Dunn* turns an unconstitutional durational residency requirement into a "bona fide" residency requirement that prohibits persons who have never resided

27

in North Carolina from voting.  D.E. 1-4 at 48.  But as noted, nothing in the state constitution *requires* voters to have resided in North Carolina for any amount of time.  Thus, nothing forecloses the state legislature from enfranchising this small subset of overseas voters.[5]

### iii.    Petitioner's UOCAVA protest is meritless as well.

Petitioner finally seeks to cancel the votes of a third group of voters—military and overseas voters who followed North Carolina statutory law and the Board's guidance by not including a photocopy of their identification with their absentee ballot.  D.E. 1-4 at 53.  But under the rules in place at the time of the election, "[m]ilitary and [o]verseas . . . voter[s]" were "not required to submit a photocopy of acceptable photo identification" or an affidavit explaining their reason for not doing so.  08 N.C. Admin. Code 17.0109(d).  Petitioner apparently fails to comprehend that absentee ballots in North Carolina can be submitted under two different sets of rules—one for civilian residents, and one for overseas and military voters.  For civilian residents, absentee ballots must be cast under Article 20 of Chapter 163 of the General Statutes.  Under that article, all absentee ballots must "accompanied by a photocopy of [an] identification" or an "affidavit."  N.C. Gen. Stat. § 163-230.1(f1).  By its own terms, however, this requirement is limited to only a certain category of voters.  The statute states that "ballots [voted] *under this section* shall be accompanied by a photocopy of identification."  *Id.* (emphasis added).

But the voters subject to Petitioner's protest did not cast ballots under that section.  Instead, Petitioner challenges military and overseas voters who submitted absentee ballots under the rules found in Article 21A.  The North Carolina General Assembly enacted UMOVA in Article 21A

---

[5]    Petitioner strangely claims that his rule would only affect non-military overseas voters in state contests—not military voters, or votes cast in federal contests.  D.E. 1-4 at 37.  But he presents no principled limit on his arguments that could possibly explain this position.  Petitioner cannot limit the logical scope of his legal arguments through bare assertions.  And by asking to disenfranchise only a subset of identically situated overseas voters, Petitioner again requests relief that would violate the Equal Protection Clause.  *See supra* p 24.

explicitly to implement a federal law, UOCAVA, which requires states to allow military and overseas voters to register, request ballots, and vote by mail in federal elections using specific federal forms. *See* 52 U.S.C. §§ 20301-11.  In implementing UOCAVA through UMOVA in Article 21A, the General Assembly chose to allow military and overseas voters to vote in both federal *and state* elections under the same sets of rules.  *See, e.g.*, N.C. Gen. Stat. § 163-258.3; *supra* p 5.

Neither UOCAVA nor UMOVA require military and overseas voters to provide a photocopy of an identification with their absentee ballots.  Rather, UMOVA calls for a voter's identity to be verified through other means, which do not require photocopied identification.  *See, e.g.*, N.C. Gen. Stat. §§ 163-258.4(e), -258.13, -258.17(b).  In short, these voters correctly cast their absentee ballots under UMOVA's rules and were under no obligation to include a photocopy of identification with their absentee ballots.  *See* D.E. 1-5 at 43, 72-79.[6]

### CONCLUSION

For the foregoing reasons, the State Board of Elections respectfully submits that this Court should retain jurisdiction and deny the motion for a preliminary injunction.

This 1st day of January, 2025.

/s/ Mary Carla Babb
Mary Carla Babb
Special Deputy Attorney General
N.C. State Bar No. 25731
MCBabb@ncdoj.gov

Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
TSteed@ncdoj.gov

North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602

---

[6]    Petitioner also suggests that Article 21A might violate the state constitution. D.E. 1-4 at 59. Because Petitioner does not provide any citations to support this argument, it is abandoned. *Root v. Robinson*, No. 5:20-cv-00239-M, 2021 WL 2601045 at *3 n.3 (E.D.N.C. June 24, 2021).

29

Phone: 919-716-6900
Fax: 919-716-6758

*Counsel for Respondent*

30

JA 252

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.2(f)(3)**

Undersigned counsel certifies that this memorandum of law complies with Local Rule 7.2(f)(3) in that the brief, including headings, footnotes, citations, and quotations, contains no more than 30 pages.

This 1st day of January 2025.

/s/ Mary Carla Babb
Mary Carla Babb
Special Deputy Attorney General

31

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:24-cv-724-M

| | |
|---|---|
| JEFFERSON GRIFFIN, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) |
| NORTH CAROLINA STATE BOARD OF | ) |
| ELECTIONS, | ) |
| | ) |
| Respondents, | ) |
| | ) |
| ALLISON RIGGS, NORTH CAROLINA | ) |
| ALLIANCE FOR RETIRED AMERICANS, | ) |
| VOTEVETS ACTION FUND, TANYA | ) |
| WEBSTER-DURHAM, SARAH SMITH, and | ) |
| JUANITA ANDERSON, | ) |
| | ) |
| Intervenor-Respondents. | ) |

**REPLY IN SUPPORT OF PETITIONER'S MOTION FOR PRELIMINARY INJUNCTION**

The Board wrongfully removed this case to federal court, as explained in Judge Griffin's contemporaneously filed motion to remand. In the meantime, a preliminary injunction is warranted to maintain the status quo until the appropriate court can decide this case on the merits.

**ARGUMENT**

**I.     The Board cannot satisfy its burden to show that removal jurisdiction is appropriate here.**

Where a district court "lacks subject matter jurisdiction," it must remand a removed case to state court, 28 U.S.C. § 1447(c), and the burden of establishing federal jurisdiction falls on the party seeking removal, *see Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 151 (4th Cir. 1994). The Board cannot satisfy its burden here.

### a. The Court should abstain and remand under *Pullman*.

Although Judge Griffin's motion raised *Pullman* abstention as a reason for remand, the Board and the other parties offer no response. Nor could they. Their arguments that "state laws bar" Judge Griffin's protests demonstrate the need for abstention: the North Carolina Supreme Court's clarification of these state-law issues could resolve this case. D.E. 40 at 14.

### b. A state appellate court's review of state agency action is not removeable.

Judge Griffin's petition in the North Carolina Supreme Court was not a "civil action" removeable under sections 1441 and 1443, it was an unremovable "supplementary proceeding." *Barrow v. Hunton*, 99 U.S. 80, 82-83 (1878). State-court proceedings reviewing state agency rulings are "merely supplementary" because they form "an integral part of the administrative enforcement scheme." *Armistead v. C & M Transp., Inc.*, 49 F.3d 43, 46 (1st Cir. 1995) (ordering remand of proceeding to enforce state agency's decision). None of the Board's authorities address these kinds of supplementary proceedings. D.E. 39 at 9-17.

Moreover, federal law does not permit removal of cases from state appellate courts. *See, e.g.*, *Shafique v. Equity Residential Real Est. Inv. Tr.*, No. 1:24-CV-00380 (UNA), 2024 WL 1989113, at *2 (D.D.C. May 1, 2024) (holding a defendant "simply cannot 'remove' an appeal from the [D.C. appellate court] to this federal court"); *Victoria Palms Resort Inc. v. City of Donna*, 234 F. App'x 179, 180 (5th Cir. 2007) (finding "no support for removal of *any* non-FIRREA cases to federal district courts while still on appeal in the state court system"). The Board's citations address different removal statutes and fact patterns. *See Harris v. U.S. Dep't of Transp. FMCSA*, 122 F.4th 418, 422 (D.C. Cir. 2024) ("liberally constru[ing]" federal-officer-removal statute); *Yassan v. J.P. Morgan Chase & Co.*, 708 F.3d 963, 970 (7th Cir. 2013) (allowing removal after "an interlocutory order" before any state-court appeal); *Resol. Tr. Corp. v. Allen*, 16 F.3d 568, 572 n.4 (4th Cir. 1994) (FIRREA removal).

**c. This case is not among the "slim category" of state-law claims removable under section 1441(a).**

Judge Griffin's petition arises under state law. Removal under section 1441(a) is therefore proper only if this case is among the "slim category" of actions in which "a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *W. Va. State Univ. Bd. of Governors v. Dow Chem. Co.*, 23 F.4th 288, 307 (4th Cir. 2022). Courts must be "cautious" in exercising this type of jurisdiction. *Burrell v. Bayer Corp.*, 918 F.3d 372, 380 (4th Cir. 2019).

**i. None of the federal questions the Board asserts are "necessarily raised."**

Judge Griffin's petition addresses federal law only to show that the Board's asserted federal defenses are inapplicable. And the Board characterizations of these federal questions shows that it considers them defenses. D.E. 39 at 11, 13. But under the well-pleaded complaint rule, a federal court "does not have original jurisdiction" over a case presenting a state-law cause of action, just because the party asserts that "a federal defense … is not sufficient to defeat the claim." *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 10 (1983). The defenses Judge Griffin asserted do not provide this Court with jurisdiction. *See Anne Arundel Cnty. Md. v. BP P.L.C.*, 94 F.4th 343, 351 (4th Cir. 2024).

Moreover, none of Judge Griffin's state-law challenges turn on determinations of federal law. To "necessarily raise a federal issue, a state law claim must hinge on the determination of a federal issue." *W. Va. State Univ. Bd. of Governors.*, 23 F.4th at 307. Here, all of Judge Griffin's protests allege that the Board would violate state law by counting the contested ballots. *See* D.E. 1-4. None of those specific state-law provisions expressly incorporate federal law by reference. Instead, they establish freestanding state requirements to vote in state elections to which neither HAVA or UOCAVA (nor the NVRA, for that matter) apply. *See* 52 U.S.C. §§ 21081, 21083, 20302, 20507. This case is therefore worlds apart from the Fourth Circuit's recent opinion in *Republican National Committee v.*

*North Carolina State Board of Elections*. 120 F.4th 390, 401 (4th Cir. 2024).  Hence none of the federal questions here are necessarily raised.  *See W. Va. State Univ. Bd. of Governors.*, 23 F.4th at 307; *Nicholson v. City of Gary,* No. 2:18-cv-257, 2020 WL 2744286, at \*6 (N.D. Ind. May 27, 2020).

### ii.  Neither the applicability of the Civil Rights Act nor the Voting Rights Act is "actually disputed."

Federal issues are "actually disputed" only when "the parties disagree about the effect of federal law." *Mayor & City Council of Balt. v. BP P.L.C.*, 31 F.4th 178, 209 (4th Cir. 2022).  The Board does not disagree that Judge Griffin's protests do not implicate the Civil Rights Act or the Voting Rights Act.  The Board never mentioned either of those federal laws in its order.  *See* D.E. 1-5 at 41-80.  And it does not argue that they are actually disputed, D.E. 39 at 13, because they are not.  *See Mayor & City Council of Balt.*, 31 F.4th at 209.

### iii.  There is no "substantial" federal interest in this case.

The substantiality requirement is a "high bar," which the Board's conclusory argument on this point, D.E. 39 at 13-14, cannot satisfy for three reasons, *Friedler v. Stifel, Nicolaus, & Co.*, 108 F.4th 241, 247 (4th Cir. 2024).  First, where a party invokes federal law "solely for the purpose of obtaining jurisdiction," *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 89 (1998), or where the federal issues raised are "obviously without merit," those issues are per se insubstantial, *Hagans v. Lavine*, 415 U.S. 528, 537 (1974).  Here, the Board says that Judge Griffin's protests fail under the NVRA, HAVA, and UOCAVA.  These laws, however, apply only to federal elections.  *See supra* Section I.c.i.  But Judge Griffin only challenges the results of a state election.  The Board's arguments are therefore meritless.  The Board further claims that applying state law in the manner Judge Griffin has requested would mean it was applying "a newly announced rule of law," in violation of substantive

due process.  But these laws were in force for years before the November 2024 election.  This argument is also meritless.  *See Am. Trucking Ass'ns, Inc. v. Smith*, 496 U.S. 167, 180, 191-93 (1990).

Second, "fact-bound and situation-specific" questions of federal law ordinarily do not satisfy the substantiality requirement.  *Burrell*, 918 F.3d at 385.  Here, the Board's procedural due process and substantive due process arguments are considerably fact bound.  Although these issues are important to the parties in this case, they are "not substantial in the relevant sense because [they] lack[] importance more generally" to the federal system as whole.  *Burrell*, 918 F.3d at 385.

Third, the North Carolina Supreme Court can be expected to "hew closely" to federal precedents regarding the federal provisions at issue here.  And to the extent any of those issues are novel, they will "at some point be decided by a federal court."  *Gunn v. Minton*, 568 U.S. 251, 262 (2013).  For these reasons, there is no substantial federal interest in this case.

### iv.  Exercising jurisdiction here would upset the "federal-state balance."

The Board denied Judge Griffin's protests based on erroneous applications of state laws and raised a slew of federal law provisions as alternative grounds to justify its decision.  It then used those alternative statements to remove this case to federal court.  *See generally* D.E. 1.  Contrary to the Board's argument, D.E. 39 at 14, allowing that tactic in other election protest cases—which are not rare—will "attract a horde of … removal cases raising other state claims," *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 315, 318-19 (2005).

### d.  This case is not removable under 28 U.S.C. § 1443(2).

The Board cannot remove under section 1443(2) because it is not being sued "for refusing to … act." 28 U.S.C. § 1443(2).  A "state court action" is not removable when it "is not brought against the … Defendants 'for refusing to do' anything."  *Common Cause v. Lewis*, 358 F. Supp. 3d 505, 510 (E.D.N.C. 2019), *aff'd*, 956 F.3d 246 (4th Cir. 2020).  "[T]he distinction between a defendant's action versus inaction" is "[c]ritical."  *Suttlar v. Thurston*, No. 4:22-cv-368, 2022 WL 2713648, at *5 (E.D. Ark. July 13, 2022).  "[T]he 'refusal to act' clause is unavailable where the removing party's *action*,

rather than its *inaction*, is the subject of the state-court suit." *City & Cnty. of S.F. v. Civil Serv. Comm'n of City & Cnty. of S.F.*, No. 3:02-cv-3462, 2002 WL 1677711, at *4 (N.D. Cal. July 24, 2002).

This case is about the Board's threat to take action, not any refusal to act. That is why Judge Griffin is seeking "a writ of prohibition to stop the State Board of Elections from counting unlawful ballots," not a writ of mandamus compelling the Board to take actions it has refused to take. D.E. 1-4 at 14. Judge Griffin's request for a writ of prohibition, and not a writ of mandamus, establishes that his suit against the Board is not based on any refusal to act. *See Common Cause*, 358 F. Supp. 3d at 511.

## II. Judge Griffin is entitled to a preliminary injunction.

### a. Irreparable harm, the equities, and the public interest favor an injunction.

Both the Board and Justice Riggs concede that Judge Griffin will suffer irreparable harm absent a preliminary injunction. D.E. 39 at 39; D.E. 40 at 29 n.6. On the equities and public interest, their arguments boil down to an assumption that enjoining the Board would disenfranchise voters. D.E. 39 at 19; D.E. 40 at 29; D.E. 42 at 34. Not so. The injunction will only stay certification of the election, preserving the status quo while a court determines whether those votes were lawfully cast.

### b. Judge Griffin is likely to succeed on the merits.

#### i. The Board erroneously decided to count votes cast by individuals who were not legally registered to vote.

Justice Riggs contends that Judge Griffin has failed to provide facts establishing that certain individuals were ineligible to vote. D.E. 40 at 17. In the next breath, though, she acknowledges that the Board's databases did not contain their drivers license or Social Security numbers. *Id.* at 18. North Carolina law requires voters to provide this information to be legally registered to vote. And if a voter is not legally registered, they are not eligible to vote. D.E. 32 at 11-12.

The Board mischaracterizes this claim as Judge Griffin's "HAVA protest." D.E. 39 at 25. But Judge Griffin has not sought relief under HAVA. He has repeatedly asserted that no federal statutes

apply here.  *See, e.g.*, D.E. 32 at 12-13.  In any event, contrary to the Board's and intervenors' arguments, *e.g.*, D.E. 39 at 25, those statutes do not apply even where the state has a unified voter registration system.  That's because Judge Griffin's protests do not seek to remove *any* voters from the registration rolls, nor do they challenge *any* votes cast in a *federal* election.  D.E. 32 at 13.  The case intervenors cite equating vote-count corrections to de-registration for NVRA purposes involves a *federal* election.  *See Majority Forward v. Ben Hill Cnty. Bd. of Elecs.*, 512 F. Supp. 3d 1354, 1368 (M.D. Ga. 2021).  It is therefore inapposite.

### ii.  The Board erred in counting votes by never residents.

The Board contends that the state constitution does not forbid individuals who have never resided in the state from voting in state elections.  D.E. 39 at 27.  In support, it cites a recent trial court decision to that effect.  *Id.*  But the state constitution clearly contains a bona fide residency requirement prohibiting never residents from voting, D.E. 32 at 14-15, and federal courts do not defer to state *trial* court interpretations of state constitutional law, but rather to the "state's highest court."  *F.D.I.C. ex rel. Co-op Bank v. Rippy*, 799 F.3d 301, 310 (4th Cir. 2015).

Justice Riggs accuses Judge Griffin of not telling the Court what the correct reading of UMOVA is, D.E. 40 at 23, but Judge Griffin's petition clearly explained that UMOVA exempts voters only from an unconstitutional durational residency requirement, D.E. 1-4 at 49.  She also erroneously argues that the state constitution's residency requirement should be defined according to domicile.  D.E. 40 at 24-26.  In the end, though, such an important question of state constitutional law is for the North Carolina Supreme Court, not this Court.  *See Minnesota v. Nat'l Tea Co.*, 309 U.S. 551, 557 (1940).

### iii.  The Board erred by counting votes by overseas voters who did not present photo identification.

The Board and intervenors next argue that the Board's regulations and UMOVA permit overseas voters to cast absentee ballots without submitting copies of their photo identification.  D.E. 39 at 28-29; D.E. 40 at 26-27.  But that argument ignores that the General Statutes require exactly those

submissions.  D.E. 32 at 15-16; D.E. 1-4 at 54-57 (explaining that Article 20 of the General Statutes, which requires photo identification for absentee ballots, applies to UMOVA voters); D.E. 1-4 at 57-59. Nor may the Board impose a greater burden—photo identification—on individuals living in North Carolina than it imposes on those living abroad.  D.E. 32 at 16.

### iv.  Judge Griffin complied with notice requirements.

Justice Riggs argues that Judge Griffin is incorrect that the burden of service falls on the county boards of elections.  D.E. 40 at 13.  But state law provides that the county boards are responsible for providing voters with "a copy of the protest or a summary of its allegations."  N.C. Gen. Stat. § 163-182.10(b).

The Board and intervenors alternatively argue that Judge Griffin failed to comply with procedural due process requirements.  D.E. 39 at 19-21; D.E. 40 at 12; D.E. 42 at 23.  As an initial matter, since a decision in favor of the Board on state law would moot this constitutional issue, the Court should abstain from deciding it.  In any event, however, Judge Griffin complied with this constitutional requirement.  D.E. 32 at 18; D.E. 1-4 at 64-65.

The Board and intervenors argue that the links to the protest filings forced voters to wade through spreadsheets to find their names, D.E. 39 at 21; D.E. 40 at 12, but their proposed solution (sending hard copies) would have exacerbated the problem by foreclosing electronic searches, *see, e.g.*, D.E. 39 at 20-21.  The Board and intervenors also assert that some voters would not have been able to use QR codes, D.E. 39 at 20; D.E. 42 at 23, but they have no evidence this method of service was not reasonably certain to reach a *sufficient* number of voters in the affected class, such that they could safeguard the interests of all affected voters.  D.E. 32 at 18.

### v.  The Fourteenth Amendment does not bar Judge Griffin's claims.

Next, the Board and intervenors contend that Judge Griffin cannot succeed under the Fourteenth Amendment.  Again, Judge Griffin alleges no claim under the Fourteenth Amendment; instead, he argues that it does not bar his relief here.  D.E. 32 at 15-16, 19; D.E. 1-4 at 69-74.  Moreover,

because a decision in favor of the Board on the state-law claims would moot the constitutional issues, abstention is warranted.

In any event, correcting the vote would not eliminate votes cast in accordance with "longstanding practices." D.E. 39 at 22; D.E. 40 at 15. Indeed, Judge Griffin's claims contend that all the challenged votes were cast in violation of state laws in place well *before* the November 2024 election. None of these state-law requirements violate the *Anderson-Burdick* line of cases. D.E. 32 at 19; D.E. 1-4 at 69-74. Further, the parties' Equal Protection Arguments are without merit. Judge Griffin did not arbitrarily challenge the ballots at issue here; he challenged the only categories of votes—provisional or absentee ballots—which are subject to retrieval and discounting as unlawful. *See, e.g.*, N.C. Gen. Stat. § 163-166.45. And in any event, the parties' reliance on *Bush v. Gore* is unavailing given that decision's "limited" precedential value. *Bush v. Gore*, 531 U.S. 98, 109 (2000).

### vi. The Civil Rights Act and Voting Rights Act do not bar Judge Griffin's claims.

Justice Riggs and the NCARA next contend that Judge Griffin cannot succeed on claims under the Civil Rights Act and the Voting Rights Act, D.E. 40 at 16; D.E. 42 at 30, but Judge Griffin brings no such claims. Instead, he argues that those laws provide no defense to his state-law claims. D.E. 1-4 at 67-69. And neither statute bars relief. Intervenors doubt the importance of a voter's driver's license or Social Security numbers, D.E. 40 at 16; D.E. 42 at 30, but these numbers verify voters are "who they claim to be," making them "material" to "the qualifications to vote." *Vote.Org v. Callanen*, 89 F.4th 459, 489 (5th Cir. 2023). Justice Riggs argues that Judge Griffin seeks to discount the ballots of eligible voters in violation of the VRA, D.E. 40 at 16, but the voters at issue were not eligible to vote for the reasons Judge Griffin has explained.

### vii. Laches does not apply.

NCARA baselessly accuses Judge Griffin of delaying this litigation through "lack of diligence," D.E. 42 at 16, but laches does not apply because Judge Griffin filed his petition mere days

after the order he is challenging. D.E. 1-4 at 84 (petition dated 12/18/24); D.E. 1-5 at 80 (order dated 12/13/24). NCARA asserts Judge Griffin should have filed his petition before the election, but that would have been impossible. At that time, the Board was not "counting unlawful ballots"—the action he challenges in this case, D.E. 1-4 at 14—and Judge Griffin was not injured by the Board's actions until they threatened to cost him the election. Had Judge Griffin brought such a pre-election suit, the Board undoubtedly would have argued it was premature.

*   *   *

For the foregoing reasons, Judge Griffin is entitled to a preliminary injunction.

Dated: January 3, 2025

Respectfully Submitted,

/s/ Mark M. Rothrock

Craig D. Schauer
41571 (NC)
Dowling PLLC
3801 Lake Boone Trial, Suite 260
919 529-3351
cschauer@dowlingfirm.com

Mark Rothrock
56747 (NC)
LEHOTSKY KELLER COHN LLP
8513 Caldbeck Drive
Raleigh, NC  27615
(336) 416-3326
mark@lkcfirm.com

Troy D. Shelton
48070 (NC)
Dowling PLLC
3801 Lake Boone Trial, Suite 260
919 529-3351
tshelton@dowlingfirm.com

William T. Thompson*
24088531 (TX)
LEHOTSKY KELLER COHN LLP
408 W. 11st Street, 5th Floor
Austin, TX 78701
(512) 693-8350
will@lkcfirm.com

W. Michael Dowling
42790 (NC)
Dowling PLLC
3801 Lake Boone Trial, Suite 260
919 529-3351
mike@dowlingfirm.com

Philip R. Thomas
N.C. State Bar No. 53751
Chalmers, Adams, Backer & Kaufman,
PLLC
204 N Person St.
Raleigh, NC 27601
Telephone: (919) 670-5185
pthomas@chalmersadams.com

*Local Rule 83.1(d) special appearance
forthcoming

Attorneys for Petitioner

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.2(f)(2)</u>

I hereby certify that this Petitioner's Reply in Support of Motion for Preliminary Injunction is in compliance with Local Rule 7.2(f)(2), as the document does not exceed 10 pages in length.

<u>/s/ *Mark M. Rothrock*</u>
Mark M. Rothrock

## CERTIFICATE OF SERVICE

I hereby certify that on January 3, 2025, I electronically filed the foregoing Petitioner's Reply in Support of Motion for Preliminary Injunction with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all parties.

/s/ *Mark M. Rothrock*
Mark M. Rothrock

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:24-cv-724-M

| | |
|---|---|
| JEFFERSON GRIFFIN, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) |
| NORTH CAROLINA STATE BOARD OF ELECTIONS, | ) |
| | ) |
| | ) |
| Respondents, | ) |
| | ) |
| ALLISON RIGGS, NORTH CAROLINA ALLIANCE FOR RETIRED AMERICANS, VOTEVETS ACTION FUND, TANYA WEBSTER-DURHAM, SARAH SMITH, and JUANITA ANDERSON, | ) |
| | ) |
| Intervenor-Respondents.) | |

**<u>PETITIONER'S MOTION TO REMAND</u>**

Petitioner Judge Jefferson Griffin respectfully requests that this Court remand this case to the North Carolina Supreme Court pursuant to 28 U.S.C. § 1447(c). Respondent and Intervenors have failed to carry their burden to show that this Court has subject-matter jurisdiction over this case. *Pullman* abstention warrants remand. And the general removal statutes prohibit removal of an appellate case seeking a writ of prohibition. Moreover, the Respondent and Intervenors have failed to show that removal was appropriate under 28 U.S.C. §§ 1441(a) and 1443(2). For these reasons and those in Petitioner's Memorandum in Support filed herewith, this Court should order remand.

Dated: January 3, 2025

Respectfully Submitted,

/s/ Mark M. Rothrock

Craig D. Schauer
41571 (NC)
Dowling PLLC
3801 Lake Boone Trial, Suite 260
919 529-3351
cschauer@dowlingfirm.com

Mark Rothrock
56747 (NC)
LEHOTSKY KELLER COHN LLP
8513 Caldbeck Drive
Raleigh, NC  27615
(336) 416-3326
mark@lkcfirm.com

Troy D. Shelton
48070 (NC)
Dowling PLLC
3801 Lake Boone Trial, Suite 260
919 529-3351
tshelton@dowlingfirm.com

William T. Thompson*
24088531 (TX)
LEHOTSKY KELLER COHN LLP
408 W. 11st Street, 5th Floor
Austin, TX 78701
(512) 693-8350
will@lkcfirm.com

W. Michael Dowling
42790 (NC)
Dowling PLLC
3801 Lake Boone Trial, Suite 260
919 529-3351
mike@dowlingfirm.com

Philip R. Thomas
N.C. State Bar No. 53751
Chalmers, Adams, Backer & Kaufman, PLLC
204 N Person St.
Raleigh, NC 27601
Telephone: (919) 670-5185
pthomas@chalmersadams.com

*Local Rule 83.1(d) special appearance forthcoming

Attorneys for Petitioner

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 3, 2025, I electronically filed the foregoing Petitioner's

Motion to Remand with the Clerk of Court using the CM/ECF system, which will send notification

of such filing to all parties.


<u>/s/ *Mark M. Rothrock*</u>
Mark M. Rothrock

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:24-cv-724-M

| | |
|---|---|
| JEFFERSON GRIFFIN, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) |
| NORTH CAROLINA STATE BOARD OF | ) |
| ELECTIONS, | ) |
| | ) |
| Respondents, | ) |
| | ) |
| ALLISON RIGGS, NORTH CAROLINA | ) |
| ALLIANCE FOR RETIRED AMERICANS, | ) |
| VOTEVETS ACTION FUND, TANYA | ) |
| WEBSTER-DURHAM, SARAH SMITH, and | ) |
| JUANITA ANDERSON, | ) |
| | ) |
| Intervenor-Respondents.) | |

**MEMORANDUM IN SUPPORT OF PETITIONER'S MOTION TO REMAND**

Petitioner Judge Jefferson Griffin respectfully requests that the Court remand this case to the North Carolina Supreme Court. This action arose out of Judge Griffin's state-law protests regarding the results of a state election. Respondent, the North Carolina State Board of Elections, ultimately denied Judge Griffin's protests, and he sought review of that decision—in the form of a petition for a writ of prohibition arising under state law—before the North Carolina Supreme Court. But rather than allow the state's highest court to determine whether the Board had correctly decided unsettled issues regarding the state's election laws, the Board removed that proceeding to this Court.

The Board contends that removal is appropriate because in its decision denying Judge Griffin's protests it alternatively held that it would have violated several federal statutes and the Fourteenth Amendment if it had sustained them under state law.

This Court should abstain and remand under *Pullman* and *Quackenbush*. In this case, the Board not only decided novel issues of state law but also raised questions arising under the federal constitution. But a serious respect for preserving harmonious federal-state relations and a need to avoid unnecessary decisions of constitutional issues requires this Court to abstain and remand this case to the North Carolina Supreme Court to decide those state-law issues.

Further, none of the general removal statutes permit removal of an appellate action like this one. And neither of the specific removal provisions on which the Board relies—28 U.S.C. §§ 1441, 1443(2)—permits removal here. That's because this state-election case neither falls within the "slim category" of cases arising under state law that raise serious federal interests, as required by section 1441, nor is based on the Board's refusal to do anything, as required by section 1443.

At bottom, the Board's attempted removal threatens our system of federalism. This case primarily turns upon unsettled issues of state election law. And states—not the federal government—have the primary responsibility to regulate elections for state offices. But the Board has attempted to circumvent a decision by the state's highest court by injecting a slew of inapplicable federal defenses and meritless arguments about their application solely for the purposes of obtaining federal jurisdiction. If this Court maintains jurisdiction here, that decision will only incentivize the Board to repeat these tactics in the future.

For all the reasons explained below, this Court should remand the case to the North Carolina Supreme Court.

## STATEMENT OF FACTS

This case presents significant and novel issues of North Carolina election law. Indeed, the Board has acknowledged that this case raises legal questions of "statewide significance." D.E. 1-5 at 44.

The court that decides this case will be required to interpret state election laws dating back to the American Revolution. Since 1776, the North Carolina Constitution has required voters to be bona fide residents of the state. N.C. Const. of 1776, art. VIII; *see* N.C. Const. art. VI, § 2(1). Since 2004, state law has required voters to provide a driver's license or Social Security number to register to vote. N.C. Sess. Law 2003-226, §§ 2, 9; N.C. Gen. Stat. § 163-82.4(a)(11). And since 2018, both the state constitution and statutory provisions have mandated photo identification for voting, including absentee ballots. N.C. Const. art. VI, §§ 2(4), 3(2); N.C. Gen. Stat. §§ 163-231(b)(1), 163-230.1(a)(4), (b)(4), (e)(3), (f1); § 163-166.16(a). These longstanding requirements were well-established before the November 2024 general election. Yet, the Board refused to enforce them in Judge Griffin's race.

During the November 2024 election, Judge Griffin, the Republican candidate for Seat 6 on the North Carolina Supreme Court, faced Justice Allison Riggs in a close race in which a margin of only a few hundred votes separated the candidates out of more than 5.5 million cast. D.E. 1-4 at 16, 18. As the county boards of elections canvassed the vote, Judge Griffin identified irregularities involving ballots that violated the state constitutional and statutory provisions outlined above, among others. *Id.* at 18-21. He therefore filed election protests with the county boards across the state, seeking to prohibit the counting of ballots cast in violation of state law. *Id.* (Importantly, in those protests, Judge Griffin raised no federal laws as bases to sustain his protests nor requested that the Board remove any voters from the state's registration rolls.) Concurrently, Judge Griffin sent notice of his protests to affected voters. D.E. 1-5 at 174-78.

Thereafter, the Board assumed jurisdiction over protests involving more than 60,000 ballots. *Id.* at 4. These protests included challenges to ballots cast by (1) individuals who had not legally registered to vote; (2) non-residents who did not meet the state constitution's residency requirement; and (3) overseas voters who did not submit the required photo identification or exemption documentation with their ballots. *See* D.E. 1-5 at 4, 10–30.

The Board denied Judge Griffin's protests. In its written order, it reasoned that each of his protests failed under state law. *Id.* at 41–80. But to buttress that decision, the Board alternatively held that it would have violated federal law had it sustained any of his protests. *Id.* Specifically, the Board said that the notices Judge Griffin sent to affected voters failed to comply with the Fourteenth Amendment's procedural-due-process requirements. *Id.* at 51-55. The Board also said that sustaining Judge Griffin's challenges to ballots cast by individuals who had not legally registered to vote would violate the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA"). *Id.* at 66-67. Additionally, the Board stated that even if North

Carolina law required overseas voters to present photo identification along with their absentee ballots, it could not enforce those laws because they would likely conflict with the Uniform and Overseas Citizens Absentee Voting Act ("UOCAVA"). *Id.* at 77-79. Finally, the Board reasoned that enforcing any of the state-law provisions raised by Judge Griffin as the bases of his protests would violate the Fourteenth Amendment's substantive-due-process doctrine. *Id.* at 63, 72, 79.

Following the Board's decision, Judge Griffin petitioned the North Carolina Supreme Court for a writ of prohibition, asking that court to stay the Board's issuance of a certificate of election and to conclude that the Board had incorrectly applied the law. *See* D.E. 1-4. Judge Griffin's petition—like his election protests—argued that state law prohibited the Board from counting the contested ballots, and that the Board was acting outside its authority by refusing to enforce those laws. *Id.* Judge Griffin's petition also rebutted the arguments under federal law the Board had raised to defend its refusal to enforce state law. *Id.*

In an unprecedented move, the Board thereafter removed Judge Griffin's petition from the North Carolina Supreme Court to this one. *See generally* D.E. 1. Judge Griffin now moves this Court to remand this case to the North Carolina Supreme Court for lack of subject-matter jurisdiction.

## LEGAL STANDARD

Where a district court "lacks subject matter jurisdiction," it must remand a removed case to state court. 28 U.S.C. § 1447(c). Thus, in removal cases, a federal court must first confirm that it has subject matter jurisdiction. *See Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 151 (4th Cir. 1994). Subject matter jurisdiction is a "threshold matter" that a court must consider prior to addressing the merits of the case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 480 (4th Cir.

2005) ("[S]ubject-matter jurisdiction is a necessary prerequisite to any merits decision by a federal court.").

Courts "must strictly construe removal jurisdiction" because it raises "significant federalism concerns." *Common Cause v. Lewis*, 956 F.3d 246, 252 (4th Cir. 2020) (quotations omitted). "If federal jurisdiction is doubtful, a remand is necessary." *Id.*; *see Palisades Collections LLC v. Shorts*, 552 F.3d 327, 336 (4th Cir. 2008) (recognizing the "duty to construe removal jurisdiction strictly and resolve doubts in favor of remand"). The burden of establishing federal jurisdiction falls on the party seeking removal. *Mulcahey*, 29 F.3d at 151.

## ARGUMENT

The Board cannot satisfy its burden to establish federal jurisdiction over this case for four reasons. First, since a decision in favor of the Board on the unsettled questions of state election law raised in Judge Griffin's petition would moot the federal constitutional issues the Board purports to raise, *Pullman* abstention is warranted and provides a basis for remand of this case because the petition seeks discretionary relief. Second, the general removal statutes prohibit appellate removal of Judge Griffin's petition. Third, this case does not fall within the "slim category" of cases arising under state law in which serious federal interests allow this court to exercise jurisdiction under 28 U.S.C. § 1441. And finally, this case is not removable under 28 U.S.C. § 1443(2) because it is not a suit grounded in the Board's refusal to do anything; rather, Judge Griffin seeks a writ of prohibition to stop the Board from taking action: namely, counting unlawful ballots.

### I.      The Court should remand under *Pullman*.

Although Judge Griffin raised the argument that *Pullman* abstention serves as a basis to remand this case, D.E. 32 at 9-10, the Board and the Intervenors have failed to respond. *See*

*generally* D.E. 39, 40, 42.  That omission is telling.  For that doctrine has direct application in this case.  *Pullman* abstention applies when (1) a case involves uncertain issues of state law, (2) state court clarification of those issues could resolve or significantly narrow the federal constitutional questions, and (3) the case otherwise warrants deferral to state adjudication.  *See Educ. Servs., Inc. v. Md. State Bd. for Higher Educ.*, 710 F.2d 170, 174 (4th Cir. 1983).  And when a federal court chooses to abstain, it may dismiss or remand a case in which a party seeks discretionary relief.  *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 731 (1996) ("Under our precedents, federal courts have the power to dismiss or remand cases based on abstention principles only where the relief being sought is equitable or otherwise discretionary").

Here, Judge Griffin's protests and petition rest on interpretations of state law that remain unresolved.  As the briefing reveals, the parties hotly dispute these issues, and "[t]his very conflict suggests the issue is far from settled."  *Wise v. Circosta*, 978 F.3d 93, 101 (4th Cir. 2020) (en banc).

The Board applied these unsettled state laws to deny Judge Griffin's protests in the first instance.  D.E. 1-5 at 41-80.  Only then did it alternatively deny the protests, claiming that sustaining them under state law would violate the Fourteenth Amendment.  *Id.* at 63, 72, 79.  Thus, were the North Carolina Supreme Court to endorse the Board's interpretation of those state-law issues, any federal constitutional problems the Board has raised would be rendered moot.  This Court should therefore abstain under *Pullman*.  *Wise*, 978 F.3d at 102 ("*Pullman* abstention [is] appropriate where the resolution of an issue concerning state [law] would moot the constitutional questions presented").

And abstention here provides yet another basis for remand.  That's because Judge Griffin's petition unquestionably seeks discretionary relief.  *See State v. Inman,* 224 N.C. 531, 542 (1944).  Thus, under *Quackenbush*, that request for discretionary relief provides the Court with authority

to remand the case. 517 U.S. at 731. Indeed, such a result is especially warranted where, as here, the case will be remanded to the North Carolina Supreme Court, which "stands ready to act." *Wise*, 978 F.3d at 103. And ordering remand will prevent "needless federal intervention into local affairs" regarding the state's election laws. *Id.* at 102; *see Quackenbush*, 517 U.S. at 728 (noting that the power to dismiss or remand a case on abstention grounds is based in the fact that a court's exercise of discretion "must reflect principles of federalism and comity." (cleaned up)).

For these reasons, *Pullman* abstention provides yet another ground for remanding this case to the North Carolina Supreme Court.

## II.     Supreme Court precedent and the text of the general removal statutes prohibits removal of this case.

The Board has claimed an extraordinary power: the power to remove a petition for a writ of prohibition from a state supreme court to a federal district court. Counsel is aware of no federal court that has ever blessed such a maneuver.

The United States Supreme Court has held that where "a supplementary proceeding so connected with the original suit as to form an incident to it, and substantially a continuation of it" federal courts may not "properly entertain jurisdiction of the case." *Barrow v. Hunton*, 99 U.S. 80, 82-83 (1878). State-court proceedings reviewing state agency rulings are "merely supplementary" because they form "an integral part of the administrative enforcement scheme." *Armistead v. C & M Transp., Inc.*, 49 F.3d 43, 46 (1st Cir. 1995) (ordering remand of proceeding to enforce state agency's decision). None of the Board's authorities address these kinds of supplementary proceedings. D.E. 39 at 9-17.

Here, the Board, acting as a state tribunal, issued an order denying Judge Griffin's election protests. Judge Griffin then asked North Carolina Supreme Court to review and reject that order by filing a petition for writ of prohibition. *See generally* D.E. 1-4. Judge Griffin's petition, then,

is simply a "supplementary proceeding," which is a substantial continuation of the election-protest proceedings originally decided by the Board. Under the principles set out in *Barrow*, such a proceeding cannot be removed to this Court. *See Barrow*, 99 U.S. at 82-83; *Armistead*, 49 F.3d at 46.

The text of the general removal statutes also does not permit appellate removal. For example, the two statutes under which the Board has attempted to remove this case, 28 U.S.C. §§ 1441(a) and 1443(2), both permit removal only of a "civil action." But the Board did not remove a civil action. It removed a petition for a writ of prohibition filed with the North Carolina Supreme Court, arising under the North Carolina Constitution, and seeking the exercise of that court's unique writ power and its power to supervise and control the exercise of judicial power in the state.

At common law, a petition for a writ of prohibition is not a "civil action," and is therefore not removable to federal court. *N.C. Pub. Serv. Co. v. S. Power Co.*, 104 S.E. 872, 873 (N.C. 1920) ("It seems to be well settled that a proceeding for a writ of mandamus in a state court is not a suit of a civil nature at law or in equity which can be removed from the state to the federal courts")[1]; *Marshall v. Crotty*, 185 F.2d 622, 626 (1st Cir. 1950); *N.C. Pub. Serv. Co. v. S. Power Co.*, 282 F. 837, 840 (4th Cir. 1922) ("The District Court of the United States has no original jurisdiction in mandamus, and therefore a mandamus proceeding is not removable"); *Rosenbaum v. Bauer*, 120 U.S. 450, 455 (1887); 2 Russell J. Davis et al., *Cyclopedia of Federal Procedure* § 3:25 (3d ed.

---

[1] In North Carolina, mandamus and prohibition are two sides of the same coin. One writ issues to compel action, the other to restrain action. *State v. Whitaker*, 19 S.E. 376, 376 (N.C. 1894) ("The writ of prohibition is the converse of mandamus. It prohibits action, while mandamus compels action"). They are often considered "interchangeable" according to the Supreme Court of North Carolina. N.C. R. App. P. 22, Drafting Committee Note (1975), *reprinted at* 287 N.C. 671, 732, *available at* https://perma.cc/QV85-WNHY.

Westlaw 2024) ("Removal of mandamus proceedings from a state court has been denied on the ground that the federal court has no original jurisdiction of them or that they are not civil actions.").

Unlike a civil action, which pits parties against one another, "prohibition is an extraordinary judicial writ, issuing to a court from another court having supervision and control of its proceedings." *Whitaker*, 19 S.E. at 376. Appeals in general, and petitions for extraordinary writs in particular, are not "civil actions" as that term is used in the general removal statutes. Indeed, that Congress does not allow removal of these types of actions is buttressed by the general removal statutes' requirement that a party may only remove an action from "a State court." 28 U.S.C. §§ 1441(a), 1443(2). There, Congress defined "State" to "include[] the District of Columbia," *id.* § 1451(2), but "State court" to include only "the Superior Court of the District of Columbia," *id.* § 1451(1). Congress thereby specifically excluded the appellate court sitting above the D.C. Superior Court—the District of Columbia Court of Appeals. *See, e.g.*, *Shafique v. Equity Residential Real Est. Inv. Tr.*, No. 1:24-CV-00380 (UNA), 2024 WL 1989113, at *2 (D.D.C. May 1, 2024) (case cannot be removed from the District of Columbia Court of Appeals); *Victoria Palms Resort Inc. v. City of Donna*, 234 F. App'x 179, 180 (5th Cir. 2007) (finding "no support for removal of *any* non-FIRREA cases to federal district courts while still on appeal in the state court system").

The Board counters with several cases, *see* D.E. 39 at 10, but none are availing. For they address different removal statutes and fact patterns. *See Harris v. U.S. Dep't of Transp. FMCSA*, 122 F.4th 418, 422 (D.C. Cir. 2024) ("liberally constru[ing]" federal-officer-removal statute); *Yassan v. J.P. Morgan Chase & Co.*, 708 F.3d 963, 970 (7th Cir. 2013) (allowing removal after "an interlocutory order" before any state-court appeal); *Resol. Tr. Corp. v. Allen*, 16 F.3d 568, 572 n.4 (4th Cir. 1994) (FIRREA removal).

Thus, Supreme Court precedent and the language of the removal statutes all caution against the novel removal power claimed by the Board here.

### III.     This case is not among the "slim category" of cases arising under state law which are removable under 28 U.S.C. § 1441(a).

Other reasons also compel this Court to conclude that the Board improperly removed this action under 28 U.S.C. § 1441(a).  Most cases invoking removal under 28 U.S.C. § 1441(a) involve disputes where "federal law creates the cause of action asserted."  *Gunn v. Minton*, 568 U.S. 251, 257 (2013).  But here, neither Judge Griffin's petition nor his election protests arise under federal law.  *See* N.C. Const. art. IV, § 12(1); *State v. Allen*, 24 N.C. (2 Ired.) 183, 188-89 (1841); N.C. Gen. Stat. § 163-182.9.

The United States Supreme Court has nonetheless recognized a "special and small category" of cases in which courts have federal-question jurisdiction even though the petitioner's claim "finds it origins in state rather than federal law."  *Gunn*, 568 U.S. at 258 (explaining that this is a "slim category" of cases); *W. Va. State Univ. Bd. of Governors v. Dow Chem. Co.*, 23 F.4th 288, 307 (4th Cir. 2022) (same).  In this narrow class of cases, federal jurisdiction over a state law claim will lie if "a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress."  *W. Va. State Univ. Bd. of Governors*, 23 F.4th at 307 (quoting *Gunn*, 568 U.S. at 258).  But courts must be "cautious in exercising jurisdiction of this type, which lies at the outer reaches" of federal-question jurisdiction.  *Burrell v. Bayer Corp.*, 918 F.3d 372, 380 (4th Cir. 2019) (quoting *Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 810 (1986)).

Here, none of the federal questions raised in the Board's order satisfies all four of these requirements.  This Court therefore lacks jurisdiction.  *See W. Va. State Univ. Bd. of Governors*, 23 F.4th at 307 (explaining that all four requirements must be met for jurisdiction to be proper).

### A. None of the federal questions the Board asserts are "necessarily raised."

#### a. Judge Griffin's petition merely argues that the Board's invocation of federal law is insufficient to defeat his state-law claims.

To determine whether a federal question is "necessarily raised," federal courts apply the "well-pleaded complaint" rule. *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 9-10 (1983) (explaining that the rule "severely limits the number of cases in which state law 'creates the cause of action' that may be initiated in or removed to federal district court, thereby avoiding more-or-less automatically a number of potentially serious federal-state conflicts"); *Burrell*, 918 F.3d at 381 ("A federal question is necessarily raised for purposes of [federal question jurisdiction] only if it is a necessary element of one of the well-pleaded state claims" (cleaned up)). Under that rule, whether a case arises under federal law "must be determined from what necessarily appears in the plaintiff's statement of his own claim in the bill or declaration, unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose." *Franchise Tax Bd.*, 463 U.S. at 10 (quotations omitted). A federal court therefore "does not have original jurisdiction over a case in which the complaint presents a state-law cause of action, but also asserts . . . that a federal defense the defendant may raise is not sufficient to defeat the claim." *Id.*; *Anne Arundel Cnty. v. BP P.L.C.*, 94 F.4th 343, 351 (4th Cir. 2024) ("[T]o establish federal-question jurisdiction, it is *not* enough that federal law becomes relevant by virtue of a defense, even if it is anticipated in the plaintiff's complaint" (emphasis in original) (cleaned up)).

Here, all the federal questions the Board raises are merely defenses asserted to protect its decision to deny Judge Griffin's state-law election protests. To reiterate, Judge Griffin's petition and protests arise under state law. *Allen*, 24 N.C. at 188-89; N.C. Gen. Stat. § 163-182.9. And none of the relief that Judge Griffin has requested either in his election protests or in his petition

has as "an element"—"and an essential one" at that—a "right or immunity created by the Constitution or laws of the United States." *Franchise Tax Bd.*, 463 U.S. at 10-11 (quotation omitted); *see* D.E. 1-5 at 10-36.

None of Judge Griffin's protests mention federal law. *See N.C. Dem. Party v. N.C. State Bd. of Elecs.*, No. 5:24-cv-699 (E.D.N.C.) D.E. 1-2, 1-3, 1-4 (protests). And to the extent Judge Griffin's petition mentions federal law at all, it does so only to rebut the Board's (erroneous) invocation of those laws as defenses to defeat his state-law claims. To reiterate, the Board's order denied each of Judge Griffin's protests on state-law grounds. D.E. 1-5 at 46-80. As alternative reasons for denying each of those protests, however, the Board stated that it would have violated various federal laws if it had sustained his protests. *Id.* Although Judge Griffin's petition primarily focuses on why the Board erred in its application of state law when it denied his protests, it also discusses each of the federal laws the Board invoked, but only to explain why the Board's appeals to those federal defenses are insufficient to defeat his state-law claims. *Id.* at 40-46, 59-60, 67-74; *see also Franchise Tax Bd.*, 463 U.S. at 10 (explaining that where a plaintiff's complaint merely explains that a "federal defense . . . is not sufficient to defeat" his state-law claims, that does not provide a federal court with federal-question jurisdiction); *id.* at 13 ("[F]ederal law becomes relevant [here] only by way of a defense to an obligation created entirely by state law, and then only if [petitioner] has made out a valid claim for relief under state law. The well-pleaded complaint rule was framed to deal with precisely such a situation." (quotation omitted)); *Anne Arundel Cnty.*, 94 F.4th at 351.

What's more, the Board's characterizations of Judge Griffin's discussions of federal law clearly show they are raised as defenses. The Board says the petition seeks a decision from the North Carolina Supreme Court "*rejecting* all arguments under the NVRA, HAVA, the VRA, and

the Civil Rights Act, as well as under the federal constitution that would *bar* [Judge Griffin's] requested relief." D.E. 39 at 11 (emphasis added) (cleaned up); *see id*. at 13 ("The petition specifically requests a judicial decree . . . that its requested relief *does not violate* four federal statutes.").

Judge Griffin's references to federal law in his petition are therefore insufficient to provide this court with subject-matter jurisdiction under 28 U.S.C. § 1441.

### b. None of Judge Griffin's claims "hinges" on the determination of a federal issue.

All these federal questions also are not "necessarily raised" for a separate reason. To "necessarily raise a federal issue, a state law claim must hinge on the determination of a federal issue." *W. Va. State Univ. Bd. of Governors.*, 23 F.4th at 307 (quoting *Burrell v. Bayer Corp.*, 918 F.3d 372, 383 (4th Cir. 2019)). That is, the "federal issues must be 'essential to resolving [the] state-law claim.'" *Id.*

Here, none of Judge Griffin's election protests hinges on a determination of federal law. Indeed, each of his protests alleged violations only of *state* law. Specifically, those protests asked the Board (and by extension on review, the North Carolina Supreme Court) to correct the vote count in his election because numerous individuals cast ballots without satisfying the state's legal registration, residency, and photo identification requirements, which are set out in the North Carolina Constitution and the General Statutes. N.C. Const. art. VI, §§ 2(1), (4), 3(2); N.C. Gen. Stat. §§ 163-82.4(a)(11), 163-231(b)(1), 163-230.1(a)(4), (b)(4), (e)(3), (f1); § 163-166.16(a).

The Board acknowledges that Judge Griffin has brought "only state-law claims" but erroneously asserts that those claims "necessarily" raise federal-law issues. D.E. 39 at 10-11.

First, the Board contends that "[d]eciding whether . . . voters were properly registered necessarily requires this Court to construe HAVA," *id.* at 11, but a court can and should decide

Judge Griffin's state-law claim without interpreting HAVA at all. Judge Griffin's claim expressly asserts a violation of "state law." D.E. 1-4 at 33. Indeed, Judge Griffin's petition affirmatively disclaims any reliance on HAVA. *See id.* at 40 ("HAVA and NVRA have nothing to do with this case"). The fact that North Carolina's statute contains provisions substantively similar to HAVA's provisions does not transform the interpretation of a North Carolina law into a federal issue. *See Nicholson v. City of Gary*, No. 2:18-cv-257, 2020 WL 2744286, at *6 (N.D. Ind. May 27, 2020) (remanding to state court and rejecting the defendant's argument "that a decision based on [a state statute] also necessarily raises a federal issue because the language in [the state statute] is substantially similar to language in" a federal statute); *Childers v. Cynosure, Inc.*, No. CV 12-67-ART, 2012 WL 13026974, at *3 (E.D. Ky. Oct. 30, 2012) ("If a state-law claim requires a plaintiff to prove a set of facts that would also prove a similar, but not raised, federal-law claim, the case will not turn on an issue of federal law.").

The Board's reliance on *Republican National Committee v. North Carolina Board of Elections* does not help it. 120 F.4th 390 (4th Cir. 2024) ("*RNC*"). In that case, the court could not decide the state-law claim without interpreting HAVA because the state law allegedly violated in that case "does nothing more than require the State Board to 'meet the requirements of [S]ection 303(a) of [HAVA].'" *RNC*, 120 F.4th at 401 (quoting N.C. Gen. Stat. § 163-82.11(c)). In this case, by contrast, the state statutory provision that the Board violated—though setting out similar requirements to those required by HAVA—establishes its own rule without incorporating HAVA by reference. *See* N.C. Gen. Stat. § 163-82.4(a)(11) (requiring a form to "request the applicant's . . . Drivers license number or . . . the last four digits of the applicant's social security number"). And as explained above, and unlike the plaintiffs in *RNC*, Judge Griffin does not allege that the

Board "violated HAVA and, as a result, state law." *RNC*, 120 F.4th at 399. That case is therefore inapposite here.

Second, the Board claims that applying North Carolina law to "overseas voters who did not include a copy of a photo ID" will require interpretation of "a federal statute: UOCAVA," but that elides the key distinction between that federal statute and the state law underlying Judge Griffin's claim. D.E. 39 at 12. Again, Judge Griffin expressly brought a claim under North Carolina law. *See* D.E. 1-4 at 53 ("State law requires these voters to submit photo identification . . . ."). That state law does not incorporate UOCAVA by reference. On the contrary, it sets its own substantive rule. *See, e.g.*, N.C. Gen. Stat. § 163-230.1(e)(3) (listing failure "to include . . . a photocopy of identification . . . or an affidavit" as "a curable deficiency"). That is why Judge Griffin could expressly disclaim any reliance on federal law for this claim, too. *See* D.E. 1-4 at 59 ("[F]ederal law has no application here.").

The Board insists that federal law is relevant because *other* provisions of North Carolina law—not the ones the Board is being sued for violating—refer to UOCAVA, *see* D.E. 39 at 12, but that is irrelevant to removal jurisdiction. The Board can raise those issues as a potential (and meritless) defense to Judge Griffin's claim, but (as explained above) "to establish federal-question jurisdiction, it is *not* enough that federal law becomes relevant by virtue of a defense, even if it is anticipated in the plaintiff's complaint." *Anne Arundel Cnty.*, 94 F.4th at 351 (emphasis in original) (cleaned up).

Finally, the Board argues that Judge Griffin sought "a judicial decree declaring that [his] requested relief does not violate" federal law, but that is both wrong and irrelevant. As an initial matter, Judge Griffin did not request a declaratory judgment about the meaning of federal law. The relief Judge Griffin sought was for the North Carolina Supreme Court "to issue a writ of prohibition

to stop the State Board of Elections from counting unlawful ballots cast in the 2024 general election." D.E. 1-4 at 14.  To be sure, Judge Griffin asked the Court "[i]n the interests of finality and expediency" to address various legal issues through its "hold[ings]," D.E. 1-4 at 83, but the fact that Judge Griffin (correctly) anticipated the Board's defenses and asked the North Carolina Supreme Court to reject them has no bearing on federal jurisdiction.  Moreover, even if Judge Griffin had sought a declaratory judgment about the meaning of federal law, that still would not support federal jurisdiction here. When analyzing federal-question jurisdiction over a declaratory-judgment suit, courts "must conceptualize a world where declaratory judgment actions do not exist and then theorize the coercive suit that would have arisen between the same parties in such a reality." *Capitol Broad. Co., Inc. v. City of Raleigh*, 104 F.4th 536, 540 (4th Cir. 2024).  Only "if *that* suit would satisfy the well-pleaded complaint rule, then the overarching declaratory judgment action does too." *Id.*  Here, identifying the relevant coercive suit is easy; it is the suit the Judge Griffin actually brought: election protests under state law challenging unlawful ballots. And that suit does not satisfy the well-pleaded complaint rule for all of the reasons identified above.  The Board's argument about declaratory relief adds nothing to the analysis.

Thus, the state-election laws undergirding Judge Griffin's protests are not "state cause[s] of action in name only," *RNC*, 120 F.4th at 401; rather, they impose freestanding requirements with which individuals must comply for their votes to be counted in a state election.  Hence, the "federal issues" raised by the Board are not "essential to resolving" Judge Griffin's claims. *W. Va. State Univ. Bd. of Governors.*, 23 F.4th at 307.  They are therefore not "necessarily raised" here.  *Id.*

### B.  Neither the applicability of the Civil Rights Act nor the Voting Rights Act is "actually disputed."

Federal issues are "actually disputed" only when "the parties disagree about the effect of federal law." *Mayor & City Council of Balt. v. BP P.L.C.*, 31 F.4th 178, 209 (4th Cir. 2022).  Here,

the Board's order expresses no disagreement with Judge Griffin's position that neither the Civil Rights Act nor the Voting Rights Act applies to this case. *See* D.E. 1-5 at 41-80. Although Justice Riggs raised arguments regarding both those provisions before the Board when it was considering Judge Griffin's protests, the Board did not determine that those laws apply here. *See id.* Judge Griffin only mentioned those provisions in his petition in anticipation of defenses Justice Riggs raised before the Board. *See* D.E. 1-4 at 67-69 (pointing out that Justice Riggs raised these arguments before the Board). In response to the Court's Show Cause Order, the Board does not argue that these issues are disputed. *See* D.E. 39 at 13. Absent disagreement between the Board's order and Judge Griffin's petition, the inapplicability of those laws to his protests is not an issue that is "actually disputed" here. *Mayor & City Council of Balt.*, 31 F.4th at 209.

### C. There is no "substantial" federal interest in this case because the federal questions the Board raises are meritless, require fact-bound determinations, or are governed by clear federal precedent.

A federal court may only exercise jurisdiction over the federal questions in a case if they are "substantial," meaning that they are important "to the federal system as a whole." *Gunn*, 568 U.S. at 260 (explaining that "it is not enough that the federal issue be significant to the particular parties in the immediate suit; that will *always* be true when the state claim necessarily raises a disputed federal issue" (cleaned up)). The substantiality requirement is a "high bar," even where the federal issue "would otherwise be within the exclusive jurisdiction of federal courts." *Friedler v. Stifel, Nicolaus, & Co.*, 108 F.4th 241, 247 (4th Cir. 2024).

Here, the Board cannot satisfy that standard for several reasons. First, where a party invokes federal law "solely for the purpose of obtaining jurisdiction," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89-90 (1998), or where the federal issues raised are "obviously without merit," those issues are per se insubstantial, *Hagans v. Lavine*, 415 U.S. 528, 537 (1974); *see* 13D

Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 3564 (3d ed. Westlaw 2024). Here, after the Board denied Judge Griffin's protests on state-law grounds, it invoked the NVRA, HAVA, and UOCAVA as alternative reasons to justify its decision. But those statutes are clearly inapplicable to this case.

Judge Griffin's petition and protests are limited to challenging the votes of individuals who cast ballots in a *state* election in which he ran as a candidate. D.E. 1-4. But the plain text of the NVRA, HAVA, and UOCAVA clearly indicates that they apply only to *federal* elections. *See* 52 U.S.C. §§ 21081(a), 21083(A)(1)(a)(viii) (HAVA); *id.* §§ 20302 (a)(1)-(3), (6)-(8), (b)(1), (c) (UOCAVA); *id.* §§ 20507(a), (c)(2) (NVRA). Indeed, Congress passed these statutes under its Elections Clause power, which permits it to prescribe rules only for federal elections, so applying these statutes to a state election (like the one at issue here) would not pass constitutional muster. *See, e.g.*, U.S. Const. art. I, § 4, cl. 1; *Moore v. Harper*, 600 U.S. 1, 10 (2023); *Arizona v. Inter Tribal Council of Am., Inc.*, 570 U.S. 1, 15 (2013); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008).

Moreover, had the Board granted Judge Griffin the relief he requested, that would have resulted only in a correction to the vote count for his state election, not to the removal of any voters from the voter rolls for federal and state elections. *See* D.E. 1-5 at 31; N.C. Gen. Stat. § 163-182.10(d)(2)(e)(1)-(2); *Bouvier v. Porter*, 386 N.C. 1, 4 (2024) (indicating that a successful election protest cannot result in anyone being removed from the voter rolls, but only in the correction of inaccurate results or a recount). But the NVRA and HAVA only prohibit the latter, *i.e.*, voter-list maintenance insofar as it relates to registrations for federal elections, not the former. 52 U.S.C. § 20507(a)(3), (c); *id.* § 21083(a)(2)(B). The Board and Intervenors attempt to equate the two, arguing that this is a "distinction without a difference" for purposes of these federal

statutes.  D.E. 42 at 28.  But the case the parties cite involved challenges to voter eligibility in both

state and *federal* elections.  *See Majority Forward v. Ben Hill Cnty. Bd. of Elecs.*, 512 F. Supp.

3d 1354, 1368 (M.D. Ga. 2021) (recognizing that the NVRA applies to "elections for *federal*

office" and stating that the NVRA "prohibits states from removing voters from registration lists

within ninety days of a primary or general election for *federal* office" (emphasis added)); D.E. 1-

5 at 66; D.E. 42 at 28.  It is therefore inapposite here.

The Board also reasoned that if it were to apply state law in the manner Judge Griffin had

asked, it would have applied a "newly announced rule of law" to this election, in violation of the

Fourteenth Amendment's substantive-due-process doctrine.  D.E. 1-5 at 72, 79 (citing nothing in

support).  But that reasoning, too, is without merit.

The provisions of state law at issue here were on the books well before the November 2024

general election.  N.C. Const. of 1776, art. VIII; N.C. Const. art. VI, §§ 2(1), (4), 3(2); N.C. Gen.

Stat. §§ 163-82.4(a)(11), 163-231(b)(1), 163-230.1(a)(4), (b)(4), (e)(3), (f1).  Simply put, the

Board gets the chronology backwards.  And here, if the North Carolina Supreme Court (or this

Court) determines that Judge Griffin's interpretation of the state laws at issue is correct, that would

simply mean that the ballots he has challenged cannot be counted under laws which had been in

force for years preceding the November 2024 election.  Such a decision would not announce "new

principle of law," but rather would apply the "law prevailing at the time" of the election.  *Am.*

*Trucking Ass'ns, Inc. v. Smith*, 496 U.S. 167, 180, 191-93 (1990).  Indeed, for all these reasons,

this is not a case in which Judge Griffin is attempting to apply state laws to "conduct antedating

[their] enactment."  *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269 (1994).  This observation

fatally flaws the Board's substantive-due-process reasoning on this point.

Thus, the Board's invocation of the NVRA, HAVA, UOCAVA, as well as the Fourteenth Amendment's substantiative-due-process doctrine are clearly "without merit," and appear to have been made solely for the purposes of obtaining federal jurisdiction. *Lavine*, 415 U.S. at 534; *Steel Co.*, 523 U.S. at 89-90. For those reasons, any federal questions raised by the Board regarding those provisions are insubstantial.

Second, "fact-bound and situation-specific" questions of federal law ordinarily do not satisfy the substantiality requirement. *Burrell*, 918 F.3d at 385. Here, after denying Judge Griffin's protests for a purported failure to satisfy state regulatory and statutory notice and service requirements, the Board alternatively held that Judge Griffin had failed to comport with the Fourteenth Amendment's procedural-due-process requirements. D.E. 1-5 at 51-54. But that question is considerably fact-bound. By way of brief background, Judge Griffin notified individuals that his protests affected their votes by sending them postcards containing QR-code links to his protest filings. *Id.* at 48. The Board, however, held that those postcards did not provide sufficient notice to those individuals under the Fourteenth Amendment. But, as the Board pointed out in its order, that question requires an assessment whether: (1) voters considered the postcards "junk mail"; (2) voters were able to use the QR codes on the postcards to view the protest filings; (3) the postcards informed voters which candidates were challenging their votes; and (4) voters could effectively locate their names in the protest filing spreadsheets, among others. *See* D.E. 1-5 at 45-51.

The Board's separate appeal to substantive due process is also considerably fact bound. There, the Board argues that insofar as individuals cast unlawful ballots because the Board did not instruct them to comply with state law, it would violate the Fourteenth Amendment to ignore those ballots when deciding the election. *See id.* at 63-65. As an initial matter, this is not a situation in

which an election official's error prevented eligible voters from casting their ballots. Rather, this is an instance in which, after the Board decided to not inform individuals of certain requirements, the individuals' ignorance of those requirements resulted in them failing to take the steps necessary to become eligible voters. But, in this situation, it is not unconstitutional to require the public to be as knowledgeable of election laws as other laws. More to the point, a determination whether the Board instructed individuals to ignore the various state-law requirements at issue here would require an extensive consideration of exactly what instructions the Board gave those individuals. *See id.* at 64.

Resolution of these fact-bound questions "is not substantial in the relevant sense because it lacks importance more generally" to the federal system as whole. *Burell*, 918 F.3d at 385 (cleaned up). Thus, these federal questions are also insubstantial.

Third, where "state courts can be expected to hew closely to the pertinent federal precedents," that counsels against finding that the federal questions in a case are substantial. *Gunn*, 568 U.S. at 262. Here, there is no reason to suspect that the North Carolina Supreme Court will not follow federal precedents when interpreting the federal statutes or constitutional provisions raised by the Board. Additionally, to the extent that any of the federal issues purportedly raised in this case are "novel," they will "at some point be decided by a federal court." *Id.* (explaining that "[i]f the question arises frequently, it will soon be resolved within the federal system, laying to rest any contrary state court precedent; if it does not arise frequently, it is unlikely to implicate substantial federal interests"). What's more, any decision regarding those issues here will be subject to immediate review by the United States Supreme Court, the ultimate arbiter of these questions within the federal system. 28 U.S.C. § 1257(a). And that Court is the only one with

appellate jurisdiction over the North Carolina Supreme Court.  *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291-92 (2005).

That this case involves a state—and not a federal election—only buttresses the conclusions above that none of the federal questions the Board attempts to raise are substantial.  In *RNC*, the Fourth Circuit explained that a state court's ruling on the issues presented there "could very much change how *federal* law is enforced for this *federal* election and in future elections."  *RNC*, 120 F.4th at 404 ("Where the answer to a question of federal law could potentially determine whether nearly a quarter-of-a-million voters may have their ballots counted in a *federal* election, it is one of substantial federal importance." (emphasis added)).  But with this challenge to the results of a state election under state law, that is emphatically not the case.

For all these reasons, the Board cannot satisfy the "high bar" of showing that the federal issues implicated here are "substantial."  *Friedler*, 108 F.4th at 247.

### D. Retaining federal jurisdiction over this dispute regarding a state election would fundamentally upset the "federal-state balance."

The final *Gunn* factor asks courts to consider whether exercising federal jurisdiction would "disrupt[] the federal-state balance approved by Congress" and upset our federal system's delicate "balance of federal and state judicial responsibilities."  *Gunn*, 568 U.S. at 258, 262.  This factor requires courts to consider whether maintaining jurisdiction over the federal questions will "attract[] a horde of original filings and removal cases raising other state claims" or "portend only a microscopic effect" on "the normal currents of litigation."  *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 315, 318-19 (2005).

"[G]enerally, federal courts review federal agencies and state courts review state agencies."  *Kirkpatrick v. Lenoir Cnty. Bd. of Educ.*, 216 F.3d 380, 386 (4th Cir. 2000).  Maintaining that balance is particularly appropriate here because Judge Griffin's election protests are based on

violations of North Carolina's Constitution and its General Statutes.  To be sure, after the Board denied his protests based on erroneous interpretations of those state laws, it raised a slew of federal defenses as alternative grounds to justify its decision.  *See generally* D.E. 1.  But if the Court chooses to maintain jurisdiction here, that will only incentivize the Board and candidates to repeat the same tactic in every future decision regarding an election protest—which are not rare in North Carolina—brought under state law.  *Cf.* D.E. 39 at 14.  And that will necessarily attract a "horde" of "removal cases" raising other state election law claims, upsetting the federal-state balance which commits such claims to the state courts.  *Grable*, 545 U.S. at 318.

More to the point, concerns about the federal-state balance are particularly pronounced in this case, given that states have a "special responsibility" to regulate their elections.  *Gunn*, 568 U.S. at 264.  Indeed, the "conduct of elections" for state offices is a "matter committed primarily to the control of states."  *Hutchison v. Miller*, 797 F.2d 1279, 1280 (4th Cir. 1986); *see Clingman v. Beaver*, 544 U.S. 581, 586 (2005) ("The Constitution grants States broad power to prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives,' which power is matched by state control over the election process for state offices."  (citation omitted)); *Welch v. McKenzie*, 765 F.2d 1311, 1317 (5th Cir. 1985) (explaining that under our federal system, "states are primarily responsible for regulating their own elections").

Further, federal district courts do not generally intervene to instruct state officials to follow state election law.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) ("A federal court's grant of relief against state officials on the basis of state law . . . does not vindicate the supreme authority of federal law.  On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law"); *Democracy N.C. v. N.C. State Bd. of Elections*, No. 1:20CV457, 2020 WL

6383222, at *7 (M.D.N.C. Oct. 30, 2020) ("In the absence of a continuing federal violation, any order by this court that the [North Carolina State Board of Elections] conform their conduct with state laws is precisely the conduct the Supreme Court forbids . . . .").

It is also "fundamental" that state courts should be "left free and unfettered by [federal courts] in interpreting their state constitutions." *Minnesota v. Nat'l Tea Co.*, 309 U.S. 551, 557 (1940). Usurping that role from the North Carolina Supreme Court would "disregard[] principles of federalism" and "denigrate[] the state's authority to fashion independent constitutional law." *Carpenter v. Wichita Falls Indep. Sch. Dist.*, 44 F.3d 362, 367 (5th Cir. 1995). Moreover, the state constitutional provision at issue here—regarding the state's bona fide residency requirement—has no analog in the federal constitution. *Cf. Blankenship v. Bartlett*, 363 N.C. 518, 522 (2009) (indicating that the North Carolina Supreme Court generally follows the analysis of the Supreme Court when interpreting state constitutional provisions that have federal counterparts). Ultimately, it is the North Carolina Supreme Court—and not the federal courts—which possesses "independent authority to interpret state constitutional provisions" thereby reflecting "the unique role of state constitutions and state courts within our system of federalism." *State v. Kelliher*, 381 N.C. 558, 580 (2022).

For all these reasons, permitting federal jurisdiction here would disrupt the federal-state balance.

\* \* \*

The Board cannot meet its burden to show that removal is appropriate under 28 U.S.C. § 1441. This Court should therefore remand the case to the North Carolina Supreme Court.

## IV.    This case is not removable under 28 U.S.C. § 1443(2).

The second removal statute the Board cites is the "refusal" clause in 28 U.S.C. § 1443(2), but it does not support removal either. *See* D.E. 1 ¶ 5

First, the Board cannot remove under section 1443(2) because it is not being sued "for refusing to act."  28 U.S.C. § 1443(2).  A "state court action" is not removable when it "is not brought against the . . . Defendants 'for refusing to do' anything."  *Common Cause v. Lewis*, 358 F. Supp. 3d 505, 510 (E.D.N.C. 2019), *aff'd*, 956 F.3d 246 (4th Cir. 2020).  "[T]he distinction between a defendant's action versus inaction" is "[c]ritical."  *Suttlar v. Thurston*, No. 4:22-cv-368, 2022 WL 2713648, at *5 (E.D. Ark. July 13, 2022).  "[T]he 'refusal to act' clause is unavailable where the removing party's *action*, rather than its *inaction*, is the subject of the state-court suit."  *City & Cnty. of S.F. v. Civil Serv. Comm'n of City & Cnty. of S.F.*, No. 3:02-cv-3462, 2002 WL 1677711, at *4 (N.D. Cal. July 24, 2002) (emphasis in original).

This case is about the Board's threat to take action, not any refusal to take action.  That is why Judge Griffin is seeking "a writ of prohibition to stop the State Board of Elections from counting unlawful ballots," not a writ of mandamus compelling the Board to take actions it has refused to take. D.E. 1-4 at 14.  Under North Carolina law, "[t]he writ of prohibition is the converse of mandamus.  It prohibits action, while mandamus compels action."  *State v. Whitaker*, 19 S.E. 376 (N.C. 1894).  The fact that Judge Griffin seeks a writ of prohibition, and not a writ of mandamus, establishes that his suit against the Board is not based on any refusal to act.  *See Common Cause*, 358 F. Supp. 3d at 511 (holding the refusal clause did not apply because

"Plaintiffs' prayer for injunctive relief" sought "to enjoin defendants from" acting and did "not seek an injunction compelling the Legislative Defendants to act").

"[T]he 'refusal' clause is unavailable in this case" because "the defendants' actions, rather than their inaction, are being challenged." *Mass. Council of Const. Emp., Inc. v. White*, 495 F. Supp. 220, 222 (D. Mass. 1980). The fact that Judge Griffin is challenging "an affirmative order" rather than "a failure to act" "is dispositive." *City & Cnty. of S.F.*, 2002 WL 1677711, at *4.

Second, removal under Section 1443(2) was improper because there is no colorable argument that Judge Griffin's request for relief is inconsistent with federal law. "If no colorable conflict between state and federal law exists then removal is improper." *Alonzo v. City of Corpus Christi*, 68 F.3d 944, 946 (5th Cir. 1995). This "is to be tested objectively; defendants cannot simply assert an unsupportable subjective belief that they are being asked to violate federal law." *Taylor v. Currie*, 386 F. Supp. 2d 929, 936 (E.D. Mich. 2005). "The defendant bears the burden of establishing its right to removal under § 1443," including pleading "a factual basis for § 1443 removal." *Charter Sch. of Pine Grove, Inc. v. St. Helena Par. Sch. Bd.*, 417 F.3d 444, 448 (5th Cir. 2005). Asserting a conflict with federal law "only in conclusory fashion" "is insufficient." *Id.*

In this case, the Notice of Removal includes no substantive allegations explaining the alleged conflict state law and federal law. It does not even argue that a conflict truly exists. Its only allegation on this topic is about the *basis* for the Board's supposed refusal, not the *legitimacy* of that basis. The Board alleges that, "[t]o the extent Defendant has indeed refused to take certain actions, its refusal was based on its obligation to comply with" certain provisions of federal law. D.E. 1 ¶ 4. The Notice of Removal does not substantively support any colorable argument for a conflict between federal and state law.

In any event, there is no colorable argument that Judge Griffin asked the Board to violate federal law. The Board claims in its Notice of Removal that Judge Griffin is seeking relief for the Board's refusal to act inconsistently with NVRA as well as 52 U.S.C. §§ 10101(a)(2) and 10307(a). D.E. 1 ¶ 5.[2] As an initial matter, the Board mentioned neither section 10101(a)(2) nor 10307(a) in its order as reasons for denying Judge Griffin's protests. *See* D.E. 1-5 at 41-80. Nor does the Board make any argument for why removal is justified under section 10101(a)(2) in its response to the Court's Show Cause order. *See* D.E. 39 at 14-17.[3] In any event, as for section 10307(a), the Board says that statute prohibits officials from failing to tabulate, count, and report the votes of individuals who were "qualified" to vote in the election. *See id.* at 16-17. But that statute cannot justify the Board's actions here because none of the individuals whose ballots Judge Griffin challenges were qualified to vote since they failed to comply with state-law voting and registration requirements. And as for the NVRA, that statute is both inapplicable to a state election, like the one challenged here, and only prohibits voter-list maintenance, something that Judge Griffin has not requested as relief in this case. *See supra* Section III.

## CONCLUSION

For the foregoing reasons, Judge Griffin respectfully requests that the Court remand this case to the North Carolina Supreme Court.

---

[2] The Board also maintains in its response to the Court's Show Cause order that removal is appropriate under the Equal Protection Clause. D.E. 39 at 17. But the Board does not cite that as a reason for refusing to act in its order. *See* D.E. 1-5 at 41-80. It therefore cannot rely on that provision to justify removal here. More to the point, all the Board's constitutional arguments are subject to *Pullman* abstention. *See supra* Section I.

[3] One of the Intervenors, in their response, asserts that sustaining Judge Griffin's claims would violate section 10101(a)(2) because providing a drivers license or Social Security number are immaterial requirements. D.E. 42 at 30. But requiring voters to submit information like this—designed to confirm a voter's identity and to ensure voter integrity—render these requirements material. *See Vote.Org v. Callanen*, 89 F.4th 459, 489 (5th Cir. 2023).

Dated: January 3, 2025

Craig D. Schauer
41571 (NC)
Dowling PLLC
3801 Lake Boone Trial, Suite 260
919 529-3351
cschauer@dowlingfirm.com

Troy D. Shelton
48070 (NC)
Dowling PLLC
3801 Lake Boone Trial, Suite 260
919 529-3351
tshelton@dowlingfirm.com

W. Michael Dowling
42790 (NC)
Dowling PLLC
3801 Lake Boone Trial, Suite 260
919 529-3351
mike@dowlingfirm.com

Philip R. Thomas
N.C. State Bar No. 53751
Chalmers, Adams, Backer & Kaufman,
PLLC
204 N Person St.
Raleigh, NC 27601
Telephone: (919) 670-5185
pthomas@chalmersadams.com

*Local Rule 83.1(d) special appearance
forthcoming*

Respectfully Submitted,

*/s/ Mark M. Rothrock*
Mark Rothrock
56747 (NC)
LEHOTSKY KELLER COHN LLP
8513 Caldbeck Drive
Raleigh, NC  27615
(336) 416-3326
mark@lkcfirm.com

William T. Thompson*
24088531 (TX)
LEHOTSKY KELLER COHN LLP
408 W. 11st Street, 5th Floor
Austin, TX 78701
(512) 693-8350
will@lkcfirm.com

*Attorneys for Petitioner*

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.2(f)(2)</u>

I hereby certify that this Petitioner's Memorandum in Support of Motion to Remand is in compliance with Local Rule 7.2(f)(2), as the document contains no more than 30 pages.

<u>/s/ *Mark M. Rothrock*</u>
Mark M. Rothrock

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 3, 2025, I electronically filed the foregoing Petitioner's Memorandum in Support of Motion to Remand with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all parties.

<u>/s/ *Mark M. Rothrock*</u>
Mark M. Rothrock

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Case No. 5:24-CV-00724-M

JEFFERSON GRIFFIN,

    Plaintiff,

v.

NORTH CAROLINA STATE
BOARD OF ELECTIONS,

    Defendant,                                             ORDER

ALLISON RIGGS,

    Intervenor-Defendant, and

NORTH CAROLINA ALLIANCE
FOR RETIRED AMERICANS et al.,

    Intervenor-Defendants.

This matter comes before the court on Plaintiff Jefferson Griffin's ("Griffin") motion for preliminary injunction [DE 31]. In this removed state action, a sitting state court judge seeks a writ of prohibition (a form of judicial relief authorized by the state constitution) from the state supreme court that would enjoin the state board of elections from counting votes for a state election contest that were cast by voters in a manner allegedly inconsistent with state law. Should a federal tribunal resolve such a dispute? This court, with due regard for state sovereignty and the independence of states to decide matters of substantial public concern, thinks not. For that reason, the court abstains from deciding Griffin's motion under *Burford*, *Louisiana Power*, and their progeny and remands this matter to North Carolina's Supreme Court. *See Burford v. Sun Oil Co.*,

1

319 U.S. 315, 332 (1943); *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 29 (1959).

## I.    Introduction and Procedural History

Griffin is a Judge on North Carolina's Court of Appeals (the state's intermediate appellate court) and candidate for Seat 6 on North Carolina's Supreme Court (the state's court of last resort). DE 1-4 at 16.[1]  Griffin ran in the 2024 general election as a Republican against Allison Riggs ("Riggs"), the Democratic candidate who is currently a sitting Justice on the North Carolina Supreme Court. *Id.* at 17.  After a full count of votes, machine recount, and partial hand recount, the canvassed results show Riggs leading Griffin by 734 votes, but Defendant North Carolina State Board of Elections (the "State Board") has not yet certified the results.  *See* DE 32 at 3; DE 39 at 7.

Griffin indicates that he "became aware of numerous irregularities with ballots cast during the election." DE 32 at 3.  As a result, he "filed election protests" with county boards of election "in each of North Carolina's 100 counties." DE 1-4 at 18.  Three protests are the subject of this action:

1.  First, Griffin challenges the votes of over 60,000 individuals who, at some point over the past 20 years, registered to vote in North Carolina without providing either their driver's license numbers or the last four digits of their social security numbers. *Id.* at 19.  According to Griffin, this past registration error contravenes state law and renders illegitimate the resulting votes from these individuals. *See id.* (citing N.C.G.S. §§ 163-82.1 & 163-82.4 for proposition that "unless someone is lawfully registered to vote, he cannot vote").

---

[1] All pin cites to materials in the record will refer to the page numbers that appear in the footer appended to those materials upon their docketing in the CM/ECF system, and not to any internal pagination.

2

2. Second, Griffin challenges absentee ballots cast by 267 individuals who admittedly have never resided in North Carolina (or anywhere in the United States). *Id.* at 20. Notwithstanding state law granting this group of individuals (whose parents are either uniformed-service or overseas voters) the right to vote in North Carolina, *see* N.C.G.S. § 163-258.2(e), Griffin asserts that counting their votes violates the North Carolina Constitution, DE 1-4 at 19-20.

3. Third, Griffin challenges the votes of approximately 5,500 overseas absentee voters who did not provide copies of their photo identification with their absentee ballots, which he contends violates state law. *Id.* at 20-21; *see also* N.C.G.S. § 163-230.1.

The State Board subsequently assumed jurisdiction over Griffin's three protests. *Id.* at 21. After a public hearing on December 11, 2024, the State Board issued a written decision that rejected Griffin's challenges on various grounds:

1. The State Board concluded that Griffin failed to properly serve potentially affected voters because, instead of serving them with copies of his protests, he mailed them postcards with the message that their "vote may be affected by one or more protests" and a QR code that linked to a website containing the hundreds of protests ongoing in North Carolina, at which point the voter would have to sift through spreadsheets of names attached to each protest to determine whether their vote had been challenged and in which protest. DE 1-5 at 46-50. The State Board found that this method of service violated a rule that it had promulgated as well as the procedural due process rights of voters. *Id.* at 50-54.

2. The State Board found that even if it credited Griffin's state law arguments in connection with his first challenge, which targets the 60,000 voters who had allegedly

3

registered to vote without providing their driver's license numbers or the last four digits of their social security numbers, granting him relief by discarding that group of votes would violate the voters' substantive due process rights, state law, and federal statutory law, including the Help America Vote Act ("HAVA") and the National Voter Registration Act ("NVRA"). *Id.* at 60-67.

3. The State Board also rejected each of Griffin's challenges on its merits. *Id.* at 54-60, 69-79.

North Carolina law provides that a party aggrieved by a decision of the State Board "has the right to appeal the final decision to the Superior Court of Wake County within 10 days of the date of service" of the State Board's decision. N.C.G.S. § 163-182.14(b). "Unless an appealing party obtains a stay of the certification from the Superior Court of Wake County within 10 days after the date of service," the election results "shall issue." *Id.* Rather than follow the appeal process provided by state law, Griffin filed this action directly in the North Carolina Supreme Court, seeking a writ of prohibition that would enjoin "the State Board [] from counting unlawful ballots cast in the 2024 general election." DE 1-4 at 14.

In his petition for a writ of prohibition, Griffin addresses his three challenges on their merits, each of which entail alleged violations of either state election law or the state Constitution. *See id.* at 33-40, 44-45, 47-50, 53-59. Griffin next argues that the State Board and Riggs' invocation of various federal laws in defense to his challenges are inapposite. *Id.* at 40-46, 50-51, 59-60, 67-74. He also responds to the procedural defects raised by the State Board. *Id.* at 60-67.

Griffin seeks various forms of relief, including the discarding of votes from voters covered by each of his three challenges and declaratory relief rejecting various conclusions of the State Board. *Id.* at 83-84. He sought this relief directly from the North Carolina Supreme Court, rather

4

than file an appeal in the Superior Court of Wake County, because of his concern that the State Board would "try to strip [that court] of jurisdiction to decide this case by improperly removing it to federal court." *Id.* at 24. The day after Griffin filed his petition, the State Board removed it to this court. DE 1.

In its notice of removal, the State Board invokes this court's subject-matter jurisdiction under 28 U.S.C. § 1441(a), which permits removal of claims arising under federal law, and 28 U.S.C. § 1443(2), which authorizes removal when a party has been sued for refusing to act on the ground that performing the act would contravene federal civil rights law. *Id.* at 1-2. The day after the State Board removed this matter to federal court, Griffin filed a motion for temporary restraining order ("TRO"), which sought a court order prohibiting the certification of the results for Seat 6. DE 13; DE 14. This court denied Griffin's motion because the alleged harm he described was not so immediate that he required a TRO "before [the State Board could] be heard in opposition." Text Order dated December 20, 2024.

Riggs promptly sought intervention in this matter and, after denial of the TRO, so did the North Carolina Alliance for Retired Americans, VoteVets Action Fund, Tanya Webster-Durham, Sarah Smith, and Juanita Anderson (the "NCARA parties"). DE 7; DE 8; DE 24; DE 25. The court granted both motions for intervention. *See* Text Order dated December 26, 2024.

On December 23, Griffin filed the instant motion for preliminary injunction, along with a consent motion to expedite briefing on the preliminary injunction motion. DE 31; DE 33. The court granted the consent motion and ordered expedited briefing, and additionally ordered the State Board, in responding to Griffin's motion, to show cause why this matter should not be remanded to the North Carolina Supreme Court for lack of subject-matter jurisdiction. *See* Text Order dated

5

December 26, 2024. The court also offered Griffin the opportunity to respond to the State Board's arguments regarding subject-matter jurisdiction in his reply. *Id.*

All parties complied with the court's briefing schedule. DE 39; DE 40; DE 42; DE 47; DE 48; DE 49.[2] In addition, Former Senate Majority Leader Thomas Daschle, former House Majority Leader Richard Gephardt, and former Representatives Christopher Shays, Jim Greenwood, Robert Wexler, Wayne Gilchrest, and Steve Israel (the "Former Members of Congress") moved the court for leave to file an amicus brief, DE 37, as did the North Carolina League of Women Voters, DE 41. The court grants those motions for leave, has considered the respective briefs, and notes the extent to which they aided in the court's decisional process.

Unless this court (or another) issues an order enjoining the State Board from certifying the election for Seat 6, those results will issue on January 10, which will render moot Griffin's protests. *See* DE 39 at 2. Griffin's motion for preliminary injunction is fully briefed, the court has considered each filing, and this matter is ready for disposition.[3]

## II.    Legal Framework

This matter, which involves a state, not federal, election, involves potential practical implications but a crucial theoretical distinction, which has in turn led some of the parties (and amici) to at times conflate what precisely is at issue. In the context of a federal election, the States and Congress enjoy dual sovereignty. U.S. CONST. art 1 § 4, cl. 1. The "States have a major role to play in structuring and monitoring the [national] election process." *California Democratic Party v. Jones*, 530 U.S. 567, 572 (2000). They must "prescribe the time, place, and manner of

---

[2] In lieu of incorporating his arguments pertaining to subject-matter jurisdiction into his reply, DE 47, Griffin separately filed a motion to remand (and supporting memorandum), DE 48; DE 49. For practical purposes, the court considers these as one filing, and not a new motion to which the State Board must be offered an opportunity to respond, because the State Board has already briefed its position on subject-matter jurisdiction in response to the court's show cause order. DE 39.

[3] Considering the short timeline between now and certification, as well as the lack of factual disputes presented by this matter, the court finds that a hearing is not necessary.

6

electing Representatives and Senators" for the national Congress. *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 8 (2013). But this grant of authority to States for federal elections only goes "so far as Congress declines to preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997).

Elections for state office are different because "the Constitution was also intended to preserve to the States the power that even the Colonies had to establish and maintain their own separate and independent governments, except insofar as the Constitution itself commands otherwise." *Oregon v. Mitchell*, 400 U.S. 112, 124 (1970) (opinion of Black, J.). Put another way, "Article I, Section IV does not give Congress the power to directly regulate state voter registration procedures in state elections or state ballot issues." *Dobrovolny v. Nebraska*, 100 F. Supp. 2d 1012, 1028 (D. Neb. 2000). And "[a]bsent the invocation by Congress of its authority under the Fourteenth [or Fifteenth] Amendment[s]," the states retain "the power to fix the time, place, and manner of the election of [their own] officials." *Voting Rts. Coal. v. Wilson*, 60 F.3d 1411, 1415 (9th Cir. 1995). Due respect for States' authority to set forth rules governing their own elections reflects the constitutional (and commonsense) principle that "[n]o function is more essential to the separate and independent existence of the States and their governments than the power to determine within the limits of the Constitution . . . the nature of their own machinery for filling local public offices." *Mitchell*, 400 U.S. at 125 (opinion of Black, J.).[4]

Pursuant to its authority under the Civil War Amendments, Congress has passed laws that apply in the context of *both* state and federal elections, including the Civil Rights Act and the Voting Rights Act. 52 U.S.C. § 10101; 52 U.S.C. § 10301. Congress has also enacted a series of

---

[4] Of course, state regulation of state and local elections remains subject to federal constitutional constraints. *E.g.*, *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 451 (2008); *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 215 (1986).

7

laws that govern *only* federal elections, notably here the NVRA and HAVA. 52 U.S.C. § 20501; 52 U.S.C. § 21081. "The NVRA requires States to provide simplified systems for registering to vote in *federal* elections, i.e., elections for federal officials, such as the President, congressional Representatives, and United States Senators." *Young v. Fordice*, 520 U.S. 273, 275 (1997) (emphasis in original). Likewise HAVA, which seeks to establish minimum standards of election administration, "applies only to federal elections." *Bay Cnty. Democratic Party v. Land*, 347 F. Supp. 2d 404, 436 (E.D. Mich. 2004); *accord Broyles v. Texas*, 381 F. App'x 370, 373 n.1 (5th Cir. 2010).

After passage of HAVA, North Carolina's General Assembly enacted a series of laws to implement HAVA and adopt equivalent requirements in the context of state and local elections. *E.g.*, N.C.G.S. §§ 163-82.4, 162-82.11, & 163-166.12. As a result, and as a practical matter, "North Carolina has a unified registration system for both state and federal elections." *Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th 390, 401 (4th Cir. 2024) ("*RNC*"). But that unified system is a choice that the people of North Carolina made through their elected representatives; nothing in federal law compels North Carolina to adopt HAVA's procedures for state and local elections. *See Mitchell*, 400 U.S. at 125; *Dobrovolny*, 100 F. Supp. 2d at 1028. Thus, to the extent North Carolina election law for state and local elections mirrors or parallels federal law, that symmetry "is state-created, not federal." *Crowley v. Nevada ex rel. Nevada Sec'y of State*, 678 F.3d 730, 735 (9th Cir. 2012).

## III.   Analysis

### a.   Subject-Matter Jurisdiction

As the court previously explained in a recent election-related lawsuit, "[t]here exist two possible paths to establishing subject matter jurisdiction in this action. First, the claims could raise

8

a federal question under 28 U.S.C. § 1331, which would permit removal under 28 U.S.C. § 1441(a). Second, the action could implicate a federal law providing for equal rights in terms of racial equality, which would authorize removal under 28 U.S.C. § 1443(2)." *Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, No. 5:24-CV-00547, 2024 WL 4523912, at *2 (E.D.N.C. Oct. 17, 2024), *rev'd and remanded*, 120 F.4th 390 (4th Cir. 2024). Extensive repetition of the relevant history of subject-matter jurisdiction is unnecessary here. *See id.* at *2-7.

      b.  Removal under 28 U.S.C. § 1441

This court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. If a plaintiff initiates a civil action "in a State court of which" a federal district court has "original jurisdiction," that action "may be removed by the defendant . . . to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). Where a plaintiff's claims all arise under state law, those claims will only present a federal question over which a district court may maintain original jurisdiction "if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013); *see also Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005); *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 810 (1986); *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. California*, 463 U.S. 1, 13 (1983).

In assessing whether a plaintiff's claim necessarily raises an issue of federal law, the court follows the well-pleaded complaint rule: "federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). In this context, *complaint* really means *claim*; a federal question is not

9

presented on the face of a complaint unless it is an "essential element[] of the plaintiff's—and only

the plaintiff's—claim." *Capitol Broad. Co., Inc. v. City of Raleigh, N. Carolina*, 104 F.4th 536,

540 (4th Cir. 2024). In other words, "[i]t is *not* enough that federal law becomes relevant by virtue

of a defense." *Burrell v. Bayer Corp.*, 918 F.3d 372, 381 (4th Cir. 2019) (emphasis in original)

(internal quotation mark omitted). This is true even where a plaintiff "'goes beyond a statement

of [his] cause of action and anticipates or replies to a probable defense,' even if that defense itself

raises a federal question." *Capitol Broadcasting*, 104 F.4th at 539–40 (quoting *Gully v. First Nat.

Bank*, 299 U.S. 109, 113 (1936)).

At the outset, the court finds that Griffin's petition in the North Carolina Supreme Court

constitutes a "civil action" within the meaning of Section 1441. Review of dictionaries, both

contemporaneous with passage of Section 1441 and more recent, reflect a capacious definition of

the term: a civil action is a judicial proceeding in which a party seeks a decree to redress a private

right. *E.g.*, *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006) (concluding that "action" meant

"any proceeding in a court of justice") (quoting Black's Law Dictionary 1488, 1603 (4th ed.1951)

(internal ellipses omitted)); *In Re Teter*, 90 F.4th 493, 499 (6th Cir. 2024) (observing that civil

action "is a generous term" and "encompass[es] the old categories of actions at law and suits in

equity," i.e., "all types of actions other than criminal proceedings") (quoting Black's Law

Dictionary (5th ed. 1979)); *Black v. Black*, No. 1:22-CV-03098, 2023 WL 3976422, at *3 (D. Colo.

Apr. 5, 2023) (noting that a "civil action is simply a civil judicial proceeding") (quoting Black's

Law Dictionary (11th ed. 2019) (cleaned up)).

Griffin's petition for a writ of prohibition squares with that definition: it is an original civil

(not criminal) judicial proceeding through which he seeks to vindicate his private (not public)

rights. The petition therefore qualifies as a civil action subject to removal under Section 1441.

10

*See City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164 (1997) (holding that state court proceeding created by state law that entailed quasi-appellate review of administrative board decision was removable where claims in proceeding included federal constitutional challenge); *Casale v. Metro. Transp. Auth.*, No. 05-CV-4232, 2005 WL 3466405, at *7 (S.D.N.Y. Dec. 19, 2005) (explaining that "technicalities of local procedure, such as what an action or pleading is called, do not affect federal question jurisdiction and removability").[5]

Although the court finds that the form of Griffin's petition permits removal to federal court under Section 1441, it concludes that the substance of the petition does not, in that it could not "have been brought in federal court originally." *Sonoco Prod. Co. v. Physicians Health Plan, Inc.*, 338 F.3d 366, 370 (4th Cir. 2003). The State Board contends that Griffin's petition to the North Carolina Supreme Court presents a federal question, but Griffin's "claims" (such as they are) falter at the first step of the *Gunn* test: no issue of federal law is *necessarily* raised.

Griffin seeks a writ of prohibition, a form of judicial relief authorized by the North Carolina Constitution. N.C. CONST. art. IV, § 12(1). To obtain such a writ, he must show that the State Board is poised to act in a manner "at variance with . . . the law of the land." *State v. Allen*, 24 N.C. 183, 189 (1841).[6] As recounted previously, Griffin's theory is that the State Board's

---

[5] The court notes Griffin's reliance on *Barrow v. Hunter*, 99 U.S. 80 (1878), but agrees with the Fifth Circuit that *Barrow's* distinction between actions "tantamount to the common-law practice of moving to set aside a judgment for irregularity" and actions "tantamount to a bill in equity to set aside a decree for fraud," *Barrow*, 99 U.S. at 83, may no longer be "good law for the purposes of 28 U.S.C. § 1441" because the basis for that distinction "relied on an interpretation of removal which may well be no longer valid" and does not reflect "the modern view of removal," *Matter of Meyerland Co.*, 910 F.2d 1257, 1261 (5th Cir. 1990). In addition, *Barrow* on its facts does not control this scenario, where Griffin filed an original action directly in North Carolina's Supreme Court rather than follow the appellate procedure designated by state law. *See* N.C.G.S. § 163-182.14(b).

[6] This showing is necessary but not sufficient; Griffin also must show that his grievance could not be "redressed, in the ordinary course of judicial proceedings, by appeal." *State v. Whitaker*, 114 N.C. 818, 19 S.E. 376, 376 (1894); *see also State v. Inman*, 224 N.C. 531, 542, 31 S.E.2d 641, 646–47 (1944) (explaining that state supreme court "uniformly denie[s]" petitions for writs of prohibition "where there is other remedy," such as an appeal); *Mountain Retreat Ass'n v. Mt. Mitchell Dev. Co.*, 183 N.C. 43, 110 S.E. 524, 525 (1922) (emphasizing that state supreme court will not "allow a litigant . . . to withdraw his case from the tribunal where the statute has placed it" by filing writ when alternative remedy is available). This is a merits issue that the court need not reach at this point.

11

imminent certification of the election results for Seat 6 entail its disregard of the state Constitution and several state laws, which he raised in his three protests to the State Board (and which he restates in his petition for a writ of prohibition). *See generally* DE 1-4; DE 33.

First, Griffin challenges the votes of voters who initially registered to vote in North Carolina without providing their driver's license numbers or the last four digits of their social security numbers, in alleged violation of state law. *See* N.C.G.S. § 163-82.4. Next, Griffin challenges the votes of voters who have never resided in North Carolina, which involves an apparent conflict between state law and the North Carolina Constitution. N.C. CONST. art. VI, § 1; N.C.G.S. § 163-258.2(e). Lastly, he contests the votes of absentee voters who failed to include a copy of their photo ID with their absentee ballot, which he argues contravenes state law. *See* N.C.G.S. § 163-230.1.

An issue of federal law is not "a necessary element" of Griffin's first challenge, and his right to relief does not "necessarily turn[] on some construction of federal law." *Franchise Tax Bd.*, 463 U.S. at 9, 14. That challenge can be resolved with exclusive reference to state law. *See* N.C.G.S. § 163-82.4. The relevant provision of North Carolina law states that a voter registration form "shall request the applicant's . . . [d]rivers license number or, if the applicant does not have a drivers license number, the last four digits of the applicant's social security number." N.C.G.S. § 163-82.4(a)(11). Per Griffin, if individuals do not provide one of those numbers, they have not been "lawfully registered" and therefore "cannot vote." DE 1-4 at 19 (citing in addition N.C. CONST. art. VI, § 3(1)). This first challenge does not reference or require consultation of federal law.[7]

---

[7] Section 163-82.4 is distinguishable in a key respect from the state statute at issue in *RNC*, which incorporated by express reference a federal standard. *See RNC*, 2024 WL 4523912, at *9 (evaluating N.C.G.S. § 163-82.11(c), which required State Board to "update the statewide computerized voter registration list and database to meet the requirements of section 303(a) of [HAVA]").

12

The State Board asserts that Griffin's challenge to voters' registrations would "require[] this [c]ourt to construe HAVA," DE 39 at 11, but that is incorrect.  After Congress passed HAVA, North Carolina's General Assembly enacted parallel legislation, establishing a uniform system of registration for both state and federal elections.  *See RNC*, 120 F.4th at 401.  But that uniform system does not eliminate the legal distinction between federal elections, which Congress may regulate (*see* 52 U.S.C. § 21081), and state elections, which Congress (with limited exception) may not (*see Mitchell*, 400 U.S. at 125).  And this matter involves a state election, so HAVA, even if practically relevant, is legally irrelevant.

As the Fourth Circuit observed under analogous circumstances in *Vlaming*, the fact that relevant provisions of state law may be "coextensive with [] analogous federal [] provisions" does not mean that a state law argument necessarily raises an issue of federal law.  *Vlaming v. W. Point Sch. Bd.*, 10 F.4th 300, 307 (4th Cir. 2021).  "Although [North Carolina] courts may rely on federal law to decide a state [law] question, there is no requirement that they must" and "[n]othing prevents [Griffin] from prevailing on his state [law arguments] on exclusively state grounds."  *Id.* at 308.  Thus, because North Carolina's Supreme Court "is not required to rely on federal law" to resolve Griffin's first challenge, "no federal question is necessarily raised."  *Id.*

As other courts have concluded, "[t]he fact that State law may look to federal law does not mean that federal law is a necessary element," and "the fact that the same set of alleged facts could trigger federal issues [], does not mean that a substantial question of federal law is *necessarily* raised; it only points to parallel federal and state cases arising from the same set of facts."  *Sage v. Tacoma Sch. Dist. No. 10*, No. 3:17-CV-5277, 2017 WL 6033015, at *2 (W.D. Wash. Dec. 6, 2017) (emphasis in original); *accord Beavers v. City of Jackson*, 439 F. Supp. 3d 824, 829 (S.D. Miss. 2020).  Phrased another way, "[w]hether a state court will adopt as the meaning of the state's

13

[law] the federal courts' interpretation of parallel language in the United States Co[de] is a matter of state law." *Rossello-Gonzalez v. Calderon-Serra*, 398 F.3d 1, 13 (1st Cir. 2004).

In this regard, the court appreciates but disagrees with the considered view of the amici Former Members of Congress. DE 37; DE 37-1. Amici concede that HAVA "only applies to federal elections," but contend nonetheless that because the State Board "uses a single voter form," the outcome of Griffin's challenge "will also dictate whether [the 60,000 voters] can vote in federal elections." DE 37-1 at 7-8. This contention conflates a potential practical implication with an important legal distinction. The people of North Carolina have chosen to implement a uniform system for both state and federal election registration. *RNC*, 120 F.4th at 401. But that legislative choice, itself a creature of state law, does not transform state law issues with state elections into federal questions for federal courts merely because resolution of the state law issues, by implication, could also inform litigation in the context of a federal election. Any symmetry between North Carolina law (for state elections) and HAVA (for federal elections) "is state-created, not federal," *Crowley*, 678 F.3d at 735, and no court's interpretation of Section 163-82.4 would *control* or *bind* future unrelated proceedings involving analogous provisions of HAVA.

A case from the Fifth Circuit is instructive. *See American Airlines, Inc. v. Sabre, Inc.*, 694 F.3d 539 (5th Cir. 2012). There, the plaintiff sued the defendant in both federal and state court. *Id.* at 541. The federal case alleged antitrust "violations of Sections 1 and 2 of the Sherman Act," whereas the state case involved a state law antitrust claim alleging "monopolization in violation of [] the Texas Free Enterprise and Antitrust Act of 1983." *Id.* The Texas antitrust law provided that its provisions "shall be construed to accomplish [its] purpose and shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes to the extent consistent with [its] purpose." *Id.* at 542 (citing Tex. Bus. & Com. Code § 15.04). The defendant removed

14

the state case to federal court, the plaintiff sought remand, and the federal district court remanded the matter. *Id.* at 541.

In affirming the decision of the district court, the Fifth Circuit observed that, notwithstanding the plaintiff's parallel lawsuits and parallel claims under federal and state law, "nothing in the plain language of the [Texas antitrust law] requires that federal law control Texas's interpretation of its state antitrust statute." *Id.* at 542. The Fifth Circuit also rejected an argument (similar to that made by amici) about the practical implications: even if a federal court's conclusion on the Sherman Act claims suggested that the plaintiff's "parallel state antitrust case would suffer a similar fate," that does not compel the conclusion that the plaintiff somehow "g[a]ve up or alter[ed] its particular rights to pursue its state-law remedies in state court." *Id.* at 544. In sum, the Fifth Circuit agreed with the district court that "the mere fact that a federal standard is to be referenced [] in determining whether there has been a state-law violation" does not "cause[] a state-law claim to 'necessarily raise a stated federal issue.'" *Id.* at 543 (quoting *Grable*, 545 U.S. at 314).

The same is true here. Nothing in Section 163-82.4 "requires that [HAVA] control [North Carolina's] interpretation of its state [election] statute." *Id.* at 542. Further, the practical implications of a state court's interpretation of Section 163-82.4, or even its "reference[]" to HAVA in making such an interpretation, does not cause Griffin's first challenge "to necessarily raise a stated federal issue." *Id.* at 543 (internal quotation marks omitted). Because Griffin's first challenge does not require resort to HAVA, it does not necessarily raise a question of federal law. *See Grable*, 545 U.S. at 314.

Griffin's second challenge also does not raise an issue of federal law. That challenge, targeting voters who have never resided in North Carolina, involves an apparent conflict between

15

state law (which grants this group of individuals the right to vote) and the state Constitution (which includes a bona fide residency requirement). DE 1-4 at 44-45 (citing N.C. CONST. art. VI, § 1); *see also* N.C.G.S. § 163-258.2(e). No party (including the State Board, Riggs, the NCARA parties, or amici) have argued that Griffin's second challenge involves an issue of federal law, and the court discerns none. *See* DE 37-1; DE 39; DE 40; DE 41-1; DE 42.

That leaves Griffin's third challenge, which contests approximately 5,500 overseas absentee ballots that voters submitted without including a copy of their photo IDs. DE 1-4 at 53-57. The State Board argues that this challenge raises an issue of federal law because a state law addressing overseas absentee voting incorporates by reference a federal requirement found in a federal statute. DE 39 at 12 (citing N.C.G.S. § 163-258.6(b), which references 52 U.S.C. § 20303). But the State Board's argument represents a defense to Griffin's claim, which is that counting the votes of these voters would violate a separate state statute, which does not reference federal law. *See* DE 1-4 at 54; DE 49 at 15 (both addressing N.C.G.S. § 163-230.1).

Under the well-pleaded complaint rule, a state law claim only raises an issue of federal law if it "is a necessary element" of the state claim. *Franchise Tax Bd.*, 463 U.S. at 13; *Caterpillar*, 482 U.S. at 392. "It is *not* enough that federal law becomes relevant by virtue of a defense." *Burrell*, 918 F.3d at 381 (emphasis in original) (internal quotation mark omitted). Here, the State Board's invocation of state law (that references federal law) only becomes relevant by way of its defense, so it is not a necessary element of Griffin's third challenge.

The last argument for federal question jurisdiction, raised by the State Board and the NCARA parties, is that Griffin's petition raises a federal question because he seeks a declaration that the State Board's "arguments under the NVRA, HAVA, the VRA, and the Civil Rights Act against the relief requested by Judge Griffin are rejected." DE 1-4 at 83; see also DE 39 at 13; DE

16

42 at 35-36. This argument fails for the same reason: the State Board's arguments about federal laws were invoked as defenses to Griffin's protests. *See* DE 1-5 at 60-67. By raising those same arguments in his petition, and seeking a declaration that they "are rejected," DE 1-4 at 83, Griffin is merely "anticipat[ing] or repl[ying] to a probable defense" that the State Board would also make before the state Supreme Court. *Capitol Broadcasting*, 104 F.4th at 540. Plaintiffs may "go[] beyond a statement of the[ir] cause of action" and anticipate federal defenses in their pleadings without converting their state law claims into federal questions. *Gully*, 299 U.S. at 113.

Under the circumstances, it was understandable that Griffin would raise the State Board's federal defenses in his petition: the State Board had just cited them as bases for rejecting his protests. DE 1-5 at 60-67. By attempting to "anticipate[] and rebut[ those] defense[s]," Griffin did not inject a federal question into his petition. *Pressl v. Appalachian Power Co.*, 842 F.3d 299, 302 (4th Cir. 2016). "[E]ven if the complaint begs the assertion of [federal] defense[s] . . . that does not" transform Griffin's protests into claims "arising under federal law." *Pinney v. Nokia, Inc.*, 402 F.3d 430, 446 (4th Cir. 2005).

In sum, the court finds that none of the three challenges in Griffin's petition necessarily raise an issue of federal law, and his request for a declaration rejecting the State Board's federal law arguments is simply an anticipatory effort at rebutting predictable federal defenses. Therefore, Griffin's petition does not arise under the laws of the United States, this court would not have had original jurisdiction over it, and removal under Section 1441 was improper. *See* 28 U.S.C. § 1331; 28 U.S.C. § 1441(a).

     c.    <u>28 U.S.C. § 1443(2)</u>

Removal is independently authorized for any civil action that involves an "act under color of authority derived from any law providing for equal rights," or the refusal "to do any act on the

17

ground that it would be inconsistent with such law." 28 U.S.C. § 1443(2). The second portion of that provision is relevant here, known as the refusal clause. *Stephenson v. Bartlett*, 180 F. Supp. 2d 779, 785 (E.D.N.C. 2001) (explaining that refusal clause "provides that state officers can remove to federal court if sued for refusing to do any act on the ground that it would be inconsistent with any law providing for civil rights") (internal brackets and quotation marks omitted).

Although the plain terms of Section 1443(2) appear to capture any number of recognized civil rights, "[t]he Supreme Court has limited the meaning of a 'law providing for equal rights' in § 1443 to only those concerning racial equality." *Vlaming v. W. Point Sch. Bd.*, 10 F.4th 300, 309 (4th Cir. 2021). In *Rachel*, the Supreme Court concluded that the statutory language "must be construed to mean any law providing for specific civil rights *stated in terms of racial equality*." *State of Ga. v. Rachel*, 384 U.S. 780, 792 (1966) (emphasis added). On the other hand, laws that "are phrased in terms of general application available to all persons or citizens," and not in "specific language of racial equality," do not grant removal jurisdiction under Section 1443. *Id.* Although "the plain text of the statute suggests a broader interpretation," this court "must take the Supreme Court at its word and faithfully apply its precedent." *Vlaming*, 10 F.4th at 310. The Fourth Circuit has recently clarified that the NVRA "provides a proper basis for removal under Section 1443(2)." *RNC*, 120 F.4th at 408.

The court first finds that, contrary Griffin's primary argument against removal under Section 1443(2), he did seek a writ of prohibition against the State Board because of its "refus[al]" to do something: the refusal to sustain his challenges and discard the votes of tens of thousands of voters. *See* DE 49 at 26. Had the State Board adopted Griffin's arguments and removed the in-question votes from the current tally, i.e., had the State Board taken affirmative action, Griffin would not have sought a writ of prohibition from the state Supreme Court. Thus, it is the State

18

Board's "inaction," not its "action," that prompted Griffin's petition.  *City & Cnty. of San Francisco v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, No. 02-CV-03462, 2002 WL 1677711, at *4 (N.D. Cal. July 24, 2002); *see also id.* (noting that "the remand suit must challenge a failure to act or enforce state law").

Having concluded that the State Board refused to act within the meaning of Section 1443(2), the court turns next to whether that refusal was based on the State Board's belief that, had it acted, it would have violated federal civil rights law stated in terms of racial equality.  28 U.S.C. § 1443(2); *Rachel*, 384 U.S. at 792.  The State Board rejected Griffin's challenges in part based on its position that "[r]etroactively removing these voters from the list of voters eligible to cast a ballot in the election would violate [the NVRA]."  DE 1-5 at 67.  The NVRA "provides a proper basis for removal under Section 1443(2)."  *RNC*, 120 F.4th at 408.  Accordingly, the State Board refused to "act on the ground that [action] would be inconsistent with [federal civil rights] law," and removal is permitted.  28 U.S.C. § 1443(2).

In reaching this conclusion, the court notes that it does not agree with the State Board that the NVRA precludes it from acting in the context of a state election.  *See Young*, 520 U.S. at 275 (explaining that NVRA establishes procedures for federal elections).  But that is ultimately a merits (not jurisdictional) issue; defendants seeking removal under Section 1443(2) must only make a "colorable claim" based on their "good faith belief" that their "conduct, if violative of state law," was required by a "federal statutory duty."  *White v. Wellington*, 627 F.2d 582, 586 (2d Cir. 1980)[8]; *see also Cavanagh v. Brock*, 577 F. Supp. 176, 180 (E.D.N.C. 1983) (holding that a "colorable federal defense in the removal papers suffices to make removal—and therefore jurisdiction— proper pursuant to § 1443(2)").  And in analogous circumstances, the Fourth Circuit and Supreme

---

[8] By operation of North Carolina law, the court presumes the State Board acts in good faith. *City of Raleigh v. Riley*, 64 N.C. App. 623, 636, 308 S.E.2d 464, 473 (1983).

19

Court have indicated that a defendant's invocation of federal law will only fail to provide a jurisdictional basis on removal if the theory is "so attenuated and unsubstantial as to be absolutely devoid of merit; wholly insubstantial; obviously frivolous; plainly unsubstantial; or no longer open to discussion." *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 206 (4th Cir. 2022) (citing *Hagans v. Lavine*, 415 U.S. 528, 536–37 (1974)); *cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) ("It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction."). The court may not agree with the State Board as to the applicability of the NVRA, but considering North Carolina's unified system of registration and election administration, the State Board's argument in favor of removal is not absolutely devoid of merit or insubstantial. The court therefore finds that removal under Section 1443(2) is permitted on that basis and does not reach the State Board's arguments related to the Voting Rights Act or Equal Protection Clause.

### d. *Burford & Louisiana Power*[9]

"Although a federal equity court does have jurisdiction of a particular proceeding, it may, in its sound discretion, . . . refuse to enforce or protect legal rights" out of "proper regard for the rightful independence of state governments in carrying out their domestic policy." *Burford v. Sun Oil Co.*, 319 U.S. 315, 317–18 (1943). This form of judicial "abstention is an exception to the general rule that federal courts must decide cases over which they have jurisdiction." *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 96 (4th Cir. 2022). The doctrine is grounded in two considerations: (1) the flexibility inherent in "traditional equity practice," but more importantly

---

[9] Griffin raises *Pullman* as a basis for abstention. DE 49 at 6-8. The court finds that doctrine is relevant, but that *Burford* and *Louisiana Power* provide more compelling bases for abstention under the circumstances. Such a conclusion is fully consistent with the principle of party presentation, meaning that the court must "address only the issues raised by the parties," *Short v. Hartman*, 87 F.4th 593, 604 (4th Cir. 2023), because once "an issue [such as abstention] is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Id.* (citing *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991)).

20

(2) "the notion of comity," meaning the "'belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.'" *Erie Ins. Exch. v. Maryland Ins. Admin.*, 105 F.4th 145, 149 (4th Cir. 2024) (quoting *Younger v. Harris*, 401 U.S. 37, 44 (1971)).

Distilled to its essence, the doctrine of *Burford* abstention instructs that "[w]here timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989) (internal quotation marks omitted) ("*NOPSI*").

"Another doctrine . . . allows abstention in cases raising issues intimately involved with the State's sovereign prerogative." *Martin v. Stewart*, 499 F.3d 360, 364 (4th Cir. 2007). In *Louisiana Power*, the Supreme Court recognized that certain "decisive issues of state law" that are "intimately involved with sovereign prerogative" should be decided in the first instance by the State's courts. *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 28–29 (1959). Rather than make "a dubious and tentative forecast" on unsettled questions of state law that implicate state sovereignty, the court should abstain and defer to state courts on the question. *Id.* at 29. Such a course of action "does not constitute abnegation of judicial duty" but rather constitutes "a wise and productive discharge of it." *Id.*

21

To be sure, *Burford* and *Louisiana Power* are not talismanic incantations that free a federal district court of its "virtually unflagging" obligation to exercise subject-matter jurisdiction when it has it. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Just as a court "will not take jurisdiction if it should not," the court "must take jurisdiction if it should." *Cohens v. State of Virginia*, 19 U.S. 264, 404 (1821). Abstention is therefore reserved for the rare and exceptional cases.

Determining whether a matter represents one of those rare cases for which abstention is warranted is no easy task. What is a *difficult* question of state law? A policy problem of *substantial* public import? How *intimately* involved must a state law issue be with considerations of sovereignty? As these nebulous terms suggest, there exists no "formulaic test for determining when dismissal [or remand] under *Burford* [or *Louisiana Power*] is appropriate." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 727 (1996). And "[t]he various types of abstention are not rigid pigeonholes into which federal courts must try to fit cases." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 12 n.9 (1987). "Overlapping rationales motivate these doctrines and considerations that support abstaining under one will often support abstaining under another." *Martin*, 499 F.3d at 364. With that said, abstention doctrines do not permit "*ad hoc* judicial balancing of the totality of state and federal interests in a case" and a court must tether its analysis to "specific doctrines that apply in particular classes of cases." *Id.* (italics in original).

Considering the relevant standards, the court finds that abstention under *Burford* and *Louisiana Power* is appropriate in this case for four reasons: (1) the issues raised in Griffin's protests reflect unsettled questions of state constitutional and statutory law and bear directly on North Carolina's right to self-government, (2) there is an existing dispute resolution process designated by state law, which a federal court should be hesitant to disrupt, (3) Griffin's claims

22

JA 322

arise purely under state law, and (4) the federal interest in this case is tenuous, and a state tribunal is competent to protect federal constitutional rights. Taken together, those factors counsel in favor of abstention.

First, Griffin's protests raise unsettled questions of state law: whether individuals who registered to vote without providing either their driver's license numbers or the last four digits of their social security numbers may vote in state elections, whether state law granting the right to vote to individuals who have never resided in North Carolina (Section 163-258.2(e)) conflicts with the state Constitution's bona fide residency requirement, and whether North Carolina's voter ID law applies to absentee ballots submitted by overseas voters in state elections. *See* DE 1-4 at 19-21 (summary of three challenges). In responding to Griffin's motion for preliminary injunction, the State Board has identified one trial court-level decision addressing the same substance as Griffin's second protest. DE 39 at 27. That hardly reflects a consensus view on the issues raised by the petition. *See Wise v. Circosta*, 978 F.3d 93, 101 (4th Cir. 2020) (finding that "*close* issue of state law involving competing interpretations of North Carolina's statutes governing election procedures" that "state courts" have not "settled . . . conclusively" supported abstention under *Pullman*) (emphasis in original); *see also Martin*, 499 F.3d at 364 (observing that abstention doctrines often contain "[o]verlapping rationales").

In *Johnson v. Collins Entertainment*, the Fourth Circuit found that it would "contravene[] *Burford* principles" for a federal district court to attempt to answer "disputed questions of state [] law that so powerfully impact the welfare of [the State's] citizens." *Johnson v. Collins Ent. Co.*, 199 F.3d 710, 720 (4th Cir. 1999). *Johnson* involved state gambling regulations, which "lie[] at the heart of the state's police power." *Id.* This matter involves the right to vote in a state election and the outcome of a state contest for a seat on the state supreme court, which lie at the heart of

23

state sovereignty and right to self-government. *Mitchell*, 400 U.S. at 125. The court finds that a citizen's right to participate in electing representatives for state government and a state's right to interpret state law in that context is no less (and likely more so) inextricably intertwined with a citizenry's welfare than the gambling regulations at issue in *Johnson*.

Likewise in *Louisiana Power*, Justice Frankfurter admonished that federal judges should hesitate to make "a dubious and tentative forecast" on unsettled questions of state law that implicate state sovereignty. *Louisiana Power*, 360 U.S. at 29. That advice maps onto this case: Griffin's protests raise novel questions of state law, and the answers to those questions could sway the outcome of a state election and affect the right to vote for tens of thousands of individuals in future *state* elections. *See NOPSI*, 491 U.S. at 361 (where "importance" of state law issues "transcends the result in the case then at bar," *Burford* abstention may be appropriate).

Second, North Carolina law designates an appellate procedure for disputes over decisions of the State Board. N.C.G.S. § 163-182.14(b). That procedure reflects the view of the General Assembly that election disputes should, after review by the State Board, proceed to the Superior Court of Wake County. *See id.* Because in these circumstances "timely and adequate state-court review is available," this court should refrain from "interfer[ing] with the [] orders of state administrative agencies," such as the State Board. *NOPSI*, 491 U.S. at 361. As the Fourth Circuit similarly concluded in *Johnson*, "[f]ederal equitable intervention" in this case "risks the disruption of state efforts to establish a coherent policy with respect to [state elections]" and "threatens the creation of a patchwork of inconsistent" interpretations of state election law. *Johnson*, 199 F.3d at 723.

Taking the third and fourth factors together, the court further finds that the primacy of state law issues in this matter, and the relatively tenuous federal interest, militate in favor of abstention

24

as well. *See Johnson*, 199 F.3d at 723 (explaining that "the predominance of state law issues affecting state public policy" should "counsel[] caution on the part of federal court"). As the court summarized previously, Griffin's challenges consist of contentions that arise exclusively under state law. *See supra* at 9-17. A federal court is poorly positioned to resolve those contentions in the first instance, particularly where such resolution (even if practically relevant) would not legally implicate federal elections. *See Moore v. Sims*, 442 U.S. 415, 429 (1979) ("State courts are the principal expositors of state law.").

The federal interest in this action also pales in comparison with the predominance of state law issues. The State Board has cited the NVRA as a basis for removal, which the court has credited. *See supra* at 17-20. But the NVRA's connection to this state election is somewhat dubious. *See Young*, 520 U.S. at 275. The State Board has also invoked federal constitutional concerns such as procedural and substantive due process, but a state court is competent to enforce federal constitutional rights. *See Huffman v. Pursue, Ltd.*, 420 U.S. 592, 609, n.21 (1975). Just as importantly, a state court could resolve Griffin's protests on the merits of their state law arguments, obviating the need for disposition of the federal constitutional issues. That consideration also tilts the scales towards abstention. *Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941); *see also Martin*, 499 F.3d at 364 (observing that abstention doctrines often contain "[o]verlapping rationales").[10]

If our system of federalism is to exist in more than name only, it means that this court should abstain in this case, under these circumstances. "As every schoolchild learns, our

---

[10] In weighing these third and fourth factors, the court is cognizant that it may not engage in "*ad hoc* judicial balancing of the totality of state and federal interests in a case." *Martin*, 499 F.3d at 364. Rather than engage in such ad hoc balancing, the court finds that those respective interests are directly relevant to answering whether the state law questions are difficult, the manner in which they transcend the case at bar, and whether they reflect substantially important state policy. *See NOPSI*, 491 U.S. at 361; *Louisiana Power*, 360 U.S. at 29; *Johnson*, 199 F.3d at 723.

25

Constitution establishes a system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). This dual-system reflects that "the perpetuity and indissolubility of the Union[] by no means implies the loss of distinct and individual existence, or of the right of self-government by the States." *Texas v. White*, 74 U.S. 700, 725 (1868). The right of self-government must include "all the functions essential to separate and independent existence"; otherwise "there could be no such political body as the United States." *Lane Cnty. v. State of Oregon*, 74 U.S. 71, 76 (1868).

The court ends as it began: a sitting state court judge seeks a writ of prohibition (a form of judicial relief authorized by the state constitution) from the state supreme court that would enjoin the state board of elections from counting votes for a state election contest that were cast by voters in a manner allegedly inconsistent with state law. A federal tribunal should "wise[ly] and productive[ly] discharge" its "judicial duty" by abstaining in such circumstances, *Louisiana Power*, 360 U.S. at 29, because "timely and adequate state-court review is available," *NOPSI*, 491 U.S. at 361; N.C.G.S. § 163-182.14(b). The issues of state law raised in this action are not just difficult and "disputed," *Johnson*, 199 F.3d at 720, they also go to the heart of North Carolina's sovereign right "to establish and maintain [its] own separate and independent government[]," *Mitchell*, 400 U.S. at 125. At bottom, the court finds that abstention under *Burford* and *Louisiana Power* is warranted.

26

IV.    **Conclusion**

The court has removal jurisdiction under 28 U.S.C. § 1443(2) but abstains from reaching

the merits of Griffin's motion for preliminary injunction and remands this matter to the North

Carolina Supreme Court.

SO ORDERED this __6th__ day of January, 2025.

_Richard E Myers II_

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE

27



**United States District Court**
**Eastern District of North Carolina**
Office of the Clerk
Post Office Box 25670
Raleigh, North Carolina 27611

Phone: (919) 645-1700
Fax:    (919) 645-1750

Peter A. Moore, Jr.
Clerk of Court

January 6, 2025

North Carolina Supreme Court
Attn: Clerk's Office
PO Box 2170
Raleigh, NC 27602

Re:     5:24-cv-724-M-RJ; Griffin v. North Carolina State Board of Elections
        North Carolina Supreme Court Case No.: 320P24

Dear Clerk:

Pursuant to the order entered by the Honorable Chief United States District Judge Richard E.
Myers II on January 6, 2025, this case is remanded to the North Carolina Supreme Court. In
accordance with 28 U.S.C. §1447(c), enclosed is a certified copy of the order of remand.

If you have any questions regarding this order, please do not hesitate to call.

Sincerely,

PETER A. MOORE, JR., CLERK

By: Kimberly McNally, Deputy Clerk

JA 328

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**No. 5:24-cv-00724-M**

JEFFERSON GRIFFIN,

               Petitioner,

    v.

NORTH CAROLINA STATE BOARD OF
ELECTIONS,

               Respondent,

   and

ALLISON RIGGS, et al.,

               Intervenor-Respondents.

**STATE BOARD'S**
**NOTICE OF APPEAL**

     Respondent North Carolina State Board of Elections hereby gives notice of its appeal to the United States Court of Appeals for the Fourth Circuit from the Order entered on January 6, 2025 (D.E. 50, 51).

1

Respectfully submitted, this 6th day of January, 2025.

NORTH CAROLINA
DEPARTMENT OF JUSTICE

/s/ Mary Carla Babb
Mary Carla Babb
Special Deputy Attorney General
N.C. State Bar No. 25731
MCBabb@ncdoj.gov

Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
TSteed@ncdoj.gov

North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
Phone: 919-716-6900
Fax: 919-716-6758

*Counsel for Respondent*

2

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

JEFFERSON GRIFFIN,

    Plaintiff,

    v.

NORTH CAROLINA STATE BOARD OF ELECTIONS,

Case No. 5:24-cv-00724-M

    Defendant,

    and

ALLISON RIGGS, NORTH CAROLINA ALLIANCE FOR RETIRED AMERICANS, VOTEVETS ACTION FUND, TANYA WEBSTER-DURHAM, SARAH SMITH, and JUANITA ANDERSON,

Intervenor-Defendants.

---

**INTERVENOR-DEFENDANTS NORTH CAROLINA ALLIANCE FOR RETIRED AMERICANS, VOTEVETS ACTION FUND, TANYA WEBSTER-DURHAM, SARAH SMITH, AND JUANITA ANDERSON'S NOTICE OF APPEAL**

The North Carolina Alliance for Retired Americans, VoteVets Action Fund, Tanya Webster-Durham, Sarah Smith, and Juanita Anderson (collectively "Intervenor-Defendants") hereby give their notice of appeal to the United States Court of Appeals for the Fourth Circuit from this Court's Order remanding this case to the North Carolina Supreme Court, entered on January 6, 2024, ECF No. 50.

Dated: January 7, 2024.             Respectfully submitted,

                               /s/ Christopher D. Dodge

Lalitha D. Madduri**
Christopher D. Dodge*
Tina Meng Morrison*
Makeba A.K. Rutahindurwa**
James J. Pinchak*
Julie Zuckerbrod*
ELIAS LAW GROUP LLP
250 Massachusetts Ave, N.W., Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
lmadduri@elias.law
cdodge@elias.law
tmengmorrison@elias.law
mrutahindurwa@elias.law
jpinchak@elias.law
jzuckerbrod@elias.law

*Participating via Notice of Special Appearance*
**Notice of Special Appearance Forthcoming*

Narendra K. Ghosh
N.C. Bar No. 37649
PATTERSON HARKAVY LLP
100 Europa Drive, Suite 420
Chapel Hill, NC 27217
Telephone: (919) 942-5200
nghosh@pathlaw.com

*Counsel for Intervenor-Defendants the North Carolina Alliance for Retired Americans, VoteVets Action Fund, Tanya Webster-Durham, Sarah Smith, and Juanita Anderson*

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:24-cv-00724-M-RN**

| | |
|---|---|
| Jefferson Griffin, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) |
| | ) |
| North Carolina State Board of Elections, | ) |
| | ) |
| *Defendant*, | ) **NOTICE OF APPEAL** |
| | ) |
| & | ) |
| | ) |
| Allison Riggs; North Carolina Alliance for Retired Americans; VoteVets Action Fund; Tanya Webster-Durham; Sarah Smith; Juanita Anderson, | ) |
| | ) |
| *Intervenor-Defendants*. | ) |

Intervenor-Defendant Allison Riggs appeals to the United States Court of Appeals for the Fourth Circuit from the Order (ECF No. 50) entered in this action on January 6, 2025.

Dated: January 7, 2025          Respectfully submitted,

**WOMBLE BOND DICKINSON (US) LLP**

/s/ *Raymond M. Bennett*
Raymond M. Bennett
N.C. State Bar No. 36341
Samuel B. Hartzell
N.C. State Bar No. 49256
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
(919) 755-2100
ray.bennett@wbd-us.com
sam.hartzell@wbd-us.com

*Counsel for North Carolina Associate Justice Allison Riggs*

JA 333

No. 320P24

## SUPREME COURT OF NORTH CAROLINA

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

| JEFFERSON GRIFFIN | From N.C. Board of Elections |
|---|---|
| v. | |
| NORTH CAROLINA BOARD OF ELECTIONS | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

<u>AMENDED ORDER</u>

On 18 December 2024, petitioner filed a petition for writ of prohibition and motion for temporary stay related to the 2024 election for a Seat 6 on the Supreme Court of North Carolina. Prior to filing a response or this Court taking action on petitioner's filings, respondent Board of Elections filed with this Court on 19 December 2024 a notice of removal of this action to the United States District Court for the Eastern District of North Carolina. On 6 January 2025, the United States District Court for the Eastern District of North Carolina remanded the matter to this Court.

Even though we received notice from the Board of Elections of its appeal of the order from the United States District Court for the Eastern District of North Carolina, in the absence of a stay from federal court, this matter should be addressed expeditiously because it concerns certification of an election.

JA 334

GRIFFIN V. STATE BOARD OF ELECTIONS

No. 320P24

*Order of the Court*

Therefore, petitioner's motion for temporary stay is allowed, and the Court upon its own motion sets the following expedited briefing schedule concerning the writ of prohibition:

1.  Petitioner shall file his brief on or before 14 January 2025;

2.  Respondent shall file its response on or before 21 January 2025; and

3.  Petitioner shall file his reply brief on or before 24 January 2025.

By order of the Court in Conference, this the 7th day of January 2025.

/s/ Allen, J.
For the Court

Riggs, J., recused

Justices Earls and Dietz dissent.

WITNESS my hand and the seal of the Supreme Court of North Carolina, this the 7th day of January 2025.



Grant E. Buckner
Clerk of the Supreme Court

Copy to:
Mr. Troy D. Shelton, Attorney at Law, For Griffin, Jefferson - (By Email)
Ms. Sarah G. Boyce, Deputy Attorney General, For State Board of Elections - (By Email)

GRIFFIN V. STATE BOARD OF ELECTIONS

No. 320P24

*Order of the Court*

Ms. Mary Carla Babb, Special Deputy Attorney General, For State Board of Elections - (By Email)
Mr. Terrence Steed, Special Deputy Attorney General, For State Board of Elections - (By Email)
Mr. Craig D. Schauer, Attorney at Law, For Griffin, Jefferson - (By Email)
Mr. W. Michael Dowling, Attorney at Law, For Griffin, Jefferson - (By Email)
Mr. Philip Thomas, Attorney, For Griffin, Jefferson - (By Email)
Mr. Paul Mason Cox, Special Deputy Attorney General, For State Board of Elections - (By Email)
Mr. Raymond M. Bennett, Attorney at Law - (By Email)
Mr. Samuel B. Hartzell, Attorney at Law - (By Email)
Mr. John R. Wallace, Attorney at Law - (By Email)
Ms. Shana L. Fulton, Attorney at Law - (By Email)
Mr. William A. Robertson, Attorney at Law - (By Email)
Mr. James W. Whalen, Attorney at Law - (By Email)
West Publishing - (By Email)
Lexis-Nexis - (By Email)

No. 320P24 – Griffin v. State Board of Elections

Justice ALLEN concurring.

I write separately to stress that the Court's order granting Judge Griffin's motion for temporary stay should not be taken to mean that Judge Griffin will ultimately prevail on the merits. It seems necessary to make this point because the opinions filed by my dissenting colleagues could give the opposite impression to readers unfamiliar with the intricacies of appellate procedure. By allowing the motion, the Court has merely ensured that it will have adequate time to consider the arguments made by Judge Griffin in his petition for writ of prohibition. As Judge Griffin himself concedes in his filings with this Court, in the absence of a stay, the State Board of Elections will certify the election, thereby rendering his protests moot.

No. 320P24 – Griffin v. State Board of Elections

Justice EARLS dissenting.

I dissent on the grounds that the standard for a temporary stay has not been met here, where there is no likelihood of success on the merits and the public interest requires that the Court not interfere with the ordinary course of democratic processes as set by statute and the State Constitution. Petitioner Judge Jefferson Griffin's motion for a temporary stay is procedurally improper, as he has failed to follow the lawful process for appealing a final decision on an election protest, instead rushing to the very Court on which he seeks membership for validation of his extraordinary legal arguments.

Moreover, even if the filing were procedurally proper, his motion for a temporary stay should be denied because he has failed to meet the standard for granting preliminary relief. Simply put, the laws and the Constitution of this State provide for the proper execution of the will of the voters following an election, with the issuance of a certificate of election duly following the procedures set by law. Free and fair elections demand nothing less, and there is a substantial public interest served by following the rule of law. For this Court to intervene in an unprecedented way to stop that process, where there is no underlying merit to the contention that some 60,000 citizens who registered to vote and voted should have their votes thrown out, there must be a strong showing of the likelihood of success on the merits. There is no such showing here. Therefore, I dissent.

JA 338

GRIFFIN v. STATE BOARD OF ELECTIONS

No. 320P24

*Earls, J. dissenting*

## I.    Judge Griffin's Request for a Temporary Stay Is Procedurally Improper

Judge Griffin invokes North Carolina Rule of Appellate Procedure 23(e) in his application for a temporary stay. Under Rule 23(e), a party may seek "an order temporarily staying enforcement or execution of the judgment, order or other determination pending decision by the court upon the petition for supersedeas." N.C.R. App. P. 23(e) (2023). Griffin asserts that Rule 23(e)'s allowance of a stay for a *petition of writ of supersedeas* should be extended to encompass his *petition for writ of prohibition*—two completely separate requests for relief—but he cites no support for such a maneuver in the Rules of Appellate Procedure.

Assuming that the Rules of Appellate Procedure supported his standalone motion for temporary stay, Griffin still has not met his burden to show he is entitled to it, since his rights can be vindicated through existing legal channels. *See A.E.P. Industries, Inc. v. McClure*, 308 N.C. 393, 401 (1983); *Pruitt v. Williams*, 288 N.C. 368, 372 (1975) (noting that a party seeking a stay bears the burden to show their entitlement to it). A temporary stay is used "to preserve the status quo of the parties during litigation." *A.E.P. Industries, Inc.*, 308 N.C. at 401 (cleaned up) (quoting *Investors, Inc. v. Berry*, 293 N.C. 688, 701 (1977)); *cf. Huskins v. Yancey Hospital, Inc.*, 238 N.C. 357, 361 (1953) (explaining that a court must "necessarily refuse[ ] an interlocutory injunction if the plaintiff fails to make out an apparent case for the issuance of the writ"). In general, granting such a stay is proper only "if a plaintiff is likely to sustain irreparable loss" without it—in other words, that "issuance is

necessary for the protection of a plaintiff's rights during the course of litigation." *Investors, Inc.*, 293 N.C. at 701; *accord Bd. of Provincial Elders v. Jones*, 273 N.C. 174, 182 (1968). That inquiry, in turn, looks to "whether the remedy sought by the plaintiff is the most appropriate for preserving and protecting its rights or whether there is an adequate remedy at law." *A.E.P. Industries, Inc.*, 308 N.C. at 406.

Here, Griffin cannot show a threat of irreparable harm because state law provides a specific procedure, in a specific venue, by a specific timeline, for raising the exact challenges he asks this Court to resolve. *See* N.C.G.S. § 163-182.14 (2023). Specifically, for statewide judicial elections, "an aggrieved party has the right to appeal the final decision [of the State Board of Elections] to the Superior Court of Wake County within 10 days of the date of service." *Id.* at (b). After the final decision, the State Board shall issue the certification of the election "unless an appealing party obtains a stay of the certification from the Superior Court of Wake County within 10 days after the date of service." *Id.* The Superior Court of Wake County "shall not issue a stay of certification unless the petitioner shows the court that the petitioner has appealed the decision of the State Board of Elections, that the petitioner is an aggrieved party, and that the petitioner is likely to prevail in the appeal." *Id.* Simply put, state law provides that the Wake County Superior Court, not our Court, is to resolve these challenges, subject to the normal appeals process—all of which Griffin has disregarded in his insistence that we resolve the merits of his challenges in the first instance.

GRIFFIN V. STATE BOARD OF ELECTIONS

No. 320P24

*Earls, J. dissenting*

That further raises the question: why does Judge Griffin say he seeks relief in this Court instead of the court where he was supposed to file? His petition asserts that a stay and corresponding ruling on the merits is necessary because otherwise the case will be "improperly remov[ed] to federal court" and because "it will take considerable time before a remand motion is briefed and ruled on." But a party's apparent hope that they are more likely to get their way with a specific court, and quicker than they might through the appropriate channels, hardly meets the "irreparable harm" standard. The majority's special order does not explain why it finds its exercise of jurisdiction proper, notwithstanding a state statute expressly to the contrary, instead asserting that Griffin's action "concerns certification of an election."

## II. Griffin Has Failed to Meet His Burden to Show He Likely Will Prevail on the Merits

Disregarding the importance of legal procedure, the majority today issued a nebulous "temporary stay related to the 2024 election" and ordered expedited briefing on the underlying merits of Griffin's challenge. This, too, is improper. Even assuming that our Court, instead of the Wake County Superior Court, were the proper place for an aggrieved party for judicial office to seek a stay of an election certification, Griffin has still failed to meet his burden to show that he is "likely to prevail in the appeal." *See* N.C.G.S. § 163-182.14(b).

GRIFFIN V. STATE BOARD OF ELECTIONS

No. 320P24

*Earls, J. dissenting*

To start, Griffin admits that one of his challenges, if successful, would not alter the outcome of the election given present vote totals. That challenge would affect the ballots of only 266 people, far fewer than Justice Allison Riggs's lead of 734 votes. *See In re Election Protests of Jefferson Griffin, Ashlee Adams, Frank Sossamon, and Stacie McGinn*, Decision and Order 3 (State Bd. of Elections, Dec. 13. 2024) [hereinafter Griffin Order]. The substance of that challenge is that there is an apparent conflict between a state law dating back to 2011, which permits individuals living overseas who are the descendants of North Carolina residents to vote in state elections, and the North Carolina Constitution. *See* UMOVA, SL 2011-182, N.C. Sess. Laws 687–97 (2011); N.C.G.S. § 163-258.2(1)(e) (2023). Entertaining Griffin's challenge to the constitutionality of a statute that has existed for over a decade, *after* an election has already occurred, and especially where it would not affect the outcome, is inappropriate to say the least. *Cf. Singleton v. Dep't of Health and Human Servs.*, No. 260PA22, 2024 WL 4524680 (per curiam) (N.C. Oct. 18, 2024) (noting the lawful procedure for a party to follow to contest the facial validity of a statute).

Griffin's second challenge is to the votes of 1,409 overseas voters, including military and armed services members, who allegedly did not provide copies of their photo identification with their absentee ballots. *See* Griffin Order, *supra*, at 3. He argues that these votes should not be counted, because of his interpretation of two state statutes.

GRIFFIN V. STATE BOARD OF ELECTIONS

No. 320P24

*Earls, J. dissenting*

Notably this challenge was the only one unanimously rejected by the State Board of Elections in its 13 December 2024 decision and order on appeal here. *See* Griffin Order, *supra*, at 39. The State Board explained that, since April 2023, through six separate elections, it has interpreted the two statutes as not requiring military and overseas-citizen voters covered by Article 21A to show a photocopy of photo identification or an ID Exception Form. *Id.* at 32, 37, 39. Neither Griffin nor the North Carolina Republican Party objected to this Rule during the administrative rulemaking process, nor did they challenge it under the traditional administrative or judicial procedure. *Id.* at 37. Indeed an agency appointed by General Assembly leadership approved the rule unanimously. *Id.* Whatever the merits of the statutory interpretation question, "We decline to grant [a party] extraordinary relief when they are responsible for their own predicament." *Kennedy v. N. Carolina State Bd. of Elections*, 905 S.E.2d 55, 57 (N.C. 2024) (mem.).

Griffin's final challenge is to exclude the votes of more than 60,000 North Carolinians because a state database lacked either a North Carolina drivers license number or the last four digits of a social security number for a registered voter. The legal and factual assumptions in this challenge are too many to count, let alone to show Griffin "is likely to prevail on appeal." *See* N.C.G.S. § 163-182.14(b). Here I will note only his extraordinary factual assumptions: nowhere in his more than 4,000 pages of filings with this Court does Griffin identify a single voter who actually possessed either number yet did not provide it when registering to vote, which must

GRIFFIN V. STATE BOARD OF ELECTIONS

No. 320P24

*Earls, J. dissenting*

be true for his challenge to bear fruit even under his own legal theory. *Cf* Griffin Order, *supra*, at 15, 17. Nor does Griffin identify a single voter who would not have been lawfully registered to vote absent an administrative technicality of a missing number in a state government database. Those factual omissions doom Griffin's challenge on this matter, because he has failed to show "probable cause to believe that a violation of election law or irregularity or misconduct has occurred," *see* N.C.G.S. § 163-182.10(a)(1), let alone one sufficient to change the outcome of the election at this late stage.

Even more fatal to the likelihood of success on this claim is the fact that at least twice before, as the State Board of Elections pointed out in its Order, this Court has rejected the proposition that a protest can be used to discount the ballots of eligible voters who did everything they were told to do to register to vote. *See Overton v. Mayor & City Comm'rs of Hendersonville,* 253 N.C. 306, 316 (1960); *Woodall v. W. Wake Highway Com.,* 176 N.C. 377, 388 (1918). That precedent instructs that alleged errors by election officials in the maintenance of voter databases or the processing of voter registration forms cannot be used to invalidate an otherwise eligible voter's ballot. That principle is especially applicable here, given that the State Board found that Griffin failed to properly serve his protests on the voters whose ballots he seeks to discard, as required by law. *Cf.* Griffin Order, *supra*, at 6–14.

At bottom, the timing of Griffin's claims speaks volumes about their substance. By waiting until after the votes were cast and the results tallied, Griffin seeks to

GRIFFIN V. STATE BOARD OF ELECTIONS

No. 320P24

*Earls, J. dissenting*

retroactively rewrite the rules of the election to tilt the playing field in his favor. His filings amount to a broadside legal attack, raising a laundry list of statutory and constitutional objections to long-established election laws. These legal arguments rest on factual assumptions that he has failed to prove. These claims, sweeping as they are, could—and should—have been brought long before voters went to the polls. From the Court's indulgence of this sort of fact-free post-election gamesmanship, I dissent.

No. 320P24 – Griffin v. State Board of Elections

Justice DIETZ dissenting.

I would deny the petition and dismiss the stay request under our state's corollary to a federal election doctrine known as the "*Purcell* principle." *See Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (per curiam). The *Purcell* principle recognizes that, as elections draw near, judicial intervention becomes inappropriate because it can damage the integrity of the election process. *See generally Merrill v. Milligan*, 142 S.Ct. 879, 880-81 (2022) (Mem.) (Kavanaugh, J., concurring) (collecting cases). We have acknowledged a state version of this doctrine in past cases. *See*, *e.g.*, *Pender Cnty. v. Bartlett*, 361 N.C. 491, 510 (2007).

In my view, the challenges raised in this petition strike at the very heart of our state's *Purcell* principle. The petition is, in effect, post-election litigation that seeks to remove the legal right to vote from people who lawfully voted under the laws and regulations that existed during the voting process. The harm this type of post-election legal challenge could inflict on the integrity of our elections is precisely what the *Purcell* principle is designed to avoid.

Now, to be fair, I believe some of these legal challenges likely have merit. This case, understandably, has drawn a tremendous amount of public attention. Nearly all of the press coverage and public discourse seems focused on Judge Griffin's challenge to the votes of around 60,000 people whose voter registration information lacked complete driver's license or social security information.

JA 346

GRIFFIN V. STATE BOARD OF ELECTIONS

No. 320P24

*Dietz, J., dissenting*

In my view, this portion of the argument is almost certainly meritless. I also do not view it, having read Judge Griffin's petition, as a central part of the argument.

Instead, the crux of Judge Griffin's legal claims are two state law arguments that appear to me quite likely to be meritorious. It is worth articulating them here because, meritorious as they may be, they still invoke *Purcell* issues.

First, the State Board of Elections decided to permit people living in foreign countries to vote in our state elections although these people (1) have never stepped foot in North Carolina and (2) informed the State Board of Elections that they have no intent to ever reside in our state. This decision by the Board appears to me to be quite plainly unconstitutional. Only residents of North Carolina can vote in our state elections. *See* N.C. Const. art. VI, § 2.

Of course, many people not currently living within the borders of our state might nevertheless be residents for voting purposes—for example, college students attending a school in another state, or military servicemembers stationed overseas. *See* N.C.G.S. § 163-57. But under our state constitution and corresponding election laws, people who admit that they have *never* resided in North Carolina and never *intend* to reside in North Carolina simply cannot vote in our state elections. *Id*. Remarkably, the State Board of Elections decided otherwise.

Second, the State Board of Elections decided that people living in foreign countries who want to vote in our state elections do not need to comply with our

GRIFFIN V. STATE BOARD OF ELECTIONS

No. 320P24

*Dietz, J., dissenting*

State's voter ID law, although all voters living in North Carolina must do so. *See* 8 N.C. Admin. Code § 17.0109(d).

I do not have the time in this opinion for a deep dive into the Board's strained reasoning for this choice. Suffice it to say that this decision—which appears to rely on the bizarre view that voter ID is a means of "authenticating" a ballot, not identifying the human being who is voting—does not appear consistent with the text of the applicable state laws. *See* N.C.G.S. § 163-166.16 & -230.1(f1); N.C.G.S. § 163-239.

Moreover, the Board's decision is obviously inconsistent with the law's intent. One does not need a law degree to understand that people claiming to be registered North Carolina voters while mailing in absentee ballots *from a foreign country* are among the key groups of people that the General Assembly (and we the people in our state constitution) intended to be subject to our voter ID law. That law is designed to protect the integrity of our elections. It is certainly easier for foreign actors to meddle in an election from overseas. Exempting voters in foreign countries from voter ID requirements that apply to everyone else simply cannot be squared with the text of the law or the obvious legislative intent.

Having said all this, these two decisions by the State Board of Elections were not made in the context of Judge Griffin's election. They are contained in election rules already in effect when Judge Griffin's election took place. The voter ID issue stems from a regulation promulgated by the Board through an open process long

GRIFFIN V. STATE BOARD OF ELECTIONS

No. 320P24

*Dietz, J., dissenting*

before the election. *See* 8 N.C. Admin. Code § 17.0109(d). Likewise, the decision to register voters who have never resided in our state and never intend to reside here is based on the Board's public interpretation of a statute in effect since 2011. *See* Uniform Military and Overseas Voters Act, S.L. 2011-182, 2011 N.C. Sess. Laws 687, 687–89; State Board of Elections Mem. 2012-01 (Jan. 23, 2012).

Thus, in my view, these potential legal errors by the Board could have been—and should have been—addressed in litigation long before people went to the polls in November. As the Fourth Circuit recently observed, in the past few years "North Carolina has been flooded with dozens of challenges to the State's electoral regulations." *Sharma v. Hirsch*, 121 F.4th 1033, 1043 (4th Cir. 2024). Many of these challenges "are reasonably grounded in the law, and their gravity should not be understated." *Id*. But this constant litigation, although often important and laudable, "is not conducive to the most efficient administration of elections." *Id*.

This is the genesis of our state's *Purcell* principle. Because of the chaos that can emerge from repeated court-compelled changes to how we administer elections, at some point the rules governing an election must be locked in. As Justice Kavanaugh has observed, when "an election is close at hand, the rules of the road should be clear and settled." *Democratic Nat'l Comm v. Wisconsin State Legislature*, 141 S.Ct. 28, 31 (2020) (Mem.) (Kavanaugh, J., concurring). Knowing that these rules are fixed and will no longer change is essential to "giving citizens (including the losing candidates and their supporters) confidence in the fairness of the election." *Id*. Taking

GRIFFIN V. STATE BOARD OF ELECTIONS

No. 320P24

*Dietz, J., dissenting*

this concept one logical step further, once people are actually *voting* in the election, it is far too late to challenge the laws and rules used to administer that election. This is, in my view, a central concept of the *Purcell* principle.

Admittedly, the *Purcell* principle itself is a federal doctrine that only applies to federal courts. *Id.* But this Court has long acknowledged a state version of *Purcell* (although not always by name). *See Pender Cnty.*, 361 N.C. at 510; *see also Holmes v. Moore*, 382 N.C. 690, 691 (2022) (Mem.) (Newby, C.J., dissenting); *Harper v. Hall*, 382 N.C. 314, 319 (2022) (Mem.) (Barringer, J., dissenting). I believe this principle is a necessary part of our state law doctrine for the same reasons it is incorporated into federal law. Accordingly, I believe we must apply it, when appropriate, in state election litigation. This is one of those cases.

In sum, I would hold that the relief sought in the petition for a writ of prohibition comes too late. Although these challenges to our state's election laws and regulations might be meritorious, they are not ones that can change the rules of an election after the voters of our state already went to the polls and voted.

Permitting post-election litigation that seeks to rewrite our state's election rules—and, as a result, remove the right to vote in an election from people who already lawfully voted under the existing rules—invites incredible mischief. It will lead to doubts about the finality of vote counts following an election, encourage novel legal challenges that greatly delay certification of the results, and fuel an already troubling decline in public faith in our elections. I therefore believe our state version

GRIFFIN v. STATE BOARD OF ELECTIONS

No. 320P24

*Dietz, J., dissenting*

of the *Purcell* principle precludes the relief sought in the petition and respectfully

dissent from the Court's decision not to deny it outright.