Nos. 25-1018 (L), 25-1019, 25-1024

═══════════════════════════════════════

In the United States Court of Appeals
for the Fourth Circuit

═══════════════════════════════════════

JEFFERSON GRIFFIN,

*Petitioner-Appellee,*

v.

NORTH CAROLINA STATE BOARD OF ELECTIONS,

*Respondent-Appellant,*

and

ALLISON RIGGS, et al.,

*Intervenor-Respondents.*

═══════════════════════════════════════

On Appeal from the United States District Court
for the Eastern District of North Carolina

═══════════════════════════════════════

## RESPONDENT-APPELLANT'S OPENING BRIEF

Ryan Y. Park
Solicitor General

Nicholas S. Brod
James W. Doggett
Deputy Solicitors General

Sripriya Narasimhan
Deputy General Counsel

Trey A. Ellis
Solicitor General Fellow

Mary Carla Babb
Terence Steed
Special Deputy Attorneys General

N.C. Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
(919) 716-6400

*Counsel for Respondent-Appellant*

# CORPORATE DISCLOSURE STATEMENT

I certify, pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, that the appellant is not in any part a publicly held corporation, a publicly held entity, or a trade association, and that no publicly held corporation or other publicly held entity has a direct financial interest in the outcome of this litigation.

Dated:  January 15, 2025

/s/ Nicholas S. Brod
Nicholas S. Brod

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................ii

JURISDICTIONAL STATEMENT ........................................................... 1

ISSUES PRESENTED ................................................................................ 2

INTRODUCTION ...................................................................................... 3

STATEMENT OF CASE ........................................................................... 4

SUMMARY OF ARGUMENT ............................................................... 11

ARGUMENT ............................................................................................ 13

     Standard of Review ........................................................................ 13

     Discussion ........................................................................................ 14

I.    The Federal Courts Have Removal Jurisdiction ........................... 14

    A.    Removal was proper under the civil-rights removal
         statute ............................................................................... 14

    B.    Removal was also proper under section 1441 ...................... 20

         1.    The petition necessarily raises federal issues ............ 20

         2.    The federal issues raised are actually disputed .......... 27

         3.    The federal issues are substantial ............................... 27

         4.    Exercising jurisdiction would not disrupt the federal-
             state balance ............................................................... 28

i

II.    The District Court Erred In Abstaining ........................................ 29

    A.    *Burford* abstention is a narrow exception to a federal court's obligation to exercise its jurisdiction ......................... 29

    B.    Federal courts may not abstain from hearing cases properly removed under section 1443 .................................... 33

    C.    The district court erred in applying *Burford* here .............. 36

        1.    Difficult state-law questions do not dominate the petition ........................................................................ 36

        2.    Federal review would not disrupt state efforts to establish uniform election policy ................................. 40

CONCLUSION .......................................................................... 42

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

CONTENTS OF ADDENDUM ....................................................... Add. 1

ii

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Adkins v. VIM Recycling, Inc.*,
   644 F.3d 483 (7th Cir. 2011) .............................................................. 33

*American Airlines, Inc. v. Sabre, Inc.*,
   694 F.3d 539 (5th Cir. 2012) ............................................................. 23

*BP P.L.C. v. Mayor and City Council of Baltimore*,
   593 U.S. 230 (2021) ................................................................. 1, 34, 35

*Burford v. Sun Oil Co.*,
   319 U.S. 315 (1943) ................................................................. passim

*Bush v. Gore*,
   531 U.S. 98 (2000) (per curiam) ........................................................ 19

*Chico Serv. Station, Inc. v. Sol P.R. Ltd.*,
   633 F.3d 20 (1st Cir. 2011) ............................................................... 33

*Colorado River Water Conserv. Dist. v. United States*,
   424 U.S. 800 (1976) .......................................................................... 4, 30

*Detroit Police Lieutenants & Sergeants Ass'n v. City of Detroit*,
   597 F.2d 566 (6th Cir. 1979) .............................................................. 35

*Edwards v. Sammons*,
   437 F.2d 1240 (5th Cir. 1971) ........................................................... 38

*Forty Six Hundred LLC v. Cadence Educ., LLC*,
   15 F.4th 70 (1st Cir. 2021) ................................................................. 42

*Georgia v. Rachel*,
   384 U.S. 780 (1966) .......................................................................... 34

*Greenberg v. Veteran*,
   710 F. Supp. 962 (S.D.N.Y. 1989) .................................................... 34

iii

*Greenberg v. Veteran,*
889 F.2d 418 (2d Cir. 1989)................................................................34

*Gross v. Weingarten,*
217 F.3d 208 (4th Cir. 2000)............................................................41

*Gunn v. Minton,*
568 U.S. 251 (2013)........................................................20, 27, 28

*Harris v. U.S. Dep't of Transp. FMCSA,*
122 F.4th 418 (D.C. Cir. 2024)........................................................15

*In re Smith,*
114 F.3d 1247 (D.C. Cir. 1997)....................................................15

*Jamison v. Wiley,*
14 F.3d 222 (4th Cir. 1994)............................................................35

*Kolibash v. Comm. on Legal Ethics of W. Va. Bar,*
872 F.2d 571 (4th Cir. 1989)..........................................................35

*Louisiana Power & Light Co. v. City of Thibodaux,*
360 U.S. 25 (1959)..............................................................................30

*Martin v. Stewart,*
499 F.3d 360 (4th Cir. 2007)..............................................13, 14, 40

*N.C. State Conf. of NAACP v. McCrory,*
831 F.3d 204 (4th Cir. 2016)..........................................................26

*Nature Conservancy v. Machipongo Club, Inc.,*
579 F.2d 873 (4th Cir. 1978)..........................................................30

*Neufeld v. City of Baltimore,*
964 F.2d 347 (4th Cir. 1992)..........................................................37

*New Orleans Pub. Serv., Inc. v. Council of New Orleans,*
491 U.S. 350 (1989)......................................................30, 32, 39, 40

*Old Dominion Elec. Coop. v. PJM Interconnection, LLC*,
  24 F.4th 271 (4th Cir. 2022) ................................................. 13

*Ponder v. Joslin*,
  138 S.E.2d 143 (N.C. 1964) .................................................. 15

*Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*,
  996 F.3d 257 (4th Cir. 2021) ............................................... 26

*Quackenbush v. Allstate Ins. Co.*,
  517 U.S. 706 (1996) .................................................. passim

*Railroad Comm'n of Tex. v. Pullman Co.*,
  312 U.S. 496 (1941) ........................................................... 9

*Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*,
  No. 5:24-cv-00547, 2024 WL 4523912 (E.D.N.C. Oct. 17, 2024) ......... 28

*Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*,
  120 F.4th 390 (4th Cir. 2024) ..................................... passim

*Shaw v. Reno*,
  509 U.S. 630 (1993) ......................................................... 16

*Siegel v. LePore*,
  234 F.3d 1163 (11th Cir. 2000) ......................................... 38

*Vlaming v. West Point Sch. Bd.*,
  10 F.4th 300 (4th Cir. 2021) ....................................... 22, 23

## Constitutional Provision

N.C. Const. art. VI, § 2 ....................................................... 18

## Statutes

28 U.S.C. § 1291 ................................................................. 1

28 U.S.C. § 1367 ............................................................... 25

28 U.S.C. § 1441(a) ................................................................... passim

28 U.S.C. § 1443(2) ................................................................... passim

28 U.S.C. § 1447(d) .............................................................................. 1

52 U.S.C. § 10101 ................................................................................ 8

52 U.S.C. § 10307 ......................................................................... 8, 18

52 U.S.C. § 20301, *et seq.* ............................................................... 25

52 U.S.C. § 20302 ............................................................................. 25

52 U.S.C. § 20501, *et seq.* ................................................................. 8

52 U.S.C. § 20901, *et seq.* ................................................................. 8

N.C. Gen. Stat. § 163-55 ................................................................ 18

N.C. Gen. Stat. § 163-82.4(a) ................................................... 21, 23

N.C. Gen. Stat. § 163-82.11 ............................................... 24, 37, 42

N.C. Gen. Stat. § 163-182(2) ............................................................ 7

N.C. Gen. Stat. § 163-182.14 ...................................................... 7, 41

N.C. Gen. Stat. § 163-258.1 ........................................................... 25

**North Carolina Session Law**

Act of June 19, 2003, S.L. No. 2003-226 .................................... 21

**Other Authorities**

Erwin Chemerinsky, *Federal Jurisdiction* (7th ed. 2016) ..................... 30

*NC SBE Election Contest Details*, N.C. State Bd. of Elections,
  bit.ly/3PA7R6P (last visited Jan. 15, 2025) ........................................ 4

## JURISDICTIONAL STATEMENT

Petitioner Judge Jefferson Griffin filed a petition for writ of prohibition in the North Carolina Supreme Court seeking an order prohibiting Respondent North Carolina State Board of Elections from counting certain ballots in the election for Seat 6 of the North Carolina Supreme Court.  JA 19-104.

The Board removed to federal district court under 28 U.S.C. §§ 1441(a) and 1443(2).  JA 13-18.

The district court issued an order holding that it had jurisdiction under 28 U.S.C. § 1443(2).  JA 318-319.  The court nonetheless abstained and remanded this case to the state supreme court.  JA 327.

The Board timely filed a notice of appeal.  JA 329-330.  This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1447(d).  *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 715 (1996); *BP P.L.C. v. Mayor and City Council of Baltimore*, 593 U.S. 230, 237, 239, 246 (2021).

## ISSUES PRESENTED

1.    Whether the district court correctly held that the Board properly removed this case to federal court.

2.    Whether the district court erred in abstaining from deciding this case under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).

**INTRODUCTION**

In this lawsuit, Petitioner seeks to retroactively change longstanding elections rules *after* an election has already taken place in the hopes that disenfranchising over 60,000 voters would reverse his narrow loss in the election for a seat on the North Carolina Supreme Court. Petitioner does not dispute that all of these voters followed the rules in place at the time of the election. And for his main election protest involving allegedly improper voter registrations, Petitioner has failed to identify a single voter who is not a lawful voter—or even one who *actually* registered without following the law. Nor does he dispute that many of these voters have voted in North Carolina, without challenge or controversy, for decades.

The North Carolina State Board of Elections refused to accede to Petitioner's astonishing request to retroactively disenfranchise these voters, in part because doing so would violate numerous federal civil-rights laws. The district court correctly held that this refusal gives rise to federal jurisdiction under 28 U.S.C. § 1443. But it then erred by abstaining from deciding this federal dispute. Federal courts have a "virtually unflagging" duty to exercise the jurisdiction conferred on

3

them by Congress. *Colorado River Water Conserv. Dist. v. United States*, 424 U.S. 800, 817 (1976). And abstention is uniquely inappropriate in a case like this one—where a plaintiff is demanding that state officials violate federal civil-rights laws.

The Board therefore respectfully requests that this Court reverse the decision below, and direct the district court to retrieve the case from state court so the federal courts can resolve this uniquely federal case.

## STATEMENT OF CASE

Petitioner Judge Jefferson Griffin and Intervenor Associate Justice Allison Riggs were candidates in the statewide 2024 general election for Associate Justice on the North Carolina Supreme Court. Final canvassed results of the election show that Justice Riggs prevailed by 734 votes.[1]

On November 19, 2024, Petitioner filed hundreds of election protests challenging the election results. The Board voted unanimously to take jurisdiction over three categories of protests: (1) ballots cast by registered voters with alleged incomplete voter registrations (60,273

---

[1]    *NC SBE Election Contest Details*, N.C. State Bd. of Elections, bit.ly/3PA7R6P (last visited Jan. 15, 2025).

votes); (2) ballots cast by overseas citizens who have never resided in the United States (266 votes); and (3) ballots cast by military and overseas-citizen voters who did not include a photocopy of a photo ID with their absentee ballots (1,409 votes).  JA 107-108.

The Board dismissed these three categories of protests in a December 13 order.  JA 105-147.  The Board first held that the protests were not properly served on the challenged voters and thus offended due process.  JA 110.  The Board noted that Petitioner had not mailed copies of his protests to voters, but had merely mailed them a postcard stating that their "vote *may* be affected by one or more protests."  JA 112 (emphasis added).  Voters were then told "to scan a QR code to view the protest filings."  JA 112.  This code, when scanned with a smartphone, took voters to a website.  JA 113.  Voters then had to hunt for their name among hundreds of protests, which listed tens of thousands of names out of alphabetical order in small print.  JA 113.  This "needle-in-a-haystack" notice, the Board held, was not "reasonably calculated . . . to apprise" voters of the protests, offending due process.  JA 116-117 (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)).

The Board also held that accepting Petitioner's protests would offend due process for another reason: Doing so would throw out votes properly cast under the "instructions" provided by "the officials charged with running the election." JA 128 (quoting *Griffin v. Burns*, 570 F.2d 1065, 1075-76 (1st Cir. 1978)). All of Petitioner's protests required rejecting "past guidance from the State Board," duly enacted "statutes," or an "administrative rule" adopted without controversy. JA 128-129, 109. The Board held that invalidating votes cast in reliance on this authority would result in "broad-gauged unfairness" that would offend due process. JA 128-129 (quoting *Griffin*, 570 F.2d at 1078). The Board thus explained that "regardless of whether state law permits [these] election protest[s] to proceed, the federal constitution does not." JA 129.

The Board further rejected Petitioner's protests on the merits. On the first protest about alleged incomplete registrations, the Board held, among other things, that Petitioner's requested relief would violate the National Voter Registration Act (NVRA), which generally prohibits the systematic removal of voters from registration lists within ninety days of federal elections. JA 130 (citing 52 U.S.C. § 20507(c)(2)). The Board explained that "state law directs that [the Board] maintain the voter

6

rolls in compliance with the NVRA." JA 131 (citing N.C. Gen. Stat.

§ 163-82.14(a1)). The result is that there are "the same rules for

registration for voters in state and federal elections, and there is one

eligible voter list for both types of elections." JA 131. Thus,

"[r]etroactively removing these voters from the list of voters eligible to

cast a ballot," even in a state election, would violate the NVRA. JA 131.

The Board also rejected Petitioner's protests as to overseas voters

who have never resided in the United States, and military and overseas

voters who did not include a copy of a photo identification with their

ballot. JA 133, 136. On this latter protest, the Board held that

requiring military and overseas voters to provide such an identification

would likely violate the federal Uniformed and Overseas Citizens

Absentee Voting Act (UOCAVA). JA 141-143.[2]

---

[2]      The Board also instructed county boards of elections to consider
the remaining protests. JA 108. On December 27, 2024, the Board
dismissed them. JA 201-222. As a result, under state law, absent a
court order to the contrary, the Board was required to certify the
election by January 10, 2025. *See* N.C. Gen. Stat. § 163-182.14. After
certification issues, the election results are final, and any protests are
rendered moot. *See id.* § 163-182(2). Here, following the district court's
remand order, the North Carolina Supreme Court stayed the statutory
certification deadline. JA 334-351.

7

After the Board rejected his protests, Petitioner filed an original action on December 18, framed as a petition for writ of prohibition, in the North Carolina Supreme Court challenging the Board's final decision. JA 19-104. The petition seeks declaratory rulings interpreting the Help America Vote Act (HAVA), 52 U.S.C. § 20901, *et seq*.; the NVRA, 52 U.S.C. § 20501, *et seq*.; the Voting Rights Act (VRA), 52 U.S.C. § 10307; the Civil Rights Act, 52 U.S.C. § 10101; and the Fourteenth Amendment. JA 101-102.

The Board removed to federal court under 28 U.S.C. §§ 1441(a) and 1443(2). JA 13-18. On December 23, Petitioner moved for a preliminary injunction. JA 172-174. On December 26, the district court directed the Board to respond to that motion, and further to show cause why this case should not be remanded to the North Carolina Supreme Court. JA 9.

On January 1, 2025, the Board filed its response. JA 223-253. That Friday evening, January 3, Petitioner filed a separate remand motion. JA 267-269. On Monday, January 6, the district court issued an order remanding the case. JA 301-327. It did so without affording the Board any opportunity to respond to Petitioner's remand motion.

8

In its order, the district court first held that it had jurisdiction under 28 U.S.C. § 1443(2), as the Board was refusing to act on the basis that doing so would violate the NVRA, a federal civil-rights law.  JA 318-319.  However, the district court abstained from deciding the case under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).  JA 301.[3]

Within minutes of issuing its order that evening, the district court sent certified copies of the remand order to the state supreme court and closed the federal case docket.  JA 328.  Respondent filed a notice of appeal the same evening.  JA 329-330.  The next morning, the North Carolina Supreme Court issued an order granting Petitioner's motion for a temporary stay of the certificate of election and setting an expedited briefing schedule.  JA 334-335 (setting briefing to conclude on January 24, 2025, and not scheduling oral argument).

On the same Monday evening that the district court issued its remand order, the district court also entered summary remand orders

---

[3]     Before the district court's order, no party or amicus had mentioned *Burford* as a possible basis for abstention.  Petitioner had cited a *different* abstention doctrine, under *Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941), in his remand motion.  JA 267.  Undersigned counsel were preparing a response to that argument when, without notice, the district court remanded under *Burford*.

9

in two related cases, *Griffin v. North Carolina State Board of Elections*,
No. 5:24-cv-00731-M-RJ, D.E. 24, 25; and *Kivett v. North Carolina State
Board of Elections*, No. 5:25-cv-00003-M-BM, D.E. 19, 20.  In those
orders, the district court adopted the reasoning from this case and
immediately issued certified copies of those orders to state court.  The
Board appealed both decisions to this Court the same day,[4] but not
before both Petitioner and the *Kivett* Plaintiffs requested emergency
hearings on their motions for a temporary restraining order or
preliminary injunction in Wake County Superior Court.[5]  After the
North Carolina Supreme Court issued its temporary stay on January 7,

---

[4]    These appeals remain pending before this Court.  Nos. 25-1020,
25-1021.

[5]    In papers that Petitioner served on the Board on the evening of
January 6, Petitioner sought a hearing the next morning.  On the
morning of January 7, Wake County court staff informed the parties
that the matter would not be heard that morning and would be
scheduled after Petitioner served a filed copy of the amended motion.
However, undersigned counsel later learned that Petitioner's counsel
went to the Wake County courthouse and obtained an ex parte order on
their motion, without notifying any of the other parties.  That order was
later withdrawn by the Court on the ground that proper notice was not
provided to the Board.  *See* Mot. to Stay, *Griffin v. N.C. State Bd. of
Elections*, No. 25-1020, (4th Cir.) (Dkt. 7 at 12).  Petitioner has declined
the Board's request to share the contents of the withdrawn ex parte
order.

10

Petitioner withdrew his request for a hearing. In *Kivett*, the trial court denied the motion; plaintiffs have appealed and are seeking emergency relief in the North Carolina Court of Appeals. Pet. at 2, No. P25-30 (N.C. Ct. App.), bit.ly/3C6O8IL.

## SUMMARY OF ARGUMENT

The district court correctly held that the Board properly removed this case to federal court. The court erred, however, in abstaining from deciding the federal issues here.

To start, the district court was correct that the case was properly removed under section 1443(2), which allows a state government defendant to remove any civil action brought in state court "for refusing to do any act on the ground that it would be inconsistent with" "any law providing for equal rights." 28 U.S.C. § 1443(2). The federal civil-rights laws under which the Board has removed—the NVRA, the VRA, and the Equal Protection Clause—are all laws providing for equal rights that prohibit the Board from canceling the more-than 60,000 challenged votes.

Removal was also proper under section 1441. The primary state statute at issue directly implements a federal statute, HAVA, as part of

11

North Carolina's unified registration system for federal and state elections. The North Carolina statute derives its meaning entirely from HAVA. The petition thus necessarily raises issues of federal law and was properly removed under section 1441.

Despite holding that the case was properly removed, the district court decided to abstain under *Burford*. This was error. Federal courts may not abstain from hearing cases properly removed under section 1443. When Congress enacted section 1443, it meant to guarantee a federal forum to state officials who refuse to violate federal civil-rights laws. In this context, it is categorically inappropriate for federal courts to decline to hear such cases.

Even if *Burford* could apply, the district court erred in abstaining on these facts. *Burford* is a narrow exception to the ordinary rule that federal courts must exercise the jurisdiction that Congress confers on them. It applies only when cases raise certain difficult state-law questions or federal-court review would threaten uniform state treatment of an important local policy. *Quackenbush*, 517 U.S. at 725-26.

The facts of this case do not call for *Burford* abstention. Unsettled state-law questions do not dominate the petition. For example, Petitioner's claims of allegedly improper voter registrations are based on a federal statute, HAVA. And the relief that Petitioner seeks is barred by multiple federal civil-rights laws. Nor would federal-court review disrupt state efforts to establish uniform election policy. Indeed, by leapfrogging the state-trial court charged with hearing these cases and filing an unprecedented original action directly in the state supreme court, Petitioner himself has created disuniformity in the State's election system.

This Court should reverse.

## ARGUMENT

### Standard of Review

This Court reviews issues of subject-matter jurisdiction, including removal, de novo. *Old Dominion Elec. Coop. v. PJM Interconnection, LLC*, 24 F.4th 271, 279 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 87 (2022).

This Court reviews "a district court's decision to abstain under *Burford* for abuse of discretion." *Martin v. Stewart*, 499 F.3d 360, 363

13

(4th Cir. 2007). "A district court abuses its discretion whenever its decision is guided by erroneous legal principles," and "there is little or no discretion to abstain in a case which does not meet traditional abstention requirements." *Id.* (quotation marks and citations omitted).

## Discussion

## I.  The Federal Courts Have Removal Jurisdiction.

### A.  Removal was proper under the civil-rights removal statute.

The district court was correct to hold that removal was proper under 28 U.S.C. § 1443(2).  JA 320.  That statute permits a state government defendant to remove any civil action brought in state court "for refusing to do any act on the ground that it would be inconsistent with" "any law providing for equal rights."  28 U.S.C. § 1443(2).  Here, the Board refused to cancel the votes of more than 60,000 North Carolinians in part because doing so would violate the NVRA, the VRA, and the Equal Protection Clause.  Removal is therefore proper.

The district court correctly concluded that the petition for a writ of prohibition is a "civil action" for purposes of removal.  JA 310.  As the court explained, the term "civil action" is generally afforded capacious meaning:  "[A] civil action is a judicial proceeding in which a party

14

seeks a decree to redress a private right." JA 310. That is, a "civil action is simply a civil judicial proceeding." JA 310 (quoting Black's Law Dictionary (11th ed. 2019)).

The court held that the petition here "squares with that definition: [I]t is an original civil (not criminal) judicial proceeding through which [Petitioner] seeks to vindicate his private (not public) rights." JA 310-311; *see also Ponder v. Joslin*, 138 S.E.2d 143, 144 (N.C. 1964) (lawsuit seeking a "writ of mandamus" against the Board concerning an election protest was a "civil action"); *In re Smith*, 114 F.3d 1247, 1250 (D.C. Cir. 1997) ("Although Congress did not define the term 'civil action' for purposes of the PLRA, we conclude that it includes a petition for a writ of prohibition that . . . includes underlying claims that are civil in nature.").

As the district court also rightly held, that Petitioner brought his civil action directly in the North Carolina Supreme Court does not change this analysis. It is still a civil action commenced in "state court." *See, e.g.*, *Harris v. U.S. Dep't of Transp. FMCSA*, 122 F.4th 418, 422-24 (D.C. Cir. 2024) (defining "state court'" as "the state court system" generally, including appellate courts, for purposes of removal).

15

The civil-rights removal statute squarely applies to this civil action.  As this Court recently held, the NVRA is a "law providing for equal rights" and thus "provides a proper basis for removal under Section 1443(2)." *Republican Nat'l Comm. v. N. Carolina State Bd. of Elections* (*RNC*), 120 F.4th 390, 408 (4th Cir. 2024).  This Court likewise observed in *RNC* that courts have routinely held that section 1443 removal under the VRA is proper.  *Id.* at 406 n.5.  The Equal Protection Clause is also a "law providing for equal rights," and thus provides a proper basis for removal under section 1443(2) as well. *Shaw v. Reno*, 509 U.S. 630, 642 (1993) (the "central purpose" of the Equal Protection Clause is "to prevent the States from purposefully discriminating between individuals on the basis of race").

Here, moreover, the Board is refusing to take the requested action because doing so would clash with those three civil-rights laws.  As the district court held, Petitioner's lawsuit is premised on the Board's "refusal to sustain his challenges and discard the votes of tens of thousands of voters."  JA 318.  "Had the State Board adopted [Petitioner's] arguments and removed the in-question votes from the current tally, i.e., had the State Board taken affirmative action, Griffin

16

would not have sought a writ of prohibition from the state Supreme Court." JA 318.

Petitioner nonetheless has argued that he does not challenge any refusal to act, but rather seeks only to "prevent the Board from taking unlawful action." Dkt. 17 at 19. In Petitioner's view, this makes the petition unsuitable for removal under section 1443(2).

As the district court correctly held, this argument fails. JA 318-319. The Board explicitly refused to accede to Petitioner's request to cancel votes because doing so would violate the NVRA twice over. JA 130-131. First, the Board explained that the NVRA prohibits the Board from removing voters from the rolls outside of narrow, enumerated circumstances that are not present here. JA 130 (citing 52 U.S.C. §§ 20507(a)(3), (a)(4), (c)(1)). Second, it explained that the NVRA also prohibits the Board from removing voters en masse from the rolls within 90 days of an election. JA 130 (citing 52 U.S.C. § 20507(c)(2)). Thus, as the district court held, "considering North Carolina's unified system of registration and election administration," the NVRA provides a proper basis for removal. JA 319-320.

In addition, although the district court did not reach the VRA or Equal Protection Clause, those laws also provide a proper basis for removal under section 1443(2).

The VRA prohibits officials from "willfully fail[ing] or refus[ing] to tabulate, count, and report" the votes of individuals who were "qualified to vote" in the election. 52 U.S.C. § 10307(a). In North Carolina, to qualify to vote, a person must (1) be at least 18 years old; (2) be a U.S. citizen; (3) have resided in the State and precinct for 30 days preceding the election; (4) not have been adjudged guilty of a felony without having citizenship rights restored; and (5), for in-person voters, present photo ID or meet a qualifying exception. N.C. Const. art. VI, § 2; N.C. Gen. Stat. § 163-55. Except for the 266 votes cast by persons who have never resided in the United States, Petitioner does not argue that any voter whose vote he is seeking to cancel fails to meet these qualifications. JA 126. As a result, under the VRA, the Board may not cancel those votes.

The Equal Protection Clause also does not allow the Board to cancel these votes. "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment,

18

value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000) (per curiam). But that is precisely what Petitioner is asking the Board to do here. The vast majority of the ballots he seeks to invalidate were cast by voters whose registration records are missing driver's license or social security numbers and voted *before* election day (either absentee or early in-person). Petitioner has not challenged voters who voted *on* election day but who also lacked a driver's license or social security number in their records. *See, e.g.*, *RNC*, 120 F.4th at 399 (noting allegation that 225,000 registered voters were missing their data in their records). By seeking to cancel only pre-election day votes, Petitioner asks the Board to "valu[e] one person's vote over that of another." *Bush*, 531 U.S. at 104-05. The Equal Protection Clause forbids the Board from taking this action.

In sum, Petitioner challenges the Board's refusal to cancel the votes of more than 60,000 voters. The reason the Board refuses to do so is because it would violate the NVRA, VRA, and Equal Protection Clause. Removal is therefore proper under section 1443(2).

19

### B.    Removal was also proper under section 1441.

The civil-rights removal statute is sufficient basis for removal of all three of Petitioner's protests.  However, removal was also proper under 28 U.S.C. § 1441.  Section 1441(a) allows a defendant to remove any claim over which a federal district court would have had original jurisdiction under section 1331.  *Id.*  "[F]ederal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress."  *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (citing *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 313-14 (2005)).  Applying that test here, the petition plainly arises under federal law.  The district court erred in concluding otherwise.

### 1.    The petition necessarily raises federal issues.

Substantial questions of federal law pervade the petition.  The petition asks to cancel votes by voters who, it claims, registered in violation of HAVA.  It also seeks a decree on the scope of "the NVRA, HAVA, the VRA, and the Civil Rights Act," as well as the "federal

20

constitution."  JA 101-102.  These requests squarely raise federal issues.

### a.    The petition requires construction of HAVA.

Petitioner demands that the Board cancel the votes of eligible and qualified voters who he claims improperly registered by failing to provide their driver's license or social security number on their registration forms.  JA 51-55.  Deciding whether these voters were properly registered necessarily requires this Court to construe HAVA.

The state statute that Petitioner alleges was violated is N.C. Gen. Stat. § 163-82.4(a).  JA 52, 54.  That statute merely implements HAVA. In fact, the provision at issue—which requires that registration forms request a driver's license or social security number—was enacted through a session law whose express purpose was to "ensure that the State of North Carolina has a system for North Carolina elections that complies with the requirements for federal elections set forth in the federal Help America Vote Act of 2002."  Act of June 19, 2003, S.L. No. 2003-226, § 1 (Add. 2).  The identification requirement did not exist in the North Carolina statutes until Congress enacted HAVA and merely implements HAVA's directive to the States.  As a result, it is impossible

21

to determine whether the state statute was violated without interpreting HAVA.

On that question, this Court has already determined that a "federal question[] [is] essential to resolving" whether "North Carolina's previous voter registration form violate[d] HAVA." *RNC*, 120 F.4th at 400. Because the issue raised by Petitioner "contains no articulation of a state [law] violation separate and apart from an alleged HAVA violation," it is a "state cause of action in name only." *Id.* at 401.

The district court held to the contrary because "this matter involves a state election." JA 313. In the court's view, HAVA applies only to federal elections and, as a result, "[n]othing prevents [Griffin] from prevailing on his state [law arguments] on exclusively state grounds." JA 313 (alterations in original) (quoting *Vlaming v. West Point Sch. Bd.*, 10 F.4th 300, 308 (4th Cir. 2021)).

That is wrong. The state statute at issue is not merely "coextensive" with "analogous federal . . . provisions." JA 313 (quoting *Vlaming*, 10 F.4th at 307). Instead, the state statute *directly* implements HAVA's requirement—based on Congress's explicit

22

directive to the States, in the context of federal elections—for state elections as well.

This is why, contrary to the district court's analysis, this case is different from *Vlaming v. West Point School Board* and *American Airlines, Inc. v. Sabre, Inc.*, 694 F.3d 539 (5th Cir. 2012). JA 313-315. In *Vlaming*, the state-law provisions were merely "coextensive" with provisions of federal law. 10 F.4th at 305. The same is true of *American Airlines*. 694 F.3d at 542 (state statute was construed "in harmony with . . . comparable federal antitrust statutes") (citation omitted). Here, by contrast, the state statute is not merely interpreted in a similar fashion as federal law—it implements federal law directly. Section 163-82.4 operates in just the same way as the related provision requiring voter-list maintenance to "meet the requirements of . . . HAVA" that was at issue in *RNC*. 120 F.4th at 401 (citing N.C. Gen. Stat. § 163-82.11(c)) (cleaned up).

Were it otherwise—and a court could look only to the four corners of the state statute for guidance on voter registration for statewide offices—that interpretation would run headlong into other provisions of state law. According to the district court, state law could require

23

different registration requirements for state and federal contests, resulting in two separate voter databases. *See* JA 314.  But the North Carolina General Assembly specifically directed the Board to create a single statewide voter database, with the same voter registration requirements, for both state and federal elections.  N.C. Gen. Stat. § 163-82.11(a) ("The State Board of Elections shall develop and implement a *statewide*" registration system that "shall serve as the official voter registration list" for "*all elections* in the State") (emphasis added).  That is why this Court held that "North Carolina has a unified registration system for both state and federal elections, and thus is bound by the provisions" of federal registration law—including HAVA— for both state and federal elections.  *RNC*, 120 F.4th at 401-02.

Petitioner seeks to cancel the votes of 60,000 North Carolinians by claiming that they were not properly registered.  A court cannot address this issue without construing HAVA.

### b. The petition also requires construction of UOCAVA.

Petitioner also asks this Court to invalidate the votes of overseas voters who did not present a photo ID at the time of voting.  JA 101.

24

This question requires this Court to interpret a different federal statute, UOCAVA.  52 U.S.C. § 20301, *et seq*.

The state laws that regulate military and overseas voters are codified in a state statute known as the Uniform Military and Overseas Voters Act (UMOVA).  N.C. Gen. Stat. § 163-258.1.  UMOVA directly implements UOCAVA's directive to the States to establish procedures enabling military and other overseas voters to use federal forms to register, submit a request for an absentee ballot, and vote absentee.  52 U.S.C. § 20302.  Thus, just as with HAVA, Petitioner's arguments regarding voting requirements for military and overseas voters cannot be considered without construing federal law.[6]

### c.   The petition affirmatively seeks declaratory relief under federal law.

The petition also explicitly requests a judicial declaration that canceling tens of thousands of votes post-election does not violate several federal laws.  JA 101-102.  By doing so, the petition necessarily

---

[6]     Because the federal court has jurisdiction over the protests raising HAVA and UOCAVA, the court may exercise supplemental jurisdiction over the other protest as well.  *See* 28 U.S.C. § 1367 (allowing federal courts to exercise supplemental jurisdiction over state-law claims paired with federal claims).

25

raises substantial issues of federal law because federal courts would have had original jurisdiction to hear Petitioner's claims seeking this same declaratory relief had he filed there directly. *See, e.g.*, *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 262 (4th Cir. 2021) (seeking declaratory judgment and order requiring the Board to comply with plaintiff's request under the NVRA); *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 218, 238 (4th Cir. 2016) (seeking declaratory judgment that state election law violated the Fourteenth Amendment). This Court therefore has jurisdiction under section 1441.

The district court held otherwise, concluding that Petitioner is "merely anticipat[ing] or reply[ing] to a probable defense" by the Board. JA 317 (alterations in original) (quoting *Capitol Broad. Co. v. City of Raleigh*, 104 F.4th 536, 540 (4th Cir. 2024)). But this misreads the actual petition. Petitioner is the master of his own complaint. He chose to seek a series of affirmative judicial decrees on the scope of federal law. By doing so, Petitioner has squarely authorized federal jurisdiction.

### 2.    The federal issues raised are actually disputed.

The federal questions raised in the petition are also "actually disputed." *Gunn*, 568 U.S. at 258.  Petitioner seeks to cancel more than 60,000 votes in a way that the Board believes would require it to violate federal civil-rights laws.  The Board further does not believe that HAVA and UOCAVA require it to cancel the challenged votes.  On the merits, the applicability of HAVA, UOCAVA, and the civil-rights provisions are "the central point of dispute." *Gunn*, 568 U.S. at 259.

### 3.    The federal issues are substantial.

A federal question is substantial when the issue is "importan[t] . . . to the federal system as a whole." *RNC*, 120 F.4th at 403-04 (citing *Gunn*, 568 U.S. at 260).

The federal issues raised in the petition are, without doubt, substantial.  Petitioner seeks to cancel the votes of more than 60,000 North Carolinians *after* all the votes have been cast and counted.  JA 32-33, 101.  A decision based on federal law that could have such wide-ranging consequences to the fundamental rights of voters is "substantial" by any measure.  Indeed, this Court recently "ha[d] no hesitation concluding that" whether a "voter through no apparent fault

27

of their own was initially registered to vote in a manner inconsistent with [HAVA]" is "of substantial importance." *RNC*, 120 F.4th at 404 (cleaned up).

### 4. Exercising jurisdiction would not disrupt the federal-state balance.

As the district court in *RNC* observed, to decide whether exercising jurisdiction would disrupt the federal-state balance, courts engage in a "practical, common-sense inquiry." No. 5:24-cv-00547, 2024 WL 4523912, at *16 (E.D.N.C. Oct. 17, 2024). Courts project whether accepting jurisdiction will "attract a horde of original filings and removal cases raising other state claims" and ask whether exercising jurisdiction would "disrupt the federal-state balance approved by Congress." *RNC*, 120 F.4th at 404 (citing *Gunn*, 569 U.S. at 258) (cleaned up)). Neither consideration militates against jurisdiction here.

First, as this Court held in *RNC*, "it will be the rare state equal protection case that turns on a violation of HAVA or the NVRA." *Id.* at 404-05. The same is true here: It will be the rare case that would seek to cancel tens of thousands of votes after an election has taken place, based on state law that implements federal law, and that would

28

potentially violate five separate federal statutes and the Fourteenth Amendment.

Moreover, the petition, though "com[ing] cloaked in state [law] garb," raises only federal questions. *Id.* at 405; *see supra* Part I.B.1. The alleged state-law violation necessarily turns on the contested interpretation of federal laws. As this Court observed in *RNC*, it is unlikely that Congress intended to prevent federal courts from deciding cases that turn on federal statutes relating to voting rights. *See RNC*, 120 F.4th at 405. The "mere invocation" of state law should not frustrate this congressional understanding. *Id.*

## II.    The District Court Erred In Abstaining.

The court below held that, even though it had jurisdiction to hear this case, it should abstain from exercising that jurisdiction. JA 326-327. Abstention, however, is categorically inapplicable in cases under section 1443(2)'s refusal clause. And even if that were not the case, the district court would have erred in deciding to abstain here.

### A.    *Burford* abstention is a narrow exception to a federal court's obligation to exercise its jurisdiction.

Federal courts "have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." *Quackenbush*, 517 U.S. at 716.

After all, "Congress, and not the Judiciary, defines the scope of federal jurisdiction within the constitutionally permissible bounds." *New Orleans Pub. Serv., Inc. v. Council of New Orleans* (*NOPSI*), 491 U.S. 350, 359 (1989). That is why abstention "remains 'the exception, not the rule,'" *NOPSI*, 491 U.S. at 359 (citation omitted). The federal courts' obligation to hear cases within their jurisdiction is thus "virtually unflagging." *Colorado River*, 424 U.S. at 817.

In keeping with these principles, the Supreme Court has "carefully defined . . . the areas in which such 'abstention' is permissible." *NOPSI*, 491 U.S. at 359 (citation omitted). The relevant abstention doctrine here arises under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).[7] In *Burford*, companies challenged in federal district court a state agency's order granting a permit to drill oil wells. *Id.* at 316-17.

---

[7] Below, the district court partly grounded its decision to abstain in the Supreme Court's decision in *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25 (1959). J.A. 321-326. *Thibodaux* abstention, however, is only warranted "in diversity cases." *See Nature Conservancy v. Machipongo Club, Inc.*, 579 F.2d 873, 875 (4th Cir. 1978); *see also* Erwin Chemerinsky, *Federal Jurisdiction* 846 (7th ed. 2016) (explaining that *Thibodaux* "establish[es] that federal courts should abstain in *diversity* cases" in certain situations (emphasis added)). Here, of course, the district court's jurisdiction is not premised on diversity.

30

The order was "part of the general regulatory system devised for the conservation of oil and gas in Texas," and Texas had established the agency to regulate it. *Id.* at 318, 324-26. The regulatory scheme allowed the parties to seek judicial review of the agency's orders in a single state trial court "[t]o prevent the confusion of multiple review of the same general issues." *Id.* at 326.

The Court held that federal courts should abstain from exercising jurisdiction in these unique circumstances. "As a practical matter," the Court explained, "the federal courts can make small contribution to the well organized system of regulation and review which the Texas statutes provide." *Id.* at 327. The regulation of oil and gas presented "as thorny a problem as has challenged the ingenuity and wisdom of legislatures." *Id.* at 318 (citation omitted). And the parties had sought federal-court review on "obviously difficult problems of state law"—from the res judicata effect of a previous state-court judgment to whether another pending state-court case had deprived the state agency of jurisdiction to act. *Id.* at 331 & n.28. The Court observed that

misinterpreting Texas state law on these questions could "provoke[ ] a needless conflict with the Texas courts." *Id.*; *see id.* at 334.

The Court also stressed Texas's need for uniform regulation. Because "each oil and gas field must be regulated as a unit for conservation purposes," the State had "to control the flow of oil and at the same time protect the interest of the many operators [who] have from time to time been entangled in geological-legal problems of novel nature." *Id.* at 319-20.

Given these unique circumstances, the Supreme Court has since made clear that *Burford* applies only in two narrow contexts. First, "when there are 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar.'" *NOPSI*, 491 U.S. at 361 (quoting *Colorado River*, 424 U.S. at 814). Second, "where the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *Id.* (quoting *Colorado River*, 424 U.S. at 814). This case does not implicate either of these "extraordinary" contexts. *Quackenbush*, 517 U.S. at 726.

32

**B.      Federal courts may not abstain from hearing cases properly removed under section 1443.**

As a threshold matter, the district court's decision to abstain should be reversed because federal courts may not abstain under *Burford* from hearing cases removed under section 1443.

When a case is properly removed under the civil-rights removal statute, the federal interest in resolving a case necessarily outweighs any competing interests that might justify abstention under *Burford*. That is so because "[a]bstention doctrines are not intended . . . to alter policy choices that Congress itself considered and addressed." *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 497 (7th Cir. 2011); *see also Chico Serv. Station, Inc. v. Sol P.R. Ltd.*, 633 F.3d 20, 31 (1st Cir. 2011) (holding that abstention only allows courts to decline jurisdiction based on considerations "that were not . . . foreseen by Congress at the time that it granted jurisdiction").

Here, when Congress enacted section 1443, Congress sought to ensure that state officials protecting federal civil rights would be able to litigate the claims against them in a federal forum. Nearly sixty years ago, the Supreme Court held that section 1443 "*entitles* . . . defendants to remove [cases] to . . . federal court" when its statutory criteria for

33

removal are satisfied. *Georgia v. Rachel*, 384 U.S. 780, 788 (1966) (emphasis added). The Court recently reaffirmed this holding, again explaining that section 1443 "*guarantees* a federal forum for certain federal civil rights claims." *BP*, 593 U.S. at 235 (emphasis added).

In keeping with this understanding of the statute, the Second Circuit has held that federal courts may not abstain from exercising jurisdiction when a case is properly removed under section 1443. In *Greenberg v. Veteran*, it reversed a district court's decision to abstain under *Burford* in a case where, as here, the refusal clause had been invoked. 889 F.2d 418 (2d Cir. 1989). The Second Circuit held that abstention under *Burford* "would be inconsistent with the purpose" of section 1443. *Id.* at 422. Congress, as the district court explained, had made an "explicit determination that state officials facing the type of federal-state conflict" addressed by the statute "should be afforded the option of a Federal forum." *Greenberg v. Veteran*, 710 F. Supp. 962, 970 n.7 (S.D.N.Y. 1989).

This Court has reached the same conclusion with respect to a similar removal statute. Section 1442 allows federal officers to remove cases in certain situations "to protect federal officers in the performance

34

of their federal duties," *Kolibash v. Comm. on Legal Ethics of W. Va. Bar*, 872 F.2d 571, 573 (4th Cir. 1989)—just as section 1443 allows state officers to remove "to protect [themselves] from being penalized for failing to enforce discriminatory state laws or policies." *Detroit Police Lieutenants & Sergeants Ass'n v. City of Detroit*, 597 F.2d 566, 568 (6th Cir. 1979).

This Court has held that because section 1442 "*guarantee[s]* a federal officer the right to remove an action," district courts have "no authority to abstain" where jurisdiction has been properly invoked under section 1442. *Jamison v. Wiley*, 14 F.3d 222, 238-39 (4th Cir. 1994) (emphasis added); *see also Kolibash*, 872 F.2d at 575 (because "the federal interest in protecting federal officials . . . is paramount," "discretionary abstention" is "not available").

Here, too, because the Supreme Court has interpreted section 1443 as "guarantee[ing] a federal forum" for state officials, federal courts lack authority to abstain when a case has been properly removed under section 1443. *BP*, 593 U.S. at 253.

## C.    The district court erred in applying *Burford* here.

Even if a court could invoke *Burford* in a case removed under

section 1443(2), the district court erred in holding that *Burford*

abstention was warranted on these facts.

### 1.    Difficult state-law questions do not dominate the petition.

Petitioner's central claim is that roughly 60,000 North Carolina

voters were improperly registered because they lack a driver's license or

social security number in the Board's voter registration database.  JA

51-55.  That is a challenge to whether voters were registered in

violation of a federal statute—HAVA—that state law implements.  *See*

*supra* Part I.B.  Petitioner also requests that the Board decline to count

these votes.  JA 32-33, 101.  That remedy is barred by multiple federal

laws.  *See supra* Part I.  Resolving this case thus does not require a

federal court to answer unsettled state-law questions.[8]

North Carolina's "unified registration system for both state and

federal elections" only underscores the pervasive federal-law issues

---

[8]    As discussed above, Petitioner's challenge to the votes of overseas
voters who did not present a photo ID at the time of voting also
implicates a federal statute, UOCAVA.  *See supra* Part I.B.1.b.

36

here. *RNC*, 120 F.4th at 401 (citing N.C. Gen. Stat. § 163-82.11). This
unified system means that North Carolina "is bound by the provisions"
of federal registration law in state and federal elections. *Id.* at 401-02;
*see also supra* Part I.B. As a result, a ruling on whether these voters
were properly registered, and whether their votes may be counted,
"could very much change how federal law is enforced" in future federal
elections, even though Petitioner here ran in a state contest. *RNC*, 120
F.4th at 404. This case thus does not present the risk of "contradictory
adjudications by the state and federal courts" on matters of pure state
policy that *Burford* was designed to prevent. *Quackenbush*, 517 U.S. at
725.

Moreover, this Court has held that federal-court review can be
particularly important in cases raising potential conflicts between state
and federal law. *Neufeld v. City of Baltimore*, 964 F.2d 347, 350 (4th
Cir. 1992) ("[A] federal court should not abstain under *Burford* just
because resolution of a federal question may result in overturning state
policy."). That is the case here. To the extent that this case raises any
state-law questions, they are in the context of federal law prohibiting
that which Petitioner claims state law requires. If, for example, state

37

law really did require canceling the ballots cast by certain voters under

these circumstances, that state law would violate the federal civil-rights

laws and the U.S. Constitution. *See supra* Part I.A.

Likewise, "the presence of federal-law issues must always be a

major consideration weighing against surrender" of federal-court

jurisdiction. *Quackenbush*, 517 U.S. at 729 (citation omitted). Here,

the significant federal issues in this case weigh strongly against

abstention. *Burford* abstention in voting-rights cases is often

"particularly inappropriate" for just this reason. *Siegel v. LePore*, 234

F.3d 1163, 1174 (11th Cir. 2000) (en banc) (per curiam); *Edwards v.*

*Sammons*, 437 F.2d 1240, 1244 (5th Cir. 1971) (reversing lower court's

decision to abstain because "abstention is not to be countenanced in

cases involving such a strong national interest as the right to vote").

Indeed, Petitioner himself seeks a judicial declaration that his

requested relief does not violate multiple federal statutes and the

Fourteenth Amendment. JA 101-102. That request emphasizes how

"the federal interests in this case are pronounced." *Quackenbush*, 517

U.S. at 728. This is not a situation where, for example, a party claims

"that a state agency has misapplied its lawful authority or has failed to

take into consideration or properly weigh relevant state-law factors"—
the type of difficult state-law questions the Court abstained from
deciding in *Burford*. *NOPSI*, 491 U.S. at 362.

The district court's contrary conclusion lacks merit. The district
court, while conceding that federal law is "practically relevant" given
North Carolina's unified registration system, reasoned that this
challenge to North Carolina's voter-registration and list-maintenance
system would not "legally implicate federal elections." JA 323, 325.
But as discussed above, state law fully implements federal law in this
context by applying that federal law to state elections. *See supra* Part
I.B; *accord RNC*, 120 F.4th at 401-02. The district court's effort to
distinguish between the practical and legal effects of federal law in this
area therefore misses the mark.

The district court also stressed that state courts are "competent to
enforce federal constitutional rights." JA 325. That is undoubtedly
true. But if accepted, that argument would justify abstention in *any*
case involving federal constitutional law. The mere availability of a
state forum in which to litigate a federal constitutional question cannot
determine whether a federal court should abstain. Rather, the question

39

is whether there are significant federal issues that predominate.

*NOPSI*, 491 U.S. at 363; *see Martin*, 499 F.3d at 370 (holding abstention

was inappropriate because "issues of federal law—the constitutionality

of [state] statutes under the Fourteenth Amendment—dominate this

action"). They do so here.

### 2. Federal review would not disrupt state efforts to establish uniform election policy.

Nor would federal review disrupt state efforts to establish uniform

election policy. To the contrary, accepting *Petitioner's* arguments would

disrupt the uniformity of North Carolina's election system.

To begin, the State's routine procedural pathway for resolving

election protests in no way approximates the complex regulatory

framework at issue in *Burford*. In that case, the Supreme Court

emphasized that "nonlegal complexities" required Texas courts to be

"working partners" with the agency "in the business of creating a

regulatory system for the oil industry." *Burford*, 319 U.S. at 323, 326.

Given that context, the Supreme Court held that federal-court review of

these orders interfered with the State's strong interest in uniform and

streamlined adjudication. *Id.* at 326-27. Here, it is true that, like in

*Burford*, the North Carolina legislature has passed a statute directing

challenges to the Board's decisions to be filed initially in a single court.
N.C. Gen. Stat. § 163-182.14(b).  But that routine and commonplace
decision to channel cases to a particular venue, without more, cannot
possibly justify abstention under *Burford*.

Moreover, even if the North Carolina statutory scheme were
analogous to the complex regulatory framework in *Burford*, Petitioner
has not followed it here.  Petitioner instead filed an unprecedented
original action directly in the North Carolina Supreme Court, asking it
to immediately cancel more than 60,000 votes and award him the
election, without allowing any factfinding regarding his claims that
those voters were ineligible based on certain information missing from a
government database.  When a party "forsakes the advantages of [a]
single state forum," exercise of federal jurisdiction cannot "hinder [a
State's] statutory goal of a single, exclusive proceeding."  *See Gross v.
Weingarten*, 217 F.3d 208, 224 (4th Cir. 2000).  Any interest in uniform
state adjudication under *Burford* is thus not present here.

In addition, the relief that Petitioner seeks will create
disuniformity.  Contrary to the design of North Carolina's uniform
registration system, Petitioner seeks to apply different rules to federal

41

and state elections.  *Contra* N.C. Gen. Stat. § 163-82.11.  And contrary to federal law, Petitioner seeks to retroactively change election rules for only a subset of voters.  *See supra* Part I.A.  Petitioner's requested relief thus threatens to create the very type of conflicting standards that *Burford* abstention seeks to avoid.

## CONCLUSION

The Board respectfully requests that this Court reverse the district court and remand with instructions that the district court retrieve the case from state court and exercise federal jurisdiction over the merits of this dispute.  *Forty Six Hundred LLC v. Cadence Educ., LLC*, 15 F.4th 70, 79, 81 (1st Cir. 2021).

This the 15th day of January, 2025.

Ryan Y. Park
Solicitor General

/s/ Nicholas S. Brod
Nicholas S. Brod
Deputy Solicitor General

James W. Doggett
Deputy Solicitor General

Sripriya Narasimhan
Deputy General Counsel

42

Trey A. Ellis
Solicitor General Fellow

Mary Carla Babb
Terence Steed
Special Deputy Attorneys General

North Carolina Department of Justice
Post Office Box 629
Raleigh, NC 27602
(919) 716-6400

*Counsel for State Board Respondent-
Appellant*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of this Court's January 14, 2025 order, Dkt. 47, because it contains 7954 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (6) because it has been prepared in a proportionally spaced typeface: 14-point Century Schoolbook font.

This the 15th day of January, 2025.

<u>/s/ Nicholas S. Brod</u>
Nicholas S. Brod

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will automatically serve electronic copies on all counsel of record

This the 15th day of January, 2025.

/s/ Nicholas S. Brod
Nicholas S. Brod

Add. 1

## CONTENTS OF ADDENDUM

**Addendum Page**

Act of June 19, 2003, S.L. No. 2003-226 .......................................... Add. 2

*The General Assembly of North Carolina enacts:*

**SECTION 1.**    G.S. 36A-78 reads as rewritten:

"**§ 36A-78.  Power of settlor.**

~~The settlor of any trust affected by this Article may, by provision in the instrument creating the trust if the trust was created by a writing, or by oral statement to the trustee at the time of the creation of the trust if the trust was created orally, or by an amendment of the trust if the settlor reserved the power to amend the trust, relieve liabilities which would otherwise be imposed upon him by this Article; or alter or deny to his trustee any or all of the privileges and powers conferred upon the trustee by this Article; or add duties, restrictions, liabilities, privileges, or powers, to those imposed or granted by this Article; but no act of the settlor shall relieve a trustee from the duties, restrictions, and liabilities imposed upon him by G.S. 36A-62, 36A-63 and G.S. 36A-66.~~

(a)    The settlor of any trust affected by this Article may (i) relieve the trustee from any or all duties, restrictions, and liabilities that would otherwise be imposed upon the trustee by this Article, (ii) alter or deny to the trustee any or all of the privileges and powers conferred upon the trustee by this Article, or (iii) add duties, restrictions, liabilities, privileges, or powers to those imposed or granted by this Article. The settlor may accomplish any of these actions by one of the following methods:

(1)    By provision in the instrument creating the trust if the trust was created by a writing.

(2)    By oral statement to the trustee at the time of the creation of the trust if the trust was created orally.

(3)    By an amendment of the trust if the settlor reserved the power to amend the trust.

(4)    By written instrument delivered to the trustee of a revocable trust.

(b)    Notwithstanding subsection (a) of this section, any settlor who has not reserved the power to revoke the trust shall not relieve the trustee from the duties, restrictions, and liabilities imposed upon the trustee by G.S. 36A-62, 36A-63, and 36A-66."

**SECTION 2.**    This act is effective when it becomes law.

In the General Assembly read three times and ratified this the 11th day of June, 2003.

Became law upon approval of the Governor at 12:47 p.m. on the 19th day of June, 2003.

**H.B. 842**                     **Session Law 2003-226**

AN ACT TO PROVIDE FOR A SYSTEM FOR ALL NORTH CAROLINA ELECTIONS THAT COMPLIES WITH THE HELP AMERICA VOTE ACT AND TO HELP PREVENT DUPLICATE NAMES ON JURY LISTS.

*The General Assembly of North Carolina enacts:*

**SECTION 1.**    The purpose of this act is to ensure that the State of North Carolina has a system for all North Carolina elections that complies with the requirements for federal elections set forth in the federal Help America Vote Act of 2002, Public Law 107-252, 116 Stat. 1666 (2002), codified at 42 U.S.C. §§ 15481-15485.

S.L. 2003-226                        Session Laws - 2003

The General Assembly finds that the education and training of election officials as required by G.S. 163-82.34 has met and continues to meet the mandate for the education and training of precinct officials and other election officials in section 254(a)(3) of the Help America Vote Act of 2002. The General Assembly further finds that the establishment, development, and continued operation of the statewide list maintenance program for voter registration set forth in G.S. 163-82.14 has met and continues to meet the mandates of section 303(a)(2) of the Help America Vote Act of 2002.

In certain other areas of the election statutes and other laws, the General Assembly finds that the statutes must be amended to comply with the Help America Vote Act.

**SECTION 2.**    G.S. 163-82.10(a) reads as rewritten:

"(a)    ~~Application Form Becomes~~ Official Record. – The State voter registration system is the official voter registration list for the conduct of all elections in the State. A completed and signed registration application ~~form~~ form, if available, described in G.S. 163-82.3, once approved by the county board of elections, becomes backup to the official registration record of the voter. Electronically captured images of the signatures of voters, full or partial social security numbers, and drivers license numbers that may be generated in the voter registration process, by either the State Board of Elections or a county board of elections, are confidential and shall not be considered public records and subject to disclosure to the general public under Chapter 132 of the General Statutes. Disclosure of drivers license numbers in violation of this subsection shall not give rise to a civil cause of action. This limitation of liability does not apply to the disclosure of drivers license numbers in violation of this subsection as a result of gross negligence, wanton conduct, or intentional wrongdoing that would otherwise be actionable. The county board of elections shall maintain custody of ~~the official~~ any paper hard copy registration records of ~~all~~ voters in the county and shall keep them in a place where they are secure."

**SECTION 3.**    G.S. 163-82.10 is amended by adding a new subsection to read:

"(a1)    Paperless, Instant Electronic Transfer. – The application described in G.S. 163-82.3 may be either a paper hard copy or an electronic document."

**SECTION 4.**    G.S. 163-82.6(b) reads as rewritten:

"(b)    Signature. – The form shall be valid only if signed by the applicant. An electronically captured image of the signature of a voter on an electronic voter registration form offered by a State agency shall be considered a valid signature for all purposes for which a signature on a paper voter registration form is used."

**SECTION 5.**    G.S. 132-1.2 reads as rewritten:

"**§ 132-1.2.  Confidential information.**

Nothing in this Chapter shall be construed to require or authorize a public agency or its subdivision to disclose any information that:

(1)    Meets all of the following conditions:

a.    Constitutes a "trade secret" as defined in G.S. 66-152(3).

b.    Is the property of a private "person" as defined in G.S. 66-152(2).

c.    Is disclosed or furnished to the public agency in connection with the owner's performance of a public contract or in connection with a bid, application, proposal, industrial development project, or in compliance with laws, regulations,

    rules, or ordinances of the United States, the State, or political subdivisions of the State.

    d.    Is designated or indicated as "confidential" or as a "trade secret" at the time of its initial disclosure to the public agency.

  (2)    Reveals an account number for electronic payment as defined in G.S. 147-86.20 and obtained pursuant to Articles 6A or 6B of Chapter 147 of the General Statutes or G.S. 159-32.1.

  (3)    Reveals a document, file number, password, or any other information maintained by the Secretary of State pursuant to Article 21 of Chapter 130A of the General Statutes.

  <u>(4)    Reveals the electronically captured image of an individual's signature, drivers license number, or a portion of an individual's social security number if the agency has those items because they are on a voter registration document.</u>"

**SECTION 6.**    G.S. 163-82.11 reads as rewritten:

"**§ 163-82.11. Establishment of statewide computerized voter registration.**

    <u>(a)    Statewide System as Official List. –</u> The State Board of Elections shall develop and implement a statewide computerized voter registration system to facilitate voter registration and to provide a central database containing voter registration information for each county. <u>The system shall serve as the single system for storing and managing the official list of registered voters in the State. The system shall serve as the official voter registration list for the conduct of all elections in the State.</u> The system shall encompass both software development and purchasing of the necessary hardware for the central and distributed-network systems.

    <u>(b)    Uses of Statewide System. –</u> The State Board of Elections shall develop and implement the system so that each county board of elections ~~can:~~ <u>can do all the following:</u>

  (1)    Verify that an applicant to register in its county is not also registered in another ~~county;~~ <u>county.</u>

  (2)    Be notified automatically that a registered voter in its county has registered to vote in another ~~county; and~~ <u>county.</u>

  (3)    Receive automatically data about a person who has applied to vote at a drivers license office or at another public agency that is authorized to accept voter registration applications.

    <u>(c)    Compliance With Federal Law. – The State Board of Elections shall update the statewide computerized voter registration list and database to meet the requirements of section 303(a) of the Help America Vote Act of 2002 and to reflect changes when citizenship rights are restored under G.S. 13-1.</u>

    <u>(d)    Role of County and State Boards of Elections. –</u> Each county board of elections shall be responsible for registering voters within its county according to law. Each county board of elections shall maintain its ~~own computer file of registered voters~~ <u>records by using the statewide computerized voter registration system</u> in accordance with rules promulgated by the State Board of Elections. Each county board of elections shall ~~transmit~~ <u>enter</u> through the computer ~~network~~ <u>system</u> all additions, deletions, and changes in its list of registered voters promptly to the statewide computer ~~file.~~ <u>system.</u> ~~The State Board of Elections shall maintain a continually updated duplicate file of each county's registered voters.~~

    <u>(e)    Cooperation on List for Jury Commissions. –</u> The State Board of Elections shall assist the Division of Motor Vehicles in providing to the county jury commission

- Add. 5 -

**S.L. 2003-226**                Session Laws - 2003

of each county, as required by G.S. 20-43.4, a list of all registered voters in the county and all persons in the county with drivers license records."

**SECTION 7.(a)** G.S. 163-82.12 reads as rewritten:

"**§ 163-82.12.  Promulgation of ~~rules~~ guidelines relating to computerized voter registration.**

The State Board of Elections shall make all ~~rules~~ guidelines necessary to administer the statewide voter registration system established by this Article. All county boards of elections shall follow these guidelines and cooperate with the State Board of Elections in implementing guidelines. These ~~rules~~ guidelines shall include provisions ~~for:~~ for all of the following:

> (1)    Establishing, developing, and maintaining a computerized central voter registration ~~file:~~ file.
>
> (2)    Linking the central file through a network with computerized voter registration files in each of the ~~counties:~~ counties.
>
> (3)    Interacting with the computerized drivers license records of the Division of Motor Vehicles and with the computerized records of other public agencies authorized to accept voter registration ~~applications:~~applications.
>
> (4)    Protecting and securing the ~~data; and~~ data.
>
> (5)    Converting current voter registration records in the counties in computer files that can be used on the statewide computerized registration system.
>
> (6)    Enabling the statewide system to determine whether the voter identification information provided by an individual is valid.
>
> (7)    Enabling the statewide system to interact electronically with the Division of Motor Vehicles system to validate identification information.
>
> (8)    Enabling the Division of Motor Vehicles to provide real-time interface for the validation of the drivers license number and last four digits of the social security number.
>
> (9)    Enabling the statewide system to assign a unique identifier to each legally registered voter in the State.
>
> (10)   Enabling the State Board of Elections to assist the Division of Motor Vehicles in providing to the jury commission of each county, as required by G.S. 20-43.4, a list of all registered voters in the county and all persons in the county with drivers license records.

These guidelines shall not be considered to be rules subject to Article 2A of Chapter 150B of the General Statutes. However, the State Board shall publish in the North Carolina Register the guidelines and any changes to them after adoption, with that publication noted as information helpful to the public under G.S. 150B-21.17(a)(6). Copies of those guidelines shall be made available to the public upon request or otherwise by the State Board."

**SECTION 7.(b)** G.S. 163-82.19 reads as rewritten:

"**§ 163-82.19.  Voter registration at drivers license ~~offices.~~ offices; coordination on data interface.**

(a)    Voter Registration at Drivers License Offices. – The Division of Motor Vehicles shall, pursuant to the rules adopted by the State Board of Elections, modify its forms so that any eligible person who applies for original issuance, renewal or correction of a drivers license, or special identification card issued under G.S. 20-37.7

344

may, on a part of the form, complete an application to register to vote or to update his registration if the voter has changed his address or moved from one precinct to another or from one county to another. The person taking the application shall ask if the applicant is a citizen of the United States. If the applicant states that the applicant is not a citizen of the United States, or declines to answer the question, the person taking the application shall inform the applicant that it is a felony for a person who is not a citizen of the United States to apply to register to vote. Any person who willfully and knowingly and with fraudulent intent gives false information on the application is guilty of a Class I felony. The application shall state in clear language the penalty for violation of this section. The necessary forms shall be prescribed by the State Board of Elections. The form must ask for the previous voter registration address of the voter, if any. If a previous address is listed, and it is not in the county of residence of the applicant, the appropriate county board of elections shall treat the application as an authorization to cancel the previous registration and also process it as such under the procedures of G.S. 163-82.9. If a previous address is listed and that address is in the county where the voter applies to register, the application shall be processed as if it had been submitted under G.S. 163-82.9.

Registration shall become effective as provided in G.S. 163-82.7. Applications to register to vote accepted at a drivers license office under this section until the deadline established in G.S. 163-82.6(c)(2) shall be treated as timely made for an election, and no person who completes an application at that drivers license office shall be denied the vote in that election for failure to apply earlier than that deadline.

All applications shall be forwarded by the Department of Transportation to the appropriate board of elections not later than five business days after the date of acceptance, according to rules which shall be promulgated by the State Board of Elections. Those rules shall provide for a paperless, instant, electronic transfer of applications to the appropriate ~~county~~ board of elections.

(b)    Coordination on Data Interface. – The Department of Transportation jointly with the State Board of Elections shall develop and operate a computerized interface to match information in the database of the statewide voter registration system with the drivers license information in the Division of Motor Vehicles to the extent required to enable the State Board of Elections and the Department of Transportation to verify the accuracy of the information provided on applications for voter registration, whether the applications were received at drivers license offices or elsewhere. The Department of Transportation and the State Board shall implement the provisions of this subsection so as to comply with section 303 of the Help America Vote Act of 2002. The Department of Transportation shall enter into an agreement with the Commissioner of Social Security so as to comply with section 303 of the Help America Vote Act of 2002."

**SECTION 7.(c)** G.S. 20-43.4 reads as rewritten:
"**§ 20-43.4.  Current list of licensed drivers to be provided to jury commissions.**

The Commissioner of Motor Vehicles shall provide to each county jury commission an alphabetical list of all persons that ~~he~~ the Commissioner has determined are residents of the county, who will be 18 years of age or older as of the first day of January of the following year, and licensed to drive a motor vehicle ~~as of July 1, 1983, and~~ as of July 1 of each ~~biennium thereafter,~~ odd-numbered year, provided that if an annual jury list is being prepared under G.S. 9-2(a), the list to be provided to the county jury commission shall be provided annually. The list shall include those persons whose license to drive has been suspended, and those former licensees whose license has been canceled. The list shall contain the address and zip code of each driver, plus ~~his~~ the driver's date of

345

~~birth and~~ birth, sex, and drivers license number, and may be in either printed or computerized form, as requested by each county. Before providing the list to the county jury commission, the Commissioner shall have computer-matched the list with the voter registration list of the State Board of Elections to eliminate duplicates. The Commissioner shall include in the list provided to the county jury commission names of registered voters who do not have drivers licenses, and shall indicate the licensed or formerly licensed drivers who are also registered voters, the licensed or formerly licensed drivers who are not registered voters, and the registered voters who are not licensed or formerly licensed drivers. The list so provided shall be used solely for jury selection and election records purposes and no other. Information provided by the Commissioner to county jury commissions and the State Board of Elections under this section shall remain confidential, shall continue to be subject to the disclosure restriction provisions of G.S. 20-43.1, and shall not be a public record for purposes of Chapter 132 of the General Statutes."

      **SECTION 7.(d)** G.S. 9-2 reads as rewritten:

"**§ 9-2.  Preparation of jury list; sources of names.**

    (a)    It shall be the duty of the jury commission ~~beginning July 1, 1981, (and each biennium thereafter)~~ on July 1 of every odd-numbered year to prepare a list of prospective jurors qualified under this Chapter to serve in the biennium beginning ~~January 1, 1982, (and each biennium thereafter).~~ on January 1 of the next year. Instead of providing a list for an entire biennium, the commission may prepare a list each year if the senior regular resident superior court judge requests in writing that it do so.

    (b)    In preparing the list, the jury commission shall use the ~~voter registration records of the county.~~ list of registered voters and persons with drivers license records supplied to the county by the Commissioner of Motor Vehicles pursuant to G.S. 20-43.4. The commission may use fewer than all the names from the ~~voter~~ list if it uses a random method of selection. The commission may use other sources of names deemed by it to be reliable.

    ~~(c)    Effective July 1, 1983, the list of licensed drivers residing in each county, as supplied to the county by the Division of Motor Vehicles pursuant to G.S. 20-43.4, shall also be required as a source of names for use by the commission in preparing the jury list.~~

    ~~(d)    When more than one source is used to prepare the jury list the jury commission shall take randomly a sample of names from the list of registered voters and each additional source used. The same percentage of names must be selected from each list. The names selected from the voter registration list shall be compared with the entire list of names, from the second source. Duplicate names shall be removed from the voter registration sample, and the remaining names shall then be combined with the sample of names selected from the second source to form the jury list. If more than two source lists are used, the same procedure must be used to remove duplicates.~~

    (e)    ~~As an alternative to the procedure set forth in subsection (d), the~~ The jury commission ~~may~~ shall merge the entire list of names of each source ~~used,~~ used ~~remove the duplicate names,~~ and randomly select the desired number of names to form the jury list.

    (f)    The jury list shall contain not less than one and one-quarter times and not more than three times as many names as were drawn for jury duty in all courts in the county during the previous biennium, or, if an annual list is being prepared as requested under subsection (a) of this section the jury list shall contain not less than one and one-quarter times and not more than three times as many names as were drawn for jury

duty in all courts in the county during the previous year but in no event shall the list include fewer than 500 names, except that in counties in which a different panel of jurors is selected for each day of the week, there is no limit to the number of names that may be placed on the jury list.

~~(g)     The custodian of the appropriate election registration records in each county shall cooperate with the jury commission in its duty of compiling the list required by this section.~~

(h)     As used in this section 'random' or 'randomly' refers to a method of selection that results in each name on a list having an equal opportunity to be selected."

**SECTION 8.**     Article 13A of Chapter 163 of the General Statutes is amended by adding a new section to read:

"**§ 163-166.7A. Voter education and information.**

(a)     Posting the Information. – For each election that involves candidates for federal or State office, each county board of elections shall post at each active voting place the following information in a manner and format approved by the State Board of Elections:

    (1)     A sample ballot as required by G.S. 163-165.2.

    (2)     The date of the election and the hours the voting place will be open.

    (3)     Instructions on how to vote, including how to cast a vote or correct a vote on the voting systems available for use in that voting place.

    (4)     Instructions on how to cast a provisional ballot.

    (5)     Instructions to mail-in registrants and first-time voters on how to comply with the requirements in section 303(b) of the Help America Vote Act of 2002 concerning voter identifications.

    (6)     General information on voting rights under applicable federal and State law, including information on the right of an individual to cast a provisional ballot and instructions on how to contact the appropriate officials if the voter believes those rights have been violated.

    (7)     General information on federal and State laws that prohibit acts of fraud and misrepresentation as to voting and elections.

(b)     Intent. – The posting required by subsection (a) of this section is intended to meet the mandate of the voting information requirements in section 302(b) of the Help America Vote Act of 2002."

**SECTION 9.**     G.S. 163-82.4 reads as rewritten:

"**§ 163-82.4.  Contents of application form.**

(a)     Information Requested of Applicant. – The form required by G.S. 163-82.3(a) shall request the applicant's:

    (1)     Name,

    (2)     Date of birth,

    (3)     Residence address,

    (4)     County of residence,

    (5)     Date of application,

    (6)     Gender,

    (7)     Race,

    (7a)     Ethnicity,

    (8)     Political party affiliation, if any, in accordance with subsection (c) of this section,

    (9)     Telephone number (to assist the county board of elections in contacting the voter if needed in processing the application),

**S.L. 2003-226**                        Session Laws - 2003

> (10)   Drivers license number or, if the applicant does not have a drivers license number, the last four digits of the applicant's social security number,

and any other information the State Board finds is necessary to enable officials of the county where the person resides to satisfactorily process the application. The form shall require the applicant to state whether currently registered to vote anywhere, and at what address, so that any prior registration can be cancelled. The portions of the form concerning race and ethnicity shall include as a choice any category shown by the most recent decennial federal census to compose at least one percent (1%) of the total population of North Carolina. The county board shall make a diligent effort to complete for the registration records any information requested on the form that the applicant does not complete, but no application shall be denied because an applicant does not state race, ethnicity, gender, or telephone number. The application shall conspicuously state that provision of the applicant's telephone number is optional. If the county board maintains voter records on computer, the free list provided under this subsection shall include telephone numbers if the county board enters the telephone number into its computer records of voters.

> (a1)   No Drivers License or Social Security Number Issued. – The State Board shall assign a unique identifier number to an applicant for voter registration if the applicant has not been issued either a current and valid drivers license or a social security number. That unique identifier number shall serve to identify that applicant for voter registration purposes.

(b)      Notice of Requirements, Attestation, Notice of Penalty, and Notice of Confidentiality. – The form required by G.S. 163-82.3(a) shall contain, in uniform type, the following:

> (1)   A statement that specifies each eligibility requirement (including citizenship) and an attestation that the applicant meets each such requirement, with a requirement for the signature of the applicant, under penalty of a Class I felony under G.S. 163-275(4).

> (2)   A statement that, if the applicant declines to register to vote, the fact that the applicant has declined to register will remain confidential and will be used only for voter registration purposes.

> (3)   A statement that, if the applicant does register to vote, the office at which the applicant submits a voter registration application will remain confidential and will be used only for voter registration purposes.

(c)      Party Affiliation or Unaffiliated Status. – The application form described in G.S. 163-82.3(a) shall provide a place for the applicant to state a preference to be affiliated with one of the political parties in G.S. 163-96, or a preference to be an "unaffiliated" voter. Every person who applies to register shall state his preference. If the applicant fails to declare a preference for a party or for unaffiliated status, that person shall be listed as "unaffiliated", except that if the person is already registered to vote in the county and that person's registration already contains a party affiliation, the county board shall not change the registrant's status to "unaffiliated" unless the registrant clearly indicates a desire in accordance with G.S. 163-82.17 for such a change. An unaffiliated registrant shall not be eligible to vote in any political party primary, except as provided in G.S. 163-119, but may vote in any other primary or general election. The application form shall so state.

Session Laws - 2003                        **S.L. 2003-226**

    (d)    Citizenship and Age Questions. – Voter registration application forms shall include all of the following:

        (1)    The question 'Are you a citizen of the United States of America?' and boxes for the applicant to check to indicate whether the applicant is or is not a citizen of the United States.

        (2)    The question 'Will you be 18 years of age on or before election day?' and boxes for the applicant to check to indicate whether the applicant will be 18 years of age or older on election day.

        (3)    The statement 'If you checked "no" in response to either of these questions, do not complete this form.'

If the voter fails to answer the question set out in subdivision (1) of this subsection, the person filling out the registration shall be notified of the omission and given the opportunity to complete the form in a timely manner in order to be registered for the next election."

    **SECTION 10.**  G.S. 163-82.10A reads as rewritten:

**"§ 163-82.10A.  Permanent voter registration numbers.**

~~Each county board of elections~~ The statewide voter registration system shall assign to each voter a unique registration number. That number shall be permanent for that voter and shall not be changed or reassigned by the county board of elections."

    **SECTION 11.**  G.S. 163-165.7 reads as rewritten:

**"§ 163-165.7.  Voting systems: powers and duties of State Board of Elections.**

    The State Board of Elections shall have authority to approve types, makes, and models of voting systems for use in elections and referenda held in this State. Only voting systems that have been approved by the State Board shall be used to conduct elections under this Chapter, and the approved systems shall be valid in any election or referendum held in any county or municipality. The State Board may use guidelines, information, testing reports, certification, decertification, recertification, and any relevant data produced by the Election Assistance Commission, its Standards Board, its Board of Advisors, or the Technical Guidelines Development Committee as established in Title II of the Help America Vote Act of 2002 with regard to any action or investigation the State Board may take concerning a voting system. The State Board may use, for the purposes of voting system certification, laboratories accredited by the Election Assistance Commission under the provisions of section 231(2) of the Help America Vote Act of 2002. The State Board may, upon request of a local board of elections, authorize the use of a voting system not approved for general use. The State Board may also, upon notice and hearing, disapprove types, makes, and models of voting systems. Upon disapproving a type, make, or model of voting system, the State Board shall determine the process by which the disapproved system is discontinued in any county. If a county makes a showing that discontinuance would impose a financial hardship upon it, the county shall be given up to four years from the time of State Board disapproval to replace the system. A county may appeal a decision by the State Board concerning discontinuance of a voting system to the superior court in that county or to the Superior Court of Wake County. The county has 30 days from the time of the State Board's decision on discontinuance to make that appeal.

    Subject to the provisions of this Chapter, the State Board of Elections shall prescribe rules for the adoption, handling, operation, and honest use of voting systems, including, but not limited to, the following:

        (1)    Types, makes, and models of voting systems approved for use in this State.

    (2)     Form of official ballot labels to be used on voting systems.
    (3)     Operation and manner of voting on voting systems.
    (4)     Instruction of precinct officials in the use of voting systems.
    (5)     Instruction of voters in the use of voting systems.
    (6)     Assistance to voters using voting systems.
    (7)     Duties of custodians of voting systems.
    (8)     Examination of voting systems before use in an election.
    (9)     Compliance with section 301 of the Help America Vote Act of 2002."

**SECTION 12.**   G.S. 163-165.4A reads as rewritten:

"**§ 163-165.4A.**  ~~Punch-Card ballots.~~Punch-card  ballots and lever machines."

    (a)    No ballot may be used in any referendum, primary, or other election as an official ballot if it requires the voter to punch out a hole with a stylus or other tool.

    (a1)   No lever machine voting system may be used in any referendum, primary, or other election as a means of voting the official ballot. A 'lever machine voting system' is a voting system on which the voter casts a vote by pressing a lever and the vote is mechanically recorded by the machine.

    (b)    In any counties that used punch-card ballots as official ballots or lever machines in the election of November 2000, and in any municipalities located in those counties, this section becomes effective January 1, 2006. It is the intent of the General Assembly that any county that uses county funds to replace voting equipment to satisfy this section shall be given priority in appropriations to counties for voting equipment."

**SECTION 13.**   G.S. 163-182.1 reads as rewritten:

"**§ 163-182.1.**  **Principles and rules for counting official ballots.**

    (a)    General Principles That Shall Apply. – The following general principles shall apply in the counting of official ballots, whether the initial count or any recount:

    (1)     Only official ballots shall be counted.
    (2)     No official ballot shall be rejected because of technical errors in marking it, unless it is impossible to clearly determine the voter's choice.
    (3)     If it is impossible to clearly determine a voter's choice in a ballot item, the official ballot shall not be counted for that ballot item, but shall be counted in all other ballot items in which the voter's choice can be clearly determined.
    (4)     If an official ballot is marked in a ballot item with more choices than there are offices to be filled or propositions that may prevail, the official ballot shall not be counted for that ballot item, but shall be counted in all other ballot items in which there is no overvote and the voter's choice can be clearly determined.
    (5)     If an official ballot is rejected by a scanner or other counting machine, but human counters can clearly determine the voter's choice, the official ballot shall be counted by hand and eye.
    (6)     Write-in votes shall not be counted in party primaries or in referenda, but shall be counted in general elections if all of the following are true:
         a.     The write-in vote is written by the voter or by a person authorized to assist the voter pursuant to G.S. 163-166.8.
         b.     The write-in vote is not cast for a candidate who has failed to qualify under G.S. 163-123 as a write-in candidate.
         c.     The voter's choice can be clearly determined.

(7)   Straight-party ticket and split-ticket votes shall be counted in general elections according to the following guidelines:

    a.   If a voter casts a vote for a straight-party ticket, that vote shall be counted for all the candidates of that party, other than those for President and Vice President, in the partisan ballot items on that official ballot except as otherwise provided in this subdivision.

    b.   If a voter casts a vote for a straight-party ticket and also votes in a partisan ballot item for a candidate not of that party, the official ballot shall be counted in that ballot item only for the individually marked candidate. In partisan ballot items where no mark is made for an individual candidate, the official ballot shall be counted for the candidates of the party whose straight ticket the voter voted.

    c.   If a voter casts a vote for a straight-party ticket and also casts a write-in vote in any partisan ballot item, the straight-party ticket vote shall not control the way the official ballot is counted in that ballot item, except to the extent it would control in the case of crossover voting under this subdivision. The following principles shall apply:

        1.   If the write-in vote is proper under subdivision (6) of this subsection, that write-in candidate shall receive a vote.

        2.   If the write-in vote is not proper under subdivision (6) of this subsection and no other candidate is individually marked in that ballot item, then no vote shall be counted in that ballot item.

        3.   If the straight-ticket voter casts both write-in votes and individually marked votes for ballot candidates in a ballot item, then the write-in and individually marked votes shall be counted unless the write-in is not proper under subdivision (6) of this subsection or an overvote results.

~~(b)   Rules and Directions by State Board of Elections. — The State Board of Elections shall promulgate rules where necessary to apply the principles in subsection (a) of this section to each voting system in use in the State. The rules shall prescribe procedures and standards for each type of voting system. Those procedures and standards shall be followed uniformly throughout the State in all places where that type of voting system is used. The State Board shall direct the county boards of elections in the application of the principles and rules in individual circumstances.~~

(b)   <u>Procedures and Standards. – The State Board of Elections shall adopt uniform and nondiscriminatory procedures and standards for voting systems. The standards shall define what constitutes a vote and what will be counted as a vote for each category of voting system used in the State. The State Board shall adopt those procedures and standards at a meeting occurring not earlier than 15 days after the State Board gives notice of the meeting. The procedures and standards adopted shall apply to all elections occurring in the State and shall be subject to amendment or repeal by the State Board acting at any meeting where notice that the action has been proposed has been given at least 15 days before the meeting. These procedures and standards shall not be considered to be rules subject to Article 2A of Chapter 150B of the General Statutes.</u>

S.L. 2003-226                    Session Laws - 2003

However, the State Board shall publish in the North Carolina Register the procedures and standards and any changes to them after adoption, with that publication noted as information helpful to the public under G.S. 150B-21.17(a)(6). Copies of those procedures and standards shall be made available to the public upon request or otherwise by the State Board. For optical scan and direct record systems, those procedures and standards shall provide that if the voter selects votes for more than the number of candidates to be elected or proposals to be approved in a ballot item, the voting system shall do all the following:

    (1)    Notify the voter that the voter has selected more than the correct number of candidates or proposals in the ballot item.

    (2)    Notify the voter before the vote is accepted and counted of the effect of casting overvotes in the ballot item.

    (3)    Provide the voter with the opportunity to correct the official ballot before it is accepted and counted."

**SECTION 14.**  G.S. 163-166.01 reads as rewritten:

"**§ 163-166.01.  Hours for voting.**

In every election, the voting place shall be open at 6:30 A.M. and shall be closed at 7:30 P.M. In extraordinary circumstances, the county board of elections may direct that the polls remain open until 8:30 P.M. If any voter is in line to vote at the time the polls are closed, that voter shall be permitted to vote. No voter shall be permitted to vote who arrives at the voting place after the closing of the polls.

Any voter who votes after the statutory poll closing time of 7:30 P.M. by virtue of a federal or State court order or any other lawful order, including an order of a county board of elections, shall be allowed to vote, under the provisions of that order, only by using a provisional official ballot. Any special provisional official ballots cast under this section shall be separated, counted, and held apart from other provisional ballots cast by other voters not under the effect of the order extending the closing time of the voting place. If the court order has not been reversed or stayed by the time of the county canvass, the total for that category of provisional ballots shall be added to the official canvass."

**SECTION 14.1.** G.S. 163-166.7 reads as rewritten:

"**§ 163-166.7.  Voting procedures.**

(a)    Checking Registration. – A person seeking to vote shall enter the voting enclosure through the appropriate entrance. A precinct official assigned to check registration shall at once ask the voter to state current name and residence address. The voter shall answer by stating current name and residence address. In a primary election, that voter shall also be asked to state, and shall state, the political party with which the voter is affiliated or, if unaffiliated, the authorizing party in which the voter wishes to vote. After examination, that official shall state whether that voter is duly registered to vote in that precinct and shall direct that voter to the voting equipment or to the official assigned to distribute official ballots. If a precinct official states that the person is duly registered, the person shall sign the pollbook, other voting record, or voter authorization document in accordance with subsection (c) of this section before voting.

(b)    Distribution of Official Ballots. – If the voter is found to be duly registered and has not been successfully challenged, the official assigned to distribute the official ballots shall hand the voter the official ballot that voter is entitled to vote, or that voter shall be directed to the voting equipment that contains the official ballot. No voter in a primary shall be permitted to vote in more than one party's primary. The precinct

352

Session Laws - 2003       **S.L. 2003-226**

officials shall provide the voter with any information the voter requests to enable that voter to vote as that voter desires.

(c)    The State Board of Elections shall promulgate rules for the process of voting. Those rules shall emphasize the appearance as well as the reality of dignity, good order, impartiality, and the convenience and privacy of the voter. Those rules, at a minimum, shall include procedures to ensure that all the following occur:

(1)    The voting system remains secure throughout the period voting is being conducted.

(2)    Only properly voted official ballots are introduced into the voting system.

(3)    Except as provided by G.S. 163-166.9, no official ballots leave the voting enclosure during the time voting is being conducted there.

(4)    All improperly voted official ballots are returned to the precinct officials and marked as spoiled.

(5)    Voters leave the voting place promptly after voting.

(6)    Voters not clearly eligible to vote in the precinct but who seek to vote there are given proper assistance in voting a provisional official ballot or guidance to another voting place where they are eligible to vote.

(7)    Information gleaned through the voting process that would be helpful to the accurate maintenance of the voter registration records is recorded and delivered to the county board of elections.

(8)    The registration records are kept secure.

(9)    Party observers are given access as provided by G.S. 163-45 to current information about which voters have voted.

(10)    The voter, before voting, shall sign that voter's name on the pollbook, other voting record, or voter authorization document. If the voter is unable to sign, a precinct official shall enter the person's name on the same document before the voter votes."

**SECTION 15.** Article 13A of Chapter 163 of the General Statutes is amended by adding a new section to read:

"**§ 163-166.11. Provisional voting requirements.**

If an individual seeking to vote claims to be a registered voter in a jurisdiction and though eligible to vote in the election does not appear on the official list of eligible registered voters in the voting place, that individual may cast a provisional official ballot as follows:

(1)    An election official at the voting place shall notify the individual that the individual may cast a provisional official ballot in that election.

(2)    The individual may cast a provisional official ballot at that voting place upon executing a written affirmation before an election official at the voting place, stating that the individual is a registered voter in the jurisdiction in which the individual seeks to vote and is eligible to vote in that election.

(3)    At the time the individual casts the provisional official ballot, the election officials shall provide the individual written information stating that anyone casting a provisional official ballot can ascertain whether and to what extent the ballot was counted and, if the ballot was not counted in whole or in part, the reason it was not counted. The State Board of Elections or the county board of elections shall establish a system for so informing a provisional voter. It shall make

**S.L. 2003-226**                Session Laws - 2003

the system available to every provisional voter without charge, and it shall build into it reasonable procedures to protect the security, confidentiality, and integrity of the voter's personal information and vote.

(4)     The cast provisional official ballot and the written affirmation shall be secured by election officials at the voting place according to guidelines and procedures adopted by the State Board of Elections. At the close of the polls, election officials shall transmit the provisional official ballots cast at that voting place to the county board of elections for prompt verification according to guidelines and procedures adopted by the State Board of Elections.

(5)     The county board of elections shall count the individual's provisional official ballot for all ballot items on which it determines that the individual was eligible under State or federal law to vote."

**SECTION 16.**   Article 13A of Chapter 163 of the General Statutes is amended by adding a new section to read:

"**§ 163-166.12. Requirements for certain voters who register by mail.**

(a)     Voting in Person. – An individual who has registered to vote by mail on or after January 1, 2003, and has not previously voted in an election that includes a ballot item for federal office in North Carolina, shall present to a local election official at a voting place before voting there one of the following:

(1)     A current and valid photo identification.

(2)     A copy of one of the following documents that shows the name and address of the voter: a current utility bill, bank statement, government check, paycheck, or other government document.

(b)     Voting Mail-In Absentee. – An individual who has registered to vote by mail on or after January 1, 2003, and has not previously voted in an election that includes a ballot item for federal office in North Carolina, in order to cast a mail-in absentee vote, shall submit with the mailed-in absentee ballot one of the following:

(1)     A copy of a current and valid photo identification.

(2)     A copy of one of the following documents that shows the name and address of the voter: a current utility bill, bank statement, government check, paycheck, or other government document.

The county board of elections shall note the type of identification proof submitted by the voter and may dispose of the tendered copy of identification proof as soon as the type of proof is noted in the voter registration records.

This subsection shall not apply to persons entitled to vote by absentee ballot under the Uniformed and Overseas Citizens Absentee Voting Act.

(c)     The Right to Vote Provisionally. – If an individual is required under subsection (a) or (b) of this section to present identification in order to vote, but that individual does not present the required identification, that individual may vote a provisional official ballot. If the voter is at the voting place, the voter may vote provisionally there without unnecessary delay. If the voter is voting by mail-in absentee ballot, the mailed ballot without the required identification shall be treated as a provisional official ballot.

(d)     Exemptions. – This section does not apply to any of the following:

(1)     An individual who registers by mail and submits as part of the registration application either of the following:

a.      A copy of a current and valid photo identification.

354

          b.    A copy of one of the following documents that shows the name and address of the voter: a current utility bill, bank statement, government check, paycheck, or other government document.

    (2)    An individual who registers by mail and submits as part of the registration application the individual's drivers license number or at least the last four digits of the individual's social security number where an election official matches either or both of the numbers submitted with an existing State identification record bearing the same number, name, and date of birth contained in the submitted registration.

    (3)    An individual who is entitled to vote by absentee ballot under the Uniformed and Overseas Citizens Absentee Voting Act.

    (4)    An individual who is entitled to vote otherwise than in person under section 3(b)(2)(B)(ii) of the Voting Accessibility for the Elderly and Handicapped Act.

    (5)    An individual who is entitled to vote otherwise than in person under any other federal law."

**SECTION 17.(a)**    Chapter 163 of the General Statutes is amended by adding a new Article to read:

"Article 8A.

"HAVA Administrative Complaint Procedure.

**"§ 163-91. Complaint procedure.**

    (a)    The State Board of Elections shall establish a complaint procedure as required by section 402 of Title IV of the Help America Vote Act of 2002 for the resolution of complaints alleging violations of Title III of that Act.

    (b)    With respect to the adoption of the complaint procedure under this section, the State Board of Elections is exempt from the requirements of Article 2A of Chapter 150B of the General Statutes. Prior to adoption or amendment of the complaint procedure under this section, the State Board of Elections shall complete all of the following:

    (1)    Publish the proposed plan in the North Carolina Register at least 30 days prior to the adoption of the final complaint procedure.

    (2)    Accept oral and written comments on the proposed complaint procedure.

    (3)    Hold at least one public hearing on the proposed complaint procedure.

    (c)    Hearings and final determinations of complaints filed under the procedure adopted pursuant to this section are not subject to Articles 3 and 4 of Chapter 150B of the General Statutes."

**SECTION 17.(b)**    G.S. 150B-1(c) is amended by adding a new subdivision to read:

"(c)    Full Exemptions. – This Chapter applies to every agency except:

    …

    (6)    The State Board of Elections in administering the HAVA Administrative Complaint Procedure of Article 8A of Chapter 163 of the General Statutes."

**SECTION 18.**    G.S. 163-256 reads as rewritten:

**"§ 163-256. Regulations of State Board of Elections.**

    (a)    The State Board of Elections shall adopt rules and regulations to carry out the intent and purpose of G.S. 163-254 and 163-255, and to ensure that a proper list of

S.L. 2003-226                    Session Laws - 2003

persons voting under said sections shall be maintained by the boards of elections, and to ensure proper registration records, and such rules and regulations shall not be subject to the provisions of ~~G.S. 150B-9.~~ Article 2A of Chapter 150B of the General Statutes.

(b)     The State Board of Elections shall be the single office responsible for providing information concerning voter registration and absentee voting procedures to be used by absent uniformed services voters and overseas voters as to all elections and procedures relating to the use of federal write-in absentee ballots. Unless otherwise required by law, the State Board of Elections shall be responsible for maintaining contact and cooperation with the Federal Voting Assistance Program, the United States Department of Defense, and other federal entities that deal with military and overseas voting. The State Board of Elections shall, as needed, make recommendations concerning military and overseas citizen voting to the General Assembly, the Governor, and other State officials."

**SECTION 19.**   G.S. 163-245 reads as rewritten:

"**§ 163-245.  Persons in armed forces, their spouses, certain veterans, civilians working with armed forces, and members of Peace Corps may register and vote by mail.**

(a)     Any individual who is eligible to register and who is qualified to vote in any statewide primary or election held under the laws of this State, and who is absent from the county of his residence in any of the capacities specified in subsection (b) of this section, shall be entitled to register by mail and to vote by military absentee ballot in the manner provided in this Article.

(b)     The provisions of this Article shall apply to the following persons:

       (1)     Individuals serving in the armed forces of the United States, including, but not limited to, the army, the navy, the air force, the marine corps, the coast guard, the Merchant Marine, the National Oceanic and Atmospheric Administration, the commissioned corps of the Public Health Service, and members of the national guard and military reserve.

       (2)     Spouses of persons serving in the armed forces of the United States residing outside the counties of their spouses' voting residence.

       (3)     Disabled war veterans in United States government hospitals.

       (4)     Civilians attached to and serving outside the United States with the armed forces of the United States.

       (5)     Members of the Peace Corps.

(c)     An otherwise valid voter registration or absentee ballot application submitted by an absent uniformed services voter during a year shall not be refused or prohibited on the grounds that the voter submitted the application before the first date on which the county board of elections otherwise accepts those applications submitted by absentee voters who are not members of the uniformed services for that year.

(d)     If any absent uniformed services or overseas voter submits a voter registration application or absentee ballot request, and the request is rejected, the board of elections that makes the rejection shall notify the voter of the reasons for the rejection.

(e)     The requirement for any oath or affirmation to accompany any document as to voter registration or absentee ballots under this Article may be met by use of the standard oath prescribed by the Presidential designee under section 101(b)(7) of the Uniformed and Overseas Citizens Absentee Voting Act."

**SECTION 20.**   G.S. 163-247(3) reads as rewritten:

"(3)     If a single application from an absentee uniformed voter is received by an election official, it shall be considered a valid absentee ballot request with respect to all general, primary, and runoff elections for federal, State, county, or those municipal offices in which absentee ballots are allowed under the provisions of G.S. 163-302, held during the calendar year the application was received. held through the next two regularly scheduled general elections for federal office. This subdivision does not apply to a special election not involving the election of candidates, unless that special election is being held on the same day as a general or primary election."

**SECTION 21.**   Article 7A of Chapter 163 of the General Statutes is amended by adding a new section to read:

"§ 163-82.27. Help America Vote Act of 2002.

As used in this Chapter, the term 'Help America Vote Act of 2002' means the Help America Vote Act of 2002, Public Law 107-252, 116 Stat. 1666 (2002), codified at 42 U.S.C. §§ 15481-15485. Citations to titles and sections of the Help America Vote Act of 2002 are as they appear in the Public Law. The State Board shall have the authority to adopt rules and guidelines to implement the minimum requirements of the Help America Vote Act of 2002."

**SECTION 22.**   Sections 1, 3, 4, 5, 12, 18, 21, and 22 of this act are effective when this act becomes law. Sections 11 and 13 of this act become effective January 1, 2006. The remainder of this act becomes effective January 1, 2004. All sections of this act apply with respect to all primaries and elections held on or after the date they become effective.

In the General Assembly read three times and ratified this the 11th day of June, 2003.

Became law upon approval of the Governor at 12:48 p.m. on the 19th day of June, 2003.

**H.B. 916**                 **Session Law 2003-227**

AN ACT TO ESTABLISH A VACCINATION PROGRAM FOR FIRST RESPONDERS TO TERRORIST INCIDENTS, CATASTROPHIC OR NATURAL DISASTERS, OR EMERGENCIES.

*The General Assembly of North Carolina enacts:*

**SECTION 1.**   Article 22 of Chapter 130A of the General Statutes is amended by adding the following new section to read:

"§ 130A-485. Vaccination program established; definitions.

(a)     The Department and local health departments shall offer a vaccination program for first responders who may be exposed to infectious diseases when deployed to disaster locations. The vaccinations shall include, but are not limited to, hepatitis A vaccination, hepatitis B vaccination, diphtheria-tetanus vaccination, influenza vaccination, pneumococcal vaccination, and other vaccinations when recommended by the United States Public Health Service and in accordance with Federal Emergency Management Directors Policy. Immune globulin will be made available when necessary, as determined by the State Health Director.