CASE NO. 25-1018, 25-1019, 25-1024

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

JEFFERSON GRIFFIN,
*Plaintiff –*
*Appellee*, v.

NORTH CAROLINA STATE
BOARD OF ELECTIONS,
*Defendant – Appellant*,

and

ALLISON RIGGS; NORTH CAROLINA ALLIANCE FOR RETIRED
AMERICANS; VOTEVETS ACTION FUND; TANYA WEBSTER-
DURHAM; SARAH SMITH; JUANITA ANDERSON,
*Intervenor-Defendants – Appellants*.

On Appeal from the United States District Court for the
Eastern District of North Carolina, No. 5:24-cv-00724-M-RN

**BRIEF OF AMICUS CURIAE BIPARTISAN FORMER MEMBERS OF
CONGRESS IN SUPPORT OF APPELLANTS**

NORMAN EISEN
TIANNA MAYS
JON GREENBAUM
SPENCER KLEIN
STATE DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
(202) 601 8678
jgreenbaum@justicels.com

WILLIAM C. MCKINNEY
HAYNSWORTH SINKLER BOYD, P.A.
223 S West St STE 925
Raleigh, NC 27603
(864) 240 3271
wmckinney@hsblawfirm.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................iii

STATEMENT OF INTEREST OF AMICI CURIAE................................................1

SUMMARY OF ARGUMENT.................................................................................2

ARGUMENT..............................................................................................................4

   I.   UNDER NORTH CAROLINA'S UNIFIED SYSTEM OF VOTER
       REGISTRATION, FEDERAL LAW DICTATES STATE LAW.....................4

       A. NORTH CAROLINA'S UNIFIED SYSTEM OF VOTER
            REGISTRATION RENDERS THE DISTINCTION BETWEEN
            STATE AND FEDERAL ELECTIONS ILLUSORY FOR PURPOSES
            OF VOTER REGISTRATION AND LIST MAINTENANCE...................4

       B. NORTH CAROLINA REWROTE ITS ELECTION CODE
            TO ADDRESS THE NVRA.......................................................................6

       C. HAVA REQUIRED FURTHER CHANGES TO NORTH
            CAROLINA'S UNIFIED VOTER REGISTRATION SYSTEM..............9

       D. BY IMPLEMENTING A UNIFIED REGISTRATION SYSTEM,
            NORTH CAROLINA BOUND ITSELF BY FEDERAL LAW FOR
            REGISTRATION AND LIST MAINTENANCE IN BOTH STATE
            AND FEDERAL ELECTIONS................................................................10

  II.  THE FEDERAL COURTS HAVE JURISDICTION OVER THIS
       MATTER..........................................................................................................11

       A. THE DISTRICT COURT ERRED IN FINDING THAT THERE
            WAS NO FEDERAL QUESTION JURISDICTION UNDER
            28 U.S.C. § 1331 AND 28 U.S.C. § 1441................................................11

       B. THE DISTRICT COURT PROPERLY FOUND THAT IT HAD
            JURISDICTION UNDER 28 U.S.C. § 1443(2)........................................18

III.  THE DISTRICT COURT ERRED IN HOLDING THAT
      ABSTENTION APPLIES...............................................................................19

CONCLUSION.........................................................................................................22

## TABLE OF AUTHORITIES

**Cases**

*American Airlines, Inc. v. Sabre, Inc.*, 694 F.3d 539 (5th Cir. 2012)...............15, 16

*Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013).................7, 10

*Browning-Ferris, Inc. v. Baltimore Cnty., Md.*, 774 F.2d 77 (4th Cir. 1985)........21

*Burford v. Sun Oil Co.*, 319 U.S. 315 (1943) .......................................4, 19, 20, 21

*Caldwell v. Collins Entertainment Co.*, 199 F.3d 710 (4th Cir. 1999)...................20

*Eriline Co. S.A. v. Johnson,* 440 F.3d 648 (4th Cir. 2006.....................................18

*Georgia v. Rachel*, 384 U.S. 780 (1966)...............................................................18

*Greenberg v. Veteran*, 889 F.2d 418, 421–22 (2d Cir. 1989)...............................18

*Gunn v. Minton*, 568 U.S. 251 (2013)...................................................................12

*Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25 (1959)....4, 19, 21

*Martin v. Stewart*, 499 F.3d 360 (4th Cir. 2007)...............................................19, 20

*Mi Familia Vota v. Fontes*, 719 F. Supp, 929 (D. Ariz. 2024).............................10

*New Orleans Pub. Serv., Inc. v. Council of New Orleans,* 491 U.S. 350 (1989)..19, 20

*Quackenbush v, Allstate Ins. Co*, 517 U.S. 706 (1996)..........................................20

*Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th 390 (4th Cir. 2024)..................................................................3, 4, 5, 12, 13, 14, 17, 18, 20

*Siegel v. LePore*, 230 F.3d 1163 (11th Cir. 2000).................................................21

*Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83 (1998)..................................14

*United States v. Burke*, 504 U.S. 229 (1992)...........................................................18

**Statutes**

28 U.S.C. § 1443(2)...................................................................4, 15, 17, 18, 19

52 U.S.C. § 20501(a)..............................................................................................6

52 U.S.C. § 20501(b)..............................................................................................7

52 U.S.C. §§ 20503-06...........................................................................................7

52 U.S.C. § 20507(b)..............................................................................................7

52 U.S.C. § 20507(a)(3)..........................................................................................8

52 U.S.C. § 20507(a)(4)..........................................................................................8

52 U.S.C. § 20507(c)(2)(A).....................................................................................8

52 U.S.C. § 21083...................................................................................................9

52 U.S.C. Subtitle II Ch. 209 Subch. III................................................................9

52 U.S.C. § 21083(a)(5).....................................................................................9, 13

52 U.S.C. § 21083(a)(5)(A)..................................................................................12

Ariz. Rev. Stat. § 16-161......................................................................................14

N.C. Gen. Stat. § 163-82.1......................................................................................8

N.C. Gen. Stat. §163-82.3(a)................................................................................11

N.C. Gen Stat. §163-82.11(a)...............................................................................11

N.C. Gen. Stat. §163-82.14...................................................................................11

N.C. Gen. Stat. §163-82.4(a)(11)..............................................................12

**Session Laws**

993 N.C. Sess. Laws 1993-762................................................................6

2003 N.C. Sess. Laws 2003-226..............................................................6

**Other Authorities**

Hannah Albarazi, *North Carolina Justice Anita Earls Opens Up About Diversity,* Law 360, (Jun. 20, 2023, 10:45 AM EDT) https://www.law360.com/articles/1687516/north-carolina-justice-anita-earls-opens-up-about-diversity........................................................................................19

Orion de Nevers, *What Happened to HAVA? The Help America Vote Act Twenty Years on and Lessons for the Future,* 110 Geo. L.J. Online 168, 171 (2022)..........9

Gabrielle B. Ruda, *Picture Perfect: A Critical Analysis of the Debate on the 2002 Help America Vote Act*, 31 Fordham Urb. L.J. 235, 246 (2003)............................10

Charles Stewart, *What Hath HAVA Wrought? Consequences, intended and Not, of the Post-Bush v. Gore Reforms*, Caltech/MIT Voting Technology at 13 (April 7, 2011)............................................................................................................10

Daniel P. Tokaji, *Early Returns on Election Reform: Discretion, Disenfranchisement, and the Help America Vote Act*, 73 Geo. Wash. L. Rev. 1206, 1214 (2005)..........................................................................................................9

48 Cong. Rec. S1175 (statement of Senator Bond).................................................10

S. Rep. No. 136-107 (2002) (statement of Senator Hatch)....................................10

S. Rep. No. 136-107 (2002) (statement of Senator Kerry)....................................10

## STATEMENT OF INTEREST OF *AMICI CURIAE*

Former Members of Congress Senate Majority Leader Thomas Daschle, House Majority Leader Richard Gephardt, and former Representatives James Greenwood, Wayne Gilchrest, Steve Israel, Christopher Shays, and Robert Wexler respectfully submit this amicus brief in support of Appellants.[1] Amici are a bipartisan group of former Congressional representatives who were serving in 2002 when the Help America Vote Act ("HAVA") was passed and most of whom were serving in 1993 when the National Voter Registration Act ("NVRA") was passed. Each of these former representatives voted in favor of HAVA and helped to secure its passage, and most did the same for the NVRA. They are interested in the issue of whether this case should be resolved in federal court. They are also uniquely situated to discuss Congress's intent in passing HAVA and the NVRA. Amici are listed below:

- **Thomas Daschle**, Democrat, Senate Majority Leader from 2001 to 2003. Senator from South Dakota from 1987 to 2005. Representative from South Dakota's 1st Congressional District from 1979 to 1983 and at-large Representative from 1983 to 1987.

---

[1] All parties consented to the filing of this brief. This brief was not authored in whole or part by counsel for a party. No one other than Amici and their counsel made a monetary contribution to the preparation or submission of the brief.

1

- **Richard Gephardt**, Democrat, House Majority Leader from 1989 to 1995. House Minority Leader from 1995 to 2003. Representative from Missouri's 3rd Congressional District from 1977 to 2005.

- **Wayne Gilchrest**, Republican, Representative from Maryland's 1st Congressional District from 1991 to 2009.

- **Jim Greenwood**, Republican, Representative from Pennsylvania's 8th Congressional District from 1993 to 2005.

- **Steve Israel**, Democrat, Representative from New York's 2nd Congressional District from 2001 to 2013 and 3rd Congressional District from 2013 to 2017.

- **Christopher Shays**, Republican, Representative from Connecticut's 4th Congressional District from 1987 to 2009.

- **Robert Wexler**, Democrat, Representative from Florida's 19th Congressional District from 1997 to 2010.

## SUMMARY OF ARGUMENT

Important issues of federal law necessarily determine the result of this case and it therefore belongs in federal court. Judge Griffin brought this case to challenge the eligibility of more than 60,000 voters. The overwhelming majority of his challenges stem from his claim that voters' registration records do not contain a drivers' license number or the last four digits of a social security number. In

challenging these voters, he dresses up a federal law claim as a state law claim, arguing that these votes violate North Carolina law which, according to him, requires voter registrant applicants to provide this information on their voter registration form. But the law he cites does not require this; that requirement comes from federal law.

In determining that this case should be remanded to the North Carolina Supreme Court, the district court made one non-dispositive and one dispositive legal error.

*First*, the district court made the non-dispositive error of determining that this case does not present a federal question, even though this Court recently held precisely the opposite in a case concerning the same core issue: whether voters whose voter registration record did not have a driver's license number or social security number are valid registrants. *Republican National Committee v. North Carolina State Board of Elections*, 120 F.4th 390 (4th Cir. 2024). Though Judge Griffin pleads his case differently than the plaintiff in *RNC* by limiting his claim to a state election contest, such a change makes no material difference: under North Carolina's "unified registration system for both state and federal elections," *id.* at 401, "[a] state court ruling could very much change how *federal* law is enforced . . . in future [federal] elections." *Id.* at 404. However, this error was non-dispositive

3

because the Court correctly found that there was federal jurisdiction under 28 U.S.C. § 1443(2).

*Second*, the Court *sua sponte* held that, although it had jurisdiction under § 1443(2), the case should nonetheless be remanded under the abstention doctrines of *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943) and *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25 (1959). In doing so, the Court dispositively erred because this case is not one of the narrow set of circumstances in which those doctrines apply.

For these reasons, this Court should stay the remand order and order the district court to retrieve the action from the North Carolina Supreme Court.

## ARGUMENT

## I. UNDER NORTH CAROLINA'S UNIFIED SYSTEM OF VOTER REGISTRATION, FEDERAL LAW DICTATES STATE LAW

### a. North Carolina's unified system of voter registration renders the distinction between state and federal elections illusory for purposes of voter registration and list maintenance

The district court denied federal-question jurisdiction in this case because it ruled that this matter does not "require consultation of federal law." JA 312. This constitutes legal error because, under North Carolina's unified registration system for state and federal elections, registered voters cannot be declared ineligible without a determination under federal law.

In North Carolina, there is no difference between state and federal voters. This court recently addressed this issue in *RNC*, under nearly identical facts. In *RNC*, the plaintiff claimed that North Carolina had improperly registered voters that had not included their driver's license number or social security number on their voter registration forms. *RNC*, 120 F.4th at 398-99. The RNC filed a state constitutional and a state statutory claim in state court, and the State Board removed. *Id.* at 394. The district court remanded one claim back to state court and retained one claim. On appeal, this Court reversed, holding that both claims belonged in federal court. *RNC*, 120 F.4th at 399-408. In its opinion reversing the district court, this Court concluded that plaintiffs brought "a state cause of action in name only," because the claims required consultation of the NVRA and HAVA. *Id.* at 401. This Court also recognized that "North Carolina has a unified registration system for both state and federal elections, and thus is bound by the provisions of the NVRA for the registrants at issue here." *RNC*, 120 F.4th at 401.

Here, Judge Griffin challenges a subset of the very voters at issue in *RNC*, on nearly identical grounds. Likewise, the issue that this Court identified in *RNC* as an essential question relating to HAVA—what happens under HAVA's list maintenance procedures to voters who registered to vote without providing a driver's license or social security number, *id.* at 400—is essential to this case as well, for reasons described below.

5

### b. North Carolina rewrote its election code to address the NVRA

Not only does North Carolina have a unified voter registration system, its relevant state procedures largely follow from federal procedures laid out in the NVRA and HAVA. North Carolina rewrote its election code addressing voter registration in 1993 to conform to the NVRA. 1993 N.C. Sess. Laws 1993-762. North Carolina also made significant changes to its voter registration system to comply with HAVA. 2003 N.C. Sess. Laws 2003-226.

When Congress passed the National Voter Registration Act of 1993, it made three statutory findings: (1) U.S. citizens have a fundamental right to vote; (2) federal, state, and local governments have a duty to promote exercise of the right, and (3) discriminatory and unfair registration laws have a negative impact on voter participation, including participation by people of color. 52 U.S.C. § 20501(a). To that end, Congress's stated purposes in passing the NVRA included adopting procedures designed to increase the number of citizens who are eligible to vote, enhance the ability of federal, state, and local governments to register eligible citizens to vote, and to maintain accurate and current voter registration rolls. 52 U.S.C. § 20501(b).

Consistent with the identified findings and purposes, Congress set forth procedures aimed at promoting voter registration, including by providing a federal mail-in voter registration form that states were required to accept and use, specifying

that states could develop their own mail-in registration form, and requiring state motor vehicles offices and public assistance agencies to provide voter registration. 52 U.S.C. §§ 20503-06; *see also Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013).

In addition, the NVRA includes two important "[r]equirements with respect to administration of voter registration" relevant to this case. The first requires states to "send notice to each applicant of the disposition of [their] application." 52 U.S.C. § 20507(b). The second set of requirements limit the reasons and timing for removing voters from the voter registration list. Under the NVRA,

> [E]ach state shall —
>
> (3) provide that the name of a registrant *may not be removed from the official list of eligible voters except*—
> (A) at the request of the registrant;
> (B) as provided by State law, by reason of criminal conviction or mental incapacity; or
> (C) as provided under paragraph (4);

52 U.S.C. § 20507(a)(3) (emphasis added). Paragraph (4) allows for removal of voters under general programs of voter maintenance designed to remove registered voters who have died or moved. 52 U.S.C. § 20507(a)(4). The NVRA also places a timing limit on when voters can be removed: "A state shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any

program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A).

North Carolina's requirements simply implement the NVRA. North Carolina requires county boards of election to inform applicants whether their application is accepted or rejected "within a reasonable time of receiving the application." N.C. Gen. Stat. § 163-82.1. Under the state's "[g]eneral principles of voter registration," a registered voter must remain registered unless (a) they request to be removed, (b) become "disqualified through death, conviction of a felony, or removal out of the country," or (c) the county board of elections, through procedures outlined in other provisions, can no longer confirm where the voter lives. *Id.*

### c. HAVA required further changes to North Carolina's unified voter registration system

HAVA builds on the NVRA by, among other things, setting uniform standards for voter registration and list maintenance. 52 U.S.C. § 21083. Congress passed HAVA on the heels of a highly controversial election in 2000, seeking to restore confidence in the electoral system and improve access to the ballot. Orion de Nevers, *What Happened to HAVA? The Help America Vote Act Twenty Years on and Lessons for the Future,* 110 Geo. L.J. Online 168, 171 (2022). One of HAVA's signature reforms was a set of minimum voter registration standards for all states and localities to adhere to. *See* 52 U.S.C. Subtitle II Ch. 209 Subch. III; Daniel P. Tokaji, *Early*

*Returns on Election Reform: Discretion, Disenfranchisement, and the Help America Vote Act*, 73 Geo. Wash. L. Rev. 1206, 1214 (2005). That includes the requirement at issue in this case, namely that a state must obtain from registrants a driver's license number or the last four of the registrant's social security number. 52 U.S.C. § 21083(a)(5).

The legislative history indicates that Congress sought to ensure that these requirements were applied in a uniform manner. Senator Kit Bond introduced the provisions at issue in this case as part of a "push for the establishment of a uniform system of identity verification for voter registration during the creation of HAVA." Gabrielle B. Ruda, *Picture Perfect: A Critical Analysis of the Debate on the 2002 Help America Vote Act*, 31 Fordham Urb. L.J. 235, 246 (2003) (citing 148 Cong. Rec. S1175 (statement of Senator Bond)); Charles Stewart, *What Hath HAVA Wrought? Consequences, intended and Not, of the Post-Bush v. Gore Reforms*, Caltech/MIT Voting Technology at 13 (April 7, 2011). Several floor statements likewise indicate a need for the requirements to be uniform across the country. S. Rep. No. 136-107 (2002) (statement of Senator Hatch); *id.* (statement of Senator Kerry).

### d. By implementing a unified registration system, North Carolina bound itself by federal law for registration and list maintenance in both state and federal elections

Because HAVA and the NVRA were passed under Congress's Elections Clause authority, *see Inter Tribal Council of Arizona,* 570 U.S. at 7-8, any state may separate its voter registration rules for federal elections from that for state elections, if it so chooses. For example, Arizona has additional registration requirements for state elections, including presenting documentary proof of citizenship. *Mi Familia Vota v. Fontes*, 719 F. Supp, 929, 948 (D. Ariz. 2024).

As discussed above, unlike Arizona, North Carolina has made its system for registering voters for state and federal elections one and the same. When a North Carolina voter registers, they fill out a single form for both state and federal elections. N.C. Gen. Stat. §163-82.3(a). When that voter's registration is processed, that voter is added to a single statewide database for state and federal elections. N.C. Gen Stat. §163-82.11(a). Most importantly, when a voter is removed from those same rolls, they lose eligibility to vote in both state and federal elections. *See* N.C. Gen. Stat. §163-82.14.

Consistent with the federal statutory design, North Carolina has enacted statutes to implement HAVA and the NVRA. *See, e.g.,* N.C. Gen Stat. §163-82.11; The relevant legal obligations, however, originate in federal law through HAVA and the NVRA, as described above. Thus, North Carolina's unified system for voter

10

registration renders any distinction between state and federal elections for purposes of voter registration illusory.

## II.   THE FEDERAL COURTS HAVE JURISDICTION OVER THIS MATTER

### A.   The district court erred in finding that there was no federal question jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1441

The district court's ruling that this case did not present a substantial federal question was in error. A state-law claim poses a substantial question of federal law if the federal issue is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *RNC,* 120 F.4th at 400 (4th Cir. 2024) (quoting *Gunn v. Minton*, 568 U.S. 251, 258 (2013)) (internal quotation marks omitted). The district court concluded that this case did not "necessarily raise" a federal question. JA. 309. This was incorrect.

In his original petition, Judge Griffin claims that a county board may not process a voter registration form if the voter does not provide a driver's license number or the last four digits of their social security number. JA 38. Judge Griffin argues that the State Board should reject any ballot cast by someone who registered without providing this information. JA 49-50. Most of the votes at issue, over 60,000 of them, involve this issue.

North Carolina law does not *require* that voter registrants with a driver's license or social security number provide that information on their application, however. The State's legislation implementing HAVA states that the voter registration application shall "request," a "[d]rivers license number or, if the applicant does not have a drivers license number, the last four digits of the applicant's social security number." N.C. Gen. Stat. §163-82.4(a)(11). Consistent with the statute, North Carolina's post-HAVA voter registration forms until December 2023 *requested* that information but did not *require* it. *RNC,* 120 F.4th at 399.

 North Carolina's HAVA implementation statute *requests* what HAVA *requires*. HAVA states that "an application for voter registration for an election for Federal office *may not be accepted or processed* by a State unless the application includes" a driver's license number or the last four digits of the applicant's social security number. 52 U.S.C. § 21083(a)(5)(A) (emphasis added). HAVA also provides an alternative for registrants who lack these numbers—that "the State shall assign the applicant a number which will serve to identify the applicant for voter registration purposes." *Id.* at (a)(5)(A)(iii).

Judge Griffin's claim "runs squarely through HAVA." *RNC*, 120 F.4th at 400 (4th Cir. 2024). In order to decide this case, the Court must determine whether an

alleged[2] failure by a voter to provide the information required by HAVA results in the vote being discounted. This places the federal question front and center.

In denying federal question jurisdiction, the district court effectively talked past the arguments above. The district court concluded that Griffin's "challenge can be resolved with exclusive reference to state law." JA 312. But this proceeds on the assumption that state law requires voters to provide a driver's license number or the last four digits of their social security number to be registered. The district court did not engage with this question and the above makes clear that this assumption is faulty.

Moreover, the district court's ruling impermissibly veered into the merits of the federal question in deciding that one was not raised in this case. Whether North Carolina law affords Griffin the relief he seeks is a *merits* question, not a jurisdictional one. As the district court acknowledged, even if a legal theory underlying an alleged federal question is wanting, the court may not dismiss for lack of jurisdiction unless that position is "absolutely devoid of merit." JA 319-320 (citing, inter alia, *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 89 (1998) ("It

---

[2] Amici note that it may be the case that some of the 60,000 voters may not have been required to provide this information in the first place. Some of these voters may have registered prior to HAVA and the accompanying state requirement related to providing a driver's license or social security number. Others may have neither number, and for those voters, as discussed above, under HAVA the State assigns them a voter registration number.

is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction."). Amici disagree with the district court's resolution of the merits of the state-law question, but nobody disputes that Amici's contentions are, at a minimum, arguable. These contentions therefore serve as a basis for federal question jurisdiction.

In its ruling on federal question jurisdiction, the court placed substantial weight on the fact that this election concerns a state, rather than federal, office. However, as described in Section I *supra*, this distinction is illusory. While certain states separate their state and federal registration systems, *see, e.g.,* Ariz. Rev. Stat. § 16-161, North Carolina does not. *RNC*, 120 F.4th at 401 (4th Cir. 2024).

The district court "appreciate[d] but disagree[d]" with the above argument made by Amici. JA 314. It stated that "this contention conflates a potential practical implication with an important legal distinction," *id.*, and stated that because North Carolina had created the "symmetry" between federal and state standards for voter registration and removal, federal question jurisdiction does not apply. *Id.*

The above argument not only (again) veers into the merits, it also runs headlong into the district court's own reasoning. Later in its opinion, the district court noted that the State Board's argument that the National Voter Registration Act prohibited it from acting in this case was *not* meritless, particularly in light of "North

Carolina's unified system of voter registration." *Id.* It was on that finding that it upheld removal under § 1443(2). *Id.* It is unclear why this same reasoning would not justify federal question jurisdiction: both the NVRA and HAVA (Amici have argued) become applicable to North Carolina because of its unified system for voter registration. Thus, while Amici disagree with the district court's reasoning on this point, that disagreement is not, and should not be, assessed as a matter of jurisdiction.

For support, the district court relied on the out-of-circuit case *American Airlines, Inc. v. Sabre, Inc.*, 694 F.3d 539 (5th Cir. 2012), JA 314-15, but that case bears no resemblance to the one at bar. *American Airlines* involved a fees dispute in which the relationship between the plaintiff's state law claim and federal law was tenuous at best. There, the plaintiff sued under the Texas Antitrust Act. *Id.* at 542. Defendants' based their removal on the fact that the relevant statute instructed courts to interpret the state law "in harmony with federal judicial interpretations of comparable federal antitrust statutes to the extent consistent with this purpose." *Id.* at 543. Defendants also cited a state court ruling's likely impact in parallel federal litigation under federal antitrust statutes. *Id.* The Fifth Circuit disagreed, concluding that plaintiff's claims arise solely under state antitrust laws and that "nothing in the plain language" of the state statute or caselaw interpreting it "requires that federal law control Texas's interpretation of its state antitrust statute" *Id.* at 542.

15

Here, by contrast, Judge Griffin's claims do not merely require interpretation "in harmony with" HAVA, they originate there. The requirements he seeks to enforce are imposed by HAVA's minimum registration requirements. *See supra* Section II. The relief Griffin seeks—discounting the challenged ballots—is more than a mere "practical implication," as the district court termed it, JA.314, it is a definitive pronouncement of a voter's status under HAVA. This is in stark contrast to *American Airlines*, where any consequences under federal law could only emerge as persuasive precedent in a parallel federal proceeding. Moreover, voters cannot be purged from North Carolina's uniform registration list—which is what Judge Griffin is *de facto* requesting by saying that they were improperly registered and their votes should accordingly be thrown out—if it conflicts with the voter purge provisions of the NVRA.

Finally, the district court's decision runs directly counter to the congressional intent behind HAVA. As discussed, the legislative history of HAVA demonstrates that Congress intended its minimum registration standards to be applied in a uniform fashion. *See supra* Section I. If HAVA is to achieve Congress's goal of uniformity across the country, federal courts must have an opportunity to interpret the statute. Allowing a state court to interpret HAVA could lead to the judicial creation of 50 different versions of HAVA across the United States. Allowing federal courts to decide these issues, by contrast, ensures that Congress's "federal mandate for voter

registration"[3] speaks with a single voice. Making a federal court available to decide disputes under HAVA helps to preserve the federal-state balance struck by the statute, while at the same time ensuring uniformity in the Act's application.

### B. The district court properly found that it had jurisdiction under 28 U.S.C. § 1443(2)

The district court was correct that it had jurisdiction under the civil rights removal statute, 28 U.S.C. § 1443(2); JA 317-320. As the district court recognized, JA 319, it was bound by this Court's decision in *RNC* to conclude that 28 U.S.C. § 1443(2) was a proper basis for removal. In *RNC*, this Court held that the NVRA is a law "providing for specific civil rights stated in terms of racial equality'" and thus provided a sufficient basis for removal because the State Board invoked the NVRA as part of its defense. *RNC*, 120 F.4th at 407-08 (quoting *Georgia v. Rachel*, 384 U.S. 780, 792 (1966).

Additionally, given the parochial interests at play in this case, civil rights removal was especially appropriate. As the Second Circuit noted in *Greenberg v. Veteran*, 889 F.2d 418, 421–22 (2d Cir. 1989), Congress approved § 1443(2) because it "evidently believed it necessary to provide a federal forum for cases which from the nature of the issues involved stir local passions, because the tenure and independence of federal judges are constitutionally guaranteed, and therefore federal

---

[3] S. Rep. No. 136-107 (2002) (statement of Senator Bond).

courts are more removed from and generally less susceptible to parochial pressures." This case embodies that purpose. As the district court noted, this case involves "a sitting state court judge" seeking relief from "the state supreme court" to "enjoin the state board of elections" from certifying the result of an election to that very court. JA 326. There can be little dispute that a federal court is a much more suitable forum for hearing a heated local political dispute such as this.[4] Amici's predecessors in Congress anticipated such cases when they passed § 1443(2).

## III. THE DISTRICT COURT ERRED IN HOLDING THAT ABSTENTION APPLIES

After the district court found it had jurisdiction under 28 U.S.C. § 1443(2), it then proceeded to raise abstention under *Burford* and *Thibodaux sua sponte*.[5] The district court committed error by misapplying both of those abstention doctrines.

---

[4] As one illustration of the fraught political dynamics at play on the ground in North Carolina, Law360 has reported that there was (as of the time of the article's publication) a poster hanging in the North Carolina Supreme Court that depicts some (but not all) members of the North Carolina Supreme Court as members of the superhero "Justice League." Included in the picture are Chief Justice Paul Martin Newby (as Superman), Justice Phil Berger Jr. (as Batman), and Justice Tamara P. Barringer (as what appears to be Hawk Girl), alongside Judge Griffin (as the Flash). Notably, Appellant-Intervenor Justice Riggs is not depicted in the picture. Hannah Albarazi, *North Carolina Justice Anita Earls Opens Up About Diversity,* Law360, p. 3 (Jun. 20, 2023, 10:45 AM EDT) https://www.law360.com/articles/1687516/north-carolina-justice-anita-earls-opens-up-about-diversity [Attached as Exhibit A].

[5] Judge Griffin makes the bizarre argument, Griffin Br. at 11, that NCSBE has waived the right to raise objections to this component of the court's opinion because

This Court has made clear that *Burford* abstention only applies in under an extremely narrow set of circumstances where federal jurisdiction would unduly interfere with complex state administration processes. It only applies when "(1) 'there are difficult questions of state law ... whose importance transcends the result in the case then at bar'; or (2) federal review would disrupt "state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Martin v. Stewart*, 499 F.3d 360, 364 (4th Cir. 2007) (quoting *New Orleans Pub. Serv., Inc. v. Council of New Orleans,* 491 U.S. 350, 361-63 (1989). In "balanc[ing] the state and federal interests to determine whether the importance of difficult state law questions or the state interest in uniform regulation outweighs the federal interest in adjudicating the case at bar," *Martin*, 499 F.3d at 364 (quoting *NOPSI*, 491 U.S. at 362), "'[t]his balance only rarely favors abstention.'" *Martin*, 499 F.3d at 364 (quoting *Quackenbush v, Allstate Ins. Co*, 517 U.S. 706, 728 (1996). The rare type

---

NCSBE did not address abstention in the district court. But there was no reason for NCSBE to address *Burford* and *Louisiana Power* abstention in the district court: those doctrines were raised by the district court *sua sponte* in its order. As the district court noted, JA 320 at n.9, Judge Griffin only raised *Pullman* abstention and *Pullman* abstention was not a basis for the district court's decision. If anything, the *Burford*/*Louisiana Power* argument was not properly before the district court and therefore should not have been considered. *See Eriline Co. S.A. v. Johnson,* 440 F.3d 648, 653–54 (4th Cir. 2006) (quoting *United States v. Burke*, 504 U.S. 229, 246 (1992) (Scalia, J., concurring) ("The rule that points not argued will not be considered is more than just a prudential rule of convenience; its observance, at least in the vast majority of cases, distinguishes our adversary system of justice from the inquisitorial one.").

of case where this Court has found that *Burford* abstention applies have involved claims that amount to "state law in federal law clothing," *Caldwell v. Collins Entertainment Co.*, 199 F.3d 710, 721 (4th Cir. 1999), such as local land use policy regulations and gambling.

This case is a far cry from that. There are fundamental federal concerns implicated in this case. As this Court recently noted in *RNC*: "It is beyond cavil that voting is of the most fundamental significance under our constitutional structure." *RNC*, 120 F.4th at 404. Given the state's unified voter registration system, the issue as to whether a voter who is on the voter registration list can be declared ineligible due to issues on a voter registration form necessarily involves an interpretation of HAVA and the NVRA. This is true even for state election contests because, as discussed *supra* at section I, the answer of whether the 60,000 voters are eligible to vote is the same for federal and state elections. Moreover, as NCSBE notes, *Burford* abstention is "particularly inappropriate" in voter registration and voting cases, as multiple federal courts have noted. State Board Br. at 38 (quoting *Siegel v. LePore*, 230 F.3d 1163, 1174 (11th Cir. 2000) (en banc) (per curiam)). Finally, as described above, HAVA reflects a strong federal interest in the Act's uniform application. *See supra* Section I. Depriving the parties of a federal forum to resolve disputes under HAVA runs directly contrary to that intent.

This case also appears to be completely at odds with how *Burford* abstention is typically invoked. Ordinarily, a state or local defendant raises the issue of *Burford* abstention by claiming that it has a complex administrative process under state law that needs to be interpreted by state courts. *See, e.g., Browning-Ferris, Inc. v. Baltimore Cnty., Md*., 774 F.2d 77 (4th Cir. 1985). Based on research done so far by counsel, Amici have not seen a case where a state or local authority removed a case to federal court based on its view that the case involved a substantial federal question, and subsequently, the district court remanded the case under *Burford* over the state or local defendant's objection. This is no surprise: a doctrine created for the benefit of state authorities should not work to the detriment of state authorities.

Application of *Thibodaux* abstention is equally ill-suited. As the NCSBE properly notes, Respondent-Appellant's Opening Brief, ECF No. 52 at 38 n.7, it does not apply here because the doctrine only applies to diversity jurisdiction cases. No party to this litigation has argued in favor of diversity jurisdiction, so the doctrine is wholly inapposite. Even Judge Griffin seems to acknowledge that *Thibodaux* abstention does not provide a standalone rationale for abstention. Opposition to Stay, ECF No. 48 at 16 (interpreting the district court opinion as mentioning *Thibodaux* to support its conclusion that *Burford* abstention applies.)

**CONCLUSION**

For the foregoing reasons, this Court should grant NCSBE's motion to stay.

January 16, 2025                           Respectfully Submitted,


/s/ *Jon Greenbaum*
JON GREENBAUM
NORMAN EISEN
TIANNA MAYS
SPENCER KLEIN
STATE DEMOCRACY DEFENDERS
FUND
600 Pennsylvania Avenue SE
#15180
Washington, D.C. 20003
jgreenbaum@justicels.com
(202) 601 8678

/s/ William C. McKinney
WILLIAM C. MCKINNEY
HAYNSWORTH SINKLER BOYD,
P.A.
223 S West St STE 925
Raleigh, NC 27603
(864) 240 3271
wmckinney@hsblawfirm.com

## CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that this motion complies with Fed. R. App. P.

27(d)(2)(C), 32(a)(5), 32(g)(1), and Local Rule 27.

This 16th day of January, 2025.

/s/ *Jon Greenbaum*
JON GREENBAUM
STATE DEMOCRACY DEFENDERS FUND
600 PENNSYLVANIA AVENUE SE #15180
Washington, D.C. 20003
(202) 601-8678
jgreenbaum@justicels.com

## CERTIFICATE OF SERVICE

I, Jon Greenbaum, certify that the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will automatically serve electronic copies on all counsel of record.

This 16th day of January, 2025.

<u>/s/ Jon Greenbaum</u>
JON GREENBAUM
STATE DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
(202) 601-8678
jgreenbaum@justicels.com

# EXHIBIT A



**Portfolio Media. Inc.** | 230 Park Avenue, 7th Floor | New York, NY 10169 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# North Carolina Justice Anita Earls Opens Up About Diversity

By **Hannah Albarazi**

Law360 (June 20, 2023, 10:45 AM EDT) -- In an interview with Law360, North Carolina Supreme Court Justice Anita Earls discusses what's behind a glaring lack of diversity on the state's appellate bench and among advocates who argue before her court, and how the newest chief justice derailed initiatives addressing implicit bias and racial inequities in the state's justice system.



Justice Anita Earls

Justice Earls, a former civil rights attorney elected as a justice of the North Carolina Supreme Court in 2019, shared her perspective on being a Black female Democrat on a state Supreme Court that is largely white, male and, after last year's elections, Republican, when voters flipped the court's majority from 4-3 Democratic to 5-2 Republican.

In this conversation, Justice Earls shined a spotlight on the decision by North Carolina Chief Justice Paul Newby — who did not respond to Law360's request for comment — to discontinue efforts within the judiciary to address implicit bias and racial discrimination at a time when there remains a significant lack of diversity on the appellate bench and among those who argue before

it.

A Law360 analysis found that North Carolina Supreme Court justices are 71% white males and that the state's Court of Appeals judges are 93% white and 60% male. A recent study by the state Solicitor General Ryan Y. Park likewise found that attorneys who argue before the state Supreme Court are 90% white and 70% male and do not reflect the state's diversity.

This interview has been edited for length and clarity.

## Why are oral advocates that come before the North Carolina Supreme Court overwhelmingly male and white, despite a diverse state population and state bar membership?

Part of it is the current pool of who's eligible to argue in front of us and then who decides who gets to do the arguments. But then beyond that: What is the pipeline to arguing in front of us? If you look at who is hired to serve as clerks to the justices … we have plenty of female clerks, but on racial diversity we're lacking. … For the term that just started in January … there were 14 or 15 law clerks serving in our court and no African Americans. One Latina.

I think another part of this, in terms of the gender and race discrepancies that you see, I really do think implicit bias is at play.

There have been cases where I have felt very uncomfortable on the bench because I feel like my colleagues are unfairly cutting off a female advocate. We have so few people of color argue, but in one case there was a Black woman who argued in front of us and I felt like she was being attacked unfairly, not allowed to answer the question, interrupted. It's not uniform. It's not in every case. And so it could certainly factor in the politics of the particular case that's being argued.

So when that is the culture of our court — that is to say, when the culture is that male advocates and advocates who reflect the majority of the court, white advocates, when they get more respect, when they are treated better — I think it filters into people's calculations about who should argue and who's likely to get the best reception and who can be the most persuasive.

I'm not suggesting that any of this is conscious, intentional, racial animus. But I do think that our court system, like any other court system, is made up of human beings and I believe the research that shows that we all have implicit biases.

## What efforts have been made to diversify the appellate bench, which is largely male and white?

Under the prior court, there was an equity committee looking at these issues. That committee was disbanded at the beginning of this year. That was an internal equity committee to look at just the North Carolina Supreme Court and our hiring practices. That's an issue, too.

The prior court had [also] issued an order appointing a Commission on Fairness and Equity in the North Carolina judicial system. It dealt with not only how we treat the public but how we operate internally. It dealt with gender as well as race. It was established by order of the court in October of 2020. And then in January of 2023, the chief justice refused to reappoint members of that committee.

There's been no attention to that because it's all been done very quietly. It's not like there was a big press conference …The new majority on the court didn't issue a new court order saying we're superseding the old order. … It's in line with the values of the current party in power in our court.

The new members of our court very much see themselves as a conservative bloc. They talk about themselves as "the conservatives." Their allegiance is to their ideology, not to the institution.



An illustration hung in the North Carolina Supreme Court depicts a slate of current elected Republican jurists as superheroes: Supreme Court Chief Justice Paul Newby and Justices Philip Berger Jr. and Tamara Barringer and Court of Appeals Judges Chris Dillon, Jeffery Carpenter, Fred Gore, Jefferson Griffin and April Wood. Click to enlarge. (Courtesy of Robyn Sanders)

## Have you faced obstacles that you attribute to your gender or race on your journey to becoming an appellate advocate or Supreme Court judge?

Both. Yes.

I had to have very sharp elbows sometimes as I got further along in my career, to say, "Look, I have 25 years' experience. You're not going to shut me out of this litigation strategy decision." So, just to be in the position to ultimately be the person who gets to argue the case on appeal, there were certainly challenges as a female litigator.

In terms of being on the court, interestingly, I didn't feel any barriers running for office. I didn't feel like voters had any preconceived notions that I couldn't be an appellate judge because I was a woman.

But I certainly think that now that I'm on the bench, I see ways in which I'm treated differently by my colleagues and during oral argument, and sometimes it's hard to separate out: Is this race or is this gender or is this because of my political views? Any one of those three or the combination of all three might be the explanation.

I've been interrupted by more junior colleagues and I've had to say, "Excuse me, I'm not finished with my question." And less often or less striking to me, but still occasionally happens is, advocates who won't let me get my question out. That just doesn't happen to my male colleagues.

There were two times when one of my colleagues publicly tried to embarrass me, and in the context of the case and the oral argument, that's just not only my perception. Other people in the courtroom at the time were shocked and surprised because that isn't how our court operates, at least in the past.

## Are there implicit bias trainings offered to North Carolina's jurists?

Well, there were.

I am co-chair of the Governor's Task Force on Racial Equity and Criminal Justice, [created] following George Floyd's murder in 2020. One of our first recommendations was that all judicial system actors have implicit bias and racial equity training.

The [University of North Carolina] School of Government … developed a curriculum. Some trial court judges attended their implicit bias training, and then when the new chief justice came into office in January 2021, he ended that by renegotiating the contract with the School of Government. It's no longer being offered to judges.

I think that it's part of the general antipathy towards seeing that racial issues matter in our justice system.

The current Chief Justice Newby — at the time [Senior Associate] Justice Newby — wrote a dissent to the order creating the Commission on Fairness and Equity, in which he basically said … that he thought the timing of the order was political, that the text of the order improperly prejudged issues of racial discrimination, and that it improperly inserts the judiciary into the policymaking arena.

So it's a very political issue. And the current party [in power] doesn't think that there are any problems of racial discrimination in our justice system.

And so why would you have training on implicit racial bias if there is no such thing as racial discrimination or racial bias, right? That's their worldview.

## What can be done to increase diversity on the bench?

It can be really challenging to figure out how you're going to run for office and keep a full-time job. Because for me, running for office was a full-time job, and I could only do it when I had the financial means to go without income for a year. It was only after 30 years of practicing law, with both my kids out of college, could I finally say, "I can go without an income for a year." So I think that's a barrier at the appellate level.

The fact that you have to campaign statewide to win the seat, you have to raise a lot of money. I had to raise $1.5 million. That was in 2018. That wouldn't be enough now. When we had public financing of statewide judicial appellate races, that was actually when you saw the bench diversify.

If you look at when did women start getting elected to our appellate courts in North Carolina. It was after public financing came in, and that has since ended. Elimination of that was part of the monster voter suppression bill in 2013.

## What would you tell women and people of color hoping to join North Carolina's appellate bench or appellate bar?

It would break my heart to think that people are discouraged from doing appellate work because they don't want to face these hurdles.

I think the message I would give is: It's twice as important that you do this. You can find resources to help you surmount the hurdles.

--Editing by Jill Coffey.

All Content © 2003-2025, Portfolio Media, Inc.