Nos. 25-1018 (L), 25-1019, 25-1024

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT
_____

JEFFERSON GRIFFIN,

*Plaintiff – Appellee*,

v.

NORTH CAROLINA STATE BOARD OF ELECTIONS,

*Defendant – Appellant*,

and

ALLISON RIGGS; NORTH CAROLINA ALLIANCE FOR RETIRED
AMERICANS; VOTEVETS ACTION FUND; TANYA WEBSTER-DURHAM;
SARAH SMITH; JUANITA ANDERSON,

*Intervenor-Defendants – Appellants*.

_____

On Appeal from the United States District Court
for the Eastern District of North Carolina

_____

### *CORRECTED* BRIEF OF *AMICI CURIAE* NORTH CAROLINA VOTERS
### AND THE LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA
### IN SUPPORT OF APPELLANTS

REQUESTING IMMEDIATE STAY

_____

Jessica A. Marsden
Anne Harden Tindall
Protect Democracy Project
510 Meadowmont Village Cir., #328
Chapel Hill, NC 27517
jess.marsden@protectdemocracy.org
anne.tindall@protectdemocracy.org
(202) 579-4582

Hayden Johnson
Protect Democracy Project
2020 Pennsylvania Ave. NW, #163
Washington, DC 20006
hayden.johnson@protectdemocracy.org
(202) 579-4582

Stacey Leyton
Danielle Leonard
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
sleyton@altber.com
dleonard@altber.com
(415) 421-7151

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ................................................................................ 1

INTEREST OF AMICI .......................................................................... 2

ARGUMENT ........................................................................................ 3

   I.   This Court Should Act to Preserve Federal Jurisdiction by Immediately Staying the Remand Order and Pending State Court Proceedings ...................... 4

     A.   This Court has the authority to stay appealable remand orders. ................. 5

     B.   This Court has the authority to enjoin further state court proceedings. ....... 8

     C.   This Court should stay the remand order and enjoin further state court proceedings. ................................................................. 10

   II.   Substantial Federal Due Process and Right to Vote Concerns at the Core of the State Board's Decision Warrant Federal Jurisdiction ................................... 13

     A.   Griffin's requested relief would violate voters' reliance interests and upset the status quo. ................................................................. 15

     B.   Griffin threatens arbitrary, broad-gauged disenfranchisement. ................. 21

   III.   An Order Reversing and Vacating the Erroneous Remand Decision Will Immediately Enjoin All Further Proceedings in State Court .............................. 25

CONCLUSION ................................................................................... 27

CERTIFICATE OF SERVICE .............................................................. 30

CERTIFICATE OF COMPLIANCE ..................................................... 31

i

# TABLE OF AUTHORITIES

**Page**

**Cases**

Acad. of Country Music v. Cont'l Cas. Co.,
991 F.3d 1059 (9th Cir. 2021) .................................5, 6, 20, 26, 27

E. Enterprises v. Apfel, 524 U.S. 498 (1998) ........................................15

Bennett v. Yoshina, 140 F.3d 1218 (9th Cir. 1998) ...........14, 15, 22, 25

Briscoe v. Kusper, 435 F.2d 1046 (7th Cir. 1970) ..............................20

Bryan v. BellSouth Commc'ns, Inc.,
492 F.3d 231 (4th Cir. 2007) ........................................7, 8, 26, 27

Bush v. Gore, 531 U.S. 98 (2000) .......................................................19

Canady v. Allstate Ins. Co., 282 F.3d 1005 (8th Cir. 2002) ..................8

Carlyle Inv. Mgmt. LLC v. Moonmouth Co.,
779 F.3d 214 (3d Cir. 2015).............................................................6, 7

Forty Six Hundred LLC v. Cadence Educ., LLC,
15 F.4th 70 (1st Cir. 2021) ................................................................6

GenCorp, Inc. v. Olin Corp., 477 F.3d 368 (6th Cir. 2007) ..................7

Greidinger v. Davis, 988 F.2d 1344 (4th Cir. 1993) ...........................15

Griffin v. Burns, 570 F.2d 1065 (1st Cir. 1978).....................14, 20, 21

Hendon v. N.C. State Bd. of Elections,
710 F.2d 177 (4th Cir. 1983)....................................................14, 20

Hoblock v. Albany Cnty. Bd. of Elections,
487 F. Supp. 2d 90 (N.D.N.Y. 2006) ..............................................20

In re Am. Honda Motor Co., Inc., Dealerships Rels. Litig.,
315 F.3d 417 (4th Cir. 2003)..............................................................8

In re Lowe, 102 F.3d 731 (4th Cir. 1996) .............................................5

Int'l Found. for Genetic Rsch. (Michael Fund) v. Shalala,
57 F.3d 1066 (4th Cir. 1995) .............................................................7

Landgraf v. USI Film Prod., 511 U.S. 244 (1994) ...............................15

League of Women Voters of N.C. v. North Carolina,
769 F.3d 224 (4th Cir. 2014)............................................................20

Lou v. Belzberg, 834 F.2d 730 (9th Cir. 1987) .....................................8

Martingale LLC v. City of Louisville, 361 F.3d 297 (6th Cir. 2004) ......................8

Maseda v. Honda Motor Co., 861 F.2d 1248 (11th Cir. 1988) ...............................8

Matter of Meyerland Co., 910 F.2d 1257 (5th Cir. 1990)........................................8

Ne. Ohio Coal. for Homeless v. Husted,
    696 F.3d 580 (6th Cir. 2012)............................................................15, 19, 23

Northrop Grumman Tech. Servs., Inc. v. DynCorp Int'l LLC,
    No. 1:16CV534(JCC/IDD) (E.D. Va. June 16, 2016) ................................11

Phoenix v. Kolodziejski, 399 U.S. 204 (1969) ......................................................14

Plaquemines Par. v. Chevron USA, Inc.,
    84 F.4th 362 (5th Cir. 2023) ...................................................................6, 7, 8

Project Vote/Voting for Am., Inc. v. Long,
    682 F.3d 331 (4th Cir. 2012).......................................................................16

Quackenbush v. Allstate Ins. Co., 517 U.S. 706 (1996) ....................................6, 12

Republican Nat'l Comm. v. N.C. State Bd. Elections,
    No. 5:24-cv-00547 (E.D.N.C. Nov. 22, 2024)............................................18

Republican Nat'l Comm. v. N.C. State Bd. of Elections,
    120 F.4th 390 (4th Cir. 2024) ..................................................................5, 11

Reynolds v. Sims, 377 U.S. 533 (1964) ................................................13, 14, 21

Roe v. Alabama, 43 F.3d 574 (11th Cir. 1995) ......................................................20

Slochower v. Bd. of Higher Ed., 350 U.S. 551 (1956) ..........................................25

South Carolina v. Moore, 447 F.2d 1067 (4th Cir. 1971) .....................................26

Voto Latino v. Hirsch, 712 F. Supp. 3d 637 (M.D.N.C. 2024) .............................15

**Statutes**

28 U.S.C. § 1441 .....................................................................................................11

28 U.S.C. § 1443 ...........................................................................................8, 11, 12

28 U.S.C. § 1447 ..............................................................5, 8, 9, 10, 27, 28

28 U.S.C. § 1651 .......................................................................................................8

28 U.S.C. § 2283 .......................................................................................................8

52 U.S.C. § 21083 ...................................................................................................25

52 U.S.C. § 20302 ...................................................................................................19

N.C.G.S. § 120-70.101 ............................................................................................19

N.C.G.S. § 143B-30.1 ...................................................................... 19
N.C.G.S. § 150B-21.9 ...................................................................... 19
N.C.G.S. § 163-22 ........................................................................... 16
N.C.G.S. § 163-82.1 ................................................................... 16, 26
N.C.G.S. § 163-82.4 ................................................................... 24, 25
N.C.G.S. § 163-82.7 ......................................................................... 16
N.C.G.S. § 163-82.10 ....................................................................... 23
N.C.G.S. § 163-82.11 ....................................................................... 16
N.C.G.S. § 163-166.16 ..................................................................... 23
N.C.G.S. § 163-182.9 ....................................................................... 18
N.C.G.S. § 163-230.2 ....................................................................... 23
N.C.G.S. § 163-230.3 ....................................................................... 23
N.C.G.S. § 163-258.4 ....................................................................... 19

## Rules

CA4 R. 29 ........................................................................................ 2

## Other Authorities

8 N.C. Admin. Code § 17.0109 .......................................................... 19
18 James Wm. Moore et al., Moore's Federal Practice § 107.31(2)
    (3d ed. 2008) ............................................................................. 26
2022 EAVS Data Brief: North Carolina, U.S. Election Assistance Comm'n ........ 22
N.C. State Bd. of Elections Hr'g (Dec. 11, 2024) ................................. 25
Review Commission Meeting Minutes (Mar. 27, 2024) ........................ 19

iv

**INTRODUCTION**

It has been 74 days since the November 2024 election and 39 days since election officials tabulated, confirmed, and reconfirmed the results of the state supreme court race, including *three* post-election recounts. Yet Appellee Jefferson Griffin, the losing candidate, continues his quest to have the state courts—on which he is a sitting judge and by appealing to the Court he wishes to join—negate over 60,000 qualified votes. That includes the ballots of *amici*, longtime North Carolina voters who did everything election officials instructed them to do before they cast their vote. Indeed, as their exhibits filed concurrently show, some have even retrieved their registration form to prove that they provided the very information that Griffin claims is missing and over which he seeks to discard their votes.

Each day that Griffin continues his pursuit of blatant unconstitutional relief is another that the targeted voters must live with the apprehension that they will be disenfranchised. *Amici* and voters like them followed the rules in place during the election, and to throw out their votes now would violate federal law and fundamental principles of due process.

Judge Griffin obscures his unprecedented request in technical questions of state law, and the District Court erroneously deferred to state courts because of that framing. But that is all beside the point because these cases turn on a straightforward federal question: do federal voting protections permit the retroactive

1

disenfranchisement of over 60,000 registered voters who are qualified to vote and followed the instructions of state election officials to do so? The clear answer is no. That these federally protected rights prevent the relief Griffin seeks, no matter the ultimate interpretation of state law, demonstrates why these cases belong in federal court.

This Court has the statutory power and responsibility to put an end to Griffin's pursuit of unconstitutional relief by immediately staying, and then vacating, the District Court's erroneous remand orders. Although the District Court abdicated its role to protect the federal rights of the targeted voters, this Court has jurisdiction to correct that error. Longstanding federal law reinforces this Court's authority to preserve its jurisdiction in the meantime by issuing a stay, confirming federal jurisdiction, and enjoining further state court proceedings.

## INTEREST OF *AMICI*[1]

*Amici* are (1) six qualified, longtime registered North Carolinians who voted in the November election and whom Griffin now seeks to disenfranchise despite their established qualifications to vote, Exs. 1-6;[2] and (2) the League of Women Voters of North Carolina, a nonpartisan, grassroots, membership organization

---

[1] No person, other than *amici* and their counsel, authored any part of this brief or contributed money to its preparation or submission. CA4 R. 29(a)(4)(D)-(E). The parties consent to this filing.

[2] *Amici* seek judicial notice of these exhibits under concurrently filed motion.

2

dedicated to encouraging informed and active participation in government and advocating for its members' rights to vote, at least 25 of whom appear on Griffin's targeted-voters list. As described below, *amici* illustrate various aspects of the serious flaws in Griffin's target list and demonstrate why his tactics threaten voters' federal due process rights and right to vote. They speak to the legal reliance interests that voters have in following the established election rules that officials confirmed and communicated to voters at the time of this election and long before.

*Amici* also reveal the falsity of the basic factual premises of Griffin's protests. For example, Exhibits 1 and 2 include copies of the original voter registration forms that *amici* Dawson-McClure and Rudolph retrieved from county elections officials this month that *contain their respective Social Security numbers*—demonstrating the inaccuracy of Griffin's claim that he targets only "people who failed to provide their driver's license number or social security number when they registered to vote." JA101. The experiences of *amici* show the hazards of Griffin's crude efforts to disenfranchise voters who may lack information in their voter record as the result of *administrative*, not voter, error.

## ARGUMENT

*Amici* address three issues:

First, Griffin is mistaken that this Court lacks the power and jurisdiction to stay the District Court's erroneous remand order—a position that would insulate a

properly appealable remand from review and deny this Court the ability to protect its own jurisdiction.

Second, federal courts are statutorily required to exercise proper federal removal jurisdiction over these cases. Returning them for state courts to decide whether to retroactively and arbitrarily invalidate over 60,000 votes cast in the November election poses a grave threat to federal rights.

Third, Griffin is wrong that nothing can be done about the ongoing state court proceedings if this Court reverses and vacates the improper remand. His incorrect argument that federal jurisdiction was irrevocably lost as soon as the District Court issued an erroneous order defies this Court's authority to issue orders protecting federal jurisdiction.

## I.  This Court Should Act to Preserve Federal Jurisdiction by Immediately Staying the Remand Order and Pending State Court Proceedings

This Court should immediately exercise its authority to stay the District Court's erroneous remand order to protect federal jurisdiction and the federal rights of the targeted voters. As early as *January 24*, the North Carolina Supreme Court is poised to decide whether Judge Griffin will unseat one of that Court's own members by overriding the confirmed results because these targeted voters relied on election officials' longstanding instructions. Griffin requests this relief based on what he calls a "low bar" standard of proof, and presents not a shred of evidence that any targeted

4

voter has committed fraud or is actually unqualified to vote. *See* JA97. Although this Court deferred resolution of the Board's stay request, it has the authority under federal law to issue such a stay and should do so immediately to prevent any further state court action in direct contravention of federal jurisdiction.

**A. This Court has the authority to stay appealable remand orders.**

This Court can stay the remand order notwithstanding its delivery to state court because it has appellate jurisdiction over the District Court's remand orders pursuant to 28 U.S.C. §1447(d). *See Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 398, 405-08 (4th Cir. 2024) (confirming appealability of remand pursuant to §1443 under §1447(d)).

Griffin's contrary argument defies longstanding precedent holding that "a federal court loses jurisdiction over a case as soon as its order to remand the case is entered" *only* when the remand order is "*not* reviewable" under §1447(d). *In re Lowe*, 102 F.3d 731, 734-36 (4th Cir. 1996) (emphasis added). But "remand orders in civil rights cases *are* reviewable." *Id.* (emphasis added). Accordingly, appellate courts consistently recognize that executed remand orders do not divest federal jurisdiction over reviewable remand orders. *Acad. of Country Music v. Cont'l Cas. Co.*, 991 F.3d 1059, 1063-64 (9th Cir. 2021); *Carlyle Inv. Mgmt. LLC v. Moonmouth Co.*, 779 F.3d 214, 217-18 (3d Cir. 2015). Likewise, "abstention-based remand

orders" are also "immediately appealable under section 1291." *Forty Six Hundred LLC v. Cadence Educ., LLC*, 15 F.4th 70, 79 (1st Cir. 2021).

Thus, this Court retains the power to stay an executed remand of a reviewable order because an *appealable* remand order is "treated like any other final judgment," and "[n]either section 1447(c)" nor any other authority supports the position that a "court lacks jurisdiction to stay an order that it retains jurisdiction to vacate." *Plaquemines Par. v. Chevron USA, Inc*., 84 F.4th 362, 372 (5th Cir. 2023). In *Plaquemines*, as here, a district court had already delivered a remand order to the state courts. *See id.* at 367-70. The Fifth Circuit rejected the argument that "the federal courts lack jurisdiction to stay a remand order after a certified copy has been mailed to the clerk of the state court" as "inconsistent with the undisputed proposition" that federal courts can vacate an "already-mailed remand order because the order is appealable under section 1447(d)." *Id*. at 372. As the court recognized, federal courts have the authority to reconsider or vacate reviewable remand orders, but lack such authority only with respect to unreviewable orders. *Id. Plaquemines* rejected the absurdity of a rule conditioning appellate review on how hastily a district court delivered the remand order and closed the docket. *Id*. at 371-73; *accord Acad. of Country Music*, 991 F.3d at 1063; *Carlyle Inv. Management*, 779 F.3d at 218.

In sum, this Court retains jurisdiction to review the remand order, and longstanding federal precedent reinforces this Court's corresponding authority to

enter a stay. Griffin conflates decisions concerning unreviewable remand orders with those involving reviewable orders (Opp. 7, 9), disregarding the clear rules in *Plaquemines* and other cases.

Griffin also reads far too much into *Bryan v. BellSouth Commc'ns, Inc*., 492 F.3d 231, 241 (4th Cir. 2007), in contending that this Court held that federal courts lose jurisdiction over appealable remand orders pending appeal. Opp. 3.[3] *Bryan* did "not resolve" that issue. 492 F.3d at 241. Rather, it *confirms* the federal courts' power to enjoin state court proceedings pursuant to the All Writs Act (discussed *infra*) when the state courts have proceeded but where federal courts properly have jurisdiction. *Id*. at 236-27. In dicta, *Bryan* discussed, but declined to reach, the issue of whether vacating the remand order on appeal years later would render all interim state court action taken during the pendency of the appeal a "nullity." *Id*. at 241. The Court did *not* conclude it lacked jurisdiction to stay state court proceedings to preserve its jurisdiction over the appeal in the first instance.

Griffin's invented rule would deprive the federal courts of the ability to protect their jurisdiction. Where this Court has the power to review district court orders, it

---

[3] Griffin's other cases (Opp. 4) also do not support his proposition. *See Int'l Found. for Genetic Rsch. (Michael Fund) v. Shalala*, 57 F.3d 1066 (4th Cir. 1995) (unpublished) (mootness decision not addressing authority to stay improper remand); *GenCorp, Inc. v. Olin Corp*., 477 F.3d 368 (6th Cir. 2007) (addressing mootness of already executed judgment).

maintains—and should exercise where appropriate—the corresponding power to issue stays to protect its jurisdiction. *See Plaquemines*, 84 F.4th at 372-73. Congress has determined both that the federal courts should exercise jurisdiction over cases that, as here, implicate important federal civil rights laws (in 28 U.S.C. §1443), *and* that remand decisions involving §1443 are *excepted* from the usual rule sending cases immediately back to state court without appellate review (in 28 U.S.C. §1447(d)). District courts should not be encouraged to attempt to insulate their erroneous remands of important civil rights cases from this Court's proper review through the hasty and immediate transmission of review orders to state court.

**B. This Court has the authority to enjoin further state court proceedings.**

The Court also has the authority under the All Writs Act to enjoin all the parties before it in these related cases—and, if necessary, the state courts—from taking any further action pending this appeal. The All Writs Act and Anti-Injunction Act permit injunctions of state court proceedings when authorized by Congress and in "aid of [federal] jurisdiction." 28 U.S.C. §§ 1651, 2283. Courts have long understood these statutes to confer federal authority to enjoin state court proceedings that threaten federal removal jurisdiction. *See, e.g.*, *Martingale LLC v. City of Louisville*, 361 F.3d 297, 302 (6th Cir. 2004); *Matter of Meyerland Co.*, 910 F.2d 1257, 1263 (5th Cir. 1990); "As long as the original lawsuit was properly brought in federal court, the federal court retains subject matter jurisdiction to remove any

8

subsequent state law action to federal court for purposes of applying the All Writs Act." *Canady v. Allstate Ins. Co.*, 282 F.3d 1005, 1013 (8th Cir. 2002); *see also In re Am. Honda Motor Co., Inc., Dealerships Rels. Litig.,* 315 F.3d 417, 437 (4th Cir. 2003) (reaching similar result for non-removal context).

The very purpose of the Anti-Injunction Act's "in aid of its jurisdiction" provision is "to make clear the recognized power of the Federal courts *to stay proceedings in State cases removed to the district courts*." *Maseda v. Honda Motor Co.*, 861 F.2d 1248, 1254-55 (11th Cir. 1988) (emphasis added); *accord Lou v. Belzberg*, 834 F.2d 730, 740-41 (9th Cir. 1987). Where, as here, this Court has authority to review a remand order on appeal, an erroneous remand order does not extinguish this Court's power under the All Writs Act to correct that order and to preserve and protect fundamental federal rights.

Section 1447 supports this conclusion. Congress gave federal courts the power to issue "all necessary orders and process" to bring removed parties before it. 28 U.S.C. §1447(a). The language in §1447(c) setting forth the procedure for remanding a case improperly removed and authorizing state courts to "thereupon proceed with such case" must be read in conjunction with §1447(d), which provides that remand orders pursuant to "section 1442 or 1443 of this title shall be reviewable *by appeal or otherwise*." *Id.* (emphasis added). Thus, Section 1447 complements this Court's longstanding All Writs Act and Anti-Injunction Act authority to protect its

9

jurisdiction, including enjoining state court proceedings that occur from erroneous remands.

### C. This Court should stay the remand order and enjoin further state court proceedings.

The Court has good reasons to exercise its authority to immediately stay the remand order and all further state court proceedings to preserve its appellate jurisdiction.

The State Board of Elections' opinion rejecting Griffin's protests is centered on a recognition that *federal* law prevents the post-election denial of eligible voters' rights. JA129. Griffin seeks reversal of that very conclusion in the state Supreme Court, leaving no doubt that federal issues are at the heart of this case. JA87-93 (contesting Board's federal law rulings), JA102 (requesting ruling that *post hoc* negating ballots would not violate federal law).

Griffin asks the state Supreme Court to decide those core federal law questions as a sword to undo the election. And he will undoubtedly attempt to use any such ruling as a shield against any subsequent federal challenge, if voters are forced to sue in federal court to undo their retroactive disenfranchisement. As discussed further *infra*, the District Court abdicated the federal responsibility to protect *amici*'s important federal rights. This Court should issue a stay and injunctive relief as soon as possible to avoid the need to address the effect of any state court rulings issued

while the erroneous remand is pending and to preserve its jurisdiction to resolve this appeal. *See, e.g.*, *Northrop Grumman Tech. Servs., Inc. v. DynCorp Int'l LLC*, No. 1:16CV534(JCC/IDD), 2016 WL 3346349, at *3-4 (E.D. Va. June 16, 2016) (collecting cases issuing stay of remand order for this reason).

The stay is warranted because the Board is likely to succeed on the federal issues in this Court, including that remand was erroneous. This Court recently confirmed, in a related appeal, that its review is not "confined to the argument for removal under Section 1443" but can also reach whether removal was proper pursuit to §1441. *RNC*, 120 F.4th at 398. Both provisions support removal here. The District Court's remand under both Sections 1441 and 1443—based on its incorrect conclusion that denying *amici's* fundamental federal rights raises only "tenuous federal interest" (JA324)—is erroneous and contrary to this Court's recent ruling. *RNC*, 120 F.4th at 399-405. Thus, federal law *required* the federal courts to maintain jurisdiction here, because this post-election quest to invalidate the democratic results decided by qualified, rule-abiding North Carolina voters necessarily implicates federal civil rights laws. The District Court contravened that law by improperly remanding.

The District Court further abused its discretion by abstaining notwithstanding the federal civil rights issues involved (supporting §1443 removal), based on its reasoning that the state Supreme Court is better-positioned to adjudicate serious

federal voting rights issues in an election deciding *its own membership*. This case is about what retrospective remedies federal law can tolerate, not what state law prospectively requires voters and election officials to do. Federal courts with proper removal jurisdiction have "a strict duty to exercise" such conferred jurisdiction. *See Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996). The unusual procedures occurring in state court further show why. By taking the extraordinary steps of staying certification and agreeing to decide a writ of prohibition as soon as January 24, the Supreme Court has approved Griffin's departure from regular appellate and election protest procedures. *See* JA348-50 (Dietz, J., dissenting); JA339-41 (Earls, J., dissenting). At the same time, Griffin and the Republican Party are on a multifront attack in the lower state courts, searching for a favorable ruling regardless of the usual procedural rules or their lack of evidence supporting their protests. JA343 (Earls, J., dissenting) ("[N]owhere in his more than 4,000 pages of filings with this Court does Griffin identify a single voter who actually possessed either number yet did not provide it when registering."); NCSBE Br. 10 (describing state court proceedings). To protect federal rights and proper removal jurisdiction, this case belongs in federal court.

Finally, Griffin argues that a stay would be inappropriate because there is no status quo to protect. But the status quo is that *amici's votes were cast and counted*, following the settled rules of election officials, just like the more than 60,000 other

votes Griffin targets. Within hours of the District Court's hasty remand, the North Carolina Supreme Court issued only a temporary stay of certification pending briefing before it, in no way (for now) altering the status quo: that those votes are valid and count towards the election result. This Court should immediately issue a stay to preserve the status quo, before the North Carolina state courts take any action to disturb it.

## II. Substantial Federal Due Process and Right to Vote Concerns at the Core of the State Board's Decision Warrant Federal Jurisdiction

Regardless of the answers to state law questions Griffin raises, the basic point for why this Court retains federal jurisdiction—and why Griffin's efforts must fail— is that no court can order Griffin's requested remedy consistent with federal law. Most obviously, Griffin's campaign to retroactively invalidate over 60,000 ballots violates the targeted voters' substantive due process rights and right to vote, including *amici*'s. This is because citizens' "constitutionally protected right to vote … and to have their votes counted … is of the essence of a democratic society." *Reynolds v. Sims*, 377 U.S. 533, 554-55 (1964). And the remedy Griffin seeks would deteriorate "the election process [to] the point of 'patent and fundamental unfairness,'" such that it "erodes the democratic process." *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983) (quoting *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978)).

13

To protect these federal rights, federal courts "need not be timid, but may and should do what common sense and justice require" to forestall mass disenfranchisement. *Burns*, 570 F.2d at 1078. Despite Griffin and the District Court suggesting that the state can do what it will when it comes to state elections (JA58, JA301), the U.S. Constitution "does not permit … the exclusion of otherwise qualified persons from the franchise" in local elections just as much as federal elections. *Phoenix v. Kolodziejski*, 399 U.S. 204, 209 (1969); *accord Reynolds*, 377 U.S. at 554. Because due process in the elections context prohibits "surprise to the voters and disenfranchisement," courts consider "(1) likely reliance by voters on an established election procedure and/or official pronouncements about what the procedure will be in the coming election; and (2) significant disenfranchisement that results from a change in the election procedures." *Bennett v. Yoshina*, 140 F.3d 1218, 1226-27 (9th Cir. 1998) (distilling caselaw). Both elements demonstrate that Griffin's efforts are unconstitutional.[4]

---

[4] The outcome is the same if the Court considers this issue under the *Anderson-Burdick* balancing framework applied to government infringements of the right to vote. *See, e.g.*, *Greidinger v. Davis*, 988 F.2d 1344, 1353 (4th Cir. 1993); *Voto Latino v. Hirsch*, 712 F. Supp. 3d 637, 664 (M.D.N.C. 2024). As described here, arbitrarily disenfranchising over 60,000 voters despite their settled expectations relying on election officials is a severe burden on the right to vote that requires strict scrutiny. *See Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012). No legitimate countervailing state interest would permit this capricious and broad-scale post-election disenfranchisement based only on supposedly missing information in an administrative database.

### A. Griffin's requested relief would violate voters' reliance interests and upset the status quo.

Griffin seeks to retroactively cancel the votes of *amici* and the rest of the targeted voters, unsettling the status quo of the rules applied for this election and many beforehand. This violates the basic "antiretroactivity principle" of the Due Process Clause that the government must "give[] people confidence about the legal consequences of their actions" and "settled expectations should not be lightly disrupted." *Landgraf v. USI Film Prod.*, 511 U.S. 244, 265-66 (1994); *accord E. Enterprises v. Apfel*, 524 U.S. 498, 532 (1998) ("Retroactivity is generally disfavored in the law … in accordance with fundamental notions of justice that have been recognized throughout history.").

The targeted voters justifiably relied on election officials who instructed them how to register, that they had successfully done so, and that all they needed to do was vote. The State Board promulgates the official registration application, and county officials confirm and approve submitted registrations and then record the information into the voter file. N.C.G.S. §§ 163-82.1(b), 163-82.7(a), 163-82.11(d). The State Board is also authorized to issue rules and regulations that fill gaps and ensure that qualified North Carolina voters who want to vote can do so. *Id.* §§ 163-22(a) (2024) ("authority to make such reasonable rules and regulations with respect to the conduct of primaries and elections"), 163-22(c) (authority to "advise [county

15

boards] as to the proper methods of conducting primaries and elections"). The overall responsibilities to correctly manage the registration system and articulate the settled rules for everyone to follow appropriately fall on election officials, not individual voters. *See Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 335 (4th Cir. 2012).

North Carolina election officials have performed those responsibilities in good faith and navigated ambiguity to empower voters to participate in our elections. As in any difficult job, mistakes happen, including in the recording of information in registration databases. But it is unmistakable that election officials have repeatedly reinforced to the targeted North Carolinians that they are rule-abiding, lawfully registered voters because they have provided (often years ago) everything the government required to confirm their eligibility. *See* JA121-29. These voters have relied on those assurances and participated in elections with confidence that their vote will count, including in elections spanning decades for most *amici*. Exs. 1-6. It is vital that the federal court retain jurisdiction to ensure those constitutional reliance interests are protected.

Take the first category Griffin targets: 60,273 voters on a public records request list who allegedly (but not definitely) lack data for driver's license or social security number from their registration form. JA107. *Each* of these voters applied on an official registration form that may have requested but did not require this

16

purportedly missing information, and county election officials reviewed and approved their submitted applications without issue. JA121. No one disputes this. The failure of election administrators to record this information in a database says *nothing* about actual voter qualification. All targeted voters in this category did exactly what election officials told them to do and relied on those instructions when registering and when casting their votes. *See* JA128.

*Amici* illustrate further flaws in Griffin's argument for this category of targeted voters. Griffin's list includes individuals who, like some *amici*, went the extra mile to *confirm* their active registration this fall and be certain that all they needed to do was vote. Exs. 1, 6. It includes voters, like some *amici*, who retrieved their voter registration application in recent weeks to confirm that they *in fact* provided the Social Security or driver's license information that Griffin claims is missing. Exs. 1 at 2, 2 at 4. Moreover, even the most risk-averse and resourceful voter made aware this fall that their registration was disputed would have been relieved by the government's reassurances that their vote would count. JA122-23 (State Board declined request to force voters to reestablish eligibility for this election because of due process concerns); Order at 4, *Republican Nat'l Comm. v. N.C. State Bd. Elections*, No. 5:24-cv-00547 (E.D.N.C. Nov. 22, 2024), ECF 73 (equity principles prevent rejecting votes this election). Griffin's effort to now

disenfranchise these 60,273 people—reliance interest cast aside—is flatly unconstitutional.

Similar concerns apply to Griffin's second category: 1,409 overseas (including military) voters whom he claims cast an absentee ballot without providing copies of their photo identification.[5] Again, even assuming Griffin correctly identifies such voters in the six counties he targets, they cannot be faulted for doing exactly what the government told them to do, several times over, in accord with federal law. N.C.G.S. § 163-258.4; 52 U.S.C. § 20302.[6]

The State Board unanimously enacted a rule confirming that the new state law requiring a copy of photo identification for domestic absentee voters did not apply to overseas voters. 8 N.C. Admin. Code § 17.0109(d). Last March, the Rules Review Commission—composed of "10 members to be appointed by the General

_____

[5] Griffin more recently says he targets 5,509 voters in this category across six counties. JA96. But his effort to disenfranchise *more* voters comes long past the statutory deadline. N.C.G.S. § 163-182.9(b)(4)(c). Either way, these votes are likely not outcome determinative because they would have to break significantly for Riggs, e.g., by over 3:1 if the total is 1,409.

[6] Griffin's selective targeting is itself unconstitutional. Like his discriminatory protests of only early and absentee voters in his first category, he may have real political motivations for his selection of overseas voters in only six of 100 counties. But such "later arbitrary and disparate treatment" of voters that "value one person's vote over that of another" violates the Fourteenth Amendment. *Bush v. Gore*, 531 U.S. 98, 104-05 (2000) (per curiam); *accord Ne. Ohio Coal. for Homeless*, 696 F.3d at 598. It is Griffin, not the Board, who attempts a "bizarre, differential treatment" of voters; only he seeks to disenfranchise them. *Cf.* JA77.

18

Assembly," whose purpose is to ensure that agency rules are "within the authority delegated to the agency" and "reasonably necessary to implement or interpret an enactment of the General Assembly," N.C.G.S. §§ 143B-30.1(a), 150B-21.9(a)— also unanimously approved the Board's overseas voter rule. Rules Review Commission Meeting Minutes (Mar. 27, 2024), perma.cc/HN9K-AZ8H. The General Assembly's Joint Oversight Committee, which reviews any agency rule that the Commission adopts, did not cry foul. N.C.G.S. § 120-70.101. And no court, at any point, has agreed with Griffin's post-election position asking to disenfranchise these voters.

Like voters in the first category, these targeted overseas voters simply did what election officials told them to do when they voted. Reversing course now, particularly when it would be exceedingly difficult for our military and overseas voters to protect their rights, amounts "to a fraud upon the absent voters" that federal law does not permit. *Burns*, 570 F.2d at 1074-1075.

Griffin's tactics are reminiscent of—and worse than—the failed efforts to discard votes in *Griffin v. Burns*, where a losing candidate contested absentee votes in a primary election because a state court accepted the argument after the election that state law did not permit absentee voting in primaries. *Id.* at 1068; *see also Hendon*, 710 F.2d at 182 (applying *Griffin v. Burns* principles as "settled" in Fourth Circuit). The First Circuit upheld an injunction to prevent the "broad-gauged

unfairness" of negating those votes, reasoning that "issuance of [absentee] ballots followed long-standing practice; and in utilizing such ballots voters were doing no more than following the instructions" of election officials. *Burns*, 570 F.2d at 1075-77. The "state's retroactive invalidation" of those ballots "violate[d] the voters'" Fourteenth Amendment rights. *Id.* at 1070. Numerous other courts have protected voters' rights by prohibiting such retroactive or last-minute disruptions of the voting status quo. *See Hoblock v. Albany Cnty. Bd. of Elections*, 487 F. Supp. 2d 90, 94-96 (N.D.N.Y. 2006); *Roe v. Alabama*, 43 F.3d 574, 580-81 (11th Cir. 1995); *Briscoe v. Kusper*, 435 F.2d 1046, 1054-56 (7th Cir. 1970).

Here, too, Griffin attempts to rewrite the rules of the election after its completion to change the result, despite voters' reliance interests. He argues that if the government made a mistake, and voters relied on it, the voters must bear the brunt because of their purported "ignorance" of election law. JA90. Griffin disrespects the core democratic ethos in this country that "favors permitting as many qualified voters to vote as possible." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). His argument fails because these voters "were doing no more than following the instructions of" election officials and they did not "ha[ve] a duty, at their peril, somehow to foresee" that a losing candidate would ask to rewrite those instructions and retroactively "invalidat[e] their ballots." *Burns*, 570 F.2d at 1074-76. And, apart from the legal defects, what Griffin demands

is not based in reality. Voters rely on their election officials because they lack the tools and information to second-guess whether a state registration form is correct or question the government telling them that they are properly registered.

Perhaps the government can prospectively address any actual inconsistencies with state election law that underlie Griffin's complaint; the State Board has already taken steps to clarify the registration form going forward. But that is not the issue before the Court. The pressing question here is whether Griffin can have a court discard these voters' ballots for this election. That is "at bottom" a federal issue because citizens' voting and reliance interests are "federally protected." *Id.* at 1077. Griffin's and the District Court's position that this is only a "tenuous federal interest" (JA324) diminishes the fundamental federal constitutional and statutory right to vote that "is of the essence of a democratic society." *Reynolds*, 377 U.S. at 554.

## B. Griffin threatens arbitrary, broad-gauged disenfranchisement.

Besides trampling voters' reliance interests, Griffin's remedy asking to discard over 60,000 votes would mandate widescale disenfranchisement of long-registered and long-eligible *amici* and other voters. This violates the Fourteenth Amendment. *See Burns*, 570 F.2d at 1077; *Bennett*, 140 F.3d at 1226-27. Griffin's hasty targeting of voters threatens to disenfranchise many who have already established their eligibility or who never should have been questioned to begin with. Thus, separate and apart from *amici*'s reliance interests, they are qualified voters and

denying their votes violates federal rights. *Amici* illustrate how it would be difficult, nearing impossible, for all 100 counties to decipher which of their voters were required to provide their driver's license or social security number information but have never done so (if any). The risks of mass erroneous disenfranchisement from such a faulty process itself warrant federal jurisdiction and relief.

First, even accepting part of Griffin's premise that *some* voters *may* not have provided a driver's license or Social Security number on their initial registration (for which he offers no proof), that form is not talismanic; it is merely a "backup to the official registration record of the voter," not the be-all-end-all for whether a voter established her identity and eligibility. N.C.G.S. § 163-82.10(a). North Carolinians also do so at the time of voting by showing their identification, most often the very driver's license Griffin claims is missing.

For early or election day in-person voting, voters must show identification to confirm their eligibility. *Id.* § 163-166.16(a). Most use a North Carolina license, while several other accepted IDs require a Social Security number or establishment of the voter's identity and eligibility with government officials before the ID can be obtained. *See id.*; 2022 EAVS Data Brief: North Carolina, U.S. Election Assistance Comm'n, perma.cc/9FW9-AMJM. Absentee voters also provide their license or Social Security number on their absentee request form. N.C.G.S. §§ 163-230.2(a)(4), 163-230.3(b)(1).

Accordingly, all individual *amici*, and likely the bulk of the targeted voters, *showed their valid driver's license or similarly confirmed their identity and eligibility when voting in person or absentee*, even if information is missing from their registration record. Exs. 1-6. Griffin glosses over these key facts and offers no evidence to the contrary. And, as a legal matter, he fails to explain why voters providing their identification when they vote is insufficient to "correct[] that omission" that Griffin claims exists, because the voter "is determined by the county board of elections to be eligible to vote" before the county canvass. N.C.G.S. § 163-82.4(f). He instead seeks to retroactively disenfranchise 60,273 voters based on a trivial focus on information allegedly not received or maintained from a form due to *administrative* error. The Due Process Clause guards against this arbitrary treatment when it comes to fundamental rights.

Second, again assuming Griffin's (wrong) premise that some voters did not provide certain information when they registered, Griffin's target list is not a trustworthy source of who those voters are. Many reasons explain the absence of a driver's license or Social Security number from a voter's file that have nothing to do with eligibility.

To start, routine data-entry or recordkeeping errors likely account for such missing information. That cannot support categorically rejecting 60,000 validly cast ballots. *See Ne. Ohio Coal. for Homeless*, 696 F.3d at 597. The registration forms of

23

*amici* Dawson-McClure and Rudolph, for example, shows that they *did provide* their Social Security information, even if their voter files purportedly lack it. Exs. 1 at 2, 2 at 4. Griffin, in fact, acknowledged before the Board that these innocent errors occur, and it is on the government to fix them. N.C. State Bd. of Elections Hr'g at 01:02:45-01:03:40 (Dec. 11, 2024), tinyurl.com/mr4xynxn [hereafter "Hr'g"].

Griffin also targets voters who provided their information when registering but later changed their name or address, potentially generating a second record for the same individual into which the earlier-provided driver's license or Social Security information may not have transferred. This is likely what happened to *amicus* Salama because of a 2012 intercounty move. Similarly, *amicus* Baddour alerted her county elections board of a post-marriage name change, which likely resulted in a failure to match preexisting DMV or Social Security records attached to her prior name and generated the missing field in her file. In such circumstances, the absence of information from the voter file is from routine government recordkeeping error, not any indication that the voter is ineligible.

Finally, Griffin targets voters for lacking information they were never required to provide. Voters can register even when their driver's license or Social Security number is unavailable. N.C.G.S. § 163-82.4(b); 52 U.S.C. § 21083(a)(5)(ii). Griffin admits he does not know how many voters fall into this category but threatens to disenfranchise them anyway. JA98; Hr'g at 1:00:00-1:01:45.

Some targeted voters, including several *amici*, also registered before 2004, when such information was not required; they have only since adjusted their existing, valid registration (e.g., a name or address change). Exs. 1 (first registering in 1994), 2 (1988), 3 (1992), 4 (1996), 6 (estimating 40 years of voting here); *see also* N.C.G.S. § 163-82.1(c) (describing permanence of registration). Griffin retroactively applies the 2004 law to voters who registered *before* the requirement existed but updated their registration afterward.

In sum, Griffin's factually erroneous process for targeting voters, and legally groundless theory for disenfranchising them, heighten the constitutional risk here. The reality of "massive *ex post* disenfranchisement" is why the Board administratively rejected Griffin's arguments and removed this matter to federal court. *See Bennett*, 140 F.3d at 1226. Maintaining federal jurisdiction is warranted to protect voting rights and guarantee "[t]he very essence of due process[:]" "the protection of the individual against arbitrary action." *Slochower*, 350 U.S. at 559.

## III.    An Order Reversing and Vacating the Erroneous Remand Decision Will Immediately Enjoin All Further Proceedings in State Court

As explained *supra* Section I, this Court should avoid the future need to decide whether vacating the improper remand invalidates any interim action taken by the state courts by immediately staying the state court proceedings. And when the Court

ultimately vacates the remand order, it can and should confirm that federal law immediately halts and enjoins any further state court proceedings.

Upon reversing and vacating the remand order, federal courts will maintain complete removal jurisdiction over these cases. Where a case is properly removed to federal court, all further action by state courts is void. 28 U.S.C. §1447; *Bryan*, 492 F.3d at 240 ("removal deprives a state court of jurisdiction and requires the state court to cease all actions in the case" (citation omitted)); *see also South Carolina v. Moore*, 447 F.2d 1067, 1073 (4th Cir. 1971). There is no dispute that, upon removal, the state court is required to "stop all proceedings unless and until the case is remanded" and any action it then takes is "void ab initio, even if the case is subsequently remanded because the initial removal was improper." 18 James Wm. Moore et al., *Moore's Federal Practice* § 107.31(2) (3d ed. 2008) (citation omitted).

Courts have applied this same law to order that reversing and vacating an erroneous remand order necessarily strips state courts of jurisdiction over the proceedings and voids any subsequent state court actions, pursuant to §1447. *See, e.g.*, *Acad. of Country Music*, 991 F.3d at 1070. Should the state courts issue any interim orders (such as a temporary restraining order or preliminary injunction or writ directing that the election rules be rewritten, the election re-run, or the status quo count of the votes cast in this election be altered) before this Court's reversal of the remand order, the removal of state court jurisdiction would at minimum void any

attempt to *enforce* those orders in the state court. This Court may avoid reaching the issue, left unresolved in *Bryan*, 492 F.3d at 241, of whether those interim orders are a "nullity" in light of the vacated remand, by confirming that all further efforts to *enforce* any such interim orders in the state court would be void.

Griffin argues that even if this Court holds the remand improper, federal courts are *powerless* to do anything other than to "request" the state courts to return the case to the federal forum. Opp. 6. Griffin is wrong: should this Court confirm that these cases were properly removed, §1447 automatically halts any further proceedings in state court. *See, e.g.*, *Acad. of Country Music*, 991 F.3d at 1070. No federal court "request" would be required.

Given the timing and importance of these issues, *amici* respectfully urge this Court to, upon reversal, engage §1447 and this Court's authority to protect federal jurisdiction to enjoin all attempts by Griffin, related Appellees, and, if necessary, the state courts from further proceeding in these properly removed cases.

## CONCLUSION

The voters—not its justices—decide the membership of the Supreme Court of North Carolina. Federal courts have the authority and obligation to safeguard these voters' fundamental federal rights. The Court should grant the Board's requested stay, reverse and vacate the remand order, and enjoin any further state court proceedings in these cases.

27

This 17th Day of January 2025     Respectfully Submitted,

/s/ *Jessica A. Marsden*
Jessica A. Marsden
Protect Democracy Project
510 Meadowmont Village Circle, No. 328
Chapel Hill, NC 27517
jess.marsden@protectdemocracy.org
(202) 579-4582
Fax: 202-769-3176
State Bar No. 50855
Attorney for *Amici Curiae*

Anne Harden Tindall
Protect Democracy Project
510 Meadowmont Village Circle, No. 328
Chapel Hill, NC 27517
anne.tindall@protectdemocracy.org
(202) 579-4582
Fax: 202-769-3176
State Bar No. 31569

Hayden Johnson
Protect Democracy Project
2020 Pennsylvania Ave. NW, Suite # 163
Washington, DC 20006
hayden.johnson@protectdemocracy.org
(202) 579-4582
Fax: 202-769-3176

Stacey Leyton
Danielle Leonard
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151
sleyton@altber.com

28

dleonard@altber.com

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will automatically serve electronic copies on all counsel of record.

Dated: January 17, 2025

/s/ *Jessica A. Marsden*
Jessica A. Marsden
*Attorney for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that this amicus brief complies with Fed. R. App. P. 29(a)(4), 32(a)(5), and 32(g)(1). This amicus brief also complies with Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,499 words.

Dated: January 17, 2025

/s/ *Jessica A. Marsden*
Jessica A. Marsden
*Attorney for Amicus Curiae*