Nos. 25-1018(L), 25-1019, 25-1024

---

## IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

---

JEFFERSON GRIFFIN,

*Petitioner-Appellee*,

v.

NORTH CAROLINA STATE BOARD OF ELECTIONS,

*Respondent-Appellant*,

and

ALLISON RIGGS, et al.,

*Intervenor-Appellants.*

---

On Appeal from the U.S. District Court
for the Eastern District of North Carolina
No. 5:24-CV-00724-M-RN
Hon. Richard E. Myers, II

---

## BRIEF FOR *AMICI CURIAE* SCHOLARS OF DEMOCRATIC BACKSLIDING

---

Kristi L. Graunke
ACLU OF NORTH CAROLINA
  LEGAL FOUNDATION
P. O. Box 28004
Raleigh, NC 27611
(919) 354-5066

Ari Savitzky
Ming Cheung
Ethan Herenstein
Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2681

*Counsel for Amici Curiae*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ ii

CORPORATE DISCLOSURE STATEMENT ......................................... viii

INTEREST OF AMICI CURIAE ......................................................... viiix

INTRODUCTION ...................................................................................... 1

ARGUMENT ............................................................................................. 2

I.    THE DEGRADATION OF FREE AND FAIR POPULAR
ELECTIONS IS A KEY FEATURE OF DEMOCRATIC BACKSLIDING 2

A.    What is Democratic Backsliding? ...................................................... 2

B.    What Does Democratic Backsliding Look Like? ............................... 7

C.    Backsliding in the United States ...................................................... 10

II.   JUDGE GRIFFIN'S EFFORTS REPRESENT A DRAMATIC
ESCALATION OF DEMOCRATIC BACKSLIDING IN NORTH
CAROLINA ........................................................................................... 11

A.    Backsliding in North Carolina ........................................................ 11

B.    Judge Griffin's Efforts .................................................................... 20

III.  FEDERAL COURT INTERVENTION IS NEEDED TO PRESERVE
DEMOCRACY IN NORTH CAROLINA AND COUNTER THE
BACKSLIDING PROCESS .................................................................... 23

A.    The Advantage of Federal Courts .................................................... 23

B.    Protecting Free and Fair Elections in North Carolina .................. 26

C.    Protecting the Independence of the North Carolina Courts .......... 31

CONCLUSION ........................................................................................ 34

# TABLE OF AUTHORITIES

## Cases

*Benavidez v. Eu,*
  34 F.3d 825 (9th Cir. 1994) ................................................................. 25

*Bush v. Gore,*
  531 U.S. 98 (2000) ................................................................................. 28

*Democracy North Carolina v. North Carolina State Bd. of Elections,*
  476 F. Supp. 3d 158 (M.D.N.C. 2020) ................................................ 30

*Dunn v. Blumstein,*
  405 U.S. 330 (1972) .............................................................................. 28

*Frazier v. Callicutt,*
  383 F. Supp. 15 (N.D. Miss. 1974) ...................................................... 27

*Griffin v. Burns,*
  570 F.2d 1065 (1st Cir. 1978) ........................................................ 31, 32

*Griffin v. North Carolina Bd. of Elections,*
  No. 320P24, 2025 WL 48269 (N.C. Jan. 7, 2025) ............................... 33

*Harper v. Hall,*
  868 S.E.2d 499 (N.C. 2023) ................................................................. 17

*Harper v. Hall,*
  886 S.E.2d 393 (N.C. 2023) ................................................................. 17

*Holmes v. Moore,*
  886 S.E.2d 120 (N.C. 2023) ................................................................. 18

*North Carolina State Conf. of NAACP v. McCrory,*
  831 F.3d 204 (4th Cir. 2016) ......................................................... 13, 15

*Northeast Ohio Coalition for Homeless v. Husted,*
  696 F.3d 580 (6th Cir. 2012) ............................................................... 31

*O'Hair v. White,*
  675 F.2d 680 (5th Cir. 1982) ............................................................... 25

*Saucedo v. Gardner,*
    335 F. Supp. 3d 202 (D.N.H. 2018) ........................................ 30

*Shivelhood v. Davis,*
    336 F. Supp. 1111 (D. Vt. 1971) ............................................ 27

*South Carolina v. Katzenbach,*
    383 U.S. 301 (1966) ................................................................ 28

*Thornburg v. Gingles,*
    478 U.S. 30 (1986) .................................................................. 25

*United States v. Carolene Products Co.,*
    304 U.S. 144 (1938) ................................................................ 25

*United States v. Executive Comm. of Democratic Party of Dallas Cnty.,*
    254 F. Supp. 537 (S.D. Ala. 1966) ........................................ 29

*United States Student Association Foundation v. Land.,*
    2 546 F.3d 373 (6th Cir. 2008). .............................................. 28

*Washington Association of Churches v. Reed,*
    492 F. Supp. 2d 1264 (W.D. Wash. 2006) ............................ 21

**Statutes**

52 U.S.C. § 10101(a)(2)(A) ......................................................... 27

52 U.S.C. § 10101(a)(2)(B) ......................................................... 29

52 U.S.C. § 10307(a) ................................................................... 29

52 U.S.C. § 20507(c)(2)(A) ........................................................ 30

N.C. Gen. Assembly, Session Law 2016-125, S.B. 4. .............. 15

N.C. Gen. Assembly, Session Law 2024-57, S.B. 382. ............ 18

N.C. Gen. Stat. Ann. § 163-55 ............................................ 21, 28

N.C. Gen. Stat. Ann. § 163-82.4(a)(11) ................................... 20

N.C. Gen. Stat. Ann. § 163-82.7 .............................................. 28

N.C. Gen. Stat. Ann. § 163-82.10 ....................................... 21, 28

## Other Authorities

Aziz Huq & Tom Ginsburg,
*How to Lose a Constitutional Democracy*,
65 UCLA L. Rev. 78 (2018) .................................................................... 10

Bernard Manin,
*The Principles of Representative Government* (1997) .............................. 4

Daniel P. Tokaji,
*The Sordid Business of Democracy*,
34 Ohio N.U. L. Rev. 341 (2008) ..................................................... 24, 32

David Zucchino,
*Wilmington*'s *Lie: The Murderous Coup of 1898 and the Rise of White Supremacy* (2020) .................................................................... 13

Douglas Gibler & Kirk Randazzo,
*Testing the Effects of Independent Judiciaries on the Likelihood of Democratic Backsliding*,
55 Am. J. of Political Science 696 (2011) ...................................... 6, 23, 25

Eli Rau & Susan Stokes,
*Income Inequality and the Erosion of Democracy in the Twenty-First Century*,
122 Proceedings of the National Academy of Sciences 1 (2025) .............. 4

Erica Frantz et al.,
*The Origins of Elected Strongmen* (2024) ...................................... *passim*

Jacob Grumbach,
*Laboratories Against Democracy* (2022) ........................................ *passim*

James Leloudis & Robert Korstad,
*Fragile Democracy: The Struggle Over Race and Voting Rights in North Carolina* (2020) .................................................................... 12, 13

Joshua A. Douglas,
*The Procedure of Election Law in Federal Courts*,
2011 Utah L. Rev. 433 (2011) .......................................................... 31-32

Julia Gabriel,
*Hungary: A Country Report*,
V-Dem Country Report Series, No. 12 (2016) ..................................... 7, 8

Kim Lane Scheppele,
*How Viktor Orbán Wins*,
33 J. of Democracy 45 (2022) ............................................................. 8, 9

Kriszta Kovács & Gábor Attila Tóth,
*Hungary's Constitutional Transformation*,
7 Euro. Const. L. Rev. 183 (2011) ........................................................... 8

Larry Diamond,
*Facing Up to the Democratic Recession*,
26 J. of Democracy 141 (2015) ............................................................. 10

Miriam Seifter,
*Judging Power Plays in the American States*,
97 Tex. L. Rev. 1217 (2018) .................................................................. 15

Nancy Bermeo,
*On Democratic Backsliding,* 27 J. of Democracy 5 (2016) ................. 5, 19

Order, *Cooper v. Berger*,
23CV029308-910 (Sup. Ct. N.C. Mar. 11, 2024). .................................. 18

Peyton McCrary,
*Bringing Equality to Power: How the Federal Courts Transformed the
Electoral Structure of Southern Politics, 1960-1990*,
5 U. Pa. J. Const. L. 665 (2003) ............................................................ 25

Pippa Norris et al.,
*Electoral Integrity in the 2018 American Elections* (2019). ................... 16

Pippa Norris,
*Why Electoral Integrity Matters* (2014) .................................................. 5

Pippa Norris,
*The Cultural Roots of Democratic Backsliding* (forthcoming 2025) ........ 4

Radio Free Europe,
*U.S. Calls Move To Void Chisinau Mayoral Vote A 'Threat To
Democracy'* (June 28, 2018) .................................................................... 22

Robert Mickey,
*Paths Out of Dixie: The Democratization of Authoritarian Enclaves in
America's Deep South, 1944-1972* (2015) ............................................. 12

Samuel P. Huntington,
*Democracy's Third Wave,*
2 J. of Democracy 12 (1991) .................................................................... 11

Scott W. Gaylord,
*Section 2 Challenges to Appellate Court Elections: Federalism, Linkage,
and Judicial Independence,*
69 Case W. Res. L. Rev. 117 (2018) ....................................................... 26

Sonali Campion & Attahiru Muhammadu Jega,
*African Election Management Bodies in the Era of Democratic
Backsliding,*
30 South African J. of Int'l Affairs 375 (2023) ....................................... 5

Stephan Haggard & Robert Kaufman,
*Backsliding: Democratic Regress in the Contemporary World* (2021) ... 10

Stephan Haggard & Robert Kaufman,
*The Anatomy of Democratic Backsliding,*
32 J. of Democracy 27 (2021) ............................................................ 4, 26

Stephen Gardbaum,
*Courts and Democratic Backsliding,*
46 Law & Policy 349 (2024). ................................................................... 26

Steven Huefner,
*Remedying Election Wrongs,*
44 Harv. J. on Legis. 265 (2007) ............................................................. 32

Steven Levitsky & Daniel Ziblatt,
*How Democracies Die* (2018) ........................................................*passim*

Steven Levitsky & Daniel Ziblatt,
*The Tyranny of the Minority* (2023) ....................................................... 11

Thomas Carothers & Benjamin Press,
  *Understanding and Responding to Global Democratic Backsliding*,
  Carnegie Endowment for International Peace (2022) .................... 10, 11

Tom Ginsburg & Aziz Z. Huq,
  *How to Save a Constitutional Democracy* (2018) ...........................*passim*

Tom Ginsburg,
  *Democratic Backsliding and the Rule of Law*,
  44 Ohio N.U. L. Rev. 351 (2018)................................................24, 27, 33

V-Dem Institute,
  Democracy Report 2022 (2022)......................................................... 9, 11

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, *amici* Erica Frantz, Tom Ginsburg, Jacob Grumbach, Aziz Huq, Robert Kaufman, Pippa Norris, Kim Lane Scheppele, and Susan Stokes, state that they are natural persons and accordingly have no disclosures to make related to corporate or organizational status.

 Date: January 22, 2025

/s/    Kristi Graunke
Kristi Graunke

*Counsel for Amici Curiae*

## INTEREST OF *AMICI CURIAE*[1]

*Amici Curiae* are leading scholars of "democratic backsliding"—the process by which a state's democratic character is eroded or degraded from within. This is a well-studied phenomenon in political science—and *amici* are profoundly concerned that North Carolina is experiencing democratic backsliding now.

*Amici*'s expertise and perspective allow them to offer important context that will help this Court understand why it must step in to review—and ultimately, to reject—Judge Jefferson Griffin's antidemocratic gambit to discard thousands of validly-cast ballots.

*Amici* are listed below, with institutional affiliations for identification purposes only. Some of *amici*'s relevant publications are discussed herein and listed in the Table of Authorities.

**Erica Frantz**
Associate Professor of Political Science
Michigan State University

**Tom Ginsburg**
Professor of International Law
University of Chicago Law School &

---

[1] Pursuant to Rule 29 of the Federal Rules of Appellate Procedure, *amici* state that no party authored any part of this brief and that no person other than *amici* and their counsel contributed any funds for the preparation or submission of this brief.

Professor of Political Science
University of Chicago

**Jacob Grumbach**
Associate Professor, Goldman School of Public Policy
University of California, Berkeley

**Aziz Huq**
Frank and Bernice J. Greenberg Professor of Law
University of Chicago Law School

**Robert Kaufman**
Professor of Political Science
Rutgers University

**Pippa Norris**
Lecturer in Comparative Politics
Harvard Kennedy School

**Kim Lane Scheppele**
Professor of Sociology and International Affairs
Princeton University

**Susan Stokes**
Professor of Political Science
University of Chicago

## INTRODUCTION

Democracies do not necessarily live forever. Sometimes, they die. *Amici*'s scholarship shows that they often erode from within, through the degradation of free and fair elections and the capture of independent courts or electoral commissions by ruling parties seeking to expand and entrench their own power. Over the last 20 years, political scientists have documented and analyzed these patterns of democratic backsliding in countries like Hungary, Turkey, and Venezuela. The process is typically piecemeal—so gradual that it may not "set off society's alarm bells." Steven Levitsky & Daniel Ziblatt, *How Democracies Die* 6 (2018).

Such backsliding is happening now in North Carolina. And Judge Griffin's effort, to invalidate tens of thousands of votes retroactively and overturn an election in the absence of any evidence of fraud or impropriety, is a dramatic escalation.

If we saw this happening in another country, we would know what to call it.

This is no ordinary legal dispute. Alarm bells *should* be ringing. From the perspective of political scientists and scholars who

1

study the breakdown of democracy, Judge Griffin's actions represent a profound challenge: Will an American state break with democratic norms and overturn an election decided by a majority of voters? Or will Judge Griffin's efforts be rejected, despite the ruling party's wishes?

One thing that separates North Carolina from Hungary or Venezuela is the ability of federal courts to enforce democratic norms embodied in federal law. Most nations do not have the benefit of an independent, politically insulated, supervening judicial authority with a duty to effectuate fundamental democratic commitments. But North Carolina has that, in the form of this Court. This Court should assert jurisdiction here, to enforce the statutory and constitutional rules that prohibit retroactively invalidating thousands of votes and to prevent further degradation of democracy in North Carolina.

## ARGUMENT

## I.   THE DEGRADATION OF FREE AND FAIR POPULAR ELECTIONS IS A KEY FEATURE OF DEMOCRATIC BACKSLIDING

### A. What is Democratic Backsliding?

Democratic backsliding refers to "a process of incremental, but

ultimately still substantial, decay in the three basic predicates of democracy—competitive elections, liberal rights to speech and association, and the rule of law," particularly "as it pertains to the possibility of fair elections." Tom Ginsburg & Aziz Z. Huq, *How to Save a Constitutional Democracy* 43, 71 (2018); *accord* Levitsky & Ziblatt at 72-96.

A key word here is "process." To be sure, democracies sometimes die from a sudden, authoritarian collapse—a "rapid, wholesale turn away from democracy." Ginsburg & Huq at 39. Think, for example, of the 1933 Reichstag fire and the passage of Germany's Enabling Act, swiftly terminating Germany's interwar democracy. *See id.* at 35-36. But in the 21st Century, democracies more commonly die through gradual erosion, "often in baby steps." Levitsky & Ziblatt at 77; *see also* Ginsburg & Huq at 26.

This erosion is usually a *state-led* process conducted by means of legal tools, commonly occurring when those in control of the government "subvert the very process that brought them to power." *E.g.*, Levitsky & Ziblatt at 3. This process "frequently enjoy[s] a veneer of legality"—the new rules "are approved by parliament or ruled constitutional by the

3

supreme court." *Id.* at 77.  Backsliding thus often represents "decay[]

from within, . . . with freely and fairly elected leaders leading the

charge to dismantle their countries' democratic institutions."  *E.g.*,

Erica Frantz et al., *The Origins of Elected Strongmen* 2 (2024).[2]

     Democratic backsliding typically occurs through the undermining

of free and fair elections.  *See* Stephan Haggard & Robert Kaufman, *The*

*Anatomy of Democratic Backsliding*, 32 J. of Democracy 27 (2021).  In

the modern era, democracy has become synonymous with elections.

*E.g.*, Bernard Manin, *The Principles of Representative Government*

(1997).  Ruling parties thus seek to change the rules of electoral

competition, tilting the electoral landscape in ways that favor them.

Those changes can include, for example, "alterations in electoral laws,

district boundaries, electoral commissions, and voter-registration

---

[2]    These moves may also have mass support, and indeed, backsliding can be a mass rather than elite-driven process.  Scholars offer various theories for *why* particular states experience democratic backsliding, including "the rise of personalist political parties," Frantz at 2, hyper-partisanship and political polarization, Levitsky & Ziblatt at 220, income inequality, Eli Rau & Susan Stokes, *Income Inequality and the Erosion of Democracy in the Twenty-First Century*, 122 Procs. of the Nat'l Acad. of Scis. of the U.S. of Am. 1 (2025), and cultural backlash, Pippa Norris, *The Cultural Roots of Democratic Backsliding* (forthcoming 2025).

procedures" among other forms of "[s]trategic manipulation … aimed at tilting the electoral playing field in favor of incumbents." Nancy Bermeo, *On Democratic Backsliding*, 27 J. of Democracy 13 (2016).

The degradation of free and fair popular elections can be accomplished by both direct and indirect means. Commonly, these means include constitutional or structural changes that entrench the party in power. Ginsburg & Huq at 72. These changes "typically concern either electoral regulation" or protection of individual or minority rights. *Id.* at 92. They may involve changes to procedural rules, and be framed as "technocratic and neutral," making them appear innocuous. *Id.* They may also involve changes to voter registration processes or other substantive rules governing political participation. *See* Sonali Campion & Attahiru Muhammadu Jega, *African Election Management Bodies in the Era of Democratic Backsliding*, 30 S. Afr. J. of Int'l Affs. 375 (2023); *see generally* Pippa Norris, *Why Electoral Integrity Matters* (2014).

Another common element is to weaponize or disrupt the neutrality of those entities charged with enforcing democratic commitments, such as the judiciary or electoral commissions—in other words, to "capture

the referees." Levitsky & Ziblatt at 78. This is often important because independent courts (that is, judicial bodies with some insulation from politics and some ability to render impartial decisions contrary to the will of the ruling party) can and do safeguard democracy. *See* Douglas Gibler & Kirk Randazzo, *Testing the Effects of Independent Judiciaries on the Likelihood of Democratic Backsliding*, 55 Am. J. of Pol. Sci. 696, 696-98 (2011). "[A]ttacks on the judiciary can occur in a variety of ways, including verbal attacks on judges, purging the court of judges who rule against the executive, and packing courts with more loyal judges." Frantz at 171. They also can occur by changing the rules for judicial appointment or retirement. *See id*. These efforts aim to ensure the referees' loyalty to the ruling party, helping to cement its hold on power.

Backsliding does not necessarily result in the end of elections. But that is precisely the point: Typically, a party or strongman leader seeks to degrade free and fair elections, entrench themselves in power, and transition to a hybrid or quasi-authoritarian regime while maintaining the formal trappings of democracy, including periodic elections and the existence of organized political opposition. Levitsky &

6

Ziblatt at 5.

## B. What Does Democratic Backsliding Look Like?

Scholars have studied the backsliding phenomenon extensively. This scholarship encompasses descriptive analysis and case studies of the legal and political changes in individual backsliding countries; comparative analyses; and quantitative methods that categorize and track the democratic features (or lack thereof) in various national systems over time. *See, e.g.*, Frantz at 19-20.

The details vary around the world, but the basic story is well understood and broadly consistent: A party or leader is elected to power, then uses the levers of law and government (as well as rhetorical and political means) to degrade free and fair elections, undermine independent oversight, and entrench itself in power. *E.g.*, Levitsky & Ziblatt at 92; Ginsburg & Huq at 43-45.

Consider Hungary, a classic example of democratic backsliding. In 1989, following the collapse of the Soviet Union, Hungary transitioned to a multi-party democratic system. Julia Gabriel, *Hungary: A Country Report Based on Data 1918-2012*, V-Dem Country Report Series, No. 12 at 6 (2016). It amended its Soviet-era

7

constitution, establishing a strong parliament, checks and balances, limitations on the authority of the executive, and an independent judiciary. Kriszta Kovács & Gábor Attila Tóth, *Hungary's Constitutional Transformation*, 7 Eur. Const. L. Rev. 183, 184 (2011). By 2004, Hungary had joined NATO and the EU and was widely considered to be a stable democracy. *See* Frantz at 104; Gabriel at 6.

In 2010, Viktor Orbán's Fidesz party—which had held power from 1998 until 2002—returned to power, securing 68% of the available legislative seats by winning 53% of the popular vote. Ginsburg & Huq at 68. The party then used its supermajority to rewrite the constitution and electoral laws to lock in its advantage. *Id.* at 69. Those changes "deepen[ed] the asymmetrical legislative seat advantage already enjoyed by Fidesz." *Id.*; *see* Kim Lane Scheppele, *How Viktor Orbán Wins*, 33 J. of Democracy 45, 50-53 (2022). Meanwhile, Orbán and Fidesz reshaped the judiciary: The new constitution expanded the country's constitutional court (adding seats that Fidesz-aligned officials would appoint), narrowed the court's jurisdiction to hear challenges to government action, and retroactively nullified the court's previous rulings. Ginsburg & Huq at 69. Other important independent

entities—including the electoral commission—were filled with Fidesz loyalists who received unusually lengthy terms. *Id.*

These changes, which were duly enacted through the legal process, had their intended effect. Fidesz won subsequent elections "with an electoral playing field so tilted in its favour that international monitors concluded the elections were unfair." Frantz at 108; *see also* Scheppele at 52-58 (describing Orbán's continuous efforts to "modify[] the electoral playing field to wrong-foot the opposition"); Ginsburg & Huq at 70 (noting Fidesz controlling two-thirds of legislative seats while winning less than half the vote). Hungary's ranking on a widely-used index of democratic performance fell dramatically. V-Dem Institute, *Democracy Report 2022* at 20 (2022), available at: https://v-dem.net/media/publications/dr_2022.pdf.

Hungary is not alone.[3] While different methodologies have been

---

[3]    Venezuela is another oft-cited example. In 1998, Hugo Chávez was elected president via largely free and fair elections. Frantz at 1. Chávez then worked to amend the constitution, "curtail[ing] the power of the opposition-led legislature, fiddl[ing] with presidential terms to extend his rule, and initiat[ing] a purge of the judiciary." *Id.* He also gutted the country's electoral bureaucracy. Ginsburg and Huq at 93. These efforts continued under Chávez's successor, Nicolás Maduro, and by 2017, Venezuela was

9

used to assess democratic health, all these methods have identified backsliding in dozens of countries in recent decades. *See* Stephan Haggard & Robert Kaufman, *Backsliding: Democratic Regress in the Contemporary World* 13 (2021); Thomas Carothers & Benjamin Press, *Understanding and Responding to Global Democratic Backsliding*, Carnegie Endowment for Int'l Peace 5 (2022) (identifying backsliding in 27 countries since 2005); *see also, e.g.*, Aziz Huq & Tom Ginsburg, *How to Lose a Constitutional Democracy*, 65 UCLA L. Rev. 78, 119 (2018) (identifying backsliding in 52 countries between 1974 and 2008). Indeed, some scholars see this as a particularly 21st-Century phenomenon—a reversal of the trend of democratization that defined the end of the 20th Century. *E.g.*, Larry Diamond, *Facing Up to the Democratic Recession*, 26 J. of Democracy 141, 142-44 (2015).

## C. Backsliding in the United States

Backsliding is happening here, too. Surveys and indexes have in recent years included the United States among the backsliders, based on certain national-level indicators such as hyper-partisanship, increased government misinformation, and changes to the rules of

widely recognized as an autocracy. Levitsky & Ziblatt at 5.

political competition and the use of executive power. *See* V-Dem Institute at 16, 37; *see also* Carothers & Press at 5. Scholars have offered accounts of this shift at the federal level. *See* Levitsky & Ziblatt at 145-75; *see also* Daniel Ziblatt & Steven Levitsky, *The Tyranny of the Minority* 92-132 (2023).

Because of our federalist system, the quality of democracy and the status of free and fair elections can also be assessed at the state level. Such assessments show that democratic backsliding is happening there, too. *See* Jacob Grumbach, *Laboratories Against Democracy* 170-72 (2022). And North Carolina is one of the clearest cases. *Id.* at 170-72.

## II. JUDGE GRIFFIN'S EFFORTS REPRESENT A DRAMATIC ESCALATION OF DEMOCRATIC BACKSLIDING IN NORTH CAROLINA

### A. Backsliding in North Carolina

In a sense, North Carolina has followed a similar path to some "Third Wave" democracies that consolidated towards the end of the 20th Century and then experienced retrenchment in the 21st.[4] Many

---

[4] Scholars refer to the democratization trend at the end of the 20th Century as the "Third Wave" of democratization. *See* Samuel P. Huntington, *Democracy's Third Wave*, 2 J. of Democracy 12 (1991); *see also, e.g.*, Ginsburg & Huq at 9.

scholars conclude that North Carolina was not a democracy until the late 20th Century. *See generally, e.g.*, Robert Mickey, *Paths Out of Dixie: The Democratization of Authoritarian Enclaves in America's Deep South, 1944-1972* (2015). Though it held periodic elections, it did so while largely operating as a one-party ethnostate: Extensive rules of political and social control, such as White Primary rules and Jim Crow laws, kept one ethnic group (Black North Carolinians) entirely disenfranchised and deprived of political and civil rights. *See* James Leloudis & Robert Korstad, *Fragile Democracy: The Struggle Over Race and Voting Rights in North Carolina* 27-94 (2020).[5] This regime was further enforced by the prospect of state and state-sponsored violence against the disfavored ethnic group, especially in response to attempts at political participation.[6]

---

[5] The process by which the southern states' Reconstruction-era experiment with multiracial democracy was, through the adoption of new constitutions and electoral rules, replaced with Jim Crow one-party regimes was itself a form of democratic backsliding. *See* Levitsky & Ziblatt at 89-92.

[6] Perhaps the most famous example is the 1898 Wilmington Coup, in which White North Carolinians associated with the Democratic Party attacked the City of Wilmington (then the State's largest), deposing the City's elected Black leadership and killing scores of Black citizens. *See*

After the passage of the 1965 Voting Rights Act, North Carolina slowly began to democratize. Along with other southern states, North Carolina resisted the VRA's requirements, enacting gerrymandered maps and other changes to the political rules in order to prevent Black North Carolinians from gaining political power. *E.g.*, *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 223-26 (4th Cir. 2016) (reviewing this history); *accord* Leloudis & Korstad at 65-122. By the 1970s, many of those rules, such as literacy tests and vote-diluting multi-member districting schemes, were still in effect. *E.g.*, Leloudis & Korstad at 65-122; *accord* Grumbach at 171.

But things changed. Due both to internal efforts as well as external enforcement of federal voting standards in the federal courts, democracy in North Carolina began to consolidate more significantly in the 1990s. Grumbach at 171. For a period, democratization accelerated: As Grumbach writes, "North Carolina had become a leader in expanding access to voting during the late 1990s and early 2000s. The state had expanded opportunities for early voting, as well as

---

*generally* David Zucchino, *Wilmington's Lie: The Murderous Coup of 1898 and the Rise of White Supremacy* (2020).

13

implemented policies to expand voter registration, such as same day registration and pre-registration for youth. Voter turnout had increased by over 10 percentage points." *Id.*

Then, a period of retrenchment began. Scholars have identified this shift as beginning with the Republican Party winning state legislative elections in 2010. *E.g.*, Levitsky & Ziblatt at 209. The next year, the Republican-controlled General Assembly rewrote the electoral rules, including gerrymandering electoral districts that allowed the party to repeatedly win large majorities of the state's legislative districts while winning only a bare majority or even a minority of the vote share. *Id.* at 210; Grumbach at 171-72.[7]

In 2012, a unified Republican-controlled government passed legislation making voting more difficult: Implementing a strict voter ID law, rolling back early voting and closing polling places in areas with heavier concentrations of Black voters, and eliminating "pre-registration" for sixteen and seventeen-year-olds. Levitsky & Ziblatt at

---

[7] For example, in 2018, Republicans won about 49.3% of the vote —but controlled 77% (10 of 13) of North Carolina's congressional seats. *See* Grumbach at 171.

209-11. While some of these measures purported to advance the integrity of elections, elements of this omnibus legislation were blocked by this Court for discriminating against Black voters. *See McCrory*, 831 F.3d at 242. But some of the changes were then implemented anyway through administrative action. Levitsky & Ziblatt at 210.

When Democrats won the governorship in 2016, the incumbent Republican Governor refused to concede for over a month, making "baseless allegations of voter fraud." *E.g.*, Levitsky & Ziblatt at 210-11. He eventually conceded, but meanwhile the Republican-controlled General Assembly called a special session during the lame-duck period and enacted legislation to curtail the incoming Governor's powers. *Id.* at 211. These changes targeted the Governor's power to appoint members of local elections boards (*i.e.*, officials who make the rules governing elections) and to fill vacancies on the appellate courts. *Id.*; *see also* Grumbach at 152 (referring to this as a "lame-duck coup"); Miriam Seifter, *Judging Power Plays in the American States*, 97 Tex. L. Rev. 1217, 1224-26 (2019); N.C. Gen. Assembly, Session Law 2016-125, S.B. 4, § 5.(h).

While some of these changes were (at least temporarily) struck

15

down in the courts, scholars nevertheless found that the quality of democracy in North Carolina deteriorated substantially following this extended period of "politics without guardrails." Levitsky & Ziblatt at 212. According to the State Democracy Index, North Carolina went from being among the most robust state democracies in 2000 to being among the least in 2018. Grumbach at 170-71. Another study, by the Electoral Integrity Project, ranked North Carolina 46th out of 50 in the perception of electoral integrity in 2018.[8] The chart below, a figure from *amicus* Grumbach's 2022 book, depicts this democratic decline:

---

[8] Pippa Norris et al., *Electoral Integrity in the 2018 American Elections* 13 (2019).



FIGURE 7.3. The Weakening of Democracy in North Carolina.
*Note*: Lines represent the State Democracy Index scores for states (2000–2018). The solid black line represents North Carolina, the dashed line represents Texas, and the dotted line Washington. Shaded ribbons are Bayesian credible intervals.

This trend has continued. After the 2020 Census, North Carolina again enacted legislative districting plans that were found to be "extreme partisan outliers, highly non-responsive to the will of the people, and incompatible with democratic principles" (cleaned up). *Harper v. Hall*, 868 S.E.2d 499, 510 (N.C. 2023). The state's Supreme Court initially struck down those gerrymandered maps, *id.* at 510-11, but after a Republican majority was later elected, the court overruled its prior decision, allowing the maps to go into effect. *Harper v. Hall*, 886 S.E.2d 393, 400-01 (N.C. 2023). The court's new majority also

17

withdrew a prior ruling that had invalidated the State's restrictive voter identification law, allowing the law to take effect. *Holmes v. Moore*, 886 S.E.2d 120, 127 (N.C. 2023). The Republican-controlled General Assembly also enacted (over the Governor's veto) new restrictions on mail ballot voting.[9]

The General Assembly also (again) sought to take the power to appoint elections board officials away from the Governor and to place that power in the hands of Republican officials.[10] After the move was stalled in the courts, the General Assembly enacted more legislation in late-2024 (following the election of a new Democratic governor), reassigning the power to appoint members of the State Elections Board from the Governor to the State Auditor (a Republican), and restricting the power of the Governor to fill vacancies in the appellate courts.[11]

From the perspective of political scientists studying democratic

---

[9] N.C. Gen. Assembly, Session Law 2023-140, S.B. 382, § 35.

[10] Order at ¶ 14, *Cooper v. Berger*, No. 23CV029308-910 (Sup. Ct. N.C. Mar. 11, 2024), available at https://www.carolinajournal.com/wp-content/uploads/2024/03/cooper-berger-electionsboard-23CV029308-910.pdf.

[11] N.C. Gen. Assembly, Session Law 2024-57, S.B. 382, §§ 3A.2.(a), 3C.1.(a).

erosion, democracy in North Carolina is in a precarious state. The last decade's events are consistent with patterns in backsliding democracies overseas. That includes repeated efforts by the party in power to change constitutional or structural rules, both to entrench themselves in power (such as via gerrymandering) and to capture or politicize "referee" entities like the election boards. Levitsky & Ziblatt at 78. It includes attempts to politicize or capture the judiciary, including by changing the appointments process. *Id.* at 80-81; *see also* Frantz at 103, 106, 138. It also includes attempts to eliminate forms of political participation that may be used more frequently by supporters of the political opposition. *E.g.*, Bermeo at 5, 13. As in other backsliding systems, these efforts are state-led, iterative, and carried out through legal means (though the legality of these efforts may be contested). Levitsky & Ziblatt at 5-6; Ginsburg & Huq at 77-78; Frantz at 13.

North Carolina's path is thus broadly comparable to the path of a country like Hungary, which has backslid over the course of a decade and a half through a similar mix of measures to entrench a dominant party as a permanent legislative majority and to assert partisan control over independent courts and election officials.

19

**B. Judge Griffin's Efforts**

All of which brings us to the matter at hand. Judge Griffin earned fewer votes than his opponent in the November 2024 general election for a seat on the Supreme Court of North Carolina. JA203. He sought and obtained multiple recounts, which confirmed that he received fewer votes. Yet he has refused to concede.

Instead, Judge Griffin seeks to selectively and retroactively invalidate the votes cast by over 60,000 North Carolinians, a move that Judge Griffin anticipates will alter the election in his favor. *See* JA37, 203. There is no election integrity reason to do this. Judge Griffin relies on a state law requiring that North Carolinians be asked to provide either a driver's license number or the last four digits of their social security number when registering to vote. N.C. Gen. Stat. Ann. § 163-82.4(a)(11); JA52. By its terms, the law does not require voters to provide either number (voters may register even if they lack a driver's license or social security number); it only says that this information should be "request[ed]." *Id.* Consistent with that, state election administrators have for decades registered voters even where they do not provide those numbers. JA37. Indeed, the state registration rule

20

and a corresponding provision of federal law ask voters to provide those numbers to aid in the construction and administration of a registration database, not to verify identity. *Cf. Washington Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1268-69 (W.D. Wash. 2006).

There is thus no serious question that these thousands of voters were in fact registered in the state database, that they are eligible to vote, and that they have in most cases been voting for years. JA107; N.C. Gen. Stat. Ann. § 163-82.10. No one suggests any fraud, or contests that these voters meet eligibility qualifications under state law, N.C. Gen. Stat. Ann. § 163-55. At most, election workers made technical mistakes in processing the registration form without a social security or driver's license number. JA118-21 (discussing benign reasons why such numbers may not be present in the voter registration database). Nevertheless, Judge Griffin (and in other parallel cases, the Republican Party) are asking the North Carolina Supreme Court—*i.e.*, the court whose composition is at issue, a super-majority of whose members belong to Judge Griffin's party—to reverse the State Election Board's decision to certify the election, and instead overturn the election, based on arguments that were already rejected by the courts

21

prior to the election, JA124.[12]

Judge Griffin in essence seeks to throw out the result of a popular election. Such incidents, where a major election is effectively canceled or overturned by the ruling party, are more often associated with situations where free and fair elections are already significantly degraded, and often occur amidst serious electoral irregularities.[13] If an electoral loser from the ruling party was installed over the votes of a popular majority in Hungary or Poland (or some similar backsliding but still formally democratic state), observers would rightly view it as a major blow to democracy and an escalation of the backsliding trend.

---

[12] *Amici* focus primarily on the largest set of voters targeted by Judge Griffin's actions, those with this purported defect in their registration, *see* JA36-39, 96. However, *amici's* arguments generally also apply to the other, smaller subsets of voters whom Judge Griffin would retroactively disenfranchise.

[13] For instance, after an opposition leader won a mayoral election in Moldova's capital in 2018 only to have the result annulled on a technicality by the courts, the State Department criticized the decision as a "threat to democracy" that "damages respect for the rule of law and democratic principles in Moldova." Radio Free Europe, *U.S. Calls Move To Void Chisinau Mayoral Vote A 'Threat To Democracy'* (June 28, 2018). In Thailand, the judiciary's annulment of 2014 legislative elections on technical grounds paved the way for a military coup later that year. *See* Ginsburg & Huq at 50-51.

22

Judge Griffin's request would also undermine the perception (and, likely, the reality) of an independent judiciary in North Carolina, one of the most significant long-term bulwarks against democratic erosion. *See infra* 23-26. If Judge Griffin were to prevail, it would send a clear signal that the state's highest court was not capable of consistently upholding democratic commitments when they conflict with the interests of the ruling party. Again, if this situation were unfolding in another country—if ruling-party affiliated judges who dominated the nation's constitutional court threw out an opposition candidate's election based on a post-hoc technicality—scholars of democratic backsliding would view it as a sign that the referees had been thoroughly captured and that democracy was on the precipice.

## III. FEDERAL COURT INTERVENTION IS NEEDED TO PRESERVE DEMOCRACY IN NORTH CAROLINA AND COUNTER THE BACKSLIDING PROCESS

### A. The Advantage of Federal Courts

An independent judiciary enforcing the rules governing free and fair elections is one of the most important backstops against democratic backsliding. *E.g.*, Gibler & Randazzo at 696. The backsliding scholarship is clear that "[c]ourts can be critical institutions to protect

23

democracy" because judicial intervention is often one of the most effective ways—and sometimes the only way—to stop the manipulation of electoral rules. Tom Ginsburg, *Democratic Backsliding and the Rule of Law*, 44 Ohio N.U. L. Rev. 351, 358-63 (2018).

And notably, relative to other countries, the American system has a uniquely potent potential defense to democratic backsliding: Highly independent and established *federal* courts.

This advantage stems in part from the nature of "dual sovereignty" and the federalist system. Hungary and Venezuela are sovereign states; there is no international or supra-national legal body capable of enforcing democratic norms from outside the constitutional order when those norms are threatened from within. By contrast, federalism offers voters multiple avenues for judicial recourse when their rights are threatened—state courts *and* federal courts, with the latter operating from outside the State's own constitutional order. Historically, federal intervention has played a key role in driving democratization in North Carolina and other southern states. Daniel P. Tokaji, *The Sordid Business of Democracy*, 34 Ohio N.U.L. Rev. 341, 342-48 (2008). That includes the adoption of the federal VRA in 1965,

24

among other statutes, and its enforcement by federal courts. Peyton McCrary, *Bringing Equality to Power: How the Federal Courts Transformed the Electoral Structure of Southern Politics, 1960-1990*, 5 U. Pa. J. Const. L. 665, 685 (2003); *see Thornburg v. Gingles*, 478 U.S. 30, 34-35 (1986).

Indeed, this insight regarding federal courts' special role in safeguarding the integrity of the political process in the States has led multiple appeals courts to conclude that applying federal abstention doctrines in the voting rights context would be "contrary to the federal courts' traditional role." *E.g.*, *Benavidez v. Eu*, 34 F.3d 825, 833 (9th Cir. 1994); *accord O'Hair v. White*, 675 F.2d 680, 694 (5th Cir. 1982) (en banc); *cf. United States v. Carolene Prods. Co.* 304 U.S. 144, 152 n.4 (1938).

Federal courts' comparative advantage also stems in part from their relative insulation from partisan politics. U.S. federal courts, which are hundreds of years old and thus especially well established, have developed a significant degree of political independence and insulation. *See* Randazzo & Gibler at 707. Moreover, virtually every other democracy imposes either a mandatory retirement age or a fixed

25

term for its constitutional judges, making life tenure a relative rarity in terms of institutional design.[14]  In the United States, most state courts, including in North Carolina, consist of elected judges who are, by definition, less insulated from political and partisan influence.  *See* Scott W. Gaylord, *Section 2 Challenges to Appellate Court Elections: Federalism, Linkage, and Judicial Independence*, 69 Case W. Res. L. Rev. 117, 121, 126 (2018).

Especially given these advantages, this Court's intervention is critical to preventing an alarming escalation in the erosion of North Carolina's democracy.  As Haggard and Kaufman observed:  "In all of the regimes that reverted to competitive authoritarianism, pliant legislatures and weak courts acquiesced or looked the other way."  Haggard & Kaufman at 75.  This Court can and should assume jurisdiction to enforce the democratic commitments threatened by Judge Griffin's actions.

## B. Protecting Free and Fair Elections in North Carolina

Several key democratic guarantees bar Judge Griffin's petition.

---

[14] Stephen Gardbaum, *Courts and Democratic Backsliding: A Comparative Perspective on the United States*, 46 L. & Pol'y 349, 350 (2024).

Enforcing these commitments would help to maintain the integrity of popular elections in North Carolina and stave off a dramatic escalation in the backsliding process. *See* Ginsburg at 357, 358, 363.

One such requirement is the equal treatment of voters. Judge Griffin asks that the registration rule he relies on be enforced against some voters but not others: People who voted early (whether in person or by mail) in the November 2024 general election would have their votes invalidated for their supposed registration-form error, while those who voted on Election Day would have their votes count, even if their registrations contained the same errors. JA246.

Numerous federal laws prohibit such obviously unequal treatment. For instance, the disparate treatment of voters violates the 1964 Civil Rights Act's uniformity provision, which provides that, in determining voter qualifications, a state may not "apply any standard, practice, or procedure different from" those applied to other voters in the same jurisdiction. 52 U.S.C. § 10101(a)(2)(A); *e.g.*, *Frazier v. Callicutt*, 383 F. Supp. 15, 20 (N.D. Miss. 1974); *Shivelhood v. Davis*, 336 F. Supp. 1111, 1115 (D. Vt. 1971). Indeed, starkly different treatment meted out to classes of favored and disfavored voters harkens

back to era before states like North Carolina were full democracies. *Cf.*
*South Carolina v. Katzenbach*, 383 U.S. 301, 312 (1966).

The guarantee of equal treatment is also protected by the U.S.
Constitution's Equal Protection Clause, which provides citizens "a
constitutionally protected right to participate in elections on an equal
basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405
U.S. 330, 336 (1972). Furthermore, "[h]aving once granted the right to
vote on equal terms, the State may not, by later arbitrary and disparate
treatment, value one person's vote over that of another." *Bush v. Gore*,
531 U.S. 98, 104-05 (2000).

A second principle guaranteeing free and fair elections is that all
ballots cast by eligible voters should be counted. Even assuming that
Judge Griffin were correct that election officials committed some
technical error processing various voters' registration forms over the
last several decades, the fact remains that those voters' registration
applications were approved, N.C. Gen. Stat. Ann. §§ 163-82.7, 82.10,
making the applicants registered voters who meet all the qualifications
under state law, N.C. Gen. Stat. Ann. § 163-55. *See U.S. Student Ass'n*
*Found. v. Land*, 546 F.3d 373, 384 (6th Cir. 2008).

28

Again, multiple federal statutes, enacted to prompt the democratization of the southern states and to guarantee some minimum standard for free and fair elections in the United States, protect the right to vote from being blocked for trivial reasons or for no reason at all. The 1964 Civil Rights Act's materiality provision, for example, prohibits errors or omissions on voting paperwork like a registration form from being used to prevent the counting of a person's ballot "if such error or omission is not material in determining whether such individual is qualified under State law." 52 U.S.C. § 10101(a)(2)(B). And Section 11(a) of the 1965 VRA prohibits officials from "willfully fail[ing] or refus[ing] to tabulate, count, and report" the votes of qualified voters. 52 U.S.C. § 10307(a). In a robust democracy, a minor, decades-old administrative mistake by election officials—based on a technical requirement that has never been enforced in this manner, JA34—cannot be a basis for erasing a person's fundamental right to vote (let alone retroactive mass disenfranchisement). *E.g.*, *United States v. Exec. Comm. of Democratic Party of Dallas Cnty.*, 254 F. Supp. 537, 540-41 (S.D. Ala. 1966).

Third, free and fair elections generally require that the rules be

29

established prior to the election and not subject to retroactive constriction. Here, Judge Griffin attempts to retroactively rescind over 60,000 votes by calling into question the validity of those voters' registrations. However, these voters received no notice prior to the election that their registrations were in any way deficient, or that they needed to take any action to correct any defect therein. *See* JA110-18.

Federal statutory and constitutional law require basic due process in such circumstances. Under the National Voter Registration Act, for example, a state must complete any mass removal of ineligible voter registrations at least 90 days *before* the election. 52 U.S.C. § 20507(c)(2)(A). Constitutional due process requires that voters be notified *before* having their registration retroactively stripped and their already-cast vote retroactively invalidated. *See Democracy N.C. v. North Carolina State Bd. of Elections*, 476 F. Supp. 3d 158, 228-29 (M.D.N.C. 2020) (holding that rejection of ballots without notice and opportunity to cure violates procedural due process) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)); *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 214, 219 (D.N.H. 2018) (similar).

Additionally, federal appellate courts have invoked constitutional

30

due process principles to prevent the use of "fundamentally unfair" mass voter disqualifications in circumstances less egregious than this one. *E.g., Northeast Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012); *Griffin v. Burns*, 570 F.2d 1065, 1078-79 (1st Cir. 1978).

The point is that the various merits arguments before the Court reflect, from *amici*'s perspective as scholars of democracy, substantive guarantees about democratic governance that are critical in maintaining free and fair elections. In acting to enforce those guarantees, the Court would not merely be getting the law "right," it would be acting to prevent an escalation in North Carolina's backsliding trend.

## C. Protecting the Independence of the North Carolina Courts

Intervening to block Judge Griffin's efforts would protect North Carolina's democracy in another way: By preventing potentially irreversible damage to the independence of the state Supreme Court.

A judicial process that resolves an election dispute must "be both fair and perceived as fair." Joshua A. Douglas, *The Procedure of Election Law in Federal Courts*, 2011 Utah L. Rev. 433, 436, 440-41

31

(2011) (citation omitted); *see also Burns*, 570 F.2d at 1071. Judge Griffin's petition to the Supreme Court of North Carolina—heading straight to the court he wishes to join to seek relief, without allowing lower courts to engage in fact-finding—creates the appearance of forum-shopping and partisan weaponization of the court in order to overturn election results. Judge Griffin seeks extraordinary relief from the state Supreme Court, where members of his political party comprise a 5-1 majority (with Justice Riggs' recusal). JA335; *see* Steven Huefner, *Remedying Election Wrongs*, 44 Harv. J. on Legis. 265, 290 (2007) ("[A] remedial system with any built-in bias that favors . . . the majority party . . . could not be considered fair.").

By petitioning the Supreme Court of North Carolina to determine the outcome of an election to the very same body—and in an election involving a current member of the court—Judge Griffin is embroiling the state's high court in a political controversy that threatens to undermine the appearance of judicial impartiality and cement the perception of the court as a partisan, self-interested actor.

One critical norm of democracy is setting a "limit[ation] on the dominant political party's ability to entrench itself" in power. *See*

32

Tokaji at 350. Should Judge Griffin's petition to invalidate the votes of more than 60,000 qualified voters and alter the outcome of an election succeed in state court, the court would likely be perceived as distorting the law to expand and entrench the ruling party's political power and influence. Such partisan capture of the judiciary is a hallmark of democratic backsliding. *E.g.*, Ginsburg at 358.

And even if the Supreme Court of North Carolina were ultimately to deny Judge Griffin's request, it would *still* be placed in a compromised position. Even giving Judge Griffin's arguments serious consideration, as the court appears poised to do, would invariably set a precedent that candidates for election to the court can refuse to concede an election and appeal directly to the State Supreme Court for intervention and a change in the rules, notwithstanding the appearance of a conflict of interest—using the courts, in short, for purposes of "incredible mischief." *See* JA350 (Dietz, J., dissenting).

Judge Griffin's damaging effort to overturn an election threatens the integrity of democracy in North Carolina and the independence of the state's judiciary and will supercharge democratic backsliding in North Carolina. This Court should intervene and stop it.

33

## CONCLUSION

For the forgoing reasons, the Court should exercise jurisdiction. The district court's abstention ruling should be reversed, and this Court should proceed to the merits and determine that Judge Griffin's efforts are contrary to law.

Dated: January 22, 2025            Respectfully submitted,

                                   /s/ Kristi L. Graunke____

Ari Savitzky                       Kristi L. Graunke
Ming Cheung                        ACLU OF NORTH CAROLINA
Ethan Herenstein                      LEGAL FOUNDATION
Sophia Lin Lakin                   P. O. Box 28004
AMERICAN CIVIL LIBERTIES           Raleigh, NC 27611
   UNION FOUNDATION                (919) 354-5066
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2681


                                   *Counsel for Amici Curiae*

34

# CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 29(b)(4) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 6,453 words.

2.    This brief complies1 with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface with 14-point Century Schoolbook font.

Date: January 22, 2025

                              */s/* Kristi Graunke
                              Kristi Graunke

                              *Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: January 22, 2025

/s/  Kristi Graunke
Kristi Graunke

*Counsel for Amici Curiae*